Transcript of the Testimony of
**SCOTT ANDO**

**Date:** November 5, 2015

**Case:** RITA KING VS. GLENN EVANS, ET AL.

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

SCOTT ANDO
November 5, 2015

Page 2

1   THE LAW OFFICE OF THOMAS G.
2   MORRISSEY by
    MR. THOMAS G. MORRISSEY and
    MR. PATRICK MORRISSEY
3   10150 South Western Avenue
    Chicago, Illinois 60643
4   (773) 233-7900
    tgmorrisseylaw@gmail.com,
5
6           on behalf of the Plaintiff;
7   MS. MEERA WERTH
    Senior Counsel
    Federal Civil Rights Litigation
8   30 North LaSalle Street
    Suite 900
9   Chicago, Illinois 60602
    (312) 744-6905,
10
11          on behalf of the Scott Ando and
            Bruce Dean;
12  MS. CARLA MADELEINE KUPE-ARION
    Assistant Corporation Counsel
13  Federal Civil Rights Litigation
    Division
14  30 North LaSalle Street
    Suite 900
15  Chicago, Illinois 60602
    (312) 744-5106
16  carla.kupearion@cityofchicago.org,
17          on behalf of Defendant, City
            of Chicago;
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RITA KING,              )
        Plaintiff,      )
                        )
        -vs-            )   13 C 1937
                        )
GLENN EVANS, et al.,    )
        Defendant.      )

        Deposition of SCOTT ANDO taken before
NANCY K. SPEARE, C.S.R., and Notary Public,
pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, 30 North LaSalle
Street, Suite 900, in the City of Chicago, Cook
County, Illinois at 2:00 o'clock p.m. on the 5th
of November A.D. 2015.

        There were present at the taking of
this deposition the following counsel:

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 3

1   MS. TIFFANY Y. HARRIS
    Assistant Corporation Counsel
2   Federal Civil Rights Litigation
    Division
3   30 North LaSalle Street
    Suite 900
4   Chicago, Illinois 60602
    (312) 744-7684
5   tiffany.harris@cityofchicago.org,
6           on behalf of Glenn Evans,
            D.T. Clifford, R.A. Sutton,
7           K.L. Rodgers, Wilfredo Lapitan,
            and Lloyd Gray;
8
9   THE LAW OFFICES OF RAVITZ &
    PALLES, P.C. by
10  MR. ERIC S. PALLES
    203 North LaSalle Street
11  Chicago, Illinois 60602
    (312) 558-1689,
12
            on behalf of Glenn Evans in
13          People of the State of
            Illinois -vs- Glenn Evans,
14          Case No. 14 CR 16367.
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 1

SCOTT ANDO
November 5, 2015

Page 4

```
 1              DEPOSITION OF
 2              SCOTT ANDO
 3          Taken:  November 5, 2015
 4
 5  EXAMINATION BY                        PAGE
 6  Mr. Thomas Morrissey                    5
 7  Mr. Palles                             97
 8
 9
10
11
12
13              EXHIBITS
14                                        PAGE
15  Exhibit A                              11
16  Exhibit B                              16
17  Exhibit C                              45
18  Exhibit D                              70
19  Exhibit E                              78
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 5

```
 1              SCOTT ANDO,
 2  called as a witness herein, having been first
 3  duly sworn, was examined upon oral
 4  interrogatories and testified as follows:
 5              EXAMINATION
 6          by Mr. Morrissey:
 7      Q   This is the discovery deposition of
 8  Scott Ando taken pursuant to notice and pursuant
 9  to the federal rules of Civil Procedure.
10          Sir, will you state your full name and
11  spell your last name.
12      A   Scott Ando, A-N-D-O.
13      Q   What is your current position?
14      A   I'm chief administrator of the
15  Independent Police Review Authority for the City
16  of Chicago.
17      Q   When did you -- and for purposes of this
18  deposition we'll refer to it as I guess it's
19  known IPRA, is that okay?
20      A   That's perfect.
21      Q   When did you first become employed by
22  IPRA?
23      A   October of 2011.
24      Q   What position did you take in October of
```

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 6

```
 1  2011?
 2      A   I was the first deputy chief.
 3      Q   Was there a chief at that time of IPRA?
 4      A   There was.
 5      Q   And what was her name?
 6      A   Ilana Rosenzweig.
 7      Q   What were your duties as first deputy
 8  chief of IPRA?
 9      A   Second in command of the department.  My
10  duties were very diverse; but, generally, I
11  supervised the deputy chiefs below me and most of
12  the investigations in the office.
13      Q   Did your duties include reviewing IPRA,
14  open IPRA files for policemen that were up for
15  promotion?
16      A   No, at the time I was the first deputy
17  chief I was responsible specifically for
18  reviewing officer involved shootings.
19      Q   So you had no involvement as first deputy
20  chief in regards to providing information to the
21  CPD, specifically IAD, for policemen that were up
22  for promotions?
23      A   No, not at that time.
24      Q   As the chief of IPRA do you have any
```

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 7

```
 1  responsibilities or duties when a policeman or
 2  supervisor with the CPD is up for a promotion?
 3      A   Some.
 4      Q   What responsibilities -- Let me
 5  backtrack.
 6          Does IPRA have any role when a person
 7  within the CPD is promoted?
 8      A   It hasn't in the past.  We are asked to
 9  check someone's open complaints that are under
10  investigation if they're going to be, you know,
11  provided with a performance award, like a medal
12  of valor or a recognition, recognition before the
13  city council; but it has been suggested by me,
14  and I believe it will be implemented, that we
15  also consult it relative to any open cases
16  involving people up for promotion.
17      Q   So, to be clear, it's your understanding
18  that IPRA does not provide information to the CPD
19  currently or IAD when an officer is up for
20  promotion?
21      A   If we were asked we would.
22      Q   In the year 2012 do you have any
23  knowledge that IAD asked for information when
24  Glenn Evans was up for a promotion?
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 2

## Page 8

SCOTT ANDO
November 5, 2015

1  A  I do not.

2  Q  Were you -- When did you become chief?

3  A  Ilana left in May of 2013, and I became

4  the acting chief and then was appointed as the

5  chief administrator in January of 2014.

6  Q  When did you first -- Strike that.

7      Do you know a gentleman by the name of

8  Superintendent McCarthy?

9  A  I do.

10  Q  When did you first have a conversation

11  with Superintendent McCarthy after joining the

12  City of Chicago?

13  MS. WERTH:  Objection to the form of the

14  question, but you can answer.

15  THE WITNESS:  A  I don't recall

16  specifically, but I believe it wasn't long after

17  I started.  So I started in October of 2011 --

18  within the first few months.

19  MR. MORRISSEY:  Q  In your role as assistant

20  chief of IPRA what contact did you have with the

21  superintendent, in what -- Let me rephrase the

22  question.

23      In your capacity as assistant chief of

24  IPRA under what circumstances did you have

## Page 9

SCOTT ANDO
November 5, 2015

1  contact with the superintendent of the police?

2  MS. WERTH:  Just for the record, I think his

3  title before assuming the position of chief was

4  first deputy.

5  THE WITNESS:  First deputy.

6  MR. MORRISSEY:  All right, well, I'm sorry,

7  it was first deputy.

8  THE WITNESS:  A  That's okay, that's okay.

9  At the time it was irregular.  Ilana, generally,

10  had a monthly meeting scheduled with the

11  superintendent.  It didn't always happen,

12  depending on their schedules; and on occasion I

13  would join them for those meetings.

14  Q  Was there an agenda for those meetings

15  when Ilana Rosenzweig was the chief?

16  A  Not that I'm aware of.  I mean she may

17  have had things that she wanted to discuss, but

18  I'm not aware of a formal agenda.

19  Q  Okay.  Were those meetings at CPD

20  headquarters?

21  A  Generally, they would be at CPD

22  headquarters.  On occasion I believe he came over

23  to our office.

24  Q  By "he" you mean Superintendent McCarthy?

## Page 10

SCOTT ANDO
November 5, 2015

1  A  Yes, sir.

2  Q  In addition to yourself and the then

3  chief of IPRA, who else would participate in

4  those meetings?

5  MS. WERTH:  Objection, foundation --

6  MR. MORRISSEY:  When you were --

7  MS. WERTH:  -- lack of --

8  MR. MORRISSEY:  -- when you were first --

9  MS. WERTH:  Let me finish my objection,

10  counsel.

11  MR. MORRISSEY:  I'm sorry.

12  MS. WERTH:  -- lack of personal knowledge.

13  You can answer if you know.

14  THE WITNESS:  A  I don't recall who may have

15  been there.  It could have been, you know, one

16  person or another at a different time; but I

17  don't recall specifically.

18  MR. MORRISSEY:  Q  When you were first

19  deputy of IPRA did you ever participate in a

20  meeting with Superintendent McCarthy where a --

21  where a person's promotion was discussed?

22  A  None that I can recall.

23  Q  As the first deputy of IPRA could you

24  recommend to the superintendent's office that a

## Page 11

SCOTT ANDO
November 5, 2015

1  police -- a sworn officer be separated from the

2  police force?

3  A  No, that would be the duties of the chief

4  administrator.

5  Q  Is there an ordinance in which the

6  responsibilities of the chief administrator of

7  IPRA are laid out?

8  A  Yes.

9  Q  I'm going to mark this as Plaintiff's

10  Exhibit A.  It's -- I'm sorry --

11      (document marked by counsel)

12  MS. WERTH:  It's A, not 1?

13  MR. MORRISSEY:  A, A as in apple.

14  Q  Showing you what's been marked as Exhibit

15  A and purports to be Chapter 2-57, Independent

16  Police Review Authority, from I believe the

17  city's municipal code --

18  MS. WERTH:  Do you need a copy?

19  MS. HARRIS:  We can share.

20  MR. MORRISSEY:  Q  -- do you recognize this

21  ordinance?

22  THE WITNESS:  A  Very well.

23  Q  And is this the ordinance which IPRA

24  operates under currently?

Plaintiff's Exhibit 1 Page 3

## Page 12

1  A   Yes.
2  Q   Under this ordinance does it have a
3  provision giving the chief administrator the
4  responsibility or the discretionary authority to
5  recommend the separation of a policeman from the
6  Chicago Police Force.
7  A   It specifically allows the chief
8  administrator to make recommendations for
9  appropriate disciplinary action.  That
10 disciplinary action could include separation.
11 Q   In July of 2014 did you make any
12 recommendation to the superintendent of police in
13 regards to a Glenn Evans?
14 A   Yes.
15 Q   Prior to that time when was the first
16 time you became personally aware of a gentleman
17 by the name of Glenn Evans?
18 A   I don't recall when exactly I became
19 aware of it.
20 Q   When you were a first deputy at IPRA were
21 you aware that Glenn Evans worked for the police
22 force?
23 A   Yes.
24 Q   How were you aware when you had the title

## Page 13

1  of first deputy that Glenn Evans was with the
2  police force?
3  A   I remember hearing that he was the
4  subject of multiple complaints.
5  Q   How did you hear that when you were a
6  first deputy?
7  A   In discussions within the office.
8  Q   So that those would be people that you
9  supervised at IPRA as first deputy, correct?
10 A   Correct.
11 Q   Did you have any formal role as first
12 deputy in monitoring any complaints brought by
13 citizens against Glenn Evans?
14 A   I wouldn't call it a formal role.  I had
15 a role in supervising the staff of IPRA, and that
16 would include investigations; and those
17 investigations would include any involving Glenn
18 Evans.
19 Q   What -- Were you aware as first deputy of
20 any claims made by citizens against Glenn Evans
21 involving the use of excessive force?
22 A   Was I, yes, I was.
23 Q   Okay, what -- do you have any
24 recollection what claims were opened when you

## Page 14

1  were first deputy against Glenn Evans in regards
2  to excessive force?
3  A   I recall that there were three specific
4  open cases that surrounded complaints relative to
5  excessive force.  One was the one that we are
6  here today discussing, which is Miss King.  One
7  was an incident that happened inside a restaurant
8  in which Commander Evans or Lieutenant Evans at
9  the time, I'm not sure which he was, was making
10 an arrest for someone selling bootleg DVDs or
11 CDs; and he went to pick up the car carrier baby
12 seat of the child who was with the subject he was
13 arresting and the baby started to fall out of the
14 car seat onto the table.  And then the third is
15 the rather infamous one for which he is now in
16 criminal court for, which is the allegation that
17 he put his pistol in the mouth of an arresting
18 subject -- arrested subject.
19 Q   Did -- Do you recall the complainant in
20 regards to the restaurant incident involving the
21 baby car seat?
22 A   I do not.
23 Q   Do you recall an open -- or a file
24 involving a claim of excessive force when

## Page 15

1  Mr. Evans was working private duty at a roller
2  rink?
3  MS. WERTH:  At what?
4  MR. MORRISSEY:  At a roller rink as a
5  security officer.
6  THE WITNESS:  A  I've never heard of that at
7  all.
8  MR. MORRISSEY:  Q  Do you have any knowledge
9  in regards to a claim brought by his former wife
10 of improper use of force?
11 A   I'm not aware of that one.
12 Q   When was the claim brought by Ricky --
13 Ricky Williams opened?
14 MS. WERTH:  Objection to the form of the
15 question, overbroad.  You can answer if you know.
16 THE WITNESS:  A  I don't know the date
17 offhand, no, I don't.
18 MR. MORRISSEY:  Q  Would any records refresh
19 your memory?
20 THE WITNESS:  A  Could.
21 MR. MORRISSEY:  Are these multiple copies of
22 the same document?
23 MR. PATRICK MORRISSEY:  No, it's one
24 document.

Plaintiff's Exhibit 1 Page 4

SCOTT ANDO
November 5, 2015

Page 16

1           (counsel marked document)

2     MR. MORRISSEY:  Q   Showing you what's being

3 marked as Plaintiff's Exhibit B, it's a Five-Year

4 Employee Complaint Register I believe in regards

5 to Glenn Evans; and then they're marked --

6 Exhibit B is marked by the city attorneys 10367

7 through 10369.  Chief Ando, does this reflect a

8 Five-Year Complaint Register involving Glenn

9 Evans?

10     MS. WERTH:  I'm going to object to

11 foundation, lack of personal knowledge.  The

12 document speaks for itself.  You can answer if

13 you know.

14     THE WITNESS:  A   Clearly, based on the

15 header of Five-Year Employee Complaint Register

16 History.  It doesn't help me in identifying which

17 one of the cases involve Ricky Williams, if

18 that's what you're asking me.

19     MR. MORRISSEY:  Q   Does this appear to be,

20 does Exhibit B appear to be a print-off from the

21 CLEAR System?

22     **A   Yes, it does appear to be.**

23     Q   Does Exhibit B reflect as of today's date

24 the open files involving Glenn Evans with IPRA?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 17

1     MS. WERTH:  Take your time.

2     THE WITNESS:  A   I can see this shows that

3 there's active cases, but I can't tell just by

4 looking at it whether it's a IPRA case or an IA

5 case.

6     MR. MORRISSEY:  Q   Does Exhibit B include

7 both open and closed IPRA files --

8     **A   It does.**

9     Q   -- involving Glenn Evans --

10     **A   It does.**

11     Q   -- for the last five-year period?

12     **A   It does, yes.  And, presumably, IA cases**

13 **as well.**

14     THE COURT REPORTER:  "And presumably"?

15     THE WITNESS:  Internal Affairs cases as well.

16     MR. MORRISSEY:  Q   For purposes of this

17 deposition, can you allow me to finish my

18 question just to make it easier for the court

19 reporter.

20     Now, when you were first deputy chief

21 of IPRA what -- did you conduct any investigation

22 in regards to Rita King's complaint?

23     **A   No.**

24     Q   Did you do any investigative work in

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 18

1 regards to the complaint by -- in regards to a

2 baby seat?

3     **A   No.**

4     Q   Did you participate in the investigation

5 involving Ricky Williams?

6     **A   Tangentially.**

7     Q   What was your tangential role in the

8 investigation of Ricky Williams' complaint?

9     **A   I asked, once we had the allegation, I**

10 **asked the Internal Affairs Bureau to have him**

11 **come in to IA, surrender his weapon to evidence**

12 **technicians and have it swabbed for evidence of**

13 **DNA.**

14     Q   Within Internal Affairs did you have, did

15 you communicate with any particular person at

16 Internal Affairs in regards to requesting Glenn

17 Evans to come in and produce his weapon?

18     MS. WERTH:  I'm going to object to this

19 question because it invades the deliberative

20 process privilege.  The Ricky Williams

21 investigation is still open, and any

22 communication between government officials

23 regarding that investigation is subject to the

24 deliberative process privilege.  And I'm going to

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 19

1 ask Mr. Ando, I'm going to instruct him not to

2 answer that question.

3     MR. MORRISSEY:  Okay, I'll certify the

4 question.

5     Q   At any of your meetings with the then

6 chief and the Superintendent of Police McCarthy

7 did you discuss Glenn Evans in regards to the

8 Ricky Williams' investigation?

9     THE WITNESS:  A   Who do you mean by the

10 "chief"?

11     Q   I mean Chief Rosenzweig.

12     **A   Oh.  Not that I can recall, no.**

13     Q   Okay.  When did you first learn -- You

14 mentioned that when you were back as a deputy you

15 learned about Rita King's complaint against then

16 Lieutenant Evans, correct?

17     **A   Correct.  I learned about this case at**

18 **some point when I was the first deputy, but I'm**

19 **not sure when.**

20     Q   So that would be prior to 2013?

21     **A   I would, I would assume that's true; but**

22 **I'm not positive.**

23     Q   Did you know at that time that

24 Miss Franko was the investigator assigned to the

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 5

SCOTT ANDO
November 5, 2015

Page 20

1  Rita King investigation?
2     A   I don't believe I did.
3     Q   Did you know that the police officers
4  that also were accused of wrongdoing in the
5  Rita King CR had not been interviewed yet by
6  Miss Franko?
7     A   As of what date?  I'm not sure.
8     Q   When you first learned of the Rita King
9  file did you know at that time that IPRA, that
10 the IPRA investigator had not interviewed
11 commander -- or Lieutenant Evans or the two other
12 police officers, Officer Sutton and Officer
13 Clifford?
14    A   No, I didn't know.
15    Q   Did you look, when you were a first
16 deputy, did you review the open investigative
17 file involving Rita King?
18    A   I don't believe so.
19    Q   When you were first deputy what knowledge
20 did you have of the Rita King investigation?
21    A   Just the basics.  And I think I became
22 aware of it because of the other cases that were,
23 allegations that were lodged, but just the bare
24 bones of it.

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 21

1     Q   Did you know who the supervisor was in
2  regards to, at that time, for the Rita King
3  investigation?
4     A   At IPRA?
5     Q   Yes.
6     A   I know now, but I didn't know who it was
7  then.  And some of the supervisors have been
8  transferred.  So I'm not sure.
9     Q   When you became acting chief of IPRA --
10 and you were acting chief again sometime in 2013,
11 correct?
12    A   It would have been like --
13    Q   2013?
14    A   Yes, Ilana left May 31st.  So it would
15 have been like June 1st.
16    Q   Okay.  When you were acting chief of IPRA
17 did you participate in any investigation
18 involving Rita King's CR?
19    A   No, I haven't participated in any
20 investigation.
21    Q   Did you supervise or review the Rita King
22 investigative file when you were, that six-month
23 period you were the acting chief of IPRA?
24    A   I don't know what the date was.  I know I

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 22

1  reviewed it, but I don't know when that review
2  took place whether I was the acting chief
3  administrator or actually the appointed chief
4  administrator.
5     Q   When you were acting IPRA investigator --
6  when you were the acting chief of IPRA did you
7  have any contact with Superintendent McCarthy?
8     A   Yes, we generally have
9  regularly-scheduled meetings monthly.
10    Q   Is there a particular day of the month
11 that you normally meet with the superintendent of
12 police?
13    A   Yeah.  I want to say it's the third
14 Wednesday of every month, but I can't be
15 positive.  And we often reschedule or cancel
16 because of commitments.
17    Q   Is that at CPD headquarters?
18    A   Generally, yes.
19    Q   Does anybody other than yourself from
20 IPRA attend those meetings?
21    A   Sometimes.
22    Q   What members of the IPRA staff at times
23 would have met with superintendent at -- Are
24 these meetings called -- go by a name?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 23

1     A   No.
2     Q   What members from your department have
3  attended at times when you've met with the
4  superintendent of police?
5     MS. WERTH:  Objection to the form of the
6  question, over broad, vague.  You can answer the
7  question if you understand the question.
8     THE WITNESS:  A   On occasion I've had my
9  first deputy chief and on occasion I've had my
10 chief of staff and on occasion I've had both.
11    MR. MORRISSEY:  Q   Okay, what are their
12 names?
13    A   First deputy chief is Steven Mitchell,
14 M-I-T-C-H-E-L-L; the chief of staff is Steven
15 Hirsch, H-I-R-S-C-H.
16    Q   Are minutes maintained of those meetings?
17    A   No.
18    Q   Who from the CPD, other than the
19 Superintendent McCarthy, attends those meetings?
20    MS. WERTH:  Objection, over broad.  Which
21 particular meeting are you talking about?  I mean
22 we've talked about meetings that happened on a
23 more or less regular basis.  You're asking him to
24 testify about who attended a particular meeting.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 6

SCOTT ANDO
November 5, 2015

Page 24

1  Which meeting are we talking about?

2      MR. MORRISSEY:  Q   Well, you've testified in

3  regards that you have regular meetings with the

4  Superintendent McCarthy.  Are there members of

5  the CPD that also attend at times those meetings?

6      THE WITNESS:  A   Yes.

7      Q   What are their names?

8      MS. WERTH:  I'm going to make that objection

9  again, over broad.  Which particular meeting are

10  you talking about?  I mean if you're asking him

11  does the same CPD personnel attend every meeting

12  and what are their names, I understand that; but

13  you're asking him to name people who attend

14  meetings.  Well, which meetings?

15      MR. MORRISSEY:  Well, I don't want to go

16  through each and every meeting.  He says that he,

17  generally, meets once a month with the

18  superintendent.

19      Q   The broad question is:  Are there staff

20  members from the CPD that also attend your

21  meetings with the Superintendent McCarthy?

22      MS. WERTH:  He said yes to that.

23      MR. MORRISSEY:   Okay, and what are their

24  names?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 26

1      You mentioned that either as an acting

2  chief of IPRA or as the chief of IPRA you've

3  reviewed the Rita King CR file, correct?

4      A   I have.

5      Q   All right, do you know when the first

6  time you actually sat down and reviewed the

7  Rita King file?

8      A   I don't know exactly when.  It was a few

9  months ago.

10      Q   Okay, do you know why you would have

11  looked at the Rita King -- Strike that.

12      When you first looked at the Rita King

13  investigative file for what reason, what purpose

14  did you do that?

15      A   It was submitted to me for my review and

16  my determination as to whether the findings were

17  correct, the evidence was complete, that

18  everything that needed to be done was done, and

19  if sustained to make a recommendation for

20  discipline.

21      Q   Prior to that time in July or August of

22  2014 did you make any recommendation to the

23  superintendent of police in regards to Glenn

24  Evans' continued employment?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 25

1      THE WITNESS:  A   Well, it varies again --

2      MS. WERTH:  Same objection.

3      THE WITNESS:  -- meeting by meeting.

4      MR. MORRISSEY:  Q   Okay, does -- do you

5  recognize -- Are there individuals that are,

6  there members of the CPD command staff that

7  normally are at these meetings?

8      THE WITNESS:  A   Yes.

9      Q   And what are their names?

10      A   Well, again, it varies.  Occasionally it

11  would be the first deputy, which would have been

12  Al Wysinger, until he retired, and again that's

13  occasional, not always; Ralph Price, who's the

14  division -- they're the CPD chief counsel; the

15  chief of Internal Affairs, at the time that was

16  Juan Rivera; commander of Internal Affairs,

17  Robert Klimas.  Then at any given time there

18  could be somebody in their stead if they're not

19  available, one of their deputies.

20      Q   Do you know a gentleman by the name of

21  Marvin Shear?

22      A   I do not.

23      Q   In July or August of two thousand --

24  Strike that.

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 27

1      A   No.

2      MS. WERTH:  Do you have a document that --

3      MR. MORRISSEY:  Well, let me rephrase the

4  question.

5      Q   In July or August of 2014 did you make

6  any recommendation to the CPD in regards to Glenn

7  Evans?

8      THE WITNESS:  A   I may have, if you have

9  something that would refresh my recollection as

10  to what you're talking about.

11      Q   Specifically in regards to the

12  investigation, the Ricky Williams' investigation,

13  did you make any kind of recommendation to the

14  CPD in regards to Mr. Evans?

15      A   I did.

16      Q   When did you make that recommendation?

17      A   I don't recall exactly when I made the

18  recommendation.

19      Q   Was it in the summer of 2014?

20      A   Possibly.  But, again, I'm not positive

21  when.

22      Q   Okay.  Prior to making that

23  recommendation in regards to following -- Strike

24  that.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 7

SCOTT ANDO
November 5, 2015

Page 28

1     Prior to making the recommendations
2 based upon the Ricky Williams' CR file had you
3 had any conversations with Superintendent
4 McCarthy in regards to Glenn Evans?
5    MS. WERTH:  I'm going -- Are you talking
6 about Ricky Williams or in general?
7    MR. MORRISSEY:  In general.
8    MS. WERTH:  Could you repeat that question?
9      (last question read back)
10   THE WITNESS:  A   I don't recall any
11 conversations prior to that recommendation.
12   MR. MORRISSEY:  Q   Prior -- was that an oral
13 recommendation; or was that in writing to
14 Superintendent McCarthy in regards to Glenn
15 Evans?
16   **A   I'm assuming you are referring to my**
17 **recommendation that he relieve Commander Evans of**
18 **his police powers, and that would have been in**
19 **writing.**
20   Q   Prior to making that written document to
21 the superintendent of police had you or anybody
22 else at IPRA provided any reports to
23 Superintendent McCarthy or memorandums or e-mails
24 to Superintendent McCarthy in regards to Glenn

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 29

1 Evans?
2    MS. WERTH:  I'm going to object to this
3 because the Ricky -- are we talking about the
4 Ricky Williams' case?
5    MR. MORRISSEY:  I'm not talking about Ricky
6 Williams.  I'm saying prior to making his
7 recommendation -- Let me rephrase it.
8    MS. WERTH:  Well, you are talking about Ricky
9 Williams.
10   MR. MORRISSEY:  Let me rephrase the question.
11   Q   Were there any other written
12 communications from you as chief of IPRA to
13 Superintendent McCarthy or members of the command
14 staff at CPD in regards to Glenn Evans?
15   THE WITNESS:  A   The only written
16 communications that I can recall would have been
17 e-mails that went along with phone calls when I
18 asked for them to take his gun and have it
19 swabbed.  Other than that I don't recall anything
20 else.
21   Q   At the time you made the recommendation
22 to CPD or Internal Affairs to have commander
23 Evans' gun swabbed, you were aware that he was a
24 high-ranking member of the CPD, correct?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 30

1   **A   I was aware he was a commander.**
2   Q   Who did you send those e-mails to in
3 regards to requesting Commander Evans' gun be
4 swabbed?
5   **A   I don't recall specifically who the**
6 **e-mails were addressed to, but I communicated**
7 **with Commander Robert Klimas both on the phone**
8 **and in writing.**
9   Q   Did, in regards to having Commander Evans
10 bring in his weapon to be swabbed, did you
11 communicate or did you copy Superintendent
12 McCarthy on those e-mails?
13   **A   I don't know.**
14   Q   Did Commander Klimas respond to you in
15 writing?
16   **A   He did.**
17   Q   And what's your recollection in regards
18 to his response?
19   MS. WERTH:  You know, I'm going to object to
20 the, going into the deliberations in the Ricky
21 Williams' case, which is still an open IPRA
22 investigation.  It's not closed.  So
23 communications related to the Ricky Williams'
24 case are subject to the deliberative process

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 31

1 privilege.  So I'm going to ask -- Are you going
2 to continue asking about communications regarding
3 the Ricky Williams' investigation?  If so, I'm
4 going to instruct Chief Ando not to answer those.
5    MR. MORRISSEY:  Okay.
6   Q   Prior to yesterday, November 4th, was the
7 Rita King investigation still open at IPRA?
8   THE WITNESS:  A   Yes.
9   Q   Okay.  How many other open files as of
10 today are there involving Glenn Evans?
11   **A   I believe two.**
12   Q   And looking at, I believe it's our
13 exhibit -- is it B?
14   **A   Um-hum.**
15   Q   Looking at that document does that tell
16 you which CR files are open in, currently open in
17 regards to Commander Evans?
18   **A   Looking at this it appears that I see**
19 **seven that are marked active, but that does not**
20 **mean that they are all IPRA.  And I can't tell**
21 **just by looking at this if they are or if they**
22 **aren't.**
23   Q   Um-hum.  Is Rita King's file still open,
24 officially open?

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 32

1    A   No, it's -- it looks here, according to
2  what I'm seeing, I believe it's the top of page
3  two, it shows that it's closed.  It says "05B,
4  arrestee, after arrest, prior to lockup."
5  So that may be that one -- and, again, I can't be
6  sure.
7    MS. WERTH:  Don't guess.
8    THE WITNESS:  I'm sorry.
9    MR. MORRISSEY:  Q  Okay, if you look at --
10  if I tell you that the case number involving
11  Miss King's, civil case number involving Miss
12  King is 13 C 1937, and if you look at Group
13  Exhibit B, the third page, which is 10369 at the
14  top, would that be the CR involving Rita King?
15    THE WITNESS:  A   The third page?
16    Q   Yeah.
17    MS. WERTH:  He's asking about that.  I'm just
18  going to object, I mean to the extent you can
19  answer that, if you know the log number by heart
20  you can answer that.
21    THE WITNESS:  A   I don't.
22    MR. MORRISSEY:  Q  Prior to today's
23  deposition did you look at any documents in
24  regards to Rita King?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 33

1    A   I did yesterday.
2    Q   What did you look at?
3    A   I looked at a summary report.
4    Q   And from what date?
5    A   I believe it was the original one.  I
6  don't know what date.  I looked at the
7  supplementary, I looked at the diagram of the
8  lockup.
9    Q   The supplemental report was done when?
10    A   Again, I don't know the date.
11    Q   Was it within the last month or two?
12    A   I would presume it was.
13    Q   You said you looked at another document.
14    A   I looked at a diagram of the lockup, and
15  I looked at a memorandum regarding an interview
16  or discussion with the sergeant at CPD who
17  teaches use of force relative to techniques, pain
18  techniques, compliance techniques.
19    THE COURT REPORTER:  "Relative to
20  techniques"?
21    THE WITNESS:  Techniques, pain compliance
22  techniques.
23    MR. MORRISSEY:  Q  Now, where is that
24  summary -- What are we at, C?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 34

1    (counsel marked document)
2    Q   Now, after you made that recommendation
3  to Superintendent McCarthy in regards to Glenn
4  Evans in writing --
5    MS. WERTH:  Are we talking about the
6  Rita King case?  I think we're a little vague
7  here, Rita King --
8    MR. MORRISSEY:  Q   Well, you mentioned that
9  in the summer of 2014 you made a written request
10  to the Superintendent McCarthy that Commander
11  Evans be relieved of his police powers, correct?
12    THE WITNESS:  A   Again, I don't know when it
13  was; but I did send a memo recommending that he
14  consider relieving him of his police powers.
15    Q   Did you receive any response from
16  Superintendent McCarthy?
17    A   Not initially.  But I know he didn't
18  follow the recommendation.
19    Q   Okay, when you say "not initially" did
20  you have any -- I'm not going to ask you what
21  communication you had -- I'm just going to ask
22  you did you have any communication with
23  Superintendent McCarthy in regards to Glenn Evans
24  following your recommendation that he be relieved

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 35

1  of his police powers?
2    A   Again, at some point.
3    Q   And was that prior to reviewing the IPRA
4  summary report involving Rita King?
5    A   Yeah, it would have been long before
6  that.
7    Q   Did you receive any written documents
8  from Superintendent McCarthy following your
9  recommendation that Evans be relieved of his
10  police powers?
11    A   No.
12    Q   Did, during your regular meetings with
13  Superintendent McCarthy, did Commander Evans ever
14  come up in conversation?
15    A   At some point after I had recommended the
16  relief of powers it was mentioned in a meeting at
17  some point, I don't know when, that he wasn't
18  going to do that; and I said, that's fine, that's
19  up to you.  I make a recommendation.  He doesn't
20  have to follow it.
21    Q   You're aware that after you made your
22  recommendation that Superintendent McCarthy
23  appeared in the media with Glenn Evans?
24    MS. WERTH:  Objection to foundation, personal

TOOMEY REPORTING
312-853-0648

**SCOTT ANDO**
**November 5, 2015**

Page 36

1  knowledge.  You can answer if you know.
2    THE WITNESS:  I don't know that he -- I don't
3  know if he appeared in the media with Glenn
4  Evans.  I know there were media stories about him
5  and Glenn Evans and what he felt or thought.
6    MR. MORRISSEY:  Q   And you're aware that
7  after your recommendation that Glenn Evans be
8  relieved of his police power Superintendent
9  McCarthy supported Glenn Evans --
10   A  Yes.
11   Q  -- in the media?
12   A  Yes, he did.
13   Q  Do you report to Superintendent McCarthy?
14   A  No, I don't.
15   Q  Does Superintendent McCarthy have to
16  follow your recommendations?
17   A  On a relief of powers?
18   Q  I'll go there, on relief of powers is he
19  not to follow your recommendation?
20   A  No, he doesn't.
21   Q  When you recommend discipline of a police
22  officer does Superintendent McCarthy have to
23  follow that recommendation?
24   A  Again, it's all outlined in the

**SCOTT ANDO**
**November 5, 2015**

Page 37

1  ordinance.  He does not, but there is a process
2  by which he disagrees.
3    Q  So when you were asked to review the
4  summary report involving the Rita King
5  allegation, the CR, the CR file 1044664, you're
6  aware that Glenn Evans had in the past been
7  supported by the superintendent of police?
8    A  When I reviewed -- You're not talking
9  about when I reviewed it yesterday?
10   Q  No, I'm talking about --
11   A  When I reviewed it to determine whether
12  the case should be closed and sent to the
13  superintendent?
14   Q  Right.
15   A  Was I aware -- say it again -- was I
16  aware that --
17   Q  Sure.  When you -- you reviewed sometime
18  in December of 2014 the file involving Rita King,
19  correct?
20   A  Right.
21   Q  And when you reviewed that, obviously,
22  you knew that previously the superintendent of
23  police had stood behind Glenn Evans?
24   A  Yes, I knew that.

**SCOTT ANDO**
**November 5, 2015**

Page 38

1    Q   And you were also aware that the mayor of
2  the City of Chicago at times appeared in the
3  media with Glenn Evans?
4    MS. WERTH:  I'm going to object to the form
5  of the question.
6    THE WITNESS:  A   I don't remember ever
7  seeing the mayor with Glenn Evans in the media.
8    MR. MORRISSEY:  Q   Okay, you're aware that
9  in December of 2014 criminal charges had already
10  been filed against Glenn Evans?
11   A  I am.
12   Q  I'm going to show you -- I'll take a
13  moment.
14   MS. WERTH:  So we're going to take a quick
15  break?
16   MR. MORRISSEY:  If he wants a break, sure, go
17  ahead.
18     (WHEREUPON, a short break was held)
19   MR. MORRISSEY:  Q   You mentioned,
20  Chief Ando, that you first became aware of Glenn
21  Evans when you were acting chief, correct?
22   THE WITNESS:  A   Yes.
23   Q   You were aware of the baby seat incident?
24   A  Yes.

**SCOTT ANDO**
**November 5, 2015**

Page 39

1    Q   The Ricky Williams' incident?
2    A  Yes.
3    Q  The Rita King incident?
4    A  Yes.
5    Q  Did you look at Glenn Evans' other prior
6  CR files, either opened or closed, over the last
7  ten years at that time?
8    A  I did not.
9    Q  Did you do anything, other than become
10  aware that Lieutenant Evans was involved in those
11  three incidents, when you were acting chief?
12   MR. PALLES:  Objection to the form.
13   MS. WERTH:  Objection to the form, join.
14   MR. MORRISSEY:  I'll rephrase it.
15   Q  Did you take any steps after becoming
16  aware of those three incidents involving Glenn
17  Evans in three separate claims as acting chief?
18   THE WITNESS:  A   I'm not sure what steps you
19  would be referring to.
20   Q  Well, within your capacity as acting IPRA
21  chief could you have recommended to the
22  superintendent of police to suspend Glenn Evans?
23   MS. WERTH:  I'm going to object to the --
24  He's already testified to a recommendation he

Plaintiff's Exhibit 1 Page 10

SCOTT ANDO
November 5, 2015

Page 40

1  made to the superintendent.  So I'm not sure what
2  else you're talking about.
3     MR. MORRISSEY:  Q  Well, I'm talking about
4  when you were acting chief did you discuss those
5  cases with the then chief of IPRA, Miss
6  Rosenzweig?
7     THE WITNESS:  A  I don't recall discussing
8  them with her.
9     Q  Did you take any follow-up steps after
10 learning about Glenn Evans as an acting chief --
11    MR. PALLES:  Object to the form.
12    MR. MORRISSEY:  -- of IPRA?
13    MS. WERTH:  Object to the form of the
14 question.  What is the question?  Can you read it
15 back?
16               (last question read back)
17    THE WITNESS:  A  Again, I'm not sure what
18 steps you're referring to.
19    MR. MORRISSEY:  Q  Well, to put it very
20 bluntly, you learned about these three complaints
21 about Glenn Evans?
22    THE WITNESS:  A  Um-hum.
23    Q  Some of them were very serious I assume,
24 correct?

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 41

1     A  Very.
2     Q  Did you do anything as the acting chief
3  after learning about those three open CR files?
4     A  I had to wait until the investigations
5  are completed in order to take any action and
6  make recommendations.
7     Q  Did you, in regards to the Rita King
8  file, did you look at the Rita file King to see
9  what stage it was opened, what stage of the
10 investigation?
11    MS. WERTH:  Objection to form of the
12 question.  Which period of time are you talking
13 about --
14    MR. MORRISSEY:  All right --
15    MS. WERTH:  -- did you look at?  I mean --
16    MR. MORRISSEY:  When you were --
17    MS. WERTH:  Let me finish.  There's an
18 affidavit from Chief Ando stating that he had no
19 knowledge about the investigation up to a certain
20 point.  We now know that he made a
21 recommendation; and that's the whole basis on
22 which I've agreed to produce him because he had
23 some information, personal knowledge about what
24 he did in the Rita King case.  And you're asking

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 42

1  him did you take any steps.  Well, of course he
2  did.  That's why he's here today for this
3  deposition.
4     MR. MORRISSEY:  Well, let me ask the question
5  because I'm the one who's asking the question,
6  not you.
7     MS. WERTH:  Not -- But tighten your question,
8  you know.
9     MR. MORRISSEY:  Well, I think he understands
10 my question.
11    MS. WERTH:  Well --
12    MR. MORRISSEY:  Q  Well, so when you learned
13 of those three open investigations as acting
14 chief did you follow up to see what stage each
15 investigation was in?
16    THE WITNESS:  A  I don't know whether it was
17 when I was the acting chief or the chief.  You
18 know, clearly from June 1st 'till January, middle
19 of January when I was appointed as the chief
20 administrator I was the acting chief.  So I'm not
21 sure when exactly I was looking at things and
22 what my official or unofficial role was.
23    Q  Okay, when you were first deputy chief
24 and you learned of those three instances did you

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 43

1  take any steps on your own to review the
2  investigations?
3     A  No.
4     MR. PALLES:  Object to the form.
5     MS. WERTH:  And asked and answered.
6     MR. MORRISSEY:  Q  When you were first
7  deputy of IPRA was it -- were there other
8  individuals within the CPD that had three open CR
9  files which you were aware of?
10    A  I don't know.
11    MS. KUPE-ARION:  Objection, relevance.
12    MR. MORRISSEY:  Q  Were there any other
13 members of the Chicago Police force other than
14 Glenn Evans that you were aware of when you were
15 assistant, when you're assistant -- when you were
16 deputy chief of IPRA?
17    MS. WERTH:  Objection to the form of the
18 question --
19    MS. KUPE-ARION:  And relevance.
20    MS. WERTH:  -- "aware of".
21    MR. MORRISSEY:  Q  All right, you stated
22 that he had been made aware of Glenn Evans by
23 other members of IPRA, correct?
24    THE WITNESS:  A  Yes --

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 44

1    Q   As --
2    MS. WERTH:  Let him answer the question you
3 put to him.  I think you just interrupted his
4 answer.  But, all right, go ahead.
5    THE WITNESS:  A   I said yes.
6    MR. MORRISSEY:  Q   Okay.  Were there any
7 other members of the police force that you were
8 also similarly made aware of by IPRA employees?
9    MR. PALLES:  Object to the form --
10   MS. WERTH:  Object to the form of the
11 question, over broad.
12   MS. KUPE-ARION:  And relevance as well.
13   MS. WERTH:  It's overbroad.  Can you repeat
14 the question?  By now he's --
15   THE WITNESS:  I can answer it.
16   MS. WERTH:  All right.
17   THE WITNESS:  A   I'm often made aware of a
18 complaint or a case, but I don't know about the
19 specificity of that.
20   MR. MORRISSEY:  Q   All right, so when you
21 were, when you were made aware as deputy chief of
22 IPRA of Glenn Evans did you take any follow-up
23 measures to monitor Glenn Evans?
24   MR. PALLES:  Objection --

---

SCOTT ANDO
November 5, 2015

Page 45

1    MS. WERTH:  Objection, asked and answered --
2    MR. PALLES:  -- asked and answered and as to
3 form.
4    MS. HARRIS:  I join.
5    MS. KUPE-ARION:  Join.
6    THE COURT REPORTER:  All of you joined?
7    ALL ATTORNEYS:  (In unison, "yes").
8    THE COURT REPORTER:  Really, it's kind of
9 hard to differentiate.  So, please, make it
10 known.
11   MR. MORRISSEY:  Q   Typically, as either the
12 deputy chief of IPRA or the chief of IPRA you
13 don't actively follow open CR files, correct?
14   THE WITNESS:  A   No.
15   Q   Now, when it came time to review in
16 December of 2014 the investigative file involving
17 Rita King did you look at the entire file?
18   A   I did.
19   Q   Okay, what are we on, D?
20   MS. WERTH:  We have A, B, and that's it.
21        (counsel marked document)
22   MR. MORRISSEY:  Q   I'm showing you what was
23 marked as Plaintiff's Exhibit C.  It's been Bates
24 stamped by the city attorneys 3203 through 3207.

---

SCOTT ANDO
November 5, 2015

Page 46

1    MS. WERTH:  Oh, thank you.
2    MR. PALLES:  Oh, we're out of luck.
3    MR. MORRISSEY:  Q   Chief Andos, you
4 looked at --
5    MS. WERTH:  Ando.
6    MR. MORRISSEY:  -- Ando, you looked at this
7 document as recently as yesterday, correct?
8    THE WITNESS:  A   No, I did not look at this
9 yesterday.
10   Q   All right, before you made your
11 recommendation in December of 2014 you looked --
12 this was part of the investigative file, correct?
13   A   Correct.
14   Q   By looking at this document does it
15 reflect the date that Rita King opened it?
16   A   11 April, 11.
17   Q   When is the first time Investigator
18 Franko spoke with the police officers and
19 Lieutenant Evans?
20   MS. WERTH:  I'm going to object to this.
21 Investigator Linda Franko has been produced for
22 her deposition.  You've asked her all these
23 questions.  I'm going to object on that ground,
24 and I'm going to object on the ground that he

---

SCOTT ANDO
November 5, 2015

Page 47

1 lacks personal knowledge about when Linda Franko
2 spoke to whoever.
3    MR. MORRISSEY:  Q   Is this a business
4 record, Exhibit C, of IPRA?
5    THE WITNESS:  A   Yes.
6    Q   And when an investigator performs any
7 function on an open CR file does he or she make
8 similar notes in an investigator's case log?
9    A   Yes.
10   Q   Looking at the first page of the
11 investigator case log, 3203, it reflects activity
12 done in April and May of 2011, correct?
13   A   Correct.
14   MS. WERTH:  You know, I'm going to object --
15 excuse me, counsel -- I'm going to object to any
16 questions having to do with the investigator log
17 which has -- the investigator has been produced.
18 You have the log.  You have follow-up documents.
19 Chief Ando is not here to talk about how the
20 investigation went.  He's here to talk about when
21 he got involved what he did with this
22 investigation.
23   MR. MORRISSEY:  You can make your objection,
24 thank you.

Plaintiff's Exhibit 1 Page 12

Page 48

1    Q   Looking at the second page of Exhibit C,
2  3204, after June 11th of 2011 is the next entry
3  on that March 26th, 2013?
4    THE WITNESS:  A   It is.
5    Q   As the chief of IPRA is it normal for an
6  investigation to be suspended for that period of
7  time from June 11, 2011 through March 26th, 2013?
8    MS. WERTH:  Objection to the form of the
9  question.  What do you mean by "normal"?  You can
10  answer.
11    THE WITNESS:  A   Again, I don't know that I
12  would call it normal.  I don't know that I would
13  call it abnormal either.  At that time IPRA had a
14  incredible inventory of open cases and the
15  investigators had an average of 35 cases a piece,
16  some much higher, as much as 70 a piece; and it
17  was very difficult for them to keep up with their
18  case work.
19    MR. MORRISSEY:  Q   Now --
20    **A   So I wouldn't say it was unusual, but**
21  **it's not something that I find acceptable.**
22    Q   Is it acceptable that when a complaint is
23  made by a citizen in April of 2011 that the
24  officers who are complained about are not

Page 50

1  used unreasonable force, correct?
2    **A   Correct.**
3    Q   In that circumstance is it acceptable for
4  an IPRA investigator to hold off interviewing the
5  three officers -- the two officers and
6  lieutenant, until after November of 2013?
7    MR. PALLES:  Object to the lack of
8  foundation, incomplete hypothetical.
9    MS. HARRIS:  Join.
10    MS. WERTH:  Join in that objection.
11    MS. KUPE-ARION:  Join.  In the course of an
12    THE WITNESS:  A   In the course of an
13  investigation an investigator with the assistance
14  of their supervisor sometimes makes a
15  determination as to when is the best time to
16  interview officers, witness officers are involved
17  or accused officers.
18    MR. MORRISSEY:  Q   Do you consider Rita
19  King's allegations to be complex, a complex file?
20    **A   No.**
21    Q   Is it better as -- You're a trained
22  investigator and police officer, correct?
23    **A   I'm a trained investigator.  I was not --**
24  **am not and was not a police officer.**

Page 49

1  interviewed until two years later, more than two
2  years later?
3    MS. WERTH:  Are you asking him is it
4  acceptable to him as the chief of IPRA?
5    MR. MORRISSEY:  Q   Do you understand the
6  question?
7    THE WITNESS:  A   I do.  It depends on the
8  circumstances.  Cases that are more complex or
9  have more witnesses or have more evidence or
10  you're waiting for lab reports take more time
11  than those that don't.
12    Q   Okay.
13    **A   So it's not something I can, I can say**
14  **with specificity.  It's individual, based on the**
15  **individual case.**
16    Q   In regards to Rita King where she
17  claims that -- You're aware of the allegations by
18  Rita King, correct?
19    **A   Yes.**
20    Q   That she was in the lockup facility, that
21  there were two officers along with Lieutenant
22  Evans, correct?
23    **A   Um-hum.**
24    Q   And she maintains that Lieutenant Evans

Page 51

1    Q   You were formerly with the Drug
2  Enforcement Agency?
3    **A   I was.**
4    Q   And as a member of the Drug Enforcement
5  Agency for the U.S. government you conducted
6  investigations, correct?
7    **A   I did.**
8    Q   And was it your practice when you were
9  investigating a case to take statements as soon
10  as possible from witnesses?
11    **A   Well, there's a difference between the**
12  **investigations I conducted and supervised**
13  **relative to drug trafficking when I was with the**
14  **Drug Enforcement Administration versus when I was**
15  **in the Office of Professional Responsibility as**
16  **an inspector, which is the DEA Internal Affairs**
17  **component; and, again, I would interview people**
18  **when I saw it was best for the case.**
19    Q   Okay, as the chief of IPRA can you tell
20  me why the accused officers in the Rita King CR
21  were not interviewed until, at the earliest,
22  November of 2013?
23    MR. PALLES:  Objection, foundation --
24    MS. HARRIS:  Yes --

Plaintiff's Exhibit 1 Page 13

SCOTT ANDO
November 5, 2015

Page 52

1    MS. WERTH:  Objection to the form of the
2 question, objection to foundation, lacks personal
3 knowledge.  It's already been asked of the
4 investigator who was --
5    MR. MORRISSEY:  But you're making a speaking
6 objection.
7    MS. WERTH:  I'm making all my objections --
8    MR. MORRISSEY:  Well, it's just enough to --
9    MS. WERTH:  -- to your questions, to which
10 there are many potential objections.
11    MS. HARRIS:  I'll join in those objections.
12    MS. KUPE-ARION:  I do too.
13    THE WITNESS:  A  At that time under the
14 collective bargaining agreement between the city
15 and the Fraternal Order of Police, the section I
16 believe it's 6 in the contract, 6.8 I think, that
17 lists the disciplinary and misconduct
18 investigation, the disciplinary process, it lays
19 out in order when things are done; and in the
20 order that is written in the contract at that
21 time it had interviewed the accused officers
22 last.  And as I understand because it's
23 procedures -- time at IPRA there was an
24 arbitration award that held that that was in fact

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 53

1 the process that was to be followed, that the
2 officers who were accused were to be interviewed
3 last.
4    MR. MORRISSEY:  Q  When you reviewed in
5 December of 2014 the Rita King file were there
6 any interviews that immediately preceded the
7 interviews of the three accused police officers?
8    MS. WERTH:  Objection to foundation, lacks
9 personal knowledge.
10    THE WITNESS:  A  I don't know.  I could look
11 at the investigator's log and figure it out, but
12 I don't have personal knowledge.
13    MR. MORRISSEY:  Q  All right, did you have
14 any concerns when you reviewed this as chief of
15 IPRA in December of 2014 that the officers had
16 not been interviewed until November of 2013?
17    **A  I didn't have concerns.  I'm not saying I**
18 **was happy about it; but I understood where, where**
19 **people in terms of their case loads and why**
20 **it took time to get those case loads down and get**
21 **cases completed.**
22    Q  So long as a case remains open at IPRA
23 the police officer, generally, remains
24 undisciplined, correct?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 54

1    **A  Yes.**
2    Q  And there is no -- and one of the
3 purposes of IPRA is to conduct prompt
4 investigations of citizens' complaints, correct?
5    **A  Fair, thorough, and timely**
6 **investigations.**
7    Q  In the period of time between April 11th,
8 2011 and the time you finally reviewed the file
9 in December of 2014 were there any communications
10 made to any governmental agency in the city in
11 regards to Miss King's CR file?
12    MS. KUPE-ARION:  Objection to the form of the
13 question, as well as competence and foundation.
14    MS. WERTH:  I'm going to join in that
15 objection.  Also, it really borders on the
16 deliberative process privilege as well.
17    THE WITNESS:  A  I'm not sure I understand.
18 Could you --
19    MR. MORRISSEY:  Q  Sure.
20    When -- is there any -- Does the chief
21 of IPRA or does IPRA have any reporting
22 requirements for open CRs?
23    **A  Yes.**
24    Q  What reports are filed by IPRA in regards

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 55

1 to open CRs?
2    **A  What we do, what we call a six-month**
3 **letter; and it's really a report to the mayor's**
4 **office and the committee on public safety, the**
5 **city council, that we have investigations that**
6 **have exceeded the six-month time frame listed in**
7 **the ordinance and just explaining why.**
8    Q  Does it -- Does your report, six-month
9 report reflect the individual names of the open
10 CRs?
11    **A  No.  It lists the CR number.  It wouldn't**
12 **list names.**
13    Q  What did you do in December of 2014 when
14 you reviewed the investigation involving --
15 brought by Rita King?
16    MR. PALLES:  Object to the form.
17    MS. WERTH:  Same, join.
18    THE WITNESS:  A  I read the summary report
19 of the investigation; and I looked at the
20 corresponding attachments, which would be
21 individual reports, photographs, lab reports, et
22 cetera, in terms of looking to ensure that the
23 investigation was complete, that everything that
24 needed to be done had been done, and then I would

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 14

SCOTT ANDO
November 5, 2015

Page 56

1  make a determination as to whether the charges
2  should be sustained or otherwise, that they're
3  not sustained, exonerated, or unfounded.  And in
4  the case of sustained, as in this case, recommend
5  discipline.
6      MR. MORRISSEY:  Q   When you conducted that
7  review did you review whether or not there were
8  any witnesses, potential witnesses that had not
9  been contacted by the investigator of IPRA?
10     **A  Yes.**
11     Q   And would -- did you -- Were you
12  comfortable at that time in December of 2014 that
13  the only witnesses to the occurrence were police
14  officers inside the lockup area at the Sixth
15  District?
16     **A  I was.**
17     Q   Was there any question in your mind that
18  where the incident between Rita King and
19  Commander Evans took place that the lockup
20  facilities where arrestees were being held was
21  not in plain view?
22     **A  I had no idea what the schematics of the**
23  **room were and whether or not anyone could see**
24  **from anywhere else.**

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 58

1      MS. HARRIS:  Join.
2      MS. WERTH:  -- and you're asking him to
3  speculate as to where it came from.
4      MR. MORRISSEY:  Q   When a file is submitted
5  for your review as chief of IPRA does the
6  investigator make a recommendation?
7      THE WITNESS:  A   Not generally.
8      Q   In the case of Rita King did the
9  investigator make a recommendation?
10     **A  Not that I'm aware of.**
11     Q   Does the investigator's supervisor make a
12  recommendation?
13     **A  They did.**
14     Q   Is that a standard procedure at IPRA that
15  the supervisor of a CR file will make a
16  recommendation to the chief?
17     **A  It was.**
18     Q   And in the case of Rita King did -- was
19  his supervisor Patrick Querfurth?
20     **A  Querfurth.**
21     Q   Querfurth.
22     **A  Q-U-E-R-F-R-U-T-H -- yes.**
23     Q   And is it correct that he made a
24  recommendation in regards to Glenn Evans of 20

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 57

1      Q   You mentioned yesterday or the day before
2  you looked at a schematic of the lockup area?
3      **A  I did.**
4      Q   And where are the lockup cells in
5  relation to where the photograph equipment and
6  the fingerprint equipment are located at the
7  Sixth District?
8      MS. WERTH:  I'm going to object to
9  foundation, lacks personal knowledge.  You can
10  answer if you know.
11     THE WITNESS:  A   I don't remember
12  specifically; but people in the lockup cannot see
13  where -- what was going on in the processing
14  area.
15     MR. MORRISSEY:  Q   Okay, and did you receive
16  that schematic from some member of the Chicago
17  Police Department?
18     **A  I just received it in the file itself.**
19     Q   Okay.  But, presumably, it came from the
20  CPD?
21     MR. PALLES:  Object to the form --
22     MS. KUPE-ARION:  Object to the form of the
23  question and competence.
24     MS. WERTH:  And --

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 59

1  days disciplinary?
2      **A  He did.**
3      Q   And in regards to Officer Sutton and
4  Officer Clifford seven days each?
5      **A  I believe so.**
6      Q   And is there any type of guideline for
7  supervisors to make recommendations to the chief
8  of IPRA in regards to sustained files against
9  police officers?
10     **A  At that time, no.  They made a**
11  **recommendation on that form.**
12     Q   Is there currently some type of
13  disciplinary form that supervisors review before
14  making recommendations?
15     **A  There is no form.  We have discussions.**
16     Q   So there's no written document --
17     **A  No.**
18     Q   -- at IPRA?
19         And that's in IPRA, Internal IPRA
20  discussion in regards to disciplinary
21  recommendations?
22     **A  Correct, it's to ensure that each**
23  **supervisor -- that that disciplinary**
24  **recommendation coming out of our office are**

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 15

SCOTT ANDO
November 5, 2015

Page 60

1  consistent.

2  Q   Okay, did you make, did you make any

3  recommendation in regards to Glenn Evans in

4  regards to Rita King's CR?

5  A   I did.

6  Q   And what did you recommend?

7  A   I recommended 15 days.

8  Q   Why did you determine that it was

9  appropriate -- Strike that.

10         You had previously recommended that his

11 police powers be removed, correct, at that time?

12 A   Um-hum.

13 Q   You have to answer yes or no.

14 A   Yes, I believe so.  I'm not sure of the

15 timing.

16 Q   And your recommendation that his police

17 powers should be removed was based upon not only

18 the Ricky Williams' file, correct?

19 MS. WERTH:  Objection to the form of the

20 question.

21 MR. MORRISSEY:  Well, let me rephrase that.

22 Q   When you recommended to Superintendent

23 McCarthy that Glenn Evans be, his police powers

24 be removed did you look at any other CR files?

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 62

1  question?  Your supervisor had recommended 20

2  days of discipline.

3  THE WITNESS:  A   Um-hum.

4  Q   At that time there was no -- Well, strike

5  that.

6         Your supervisor recommended 20 days.

7  Why did you feel that it should be reduced to 15?

8  A   Because I felt 15 days was the

9  appropriate discipline for that sustained case.

10 Q   Based upon what?

11 MS. WERTH:  Objection to the form of the

12 question.

13 MR. MORRISSEY:  Q   What did you base your

14 judgment that 15 days was appropriate?

15 THE WITNESS:  A   Experience and past

16 practice in similar cases.

17 Q   Past practice at IPRA?

18 A   Past practice in disciplinary

19 recommendations for similar offenses.

20 Q   Is 15 days considered a high disciplinary

21 recommendation to be made by the chief of IPRA?

22 MR. PALLES:  Object --

23 MS. WERTH:  Objection to the form of the

24 question --

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 61

1  A   No, just the Ricky Williams' file.

2  Q   Were you aware of the other complaints

3  over the years that had been made about Glenn

4  Evans?

5  MS. WERTH:  I think we've gone over that,

6  asked and answered.  You can do it again.

7  THE WITNESS:  A   I believe I was aware of

8  other complaints; but it was -- I was certainly

9  aware of it then once the Ricky Williams'

10 complaint came up.

11 Q   Given your recommendations in the summer

12 of 2014 that Glenn Evans' police powers be

13 terminated, why did you recommend in regards to

14 the Rita King CR that the discipline be reduced

15 from 20 days to 15?

16 MR. PALLES:  I'm going to --

17 MS. WERTH:  Objection to the form of the

18 question, misleading and --

19 MR. PALLES:  States facts not in evidence.

20 MS. WERTH:  Right.

21 MS. HARRIS:  Join.

22 MS. KUPE-ARION:  Join.

23 MS. WERTH:  And it's argumentative.

24 MR. MORRISSEY:  Q   Do you understand the

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 63

1  MS. HARRIS:  Object --

2  MS. KUPE-ARION:  Object --

3  THE COURT REPORTER:  Wait, everybody state

4  your objection separately.

5  MR. PALLES:  I'm sorry, objection, lack of

6  foundation.

7  MR. MORRISSEY:  Q   Let me rephrase it.  When

8  you were chief, as chief of IPRA have you

9  recommended disciplinary action before to the

10 superintendent?

11 THE WITNESS:  A   Yes.

12 Q   What is the range of discipline that

13 you've recommended to Superintendent McCarthy for

14 sustained CRs?

15 A   Anywhere from violation noted to

16 separation.

17 Q   A violation notice would carry what type

18 of penalty?

19 A   None, just a notation that they made a

20 violation.  Discipline starts at a reprimand.

21 Q   Okay.  Now, in regards to Officer Sutton

22 and Officer Clifford what violation was sustained

23 against those two officers?

24 MS. WERTH:  Do you want to show him the --

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 16

SCOTT ANDO
November 5, 2015

Page 64

1   MR. MORRISSEY:  Q   Well, I'm just asking do
2   you recall --
3       MS. WERTH:  If he remembers --
4       MR. MORRISSEY:  Q   -- what allegations were
5   sustained against Clifford and Sutton?
6       THE WITNESS:  A   The allegations that were
7   made against them that were later not sustained
8   was that they failed to report misconduct on the
9   part of Commander Evans.
10      Q   What allegations were sustained against
11  those two officers, Sutton and Clifford?
12      A   **None.**
13      Q   When you made a disciplinary
14  recommendation for Clifford and Sutton what
15  allegations had been sustained?
16      A   **That they failed to report misconduct on**
17  **the part of Commander Evans.**
18      Q   And in December of 2014 you concurred
19  with that finding?
20      A   **I did.**
21      Q   What -- After you made that
22  recommendation did you then send it to
23  Superintendent McCarthy's office?
24      A   **I did.**

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 66

1       MS. WERTH:  I'm sorry, which determination?
2       MR. MORRISSEY:  In December of 2014.
3       MS. KUPE-ARION:  But which determination --
4       MR. MORRISSEY:  The determination in December
5   of '14, which you just testified to, that Evans
6   would be -- the recommendation would be 15 days
7   for Evans and one day for each of the other
8   officers.
9       MS. WERTH:  I'm not sure I understand.  I'm
10  confused by the question.
11      MR. MORRISSEY:  Q   Do you understand the
12  question?
13      THE WITNESS:  A   I do.  It would be part of
14  the electronic record.  It would be reflected in
15  CLEAR, but I don't know that date.
16      Q   Under the IPRA ordinance how long does
17  the superintendent's office review the
18  recommendation?
19      A   **He has 90 days.**
20      Q   By "he" you mean the superintendent of
21  police?
22      A   **Correct.**
23      Q   After you made the recommendation in
24  regards to Glenn Evans you continued to have

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 65

1       Q   How does a recommendation from the chief
2   of IPRA get transmitted to Superintendent
3   McCarthy's office?
4       A   **It's submitted electronically in CLEAR,**
5   **which is the database; and it is also the paper**
6   **file is delivered to the Bureau of Internal**
7   **Affairs.**
8       Q   By the paper file you mean all the
9   supporting documentation for the investigation is
10  given to IAD?
11      A   **Correct.**
12      Q   And if you made your finding on December
13  18th, 2014 when would that finding be entered
14  into the CLEAR System?
15      MS. WERTH:  Objection to foundation, personal
16  knowledge.  You can answer if you know.
17      THE WITNESS:  A   My recommendation would be
18  entered into the CLEAR System by me when I closed
19  the case, which would then cause it to be sent
20  over electronically.  It would actually go to our
21  Records Department; and then they send it over
22  electronically.
23      Q   In looking at the file yesterday did it
24  reflect when you made that determination?

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 67

1   monthly meetings with Superintendent McCarthy,
2   correct?
3       MS. WERTH:  Objection to the form of the
4   question, over broad, vague.
5       THE WITNESS:  A   I'm sure I had meetings.  I
6   don't recall when they were or how many were
7   cancelled or how many we had; but I know there
8   were meetings since then, sure.
9       MR. MORRISSEY:  Q   In those meetings
10  subsequent to making the recommendation in
11  December of 2014 in regards to the Rita King file
12  did you ever -- was that ever brought up with
13  Superintendent McCarthy?
14      A   **Yes.**
15      Q   When?
16      A   **Don't know.**
17      Q   Was it at one of the monthly meetings?
18      A   **Yes.**
19      Q   And what -- what did Superintendent
20  McCarthy say?
21      A   **That they were sending the case back for**
22  **further investigation so that we could determine**
23  **if there were additional witnesses who were in**
24  **the lockup at the time that may have witnessed**

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 68

1  the misconduct and if we identified those
2  witnesses to interview them.
3      Q  Who was present during this conversation
4  between you and Superintendent McCarthy?
5      A  I don't recall.
6      Q  Was there any written document, record
7  that was sent by Superintendent McCarthy to you
8  as IPRA, as the IPRA chief, in regards to the
9  Rita King CR?
10     A  I believe the only communication relative
11 to that would have been electronically in CLEAR,
12 and it would say something like returned for
13 further investigation.
14     Q  Do you know whether or not the
15 superintendent orally informed you that he was
16 sending it back to IPRA for -- to reopen the
17 investigation, whether that was done within the
18 90-day period?
19     MS. KUPE-ARION:  Objection to the form of the
20 question --
21     MS. WERTH:  Objection --
22     MS. KUPE-ARION:  -- and relevance.
23     MR. MORRISSEY:  It's a discovery deposition.
24 It doesn't have to be relevant.

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 69

1      MR. PALLES:  Well, it's actually not a
2  discovery deposition -- that being limited to
3  Illinois practice.  It's actually a deposition.
4      MR. MORRISSEY:  It's a deposition, all right;
5  but it is a discovery --
6      MS. WERTH:  Federal rules apply.  So that's
7  why we make all these objections because it's not
8  a state court proceeding.
9      MR. MORRISSEY:  Q  You believe within 90
10 days Superintendent McCarthy orally told you that
11 he was going to, he was requesting you to reopen
12 the investigation?
13     THE WITNESS:  A  The superintendent by the
14 ordinance has 90 days to either accept or not
15 concur.  If I do not receive any nonconcurrence
16 it is accepted.  My recommendation was accepted.
17 So in order for it to be sent back for further
18 investigation it would have to have been within
19 the 90-day period.
20     Q  Now, in the documents that you -- that
21 reopened -- Strike that.
22          To your knowledge when was the
23 Rita King investigation reopened by IPRA?
24     A  It was returned to us for further

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 70

1  investigation.  I don't know.  Again, I could do
2  as you could and look in the log.
3          (counsel marked document)
4      MR. MORRISSEY:  Q  Showing you -- In regards
5  to Rita King, when Superintendent McCarthy
6  required IPRA to reopen the investigation does
7  that mean that the three officers were still not
8  disciplined?
9      MS. KUPE-ARION:  Objection to the form of the
10 question.
11     MS. HARRIS:  Join.
12     MS. WERTH:  Objection to the foundation,
13 lacks personal knowledge.
14     MS. HARRIS:  I'll join that as well.
15     MR. PALLES:  I'll join.
16     MS. KUPE-ARION:  Join.
17     MR. MORRISSEY:  Q  Do you understand the
18 question?
19     THE WITNESS:  A  Yes.  Yes.
20     Q  Okay, showing you what's been marked as
21 Exhibit D, these are documents just turned over
22 yesterday, it's 10500 and 10501, I want you to
23 take a look at that document.  Before I ask you
24 about that document --

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 71

1      MS. WERTH:  I can share with you.
2      MR. MORRISSEY:  Q  You've either been the
3  acting chief or the chief of IPRA for,
4  approximately, a year and a half?
5      THE WITNESS:  A  Um-hum.
6      THE COURT REPORTER:  Is that yes?
7      THE WITNESS:  Yes.
8      MR. MORRISSEY:  Q  During that year and a
9  half period of time how many recommendations has
10 your office made to the superintendent to
11 discipline a police officer?
12     MS. KUPE-ARION:  I'm sorry, what was the
13 question?
14     MR. MORRISSEY:  You can read it back.
15          (last question read back)
16     THE WITNESS:  A  I don't know the exact
17 number.
18     MR. MORRISSEY:  Q  Is it more than ten?
19     A  Yes, much more than ten.
20     Q  More than 100?
21     A  Much more than 100.
22     Q  More than 200?
23     A  200 to 300, somewhere in that range.
24     Q  Of those two to three hundred files,

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 18

SCOTT ANDO
November 5, 2015

Page 72

1  disciplinary -- Strike that.
2          Of the two or three hundred completed
3  CR files which were forwarded to the
4  superintendent for discipline, on how many
5  occasions has the superintendent of police asked
6  for the file to be reopened?
7      A   That can happen at a lower level as well
8  based on command channel review in the police
9  department.  It doesn't happen all that often.  I
10 couldn't come up with a number.
11     Q   In the last month how many files have
12 been returned to you from the superintendent of
13 police or the command channel of the CPD to
14 reopen after IPRA has made a finding against the
15 accused police officer?
16     MR. PALLES:  Objection to relevance, lack of
17 foundation, incomplete hypothetical.
18     MS. HARRIS:  Join.
19     MS. KUPE-ARION:  Join.
20     MS. WERTH:  Join, and to lack of personal
21 knowledge.
22     MR. MORRISSEY:  Q   Well --
23     THE WITNESS:  A   I'm not aware of any, but
24 that doesn't mean that there haven't been cases

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 73

1  returned for further investigation below my
2  level.
3      Q   As the IPRA chief when a
4  recommendation -- Strike that.
5          All IPRA recommendations to the
6  superintendent's office are approved by you as
7  the chief, correct?
8      A   All sustained recommendations go through
9  me.
10     Q   Okay.  And would it also be true that
11 when you recommend a sustained investigation that
12 the superintendent's office or the command
13 channel at CPD would communicate back to you as
14 the IPRA chief that they want an investigation
15 reopened?
16     MS. KUPE-ARION:  Objection to the form of the
17 question.
18     MS. WERTH:  I join in that.
19         Do you understand the question?
20     THE WITNESS:  Yeah.  It's just, it's hard to
21 explain the process.
22     MR. MORRISSEY:  Q   Well, tell me what
23 happens.
24     A   If in a command channel review, so if

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 74

1  it's a police officer and you're talking a
2  sergeant, a lieutenant, captain, or commander,
3  right on up, they would review it and they may
4  not concur; and in that nonconcurrence they may
5  say they don't concur with a finding in a certain
6  allegation, they may say they agree with the
7  finding but not the level of discipline
8  recommended, and they can also say that they
9  think that further investigation is needed,
10 generally, interview a witness or something else
11 that they feel was missed.  So that can happen;
12 and that, and that happens more often than I
13 would be aware of, it happens at that level.
14     Q   So if you sustain a CR against a police
15 officer that police officer's commanding officer
16 could review it and send it back to IPRA because
17 he or she might not approve of your
18 recommendation, correct?
19     A   They can say they don't concur, and it
20 would be up to the deputy chief reviewing it to
21 determine whether we agree with that
22 nonconcurrence and are going to do anything to
23 change either the finding or the discipline or
24 conduct further investigation.

TOOMEY REPORTING
312-853-0648

SCOTT ANDO
November 5, 2015

Page 75

1      MS. WERTH:  Finished?
2      MR. MORRISSEY:  I'm thinking.
3      Q   When a police officer retires before the
4  superintendent of police finally reviews the --
5  Strike that.
6          In the event that the chief of IPRA
7  recommends a form of discipline for a police
8  officer on a sustained file and it goes to the
9  superintendent's office and between the time the
10 officer -- between the time the superintendent
11 responds to the recommendation by you as the
12 chief he or she retires does that have any impact
13 on the investigation?
14     MR. PALLES:  I'm going to object as an
15 incomplete hypothetical but, also, really to the
16 relevance.
17     MS. KUPE-ARION:  I join in that.
18     MS. HARRIS:  I join.
19     MS. WERTH:  I'll join to the incomplete
20 hypothetical.  And it calls for speculation.
21 Each case has to be different.
22     THE WITNESS:  A   If someone retires in the
23 hypothetical situation you present the
24 investigation would still have been completed;

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 19

SCOTT ANDO
November 5, 2015

Page 76

1  and the sustained findings and any recommendation
2  for discipline relative to that officer would be
3  placed in what we call a closed-hold status
4  because we, obviously, can't suspend them if
5  they've been retired.  So it goes into a
6  closed-hold status is the answer.
7      MR. MORRISSEY:  Q   Looking at Exhibit D does
8  that refresh your memory when the file, the
9  investigative file, was returned to IPRA
10 involving --
11     **A  Yes.**
12     Q  -- the three officers?
13     **A  Yes.**
14     Q  And that's May 19th, 2015?
15     **A  Correct.**
16     Q  When Superintendent McCarthy sent it back
17 to IPRA did he provide any written instructions
18 in regards to what IPRA is required to do?
19     MS. KUPE-ARION:  Objection to the form of the
20 question and competence.
21     MS. WERTH:  Objection to lack of personal
22 knowledge.  You can answer if you know.
23     MS. HARRIS:  Join.
24     THE WITNESS:  A   There may have been, and I

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 77

1  assume there are --
2      MS. WERTH:  Don't assume, don't guess.
3  Personal knowledge, if you know.
4      THE WITNESS:  A   He didn't, he didn't send
5  anything written to me.
6      MR. MORRISSEY:  Q   All right, generally,
7  when the superintendent, when the superintendent
8  sends back a file for review by IPRA is it
9  accompanied by any written instructions?
10     MS. KUPE-ARION:  Objection to the form of the
11 question.
12     MS. WERTH:  Join.
13     MS. HARRIS:  Join.
14     THE WITNESS:  A   There may be written
15 instructions.  There have to be written
16 instructions in CLEAR in the review, in the
17 command channel review.
18     MR. MORRISSEY:  Q   Is that pursuant to the
19 city ordinance that the superintendent has to
20 respond within 90 days when he decides to not
21 accept a recommendation by the chief of IPRA?
22     **A  It's not in the ordinance per se.  The**
23 **procedure, as in this case, they're asking for**
24 **further investigation.  They have to tell you**

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 78

1  **what it is they think you missed and that you**
2  **need to continue your investigation.**
3      MR. MORRISSEY:  Go off the record.
4          (WHEREUPON, a discussion was
5          held off the record)
6      MR. MORRISSEY:  I'll make this E.  I'll show
7  you what's being marked Exhibit E.  It's the
8  documents your attorney just mentioned.
9          (counsel marked document)
10     MS. WERTH:  Exhibit?
11     MR. MORRISSEY:  E, it's 10370 through 84.  Do
12 you have that in front of you?
13     MS. WERTH:  Is it all of this?  Wait, I think
14 it's more --
15     THE WITNESS:  It says one of 15 pages.
16     MS. WERTH:  Yeah, I have --
17     THE WITNESS:  Do you need this?
18     MS. WERTH:  You've given me --
19     MR. MORRISSEY:  That's the exhibit I'm
20 tendering.
21     MR. PALLES:  There's like 385 through 93, you
22 want those as well?
23     MR. MORRISSEY:  Q   Well, looking at Exhibit
24 E, does this document -- is this a document from

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 79

1  CLEAR?
2      THE WITNESS:  A   Yes.
3      Q   Okay, does it reflect --
4      MS. KUPE-ARION:  Can you specify the pages?
5  We're still not all clear on how many different
6  documents there are in this packet.
7      MR. MORRISSEY:  Well, there's a document that
8  Chief Ando has I think it's 10370 --
9      MS. KUPE-ARION:  Well --
10     MR. MORRISSEY:  -- through 103 --
11     MS. KUPE-ARION:  -- I would like him to go
12 through it and make sure that they're all
13 CLEAR --
14     MS. WERTH:  Yeah, you've just handed him a
15 multiple-page document.  I mean if you have
16 specific questions on specific pages of this
17 document, please proceed; but if you're going to
18 ask him does this document do blah-blah I think
19 that's not fair because he can't sit here and
20 read every line in every page of this multi-page
21 document to answer your question.  So what is
22 your question?
23     MR. MORRISSEY:  Q   Chief, you said that when
24 a -- the superintendent's office sends back a

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 20

Page 80

1  sustained file to IPRA that they make a notation,
2  generally, in CLEAR in regards to the remarks or
3  their recommendations for follow-up
4  investigation.
5      THE WITNESS: A   Right.
6      Q   Looking at this document does this
7  document reflect in regards to the Rita King file
8  what recommendations were made by the CPD to
9  IPRA?
10     A   Yes.
11     Q   And on what page would those
12 recommendations be found?
13     A   Page 5 --
14     MS. KUPE-ARION:  Can you provide --
15 (inaudible).
16     THE COURT REPORTER:  I'm sorry?
17     MS. KUPE-ARION:  I'm asking to tell us what
18 Bates stamp number that has.
19     MS. HARRIS:  The numbers are at the bottom,
20 FCRL --
21     MS. WERTH:  Yeah, it's -- I can tell you.
22     MS. KUPE-ARION:  Thank you.
23     MS. WERTH:  Page 5 is FCRL 10374.
24     MR. MORRISSEY:  Q   On this exhibit, on that

Page 81

1  page 10374, what member of the CPD communicated
2  back to IPRA in regards to the Rita King
3  sustained file?
4      MS. WERTH:  According to this document,
5  right?
6      MR. MORRISSEY:  That's what I asked.  He's
7  looking at the document.
8      THE WITNESS: A   On page 5 it appears that
9  it was Marvin Shear; and on pages 10, 11, 12, and
10 13 it appears -- it's hard to tell based on the
11 way the printout came -- but it appears to be
12 Wayne Gulliford, G-U-L-L-I-F-O-R-D.
13     Q   Looking at page -- say page 10 of 15,
14 looking at, which is Bates stamped 10379, I think
15 it's page 10 you're referring to, where on that
16 page does it reflect this other person?
17     A   It doesn't on 10.  But I see that the
18 narrative starts on the right; but as you go to
19 the next page it shows Wayne Gulliford.
20     MS. KUPE-ARION:  I just want to --
21     MR. MORRISSEY:  That's on page 103.
22     MS. KUPE-ARION:  Before counsel asks anymore
23 questions, are you still asking with regards to
24 Glenn Evans or other officers?  Because other --

Page 82

1  different officers have different people who have
2  reviewed this in the command channel.  So are we
3  still talking about Glenn Evans?
4      MR. MORRISSEY:  I'm talking about his
5  recommendations in regards to the CR file filed
6  by Rita King.
7      MS. KUPE-ARION:  No, you were asking about
8  command channel review.  My question is that
9  since there are different officers listed in this
10 complaint, are you asking specifically in regards
11 to Glenn Evans or any of the other named
12 defendants?  That's my question.  Because that
13 will change the answer.
14     MS. HARRIS:  That's what I want to know.
15     MR. MORRISSEY:  Well, you'll have a chance to
16 follow up after the end of --
17     MS. HARRIS:  Well, it's not so much following
18 up, counsel.  You're asking which -- who reviewed
19 for these officers; and you haven't specified
20 which officers.  Every single page is a different
21 officer and a different person that reviewed it.
22 So it's vague.
23     MR. MORRISSEY:  Q   All right, in regards to
24 the Rita King investigation, when it was remanded

Page 83

1  by Superintendent McCarthy --
2      MS. KUPE-ARION:  Objection, that's a
3  misrepresentation of the testimony --
4      MR. MORRISSEY:  Q   Well, when the file came
5  to IPRA in regards to the CR of Rita King were
6  there multiple instructions given to IPRA by
7  different members of -- from the CPD?
8      THE WITNESS:  A   There were multiple remarks
9  in CLEAR relative to their reviews.
10     Q   Okay, specifically to Glenn Evans was the
11 only person that commented on the finding against
12 Glenn Evans Marvin Shear?
13     A   It would appear to be.
14     Q   Okay, in regards to the other two
15 officers, Sutton and Clifford, were there
16 multiple members of the command staff at CPD that
17 commented on that?
18     A   Yes.
19     Q   Do you know who Wayne Gulliford is?
20     A   I do.
21     Q   Who is he?
22     A   Currently he's the chief of patrol.
23     Q   Do you know why on page 10380 he would be
24 in a position to comment on the Rita King

Page 84

```
1   sustained file?
2       MS. WERTH:  Objection --
3       MS. HARRIS:  Objection --
4       MS. WERTH:  -- lack of personal knowledge --
5       MS. HARRIS:  Join --
6       MS. WERTH:  -- as to why somebody would be --
7       MR. MORRISSEY:  Well, that's why I'm asking.
8   It's discovery.
9       MS. WERTH:  Right.  And I'm making my
10  objection, counsel, lacks personal knowledge.
11      MR. MORRISSEY:  I don't know, we don't know.
12  That's why I'm asking does he know why Wayne
13  Gulliford would have commented about this CR file
14  by Rita King.
15      MS. HARRIS:  Same objection --
16      MS. WERTH:  You can answer as to whether you
17  know why he would have commented.
18      MR. PALLES:  Objection --
19      THE WITNESS:  A   Because the officers are
20  patrol officers; and Chief Gulliford is the chief
21  of patrol, so he is in their chain of command
22  and, therefore, command channel review.
23      MR. MORRISSEY:  Q   So, just to be clear, if
24  the IPRA chief recommends a sustained file
```

Page 86

```
1   procedures that require the case to move through
2   CLEAR do and the collective bargaining agreements
3   between the union and the city require us to
4   provide for a command channel review.
5       MR. MORRISSEY:  Q   After the -- looking at
6   Exhibit D again, the investigator's notes between
7   May and -- May 19th, 2015 and November 4th, 2015
8   what -- what steps did you take after the
9   investigation came back to IPRA personally?
10      A   I advised Supervisor Querfurth that we
11  were being requested to further investigate
12  because the command channel review did not concur
13  with the allegations and the findings against
14  Officers Sutton and Clifford, as well as to
15  determine if we could identify and interview
16  witnesses that may have been in the lockup who
17  may have seen the incident.
18      Q   Was that shortly after getting it back in
19  May of 2015?
20      A   Yes.
21      Q   Did you participate or talk to
22  Investigator Franko about the CR after May of
23  2015?
24      A   I did.
```

Page 85

```
1   finding against a police officer that police
2   officer's commander, commanding officer can
3   always ask IPRA to review the finding?
4       MS. WERTH:  Objection to the term "always".
5   You can answer.
6       THE WITNESS:  A   They can make remarks in
7   CLEAR relative to their review and any
8   disagreements that they may have, any
9   nonconcurrences.  Within that nonconcurrence
10  there could be a request for us to do more.
11      MR. MORRISSEY:  Q   Under your charter, under
12  the IPRA chapter in the municipal code, is there
13  any portion of the municipal code that allows an
14  officer's commanding officer to request a
15  reconsideration of the finding against a police
16  officer?
17      MR. PALLES:  Objection, lack of foundation.
18      MS. HARRIS:  Join.
19      MS. WERTH:  Objection, calls for interpreting
20  the municipal code as we sit here.
21      MS. KUPE-ARION:  Objection, form of the
22  question.
23      THE WITNESS:  A   I don't know that the
24  municipal code would, but certainly the
```

Page 87

```
1       Q   When did you do that?
2       A   Judging by the log, it would have been at
3   some point after 8 October, 2015, so October into
4   November, because that's when I looked at the
5   diagrams of the Sixth District and the memo that
6   you alluded to earlier relative to Sergeant
7   Snelling and the interview within the academy.
8       Q   Is Sergeant Shelling from the academy, is
9   that --
10      THE COURT REPORTER:  "Is that", I'm sorry --
11      MR. MORRISSEY:  Shelling, I guess it's --
12      THE COURT REPORTER:  No, I'm missing the end
13  of it because of the siren.  Can you repeat that
14  question again, please.
15      MR. MORRISSEY:  Oh, I'm sorry.
16      Q   The question is:  On page 10501 there's a
17  gentleman by the name of Sergeant Shelling --
18      MS. KUPE-ARION:  Snelling.
19      MR. MORRISSEY:  Q   Snelling -- it looks
20  like an H; and it looks like August 14th, 2015.
21  That's the individual you're talking of, talking
22  about?
23      THE WITNESS:  A   Yes.
24      Q   All right, when you reviewed this file
```

Plaintiff's Exhibit 1 Page 22

Page 88

1   yesterday you were aware you were going to sit
2   for a deposition today, I assume?
3       **A   Yes.**
4       Q   What did you do yesterday in -- Did you
5   conclude the file yesterday?
6       **A   I did.**
7       MS. WERTH:  Objection to form of the
8   question.  What do you mean by "conclude the
9   file"?
10      MS. KUPE-ARION:  Join, I join in that
11  objection.
12      MR. MORRISSEY:  Okay, let me rephrase it.
13      MS. HARRIS:  Join.
14      MR. MORRISSEY:  Q   Yesterday, November 4th,
15  2015, what did you do in regards to the CR file
16  filed by Rita King?
17      THE WITNESS:  A   The file had already been
18  reviewed by me yesterday.  All I did was close it
19  electronically in CLEAR.
20      Q   Prior to November 4th when did you review
21  the file in detail?
22      **A   Within the last week or two.  I don't**
23  **know exactly when.**
24      Q   And yesterday -- I don't see any

Page 90

1       MR. PALLES:  You've got to be kidding.  I got
2   a kid to pick up too.
3       MS. KUPE-ARION:  Yeah --
4       MR. MORRISSEY:  Q   All right, on page 10383
5   does it reflect any recommendation you made in
6   regards to Officer Clifford?
7       MS. WERTH:  Officer Clifford?
8       MR. MORRISSEY:  Yeah.
9       THE WITNESS:  A   Well, what it shows as
10  you're looking under the review, which is under
11  Accused Penalty History, you'll see that when you
12  get to the first mention of Dennis Clifford
13  you'll see that the original penalty was a
14  suspension of one day, which is what I had
15  recommended originally, and now there is no
16  penalty; and the reason is there is no penalty,
17  and the same applies for Rosilynn Sutton, is that
18  the charges were not sustained against them.  But
19  it does reflect the penalty of 15 days suspension
20  recommended for Commander Evans.
21      Q   The original sustained file -- finding
22  against Officer Sutton was what in December of
23  2014?
24      **A   It was sustained for failure to report**

Page 89

1   recommendation on Group Exhibit D that you now
2   are making in regards to Glenn Evans and Officers
3   Sutton and Officer Clifford, correct?
4       **A   I don't see -- it's not in the log, no.**
5       Q   Okay, did you prepare any report
6   yesterday or previous -- did you -- after the
7   file was sent back by the superintendent did you
8   prepare any further recommendation in regards to
9   those three members of the CPD?
10      MS. WERTH:  Counsel, let me direct you to
11  Exhibit E, maybe that will help, because --
12      MR. MORRISSEY:  Where is it, what page?
13      MS. WERTH:  Page FCRL 10383.
14      MR. MORRISSEY:  It's the document you have.
15      MS. WERTH:  Maybe that answers your question.
16  I think we're belaboring this, and I'm just
17  trying to expedite.
18      MR. MORRISSEY:  That's fine.
19      MS. KUPE-ARION:  How much longer do you have?
20      MR. MORRISSEY:  I don't know, maybe ten more
21  minutes.
22      MS. WERTH:  We'll hold you to that, Tom.
23      MR. MORRISSEY:  No, I said maybe, notice the
24  word maybe.

Page 91

1   **misconduct on the part of Commander Evans.**
2       Q   And that's the same for Clifford?
3       **A   Correct.**
4       Q   Yesterday you sustained again the finding
5   against Officer -- or Commander Evans, correct?
6       **A   Yes, I did.**
7       Q   And what sustained finding did you
8   determine was appropriate for Glenn Evans
9   yesterday?
10      **A   That he used excessive force.**
11      Q   Okay, why then have you decided that it
12  would be a not sustained -- Strike that.
13          Why had you changed your -- based upon
14  your review and your IPRA's review, why has the
15  previous sustained findings against Clifford and
16  Sutton been changed?
17      MS. HARRIS:  Object to form.
18      THE WITNESS:  A   Well, first and foremost,
19  it was -- the allegation was failure to report
20  misconduct.  In investigator Franko speaking with
21  Sergeant Larry Snelling at the police academy,
22  who is the primary use of force instructor at the
23  academy, we learned that applying pressure to the
24  nose is an acceptable pain compliance technique

Plaintiff's Exhibit 1 Page 23

Page 92

1  taught to officers at the academy. Therefore,
2  unless they could measure, you know, the amount
3  of force Commander Evans was using they would not
4  recognize the use of something they were trained
5  to use as a pain compliance technique as
6  misconduct.
7     Q   Now, your finding why did you sustain a
8  finding against Evans that he used excessive
9  force?
10    A   Because there's a preponderance of
11 evidence to believe that he did.
12    Q   Was there any -- was there a
13 preponderance of evidence that Miss King did not
14 strike Evans -- Rephrase the question.
15        Is there any -- During the
16 investigation and the interview of Sutton and
17 Clifford was there any indication that Miss King
18 used any -- struck or hit Glenn Evans?
19    A   No.
20    Q   Did you listen to the transcripts of the
21 interview by Franko with Clifford and Sutton?
22    A   I definitely read them.  I don't know if
23 I listened to them.  I don't recall.
24    Q   I'll take a two-minute break -- make it

---

Page 93

1  five.
2        (WHEREUPON, a short break was held)
3     MR. MORRISSEY:  Q   Is -- Do you know of any
4  other recommendations by IPRA in regards to Glenn
5  Evans to the superintendent's office that had
6  been sent back for further review, other than
7  Rita King?
8     THE WITNESS:  A   I'm not aware of any, no.
9     MS. KUPE-ARION:  Objection, asked and
10 answered, form of the question, competence.
11    MS. HARRIS:  And relevance.
12    MR. MORRISSEY:  Q   Now that you've made a
13 recommendation in regards to Evans again does the
14 clock begin to run a second time, that there's a
15 90-day period for the superintendent to review
16 your findings?
17    THE WITNESS:  A   Yes.
18    Q   In regards to the other two officers,
19 Sutton and Clifford, is there any further review
20 in regards to those officers?
21    A   I'm not sure if it goes through command
22 channel review again or not.
23    Q   But you've now not sustained all
24 allegations against Clifford and Sutton, correct?

---

Page 94

1     A   Right, I think they only had one each.
2     Q   Okay, to your knowledge was Linda Franko
3  off for an extended period of time while you were
4  with IPRA?
5     MS. WERTH:  Objection to -- well --
6     THE WITNESS:  A   Yes, she was.
7     MS. WERTH:  -- personal -- okay.
8     MR. MORRISSEY:  Q   In the event that an
9  investigator is not at work for a period of time
10 is there any procedure at IPRA to have another
11 investigator take over his or her file?
12    THE WITNESS:  A   That would be up to the
13 supervisor, depending on the length of time the
14 person would be absent.
15    Q   To your knowledge how long was -- I'll
16 rephrase the question.
17        From the time Rita King filed her
18 complaint in April of 2011 to November of 2013
19 for what period of time was Miss Franko not
20 present --
21    MS. WERTH:  Objection --
22    MR. MORRISSEY:  -- at IPRA, if you know?
23    MS. WERTH:  Objection, this person lacks
24 personal knowledge.  Also, you have documents --

---

Page 95

1     MR. MORRISSEY:  Well, we've made a production
2  request for her, her work schedule.
3     Q   But to your knowledge for what period of
4  time was she absent?
5     MS. WERTH:  What does her work schedule have
6  to do with anything?
7     MR. MORRISSEY:  Well, that apparently is your
8  position in regards to why this file has been
9  opened for an extended period of time.  So that's
10 why I'm asking --
11    MS. WERTH:  That's not our position.  But,
12 anyway, answer the question, if you remember what
13 it is.
14    THE WITNESS:  A   I know for an extended
15 period of time she was out intermittently.  I
16 don't know that she was out continuously for a
17 great length of time.
18    MR. MORRISSEY:  Q   By intermittently do you
19 mean more than a month at a time?
20    A   I mean a week, two weeks.  Her husband
21 was terminally ill and passed away.
22    MS. WERTH:  Yeah, we're now getting into some
23 HIPAA concerns about an employee.  Yes, she was
24 absent for some medical reasons.

Plaintiff's Exhibit 1 Page 24

Page 96

1  MR. MORRISSEY:  Q   Is there any procedure
2  now at IPRA if an employee, meaning an
3  investigator, is absent for a period of time for
4  those files to be given to another investigator?
5  MS. HARRIS:  Objection, relevance, remedial
6  measures --
7  MS. WERTH:  Objection, it's been asked and
8  answered --
9  THE COURT REPORTER:  I'm sorry, one at a
10  time, "objection" --
11  MS. HARRIS:  Objection, relevance, remedial
12  measures, irrelevant.
13  MS. WERTH:  And it's been asked and answered.
14  MS. KUPE-ARION:  And I join in all of those.
15  MR. PALLES:  As do I.
16  THE WITNESS:  A   It would be up to the
17  supervisor in discussions with management, you
18  know, in the instance of say an employee out on
19  maternity leave for an extended period of time we
20  would reassign the cases.
21  MR. MORRISSEY:  Q   Did you have -- have you
22  had any conversation with Marvin Shear in regards
23  to the Rita King file?
24  **A   I don't even know who Marvin Shear is.**

Page 98

1  19th, 2015, okay.  Now, do you understand that
2  when he asks you if that refreshes your
3  recollection that means the light goes on in your
4  head and you say, oh, yes, May 19th, 2015 -- is
5  that what happened in your situation?
6  **A   No.  I'm just looking at what it says**
7  **here.**
8  Q   Okay, so you're relying then on the
9  accuracy of this as a business record; but you
10  have no independent recollection as to when the
11  case was returned?
12  **A   Right, I don't recall the exact date.  It**
13  **was around this.**
14  Q   Okay, and this document didn't refresh
15  any recollection that you had?
16  **A   It helped me to remember that it was**
17  **around that time.**
18  Q   Okay, good.
19  Now, we talked also about a finding of
20  excessive force against Commander Evans,
21  lieutenant at the time.  Now, under the use of
22  force model had made a determination as to
23  what Miss King's status was?
24  MS. WERTH:  Objection to the form of the

Page 97

1  MR. MORRISSEY:  I have nothing further.
2  MR. PALLES:  I have a few questions.
3  EXAMINATION
4  by Mr. Palles:
5  Q   First of all, do you recall seeing this
6  document that's FCRL 10500 and 501?
7  **A   Um-hum, sure.**
8  MS. WERTH:  Has this been marked as an
9  exhibit?
10  MR. PALLES:  I believe it has been, but I
11  don't know which one it is.
12  THE WITNESS:  It's a -- here, I think it's --
13  MR. PALLES:  The two page one -- two-pager,
14  yeah.  Okay -- all right, now -- Okay, I believe
15  you testified earlier that you considered this a
16  business record of IPRA?
17  THE WITNESS:  A   Sure.
18  Q   Okay, and it's routinely prepared
19  contemporaneously with the entries that are made
20  there, correct?
21  **A   Yes, yes.**
22  Q   Okay.  Now, Mr. Morrissey asked you
23  whether or not this document refreshed your
24  recollection that the file was returned on May

Page 99

1  question.
2  MR. PALLES:  Q   In other words, was she a
3  resister, a passive resister, an active resister,
4  do you recall whether or not any sort of -- any
5  conclusions were drawn in that respect?
6  THE WITNESS:  A   She certainly wasn't an
7  active resister -- if anything, a passive
8  resister.
9  Q   Okay.  And then, lastly, there's been a
10  lot of discussion about the delay in these -- in
11  this investigation, correct?
12  **A   Um-hum, right.**
13  Q   Okay, and in addition to that you
14  indicated that as a matter of policy and also as
15  a result of the collective bargaining agreement
16  the police officers would be interviewed at the
17  end of this process, is that correct?
18  **A   Under the former collective bargaining**
19  **agreement, correct.**
20  Q   Okay.  In your experience of
21  investigations of these CRs does a complainant,
22  generally, have a clearer memory of these
23  incidents than does an officer who confronts many
24  citizens during the course of a day?

Plaintiff's Exhibit 1 Page 25

SCOTT ANDO
November 5, 2015

Page 100

1    MR. MORRISSEY:  Objection.

2    MS. WERTH:  I'll join on the objection and

3 lack of personal knowledge, calls for

4 speculation.

5    MR. PALLES:  Okay.

6    Q  Can you answer the question?

7    THE WITNESS:  A  Again, it would be

8 speculative; but I would imagine that they would.

9    Q  Okay, you've been in law enforcement for

10 a while; and are you aware that under federal and

11 state statutes there are, in the case of criminal

12 prosecutions there are what's known as speedy

13 trial acts?

14    **A  Um-hum.**

15    Q  Is that a yes?

16    **A  Yes.**

17    Q  And the -- one of the purposes is that,

18 would you agree, that an accused may -- an

19 accused memory, an accused memory may fade over a

20 period of time, is that correct?

21    MS. WERTH:  Objection, speculation, calls for

22 speculation.

23    MR. PALLES:  Q  If you know.

24    THE WITNESS:  A  I don't know the reason

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 101

1 behind the speedy trial requirement.

2    Q  Okay, okay.  In your experience in

3 investigations does -- have you seen an officer's

4 memory of these incidents fade over a period of

5 time?

6    **A  I have.**

7    Q  Okay --

8    **A  Or I should say I've seen officers say**

9 **that their memories have faded over time.**

10    Q  Okay.  Would you agree that it's possible

11 that a delay in an investigation could result in

12 prejudice to the accused officer?

13    MR. MORRISSEY:  Objection --

14    MS. WERTH:  Objection, form of the question,

15 calls for speculation --

16    THE WITNESS:  A  I don't know.

17    MS. WERTH:  -- hypothetical.

18    MR. PALLES:  Q  Okay, and your answer was?

19    THE WITNESS:  A  I don't know.

20    MR. PALLES:  Those are all the questions I

21 have.

22    MS. WERTH:  Anyone else?  No?  You're done.

23    MR. MORRISSEY:  I'm done.

24    MS. WERTH:  We'll reserve.

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 102

1 STATE OF ILLINOIS  )

2               ) ss:

   COUNTY OF COOK  )

3         The within and foregoing deposition of

4 the aforementioned witness was taken before

5 NANCY K. SPEARE, C.S.R, and Notary Public, at the

6 place, date and time aforementioned.

7         There were present during the taking

8 of the deposition the previously named counsel.

9 The said witness was first duly sworn and was

10 then examined upon oral interrogatories; the

11 questions and answers were taken down in

12 shorthand by the undersigned, acting as

13 stenographer and Notary Public; and the within

14 and foregoing is a true, accurate and complete

15 record of all of the questions asked of and

16 answers made by the aforementioned witness, at

17 the time and place hereinabove referred to.

18         The signature of the witness was not

19 waived, and the deposition was submitted,

20 pursuant to Rules 207 and 211 (d) of the Rules of

21 the Supreme Court of Illinois, to the deponent

22 per copy of the attached letter.

23

24

TOOMEY REPORTING
312-853-0648

---

SCOTT ANDO
November 5, 2015

Page 103

1         The undersigned is not interested in

2 the within case, nor of kin or counsel to any of

3 the parties.

4         Witness my official signature and seal

5 as Notary Public in and for Cook County, Illinois

6 on this       day of          , A.D.

7 2015.

8

9

10         NANCY K. SPEARE, C.S.R.,

         Notary Public

         License No. 084-001584

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 1 Page 26

SCOTT ANDO
November 5, 2015

Page 104

TOOMEY REPORTING
205 West Randolph Street
Suite 1230
Chicago, IL  60606

WITNESS CERTIFICATION

I hereby certify that I have read the foregoing transcript of my deposition consisting of pages 1 through 104 inclusive.  Subject to the changes set forth on the preceding pages, the foregoing is a true and correct transcript of my deposition taken on 11-5-15.

(Signed)
SCOTT ANDO

SUBSCRIBED AND SWORN TO
Before me this    day of
A.D. 2015.

Notary Public

TOOMEY REPORTING
312-853-0648

Transcript of the Testimony of
**WAYNE GULLIFORD**

**Date:** November 24, 2015

**Case:** RITA KING VS. GLENN EVANS, ET AL.

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

WAYNE GULLIFORD
November 24, 2015

Page 2

1
2  A P P E A R A N C E S:
   THE LAW OFFICES OF:
   THOMAS G. MORRISSEY
3
   BY:  MR. PATRICK MORRISSEY
4       10150 South Western Avenue
        Chicago, Illinois  60643
5       (773) 233-7900
        patrick1920@gmail.com
6
        Appeared on behalf of the
7       Plaintiff;
8  THE LAW OFFICES OF:
   CITY OF CHICAGO
9  FEDERAL CIVIL RIGHTS
   LITIGATION DIVISION
10
   BY:  MS. CARLA MADELEINE KUPE-ARION
11      MR. GREGORY BECK
        30 North LaSalle Street
12      Suite 900
        Chicago, Illinois 60602
13      (312) 744-0226
        carla.kupearion@cityofchicago.org
14
        Appeared on behalf of the
15      Defendant, City of
        Chicago;
16
   THE LAW OFFICES OF:
17    RAVITZ & PALLES, PC
18 BY:  MR. ERIC PALLES
        203 North LaSalle Street
19      Suite 2300
        Chicago, Illinois 60601
20      (312) 558-1689
        epalles@ravitzpalles.com
21
        Appeared on behalf of
22      Glenn Evans in the
        criminal case;
23
24

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RITA KING,                        )
                                  )
         Plaintiff,               )
                                  )
         vs.                      )  No. 13 C 1937
                                  )
GLENN EVANS, et al.,              )
                                  )
         Defendants.              )

     This is the deposition of WAYNE GULLIFORD,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, taken before
PEGGY A. ANDERSON, a Certified Shorthand Reporter
of the State of Illinois, at 30 North LaSalle Street,
Suite 900, Chicago, Illinois, on November 24th, 2015,
at 1:20 p.m.

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 3

1              I N D E X
   WITNESS                          PAGE
2
   WAYNE GULLIFORD
3
   DIRECT EXAMINATION BY
4  MR. MORRISSEY:                   4-55
5  CROSS-EXAMINATION BY
   MR. PALLES:                      55-57
6
   REDIRECT EXAMINATION BY
7  MR. MORRISSEY:                   57-59
8
9              E X H I B I T S
10
11 MARKED                          PAGE
12 PLAINTIFF'S (GULLIFORD) EXHIBIT NO. 1    30
13 PLAINTIFF'S (GULLIFORD) EXHIBIT NO. 2    31
14
15
16        CONFIDENTIAL DESIGNATIONS
17           PAGES 27-46
18           PAGES 48-60
19
20
21
22           ******
23
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 1

WAYNE GULLIFORD
November 24, 2015

Page 4

1           (WHEREUPON, the witness
2           was first duly sworn.)
3       MR. MORRISSEY:  This is the
4   deposition of King versus Evans taken
5   pursuant to notice and continued to this
6   date.  We are at the City's law office.
7   WHEREUPON:
8           WAYNE GULLIFORD,
9   called as a witness herein, having been first
10  duly sworn, was examined and testified as
11  follows:
12      D I R E C T   E X A M I N A T I O N
13          BY MR. MORRISSEY:
14      Q   Sir, can you state your name for the
15  record?
16      A   Wayne Gulliford.
17      Q   Are you currently employed?
18      A   Yes.
19      Q   Where do you work?
20      A   City of Chicago, Chicago Police
21  Department.
22      Q   What's your title?
23      A   Chief.
24      Q   What are you chief of, sir?

---

WAYNE GULLIFORD
November 24, 2015

Page 6

1   position?
2       A   I was the deputy chief of Area South
3   patrol.
4       Q   How long were you deputy chief of
5   Area South?
6       A   Approximately two years.
7       Q   What were your responsibilities as
8   deputy chief of Area South?
9       A   Coordinating the police service and
10  response in the five Area South Districts,
11  which were the 4th, 5th, 6th, 7th and 22nd
12  Districts.
13      Q   Do you recall approximately which
14  years you were deputy chief of Area South?
15      A   2011 to 2013.
16      Q   Do you recall what month you became
17  deputy chief of Area South?
18      A   It was August of 2011.
19      Q   Can you briefly tell me the other
20  assignments you've had as a member of the
21  police department?
22      A   Prior to Area South, I was the deputy
23  chief of Area 1 at the time.  I was there from
24  March of 2010 through August 2011.  Prior to

---

WAYNE GULLIFORD
November 24, 2015

Page 5

1       A   Bureau of Patrol.
2       Q   How long have you been chief of
3   Bureau of Patrol?
4       A   Two and a half years.
5       Q   As chief, what are your
6   responsibilities?
7       A   To coordinate our response to crime
8   conditions throughout the city, ensure that we
9   provide a police service throughout each of the
10  districts, coordinate deployments with other
11  bureaus, part of the chain of command for
12  implementation of the policy and procedures for
13  the department.
14      Q   Who do you report to?
15      A   First deputy, currently John
16  Escalante.
17      Q   Do you have members of the police
18  department that report directly to you?
19      A   Yes.
20      Q   Who are they?
21      A   Deputy chiefs report directly to me.
22      Q   How many deputy chiefs report to you?
23      A   Five.
24      Q   Prior to being chief, what was your

---

WAYNE GULLIFORD
November 24, 2015

Page 7

1   that, I was deputy chief of Area 4 from March
2   of 2008 until I moved to Area 1.  Prior to
3   that, commander of the Field Monitoring Unit,
4   commander of Special Operations Section,
5   lieutenant in the Special Operations Section,
6   lieutenant in Legal Affairs, lieutenant in the
7   25th District, sergeant in Education and
8   Training, sergeant in 25, police officer in
9   narcotics, 11th District and 13th Districts.
10      Q   What's your highest level of formal
11  education?
12      A   I have a master's degree.
13      Q   What's your master's degree in?
14      A   Public administration.
15      Q   Which university did you attend?
16      A   Illinois Institute of Technology.
17      Q   Where did you attend college?
18      A   University of Illinois, Chicago
19  Circle.
20      Q   What was your major?
21      A   Criminal justice.
22      Q   Do you know an individual at the
23  department by the name of Patricia Walsh?
24      A   Yes.

Plaintiff's Exhibit 2 Page 2

## Page 8

WAYNE GULLIFORD
November 24, 2015

1  Q   What is Patricia Walsh's title?
2  A   She's currently chief of Chicago
3  State University.
4  Q   Do you know how long she's held that
5  position for?
6  A   Less than a year.
7  Q   And is a chief of Chicago State
8  University a member of the Chicago Police
9  Department?
10 A   No.
11 Q   Has Ms. Walsh worked for the police
12 department, to your knowledge?
13 A   Yes.
14 Q   Do you recall when she retired?
15 A   It was in the past year.
16 Q   Prior to her retirement, what was her
17 position?
18 A   She was the deputy chief of Area
19 South.
20 Q   Do you recall approximately which
21 years she was deputy chief of Area South?
22 A   2014.
23 Q   Did Deputy Chief Walsh report
24 directly to you?

TOOMEY REPORTING
312-853-0648

## Page 9

WAYNE GULLIFORD
November 24, 2015

1  A   Yes.
2  Q   Do you know an individual by the name
3  of the Fred Waller?
4  A   I do.
5  Q   Is Mr. Waller currently employed by
6  the police department?
7  A   He is.
8  Q   What is his title, to your knowledge?
9  A   He's the deputy chief of Area South.
10 Q   Do you know how long Mr. Deputy Chief
11 Waller has been deputy chief of Area South?
12 A   Since the retirement of Deputy Chief
13 Patricia Walsh.
14 Q   Do you know an individual by the name
15 of Eugene Williams?
16 A   I do.
17 Q   Is Mr. Williams currently employed
18 with the police department?
19 A   He is.
20 Q   What is his title?
21 A   Chief of the Bureau of Support
22 Services.
23 Q   Do you know who Chief Williams
24 reports to?

TOOMEY REPORTING
312-853-0648

## Page 10

WAYNE GULLIFORD
November 24, 2015

1  A   First Deputy Superintendent
2  Escalante.
3  Q   Do you know Glenn Evans?
4  A   I do.
5  Q   How long have you known Glenn Evans
6  for?
7  A   Since I went to Area South.
8  Q   That would be approximately August of
9  2011?
10 A   Approximately, yes, sir -- no -- Yes.
11 I'm sorry.  Yes.
12 Q   How did you become aware of Glenn
13 Evans when you were deputy chief of Area South?
14    MS. KUPE-ARION:  Objection to the
15    form of the question, but you may answer.
16 BY THE WITNESS:
17 A   Glenn Evans worked in the 6th
18 District at the time.
19 BY MR. MORRISSEY:
20 Q   Did you interact with Glenn Evans?
21    MS. KUPE-ARION:  Objection -- Can you
22    repeat the question?
23 BY MR. MORRISSEY:
24 Q   Did you interact with Glenn Evans

TOOMEY REPORTING
312-853-0648

## Page 11

WAYNE GULLIFORD
November 24, 2015

1  when you were deputy chief of Area South?
2     MS. KUPE-ARION:  Objection to the
3     form of the question, but you may answer.
4  BY THE WITNESS:
5  A   Occasionally.
6  BY MR. MORRISSEY:
7  Q   Do you have any specific
8  recollections of times when you interacted with
9  Glenn Evans when you were deputy chief of Area
10 South?
11    MS. KUPE-ARION:  Same objection.  You
12    may answer.
13 BY THE WITNESS:
14 A   Specifically, no.
15 BY MR. MORRISSEY:
16 Q   Do you know a police officer by the
17 name of Dennis Clifford?
18 A   I do not.
19 Q   Do you know a police officer by the
20 name of Roslyn Sutton?
21 A   I don't believe I do.
22 Q   As chief, do you have any
23 responsibility when IPRA completes an
24 investigation and sends the findings to the

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 3

WAYNE GULLIFORD
November 24, 2015

Page 12

1  superintendent?
2        MS. KUPE-ARION:  Objection to the
3  form of the question, but you can answer.
4  BY THE WITNESS:
5        A    If I'm part of the Command Channel
6  Review, I have the opportunity to review the
7  findings.
8  BY MR. MORRISSEY:
9        Q    What is this Command Channel Review,
10  to your knowledge?
11        A    It's a review of a complaint
12  allegation and the subsequent investigation,
13  and then a determination of concurrence or
14  nonconcurrence by the parties in the review
15  process.
16        Q    What is the first level of this
17  Command Channel Review, to your knowledge?
18        A    It's the accused's immediate
19  supervisor, immediate command supervisor.
20        Q    If the accused is a patrol officer,
21  who typically would be the immediate command
22  supervisor?
23        MS. KUPE-ARION:  Objection to the
24  form of the question.  You may answer.

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 14

1  Channel Review?
2        A    I did.
3        Q    When you were deputy chief of Area
4  South, did the police department provide you
5  with training on how to conduct a Command
6  Channel Review?
7        A    Not at that time, no.
8        Q    When you were deputy chief of Area
9  South, did he provide any training to the
10  commanders under your supervision how to
11  conduct the Command Channel Review?
12        A    Yes.
13        Q    Tell me what training you provided to
14  your commanders?
15        A    I asked them to review the documents
16  included in the investigation and then form an
17  opinion in order to make a decision to concur
18  or not concur with the investigation -- with
19  the findings of the investigation.
20        Q    When do you provide this training to
21  your commanders?
22        A    When I was first assigned to Area
23  South.
24        Q    Do you disseminate anything in

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 13

1  BY THE WITNESS:
2        A    Depends on which unit the accused
3  officer is assigned to in patrol.  It would
4  most likely be the district commander.
5  BY MR. MORRISSEY:
6        Q    In the Bureau of Patrol after the
7  first level of Command Channel Review, what is
8  the next level?
9        A    It depends on what rank the accused
10  is, but it will be the next command level above
11  the first level in the chain of command.
12        Q    So let's assume the accused is a 6th
13  District patrol officer.  Would you agree that
14  the first level of review would be the
15  commander of the 6th District?
16        A    Correct.
17        Q    And using that hypothetical,
18  continuing it, who would be the second level in
19  the Command Channel Review?
20        A    The second level would be the deputy
21  chief of the area.  In this case, if it's
22  6th District, it would be Area South.
23        Q    And when you were deputy chief of
24  Area South, did you participate in this Command

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 15

1  writing to lay out this procedure?
2        A    No.
3        Q    Where was this training held?
4        A    One of our regular meetings.
5        Q    Did you provide this training in one
6  setting?
7        MS. KUPE-ARION:  Objection to the
8  form of the question.  You may answer, if
9  you understand the question.
10  BY THE WITNESS:
11        A    More than likely, I would have had
12  all of the commanders together and explained to
13  them what my expectations were for reviewing
14  the complaint registers.
15  BY MR. MORRISSEY:
16        Q    And this was training that you
17  provided, not the police department?
18        MS. KUPE-ARION:  Objection, misstates
19  prior testimony, form of the question but
20  you may answer.
21        MR. MORRISSEY:  I will rephrase the
22  question.
23  BY MR. MORRISSEY:
24        Q    Did the police department tell you

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 4

WAYNE GULLIFORD
November 24, 2015

Page 16

1  how to instruct your commanders with the
2  Command Channel Review?
3      MS. KUPE-ARION:  Objection to the
4      form of the question.  You may answer.
5  BY THE WITNESS:
6      A    All supervisor personnel are provided
7  training in complaint review investigations and
8  the subsequent Command Channel Review, which is
9  part of the investigation.
10      I just told my commanders what I
11  expect, what my expectations were, while I was
12  the deputy chief of Area South.
13      Q    And you instructed your commanders to
14  make findings based on the investigation of
15  IPRA?
16      MS. KUPE-ARION:  Objection to the
17      form of the question and misstates prior
18      testimony, but you may answer.
19  BY THE WITNESS:
20      A    I asked them to review the
21  investigation to make an informed decision
22  whether they concur or not concur with the
23  findings of the initial investigation.
24

---

WAYNE GULLIFORD
November 24, 2015

Page 17

1  BY MR. MORRISSEY:
2      Q    And were your commanders instructed
3  to provide this information in writing?
4      A    As part of the Command Channel
5  Review, they are required to provide a
6  determination in writing.
7      Q    Is that through the CLEAR system?
8      A    Depending on how the complaint
9  register is submitted.
10      Q    And how can a complaint register be
11  submitted?
12      A    Either through the CLEAR system
13  electronically or through the paper package.
14  It moves through the chain of command.
15      Q    When you were promoted to chief, were
16  you provided any training with how to conduct a
17  Command Channel Review?
18      A    No.
19      Q    As a chief, are you involved in
20  Command Channel Reviews?
21      A    I am.
22      Q    How do you typically conduct a
23  Command Channel Review?
24      A    I review the allegations, read the

---

WAYNE GULLIFORD
November 24, 2015

Page 18

1  summary digest, summary report digest, and then
2  review the pertinent attachments.
3      Q    If you concur with a finding, what
4  happens next, to your knowledge?
5      A    If I concur, I indicate that I concur
6  and then forward the package to the next level
7  of review, if there is one.
8      Q    And for Command Channel Review, are
9  there always at least two levels of review?
10      A    Yes.
11      Q    Have you ever observed or
12  participated in a Command Channel Review where
13  there are three levels?
14      A    Yes.
15      Q    Can you describe a situation where
16  that may occur?
17      A    It may occur when there are sustained
18  findings.
19      Q    So going back to my earlier
20  hypothetical about a police officer in the
21  6th District if he or she had a sustained
22  finding, the first level of review would be the
23  commander of the 6th District, correct?
24      A    Correct.

---

WAYNE GULLIFORD
November 24, 2015

Page 19

1      Q    If the commander concurred, it would
2  go to Area South, the deputy chief?
3      A    Correct.
4      Q    Assuming the deputy chief of Area
5  South concurred with the sustained finding,
6  would it move on to the chief of the Bureau of
7  Patrol?
8      A    Sometimes it may.
9      Q    What circumstances would it move on
10  to the chief of the Bureau of Patrol?
11      A    Again, I've seen them where it's been
12  sustained where it would go to a third level.
13      Q    Under what circumstances would a
14  sustained finding against a police officer in
15  the 6th District go all the way up to chief of
16  the Bureau of Patrol assuming that the
17  commander of the 6th District and deputy chief
18  of Area South agreed with the sustained
19  finding?
20      MS. KUPE-ARION:  Objection to the
21      form of the question, convoluted, but you
22      may answer.
23  BY THE WITNESS:
24      A    The sustained finding may make its

Plaintiff's Exhibit 2 Page 5

Page 20

1  way through my electronic queue or across my
2  desk.
3  BY MR. MORRISSEY:
4      Q    So using the same hypothetical, if
5  the deputy chief of Area South agreed with a
6  sustained finding against a patrol officer, you
7  still would have the opportunity as the chief
8  to review that determination?
9      MS. KUPE-ARION:  Objection to the
10     form of the question.  Incomplete
11     hypothetical and speculative, but you may
12     answer.
13 BY THE WITNESS:
14     A    I believe that the sustained -- a CR
15 with a sustained finding would come across my
16 desk at the third level review.
17 BY MR. MORRISSEY:
18     Q    If it came across your desk under
19 these circumstances, is there a time limit for
20 you as chief to act on it?
21     A    On a sustained finding, I have ten
22 days to review it.
23     Q    Are you aware of anything in writing
24 that says you have ten days as chief to act on

Page 22

1  BY THE WITNESS:
2      A    If I'm reviewing a CR, my options are
3  to concur or not concur with the findings of
4  the other reviewers, the initial investigator
5  and the other reviewers in the chain of
6  command.
7  BY MR. MORRISSEY:
8      Q    What happens if ten days pass after
9  the CR comes to your attention and you take no
10 action?
11     A    I will take action as soon as I
12 become aware of it or have the time to take
13 care of it.
14     Q    Are there any consequences if you
15 wait more than ten days after receiving the CR
16 file?
17     MS. KUPE-ARION:  Objection to the
18     form of the question and competence, but
19     you may answer.
20 BY THE WITNESS:
21     A    I am not aware of any.
22 BY MR. MORRISSEY:
23     Q    As chief, if you concur with a
24 sustained finding, is there an additional level

Page 21

1  a sustained finding?
2      A    One of our orders determines or
3  states that that's the timeframe.
4      Q    As chief, have you acted on a
5  sustained finding of a patrol officer?
6      MS. KUPE-ARION:  Objection to the
7      form of the question, but you may answer.
8  BY THE WITNESS:
9      A    Yes.
10 BY MR. MORRISSEY:
11     Q    During your tenure as chief, how many
12 times has that occurred?
13     A    Numerous times.
14     Q    When you say numerous, do you mean
15 more than ten?
16     A    I'm going to say more than ten, yes.
17     Q    More than 50?
18     A    No, I wouldn't say more than 50.
19     Q    And if you, as chief, are conducting
20 the third chain of review, level of review,
21 what are your options?
22     MS. KUPE-ARION:  Objection to the
23     form of the question, but you may answer.
24

Page 23

1  of review, to your knowledge?
2      A    To my knowledge, electronically, I
3  don't know where it would go next.  I'm not
4  really sure where it goes after I get it, if it
5  goes to internal affairs or goes to the next
6  level.
7      Q    During your time as chief, have you
8  ever agreed with a sustained finding that
9  you've reviewed through the Command Channel
10 level?
11     A    I have.
12     Q    Same question.  In the same period --
13 Strike that.  Have you ever not concurred as
14 chief of a CR that you've reviewed under the
15 Command Channel level?
16     A    Yes, I have.
17     Q    If you don't -- For clarity, when
18 we're talking about when you make a decision to
19 concur or not concur, are you talking about
20 with IPRA's determination or with the Command
21 Channel's assessment of IPRA's determination?
22     A    It could be either.
23     Q    So when you concur with a CR, what
24 are you concurring with, the IPRA finding or

Plaintiff's Exhibit 2 Page 6

WAYNE GULLIFORD
November 24, 2015

Page 24

1  the finding by a member for the department
2  under your chain of command?
3      **A      Concurring with -- The determination**
4  **is based upon the initial investigator's**
5  **findings.  So if it was IPRA, the concurrence**
6  **or not concurrence would be with the initial**
7  **finding.**
8      Q      And the Command Channel only reviews
9  CRs that are sustained, correct?
10     **A      No.**
11     Q      Does a Command Channel Review --
12  strike that.  Does Command Channel Review
13  review CRs that are not sustained by IPRA?
14     **A      Yes.**
15     Q      Under what circumstances are you
16  aware of that the police department will review
17  CR files that are not sustained by IPRA?
18     MS. KUPE-ARION:  Objection to the
19  form of the question.  Objection,
20  competence.  Chief Gulliford is not here to
21  speak on behalf of the police department in
22  regards to that topic, but he may answer
23  based on his experience alone.
24

---

WAYNE GULLIFORD
November 24, 2015

Page 26

1  BY MR. MORRISSEY:
2      Q      When you were a deputy chief of Area
3  South, were you ever involved in Command
4  Channel Review where a commander under your
5  control, under your chain of command, did not
6  agree with an IPRA determination that a CR was
7  not sustained?
8      **A      Probably.**
9      Q      Do you have any -- a recollection of
10  when that occurred?
11     **A      Sometime when I was in Area South.**
12     Q      Do you remember the circumstances of
13  that CR?
14     **A      I do not.  Specifically, I do not.**
15     Q      As, chief when you participated in
16  Command Channel Review, what materials do you
17  have access to when conducting your review of a
18  CR?
19     **A      All of the documents reviewed in**
20  **the -- or obtained and reviewed during the**
21  **investigation included as attachments in the**
22  **CR.**
23     Q      Is this electronic material?
24     **A      From IPRA, it generally is**

---

WAYNE GULLIFORD
November 24, 2015

Page 25

1  BY THE WITNESS:
2      **A      No matter what the finding is by the**
3  **initial investigator, whether it's IPRA or**
4  **someone else, it still proceeds through the**
5  **chain, the Command Channel Review, for at least**
6  **two levels.**
7      Q      When you were deputy chief of Area
8  South, did you participate in Command Channel
9  Review where IPRA made a determination that a
10  CR was not sustained?
11     **A      Yes.**
12     Q      And if the police officer from the
13  6th District was the individual who had the CR
14  file, would the commander of the 6th District
15  have to agree with IPRA's finding of not
16  sustaining the CR?
17     MS. KUPE-ARION:  Objection to the
18  form of the question, incomplete
19  hypothetical.  You may answer.
20  BY THE WITNESS:
21     **A      Not required to agree with it.  They**
22  **have the option of concurring or not**
23  **concurring.**
24

---

WAYNE GULLIFORD
November 24, 2015

Page 27

1  electronic, yes.
2      Q      Do you know when the superintendent
3  of police becomes involved with an IPRA
4  determination if a CR is sustained?
5      MS. KUPE-ARION:  Objection,
6  competence and form of the question; but
7  you may answer.
8  BY THE WITNESS:
9      **A      At some point, the superintendent**
10  **gets to review the IPRA findings.  I don't know**
11  **exactly what the timeframe is.**
12  BY MR. MORRISSEY:
13     Q      Were you involved in the Command
14  Channel Review of Ms. Rita King's CR?
15     MR. PALLES:  Let me stop there for a
16  moment and interpose this objection that as
17  we go forward with the specifics of this
18  particular CR investigation, I am moving to
19  designate this portion of the deposition
20  confidential.
21     MR. MORRISSEY:  That's fine.  I think
22  to make it confidential, you have to bring
23  a motion before the judge.
24     MR. PALLES:  I believe I have to tell

Plaintiff's Exhibit 2 Page 7

WAYNE GULLIFORD
November 24, 2015

Page 28

```
 1      you during the course of the deposition
 2      that I'm asking that it be done; and then
 3      when it's typed up, you're right, the
 4      burden will be on me to go forward.
 5  BY MR. MORRISSEY:
 6      Q    Were you involved with Ms. Rita
 7  King's CR?
 8          MS. KUPE-ARION:  Objection to the
 9      form of the question, but you may answer.
10  BY THE WITNESS:
11      A    I'm not sure who the complainant was
12  in the CR we are talking about.
13  BY MR. MORRISSEY:
14      Q    What documents did you review in
15  preparation for today's deposition?
16      A    The Command Channel Review from a
17  complaint register.
18      Q    Did you participate in that Command
19  Channel Review of that CR?
20      A    Yes.
21      Q    As you sit here today, do you have
22  any personal recollection of your involvement
23  in that CR Command Channel Review?
24      A    Yes.
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 30

```
 1      Q    Did you listen to the audio
 2  statements of the police officer and the
 3  complainant's?
 4      A    I don't recall.
 5      Q    Do you have any independent
 6  recollection why you did not concur with the
 7  IPRA investigator's decision?
 8      A    From my review of the Command
 9  Channel, it was that there were varying
10  perceptions of the technique that was applied
11  or if it was applied by the other accused.
12      Q    And was the other accused Glenn
13  Evans?
14      A    To my recollection, yes.
15          MR. MORRISSEY:  Why don't we mark
16  this as Exhibit 1?
17                  (WHEREUPON, Plaintiff's
18                  Exhibit No. 1 was marked
19                  for identification.)
20  BY MR. MORRISSEY:
21      Q    Chief, I'm showing you what's been
22  marked as Exhibit 1.  It's marked FCRL 3177 and
23  it goes up to 3207.  Would you take a moment
24  and review that material?
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 29

```
 1      Q    Tell me about your involvement,
 2  Chief.
 3      A    I reviewed the information forwarded
 4  by the previous reviewer in the Command
 5  Channel, in this case, Deputy Chief Walsh.  I
 6  probably reviewed the documents as attachments
 7  to that CR.
 8      Q    Do you recall what Deputy Chief
 9  Walsh's assessment was in the Command Channel
10  Review of that CR?
11      A    I believe she did not concur with the
12  findings of IPRA because they referred to
13  Officer Clifford.
14      Q    Did you have a conversation with
15  Deputy Chief Walsh about this CR?
16      A    I did not.
17      Q    As you sit here today, do you have an
18  independent recollection of your Command
19  Channel Review of that CR?
20      A    Just that I did not concur with the
21  initial findings of the IPRA investigator.
22      Q    Did you read the summary of the IPRA
23  complaints?
24      A    When I made my determination.
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 31

```
 1                  (WHEREUPON, a short
 2                  break was had.)
 3  BY MR. MORRISSEY:
 4      Q    Chief, did you have an opportunity to
 5  review --
 6          MR. BECK:  Wait for Carla to get
 7      back.
 8  BY MR. MORRISSEY:
 9      Q    Chief, you've had an opportunity to
10  review Exhibit 1, correct?
11      A    Correct.
12      Q    Did you review this document, Exhibit
13  1, when you were conducting your Command
14  Channel Review?
15      A    Yes.
16      Q    Do you recall approximately when you
17  conducted this Command Channel Review?
18      A    I do not.
19          MR. MORRISSEY:  Why don't we mark
20  this CLEAR printout Exhibit 2.
21                  (WHEREUPON, Plaintiff's
22                  Exhibit No. 2 was marked
23                  for identification.)
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 8

WAYNE GULLIFORD
November 24, 2015

Page 32

1  BY MR. MORRISSEY:
2      Q    Chief, I'm showing you what's marked
3  as Exhibit 2.  It's a CLEAR printout.  I would
4  ask you to flip to page 10379 and 10380.  On
5  page 10380, do you see your name?
6      A    I do.
7      Q    And it has a date of March 13, 2015
8  next to your name, right?
9          MS. KUPE-ARION:  Did you give him the
10  right --
11         MR. MORRISSEY:  Yes, we have a copy
12  for you over there.
13  BY THE WITNESS:
14      A    Page 10380?
15  BY MR. MORRISSEY:
16      Q    Correct.
17      A    Yes, 13 March 2015.
18      Q    And is that when you completed your
19  Command Channel Review?
20      A    Yes.
21      Q    And when you were conducting your
22  Command Channel Review, did you know that Glenn
23  Evans was under criminal investigation?
24         MS. KUPE-ARION:  Objection, relevance

WAYNE GULLIFORD
November 24, 2015

Page 33

1      but you may answer.
2  BY THE WITNESS:
3      A    If he was at this time, I was
4  probably aware of it, yes.
5  BY MR. MORRISSEY:
6      Q    Approximately how long did it take
7  you to conduct your Command Channel Review of
8  this CR?
9      A    I don't recall.
10      Q    Did you take any notes when you were
11  conducting your review?
12      A    I don't -- I usually don't take
13  notes.
14      Q    At the time, did Officer Clifford
15  have one sustained allegation against him?
16         MS. KUPE-ARION:  Objection to the
17      form of the question, competence.  Are you
18      talking to this CR or what?
19         MR. MORRISSEY:  This CR.
20  BY THE WITNESS:
21      A    I don't recall.
22  BY MR. MORRISSEY:
23      Q    Why don't we go over to Exhibit 1,
24  page 3195 where it starts talking about

WAYNE GULLIFORD
November 24, 2015

Page 34

1  allegations against Officer Clifford.
2      A    Okay.
3      Q    And the middle paragraph begins:  The
4  reporting investigator recommends a finding of
5  sustained for Allegation Number 1 against
6  Officer Clifford, that he observed the
7  misconduct of Commander Evans who forcibly
8  pressed his hand against Rita King's nose after
9  she refused to be fingerprinted, and failed to
10  take appropriate action and report the
11  incident.
12         MS. KUPE-ARION:  Is there a question?
13  BY MR. MORRISSEY:
14      Q    When you were conducting your Command
15  Channel Review, were you reviewing that
16  sustained finding against Officer Clifford?
17      A    Yes.
18      Q    Tell me what you did when you
19  conducted your Command Channel Review to --
20  relating to the sustained allegation against
21  Officer Clifford?
22      A    I reviewed the summary report by the
23  investigator, reviewed the statement of
24  nonconcurrence by Deputy Chief Walsh, reviewed

WAYNE GULLIFORD
November 24, 2015

Page 35

1  the documents that pertained to Officer
2  Clifford.
3      Q    Did you come to any conclusion
4  whether Glenn Evans used force against Rita
5  King?
6         MS. KUPE-ARION:  Objection to the
7      form of the question and not relevant to
8      Officer Clifford, but you may answer.
9  BY THE WITNESS:
10      A    No, I did not.
11  BY MR. MORRISSEY:
12      Q    Based on reviewing the CR and the
13  summary report by IPRA, what is your opinion of
14  what happened in the lockup when Ms. King was
15  there in the 6th District?
16         MR. PALLES:  I'm going to object to
17      the form of the question, lack of
18      foundation.
19         MS. KUPE-ARION:  And competence but
20      you a may answer the question to the best
21      of your ability.
22  BY THE WITNESS:
23      A    That Officer Clifford had an
24  uncooperative arrestee and that the watch

Plaintiff's Exhibit 2 Page 9

WAYNE GULLIFORD
November 24, 2015

Page 36

```
 1    lieutenant intervened to gain the cooperation
 2    of the uncooperative arrestee.
 3    BY MR. MORRISSEY:
 4        Q    Describe how the arrestee was being
 5    uncooperative.
 6            MS. KUPE-ARION:  Objection to the
 7        form of the question and competence.
 8            MR. PALLES:  And for lack of
 9        foundation.
10            THE WITNESS:  Do I have to answer?
11            MS. KUPE-ARION:  You can answer.  I'm
12        sorry.
13    BY THE WITNESS:
14        A    From what I recall in reviewing the
15    summary is that the arrestee had clenched fists
16    and didn't cooperate with being photographed or
17    fingerprinted.
18    BY MR. MORRISSEY:
19        Q    Did she physically threaten the
20    officers that were present in the lockup?
21            MS. KUPE-ARION:  Objection to the
22        form of the question, objection,
23        competence.
24            MR. PALLES:  And I will object to
```

TOOMEY REPORTING
312-853-0648

WAYNE GULLIFORD
November 24, 2015

Page 37

```
 1    relevance, too.
 2            MS. KUPE-ARION:  Based on the records
 3        you reviewed.  Obviously you were not there
 4        yourself, but you can answer.
 5    BY THE WITNESS:
 6        A    I don't recall seeing that.
 7    BY MR. MORRISSEY:
 8        Q    Would you classify this arrestee as a
 9    resistor?
10            MS. KUPE-ARION:  Objection to the
11        form of the question, but you may answer.
12    BY THE WITNESS:
13        A    She's uncooperative with the process.
14    She's already under arrest.
15    BY MR. MORRISSEY:
16        Q    So as chief, would you consider this
17    arrestee being a passive or active resistor?
18            MS. KUPE-ARION:  Objection to the
19        form of the question, but you may answer.
20    BY THE WITNESS:
21        A    I would consider this person being an
22    uncooperative arrestee.
23    BY MR. MORRISSEY:
24        Q    In your opinion, what is an
```

TOOMEY REPORTING
312-853-0648

WAYNE GULLIFORD
November 24, 2015

Page 38

```
 1    uncooperative arrestee?
 2        A    A person that doesn't cooperate with
 3    the arrest process.
 4        Q    Did you understand that this arrestee
 5    had mental illness?
 6            MS. KUPE-ARION:  Objection to the
 7        form of the question.  You may answer.
 8    BY THE WITNESS:
 9        A    It was mentioned in the report.
10    BY MR. MORRISSEY:
11        Q    What are police officers under your
12    chain of control and command supposed to do
13    when they have an arrestee in the lockup that's
14    not cooperative?
15            MS. KUPE-ARION:  Objection to the
16        form of the question, but you may answer.
17    BY THE WITNESS:
18        A    Attempt to gain the cooperation of
19    the arrestee through -- to attempt to gain
20    their cooperation generally by reasoning with
21    them.
22    BY MR. MORRISSEY:
23        Q    Is that verbal reasoning?
24        A    In most cases, yes.
```

TOOMEY REPORTING
312-853-0648

WAYNE GULLIFORD
November 24, 2015

Page 39

```
 1        Q    And if the arrestee doesn't respond
 2    positively to the verbal reasoning, what are
 3    police officers supposed to do next if they
 4    have an arrestee who is uncooperative in the
 5    lockup?
 6            MS. KUPE-ARION:  Objection to the
 7        form of the question.  Again, this witness
 8        is not produced to speak on behalf of the
 9        Chicago Police Department.
10    BY THE WITNESS:
11        A    They can return the arrestee to the
12    holding cell.
13    BY MR. MORRISSEY:
14        Q    Is there any other training that's
15    provided to your officers about what to do when
16    an arrestee is uncooperative in the lockup?
17            MS. KUPE-ARION:  Objection to the
18        form of the question and competence to a
19        certain degree, but you may answer.
20    BY THE WITNESS:
21        A    I'm not aware of specific training.
22    BY MR. MORRISSEY:
23        Q    Are you aware of any general order or
24    special order that says if an arrestee is
```

TOOMEY REPORTING
312-853-0648

WAYNE GULLIFORD
November 24, 2015

Page 40

1  uncooperative in the lockup, the police officer
2  should put him or her in a holding cell?
3     **A    I don't recall immediately if there**
4  **is a directive that states that specifically.**
5     Q    So under this CR that you conducted a
6  Command Channel Review, it's your understanding
7  that Lieutenant Evans was summoned to the
8  lockup?
9     **A    He did come into the lockup at some**
10 **point.**
11    Q    Based on your review, did this -- did
12 Commander Evans or Lieutenant Evans engage the
13 arrestee?
14       MS. KUPE-ARION:  Objection to the
15       form of the question, but you may answer.
16 BY THE WITNESS:
17    **A    It does appear that he did.**
18 BY MR. MORRISSEY:
19    Q    Based on your Command Channel Review,
20 did you understand that Commander Evans used a
21 pain compliance technique to Ms. King?
22    **A    There's a differing of opinions of**
23 **that.**
24    Q    Can you explain the difference of

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 41

1  opinions?
2     **A    Well, it wasn't clear that this**
3  **technique was applied based on the investigator**
4  **not sustaining the allegation for -- where the**
5  **investigator says that it cannot be determined**
6  **whether the amount of force Commander Evans**
7  **used in executing the technique warranted the**
8  **completion of a TRR. So the investigator wasn't**
9  **clear that any force was used.**
10    Q    You'll agree that Commander Evans
11 made physical conduct with Ms. King's face,
12 right?
13       MS. KUPE-ARION:  Objection to the
14       form of the question especially with
15       "you'll agree," but you can answer the
16       question.
17       MR. MORRISSEY:  I'll rephrase the
18       question.
19 BY MR. MORRISSEY:
20    Q    If you look to page 3185 of Exhibit
21 1, Footnote 19 indicates that the investigator
22 came to a conclusion that Evans used a firm
23 grasp to redirect Ms. King's face; do you see
24 that?

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 42

1     **A    Yes.**
2     Q    Did you dispute the investigator's
3  finding that Mr. Evans used or made contact
4  with Ms. King's face?
5        MS. KUPE-ARION:  Objection to the
6        form of the question and competence, but
7        you may answer based on your review.
8  BY THE WITNESS:
9     **A    It wasn't that there was any contact**
10 **with the complainants's face.  It was that any**
11 **force -- or the amount of force that was used.**
12 BY MR. MORRISSEY:
13    Q    So you agree that there was contact
14 that was made, and you dispute the amount of
15 force; is that fair to say?
16       MS. KUPE-ARION:  Objection to the
17       form of the question.
18       MR. PALLES:  Objection to the form of
19       the question.
20 BY THE WITNESS:
21    **A    Or where the contact was made.**
22 BY MR. MORRISSEY:
23    Q    Is there a dispute where the contact
24 was made?

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 43

1     **A    Yes.**
2     Q    Based on your review, where is the
3  difference of opinion regarding where the
4  contact was made?
5     **A    Commander Evans said that he used the**
6  **left area of the face.  The other officer saw**
7  **Commander Evans' hand near the front of the**
8  **face, and one officer or detention aide did not**
9  **know where his hand was.**
10    Q    Do you know the identity of the
11 detention aide?
12    **A    Could it have been -- Let me check.**
13 **Okay, I thought it was a detention aide, but**
14 **apparently it was Officer Kevin Rogers who was**
15 **working in the lockup that day.**
16    Q    Under what circumstances can a police
17 officer in a lockup make physical contact with
18 the face or the head of an uncooperative
19 arrestee?
20       MS. KUPE-ARION:  Objection to the
21       form of the question, incomplete
22       hypothetical, speculative.  You may answer
23       the question.
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 11

WAYNE GULLIFORD
November 24, 2015

Page 44

1  BY THE WITNESS:
2      A    If the arrestee is using their head
3  in some manner that could injure themselves or
4  one of the processing officers.
5  BY MR. MORRISSEY:
6      Q    Any other circumstances you're aware
7  of?
8      A    Depending on the level of activity of
9  the arrestee.  I mean, if the arrestee becomes --
10  attacks one of the officers, the officers can
11  use the appropriate amount of force to defend
12  themselves and control the arrestee.
13      Q    Based on your Command Channel Review,
14  did you find any evidence that Ms. King was
15  using her head to harm any of the officers in
16  the lockup?
17      A    Except for the spittle that may have
18  been spraying, that's all I saw.
19      Q    Based on your Command Channel Review,
20  did you see any evidence that the level of
21  physical activity of Ms. King would have harmed
22  the officers in the lockup?
23      MS. KUPE-ARION:  Objection to the
24  form of the question, competence and

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 46

1      record since we have gone away from the
2      specifics, I have now withdrawn my
3      confidentiality objection for the time
4      being.
5  BY THE WITNESS:
6      A    It's a technique that applies
7  pressure to various positions on a person's
8  body where nerves are present that would cause
9  pain, and it's applied to get a person's
10  compliance with whatever directions they're
11  given.
12      Q    Does the police department teach this
13  technique to be applied to the face?
14      MS. KUPE-ARION:  Objection to the
15      form of the question, competence and you
16      have another witness that will be talking
17      specifically about that particular
18      training, and that's not the purposes for
19      which Chief Gulliford was produced today;
20      but you may answer, if you know.
21  BY THE WITNESS:
22      A    It's been awhile, but I do recall
23  being taught that.
24

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 45

1      speculative.  You may answer the question.
2  BY THE WITNESS:
3      A    It's possible, yes.
4  BY MR. MORRISSEY:
5      Q    Can you tell me what you base that
6  testimony on?
7      A    I believe there was one statement
8  where she was -- while she was going limp and
9  if the officers were not prepared, that could
10  have injured the officers.  She was swearing
11  and cursing.  I believe at one point, she was
12  putting her feet against the wall or the door.
13      Q    Based on your review, did you --
14  Strike that.  Are patrol officers taught a pain
15  compliance technique?
16      MS. KUPE-ARION:  Objection to the
17      form of the question, but you may answer.
18  BY THE WITNESS:
19      A    Yes.
20  BY MR. MORRISSEY:
21      Q    What is a pain compliance technique?
22      MS. KUPE-ARION:  Objection to the
23      form of the question.  You may answer.
24      MR. PALLES:  Let me just say for the

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 47

1  BY MR. MORRISSEY:
2      Q    Are there circumstances where a pain
3  compliance technique is taught to be applied to
4  arrestees?
5      MS. KUPE-ARION:  Same objection.  You
6      may answer, to the best of your knowledge.
7  BY THE WITNESS:
8      A    Yes.
9  BY MR. MORRISSEY:
10      Q    What is your understanding of the
11  circumstances?
12      A    If they were active resistors.
13      Q    What is an active resistor?
14      A    A person that's using body movement
15  away from the control -- to get away from the
16  control of the controlling officer.
17      Q    Based on your Command Channel Review,
18  did you consider Ms. King an active resistor in
19  the 6th District lockup?
20      MS. KUPE-ARION:  Objection.  I think
21      that was asked and answered before, but you
22      can answer.
23  BY THE WITNESS:
24      A    Correct.  She was an uncooperative

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 12

WAYNE GULLIFORD
November 24, 2015

Page 48

1  arrestee.
2  BY MR. MORRISSEY:
3      Q    Is that different than an active
4  resistor?
5      A    Yes.
6      Q    Based on your knowledge, can a police
7  officer use a pain compliance technique to an
8  uncooperative arrestee?
9          MS. KUPE-ARION:  Objection to the
10     form of the question, speculative and
11     competence.  You may answer.
12 BY THE WITNESS:
13     A    I would say no.
14 BY MR. MORRISSEY:
15     Q    You also -- Part of Allegation 1
16 against Officer Clifford was that he did not
17 document the use of force by Mr. Evans in the
18 lockup; is that also true?
19         MS. KUPE-ARION:  Do you want that
20     confidentiality marking back on?
21         MR. PALLES:  Yes, I'm sorry.  I
22     apologize.  Thank you.  Going back to -- I
23     request that this be under -- be treated
24     confidentially.

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 49

1  BY THE WITNESS:
2      A    Could you repeat the question?
3  BY MR. MORRISSEY:
4      Q    Sure.  Part of Allegation 1 that was
5  sustained by IPRA was that Officer Clifford
6  failed to take appropriate action and report
7  the incident; is that fair to say?
8      A    That's what the allegation is, yes.
9      Q    What did you consider when you were
10 conducting your Command Channel Review relating
11 to that portion of the allegation?
12         MS. KUPE-ARION:  Objection to the
13     form of the question.  You may answer if
14     you understood the question.
15 BY THE WITNESS:
16     A    The summary of the investigator, the
17 statements of Officer Clifford.  That would be
18 it that I recall.
19 BY MR. MORRISSEY:
20     Q    You're familiar with the term TRR,
21 correct?
22     A    Correct.
23     Q    Under what circumstances is a police
24 officer supposed to complete a TRR?

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 50

1          MS. KUPE-ARION:  Objection to the
2      form of the question.  You may answer.
3  BY THE WITNESS:
4      A    When force is used during the course
5  of an arrest or when an arrestee claims injury
6  when no force is used.
7  BY MR. MORRISSEY:
8      Q    Based on your review, did you find
9  any evidence that Ms. King claimed injury when
10 she was in the 6th District lockup?
11     A    No.
12     Q    Did you review the mug shots of
13 Ms. King in the 6th District lockup?
14     A    I don't recall.
15     Q    Did you read the deposition
16 transcript of Ms. King when you were conducting
17 your review?
18         MS. KUPE-ARION:  Objection to the
19     form of the question -- actually,
20     objection, competence.  Deposition or IPRA
21     statement?
22         MR. MORRISSEY:  Deposition.
23         MS. KUPE-ARION:  Deposition in this
24     civil matter?

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 51

1          MR. MORRISSEY:  Correct.
2          MS. KUPE-ARION:  You may answer.
3  BY THE WITNESS:
4      A    I don't recall which statement I read
5  of the complainant.
6  BY MR. MORRISSEY:
7      Q    I want to direct your attention to
8  Exhibit 1, page 3183, the first full paragraph.
9  It reads:  Ms. King's central booking
10 photograph depicts her crying.  The photograph
11 also depicts swelling of Ms. King's face.  Did
12 you read that statement when you were
13 conducting your Command Channel Review?
14     A    Yes.
15     Q    Do you have any reason to dispute
16 that review by the IPRA investigator?
17     A    Excuse me, page 3183?
18     Q    Correct.
19     A    First paragraph?
20     Q    First full paragraph.  The question
21 is do you have any reason to dispute that
22 statement by the IPRA investigator?
23         MS. KUPE-ARION:  Objection to the
24     form of the question.  You may answer.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 13

WAYNE GULLIFORD
November 24, 2015

Page 52

```
 1   BY THE WITNESS:
 2       A    Because she's crying doesn't mean
 3   that she's been injured.  The swelling doesn't
 4   say exactly where on her face it was, and there
 5   was evidence of a struggle with her -- the
 6   complainant who had her arrested.
 7   BY MR. MORRISSEY:
 8       Q    Did you review the photograph before
 9   you made your Command Channel finding?
10       A    I don't recall if I did.
11       Q    When you conducted your Command
12   Channel Review, did you look to determine
13   whether Officer Clifford had other sustained CR
14   findings against him?
15           MS. KUPE-ARION:  Objection, relevance
16       but you may answer.
17   BY THE WITNESS:
18       A    I would have had the opportunity to
19   review his disciplinary history.
20   BY MR. MORRISSEY:
21       Q    Does a police department require
22   documentation of an uncooperative arrestee?
23           MS. KUPE-ARION:  Objection to the
24       form of the question, also competence.
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 54

```
 1   BY MR. MORRISSEY:
 2       Q    When you don't agree with an IPRA
 3   sustained finding, do you typically provide
 4   instructions where you want IPRA to conduct a
 5   further investigation?
 6       A    If my determination is that I believe
 7   further investigation is needed.
 8       Q    Based on your review of Officer
 9   Clifford's CR finding, did you believe
10   additional investigation was necessary?
11       A    No, I believe a different finding was
12   more appropriate.
13       Q    Did you have any conversation with
14   Superintendent McCarthy about your Command
15   Channel Review of Officer Clifford's CR file?
16       A    No, I did not.
17       Q    Did you have any conversation with
18   the first assistant superintendent about your
19   investigation regarding Officer Clifford's CR
20   finding?
21       A    With First Deputy Superintendent
22   Escalante?
23       Q    Correct.
24       A    No, sir.
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 53

```
 1       Again, Chief Gulliford was not produced to
 2       speak on department policies, but to answer
 3       questions regarding Officer Clifford's --
 4       IPRA's review concerning Officer Sutton --
 5       I mean, sorry, Clifford.  You may answer if
 6       you know to the best -- based on your
 7       experience.
 8   BY THE WITNESS:
 9       A    It's usually documented in the watch
10   commander comments or watch operations,
11   lieutenant comments on the arrest report.
12   BY MR. MORRISSEY:
13       Q    Is that pursuant to any general order
14   or special order?
15       A    I don't recall if it is.
16       Q    After you concluded your Command
17   Channel, did you have any instructions with how
18   you wanted IPRA to conduct further
19   investigation regarding Officer Clifford?
20           MS. KUPE-ARION:  Objection to the
21       form of the question, but you may answer.
22   BY THE WITNESS:
23       A    No, I don't believe I made any
24   recommendations.
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 55

```
 1       Q    After you conducted your Command
 2   Channel Review, did you discuss with Ms. Walsh
 3   your Command Channel Review of Officer
 4   Clifford?
 5       A    I don't recall doing that, no.
 6           MR. MORRISSEY:  Nothing further.
 7           MR. PALLES:  I just want to clarify
 8       one thing.
 9        C R O S S - E X A M I N A T I O N
10           BY MR. PALLES:
11       Q    Mr. Morrissey had a series of
12   questions in which you seemed to draw a
13   distinction between a passive resistor and an
14   uncooperative arrestee, correct?
15       A    We also discussed active resistor,
16   too, I believe.
17       Q    Yeah, that's true.  But in any event,
18   the difference between a passive resistor and
19   an uncooperative arrestee is what, the fact
20   that they're in custody?
21       A    Basically that's the big difference.
22       Q    And you indicated, did you not, with
23   respect to -- well, you're familiar with the
24   terminology passive resistor is somebody who
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 14

WAYNE GULLIFORD
November 24, 2015

Page 56

1  doesn't comply with verbal orders or direction;
2  is that right?
3      A   Yes.
4      Q   And correct me if I'm wrong, you seem
5  to indicate that once a person has been
6  arrested, the use of physical force would
7  generally be confined to that involving an
8  active resistor in custody; is that right?
9          MS. KUPE-ARION:  Objection, somewhat
10         misrepresents prior testimony, but you may
11         answer.
12         MR. PALLES:  I wanted to clarify.
13 BY THE WITNESS:
14     A   **Generally, it depends on the level of**
15 **the resistance or lack of cooperation by the**
16 **arrestee.**
17 BY MR. PALLES:
18     Q   You indicated that somebody who I
19 might refer to unintelligently as a passive
20 resistor but really an uncooperative arrestee,
21 one of the solutions for them would be to place
22 them in a holding cell, correct, until you can
23 assure compliance?
24     A   **That probably won't assure**

WAYNE GULLIFORD
November 24, 2015

Page 57

1  **compliance.  I mean, in my experience, it's --**
2  **The lockup keepers talk to the arrestee, try to**
3  **ask if they are ready to be processed and just**
4  **try to ask for their cooperation.**
5      Q   Now, the holding cell, was that
6  located in the lockup area or is it someplace
7  else in the 6th District, if you know?
8      A   **In the 6th District, there actually**
9  **is not a female holding cell.  There are some**
10 **other rooms available where people can be**
11 **detained.**
12     Q   Okay, so in this particular context,
13 placing Ms. King in a holding cell wasn't, as a
14 result of her uncooperativeness, was not
15 necessarily an -- an option that was open to
16 the officers involved; would you agree with
17 that?
18     A   Yes.
19         MR. PALLES:  That's all the questions
20 I have.
21     R E D I R E C T   E X A M I N A T I O N
22         BY MR. MORRISSEY:
23     Q   What rooms in the 6th District could
24 you have used -- Strike that.  Where are these

WAYNE GULLIFORD
November 24, 2015

Page 58

1  other rooms in the 6th District where you could
2  hold detainees or arrestees?
3          MS. KUPE-ARION:  Objection to the
4          form of the -- actually, objection,
5          competence.  If you know, you can answer.
6  BY THE WITNESS:
7      A   **If I recall, there are -- There's at**
8  **least one room adjacent to the processing area**
9  **that's available.**
10 BY MR. MORRISSEY:
11     Q   And it could be used to hold or
12 detain an uncooperative female arrestee,
13 correct?
14         MS. KUPE-ARION:  Objection to the
15         form of the question, speculative.
16 BY THE WITNESS:
17     A   **It's possible.**
18 BY MR. MORRISSEY:
19     Q   Can a police officer use a pain
20 compliance technique to a passive resistor in
21 the lockup?
22         MS. KUPE-ARION:  Objection to the
23         form of the question.  I think we already
24         talked about the terminology issue before,

WAYNE GULLIFORD
November 24, 2015

Page 59

1          also speculative and incomplete
2          hypothetical, but you may answer.
3  BY THE WITNESS:
4      A   **I don't recall at this time.**
5  BY MR. MORRISSEY:
6      Q   Can you recall any circumstances when
7  a police officer can use a pain compliance
8  technique on a passive resistor in the lockup?
9          MS. KUPE-ARION:  Same objection as
10         well as, again, Chief Gulliford is not
11         being produced today to talk about lockup
12         procedures or use of force generally.  You
13         have the other witness that's waiting for
14         you actually at this point in time.
15         So I think those questions are
16         better suited for that person; but if you
17         know based on your experience, Chief, you
18         may answer.
19 BY THE WITNESS:
20     A   **I don't -- you know, for a passive**
21 **resistor, I would say it's not appropriate.**
22         MR. MORRISSEY:  I have nothing
23 further.  Thanks, Chief.
24         MR. PALLES:  Thank you, Chief.

Plaintiff's Exhibit 2 Page 15

WAYNE GULLIFORD
November 24, 2015

Page 60

```
 1        MS. KUPE-ARION:  Chief, you have one
 2   of two options.  You can either waive your
 3   signature or reserve it meaning that
 4   whenever any of us will order this
 5   transcript and if you reserve your
 6   signature, you would see the transcript and
 7   then you would be able to sign off on it
 8   before it's disseminated; or, you waive it,
 9   and you won't be able to review it.
10        THE WITNESS:  When will it be ready
11   to review?
12        MS. KUPE-ARION:  It's whenever any of
13   us order it.  That could be never.  It
14   could be tomorrow.  It could be like two
15   weeks from now or years from now.  Who
16   knows?
17        THE WITNESS:  I'll waive it.
18
19        FURTHER DEPONENT SAITH NOT.....
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 62

```
 1        IN WITNESS WHEREOF, I do hereunto set
 2   my hand at Chicago, Illinois, this _____ day
 3   of _____, 2015.
 4
 5
 6
 7
 8   Peggy A. Anderson
 9   Certified Shorthand Reporter
10   License No. 084-003813
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

WAYNE GULLIFORD
November 24, 2015

Page 61

```
 1   STATE OF ILLINOIS )
                        )  ss:
 2   COUNTY OF C O O K )
 3        I, Peggy A. Anderson, a Certified
 4   Shorthand Reporter in the State of Illinois do
 5   hereby certify:
 6        That previous to the commencement of
 7   the examination of the witness, the witness was
 8   duly sworn to testify the whole truth
 9   concerning the matters herein;
10        That the foregoing deposition
11   transcript was reported stenographically by me,
12   was thereafter reduced to typewriting under my
13   personal direction, and constitutes a true
14   record of the testimony given and the
15   proceedings had;
16        That the said deposition was taken
17   before me at the time and place specified;
18        That the said deposition was
19   adjourned as stated herein;
20        That I am not a relative or employee
21   or attorney or counsel, nor a relative or
22   employee of such attorney or counsel for any of
23   the parties hereto, nor interested directly or
24   indirectly in the outcome of this action.
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 2 Page 16

Transcript of the Testimony of
**ROBERT J. KLIMAS**

**Date:** October 16, 2015

**Case:** RITA KING VS. GLENN EVANS, ET AL.

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

ROBERT J. KLIMAS
October 16, 2015

Page 2

```
1
2    APPEARANCES:
3        THOMAS G. MORRISSEY, LTD.
     BY:  MR. THOMAS G. MORRISSEY
4            MR. PATRICK W. MORRISSEY
         10150 South Western Avenue
5        Chicago, Illinois  60643
         (773) 233-7900
6        tgmassistant@gmail.com

7                Representing the Plaintiff;
8
9    CITY OF CHICAGO
     LAW DEPARTMENT
10   BY:  MS. CARLA MADELEINE KUPE-ARION
             MS. TIFFANY HARRIS
11       30 North LaSalle Street
         Suite 900
12       Chicago, Illinois  60602
         (312) 744-5106
13       carla.kupearion@cityofchicago.org
14               Representing the City of Chicago;
15
         RAVITZ & PALLES, PC
16
     BY:  MR. ERIC PALLES
17       203 North LaSalle Street
         Suite 2100
18       Chicago, Illinois  60602
         (312) 558-1689
19       epalles@ravitzpalles.com
20               Representing Glenn Evans.
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 1

```
     IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

RITA KING,               )
                         )
         Plaintiff,      )
                         )
  vs.                    ) No. 13 C 1937
                         )
GLENN EVANS, et al.,     )
                         )
         Defendants.     )


     The deposition of ROBERT J. KLIMAS,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before EMILY TOMALA, CSR, a notary public
within and for the County of Cook and State of
Illinois, at 10150 South Western, Chicago,
Illinois, on the 16th day of October, 2015, at
the hour of 2:00 o'clock p.m.
```

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 3

```
1                  I N D E X
2    WITNESS                      EXAMINATION
3    ROBERT J. KLIMAS
4      By Mr. Morrissey:              4-91
5
6
7
8
9
                 E X H I B I T S
10   NUMBER                  MARKED FOR ID
11   Plaintiff's Exhibit
12     No. 1                      5
       No. 2                      46
13     No. 3                      59
       No. 4                      85
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 1

Page 4

1  (Whereupon, the witness was

2  duly sworn.)

3  MR. MORRISSEY:  This is a 30(b)(6)

4  deposition taken by notice and continued to

5  today's date.

6  Sir, I'm going to ask you a series of

7  questions in regards to a notice that was

8  given to your attorneys, and I'm going to

9  ask you to answer orally so the court

10  reporter can take down your response.  If

11  you don't understand my question, please

12  stop me, and I'll attempt to rephrase it.

13  You're free if there's no question pending

14  to take a break at any time.

15  ROBERT J. KLIMAS,

16  having been first duly sworn, was examined and

17  testified as follows:

18  DIRECT EXAMINATION

19  BY MR. MORRISSEY:

20  Q.  Will you please state your full name

21  for the record?

22  A.  It's Robert Klimas, K-l-i-m-a-s.

23

24

Page 6

1  civilian commander.  It was kind of a unique

2  position.  I have been there since August of

3  2008 after retiring from the FBI at the end of

4  July 2008.

5  Q.  Were you ever a sworn member of the

6  Chicago Police Department?

7  A.  Never.

8  Q.  What is your -- where did you go to

9  college?

10  A.  Starting with University of Illinois,

11  Urbana-Champaign, graduated there in 1980 with a

12  bachelor's in industrial engineering.  In 1981,

13  I received a master's of industrial engineering

14  from Purdue University at West Lafayette,

15  Indiana.  And in 1987, I received a juris

16  doctorate from IAT Chicago Kent College of Law.

17  That's it.

18  Q.  After graduating from University of

19  Illinois, did you work as an industrial

20  engineer?

21  A.  No.  I went directly to Purdue

22  University and received my master's.  Then I

23  worked after that.

24  Q.  After receiving your master's in

Page 5

1  (Whereupon, Plaintiff's Exhibit

2  No. 1 was marked for

3  identification.)

4  BY MR. MORRISSEY:

5  Q.  Commander Klimas, I'm going to show you

6  what's been marked as Plaintiff's Exhibit No. 1.

7  It's a notice of Rule 30(b)(6) deposition, and

8  I'm going to ask you -- it's a 4-page document.

9  I'm going to ask you to look at that document

10  and tell me for what topics you have been

11  produced by the City of Chicago.

12  A.  Okay, number 1 (A),(D),(E),(F),(B) and

13  (C) to a limited amount.

14  Q.  To number 1?

15  A.  Yeah, number 1; 2, 3 with -- limited 3,

16  that's all.

17  Q.  What is your current rank with the

18  Chicago Police Department?

19  A.  I'm a commander in the Bureau of

20  Internal Affairs within the Chicago Police

21  Department.

22  Q.  How long have you been a sworn Chicago

23  police officer?

24  A.  I am not a sworn commander.  I'm a

Page 7

1  engineering in 1981, did you work as an

2  engineer?

3  A.  I worked as a consultant with Arthur

4  Andersen & Company in Chicago in their

5  management information consulting division.  I

6  was there until 1984.

7  Q.  You mentioned you retired from the FBI.

8  When did you join the FBI?

9  A.  I started in August of 1987 and retired

10  in July 2008.

11  Q.  What was your position -- your last

12  position with the FBI?

13  A.  I was always a special agent with the

14  FBI.

15  Q.  You mentioned that you went to law

16  school and graduated in 1987.  Are you a

17  licensed attorney?

18  A.  I took the Bar, passed the Bar in 1987.

19  I am a nonpracticing lawyer.  I never practiced.

20  At one point, the State of Illinois required

21  continuing legal education, and that was after

22  1987.  And I wasn't living in Illinois.  So I

23  did not -- at that point, I petitioned the

24  Illinois Supreme Court to take me off the rolls

Plaintiff's Exhibit 3 Page 2

ROBERT J. KLIMAS
October 16, 2015

Page 8

1  of a licensed practicing attorney.  I would have
2  to petition back.
3      Q.   You mentioned that after retirement
4  from the FBI, you joined the Chicago Police
5  Department, correct?
6      A.   That's correct.
7      Q.   And you took a position as commander in
8  the Chicago Police Department, correct?
9      A.   That is correct, in the Bureau of
10 Internal Affairs.
11     Q.   Is that an exempt position?
12     A.   It is.
13     Q.   How does one apply to be a commander in
14 the Chicago Police Department if -- let me
15 rephrase the question.
16         Are you the only commander in the
17 Chicago Police Department who is not a sworn
18 officer?
19         MS. KUPE-ARION:  Objection to the form
20     of the question.
21 BY MR. MORRISSEY:
22     Q.   To your knowledge?
23         MS. KUPE-ARION:  You may answer if you
24     know.

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 9

1  BY THE WITNESS:
2      A.   I am.
3  BY MR. MORRISSEY:
4      Q.   How does one apply to become a
5  commander in the police department if they're
6  not already a sworn member of the Chicago Police
7  Department?
8      A.   That was a request by
9  then-superintendent Jody Weis that they were
10 looking for someone to come in as a commander in
11 Internal Affairs from the outside of the Chicago
12 Police Department back in 2008.
13     Q.   To your knowledge, were you hired
14 directly by the then-superintendent of police,
15 Jody Weis?
16     A.   I was.
17     Q.   To your knowledge, are all commanders
18 within the Chicago Police Department hired by
19 the superintendent of police?
20         MS. KUPE-ARION:  Objection to the form
21     of the question, but you may answer if you
22     understand.
23         MR. MORRISSEY:  Let me rephrase the
24     question.

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 10

1  BY MR. MORRISSEY:
2      Q.   Do you know how commanders in the
3  police department are normally selected?
4      A.   Yes.
5      Q.   Tell me about the selection process for
6  becoming a commander in the Chicago Police
7  Department.
8      A.   The superintendent has the ability to
9  promote personnel to those positions.  There's
10 civilians, and there's sworn members within the
11 Chicago Police Department in the exempt ranks --
12 in the command staff ranks, I should say.  That
13 term has gone back and forth, exempt, command
14 staff.  And I'm not sure who started which term.
15 Superintendent Weis called it one.  I don't know
16 if it was exempt.  The other was command staff.
17 We used one or the other.
18     Q.   Since you have been with the Chicago
19 Police Department in 2008 to the present, to
20 your knowledge, has it always been the
21 superintendent of police that promotes
22 individuals to the command position, to be a
23 commander of the Chicago Police Department?
24         MS. KUPE-ARION:  I believe that was

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 11

1      asked and answered, but you can answer
2      again.
3  BY THE WITNESS:
4      A.   That's my understanding.
5  BY MR. MORRISSEY:
6      Q.   Is there a formal application process
7  in the Chicago Police Department to seek the
8  position of a commander?
9          MS. KUPE-ARION:  Objection to the form
10     of the question especially the term formal,
11     but you may answer the question if you
12     understand.
13 BY THE WITNESS:
14     A.   I could speak for what occurred with
15 me.  I can generally say what happens from what
16 Bureau of Internal Affairs does for certain
17 individuals that are being promoted to the
18 command staff rank.
19         MS. KUPE-ARION:  And let me just -- so
20     we're clear just because we have the
21     uniqueness, I guess, of civilians getting
22     the title of commander, so, Counsel, from
23     now on when you say commander, you're
24     talking about sworn police officers within

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 3

ROBERT J. KLIMAS
October 16, 2015

Page 12

1    **the police department, correct, as far as**

2    **your questioning concerning the commander**

3    **position, right?**

4    BY MR. MORRISSEY:

5    Q.  Mr. Klimas, you're the only nonsworn

6    commander currently with the Chicago Police

7    Department?

8    **A.  That's correct.**

9    Q.  And from 2008 to the present, you're

10   not aware of any other nonsworn commander in the

11   police department?

12   **A.  That's correct.**

13   **MS. KUPE-ARION:  I just want to make**

14   **sure your line of questioning, Counsel,**

15   **concerns sworn members.**

16   MR. MORRISSEY:  That would include

17   everybody except the deponent.

18   MS. KUPE-ARION:  Right, but I just want

19   to be clear so that he does not have to keep

20   answering on both --

21   MR. MORRISSEY:  All right.

22   BY MR. MORRISSEY:

23   Q.  Before we get to that, other than --

24   you're familiar with the CLEAR system, correct?

TOOMEY REPORTING
312-853-0648

ROBERT J. KLIMAS
October 16, 2015

Page 13

1    **A.  Absolutely.**

2    Q.  What is the CLEAR system?

3    **A.  The CLEAR system is a computer software**

4    **program that we access -- certain individuals**

5    **have access to different modules, more modules**

6    **than others, and it depends on their rank and**

7    **what they need to view, but it has an Internal**

8    **Affairs module in there.  It has arrest module,**

9    **inventory, human resources, major notifications,**

10   **patrol, et cetera, et cetera.  It's the nuts and**

11   **bolts of what happens within the department on a**

12   **daily basis.**

13   Q.  For purposes of this deposition, if a

14   citizen makes a complaint either to IPRA or the

15   Chicago Police Department that a police officer

16   physically abused him or her, can we agree that

17   that would be a claim about excessive force --

18   MS. KUPE-ARION:  Objection to the form

19   of the question.

20   BY MR. MORRISSEY:

21   Q.  -- by a citizen?

22   The term excessive force would include

23   a claim where a citizen contends that a police

24   officer used more force than necessary?

TOOMEY REPORTING
312-853-0648

ROBERT J. KLIMAS
October 16, 2015

Page 14

1    MR. PALLES:  I'm going to object to the

2    form of the question.

3    BY THE WITNESS:

4    **A.  It would be a citizen's complaint that**

5    **is captured by the auto CR which is -- CR stands**

6    **for complaint register, and it is issued a log**

7    **number.  That is completed or done by IPRA, and**

8    **that's the Independent Police Review Authority,**

9    **I-P-R-A.  And I'll call it IPRA.**

10   BY MR. MORRISSEY:

11   Q.  Now, can a citizen make a complaint to

12   a member of the Chicago Police Department that

13   another member of the department used excessive

14   force against them?

15   **A.  Absolutely.**

16   Q.  And how does the Chicago Police

17   Department process such a complaint?

18   **A.  Normally, typically what happens is,**

19   **let's say that citizen walked into a district**

20   **station, went to the front desk, talked to a**

21   **supervisor, that being the sergeant or above,**

22   **lodged their complaint of what happened.  That**

23   **supervisor would complete a to-from, immediately**

24   **call IPRA, and obtain a log number.  That**

TOOMEY REPORTING
312-853-0648

ROBERT J. KLIMAS
October 16, 2015

Page 15

1    **to-from explaining what was related to them,**

2    **it's not verbatim, but in summary what that**

3    **citizen just told that supervisor is then faxed**

4    **over to IPRA and attached to that log number.**

5    **So what you have now is 2 documents; 1 is the**

6    **initial call by the supervisor to IPRA and**

7    **that -- what is completed is called a face**

8    **sheet.  That's the initial facts that have been**

9    **transmitted from that supervisor at the district**

10   **to IPRA.  Attached to that log number is also --**

11   **it would be document number 2, in this case, the**

12   **initiation report.  That is that supervisor's**

13   **to-from, again, summarizing what that citizen**

14   **complained to that supervisor.**

15   Q.  I'm not certain I understand.  John Doe

16   walks into the First District and complains that

17   Officer Larry struck me in the face during the

18   course of an arrest.  He then walks into the --

19   he then talks to the sergeant at the desk.  Is

20   there any document that is maintained by the

21   Chicago Police Department in regards to that

22   citizen complaint?

23   **A.  Yes.  That initial to-from that that**

24   **supervisor is supposed to complete about what**

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 4

ROBERT J. KLIMAS
October 16, 2015

Page 16

1  that citizen, in your case, example, Larry, told
2  that sergeant, supposed to complete a to-from
3  and fax that over to IPRA after they obtained a
4  log number because that to-from should include
5  the log number that IPRA provided that
6  supervisor so they can put that -- type it into
7  that to-from.
8     Q.   What happens to the to-from that's
9  prepared by the sergeant?
10    A.   It's faxed over to IPRA, and it's
11 included in the automated CR.
12    Q.   Does the Chicago Police Department open
13 an investigation in regards to that citizen's
14 complaint that a police officer used excessive
15 force against him or her?
16    A.   No --
17         MS. KUPE-ARION:  Objection to the form
18    of the question, but you may answer.
19 BY THE WITNESS:
20    A.   No.  It's IPRA's responsibility by
21 ordinance to investigate all excessive force
22 complaints.
23
24

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 17

1  BY MR. MORRISSEY:
2     Q.   So there's a difference -- if a citizen
3  walks into the First District and says, my
4  neighbor struck me in the face, and the person
5  wants to fill out a complaint against the
6  neighbor, does the police department investigate
7  that incident?
8         MS. KUPE-ARION:  Objection to the form
9    of the question.
10 BY MR. MORRISSEY:
11    Q.   Do you understand the question?
12    A.   Let's step back real quick so I can
13 explain.  Your example, I was assuming this
14 officer that's alleged the excessive force is on
15 duty, that this citizen came in and complained
16 about an officer that's on duty.
17    Q.   Correct.
18    A.   Okay.  That's my testimony about an
19 on-duty officer.  What you have just described
20 is my neighbor has struck me, okay, they come
21 into the First District, they're reporting --
22 it's a complaint against the neighbor.  Yes,
23 that would generate an incident report.  That
24 would then eventually go to the detective

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 18

1  division to look at -- to investigate that
2  assault or battery.  That neighbor could also be
3  a police officer, but off duty.
4     Q.   The example I'm giving you is that a
5  nonmember -- nonsworn member of the Chicago
6  Police Department.
7     A.   Okay.  In that case, that citizen comes
8  to the front desk.  The officer would fill out
9  an incident report.  And I may have the wrong
10 term for that.  It could be case report.  That
11 eventually gets to the detective division.
12 They would investigate that as an assault or
13 battery.
14    Q.   But in the instance where a citizen
15 comes in to report being struck in the face by
16 an on-duty police officer, there's a to-from
17 done by the supervisor in the First District,
18 and there's a forward to IPRA, correct, with the
19 CR number?
20    A.   That's correct.  That's how it's
21 supposed to occur.
22    Q.   And IPRA is the one that then conducts
23 whatever investigation is done of that incident?
24    A.   That is correct, by ordinance.

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 19

1     Q.   The CR number that is obtained, is that
2  entered into the CLEAR system?
3     A.   It is under what's called auto CR.
4     Q.   And is that -- is there any other way
5  to your knowledge that the City of Chicago can
6  track claims of excessive force by members of
7  the Chicago Police Department?
8         MS. KUPE-ARION:  Objection to the form
9    of the question, but you may answer if you
10   understand, and to the best of your
11   knowledge.
12 BY THE WITNESS:
13    A.   The Chicago Police Department operates
14 on 2 databases, auto CR and CRMS, C-R-M-S, which
15 stands for complaint register management system.
16 The Bureau of Internal Affairs and IPRA utilize
17 auto CR.  The districts' units are paper.  So
18 all investigations done on complaints, and
19 that's CRs, all are entered into CRMS at some
20 point because you have paper and you have the
21 automated system.  It all has to be manually
22 typed into CRMS.  So in order to generate some
23 of the reports, we utilize auto CR and also
24 CRMS.  CRMS can also be searched for excessive

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 5

ROBERT J. KLIMAS
October 16, 2015

Page 20

```
 1   reports, and it goes back further than auto CR.
 2   Auto CR, to the best of my knowledge, started
 3   around early 2007.  So there would not be
 4   records prior to that, but you can go to CRMS,
 5   C-R-M-S, that will go back to the 1980s.
 6   BY MR. MORRISSEY:
 7       Q.   When there's a finding -- Strike that.
 8            Is it correct that the City of Chicago
 9   depends upon IPRA to make initial findings in
10   regards to claims of excessive force brought by
11   citizens involving members of the Chicago Police
12   Department?
13       A.   It is by municipal ordinance that they
14   investigate that, and that's their
15   responsibility is to investigate that and
16   determine what happened and come with a finding.
17   There's 4 findings.
18       Q.   What are the 4 determinations or
19   findings that IPRA can render in regards to a CR
20   that's opened by a citizen?
21       A.   Not sustained, exonerated, unfounded,
22   sustained.
23       Q.   Are those 4 findings -- Strike that.
24            If you knew the name of a police
```

ROBERT J. KLIMAS
October 16, 2015

Page 22

```
 1   that's active on this old, very old system, but
 2   the information that's there is very, very
 3   limited, and sometimes it doesn't even make
 4   sense, but I'm throwing that out there.
 5   BY MR. MORRISSEY:
 6       Q.   What is the Internal Affairs unit of
 7   the Chicago Police Department?
 8       A.   It is the unit that investigates
 9   department members, both sworn and civilian, for
10   misconduct and for infractions related to
11   violations of the rules, procedures, and
12   policies of the Chicago Police Department.
13       Q.   Does Internal Affairs investigate
14   police officers and the supervisory rank in
15   regards to claims by citizens that excessive
16   force has been used against them?
17       A.   No.  That is done by IPRA.
18       Q.   The general orders of the Chicago
19   Police Department require police officers to
20   conform their conduct under the constitution, I
21   assume, correct, hopefully?  Strike that
22   question.
23            MS. KUPE-ARION:  Objection to the form
24   of the question.
```

ROBERT J. KLIMAS
October 16, 2015

Page 21

```
 1   officer and the person's star number, can you
 2   access any findings by IPRA in regards to
 3   citizen complaints that have been registered
 4   against that officer?
 5       A.   Yes.
 6       Q.   But CLEAR only goes back to 2007,
 7   correct?
 8       A.   Correct.
 9       Q.   But you can go back further in CRMS?
10       A.   Correct.
11       Q.   How hard is it to determine all the CRs
12   that have been filed against a police officer in
13   either CLEAR or CRMS?
14            MS. KUPE-ARION:  Objection to the form
15   of the question, but you may answer.
16   BY THE WITNESS:
17       A.   It's a computer database.  You enter
18   the person's name, and it pops up, and the
19   information comes up on the screen.  There's one
20   little caveat to do this.  It really depends on
21   when the member started with the Chicago Police
22   Department.  There's a very, very old system
23   that had 2 tape reels.  There are times when --
24   it's possible that someone may still --
```

ROBERT J. KLIMAS
October 16, 2015

Page 23

```
 1   BY MR. MORRISSEY:
 2       Q.   You mentioned that Internal Affairs
 3   conducts investigations?
 4       A.   Correct.
 5       Q.   How does an investigation get started
 6   in Internal Affairs?
 7       A.   Everything goes through IPRA.  All
 8   complaints, whether that is complaints that are
 9   eventually going to come to Internal Affairs or
10   going to end up with IPRA, everything starts at
11   IPRA.  IPRA initiates or assigns a log number to
12   all complaints, whether that's citizens'
13   complaints or internal complaints, that is, a
14   supervisor on another member, another member on
15   another member of the same rank.  Everything
16   goes to IPRA and is assigned a number.  IPRA
17   goes through that daily list of log numbers that
18   comes in.  It's 24/7.  They look at what the
19   complaint is.  They keep theirs.  Whatever by
20   ordinance they are charged with investigating
21   stays with IPRA.  Everything else gets
22   electronically sent over to the Bureau of
23   Internal Affairs.  We have an intake section or
24   unit within the Bureau of Internal Affairs that
```

Plaintiff's Exhibit 3 Page 6

Page 24

1  goes through all those log numbers that come in
2  on a daily basis.  Some of them have nothing to
3  do with the department or those are -- they're
4  complaints that have -- that we do not
5  investigate; example, a normal ticket.  You got
6  a speeding ticket.  You got a traffic ticket.
7  You're going to go to court, and the judge is
8  going to rule on the ticket.  We don't
9  investigate tickets unless it's an abuse of one
10  member onto another citizen, excessive amount,
11  you know, constantly 3 tickets a day on the same
12  car, then we'll look at that, but there are
13  complaints that relate to cars going through
14  intersections and the plate number has nothing
15  to do with the department; it's an M plate from
16  Cook County.
17      Taking out all that, what's left is what's
18  going to be assigned within the Bureau of
19  Internal Affairs.  Those assignments can go to
20  the district in units or could stay with the
21  Bureau of Internal Affairs.  We make that
22  decision where that complaint goes.
23      Q.  In Internal Affairs, how many sworn
24  officers are there?

Page 25

1      A.  We have just under 100 members within
2  the Bureau of Internal Affairs, and I would say
3  around 90 are sworn.
4      Q.  Are there detectives assigned to
5  Internal Affairs?
6      A.  We have 3.
7      Q.  Are there sergeants assigned to
8  Internal Affairs?
9      A.  Yes.
10      Q.  How many?
11      A.  Over 50.
12      Q.  Are there lieutenants assigned to
13  Internal Affairs?
14      A.  There are.
15      Q.  How many?
16      A.  3.
17      Q.  What about captains?
18      A.  No.
19      Q.  And there's 1 commander?
20      A.  No, there's 2.
21      Q.  2 commanders, okay.  Are the sergeants
22  trained -- did most of the 50 sergeants come up
23  through the ranks?
24      MS. KUPE-ARION:  Objection to the form

Page 26

1      of the question.
2      MR. MORRISSEY:  I'll rephrase the
3  question.
4  BY MR. MORRISSEY:
5      Q.  Are the 50 sergeants skilled
6  investigators?
7      MS. KUPE-ARION:  Objection to the form
8      of the question.  Are we talking about
9      occupational, special training?  What are we
10      talking about?  That's kind of a broad
11      question.
12  BY MR. MORRISSEY:
13      Q.  You mentioned that you have 3
14  detectives, correct?
15      A.  Correct.
16      Q.  Do they receive training within the
17  Chicago Police Department in regards to
18  conducting investigations?
19      A.  Yes, they receive a certain amount of
20  training of how to conduct the complaint
21  register investigations; however, they are used
22  for criminal activity, okay.  So we have a
23  section within the Bureau of Internal Affairs
24  that handles criminal activity of department

Page 27

1  members, both civilians and sworn.  Those
2  detectives are assigned to that unit.
3      Q.  Do the detectives, the 3 detectives
4  work on citizens' complaints in regards to
5  excessive force by a police officer?
6      A.  No.
7      Q.  You have 50 sergeants.  Are they -- do
8  they receive training in conducting
9  investigations?
10      A.  Training, yes, in CR investigations
11  when they initially come over.
12      Q.  That's after IPRA has sorted through
13  the ones that they determine are their
14  responsibility, correct?
15      A.  That's correct.
16      Q.  But the 50 sergeants do not handle
17  investigations in regards to a citizen
18  complaining about the conduct of a sworn member
19  of the police department?
20      MS. KUPE-ARION:  Objection to the form
21      of the question and mischaracterizes prior
22      testimony.
23  BY MR. MORRISSEY:
24      Q.  Do you understand the question?

Plaintiff's Exhibit 3 Page 7

ROBERT J. KLIMAS
October 16, 2015

Page 28

1  A.  Did you say that our sergeants do not
2  investigate sworn members?
3  Q.  No.  The question was, when a citizen
4  makes a complaint that a police officer has
5  used, let's say, excessive force against them,
6  the 50 sergeants in Internal Affairs are not
7  assigned to investigate those types of matters?
8  A.  That is correct.  They don't
9  investigate excessive force.
10  Q.  Does the Internal Affairs division have
11  any role in monitoring the number of complaints
12  against a police officer that are brought by
13  citizens for, let's say, excessive force?
14  A.  We do have a role.
15  Q.  What is that role?
16  A.  On a quarterly basis, we run a computer
17  report based on parameters that are in the
18  Chicago Police Department's directives, and
19  there's specifically 2 of them.  That report is
20  generated.  It is disseminated to the
21  appropriate units and districts and to human
22  resources.
23  Q.  What are the parameters in regards
24  to a report in regards to an individual

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 30

1  prefaced by EO.  I believe that's -- or ES.
2  Again, I would have to -- I think it's EO.  I
3  could be wrong.
4  Q.  What does EO mean?
5  A.  I was going to say employee order, but
6  that's not sounding right.  So they changed --
7  several years ago, they renumbered everything
8  and retermed everything.  All I know is it's the
9  behavioral intervention program and personnel
10  concerns.
11  Q.  What do you understand personnel
12  concerns to involve?
13  A.  Those would be 2 levels of employee
14  behavior that needs to be monitored, and under
15  behavioral intervention would be the first
16  level.  Under personnel concerns would be a step
17  up, and that would be the second level.
18  Q.  What triggers, you said, an employee
19  behavior report on a quarterly basis for an
20  individual officer?
21  MS. KUPE-ARION:  Objection to the form
22  of the question.
23
24

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 29

1  officer --
2  MS. KUPE-ARION:  What was the question?
3  I didn't catch the first part of it.
4  BY MR. MORRISSEY:
5  Q.  You used the word parameters, and you
6  also said that a quarterly report is done in
7  regards to citizen complaints against police
8  officers, correct?
9  A.  Correct.
10  Q.  Does that report come up in regards to
11  individual officers?
12  A.  It does.
13  Q.  What criteria does Internal Affairs use
14  in generating reports in regards to individual
15  officers?
16  A.  There are 2 directives, the behavioral
17  intervention program and the personnel concerns.
18  Those 2 special orders contain the parameters.
19  I would have to refer to those 2 orders to point
20  out to you those parameters.
21  Q.  Are the 2 orders, are they general
22  orders, or are they special orders by the
23  superintendent?
24  A.  They're special orders, and they're now

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 31

1  BY THE WITNESS:
2  A.  I'm going to give you an example, and
3  this is probably not correct, but it gives you a
4  flavor of what is in these orders.  It would say
5  4 SPARs within 1 year, 3 or 4 sustained
6  excessive force within a certain time frame will
7  trigger that name to be on this report.  These
8  orders go through in detail.  They have the
9  parameters.  And we run this report based on
10  those parameters.  And the names are generated
11  on this report, and it's divided up by unit or
12  district so that commander of that unit or
13  district would get the personnel under him or
14  her that meet this criteria.  Human resources
15  would also get the whole list because they're
16  the ones that are -- they administer the
17  behavioral intervention program and personnel
18  concerns.  Internal Affairs just generates the
19  report.
20  BY MR. MORRISSEY:
21  Q.  What do you mean by SPARs?
22  A.  SPARs are summary punishment action
23  request.  It's a lesser transgression, and that
24  could be uniform infractions, the officer does

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 8

ROBERT J. KLIMAS
October 16, 2015

Page 32

1  not have his star outside on his uniform,
2  doesn't have his nameplate.  If that sergeant,
3  lieutenant, commander, whatever, observes that,
4  they can issue a SPAR on that officer.  There's
5  probably 35 transgressions, and they're
6  nongrievable.  This is something that the union
7  agreed to many, many years ago.  So there's no
8  appeal process on these transgressions.  But
9  they're the day-to-day things that occur in the
10 department that supervisors can issue a SPAR.
11 Citizens' complaints cannot be handled by a
12 SPAR.  It has to go through the log system.
13     Q.  A quarterly report that's generated
14 about a police officer based upon these
15 triggers, does the report also go to the
16 superintendent?
17     A.  No.
18     Q.  Why not?
19         MS. KUPE-ARION:  Objection to the form
20     of the question.
21         MR. MORRISSEY:  If you know.
22 BY THE WITNESS:
23     A.  I have no idea.
24

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 34

1  fall within the time frame that is delineated in
2  these orders, that name should appear on that
3  report.
4  BY MR. MORRISSEY:
5     Q.  If IPRA exonerates a police officer,
6  does that -- would that possibly trigger a
7  quarterly report?
8     A.  No.
9     Q.  If IPRA not sustains a citizen
10 complaint, would that trigger one of these
11 quarterly reports about a police officer?
12     A.  No.
13     Q.  If IPRA determines the complaint was
14 unfounded, does that trigger one of these
15 quarterly reports?
16     A.  No.
17     Q.  The Internal Affairs depends upon IPRA
18 to make a judgment that a complaint is sustained
19 in order to trigger one of these quarterly
20 reports, correct?
21         MS. KUPE-ARION:  Objection to the form
22     of the question, but you can answer.
23
24

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 33

1  BY MR. MORRISSEY:
2     Q.  One of the triggers you said for the
3  report is a finding of sustained by IPRA,
4  correct?
5         MS. KUPE-ARION:  Objection to the form
6     of the question and mischaracterizes prior
7     testimony.
8  BY THE WITNESS:
9     A.  I said as an example.  I'm not sure
10 what the exact number is, and I don't know the
11 exact time frame.  I would have to look at the
12 order.  But, yes, if excessive force is
13 sustained, that would be a recommendation by
14 IPRA as sustained.
15 BY MR. MORRISSEY:
16     Q.  In order to trigger -- one of the ways
17 to trigger is for IPRA to come back with some
18 number of sustained against a police officer,
19 correct?
20         MS. KUPE-ARION:  Objection to the form
21     of the question.
22 BY THE WITNESS:
23     A.  If IPRA has sustained excessive force
24 complaints against a particular officer and they

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 35

1  BY THE WITNESS:
2     A.  Yes, IPRA makes a finding, and then
3  that goes through a whole review process with
4  command staff and possibly up to the
5  superintendent.
6  BY MR. MORRISSEY:
7     Q.  Is IPRA part of the Chicago Police
8  Department?
9     A.  No.  It's an outside agency, civilian
10 agency.
11     Q.  Does the Chicago Police Department do
12 anything internally on its own to determine
13 whether a citizen's complaint against a police
14 officer for excessive force is justified or not?
15     A.  Excessive force?
16     Q.  Yes.
17     A.  No.  They are charged by -- IPRA is
18 charged by ordinance to investigate those
19 complaints.
20     Q.  You mentioned that if a quarterly
21 report is generated against a particular sworn
22 member of the police department, a notification
23 goes to the district the person is assigned to?
24     A.  The commander in that district or unit

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 9

Page 36

1   and also to HR, human resources.  Human
2   resources gets the whole list.
3       Q.   What if there's an instance where the
4   person generating a quarterly report is, in
5   fact, the commander in the unit, would he get a
6   copy of the report theoretically?
7           MS. KUPE-ARION:  Objection --
8   BY MR. MORRISSEY:
9       Q.   Do you understand the question?
10      A.   Please repeat the first part.
11      Q.   All right.  Sure.  Assuming the member
12  of the police department happens to be the
13  commander himself where a quarterly report has
14  been generated by Internal Affairs, who then
15  does the report go to other than human
16  resources?
17      A.   I have not seen that happen, and I
18  think I understand your question is that --
19  let's say I was the commander, and the report
20  was generated -- it was generated by Internal
21  Affairs, and I received it, but my name is on
22  there because I have 3 excessive or 4 excessive
23  force within the time frame that's delineated,
24  if that's the question, if that came -- I have

Page 38

1   BY THE WITNESS:
2       A.   If a report was generated which
3   included personnel in, if I'm correct, it was in
4   the Third District, if there was any sworn
5   members that were on that list from the Third
6   District, he would have received that report.  I
7   can't testify here today that there was anyone
8   in the Third District on any given list at any
9   given time, but during that time, he would be
10  entrusted with that decision.
11  BY MR. MORRISSEY:
12      Q.   You said that if somebody comes up on
13  the quarterly report, that it's also sent to
14  human resources?
15      A.   Correct.
16      Q.   Is that the commander in human
17  resources?
18      A.   Director.
19      Q.   Director.  Is that a civilian?
20      A.   It is a civilian.
21      Q.   What, if anything, can the civilian
22  director in human resources do if a police
23  officer's name appears on a quarterly report?
24      A.   They can also put that person into a

Page 37

1   been there over 7 years.  That has not occurred.
2   But I would as commander talk to the chief of
3   Bureau of Internal Affairs, and we would send
4   that -- a copy of that report to the next level,
5   and that could be a deputy chief or a chief.
6       Q.   Under the practice and policies in the
7   police department, if a report, a quarterly
8   report is generated by Internal Affairs and sent
9   to the district commander, what, if anything, is
10  the district commander entrusted to do?
11      A.   It is their responsibility to go
12  through that list and determine if any of the
13  members that are on that list needs to be placed
14  into the behavioral intervention program or the
15  personnel concerns.
16      Q.   So that's a discretionary call by the
17  district commander?
18      A.   It is.
19      Q.   When Evans was a district commander,
20  did he have a discretion to refer a person to
21  behavioral or personnel concerns?
22          MS. KUPE-ARION:  Objection to the form
23  of the question.  You can answer in your
24  capacity of a 30(b)(6) witness.

Page 39

1   program as well as the chief of IPRA.  At any
2   time, they can make the recommendation, the
3   chief administrator of IPRA, not the chief.
4       Q.   You mentioned a behavioral program that
5   can be recommended either by the civilian
6   director of human resources or a district
7   commander.  What is the behavioral program?
8       A.   It is not administered by Internal
9   Affairs, and I have read both orders at multiple
10  times, at different times, and I haven't read it
11  lately, but the district, human resources, the
12  officer, they come up with a plan.  And I'm
13  speaking very macro here.  And that plan goes
14  for a certain amount of time.  It could be 1
15  year.  It could be 6 months, whatever the order
16  says.  And they monitor that officer's behavior
17  during that time, and they look for different
18  factors.  So whatever triggered this, they're
19  monitoring that behavior during that time.  And
20  it's the same thing for personnel concerns, but
21  it's a little bit more severe.  So, again,
22  without looking at the order, that explains it.
23  That's kind of the summary.
24      Q.   Between 2010 and 2015, do you have

Plaintiff's Exhibit 3 Page 10

ROBERT J. KLIMAS
October 16, 2015

Page 40

1  knowledge of how many police officers had been
2  subjected to this behavioral program?
3      A.  I do not.
4      Q.  Do you know if, in fact, there is such
5  a program?
6          MS. KUPE-ARION:  Objection to the form
7      of the question.
8  BY MR. MORRISSEY:
9      Q.  You mentioned that Internal Affairs
10  doesn't administer it, but do you have personal
11  knowledge --
12      A.  There's an order.
13      Q.  Other than there being a written order,
14  do you know as a person from Internal Affairs
15  what actually transpires?
16      A.  I do not.
17      Q.  Or how many people actually are put
18  into these behavioral programs?
19      A.  I have no idea.
20      Q.  Do you know how many people, between
21  2010 and 2015, have been -- have fallen into
22  this personnel concern category?
23      A.  I do not.
24      Q.  Is there any documentation maintained

ROBERT J. KLIMAS
October 16, 2015

Page 42

1  period of time, you're also going to go for
2  retraining, for whatever, you know, whether
3  that's handcuffing techniques or take-down
4  techniques, et cetera.
5  BY MR. MORRISSEY:
6      Q.  The number of police officers on an
7  annual basis that are provided additional
8  training based upon this quarterly report by
9  Internal Affairs, you're not privy to?
10      A.  I am not.
11      Q.  There's how many districts in the
12  Chicago Police Department?
13      A.  I don't mean to laugh.  There used to
14  be 25.  I probably got this wrong.  I think
15  there's 22.  I think they consolidated 3 sets,
16  22 or 23.  I should know that.  I'm sorry.
17      Q.  In the year 2014, how many -- based
18  upon the quarterly reports, how many police
19  officers have generated a referral to the
20  district commander and to human relations?
21      A.  How many people are on the list at any
22  given time on a quarterly basis?
23      Q.  Yeah, on a quarterly basis.  Let's say,
24  look at 2014, the first quarter in 2014,

ROBERT J. KLIMAS
October 16, 2015

Page 41

1  by the Chicago Police Department in regards to
2  how many police officers, after being referred
3  to either the behavioral program or the
4  personnel concerns program, how many there are?
5  Can you look at some document in the CLEAR
6  system or CRMS?
7      A.  No, that's not part of the CLEAR
8  system.  That would be a question to human
9  resources.
10      Q.  Do you know if a police officer comes
11  up on one of these quarterly reports, is there
12  any standard training that's provided for a
13  police officer in such a case where excessive
14  force claims have arisen in a substantial number
15  that trigger a quarterly report?
16          MS. KUPE-ARION:  Objection to the form
17      of the question.  If you understand, you can
18      answer.
19  BY THE WITNESS:
20      A.  That would be part of the plan.  That
21  plan, if human resources and the commander of
22  that district or unit and that officer, training
23  could be part of that plan; not only are we
24  going to monitor your behavior for a certain

ROBERT J. KLIMAS
October 16, 2015

Page 43

1  approximately how many police officers are on
2  the quarterly report which would be triggered by
3  what you have testified to?
4      A.  I understand.  There could be 100, or
5  there can be more than 100 from the entire
6  police department, and that could be -- you have
7  2 orders, and you have 5, 6 parameters per
8  order.  So you got about 12 different parameters
9  that would generate possibly over 100 people in
10  a given quarter.
11          Now, those same persons may be on the
12  next quarter, okay, because the time frame is
13  overlapping.  One could be 100.  The next one
14  might be 120.  It could be 80 that are the same
15  on each one, okay, because of the time frame,
16  because we're looking at a snapshot every
17  quarter.  Because of the different infractions
18  and parameters, there could be over 100.
19      Q.  What time period does your quarter
20  cover?  Does it go back historically 15, 20
21  years, or is it a shorter period of time?
22      A.  No, it's a much shorter period of time.
23      Q.  How short a period of time does each
24  quarterly report focus on?

Plaintiff's Exhibit 3 Page 11

ROBERT J. KLIMAS
October 16, 2015

Page 44

1     A.   Most of the parameters are a year;
2  however, it could be that -- there could be some
3  that are sustained in a certain category over
4  their entire career.  Again, I would have to
5  look at that general order.
6     Q.   Now, the quarterly report includes both
7  the SPARs and IPRA-generated excessive force
8  findings that are sustained, correct?
9     A.   That's correct.
10    Q.   If we take out the SPARs which could be
11 the man dresses or the woman dresses sloppy,
12 their hair is too long according to departmental
13 regulations, if we just focus on excessive
14 force, how many police officers appear on a
15 quarterly report involving CRs -- sustained CRs
16 for excessive force?
17    A.   As I sit here right now on any given
18 report, I don't know.
19    Q.   In general, how many on a quarterly
20 report involve -- you said as a general rule,
21 there's about 100 for each quarterly report.  Of
22 that 100, approximately how many deal with
23 claims of excessive force, repeat claims of
24 excessive force against police officers?

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 46

1     A.   Look under 4, Roman numeral 4, and
2  maybe -- on the behavioral intervention, maybe 5
3  or 6 under the personnel concerns.
4              (Whereupon, Plaintiff's Exhibit
5              No. 2 was marked for
6              identification.)
7  BY MR. MORRISSEY:
8     Q.   I'm showing you what's been marked as
9  Plaintiff's Exhibit No. 2.  I don't have enough
10 copies for everybody.  It's a 5-year employee
11 complaint register history for a guy named --
12 the defendant, Glenn Evans.  Do you recognize
13 the type of information that's on Group
14 Exhibit 2?  It's Bates stamped 251 through 574,
15 and it was turned over by the city attorneys.
16    A.   Yes, I recognize this format of this
17 report.
18    Q.   What is the format?  Where did this
19 come from?  What program generally is this
20 report?
21    A.   This is generated by CRMS, the C-R-M-S
22 system.
23    Q.   Does your quarterly report in Internal
24 Affairs pick up CRs that are entered into CRMS?

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 45

1         MR. PALLES:  Objection, asked and
2     answered.
3         MS. KUPE-ARION:  Objection to the form
4     of the question.
5  BY THE WITNESS:
6     A.   Again, I would have to look at the
7  parameters.  There's 5 or 6 parameters per order
8  and -- excuse me.  Can I ask --
9         MS. KUPE-ARION:  Do you want to --
10        THE WITNESS:  No, that's it.
11        MS. KUPE-ARION:  Counsel, can we take a
12    break?  He answered.  He said he's finished
13    with his answer.  Can we take a break?
14        MR. MORRISSEY:  Sure.
15             (Whereupon, a short break was
16             taken.)
17 BY MR. MORRISSEY:
18    Q.   Are the special orders on the internet?
19    A.   They are.
20    Q.   So they're public knowledge?
21    A.   Absolutely.
22    Q.   And the parameters, where would we find
23 that under the special orders, what section of
24 the special orders?

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 47

1     A.   Correct.  They do.
2     Q.   Looking at the first page, 251, it
3  starts I guess on September 20, 2008.  First of
4  all, let me ask you, do you know this gentleman
5  by the name of Glenn Evans?
6     A.   Yes, I know him.
7     Q.   Was Glenn Evans a fellow commander in
8  the police force with you?
9         MS. KUPE-ARION:  Objection to the form
10    of the question.
11 BY MR. MORRISSEY:
12    Q.   Was he a commander with the Chicago
13 Police Department to your knowledge?
14    A.   He was.
15    Q.   Is he currently a commander?
16    A.   No.
17    Q.   Is he currently a member of the Chicago
18 Police Department?
19    A.   He's a no-pay status, but technically
20 he's still a member.
21    Q.   When did he receive the no-pay status
22 as a member of the Chicago Police Department?
23    A.   When he lost his FOID card.  It was
24 revoked.  That's the firearms owner's

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 12

ROBERT J. KLIMAS
October 16, 2015

Page 48

```
1   identification card.
2       Q.   When did that occur?
3       A.   I don't know the date.
4       Q.   Do you know the reason why he lost his
5   FOID card?
6       A.   That's handled by HR or human
7   resources.  They would have received a
8   notification from the Illinois State Police.  I
9   don't know exactly the reason the Illinois State
10  Police revoked it.
11      Q.   To your knowledge, has Internal Affairs
12  ever conducted an investigation of Glenn Evans?
13      A.   It looks like some of these numbers,
14  they would be our investigation.
15      Q.   Looking at Exhibit No. 2, how do you
16  determine if an investigation was generated by
17  Internal Affairs?
18      A.   Just by some of the numbers that are
19  listed here, 5B, that would be IPRA, 10J, 3C,
20  3C, 10Z.
21      Q.   I'm sorry?
22      A.   I'm sorry.  Under final category,
23  that's 6 columns over, the first code, without
24  going a little bit deeper into each one, the
```

ROBERT J. KLIMAS
October 16, 2015

Page 50

```
1       Q.   If IPRA -- if a CR has been lodged with
2   IPRA for excessive force, does Internal Affairs
3   follow to make sure that IPRA closes out their
4   investigation in a timely manner?
5           MS. KUPE-ARION:  Objection to the form
6       of the question, but you can answer.
7           MR. MORRISSEY:  Let me rephrase the
8       question.
9   BY MR. MORRISSEY:
10      Q.   Assuming a file is opened in the year
11  2011 in regards to a claim of excessive force,
12  does any department within the Chicago Police
13  Department follow up with IPRA to make sure that
14  they timely report a finding?
15          MS. KUPE-ARION:  Objection to the form
16      of the objection, objection, competence, but
17      you may answer to the best of your
18      knowledge.
19  BY THE WITNESS:
20      A.   To the best of my knowledge, we have no
21  jurisdiction, that being the Bureau of Internal
22  Affairs, over IPRA.  They are responsible to the
23  mayor and the city council.  They provide -- I
24  think they're charged to provide a report
```

ROBERT J. KLIMAS
October 16, 2015

Page 49

```
1   10J, 3C, 3C, 10Z is most likely handled by
2   Bureau of Internal Affairs, and the 5B at the
3   very top, and the 5B on the second page would be
4   handled by IPRA, and the 5A on the third page
5   would be handled by IPRA.  The other ones are
6   open, and I would have -- we would have to look
7   at each one and determine who's investigating
8   it.
9       Q.   If a file is open with IPRA, does any
10  report get generated for Internal Affairs -- let
11  me rephrase it.
12          If a complaint of citizen -- excessive
13  force by a citizen is open, does the fact that a
14  file has been opened become part of your
15  quarterly report generated to determine if a
16  police officer should be referred to human
17  relations and/or district commander?
18      A.   No, because there has to be a sustained
19  finding.  But, again, there may be one of those
20  parameters that escapes me, but an open
21  investigation would not trigger that party being
22  on the quarterly report.  A caveat to that is
23  the chief administrator of IPRA can refer a
24  party or member to one of those programs.
```

ROBERT J. KLIMAS
October 16, 2015

Page 51

```
1   over -- a report every 180 days of open
2   investigations.  However, the police board, if
3   they go to seek separation, over the last couple
4   years, there's been a finding that anything over
5   5 years is going to be scrutinized very heavily
6   by the police board, and so they have made that
7   ruling, but Internal Affairs has no jurisdiction
8   over IPRA.
9   BY MR. MORRISSEY:
10      Q.   When you say open for 5 years, is that
11  a file that's been lodged with IPRA that remains
12  undetermined for a 5-year period?
13      A.   It's an incident that occurred -- say
14  the same day that an incident occurs of
15  excessive force and IPRA has it and it's over 5
16  years before it gets to the police board, the
17  police board is -- the last couple years, they
18  have this ruling that it prejudices the accused
19  member of obtaining witnesses and evidence, et
20  cetera, so it comes under a very high level of
21  scrutiny by the police board.
22      Q.   Under what circumstances would, to your
23  knowledge, would IPRA maintain an open file for
24  a claim of excessive force for over 3 years?
```

Plaintiff's Exhibit 3 Page 13

Page 52

1    MS. KUPE-ARION: Objection to the form
2  of the question, objection, competence.
3  This is not -- Commander Klimas is not being
4  produced to speak on behalf of IPRA today.
5  That should have been posed to the IPRA
6  witness you had in front of you. So this
7  question is not in the purview of the
8  commander.
9    MR. MORRISSEY: I'm asking as a
10  representative of the City of Chicago.
11    MS. KUPE-ARION: You know what
12  department he's from, Counsel. He's not
13  from IPRA, okay. So that question -- that
14  particular question you just posed should be
15  directed at the witness you had in front of
16  you, not Commander Klimas. Ask a different
17  question.
18  BY MR. MORRISSEY:
19    Q. The question is, what does Internal
20  Affairs or the Chicago Police Department do to
21  monitor how quickly IPRA completes their
22  investigation of claims of excessive force?
23    MS. KUPE-ARION: And that was already
24  asked and answered. Mr. Klimas already

Page 54

1    Q. And the incident date would be the date
2  in which the CR was open, correct?
3    A. No. That's the incident date of the --
4  whatever the complainant is saying that it
5  occurred. Open dates can occur -- sometimes
6  they occur -- sometimes we get complaints over
7  5 years from the date of the incident.
8    Q. How would we be able to determine when
9  the citizen actually opened a complaint either
10  with the Chicago Police Department or with IPRA?
11    A. The first one, 1020192, go to the fifth
12  page, so that's on your document FCRL 000554.
13  Look at the last line. It says September 22,
14  2008, 9:30, preliminary, that's when that
15  complaint came into IPRA. That's when they
16  generated a log number. That log number is
17  1020192. So the first page refers to an
18  incident date on September 20, but that
19  complaint was not lodged until September 22 of
20  2008.
21    Q. You mentioned that Internal Affairs can
22  open an investigation in regards to a sworn
23  police officer, correct?
24    A. Yes.

Page 53

1  said --
2    MR. MORRISSEY: You can't have speaking
3  objections.
4    MS. KUPE-ARION: That's fine. I will
5  renew my objection. That was asked and
6  answered.
7  BY MR. MORRISSEY:
8    Q. Do you understand the question?
9    A. I do. We do not have jurisdiction over
10  IPRA. We do not monitor the length of their
11  investigations. They're an independent agency
12  within the City of Chicago.
13    Q. Looking at the first page of Exhibit 2,
14  you said the files with the 05B would have been
15  lodged with IPRA, correct?
16    A. That is correct.
17    Q. And if it's not sustained, then
18  Internal Affairs would not report it -- it would
19  not be considered as part of the quarterly
20  report by Internal Affairs, correct?
21    A. You're talking about the quarterly
22  report?
23    Q. Yeah.
24    A. Yeah, it's highly unlikely.

Page 55

1    Q. Does Internal Affairs maintain any
2  reports in regards to how long their
3  investigations remain open in regards to a file?
4    MS. KUPE-ARION: Objection to the form
5  of the question. If you understand what
6  he's asking --
7  BY THE WITNESS:
8    A. How long are cases opened?
9  BY MR. MORRISSEY:
10    Q. The question is, how long -- does
11  Internal Affairs generate periodic reports in
12  regards to open files?
13    A. Yes, our files and the district, we --
14  especially during the budget hearing process, we
15  like to know what our number of -- how long does
16  it take for us to investigate certain, you
17  know -- how long is it taking for us to
18  generate -- to complete our cases, our
19  investigations. And it's been fairly consistent
20  that 70 percent of our cases, both on a district
21  level and Bureau of Internal Affairs level, they
22  have been completed within 9 months; however, we
23  have criminal matters. We have other matters
24  that take longer, and there's reasons for that.

Plaintiff's Exhibit 3 Page 14

ROBERT J. KLIMAS
October 16, 2015

Page 56

1    Q.   Does Internal Affairs generate any
2  reports to either the city council or the
3  superintendent of police in regards to how long
4  on average investigations are open?
5    A.   When it's asked in the budget hearings,
6  we had that number for our budget hearings
7  several weeks ago.  Again, it's been fairly
8  consistent over the last several years, around
9  70 percent completed within 9 months.
10   Q.   Do you know how long IPRA normally
11 takes to complete an investigation?
12       MS. KUPE-ARION:  Objection to the form
13   of the question and competence and, again,
14   he's not here to speak on behalf of IPRA.
15 BY THE WITNESS:
16   A.   I do not know.
17 BY MR. MORRISSEY:
18   Q.   If we look at the second page of Group
19 Exhibit No. 2, are there any CRs that were
20 directed to IPRA on that page?
21   A.   We have to go back to this backup.  It
22 looks like it's attached there.
23   Q.   Let me ask a preliminary question.
24 Looking at the second page, 252, other than case

ROBERT J. KLIMAS
October 16, 2015

Page 57

1  number 1038067 which has 05B under final
2  category, the other entries don't appear to have
3  the code entered, correct?
4    A.   Correct.
5    Q.   Under what circumstances would there
6  not be a code entered?
7    A.   Anything that's open.  We don't -- all
8  we print out is it's open, and then we have to
9  look at who's investigating that.
10   Q.   So if we look at, for instance, the
11 first entry, 1034754, the incident date was
12 March 19, 2010.  In this packet, can we locate
13 that file?
14   A.   Was that 1034754?
15   Q.   Yeah.  I'm looking at the first entry.
16   A.   On 252, correct?
17   Q.   Yeah.
18   A.   Go to 555, FCRL 555, that's the log
19 number.  And go to the second page, 556, this is
20 an IPRA investigation.  Under assignment
21 history, it says assigned to, and it's IPRA,
22 I-P-R-A.
23   Q.   So that was opened on March 19, 2010,
24 and as of the date of this report, it's still

ROBERT J. KLIMAS
October 16, 2015

Page 58

1  open, correct?
2    A.   It was open on March 19, 2010; that's
3  correct.
4    Q.   If we look at the third entry here,
5  1049208, does the document reflect whether
6  that's an IPRA investigation?
7    A.   Yes.  Go to 561 and 562.  That's an
8  IPRA investigation.
9    Q.   And that was opened by the citizen on
10 what date?
11   A.   That was opened on October 11, 2011.
12   Q.   So 4 years later, it's still open.  The
13 investigation is still open.  If we look at the
14 next one that's listed as active, it's 105933 --
15   A.   Excuse me.  But this is a report from
16 2013.
17   Q.   So we don't know -- as of that date,
18 these things are open.  So you would need to get
19 supplemental information from the city, correct?
20 We can go down each one of these and determine
21 whether or not -- when the incident was opened
22 and when it was closed, correct?
23   A.   Correct, or whether or not it's still
24 open.

ROBERT J. KLIMAS
October 16, 2015

Page 59

1        MR. MORRISSEY:  We're going to make a
2    demand at this time for an updated 5-year
3    employee complaint register --
4        MS. KUPE-ARION:  You can send me a
5    supplemental.
6        MR. MORRISSEY:  It wouldn't be a
7    supplemental.  We would just ask to update
8    the information that's contained in this
9    report.
10       MS. KUPE-ARION:  Like I said, if you
11   could send me something, I'll take care of
12   it.
13           (Whereupon, Plaintiff's Exhibit
14            No. 3 was marked for
15            identification.)
16 BY MR. MORRISSEY:
17   Q.   Showing you what has been marked as
18 Plaintiff's Exhibit No. 3, a document Bates
19 stamped 3197 through 3207.  It involves -- the
20 accused is Glenn Evans, and it's an IPRA
21 finding.  It looks like there's 4 sustained
22 findings against Glenn Evans.
23       Prior to today's deposition, have you
24 looked at any documents in regards to Glenn

Plaintiff's Exhibit 3 Page 15

Page 60

1    Evans?
2        A.    Specifically for this deposition?
3        Q.    Correct.
4        A.    Not in the CLEAR system.  Let me
5    explain something.  I have looked at my
6    electronic records because there's a criminal
7    case, and I'm called as a witness, but I have
8    looked at certain records, but not for this
9    deposition.
10       Q.    To your knowledge, has Internal Affairs
11   opened any investigations in regards to Glenn
12   Evans?
13           MR. PALLES:  Excuse me.  May I hear
14       that question again?
15               (Whereupon, the record was read
16                as requested.)
17   BY THE WITNESS:
18       A.    There has in the past, yes.  Even by
19   this 5-year history, we have cases that were
20   opened.  And I'm going to assume by the category
21   that it's ours.
22   BY MR. MORRISSEY:
23       Q.    Have you personally been involved in
24   any Internal Affairs investigations involving

Page 61

1    Glenn Evans?
2        A.    I would not be personally involved in
3    anything unless it was sustained and the penalty
4    was over 30 days.  However, I was involved in --
5    again, there's a criminal matter that's pending
6    at the Cook County court in which we were tasked
7    with a request by IPRA and that's -- that matter
8    is pending in the criminal courts.
9        Q.    Under what circumstances can IPRA refer
10   investigations to the Chicago Police Department?
11       A.    I don't understand the term refer as
12   opposed to tasked.
13       Q.    Well, tasked, referred, opened, what
14   responsibility does IPRA have to refer matters
15   over to the Chicago Police Department?
16           MS. KUPE-ARION:  Objection to the form
17       of the question.  Counsel, you need to speak
18       up because your voice drops.
19   BY THE WITNESS:
20       A.    IPRA is not a law enforcement agency,
21   and there are certain matters in which IPRA will
22   request from Internal Affairs certain tasks.  An
23   example is if IPRA has an excessive force
24   investigation that has gone criminal and they're

Page 62

1    working with the State's Attorney's Office and
2    the State's Attorney's Office charges that
3    officer, IPRA doesn't arrest that officer.  They
4    will request Internal Affairs to handle the
5    arrest of that officer.  So we are tasked with
6    that function.
7            The department has to cooperate with IPRA,
8    and that's in the order.  So IPRA can also ask
9    us to obtain sworn members' ASPS, A-S-P-S, and
10   firearms if it's used in excessive force, and we
11   are a part of that process at times, not all the
12   time, but at times.
13   BY MR. MORRISSEY:
14       Q.    As a city representative or designee,
15   has Glenn Evans since 2005 to the present
16   received any additional training resulting from
17   complaints by citizens of excessive force?
18       A.    I have no knowledge of that.
19       Q.    You mentioned that Internal Affairs
20   generates the quarterly reports.  Has Glenn
21   Evans ever been the subject of a quarterly
22   report?
23       A.    Not -- it is not my -- it's my
24   understanding he has not been.

Page 63

1        Q.    When a police officer is promoted from
2    being a police officer to detective or let's say
3    sergeant, what review is done by the Chicago
4    Police Department in regards to citizen
5    complaints against that person involving
6    excessive force?
7        A.    There are 2 pools of personnel in the
8    promotional process.  There are those that have
9    taken a test and those that are termed merit.
10   First let's go down the road of those who have
11   tested, so that could be a PO to detective; it
12   could be a PO to sergeant; it could be detective
13   to sergeant; it could be sergeant to lieutenant.
14   If the number comes up, however they tested,
15   they are selected to be promoted.  However, the
16   department still would like to -- when they go
17   through that process, like to -- the first
18   deputy's office likes to see their 5-year
19   history.  It cannot preclude them from getting
20   promoted unless that person is at the police
21   board pending separation.  We generate that
22   5-year history which is similar to this Exhibit
23   No. 2 you showed me for all the selectees for
24   that class, and that's provided to the first

Plaintiff's Exhibit 3 Page 16

ROBERT J. KLIMAS
October 16, 2015

Page 64

1  deputy's office.
2      Q.   For what period of time has Internal
3  Affairs provided a 5-year employee complaint
4  register history to the first deputy within the
5  Chicago Police Department prior to a promotion?
6      A.   This is for the sworn members that have
7  tested, okay?
8      Q.   Right.
9      A.   As long as I've been there.
10      Q.   What type of investigation to your
11  knowledge since 2008 to the present has been
12  conducted by the first deputy within the police
13  department when he or she has received a 5-year
14  history for a person scheduled to be promoted
15  based upon a test result?
16          MS. KUPE-ARION:  Objection, competency,
17      objection to the form of the question.
18  BY THE WITNESS:
19      A.   I have no idea what they do with it.
20  Again, they can't preclude that officer from
21  being selected because they have tested.
22  BY MR. MORRISSEY:
23      Q.   How many police officers in 2014 were
24  separated from the police force by the police

ROBERT J. KLIMAS
October 16, 2015

Page 66

1  sergeant, sergeant to lieutenant.  Some
2  commanders get 2, some get 1, most get 1, deputy
3  chiefs get 1 recommendation.  You have now a
4  pool of merit recommendations.  Every single
5  name that's recommended, we do -- now we do a
6  complete history.  For lack of a better term,
7  I'll say it's the full complaint history of
8  their career.  And that's really because they're
9  merit, we're not obligated under the collective
10  bargaining agreement just to look at the 5-year
11  history, so we look at their entire history.  So
12  from that promotion level, we provide the first
13  deputy's office a complete history.  It goes
14  into the folders, I assume, and then there's an
15  interview panel that interviews these
16  individuals.  And I don't know that process.  I
17  don't know if they interview every single one or
18  do they just look at that list -- it's a very
19  long list, and they call it down, and then they
20  interview, you know, out of over 100 people,
21  they interview 50 or 40, whatever.
22          And what happens, as they get -- when they
23  make a list of recommendations to the
24  superintendent for those particular promotions,

ROBERT J. KLIMAS
October 16, 2015

Page 65

1  board?
2      A.   I'll say we put in for 20, and I
3  couldn't tell you how many.  Some of them
4  resigned during that process, and some of them
5  are -- they're not separated, and some are
6  separated by the police board.  That is
7  published by the police board on their website.
8  I'd say -- I couldn't guess how many were
9  actually separated by the police board.
10      Q.   You mentioned that there's another
11  selection process for promotion within the
12  police department and it's based upon merit?
13      A.   That's correct.
14      Q.   What is the procedure for reviewing
15  claims of excessive force prior to promoting a
16  person based upon their merit system?
17      A.   We don't just look at excessive force.
18  Even with -- this is a 5-year history of
19  everything that's here on the first group.  The
20  second group, what's called -- it's called the
21  merit selection.  There's commanders and some
22  deputy chiefs are allowed to recommend
23  individuals for promotion.  Again, that's PO to
24  detective, PO to sergeant, detective to

ROBERT J. KLIMAS
October 16, 2015

Page 67

1  whatever they're promoting, detectives or
2  sergeants or lieutenants, we run that list again
3  to make sure nothing else has popped up on their
4  complaint history.  After the superintendent
5  reviews those names, he makes a selection and,
6  again, those names are run a third time.
7      Q.   Now, the history is similar to the
8  history that is in Exhibit No. 2, correct?
9      A.   It is, but it's for their entire
10  career.
11      Q.   Do you know whether or not Glenn Evans
12  was a merit selection to become a detective?
13      A.   I have no knowledge.
14      Q.   Do you know if Glenn Evans was a merit
15  selection to become a sergeant?
16      A.   I have no knowledge of that.
17      Q.   How would we be able to determine that?
18      A.   That would be a question for human
19  resources.  It may be in his personnel file.
20  Because when I started in 2008, he was a
21  lieutenant, and I don't know -- I don't know his
22  background.
23      Q.   If he was selected as a merit appointee
24  for lieutenant, that would have been done by the

Plaintiff's Exhibit 3 Page 17

ROBERT J. KLIMAS
October 16, 2015

Page 68

1  superintendent at that time?

2      A.   Correct.

3      Q.   The final selection would have been

4  done by the superintendent?

5      A.   Right.

6      Q.   When a person is -- what is the

7  procedure to be appointed a commander in the

8  Chicago Police Department?

9      A.   I know what occurred with me is the --

10 you provide a resume to the superintendent's

11 office or his designee.  Inside it's probably

12 very similar; however, we provide the front

13 office -- the chief of staff will request from

14 Internal Affairs a history of that individual.

15     Q.   By history, would that include

16 Exhibit 2, the register history of complaints?

17     A.   Correct, but it would be a full

18 history, and that's provided to the chief of

19 staff which is different than the other process

20 which goes to the first deputy's office.

21     Q.   The chief of staff worked directly for

22 the superintendent?

23     A.   Yes.

24     Q.   Do you know what the next -- what other

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 69

1  reports are requested from Internal Affairs by

2  the chief of staff or superintendent prior to

3  promoting an individual to the commander level?

4      A.   Yes.  If there's any open

5  investigations, the chief of staff would require

6  us to provide additional information, and that's

7  easy for Internal Affairs if it's their cases.

8  We make a request to IPRA if they have open CRs,

9  and we inform them that a certain individual is

10 being considered for promotion, and we ask them

11 to -- because I could see what's open on the

12 screen.  I can't see the file inside, but I can

13 see what's open, and ask for additional

14 information to assist the superintendent in

15 making his decision.

16     Q.   So if a person is elevated or on a

17 list -- Strike that.

18          How does IPRA become aware of a

19 candidate potentially to be promoted to the

20 commander level?

21     A.   Usually from Internal Affairs.

22     Q.   I don't know if you understand the

23 question.  How does Internal Affairs become

24 aware that a report needs to be generated in

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 70

1  regards to a person who's applying to become a

2  commander?

3      A.   There's a phone call, meeting in the

4  hallway, telephone call, email, that we would

5  like you to run this individual's name.

6      Q.   Does Internal Affairs then open a file

7  on that individual?

8      A.   No.  We go to the computer, and we

9  print out the -- we have a records section, and

10 I would go to the sergeant of the records

11 section, and I need a full history on Bob

12 Klimas.

13     Q.   And for any open IPRA files, then

14 there's a communication made to the chief of

15 IPRA?

16     A.   Correct.

17     Q.   How is that communication forwarded to

18 the chief of IPRA for a person under

19 consideration to become a commander?

20     A.   It's an email from me.

21     Q.   When you send an email -- such an email

22 to the IPRA chief, do you list all the open CR

23 files to the chief of IPRA?

24     A.   Yes, that are open with IPRA.

TOOMEY REPORTING
312-853-0648

---

ROBERT J. KLIMAS
October 16, 2015

Page 71

1      Q.   And prior to closing out your

2  investigation of a person under consideration

3  for a commander position, do you receive a

4  response from IPRA?

5          MS. KUPE-ARION:  Objection to the form

6      of the question especially as to

7      investigation.  You may answer the question.

8  BY THE WITNESS:

9      A.   Yes, it's not investigation.  It is

10 running a report.  I inform IPRA, and I get a

11 communication back one way or another, and it

12 varies.  Sometimes it goes to general counsel

13 for IPRA, and they may say that, you know, we

14 have these cases, we don't think it will be a

15 problem, or it comes from the chief

16 administrator herself or himself to me.

17 BY MR. MORRISSEY:

18     Q.   Did you open a report for Glenn Evans

19 when he was selected to be a candidate to become

20 a commander?

21     A.   It's really not open a report.  I

22 requested from IPRA the -- you have 4 open

23 cases.  The superintendent is recommending Glenn

24 Evans to be promoted.  Can you review them just

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 3 Page 18

ROBERT J. KLIMAS
October 16, 2015

Page 72

1 to aid the superintendent in his selection
2 process.
3    Q.   Do you recall the circumstances in
4 regards to your -- were you involved with the
5 review of Glenn Evans prior to him becoming a
6 commander?
7         MS. KUPE-ARION:  Objection to the form
8    of the question.
9 BY THE WITNESS:
10   A.   My involvement is just what I
11 explained.  There was a request that came from
12 the chief of staff's office regarding that
13 individual.  I didn't know Glenn Evans except
14 for his picture was in the Chicago Tribune
15 during the Natal conference because I'm from the
16 outside.  I know very little of these
17 individuals, so.
18 BY MR. MORRISSEY:
19   Q.   Who was the chief of staff when Glenn
20 Evans was up for promotion in August of 2012?
21   A.   Illena Rosenzweig.
22        MS. KUPE-ARION:  I'm sorry.  What was
23   the question?
24        MR. PALLES:  The chief of staff.

ROBERT J. KLIMAS
October 16, 2015

Page 73

1        MS. KUPE-ARION:  Of IPRA or CPD?
2        MR. MORRISSEY:  The chief of staff of
3    CPD.
4        THE WITNESS:  I'm sorry.  That was
5    Constantine Miniotis, M-i-n-i-o-t-i-s, also
6    goes by Gus Miniotis.
7 BY MR. MORRISSEY:
8    Q.   Did you meet Gus in the hallway, or did
9 he call you to say, hey, I want you to look into
10 Glenn Evans in August of 2012?
11   A.   Most likely with Gus, he would call me
12 into his office and provide me the name.
13   Q.   In what manner did you approach the
14 chief of IPRA in regards to Commander Evans?
15   A.   Email.
16   Q.   Was that Commander Andos -- Strike
17 that.
18        Was that Chief Andos (phonetic) at the
19 time?
20   A.   It was not.
21   Q.   Who was the chief in 2012 of IPRA?
22   A.   Illena Rosenzweig.
23   Q.   Did you receive any communication back
24 from Illena Rosenzweig in regards to open files

ROBERT J. KLIMAS
October 16, 2015

Page 74

1 within IPRA for Glenn Evans?
2    A.   Yes.
3    Q.   What communications did you receive
4 back?
5    A.   I received a telephone call.
6    Q.   What, if anything, did she tell you?
7    A.   She said that she would call and talk
8 to the superintendent directly.
9    Q.   That would be Superintendent McCarthy?
10   A.   That's correct.
11   Q.   Did you have any further involvement
12 after talking to Chief Rosenzweig in regards to
13 reviewing the open IPRA files --
14   A.   Yes.
15   Q.   -- involving Glenn Evans?
16        What other involvement did you have?
17   A.   I communicated with the chief of staff
18 of the conversation I had with Illena and told
19 him that she will be calling the superintendent
20 directly.
21   Q.   Did you put anything in writing or in
22 email in regards to this conversation you had
23 with Illena Rosenzweig?
24   A.   Just my email to her, but you're

ROBERT J. KLIMAS
October 16, 2015

Page 75

1 talking about the conversation after?
2    Q.   Right.
3    A.   No.
4    Q.   On how many other prior occasions have
5 you contacted the chief of IPRA in regards to
6 open files or individuals that were seeking
7 promotion to the commander level?
8    A.   Several times.
9    Q.   Since you have been with the CPD since
10 2008 to the present, has this been one of your
11 functions to screen candidates for the chief of
12 staff for the commander position?
13        MS. KUPE-ARION:  Objection to the form
14   of the question especially the word
15   screening.
16 BY MR. MORRISSEY:
17   Q.   Do you understand the question?
18   A.   I understand the question.  I don't
19 consider it screening.  I consider it generating
20 a report for the chief of staff and the
21 superintendent of the full disciplinary history
22 of a candidate, and if they have additional
23 questions, we try to answer those questions in
24 order for them to make a judgment on who they

Plaintiff's Exhibit 3 Page 19

ROBERT J. KLIMAS
October 16, 2015

Page 76

1  should promote.

2      Q.   Since 2008 to the present, has this

3  been one of your tasks to provide a disciplinary

4  history to the chief of staff and to the

5  superintendent in regards to individuals

6  selected to be promoted to commander level?

7      A.   Yes, and it just doesn't fall upon me.

8  It could be the chief of Internal Affairs.  It

9  could be the -- now we have a deputy chief.  Now

10  we have a new commander.  He could also do it,

11  but I don't think he has, but in the past, it

12  has --

13      Q.   On how many prior occasions --

14          MS. KUPE-ARION:  Counsel, let him

15      finish his answer, please.

16          THE WITNESS:  Go ahead.

17  BY MR. MORRISSEY:

18      Q.   In that period of time, how many

19  candidates for commander have you provided

20  information to either the chief of staff or to

21  the superintendent?

22      A.   For the position of?

23      Q.   Commander?

24      A.   This may be the only one.

ROBERT J. KLIMAS
October 16, 2015

Page 77

1      Q.   So between 2008 and the present time,

2  2015, there's only been one person --

3          MS. KUPE-ARION:  Objection to the form

4      of the question, mischaracterizes his prior

5      testimony.  You may answer.

6  BY THE WITNESS:

7      A.   Because there are times when there's

8  promotions to captain and that's a merit

9  selection, also, and I know there's several

10  times I have requested for the superintendent's

11  office positions, and I'm trying to remember

12  exactly what positions they were asking about.

13  Let me just have a minute here.

14  BY MR. MORRISSEY:

15      Q.   Sure.  Take your time.

16      A.   Okay.  I know there are several times I

17  have requested information from IPRA regarding

18  promotions that the superintendent was going to

19  make.  And I can't separate those that were

20  captains, those which were commanders, but also

21  those who are merit selectees that may have open

22  IPRA investigations, and to explain, you have

23  POs to detectives, POs to sergeants, you know,

24  to lieutenants.  If they're merit and they have

ROBERT J. KLIMAS
October 16, 2015

Page 78

1  an open IPRA investigation, I would inquire to

2  IPRA about those open CRs.  So I cannot -- I

3  said earlier, was this the only commander -- or

4  this may be the only commander.  Actually, I'm

5  having a little difficulty of separating those

6  merit at the lower ranks versus at the commander

7  level.

8      Q.   Approximately how many times did you

9  contact IPRA last year for one of these

10  individuals that was a merit appointment for

11  promotion within the CPD?

12      A.   Maybe once.

13      Q.   Over the course of the last 7 years,

14  how many times -- Strike that.

15          By contact, I mean either by email or

16  by phone or whatever.

17      A.   Let me explain.  With the lower ranks

18  now, that really could be handled by the records

19  section, so we would just send a communication

20  over to IPRA and say, listen, these individuals

21  are being considered for promotion to sergeant

22  or lieutenant, and you may not go through me

23  anymore.  I mean, I might be aware of it, but as

24  the higher up you go, we want to be informed,

ROBERT J. KLIMAS
October 16, 2015

Page 79

1  especially the command staffing for the captains

2  rank, so that's why it's really dropped off.

3      Q.   Superintendent McCarthy was provided

4  with the disciplinary history of Glenn Evans

5  prior to his promotion to commander?

6          MS. KUPE-ARION:  Objection to the form

7      of the question and competence, but if you

8      know --

9  BY THE WITNESS:

10      A.   I do not know.

11  BY MR. MORRISSEY:

12      Q.   The chief of staff to Superintendent

13  McCarthy was provided with the disciplinary

14  history of Glenn Evans prior to his promotion to

15  commander?

16          MS. KUPE-ARION:  Is that a question?

17          MR. MORRISSEY:  It's a question.

18  BY THE WITNESS:

19      A.   Yes.

20  BY MR. MORRISSEY:

21      Q.   The selection of Glenn Evans to be a

22  commander was made by the superintendent of

23  police?

24      A.   Yes.

Plaintiff's Exhibit 3 Page 20

ROBERT J. KLIMAS
October 16, 2015

Page 80

1     Q.  Is Ms. Rosenzweig still with the

2 Chicago Police Department?

3     A.  **She was never with the Chicago Police**

4 **Department.**

5     Q.  Is she still with the City of Chicago?

6     A.  **No.**

7     Q.  Do you know where she's working?

8     A.  **Last I heard, she was in Singapore.**

9 **Her husband took a position out there, and**

10 **that's when Scott Angle (phonetic) became the**

11 **chief administrator.**

12     Q.  Do you know how the superintendent uses

13 the disciplinary history of -- Strike that.

14        Do you know how the police department

15 uses the disciplinary history prior to promoting

16 a person to the commander level?

17     A.  **I do not.**

18     MS. KUPE-ARION:  Objection to the form

19  of the question.

20 BY MR. MORRISSEY:

21     Q.  Do you know how the chief of staff to

22 the superintendent or Superintendent McCarthy

23 uses the disciplinary history prior to promoting

24 a person to commander?

ROBERT J. KLIMAS
October 16, 2015

Page 81

1     MS. KUPE-ARION:  Objection to the form

2  of the question, competence.

3 BY THE WITNESS:

4     A.  **I do not.**

5 BY MR. MORRISSEY:

6     Q.  Do you know if -- looking at, I believe

7 it's Exhibit 3, it's the Independent Police

8 Review Authority's findings in regards to

9 Commander Evans -- is that Exhibit 3?

10     A.  **It is.**

11     Q.  The last page of that group exhibit,

12 3208, has a disciplinary recommendation.  For

13 Glenn Evans, the recommendation was 20 days and

14 later altered by somebody to 15 days.  Do you

15 know whether or not Glenn Evans was ever

16 disciplined by the Chicago Police Department?

17     A.  **Regarding this?**

18     Q.  As regards to this CR file?

19     A.  **I do know.**

20     Q.  Was he disciplined?

21     A.  **No.  It's still pending.**

22     Q.  What do you base your knowledge that

23 it's still pending -- Strike that.

24        In regards to the CR file 104464, what

ROBERT J. KLIMAS
October 16, 2015

Page 82

1 information do you have in regards to the

2 pendency of the disciplinary recommendation?

3     A.  **When this log investigation comes over**

4 **to Chicago Police Department, it still has to go**

5 **through command channel review.  And in this**

6 **particular instance, the first level of review**

7 **is allowed to send the investigation back,**

8 **whether it's Internal Affairs or IPRA, for**

9 **further investigation.  So that first level of**

10 **review under command channel sent this log**

11 **investigation back to IPRA for further**

12 **investigation.**

13     Q.  When was that?

14     A.  **It would have been earlier -- I should**

15 **say -- sometime this year.**

16     Q.  You say the first channel of review

17 within the CPD.  What level are we talking

18 about, who in particular?

19     A.  **Marv Shear.**

20     Q.  Pardon?

21     A.  **Marv Shear, S-h-e-a-r.  Marv would have**

22 **been his commanding officer at this time because**

23 **Commander Evans was assigned to call back**

24 **because he was relieved of his police powers**

ROBERT J. KLIMAS
October 16, 2015

Page 83

1 **because of the pending criminal matter that's**

2 **going on.  So he would have been the first level**

3 **of review.  So if he was still in District 3, it**

4 **would have been his deputy chief, whoever that**

5 **is, and the second level was the chief of**

6 **patrol.  So Marv Shear was the first level.  And**

7 **in all cases -- in all log investigations that**

8 **are sustained, they go through the command**

9 **channel review.**

10     Q.  Was there any documentation to your

11 knowledge sent by -- was he Commander Shear?

12     A.  **Director -- excuse me.  He's a civilian**

13 **deputy chief.**

14     Q.  Is he still with the department?

15     A.  **Yes.**

16     Q.  So any documentation -- do you know

17 when Deputy Chief Shear sent the investigation

18 back to IPRA?

19     A.  **Sometime this year.  Because this is**

20 **dated December 18, 2014, so it would have been**

21 **sometime this year.**

22     Q.  Under the city council ordinance, the

23 superintendent's office has a certain number of

24 days to --

Plaintiff's Exhibit 3 Page 21

ROBERT J. KLIMAS
October 16, 2015

Page 84

1    A.    90 days.

2    Q.   And if the superintendent's office or

3  the superintendent does not agree with the

4  finding, they're required to prepare a report

5  for IPRA, correct?

6    A.   Correct.

7    Q.   Do you know if any report was prepared

8  at the direction of Commander McCarthy -- or

9  Superintendent McCarthy?

10    A.   No, because the first level of review

11  can send a case directly back without ever

12  getting to the superintendent.  This is -- yes,

13  the 90 days starts when Marv Shear would have

14  received this case, all right.  In all cases,

15  whether it's Internal Affairs or IPRA, that

16  first level of review is allowed to send back

17  for further investigation based on whatever they

18  read or saw, they want an additional

19  investigation be conducted, that tolls the 90

20  days.  So that case is back with IPRA.

21    Q.   Is there any documentation that was

22  sent by the police department at this first

23  level of review of Chief Deputy Shear to IPRA?

24    A.   There would have been notes in the

---

ROBERT J. KLIMAS
October 16, 2015

Page 85

1  CLEAR.  It's all done automated.

2    Q.   Did you look at -- how did you become

3  aware that this finding on December 18, 2014,

4  was sent back to IPRA?

5    A.   I know the log number is sent back.

6  I've never seen this document before

7  (indicating), but I know the log number was sent

8  back because Deputy Chief Marv Shear called me

9  into his office because he didn't know how to do

10  it, how to write into the notes and click the

11  right buttons to send it back, so I assisted

12  him.

13    Q.   Did Deputy Chief Shear give a reason

14  why he was referring the matter back to IPRA?

15    A.   He wanted -- I vaguely remember that he

16  wanted additional witnesses interviewed.  That's

17  the extent I recall.

18             (Whereupon, Plaintiff's Exhibit

19             No. 4 was marked for

20             identification.)

21  BY MR. MORRISSEY:

22    Q.   Showing you what's being marked as

23  Exhibit No. 4 -- Strike that.

24           Within the police department, is there

---

ROBERT J. KLIMAS
October 16, 2015

Page 86

1  any written document that allows the first level

2  of review to take place in regards to an IPRA

3  recommendation for disciplining a member of the

4  Chicago Police Department?

5    A.   Yes.

6    Q.   And what is that?

7    A.   It's a special order.  In an Internal

8  Affairs investigation, there's a whole host of

9  special orders, and that would fall under,

10  I think it's called command channel review or

11  the review process because -- there's definitely

12  one called conduct of investigation, but I think

13  there's one that's termed command channel review

14  or the review process.

15    Q.   And you're aware of an independent

16  police review ordinance you mentioned?

17    A.   Yes.

18    Q.   Showing you Exhibit No. 4 which is

19  Chapter 2-57 of the municipal code and ask you,

20  in the city ordinance, is there anything that

21  once a chief of IPRA makes a finding that allows

22  this additional level of review by the Chicago

23  Police Department?

24        MS. KUPE-ARION:  Objection to the form

---

ROBERT J. KLIMAS
October 16, 2015

Page 87

1    of the question.

2  BY THE WITNESS:

3    A.   That's going to be 2-57-040 (m) which

4  is on Page 3:  To promulgate rules, regulations,

5  and procedures for the conduct of the

6  Independent Police Review Authority's

7  investigations consistent with the requirements

8  of collective bargaining agreements, due process

9  of law and equal protection under the law.

10        They follow the same general orders,

11  special orders, collective bargaining agreements

12  regarding investigations as Internal Affairs

13  does.  So that is a process that has been in

14  place, the command channel review, for decades

15  that they -- any sustained case that comes over

16  goes through the command channel review unless

17  separation.

18  BY MR. MORRISSEY:

19    Q.   So that trumps the specific portion of

20  the ordinance which would be 2-57-060 --

21        MR. PALLES:  Object to the form.

22        MR. MORRISSEY:  I'll take the word

23    trumps --

24

Plaintiff's Exhibit 3 Page 22

ROBERT J. KLIMAS
October 16, 2015

Page 88

1  BY MR. MORRISSEY:
2      Q.  It's your understanding that collective
3  bargaining and special orders by the police
4  department can obviate the need for the
5  superintendent to respond to the chief
6  administrator's recommendation of discipline
7  within 90 days?
8          MR. PALLES:  Objection --
9          MS. KUPE-ARION:  Objection to the form
10  of the question.
11         MS. HARRIS:  I'll join.
12  BY THE WITNESS:
13     A.  I would say that's not correct because
14  the superintendent still will weigh in after the
15  command channel review within that 90 days.  He
16  takes their review comments, considers them, I
17  assume, and makes a decision.  He has within 90
18  days to either agree or disagree with IPRA.
19  BY MR. MORRISSEY:
20     Q.  To your knowledge, has the
21  superintendent of police, Mr. McCarthy, entered
22  any type of determination whether he's going to
23  agree or disagree with IPRA's finding of
24  December 18, 2014, that Glenn Evans should be

---

ROBERT J. KLIMAS
October 16, 2015

Page 89

1  disciplined?
2      A.  No, because it hasn't gone to that
3  level.  It's back with IPRA.
4          MR. MORRISSEY:  Let's take a couple
5  minute break here.
6              (Whereupon, a short break was
7              taken.)
8  BY MR. MORRISSEY:
9      Q.  Do you know of any monitoring by the
10  Chicago Police Department or the City of Chicago
11  of Glenn Evans in regards to excessive force
12  from 2005 to the present?
13     A.  I do not.
14     Q.  If a person was up for -- a police
15  officer was up for a merit appointment and had
16  80 CRs involving excessive force which had not
17  been sustained by IPRA, would that weigh in in
18  regards to any recommendation by -- Strike that.
19         If a police officer has 80 CR files in
20  the last 5 years involving excessive force, but
21  IPRA had not sustained any of them, would that
22  come up on any quarterly report generated by
23  Internal Affairs?
24     A.  Again, going back to what the

---

ROBERT J. KLIMAS
October 16, 2015

Page 90

1  parameters are, I don't think a not sustained
2  would trigger anything.  It's got to be
3  sustained.  But without looking at those 2
4  orders and what the parameters are, I just want
5  to put that caveat there that I could be
6  mistaken, but I believe it has to be sustained.
7      Q.  How long is the Chicago Police
8  Department going to wait for IPRA to come up
9  with a completion of their investigation of
10  Commander Evans?
11         MS. KUPE-ARION:  Objection to the form
12  of the question, and I believe we've had
13  variations of that same question already
14  before.
15         MR. PALLES:  I object to a lack of
16  foundation.
17  BY THE WITNESS:
18     A.  I have no idea.  We don't have
19  jurisdiction over IPRA.
20         MR. MORRISSEY:  I have no further
21  questions.  Thanks for your time.
22         MS. KUPE-ARION:  I don't have any
23  further questions.
24         MS. HARRIS:  I have no questions.

---

ROBERT J. KLIMAS
October 16, 2015

Page 91

1          MR. PALLES:  Nothing.
2          MS. KUPE-ARION:  Commander Klimas, you
3  have 1 of 2 options.  You can either waive
4  your signature and believe that the court
5  reporter typed everything up accurately or
6  you can reserve your signature and she'll
7  type it up and you get to review it before
8  your signature is affixed to it.
9          THE WITNESS:  I waive it.
10
11
12
13
14         AND FURTHER DEPONENT SAITH NOT...
15
16
17
18
19
20
21
22
23
24

Plaintiff's Exhibit 3 Page 23

ROBERT J. KLIMAS
October 16, 2015

Page 92

1   STATE OF ILLINOIS      )
2                          )   SS.
3   COUNTY OF C O O K      )
4        I, EMILY TOMALA,  CSR, a notary public
5   within and for the County of Cook County and
6   State of Illinois, do hereby certify that
7   heretofore, to-wit, on the 16th day of October,
8   2015, ROBERT J. KLIMAS personally appeared
9   before me in a cause now pending and
10  undetermined in the Circuit Court of Cook
11  County, Illinois.
12       I further certify that the said ROBERT J.
13  KLIMAS was first duly sworn to testify the
14  truth, the whole truth and nothing but the truth
15  in the cause aforesaid; that the testimony then
16  given by said witness was reported
17  stenographically by me in the presence of the
18  said witness, and afterwards reduced to
19  typewriting by Computer-Aided Transcription, and
20  the foregoing is a true and correct transcript
21  of the testimony so given by said witness as
22  aforesaid.
23       I further certify that the signature to
24  the foregoing deposition was waived by counsel

TOOMEY REPORTING
312-853-0648

ROBERT J. KLIMAS
October 16, 2015

Page 93

1   for the respective parties.
2        I further certify that I am not counsel
3   for nor in any way related to the parties to
4   this suit, nor am I in any way interested in the
5   outcome thereof.
6        IN TESTIMONY WHEREOF:  I have hereunto
7   set my hand and affixed my notarial seal this
8   21st day of October, 2015.
9
10
11
12
13  _____
14       EMILY TOMALA, CSR
15
16
17
18
19
20
21
22
23
24  LIC. NO. 084003736

TOOMEY REPORTING
312-853-0648

Transcript of the Testimony of
**BRUCE DEAN**

**Date:** October 8, 2015

**Case:** RITA KING VS. GLENN EVANS, ET AL.

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

BRUCE DEAN
October 8, 2015

Page 2

A P P E A R A N C E S:

THE LAW OFFICES OF:
THOMAS G. MORRISSEY
BY: MR. THOMAS G. MORRISSEY
MR. PATRICK MORRISSEY
10150 South Western Avenue
Chicago, Illinois 60643
(773) 233-7900
tgmorrisseylaw@gmail.com

Appeared on behalf of the
Plaintiff;

THE LAW OFFICES OF:
CITY OF CHICAGO
FEDERAL CIVIL RIGHTS
LITIGATION DIVISION
BY: MS. TIFFANY Y. HARRIS
30 North LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-7684
tiffany.harris@cityofchicago.org

Appeared on behalf of the
individual defendants:
Glenn Evans, D.T. Clifford,
R.A. Sutton, K.L. Rodgers,
Wilfredo Lapitan, and
Lloyd Gray;

TOOMEY REPORTING
312-853-0648

---

BRUCE DEAN
October 8, 2015

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RITA KING,                    )
                              )
        Plaintiff,            )
                              )
        vs.                   )   No. 13 C 1937
                              )
GLENN EVANS, et al.,          )
                              )
        Defendants.           )

    This is the deposition of BRUCE DEAN,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, taken before
PEGGY A. ANDERSON, a Certified Shorthand Reporter
of the State of Illinois, at 10150 South Western
Avenue, Chicago, Illinois, on October 8, 2015,
at 2:00 p.m.

TOOMEY REPORTING
312-853-0648

---

BRUCE DEAN
October 8, 2015

Page 3

A P P E A R A N C E S:

THE LAW OFFICES OF:
CITY OF CHICAGO
FEDERAL CIVIL RIGHTS
LITIGATION DIVISION
BY: MS. CARLA MADELEINE KUPE-ARION
30 North LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-0226
carla.kupearion@cityofchicago.org

Appeared on behalf of the
Defendant, City of
Chicago;

THE LAW OFFICES OF:
CITY OF CHICAGO
FEDERAL CIVIL RIGHTS LITIGATION
BY: MS. MEERA WERTH
30 North LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-6905
Appeared on behalf of the
witness, Bruce Dean;

THE LAW OFFICES OF:
RAVITZ & PALLES, PC

BY: MR. ERIC PALLES
203 North LaSalle Street
Suite 2300
Chicago, Illinois 60601
(312) 558-1689
epalles@ravitzpalles.com
Appeared on behalf of
Glenn Evans in the
criminal case;

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 1

BRUCE DEAN
October 8, 2015

Page 4

```
 1                    I N D E X
 2   WITNESS                                   PAGE
 3   BRUCE DEAN
 4   DIRECT EXAMINATION BY
     MR. MORRISSEY:                            5-65
 5
 6
 7
 8                  E X H I B I T S
 9
10   MARKED                                    PAGE
11   PLAINTIFF'S EXHIBIT NO. 1                 5
12   PLAINTIFF'S EXHIBIT NO. 2 (not attached)  32
13   PLAINTIFF'S EXHIBIT NO. 3 (not attached)  53
14
15
16
17
18
19                    ******
20
21
22
23
24
```

---

BRUCE DEAN
October 8, 2015

Page 6

```
 1   BY MR. MORRISSEY:
 2       Q   I'm going to show you what's been
 3   marked as Plaintiff's Exhibit Number 1.  It's a
 4   Rule 30(b)(6) for deposition.  Have you seen
 5   this Exhibit 1 before?
 6       A   Yes.
 7       Q   Are you prepared to testify in
 8   regards to this 30(b)(6) Notice of Deposition?
 9       MS. WERTH:  Objection to form.  You
10       can answer.
11   BY THE WITNESS:
12       A   Yes.
13   BY MR. MORRISSEY:
14       Q   What parts of the 30(b)(6) Notice of
15   Deposition are you prepared to testify on
16   behalf of?  Well, let me rephrase the question.
17       Are you here on behalf of the
18   Independent Police Review Board?
19       MS. WERTH:  Sorry.  What did you say?
20       Independent what?
21   BY MR. MORRISSEY:
22       Q   Are you here as the representative of
23   IPRA?
24       A   Yes.
```

---

BRUCE DEAN
October 8, 2015

Page 5

```
 1               (WHEREUPON, the witness
 2               was first duly sworn.)
 3       MR. MORRISSEY:  This is the 30(b)(6)
 4       notice of deposition that was served on
 5       July 31st, 2015 and continued by the
 6       parties to today's date.
 7   WHEREUPON:
 8               BRUCE DEAN,
 9   called as a witness herein, having been first
10   duly sworn, was examined and testified as
11   follows:
12       D I R E C T   E X A M I N A T I O N
13         BY MR. MORRISSEY:
14       Q   Sir, I'm going to show you -- Your
15   name is?
16       A   Bruce Dean.
17       Q   And your position -- What is your
18   current occupation?
19       A   I'm a supervisor at the Independent
20   Police Review Authority.
21               (WHEREUPON, Plaintiff's
22               Exhibit No. 1 was marked
23               for identification.)
24
```

---

BRUCE DEAN
October 8, 2015

Page 7

```
 1       Q   As the representative of IPRA under
 2   Rule 30(b)(6), what portions of this notice are
 3   you prepared to testify?
 4       MS. WERTH:  I'm going to object to
 5       that.  We've already provided you -- You're
 6       asking him to explain what a 30(b)(6) is?
 7       To that extent, I will object.
 8       MR. MORRISSEY:  Let me rephrase the
 9       question.
10   BY MR. MORRISSEY:
11       Q   What portion of this notice are you
12   prepared to testify to today because there are
13   four parts to this notice?  Which areas of this
14   notice are you prepared to testify to?
15       A   Well, Part 1 (a), (b) and (c).
16       Q   Is there any other portion of this
17   notice that you're prepared to testify on
18   behalf of IPRA?
19       MS. WERTH:  Counsel, I will object to
20       the form of the question.  If you ask him
21       questions, he's prepared to answer your
22       questions.  You're asking him to interpret
23       your Notice of Deposition.
24       MR. MORRISSEY:  I'm asking him -- He
```

Plaintiff's Exhibit 4 Page 2

BRUCE DEAN
October 8, 2015

Page 8

```
 1    has the Exhibit 1 in front of him.  I asked
 2    him what portion of that notice he's been
 3    asked to testify on behalf of IPRA, and he
 4    already testified 1(a), (b) and (c).
 5  BY MR. MORRISSEY:
 6    Q    Is that your answer?
 7    A    Yes.
 8    Q    In regards to the remainder of this
 9  notice, you're not prepared to testify on
10  behalf of IPRA, correct?
11       MS. WERTH:  I'm going to object to
12       that as misleading.  Ask him the questions,
13       and he will answer the questions that you
14       put to him if he can.  He's not here to
15       interpret your Notice of Deposition.
16  BY MR. MORRISSEY:
17    Q    Number 4 asks:  Explain the IPRA
18  investigation relating to Plaintiff King's
19  allegation including (a), the explanation for
20  waiting until December 18th, 2014 to issue a
21  memorandum entitled Disciplinary Recommendation
22  to IPRA's Chief Andos.  Are you prepared to
23  testify in regards to that?
24    A    I don't know anything about that.
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 10

```
 1  presenting a person to respond to Number 4
 2  of the Notice of Rule 30(b)(6) deposition?
 3       MS. WERTH:  Who are you asking that
 4  question to?
 5       MR. MORRISSEY:  To you.
 6       MS. WERTH:  We have already produced
 7  Linda Franko, the investigator who was
 8  involved in -- Are you communicating with
 9  each other while I'm talking or do you want
10  a moment?
11       MR. MORRISSEY:  No, you can continue,
12  ma'am.
13       MS. WERTH:  We've already produced
14  Linda Franko who was the primary
15  investigator in this particular
16  investigation.  You have asked her the
17  questions that I believe are covered in
18  your Number 4.
19       The fact that you called her for
20  a deposition earlier than when you had
21  received all the documents that were
22  provided to you is not a reason we are
23  going to call her back again, and so our
24  position is that we have already produced
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 9

```
 1    Q    In regards to 4(b), describe with
 2  reasonable specificity why the disciplinary
 3  recommendation of a 20-day suspension was
 4  reduced to 15 days.  Are you prepared to
 5  testify in this regards to that?
 6    A    I don't know.
 7    Q    Will you be able to testify in
 8  regards to why the recommendation from the IPRA
 9  was reduced from 20 days to 15 days for
10  Commander Evans?
11    A    No.
12    Q    (C), Describe, with reasonable
13  particularity, whether the chief of police
14  adopted IPRA's recommendation for the
15  discipline of Commander Evans.
16       Are you prepared to respond to that
17  portion of the 30(b)(6)?
18    A    No.
19    Q    (D), Describe whether the City of
20  Chicago has disciplined Commander Evans
21  relating to this encounter with Plaintiff King.
22  Are you prepared to respond to that?
23    A    No.
24       MR. MORRISSEY:  Will IPRA be
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 11

```
 1  the person who best could answer Question
 2  Number 4(a) through (d), and we're not
 3  going to produce her again.
 4       MR. MORRISSEY:  Well, I'm not asking
 5  you to produce Ms. Franko.  Are you telling
 6  me today that there are additional
 7  documents that are responsive to 4(b):  Why
 8  was the disciplinary recommendation reduced
 9  from 20 days to 15 days?
10       MS. WERTH:  No, I'm not prepared to
11  tell you anything of the sort because --
12       MR. MORRISSEY:  Are you --
13       MS. WERTH:  Hang on.
14       MR. MORRISSEY:  Sure.
15       MS. WERTH:  We've produced all of the
16  documents that we have received that are
17  responsive to your document request, and
18  you know we produced those in April.  You
19  have those.
20       MR. MORRISSEY:  So there is not a
21  document from the superintendent of police,
22  to your knowledge, in response to the
23  recommendation by IPRA for Commander Evans?
24       MS. WERTH:  Counsel, this is not my
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 3

BRUCE DEAN
October 8, 2015

Page 12

```
1   deposition, but I will answer that question
2   and tell you that, to our knowledge, there
3   is no other document that has not been
4   produced to you.
5        MR. MORRISSEY:  For the record, we
6   are going to request that you produce
7   somebody that's responsive to those four --
8   to what's been requested in 4; and unless
9   we can resolve this issue, we are going to
10  bring it before Magistrate Gilbert.  Is
11  there anything additional you would like to
12  state on the record?
13       MS. WERTH:  No.
14       MR. MORRISSEY:  So, to be clear,
15  you're not going to produce anybody from
16  IPRA in regards to the remaining portions
17  other than 1(a), (b) and (c).
18       MS. WERTH:  Well, I don't want to
19  beat a dead horse; but as I have said, we
20  have produced Supervisor Dean as a
21  (30)(b)(6).  Your Question Number 4(a)
22  through (d) is not a (30)(b)(6) issue.  It's
23  an issue, a factual issue, about what
24  happened in this particular investigation.
```

BRUCE DEAN
October 8, 2015

Page 13

```
1        We have already produced the
2   investigator who handled this
3   investigation, and we believe that we have
4   covered whatever you have asked, whatever
5   you want from 4(a) through (d).
6        MR. MORRISSEY:  We'll take one
7   minute.
8                     (WHEREUPON, a short
9                     break was had.)
10  BY MR. MORRISSEY:
11       Q   Looking at Question Number 1 on
12  Exhibit Number 1, 1(a), the question is:  How
13  does the City of Chicago track or monitor
14  allegations of excessive force by members of
15  the Chicago Police Department?  Can you explain
16  that?
17       A   Yes.  We register log numbers.  Each
18  log number represents a complaint and
19  subsequent investigation.
20       Q   Just for some preliminary matters,
21  you mentioned that you're a superintendent for
22  the Independent Police Review Association?
23       A   Authority.
24       MS. WERTH:  Authority.
```

BRUCE DEAN
October 8, 2015

Page 14

```
1   BY MR. MORRISSEY:
2        Q   Authority.  I'm sorry.  How long have
3   you been with the agency?
4        A   Since it's beginning.
5        Q   And that's in 2007?
6        A   Correct.
7        Q   What is your educational background?
8   Where did you go to college, if you went to
9   college?
10       A   Bachelor's degree from Manchester
11  College in Indiana, and I have a master's
12  degree from Northeastern Illinois.
13       Q   In regards to your bachelor degree,
14  what was your major?
15       A   Bachelor degree is in history and
16  economics.
17       Q   And what year did you earn that
18  degree?
19       A   1982.
20       Q   And you mentioned that you have a
21  master's degree also?
22       A   Yes.
23       Q   And what was that in?
24       A   Gerontology.
```

BRUCE DEAN
October 8, 2015

Page 15

```
1        Q   And what year did you receive that
2   degree?
3        A   I want to say 2004.  I'm not sure
4   about that.
5        Q   From 1982 up to 2007, did you work in
6   law enforcement?
7        A   No.
8        Q   Were you employed during that period
9   of time in 1982 through 2007?
10       A   Yes.
11       Q   Briefly, how were you employed
12  starting from the most recent, 2007 and going
13  backwards?
14       A   2007 to 1995, I worked at the Office
15  of Professional Standards in the Chicago Police
16  Department.  And from 1993 to 1995, I worked
17  for the City of Chicago, Department on Aging.
18       Q   Okay, and from 1993 back to 19 --
19  1982?
20       A   Let's see, from 1993 to 1988, I
21  worked for the Polish Welfare Association,
22  which is now the Polish American Association.
23  And from 1988 to 1984, I taught English in
24  Poland.
```

Plaintiff's Exhibit 4 Page 4

BRUCE DEAN
October 8, 2015

Page 16

1    Q    When you worked for the Office of
2  Professional Standard, what was your title?
3    A    I started as an investigator.
4    Q    What was your last rank with OPS
5  before it became IPRA?
6    A    I was a supervisor for OPS.
7    Q    What is considered excessive force?
8        MS. WERTH:  Objection to the form of
9    the question, vague, overbroad, calls for a
10   legal conclusion.
11 BY THE WITNESS:
12   A    Force beyond that which is necessary.
13 BY MR. MORRISSEY:
14   Q    Does the City of Chicago track and
15 monitor excessive force differently from other
16 complaints about members of the Chicago Police
17 Department?
18   A    I don't think I understand the
19 question.
20   Q    Sure.  In addition to excessive
21 force, are complaints filed with IPRA by
22 citizens in regards to other allegations?
23   A    Yes.
24   Q    What other types of allegations are

BRUCE DEAN
October 8, 2015

Page 18

1    A    Yes.
2    Q    And what type of database does the
3  City of Chicago maintain in regards to
4  excessive force claims made against members of
5  the Chicago Police Department?
6    A    The database is in CLEAR, C-L-E-A-R.
7  It's an acronym.
8    Q    Is that system also -- Strike that.
9  Who maintains the CLEAR system?
10   A    The Chicago Police Department.
11   Q    Can employees -- Excuse me.  We'll
12 just take a two-minute break.
13               (WHEREUPON, there was an
14               interruption in the
15               deposition proceedings.)
16       MR. MORRISSEY:  I'm sorry.  Can you
17   repeat the last question?
18               (WHEREUPON, the record
19               was read as requested.)
20 BY MR. MORRISSEY:
21   Q    Can employees within IPRA access the
22 CLEAR system?
23   A    Yes.
24   Q    Are there any limitations, to your

BRUCE DEAN
October 8, 2015

Page 17

1  filed with IPRA by citizens?
2        MS. WERTH:  Are you asking for
3    examples?  Otherwise, I'm going to object
4    to overbroad.
5  BY MR. MORRISSEY:
6    Q    Well, I would ask for briefly
7  examples.
8    A    As examples, I could say verbal
9  abuse, you know, unjustified altercations,
10 improper conduct on and off duty.
11   Q    In regards to those three examples of
12 complaints lodged with IPRA, is the tracking
13 and monitoring of those complaints any
14 different than IPRA's tracking and monitoring
15 of excessive force claims?
16   A    No.  In it -- No.
17   Q    Where does the City of Chicago track
18 excessive force claims filed by members of the
19 public against police officers?
20   A    With IPRA.  The complaints come to
21 IPRA.
22   Q    Does IPRA maintain a database of
23 complaints of excessive force by citizens in
24 regards to police officers?

BRUCE DEAN
October 8, 2015

Page 19

1  knowledge, in regards to the ability to access
2  the CLEAR system for IPRA employees?
3    A    Are there any limitations?
4    Q    Yes.
5    A    It would depend on the level of
6  employment.
7    Q    How many employees -- Strike that.
8  In 2011, how many employees did IPRA have?
9    A    I don't know.
10   Q    How many employees does IPRA
11 currently have?
12   A    I don't know the answer to that
13 either, the exact number.
14   Q    Are there different titles or ranks
15 within IPRA?
16   A    Yes.
17   Q    What are the different positions
18 within the IPRA association?
19   A    We have a clerical staff.  We have an
20 intake aide.  We have an Investigator 1, 2 and
21 3 positions.  We have an IPRA supervisor level
22 and then there's the IPRA coordinator or deputy
23 chief level, and then there is the chief
24 administrator of the agency.

Plaintiff's Exhibit 4 Page 5

BRUCE DEAN
October 8, 2015

Page 20

1    Q    Can investigators with IPRA -- Strike
2  that.  In regards to a specific police officer
3  within the police department, can an
4  investigator of IPRA access the CLEAR system to
5  determine how many citizen complaints had been
6  filed against that person over the last ten
7  years?
8        MS. WERTH:  You're asking about an
9    investigator?
10       MR. MORRISSEY:  At the investigative
11   level.
12 BY THE WITNESS:
13   A    Over the last ten years?
14 BY MR. MORRISSEY:
15   Q    Yeah.
16   A    No.
17   Q    How can an investigator access the
18 CLEAR system to determine any information about
19 prior claims of excessive force against any
20 member of the Chicago Police Department?
21   A    An investigator can search the CLEAR
22 system, which has been in existence since about
23 2006; and by entering name, star number
24 information about the officer, they can search

TOOMEY REPORTING
312-853-0648

---

BRUCE DEAN
October 8, 2015

Page 22

1    Q    So --
2    A    Well --
3    Q    Sorry.  Go ahead.  If I ever -- If
4  you want to expand on an answer, don't let me
5  cut you off.
6        MS. WERTH:  Do you?
7  BY THE WITNESS:
8    A    To be clear, CLEAR generates the
9  number.  We don't enter the number.
10 BY MR. MORRISSEY:
11   Q    Can an investigator then do a
12 printout of all claims lodged with IPRA since
13 2006 to the present against a specific officer?
14   A    I believe so, yes.
15   Q    And does -- What information for each
16 complaint would be contained in the CLEAR
17 system?
18       MS. WERTH:  Objection to form of the
19   question, vague, overbroad.  You could
20   answer if you understand.
21 BY THE WITNESS:
22   A    I can tell you what is registered.
23 Well, if we take the complaint, then we would
24 take the complainant's name and address and

TOOMEY REPORTING
312-853-0648

---

BRUCE DEAN
October 8, 2015

Page 21

1  their history of complaints.  There's also a
2  Crystal report that goes back seven years, but
3  I'm not sure that investigators have access to
4  that.
5    Q    In regards to the CLEAR system, if an
6  investigator knew the first and last name of a
7  police officer, let's say, John Doe, what
8  information by entering the person's name in
9  the system could be obtained in regards to
10 citizens' complaints?
11   A    Well, if -- If you enter the name,
12 you would have to find the specific officer.
13 In other words, it would auto suggest the name
14 of the officer so that you make sure that you
15 have the right one, and then you can check back
16 over his history.  It will bring up those
17 numbers.
18   Q    When a citizen files a complaint with
19 IPRA, is there a specific number assigned to
20 it?
21   A    Yes.
22   Q    And is that number entered into the
23 CLEAR system?
24   A    Yes.

TOOMEY REPORTING
312-853-0648

---

BRUCE DEAN
October 8, 2015

Page 23

1  telephone number, information about the
2  complainant, date, time and location of the
3  complaint, names of any witnesses, names of the
4  accused if they know who it is.
5    Q    After a CR is opened by an IPRA
6  investigator, do their notes -- are their notes
7  and documents that are assembled for that
8  investigation, are they stored in the CLEAR
9  system?
10   A    The notes --
11       MS. WERTH:  I'm going to object to
12   form.  If you understand what he's asking,
13   you can answer it.
14 BY MR. MORRISSEY:
15   Q    Well, let me make it a little bit
16 clearer.  Have you reviewed the investigative
17 file by Investigator Franko in regards to Rita
18 King?
19   A    No.
20   Q    Other than what you have previously
21 testified in regards to what generally is in
22 the CLEAR system for a CR file, the name
23 address, witnesses, the complainant, name of
24 accused, is there any other general information

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 6

BRUCE DEAN
October 8, 2015

Page 24

1  contained in CLEAR about a CR file?
2      A    As far as the initial information
3  that we take?
4      Q    Right.
5      A    Well, we would ask, for instance,
6  were you arrested, were you injured, did you
7  seek medical treatment.  Normally, we would say
8  is this pursuit related, is this alcohol
9  related, things like that.
10      Q    Is that all entered into the CLEAR
11  system at the time the complaint is taken?
12      A    Yes.
13      Q    And are there intake people at IPRA
14  that record that information --
15      A    Yes.
16      Q    -- and enter it into the CLEAR
17  system?
18          MS. WERTH:  Let him finish.
19  BY THE WITNESS:
20      A    At the time the complaint is taken,
21  yes.
22  BY MR. MORRISSEY:
23      Q    After that initial intake is done by
24  an IPRA person, is there any additional

BRUCE DEAN
October 8, 2015

Page 26

1      Q    To your knowledge, how long does the
2  CLEAR system maintain the information about a
3  CR file?
4      A    To my knowledge, forever.  In
5  perpetuity.
6      Q    So it goes back to 2006?
7      A    Yes.
8      Q    Are there other files that had been
9  entered in prior to 2006 that would be in the
10  CLEAR system?
11          MS. WERTH:  Objection to "other
12      files."
13          MR. MORRISSEY:  Well, let me rephrase
14      that.
15  BY MR. MORRISSEY:
16      Q    IPRA began in the year 2007, correct?
17      A    Correct.
18      Q    Its predecessor was OPS, Office of
19  Professional Standards, correct?
20      A    Yes.
21      Q    To your knowledge, are files that
22  were conducted by OPS, are there CR files that
23  were maintained that were opened by OPS that
24  are also in the CLEAR system?

BRUCE DEAN
October 8, 2015

Page 25

1  information that's entered by members of the
2  IPRA staff in regards to a CR investigation?
3          MS. WERTH:  Objection, lacks personal
4      knowledge.  Objection, foundation as to
5      what these individual investigators enter
6      into the system.
7  BY THE WITNESS:
8      A    The information that I gave you about
9  what we try to obtain from the complainant,
10  that usually covers the preliminary part of
11  this.  Now, there may be other things that we
12  find relative to their complaint; but I'm not
13  sure I understand the rest of the question.
14  BY MR. MORRISSEY:
15      Q    Well, I guess the question is other
16  than the initial background about a complaint,
17  the CLEAR system is used to -- is periodically
18  updated as the investigation is ongoing,
19  correct?
20      A    Yes.
21      Q    And that updating would be done by
22  the assigned investigator or supervisor with
23  IPRA?
24      A    Yes.

BRUCE DEAN
October 8, 2015

Page 27

1      A    There is some information about those
2  investigations.  It's limited and it was all
3  entered after we started using the CLEAR
4  system.
5      Q    When a new CR file is initiated
6  against a police officer and assigned to an
7  investigator, what, if any, use does IPRA make
8  of information in the CLEAR system against that
9  officer?
10          MS. WERTH:  Objection, calls for
11      speculation.  It's overbroad, lacks
12      knowledge as to what a particular
13      investigator uses the CLEAR system for.
14  BY THE WITNESS:
15      A    If I understand correctly, against an
16  officer, we don't obtain anything specifically
17  for the purpose of using it against an officer.
18  BY MR. MORRISSEY:
19      Q    Well, let me rephrase it.  When a new
20  allegation is made against a police officer,
21  does IPRA have a practice and policy of
22  reviewing prior citizens' complaints that may
23  be lodged in the CLEAR system?
24      A    Yes.

Plaintiff's Exhibit 4 Page 7

BRUCE DEAN
October 8, 2015

Page 28

1    Q    For what purpose does IPRA look at
2  prior allegations against a police officer that
3  are maintained in the CLEAR system?
4    A    It could be to check to see if
5  there's any redundancy in the investigations,
6  to see what most recent complaints are.  Just
7  to make sure that there's no overlap and to
8  evaluate the allegations against the officer as
9  what perhaps could end up being a pattern of
10  behavior.
11    Q    In addition to what's the material --
12  Strike that.  We have talked about what is
13  entered into the CLEAR system initially by the
14  intake officer, intake person, when a citizen
15  lodges a complaint, correct?
16    A    (Indicating.)
17    Q    During the course of the file being
18  opened, what types of material are entered into
19  the CLEAR system by either the investigator or
20  the supervisor assigned to the file?
21    A    Well, we would take the initial
22  information, as I said, and we would take the
23  information and decide if we're going to look
24  for arrest reports, if we're going to look for

BRUCE DEAN
October 8, 2015

Page 30

1    Q    Is there any practice within IPRA of
2  monitoring -- Strike that.  After the complaint
3  has been opened and the CR file is opened, is
4  it normally assigned to an investigator?
5    A    Yes.
6    Q    And after a certain period of time,
7  is the investigation supposed to be concluded?
8    A    Yes.
9    Q    And that's a six-month window by
10  ordinance?
11    A    Well, that depends.
12       MS. WERTH:  That's a vague question.
13    I'm going to object.  Are you asking him --
14       MR. MORRISSEY:  Well, let me rephrase
15    the question.
16       MS. WERTH:  Are you asking him what
17    the ordinance says?
18       MR. MORRISSEY:  Let me rephrase the
19    question.
20  BY MR. MORRISSEY:
21    Q    Are there any documents that are
22  maintained by IPRA in regards to a time that a
23  file has been opened?
24       MS. WERTH:  Objection, vague.  You

BRUCE DEAN
October 8, 2015

Page 29

1  contact cards, case reports, OEMC records,
2  anything that we would be able to obtain in our
3  office in the very short time after the
4  complaint is registered.
5    Q    In addition to maintaining computer
6  records in the CLEAR system, does the Office of
7  IPRA maintain a physical file once a complaint
8  has been lodged against a police officer?
9    A    We maintain a physical file, yes.
10    Q    Does IPRA also maintain any other
11  kind of data system in regards to a CR that's
12  opened against a police officer?
13    A    Not that I'm aware of.
14    Q    Other than the CLEAR system, does
15  IPRA rely on any other data system to track
16  allegations of excessive force made against a
17  member of the Chicago Police Department?
18    A    No.  Everything is in CLEAR, even the
19  Crystal report that I referred to earlier is
20  part of CLEAR.
21    Q    After -- When a CR is open, there is
22  a date in which the complainant makes the
23  complaint on the file, correct?
24    A    Correct.

BRUCE DEAN
October 8, 2015

Page 31

1  can answer, if you understand.
2  BY THE WITNESS:
3    A    Well, from the minute we take the
4  complaint, the clock is running.  Every entry,
5  new information, things like that, new
6  attachments, the time and date are stamped on
7  it through CLEAR.
8  BY MR. MORRISSEY:
9    Q    Do you prepare -- Does IPRA prepare
10  any reports for the City of Chicago in tracking
11  a specific open CR file?
12    A    Yes.
13    Q    What reports are prepared to the City
14  of Chicago in regards to an open CR file?
15    A    Periodically, there is a letter sent
16  and a report to the council.
17    Q    Who is responsible from IPRA to
18  provide a periodic status report in regards to
19  an investigation?
20    A    To the best of my knowledge, the
21  chief administrator.
22    Q    And between 2011 and the present, is
23  that Mr. Ando?
24    A    I'm not sure of the date he started

Plaintiff's Exhibit 4 Page 8

BRUCE DEAN
October 8, 2015

Page 32

1   as chief administrator.
2        Q    Have you ever seen his signature?
3        A    Yes.
4        Q    Have you seen his initials --
5        A    Yes.
6        Q    -- on any reports?
7                      (WHEREUPON, Plaintiff's
8                      Exhibit No. 2 was marked
9                      for identification.)
10  BY MR. MORRISSEY:
11       Q    I'm showing you what is being marked
12  as Plaintiff's Exhibit Number 2, and I don't
13  think you moved to make this confidential
14  formally in front of the Court.  At some point --
15       MS. WERTH:  Well, actually, I have.
16       MR. MORRISSEY:  Well, if you have --
17       MS. WERTH:  So we are going to
18  actually put this under seal because we
19  have produced this for attorneys' eyes
20  only, and we -- it's also covered by the
21  protective order.
22       MR. MORRISSEY:  All right, well, if
23  that's the case, then I stand corrected.
24

BRUCE DEAN
October 8, 2015

Page 34

1        MS. WERTH:  I'm sorry.  I missed the
2   first part of your question.
3        MR. MORRISSEY:  I'm sorry.
4   BY MR. MORRISSEY:
5        Q    To your knowledge, the chief
6   administrator prepares certain reports to track
7   excessive force claims periodically to the City
8   of Chicago, correct?
9        A    Yes.
10       Q    How frequently after a report --
11  after a CR is open does the chief administrator
12  have to prepare a status report?
13       A    Oh, I don't know.
14       Q    Does it appear like six months; does
15  that ring a bell?
16       A    As far as the letters and the regular
17  reporting to the city council, if it's
18  included, if that number is included in that
19  six-month period, yes.
20       Q    So to your knowledge, the chief
21  administrator from IPRA sends a letter to the
22  city council committee on police and fire?
23       MS. WERTH:  I'm going to object to
24  lack of foundation, lack of personal

BRUCE DEAN
October 8, 2015

Page 33

1   BY MR. MORRISSEY:
2        Q    I'm showing you what has been
3   formerly -- previously --
4        MS. WERTH:  Do you have a copy for
5   me?
6        MR. MORRISSEY:  I did.
7        MR. PALLES:  Oh, I'm sorry.  Did I --
8   You can have mine.
9   BY MR. MORRISSEY:
10       Q    I have handed you Exhibit Number 2,
11  which has previously been Bates stamped by the
12  City and maybe IPRA's attorney as 3197 through
13  3208, and I'd ask you to turn to the final page
14  of that document, 3208.  And under Commander
15  Glen Evans, accused member, to the right,
16  there's 20 days, and it was crossed out on
17  May 15th; and to the right of that, there
18  appear to be some initials.  Do you recognize
19  that as Mr. Ando?
20       A    I don't.
21       Q    Do you recognize those initials?
22       A    I don't.
23       Q    To your knowledge, the chief
24  administrator --

BRUCE DEAN
October 8, 2015

Page 35

1   knowledge.  I mean, I think he's -- which
2   part of the Notice of Deposition --
3        MR. MORRISSEY:  How does the City of
4   Chicago track or monitor allegations of
5   excessive force by members of the Chicago
6   Police Department.
7        MS. WERTH:  I think he's answered
8   that but --
9        MR. MORRISSEY:  Well, I'm asking --
10       MS. WERTH:  Go ahead.
11       MR. MORRISSEY:  There's other people
12  in the City of Chicago that are employed by
13  the City of Chicago other than IPRA.
14  BY MR. MORRISSEY:
15       Q    So, to your knowledge, does the
16  mayor's office receive a status report?
17       MS. WERTH:  I'm going to object to
18  lack of knowledge, personal knowledge, on
19  that.  You can answer, if you know.
20  BY THE WITNESS:
21       A    I know that we have reporting
22  obligations.  How that information is conveyed,
23  though, the exact details of that, I'm not
24  aware of that.

Plaintiff's Exhibit 4 Page 9

Page 36

```
 1   BY MR. MORRISSEY:
 2       Q    Would Mr. Andos know those answers,
 3   to your knowledge, as the chief administrator?
 4           MS. WERTH:  Objection.
 5           MR. MORRISSEY:  Let me rephrase the
 6       question.
 7   BY MR. MORRISSEY:
 8       Q    To your knowledge Chief Andos
 9   prepares reports to various members of the City
10   of Chicago -- Strike that.  To your knowledge,
11   the Chief Administrator Andos --
12           MS. WERTH:  I think it's Ando, no "s"
13       at the end.
14           MR. MORRISSEY:  That's what I said,
15       Ando.
16           MS. WERTH:  Oh.
17           MR. MORRISSEY:  Sorry.
18   BY MR. MORRISSEY:
19       Q    To your knowledge, Chief Andos --
20   Ando prepares reports for CRs that are open a
21   certain period of time, correct?
22       A    Yes.
23       Q    You personally don't know to all the
24   entities that the chief sends those reports to,
```

Page 38

```
 1       A    It's concluded with a report with the
 2   findings.
 3       Q    Are investigators required to do a
 4   summary prior to making a recommended finding?
 5       A    Well, they prepare the report with
 6   the findings.  So the findings are included in
 7   that report.
 8       Q    What types -- When a CR is open, what
 9   type of findings are made by IPRA if they
10   conclude the CR?
11       A    There are four findings.
12       Q    And what are they?
13       A    Not sustained.
14       Q    Which means what?
15       A    There's insufficient evidence to
16   determine if the actions and the allegations
17   actually occurred or not.
18       Q    Okay.
19       A    There is unfounded, which means the
20   incident did not occur as alleged.  There's
21   exonerated, which means, yes, the officer did
22   what was alleged but was justified in doing so;
23   and then there is sustained, which is a finding
24   that says there is sufficient evidence to move
```

Page 37

```
 1   correct?
 2       A    I do not.
 3       Q    Now, you mentioned that after a CR
 4   file is open, in addition to entries being made
 5   in the CLEAR system that there is a physical
 6   file, correct?
 7       A    Correct.
 8       Q    Other than those two places where
 9   information is stored in regards to a CR, is
10   there any other manner in which information
11   concerning a specific CR would be maintained?
12       A    Not that I'm aware of, no.
13       Q    When a -- Strike that.  When a CR
14   investigation is concluded, is there usually a
15   determination made by IPRA?
16           MS. WERTH:  Objection to the form of
17       the question.  You can answer, if you
18       understand it.
19   BY THE WITNESS:
20       A    A determination is made at the end of
21   the investigation, yes.
22   BY MR. MORRISSEY:
23       Q    And how does IPRA document when an
24   investigation has been concluded?
```

Page 39

```
 1   forward with a consideration of discipline for
 2   an accused officer.
 3       Q    Is it up to the individual
 4   investigator assigned a CR file to initially
 5   make one of those four findings?
 6       A    Initially, yes.
 7       Q    And is there any review process of a
 8   finding made by an investigator after a CR has
 9   been opened?
10       A    Yes.
11       Q    And what type of review is there for
12   a finding made by an investigator?
13           MS. WERTH:  I'm going to make an
14       objection that it almost infringes on the
15       deliberative process privilege; but in a
16       general sense, you can answer that
17       question.
18   BY THE WITNESS:
19       A    When the investigator finishes the
20   investigation and writes the report, they come
21   up with the findings; and then they submit the
22   case to their supervisor, to his or her
23   supervisor.  And the supervisor reviews the
24   case and either agrees or suggests corrections
```

Plaintiff's Exhibit 4 Page 10

BRUCE DEAN
October 8, 2015

Page 40

1  or changes or he may return it for additional
2  work.
3  BY MR. MORRISSEY:
4       Q     Are there any documents relating to
5  how an investigator makes a determination about
6  a particular CR?
7       A     Is there a specific document
8  regarding how the choice of findings is made?
9       Q     (Indicating.)
10      A     No.
11      Q     Is there a specific document -- Let
12 me ask a preliminary question.  Do
13 investigators assess discipline -- Strike that.
14 Do investigators recommend any form of
15 discipline if they find that they sustain --
16 initially sustain a CR?
17      A     The investigator does not, no.
18      Q     Who makes the determination in
19 regards to a recommended discipline for an
20 officer who has a sustained CR file?
21      A     The chief administrator makes that
22 recommendation, a consultation with the
23 investigator and the supervisor.
24      Q     Is there any document that IPRA uses

BRUCE DEAN
October 8, 2015

Page 41

1  to -- Strike that.  Do you know if there's any
2  document within IPRA that lays out the
3  potential discipline that a chief administrator
4  can recommend when a CR has been sustained
5  against a police officer?
6            MS. WERTH:  I'm going to object to
7  vague, but you can answer.  Are you asking
8  him --
9            MR. MORRISSEY:  Let me rephrase the
10 question.
11           MS. WERTH:  Okay.
12 BY MR. MORRISSEY:
13      Q     You mentioned that if a CR comes back
14 sustained that a chief administrator after
15 consulting with the investigator and supervisor
16 can recommend discipline against a member of
17 the Chicago Police Department?
18      A     (Indicating.)
19      Q     You have to answer orally.
20      A     Yes.
21      Q     My question -- My next question is is
22 there any document that lays out what level of
23 discipline can be recommended by IPRA for a CR
24 that comes back sustained against an officer?

BRUCE DEAN
October 8, 2015

Page 42

1       A     Well, we can recommend anything from
2  a reprimand or violation noted to separation.
3       Q     Is there any document that lays out
4  these various levels of discipline that can be
5  leveled against a police officer found to have
6  infringed on IPRA's findings?
7       A     Well, there's no document that states
8  specifically that if you do this, then you will
9  get that.  The City of Chicago uses progressive
10 discipline.
11      Q     When you say the City of Chicago, you
12 mean the Chicago Police Department or --
13      A     Yes, the Chicago Police Department.
14      Q     So does IPRA -- Does the IPRA chief
15 rely on any type of general order or procedure
16 within the Chicago Police Department as far as
17 recommending a discipline?
18      A     It all has to -- If I understand the
19 question correctly, it all takes place within
20 the boundaries of the ordinance and the general
21 orders.
22           In other words, a reprimand is for
23 minor infractions, and it goes progressively
24 more serious for subsequent infractions after

BRUCE DEAN
October 8, 2015

Page 43

1  that.  The decisions are more based on
2  progressive discipline rather than a set
3  matrix.
4       Q     The Exhibit 2 that I showed you
5  involving Rita King, the last page has a
6  recommended discipline for the three officers
7  involved, correct?
8       A     Correct.
9       Q     Does this document, and it's titled
10 Independent Police Review Authority and it's in
11 memo form to Scott Ando from, in this case,
12 supervisor Patrick McQuerfurth --
13      A     Querfurth.
14      Q     All right, is this a standard form
15 used within IPRA?
16      A     Yes.
17      Q     And this is the form that's used in
18 the conclusion of the investigation?
19      A     Correct.
20      Q     Do you know if this form is forwarded
21 to any other officer within the City of
22 Chicago?
23           MS. WERTH:  Are you asking in general
24 this type of form or this particular form?

Plaintiff's Exhibit 4 Page 11

BRUCE DEAN
October 8, 2015

Page 44

1    MR. MORRISSEY: I'm not asking this
2  particular form -- Strike that.
3  BY MR. MORRISSEY:
4    Q    When a finding is made, for example,
5  3208, in this case, it was in regards to a
6  complaint by Rita King. To your knowledge, is
7  this form generally forwarded to the
8  superintendent of police?
9    A    I don't know.  It --
10   Q    Who -- I'm sorry.
11   A    Yeah, I don't know the answer to
12  that.
13   Q    What documentation -- Strike that.
14  To your knowledge, does the decision by the
15  Independent Police Review Authority, in this
16  case, the chief administrator, have to be
17  approved by any other entity within the Chicago --
18  City of Chicago.
19     MS. WERTH: I'm sorry. Could you
20  repeat that question?
21            (WHEREUPON, the record
22             was read as requested.)
23     MS. WERTH: I'm going to object to
24  vague and ambiguous. You can answer.

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 46

1    Q    What documentation flows from that
2  finding by the chief administrator of IPRA that
3  a member of the police department has a
4  sustained finding against him or her?
5    A    The recommendation goes to the
6  Chicago Police Department, to the
7  superintendent's office.
8    Q    What documentation goes to the
9  superintendent's office?
10   A    I don't know that.  I -- Okay.
11   Q    Do you know what documentation -- Do
12  you know whether or not the IPRA -- Strike
13  that.  When a finding, a sustained finding is
14  made against a member of the Chicago Police
15  Department by the chief administrator, do you
16  know whether or not the IPRA hard file is
17  forwarded to the superintendent of police?
18   A    I don't know.  In every case, I don't
19  know.
20   Q    Who would know that?
21   A    We have a document section, and they
22  control the flow of documents in and out of
23  IPRA.
24   Q    Do you know if the chief

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 45

1  BY MR. MORRISSEY:
2    Q    Do you understand the question?
3    A    Yeah, IPRA makes the decisions.  I
4  mean, the chief administrator makes the
5  recommendation; but -- if that's what you're
6  asking.
7    Q    When the chief administrator of IPRA
8  makes a recommendation about disciplining a
9  member of the Chicago Police Department, that
10  isn't the final -- the end of the police review
11  process, correct?
12     MS. WERTH: Objection to the form of
13  the question. What do you mean by the
14  review process? Do you mean the review
15  processes within IPRA or something else?
16  BY MR. MORRISSEY:
17   Q    Do you understand the question?
18   A    I think so.
19   Q    I'll rephrase it if you don't.  IPRA
20  makes a finding.
21   A    Right.
22   Q    The chief administrator makes a
23  finding.
24   A    Right.

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 47

1  administrator, Mr. Ando, has to forward a
2  letter to the superintendent of police when
3  there is a sustained finding against a police
4  officer?
5     MS. WERTH: I think we are getting
6  far afield from the 1(a), (b) and (c),
7  which talks about -- which is confined to
8  excessive force.
9     MR. MORRISSEY: I will rephrase it
10  because I think (c) talks about identify
11  any and all documents relating to
12  determinations concerning excessive force
13  claims against members of the CPD.
14     MS. WERTH: Right.
15  BY MR. MORRISSEY:
16   Q    So my question really is in regards
17  to when the chief administrator has made a
18  finding, a sustained finding, about excessive
19  force against a police officer, does the IPRA
20  investigative file get forwarded to the chief
21  of police, to the superintendent of police?
22     MS. WERTH: That's been asked and
23  answered, but you can --
24     MR. MORRISSEY: Well, I'm being very

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 12

BRUCE DEAN
October 8, 2015

Page 48

```
 1      specific as to the excessive force claims
 2      at your request.
 3   BY THE WITNESS:
 4      A    I'm not sure what parts of the
 5   physical file are conveyed to the
 6   superintendent's office.
 7   BY MR. MORRISSEY:
 8      Q    Do you know what type of documents
 9   are forwarded to the superintendent of police?
10      A    Electronically, all the attachments
11   are forwarded.
12      Q    Do you know if the superintendent of
13   police is required to send any documents back
14   to IPRA if there is a finding -- if he agrees
15   with the finding by the chief administrator for
16   a CR involving excessive force?
17           MS. WERTH:  Objection to -- lacks
18      knowledge, outside the scope of the (a),
19      (b), (c).
20           MR. MORRISSEY:  The question --
21           MS. WERTH:  Let me finish.
22           MR. MORRISSEY:  Go ahead.
23           MS. WERTH:  As to what documents are
24      sent back from the superintendent to IPRA,
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 49

```
 1      it's an overbroad question.  You can answer
 2      if you understand the question.
 3   BY MR. MORRISSEY:
 4      Q    Do you understand the question?
 5      A    I think so, yeah; and I have to say
 6   that I'm not familiar with exactly what
 7   physical documents are exchanged between the
 8   chief administrator's office and the
 9   superintendent's office.
10      Q    Do you know whether or not after a
11   finding of excessive force has been recommended
12   by IPRA's chief whether the superintendent of
13   police has a 90-day window to write back saying
14   he agrees or disagrees with that finding?
15      A    I believe that's it.  It's all
16   detailed in the ordinance.
17      Q    Have you ever seen -- As the
18   representative of IPRA, have you ever received --
19   Have you ever -- Strike that.
20           As the IPRA representative, are you
21   aware that when a recommendation for excessive
22   force with discipline has been forwarded to the
23   superintendent of police that the
24   superintendent always responds with a letter or
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 50

```
 1   a response to that request?
 2           MS. WERTH:  First, I'm going to
 3      object to your continuing reference to
 4      Mr. Dean as an IPRA representative.  He is
 5      here in the capacity of a (30(b)(6) witness
 6      to answer specific questions that are
 7      identified in your notice of 30(b)(6)
 8      deposition.  He's not a representative of
 9      IPRA for everything.  So that's number one.
10           Number two, the question is
11      complex, and I would ask you to answer it,
12      if you understand.
13   BY MR. MORRISSEY:
14      Q    Well, I'm asking as the 30(b)(6)
15   person under 1(c), what documents does his
16   agency receive back from the superintendent's
17   office after a recommendation of discipline has
18   been made by the chief of IPRA?
19      A    I'm not aware of the exact documents.
20   There is no way I could know that, but I know
21   that the superintendent acknowledges receipt of
22   our recommendation electronically.
23      Q    On what electronic system?
24      A    That's in CLEAR.
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 51

```
 1      Q    Is there somebody else within IPRA
 2   that would be better able to respond what
 3   documentation comes back from this
 4   superintendent of police after a recommendation
 5   has been made of discipline?
 6           MS. WERTH:  I'm going to object to
 7      that as a -- What document comes back from
 8      the superintendent to IPRA in each and
 9      every case or in this particular case?
10           MR. MORRISSEY:  Well, let me make a
11      broad question.
12   BY MR. MORRISSEY:
13      Q    My 30(b)(6) talks about documents in
14   regards to determinations against the CPD for
15   excessive force.
16           Are you prepared to answer -- You
17   stated that disciplinary recommendations are
18   sent to the superintendent's office, correct?
19      A    Correct.
20      Q    And you acknowledge that, in general,
21   the practice is for the superintendent to
22   acknowledge that he -- his office have received
23   recommendations of discipline, correct?
24      A    Correct.
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 13

BRUCE DEAN
October 8, 2015

Page 52

1    Q    My question is what documents does
2  your office receive back once a recommendation
3  of discipline has been sent and acknowledged by
4  the superintendent of police?
5    A    I don't know.
6    Q    Okay.  Is there a -- To your
7  knowledge, is there a department within IPRA
8  that would receive these documents back from
9  the superintendent of police in regards to
10 disciplinary recommendations?
11   A    Our records staff.
12   Q    Do you know if Chief Andos receives
13 responses from the superintendent's office in
14 regards to recommendations of discipline?
15   MS. WERTH:  Objection to this person
16 lacks personal knowledge.  You can answer
17 if you know, to your knowledge.
18   MR. MORRISSEY:  The question is he is
19 the representative that you're producing.
20   MS. WERTH:  But he can't answer what --
21   MR. MORRISSEY:  If he doesn't know --
22 Obviously, if he doesn't know, then
23 somebody else might know.
24   MS. WERTH:  Let me make my objection.

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 54

1    MS. WERTH:  Counsel, you can show him
2  this; but if you're going to ask him
3  questions about an ordinance, I would have
4  to object on the ground that it calls for a
5  legal conclusion, but go ahead with your
6  question.  Can I have a copy?
7  BY MR. MORRISSEY:
8    Q    I would ask you to turn to Page 3.
9  The code section is 2-57-3 -- on Page 3, the
10 code section is 2-57-060, and I would ask you
11 to read B 1, 2, 3 and 4.
12   MS. WERTH:  Objection to this request
13 to read an ordinance while you sit here
14 without any idea of what -- where you're
15 going with this.  Are you asking him to
16 interpret an ordinance, a Chicago
17 ordinance?
18   If so, I would object on the
19 ground that it calls for a legal
20 conclusion.  He's not a qualified legal
21 expert.
22   MR. MORRISSEY:  I'm not asking him to
23 opine about the ordinance.  After he
24 reviews it, I'm going to ask you under B if

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 53

1    MR. MORRISSEY:  Sure, go ahead.
2    MS. WERTH:  He can't answer what
3  document Chief Ando received from the CPD
4  obviously.  So that's my objection.
5  BY MR. MORRISSEY:
6    Q    Okay.  Do you know whether or not --
7  Do you have knowledge as the IPRA designee
8  whether the superintendent of police's office
9  sends back any documentation to Chief Ando's
10 office concerning recommendations of
11 discipline?
12   A    They acknowledge the receipt of the
13 recommendation.  What goes back and forth after
14 that, as I said, is detailed in the ordinance.
15 I am not aware, though, of the exact
16 information or documents that is exchanged
17 between the offices.
18   Q    I'm showing you what we will mark as
19 Plaintiff's Exhibit Number 3.  It's Chapter
20 2-57 of the municipal code in regards to
21 Independent Police Review Authority.
22        (WHEREUPON, Plaintiff's
23         Exhibit No. 3 was marked
24         for identification.)

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 55

1    the superintendent does not agree with the
2  disciplinary action, he apparently,
3  according to the ordinance, is supposed to
4  write back with certain information to
5  Chief Ando.
6    MS. WERTH:  Okay, you just answered
7  your own question.  That's what the
8  ordinance says.  That's what it says.
9    MR. MORRISSEY:  Well, I'm going to
10 ask him whether he knows whether or not
11 that documentation generally is done by the
12 superintendent's office.
13   MS. WERTH:  I'm going to object to
14 that as lacks personal knowledge of whether
15 that is -- whether the superintendent
16 actually follows the ordinance.
17   MR. MORRISSEY:  The question is he's
18 the person who's being presented from IPRA.
19 It's a simple question.  Does IPRA receive
20 any documentations back --
21   MS. WERTH:  He's answered that.
22   MR. MORRISSEY:  -- from the
23 superintendent of police when the
24 superintendent of police does not agree

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 14

BRUCE DEAN
October 8, 2015

Page 56

1  with the recommendation?  Does he know
2  that?
3      MS. WERTH:  He has been asked that
4  question.  He has answered it, and he has
5  even told you that the records staff would
6  know about documents received back.
7      MR. MORRISSEY:  So he's not prepared
8  to talk about that.
9      MS. WERTH:  I'm not sure what you
10 mean by prepared to talk about that.
11     MR. MORRISSEY:  Well, he's not the
12 person that would have knowledge of what
13 documentation is received back from the
14 superintendent in regards to a
15 determination of excessive force.
16     MS. WERTH:  Well, I would imagine it
17 depends on a case-by-case basis.  If you
18 want to put an exact question to him, do
19 that and then we will go from there.
20     MR. MORRISSEY:  Okay.
21 BY MR. MORRISSEY:
22     Q    The ordinance provides that the
23 superintendent of police, if he disagrees with
24 a recommendation from IPRA, that he is supposed

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 58

1  BY MR. MORRISSEY:
2      Q    In the event the superintendent of
3  police does not agree with a recommendation
4  from IPRA, do you know whether or not any
5  documentation is received back from the
6  superintendent of police by IPRA?
7      MS. WERTH:  Am I missing something?
8  It's been asked and answered.
9      MR. MORRISSEY:  You're not missing
10 anything.  It's a very simple question.
11 I'm asking --
12     MS. WERTH:  My objection is simple.
13 It's been asked and answered.
14 BY MR. MORRISSEY:
15     Q    My question is when a recommendation
16 is not approved by the superintendent, does
17 IPRA receive any documents back?
18     MS. WERTH:  He's answered that
19 question by telling you that, according to
20 the ordinance, they are supposed to receive
21 a document back.
22     MR. MORRISSEY:  But I'm asking in
23 practice, does it actually happen?  I
24 understand what the ordinance says.  I'm

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 57

1  to provide some type of a response to your
2  organization, correct?
3      A    Correct.
4      Q    Do you have any knowledge in general
5  whether or not that is done?
6      A    We follow the ordinance; and
7  according to the ordinance, the response must
8  be submitted to the chief administrator within
9  the 90-day decision period.
10     Q    My question is do you know whether or
11 not the superintendent of police does provide
12 that documentation to IPRA if he disagrees with
13 an IPRA recommendation of discipline?
14     MS. WERTH:  I'm going to object on
15 the ground of lacks knowledge, and it's
16 already been asked and answered; and he
17 cannot answer to whether or not the
18 superintendent of the Chicago Police
19 Department follows the ordinance.
20 BY THE WITNESS:
21     A    To my knowledge, if the
22 superintendent takes no action, then our
23 recommendation is valid.
24

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 59

1  asking whether or not IPRA actually does
2  receive documents back from the
3  superintendent when a recommendation is not
4  followed for discipline.
5      MS. WERTH:  I believe he's answered
6  that question, and he's told you he doesn't
7  know.
8      MR. MORRISSEY:  Okay.
9      MS. WERTH:  But you can answer it
10 again over my objection.
11 BY THE WITNESS:
12     A    IPRA follows the ordinance.  I am not
13 familiar with the exact practice as far as the
14 details of which documents and what those
15 documents look like in the exchange between the
16 offices.
17 BY MR. MORRISSEY:
18     Q    The question very narrowly is does
19 IPRA receive, when a recommendation of
20 discipline is not agreed to by the
21 superintendent, does -- in practice, does your
22 office receive documents back from the
23 superintendent?
24     MS. WERTH:  I think this is the

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 60

1  umpteenth time you're asking this question.
2      MR. MORRISSEY:  And I haven't gotten
3  the answer.
4      MS. WERTH:  He's given you the
5  answer; and if you keep on badgering him,
6  I'm going to tell him not to answer again
7  the same answer he just gave you.
8      MR. MORRISSEY:  So if the --
9      MS. WERTH:  Why don't you read back
10 the last question and answer and you will
11 see that you have already asked that.
12     MR. MORRISSEY:  I believe he's
13 answered it, but you can.  I don't want to
14 belabor this because it appears that he
15 doesn't have the answer to that question.
16     MS. WERTH:  Right, and it's a
17 question that nobody will have an answer to
18 because it varies from case to case.  What
19 a superintendent does in a particular case,
20 whether he sends back a document or not --
21 I'm not sure what you're trying to get at
22 and how it helps your Monell claim.
23     MR. MORRISSEY:  Well, you don't have
24 to question what the other side's view on a

BRUCE DEAN
October 8, 2015

Page 61

1      case is.
2  BY MR. MORRISSEY:
3      Q    The question, though, is, as a
4  general practice, when a disciplinary
5  recommendation is made by the chief
6  administrator, does the superintendent send
7  back a written document?
8      MS. KUPE-ARION:  Okay, at this point
9  in time, I'm going to say that this has
10 been asked several times.  I believe it has
11 been answered several times.  So just
12 because it's not a satisfactory answer,
13 doesn't mean it hasn't been answered,
14 Counsel.
15     MR. MORRISSEY:  Well, it hasn't been
16 answered.  If you want to read back his
17 response.
18     MS. WERTH:  No, we'll move on unless
19 you want to --
20     MR. MORRISSEY:  Then the record will
21 reflect, unless you are going to produce
22 somebody responsive to that, I'm going to
23 go before Magistrate Gilbert to ask you to
24 produce somebody.

BRUCE DEAN
October 8, 2015

Page 62

1      MS. WERTH:  You can do whatever you
2  want in front of Magistrate Gilbert and ask
3  him to sanction me or whatever your modus
4  operandi is, and we will deal with that.
5      MR. MORRISSEY:  That's fine.  That's
6  fine.  I'll take a few-minutes break.
7          (WHEREUPON, a short
8           break was had.)
9  BY MR. MORRISSEY:
10     Q    Does the City of Chicago track when a
11 CR file has been opened and a police officer
12 has been disciplined in accordance with the
13 chief administrator of IPRA?
14     MS. WERTH:  Did you get that?
15 BY THE WITNESS:
16     **A    In other words, do we keep track of
17 how many times the chief administrator's
18 recommendation is accepted by the
19 superintendent?**
20     MS. WERTH:  Is that your question?
21 BY MR. MORRISSEY:
22     Q    That's part of it.
23     MS. WERTH:  Do you want to read back
24 the question unless you want to rephrase

BRUCE DEAN
October 8, 2015

Page 63

1      it.
2      MR. MORRISSEY:  I'll rephrase it.
3  BY MR. MORRISSEY:
4      Q    When the chief administrator makes a
5  recommendation for disciplining an officer,
6  does your office have any way of tracking
7  whether or not that recommendation has been
8  followed?
9      **A    Well, according to the ordinance, he
10 has a time period in which to reply; and when
11 the time runs up, either we have a response or
12 we don't.**
13     Q    And if you don't have a response,
14 IPRA assumes that the person has been
15 disciplined in accordance with the chief
16 administrator's recommendation?
17     MS. WERTH:  Objection, speculation as
18 to what IPRA assumes, but you can answer.
19 BY THE WITNESS:
20     **A    I don't know the answer to that.**
21 BY MR. MORRISSEY:
22     Q    Any other way of tracking whether a
23 recommendation of discipline by the chief
24 administrator has been followed?

Plaintiff's Exhibit 4 Page 16

BRUCE DEAN
October 8, 2015

Page 64

```
 1        A    The CLEAR system is the only way that
 2   I'm aware of.
 3        Q    How would the CLEAR system track
 4   whether or not a recommendation by the chief
 5   administrator of IPRA has been filed?
 6        A    The responses are anything that
 7   anyone wants to put on the record for the
 8   investigation is included in the CLEAR system.
 9   There is a place where you can enter responses,
10   your agreement or disagreement with the finding
11   of the recommendation.
12             As far as what the finance payroll
13   implications of that are, if any, that's beyond
14   IPRA's control.
15        Q    So if a recommendation by the chief
16   administrator -- Strike that.
17             By looking at the CLEAR system for a
18   particular CR file, a person from IPRA could
19   determine whether or not the recommendation by
20   IPRA's chief has been disapproved by the
21   superintendent's office?
22             MS. WERTH:  Objection.  That
23        mischaracterizes the evidence.  That's not
24        what he said.
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 66

```
 1   obligated to police itself; but if it does
 2   so, that's fine; but there is no
 3   constitutional right to have IPRA -- and
 4   certainly no constitutional right to have
 5   IPRA do investigations within a certain
 6   time period.  Just saying so you know.  You
 7   can look up the case law.
 8        MR. MORRISSEY:  That's fine.  All
 9   right.  Thanks.  We'll write it up.
10        MS. WERTH:  So we reserve.
11
12        FURTHER DEPONENT SAITH NOT....
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 65

```
 1   BY THE WITNESS:
 2        A    I suppose perhaps, but it would
 3   depend on the level of access to the
 4   investigations.
 5        MR. MORRISSEY:  I have nothing
 6   further.
 7        MS. WERTH:  Okay.
 8        MR. MORRISSEY:  Anybody have any
 9   questions?
10        MS. WERTH:  I have no questions.  Do
11   you have any questions?
12        MS. HARRIS:  I have no questions.
13        MR. PALLES:  (Indicating.)
14        MR. MORRISSEY:  All right, thanks a
15   lot.
16        MS. WERTH:  So while we are on the
17   record, let me just make one observation,
18   if I may.  Just, you know.  It may be
19   useful for you, Mr. Morrissey, to know, of
20   course, you know, IPRA -- the existence of
21   IPRA or nonexistence of IPRA is really
22   besides the point.
23             There is a plethora of case law
24   that says that a municipality is not
```

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 67

```
 1        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3   RITA KING,                )
                               )
 4           Plaintiff,        )
                               )
 5           vs.               )   No. 13 C 1937
                               )
 6   GLENN EVANS, et al.,      )
                               )
 7           Defendants.       )
 8
 9        I, BRUCE DEAN, being first duly
10   sworn, on oath, say that I am the deponent in
11   the aforesaid deposition, that I have read the
12   foregoing transcript of my deposition,
13   consisting of pages 1-67 inclusive, taken at
14   the aforesaid time and place and that the
15   foregoing is a true and correct transcript of
16   my testimony so given.
17
18        _____
                 BRUCE DEAN
19
     SUBSCRIBED AND SWORN TO
20   me before this _____ day
21   of _____, A.D. 2015.
22
     _____
23   Notary Public
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 17

BRUCE DEAN
October 8, 2015

Page 68

1   STATE OF ILLINOIS )
                      )  ss:
2   COUNTY OF C O O K )

3           I, Peggy A. Anderson, a Certified
4   Shorthand Reporter in the State of Illinois do
5   hereby certify:
6           That previous to the commencement of
7   the examination of the witness, the witness was
8   duly sworn to testify the whole truth
9   concerning the matters herein;
10          That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction, and constitutes a true
14  record of the testimony given and the
15  proceedings had;
16          That the said deposition was taken
17  before me at the time and place specified;
18          That the said deposition was
19  adjourned as stated herein;
20          That I am not a relative or employee
21  or attorney or counsel, nor a relative or
22  employee of such attorney or counsel for any of
23  the parties hereto, nor interested directly or
24  indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

BRUCE DEAN
October 8, 2015

Page 69

1           IN WITNESS WHEREOF, I do hereunto set
2   my hand at Chicago, Illinois, this _____ day
3   of _____, 2015.

4

5

6

7   _____
8       Peggy A. Anderson
9       Certified Shorthand Reporter
10      License No. 084-003813
11

12

13

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 4 Page 18

Transcript of the Testimony of
**GARRY MCCARTHY**

**Date:** January 20, 2016

**Case:** KING VS. EVANS

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

GARRY MCCARTHY
January 20, 2016

Page 2

1   A P P E A R A N C E S :
2
3       THE LAW OFFICES OF:
        THOMAS G. MORRISSEY
4       BY:  MR. PATRICK MORRISSEY
             MR. THOMAS G. MORRISSEY
5            10150 South Western Avenue
             Chicago, Illinois  60643
6            (773) 233-7900
             patrickmorrissey1920@gmail.com
7
             Appeared on behalf of the
8            Plaintiff;
9
10      THE LAW OFFICES OF:
        CITY OF CHICAGO
11      FEDERAL CIVIL RIGHTS
        LITIGATION DIVISION
12      BY:  MR. BRIAN F. KOLP
             30 North LaSalle Street
13           Suite 900
             Chicago, Illinois 60602
14           (312) 744-0747
             brian.kolp@cityofchicago.org
15
             Appeared on behalf of the
16           individual defendants,
             D.T. Clifford, R.A. Sutton,
17           K.L. Rodgers.
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 1

1   IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

RITA KING,                    )
                              )
        Plaintiff,            )
                              )
        vs.                   )   No. 13 C 1937
                              )
GLENN EVANS, et al.,          )
                              )
        Defendants.           )

    This is the deposition of GARRY McCARTHY,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, taken before
PEGGY A. ANDERSON, a Certified Shorthand Reporter
of the State of Illinois, at 10150 South Western
Avenue, Chicago, Illinois, on January 20, 2016
at 3:00 p.m.

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 3

1   A P P E A R A N C E S :
2
3       THE LAW OFFICES OF:
        CITY OF CHICAGO
4       FEDERAL CIVIL RIGHTS
        LITIGATION DIVISION
5       BY:  MR. THOMAS J. PLATT
             30 North LaSalle Street
6            Suite 900
             Chicago, Illinois 60602
7            (312) 744-4833
             Thomas.Platt@cityofchicago.org
8
             Appeared on behalf of the
9            Deponent, Garry McCarthy;
10
        THE LAW OFFICES OF:
11      QUINTAIROS, PRIETO,
        WOOD & BOYER, P.A.
12
        BY:  MR. KENNETH BATTLE
13           233 South Wacker Drive
             70th Floor
14           Chicago, Illinois 60606
             (312) 566-0040
15           kenneth.battle@qpwblaw.com
16           Appeared on behalf of the
             Defendant, Glenn Evans.
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648



Plaintiff's Exhibit 5 Page 1

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 4

```
1              I N D E X                    PAGE
   WITNESS                                  PAGE
2
   GARRY McCARTHY
3
   DIRECT EXAMINATION BY
4  MR. MORRISSEY:                           6-96
5
6
7              E X H I B I T S
8
   MARKED                                   PAGE
9
10
11
12                   ******
13
14
15
16
17
18
19
20
21
22
23
24
```

**TOOMEY REPORTING**
**312-853-0648**

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 6

```
1  WHEREUPON:
2              GARRY McCARTHY,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6      D I R E C T   E X A M I N A T I O N
7          BY MR. MORRISSEY:
8      Q   Mr. McCarthy, did you review any
9  documents in preparation for today's
10 deposition?
11     A   I did.
12     Q   What did you review?
13     A   Mr. Platt sent me a couple of
14 documents.  One of them being Commander
15 Evans' -- some disciplinary history.  The
16 second one being the policy regarding
17 emotionally disturbed persons that was revised
18 in, I think, April of 2015 or something like
19 that, 2014 maybe.
20     Q   So you reviewed the April 2015 policy
21 regarding emotionally disturbed arrestees?
22     A   If that's when it was from.  I don't
23 recall.  I reviewed a policy on emotionally
24 disturbed persons.
```

**TOOMEY REPORTING**
**312-853-0648**

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 5

```
1          (WHEREUPON, the witness
2               was first duly sworn.)
3      MR. MORRISSEY:  This the deposition
4  of King versus Evans taken pursuant to
5  notice and continued to this date.
6          My name is Pat Morrissey.  I
7  represent the Plaintiff, Rita King.  Sir,
8  could you state your name for the record?
9      THE WITNESS:  Garry McCarthy.
10     MR. MORRISSEY:  Have you sat for a
11 deposition before?
12     THE WITNESS:  Yes.
13     MR. MORRISSEY:  So you understand the
14 rules?  I'm going to ask you questions, and
15 I'm going to ask that you answer them
16 orally.  If you are confused with the
17 question, please ask me to clarify, okay?
18     THE WITNESS:  You got it, yeah.
19
20
21
22
23
24
```

**TOOMEY REPORTING**
**312-853-0648**

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 7

```
1      Q   Can you describe the document you
2  reviewed regarding Commander Evans'
3  disciplinary history?
4      A   Describe the document?  I looked at
5  it on my iPad, so not particularly.  It had
6  some allegations on there and some dispositions
7  but I only glanced at it, quite frankly.  So I
8  can't give you too much detail on it.
9      Q   Was it a print off of the CLEAR
10 system?
11     A   I have no clue.
12     Q   Do you recall what the allegations
13 were relating to Commander Evans?
14     A   No.
15     Q   Do you recall the disposition of the
16 charges against Commander Evans?
17     A   I don't recall if there were any
18 charges against Commander Evans, so no.
19     Q   Are you currently employed?
20     A   I'm sorry?
21     Q   Are you currently employed?
22     A   I have my own business.
23     Q   What do you do?
24     A   I started an LLC.
```

**TOOMEY REPORTING**
**312-853-0648**

Plaintiff's Exhibit 5 Page 2

GARRY MCCARTHY
January 20, 2016

Page 8

1  Q   What does your LLC do?
2  A   Consulting.
3  Q   In what years were you superintendent
4  of the Chicago Police Department?
5  A   From May of 2011 until December 2015.
6  Q   Going back to the document you
7  reviewed in preparation for today's deposition,
8  do you have it on your possession?
9  A   No.
10 Q   Is it on your phone?
11 A   No.
12 Q   Did you delete the e-mail?
13 A   I may have.  I don't recall.
14 Q   Have you ever reviewed a document
15 similar to that before?
16 A   Sure.
17     MR. PLATT:  Objection to the form of
18 the question.  What document are you
19 talking about?  You can answer if you
20 understand.
21 BY THE WITNESS:
22 A   I expect that you're asking me if I
23 reviewed the disciplinary history.  The answer
24 is yes.

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 9

1  BY MR. MORRISSEY:
2  Q   As superintendent of the Chicago
3  Police Department, have you ever reviewed a
4  disciplinary history of an officer before?
5  A   Yes.
6  Q   Are they generally printed off the
7  CLEAR system?
8  A   I'm not positive.  My staff would
9  bring me a printout of something.  I don't know
10 where they got it from.
11 Q   Did this document you reviewed, did
12 it include more than one allegation of
13 misconduct by Evans?
14 A   Yes.
15 Q   Did it include more than two
16 allegations of misconduct?
17 A   Yes.
18 Q   More than five?
19 A   I have no idea.  I told you I didn't
20 really study it.  I glanced at it.
21 Q   Were there any years relating to any
22 of these allegations against Commander Evans?
23 A   I presume there were.
24 Q   Do you recall which years they were?

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 10

1  A   No.
2  Q   Why did you review that document
3  regarding Commander Evans' disciplinary
4  history?
5  A   Because I was coming here for this
6  deposition.
7  Q   Had you ever reviewed that document
8  before?
9  A   I don't recall.
10 Q   Prior to holding the position of
11 superintendent of the Chicago Police
12 Department, did you work in law enforcement?
13 A   Uh-huh, yes.
14 Q   Can you briefly describe where you
15 worked in law enforcement?
16 A   From July of '81 until October of
17 2006, I was the -- I was a police officer in
18 New York City.  I went through the ranks
19 retiring as a deputy commissioner.  After that,
20 from October of '06 until May of 2011, I was
21 the police director of the city of Newark, New
22 Jersey.
23 Q   Did you apply to become the
24 superintendent of the Chicago Police

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 11

1  Department?
2  A   Yes.
3  Q   Can you describe that process?
4  A   There's an application with essay
5  questions.  It's available online or on a
6  Website.  I don't recall where.  There's an
7  application that you can get online, printed
8  out.  You answer essay questions and fill in
9  whatever blanks that they ask for, return it to
10 the police board, Chicago Police board.
11     Then the police board does a vetting
12 process.  They bring in a number of candidates
13 for interviews with the police board.  I think
14 it's -- I think, in my case, it was around ten
15 individuals, and then they recommend three
16 candidates to the mayor and the mayor makes the
17 selection.
18 Q   Did the mayor interview you before
19 you became superintendent?
20 A   Yes.
21 Q   What did you discuss with the mayor?
22 A   Police procedures and policy.
23 Q   How many meetings did you have with
24 the mayor before he appointed you the

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 3

**GARRY MCCARTHY**
**January 20, 2016**

Page 12

```
 1   superintendent of police?
 2       A    Two -- actually, one and there was a
 3   second meeting that the mayor stopped by, and I
 4   spoke to him for a moment; but it was a meeting
 5   with the mayor.
 6       Q    So in May of 2011, you became the
 7   superintendent of the Chicago Police
 8   Department?
 9       A    Yes.
10       Q    Were you a sworn officer?
11       A    Yes.
12       Q    Did you become familiar with the
13   rules and regulations of the Chicago Police
14   Department?
15       A    Yes.
16       Q    Tell me how you did that?
17       A    So to become a sworn officer in
18   Illinois, I had to do I think it was 40 hours
19   of training; and based upon my 30 years in law
20   enforcement, there was a -- I forget what you
21   call it, like a grandfathering in, if you will.
22   So I didn't have to go through six months of
23   training in the police academy.
24       Q    Did you review the Ch    TOOMEY REPORTING  (312) 853-0648
```

**TOOMEY REPORTING**
**312-853-0648**

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 14

```
 1          MR. BATTLE:  The police department or
 2       IPRA doing the investigations?
 3   BY THE WITNESS:
 4       A    Yes.
 5   BY MR. MORRISSEY:
 6       Q    Who investigates allegations of
 7   misconduct by members of the police department?
 8       A    It depends on the type of misconduct.
 9       Q    How does the police department
10   differentiate the misconduct?
11       A    As I said, IPRA investigates force,
12   police-related shootings and special category
13   verbal abuse.  Internal affairs investigates
14   everything else.
15       Q    Would everything else include -- Can
16   you give me some examples?
17       A    Stealing money from a drug dealer.
18       Q    Anything else?
19       A    Everything else.
20       Q    Why does IPRA investigate allegations
21   of physical misconduct by the police
22   department?
23       A    It's a great question.  I would like
24   to ask the same question.
```

**TOOMEY REPORTING**
**312-853-0648**

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 13

```
 1   Department general orders?
 2       A    Yes.
 3       Q    Did you learn about IPRA when you
 4   became the superintendent of the Chicago Police
 5   Department?
 6       A    Yes.
 7       Q    Tell me how you learned about IPRA?
 8       A    Well, I worked with IPRA.  IPRA was
 9   the investigating component for force
10   complaints, police-related shootings and I
11   guess the best way to put it is special
12   category verbal abuse, if it involves
13   ethnicity, race, gender or sexual orientation,
14   things of that nature.
15       Q    How did you learn about the
16   organization IPRA when you became
17   superintendent?  Did you have meetings with the
18   IPRA chief at the time?
19       A    Yes.
20       Q    When you became superintendent of the
21   Chicago Police Department, did you learn how
22   the police department investigates allegations
23   of misconduct by members of the police
24   department?
```

**TOOMEY REPORTING**
**312-853-0648**

---

**GARRY MCCARTHY**
**January 20, 2016**

Page 15

```
 1       Q    Do you know the answer?
 2       A    No.
 3       Q    Did you ever have any conversations
 4   with -- Strike that.
 5            When you became superintendent, did
 6   you ever ask the mayor about why IPRA has
 7   delegated the responsibility of investigating
 8   police misconduct?
 9       A    I doubt I'd ask the mayor.
10       Q    Why doesn't the Chicago Police
11   Department investigate allegations of physical
12   misconduct by a police officer?
13          MR. PLATT:  Objection to the form of
14       the question and --
15   BY THE WITNESS:
16       A    All I could tell you is how it
17   happened.  I can't tell you why.
18   BY MR. MORRISSEY:
19       Q    Did you ever raise that to the mayor
20   about why IPRA is delegated the responsibility
21   of investigating police misconduct?
22          MR. PLATT:  Objection, relevance, you
23       can answer.
24
```

**TOOMEY REPORTING**
**312-853-0648**

Plaintiff's Exhibit 5 Page 4

GARRY MCCARTHY
January 20, 2016

Page 16

1  BY THE WITNESS:
2       A    Yes.
3  BY MR. MORRISSEY:
4       Q    What did you tell the mayor?
5       A    It's not just the mayor.  I had the
6  conversations with the corporation counsel,
7  mayor's chief of staff and I pointed out what I
8  believed was a dysfunctional disciplinary
9  system where I had accountability but not
10  authority.  The police board is the final
11  determiner on suspensions of 30 days or more.
12       IPRA investigates those categories
13  that I mentioned, not the Chicago Police
14  Department.  Yet, I'm accountable for the
15  behavior of every police officer in the Chicago
16  Police Department and those entities may or may
17  not share the vision of the person who is
18  running the department nor understand police
19  culture because they're all civilians.
20       MR. MORRISSEY:  Let's take a
21  few-minute break.
22            (WHEREUPON, a short
23             break was had.)
24       MR. MORRISSEY:  Back on the record.

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 17

1  BY MR. MORRISSEY:
2       Q    Before we took a break,
3  Superintendent, you talked about how the --
4  there's a dysfunctional process to discipline a
5  police officer, correct?
6       A    Yes.
7       Q    And you had conversations with
8  corporation counsel about this issue?
9       A    Yes.
10       Q    When did you first have a
11  conversation with the corporation counsel
12  regarding this issue?
13       MR. PLATT:  I'm going to object to
14  this line of questioning.  It has nothing
15  to do with the allegations in this case or
16  the claims against the city of Chicago, but
17  you can answer the question.
18       MR. BATTLE:  I'll join in that
19  objection.
20  BY THE WITNESS:
21       A    I can't answer the question.  I don't
22  recall.
23  BY MR. MORRISSEY:
24       Q    Did you have more than one

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 18

1  conversation with the corporation counsel
2  regarding this issue?
3       MR. PLATT:  Same objection.  You can
4  answer.
5  BY THE WITNESS:
6       A    Sure.
7  BY MR. MORRISSEY:
8       Q    Who was the corporation counsel?
9       A    Steve Pett (phonetic).
10       Q    And has he been the corporation
11  counsel during your tenure as superintendent?
12       A    Yes.
13       Q    You also mentioned you discussed this
14  with the mayor, correct?
15       A    Yes.
16       Q    Did you discuss this issue with the
17  mayor on more than one occasion?
18       A    Probably.
19       Q    Do you recall when the first time you
20  mentioned this to the mayor was?
21       MR. PLATT:  Objection to this line of
22  questioning, irrelevant.  You can answer
23  the question.
24

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 19

1  BY THE WITNESS:
2       A    The answer is no.  It was probably
3  sometime in early 2012.
4  BY MR. MORRISSEY:
5       Q    What did the mayor say to you?
6       A    As a result of my conversations with
7  the mayor, there was a process that was begun
8  where a group called AT Kearney --
9       THE REPORTER:  AT what?
10       THE WITNESS:  Kearney, K-e-a-r-n-e-y,
11  I believe.
12  BY THE WITNESS:
13       A    -- came in on a pro bono basis to
14  review our disciplinary system and the
15  interactions between the police board, IPRA,
16  the police department, our internal affairs and
17  the overall methods that we used whether it be
18  arbitration, conferral and the way the entire
19  system worked.
20  BY MR. MORRISSEY:
21       Q    Do you know whether this company
22  generated a report based on the investigation?
23       A    They did.
24       Q    What's the report titled?

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 5

Page 20

1    A    I think it's called the AT Kearney
2  Report.
3    Q    Do you know when the report was
4  published?
5    A    No.
6    Q    Did you receive a copy of the report?
7    A    I believe I did, but I don't recall.
8    Q    Do you know who else received a copy
9  of the report?
10    A    No.
11    Q    Do you know what the findings of this
12  report were?
13    A    You know, I'm a little bit confused
14  because there was a second report called the
15  Safer Report that was somehow generated from
16  the same process.  So I don't remember if
17  Kearney issued the report or Safer issued the
18  report.  I don't know if they're one in the
19  same.  I don't know if there's -- I don't know
20  if they have different recommendations; but I
21  do know that I read one or the other, an
22  executive summary of it.
23           And basically they asked us questions
24  about what we thought we should do internally

Page 21

1  about the disciplinary system.  We told them
2  what we were doing, and then they recommended
3  that we do it.
4    Q    Do you know if any of these reports
5  were made public?
6    A    Yes, I believe it was the Safer
7  Report was actually presented to the community
8  in some fashion.  There was some sort of a
9  meeting that I couldn't attend.  It was brought
10  to my attention at the last moment.  I didn't
11  get to review the report before it was
12  published.  It was given out to the community,
13  some sort of a form.
14    Q    Do you know whether the police
15  department or the city of Chicago changed any
16  procedures based on either one of the reports?
17    A    I can't speak for the city, but what
18  I can tell you is that we implemented a number
19  of the recommendations that we had made.  I
20  didn't have to wait for a report to implement
21  the things that I wanted to do internally to
22  try and strengthen our disciplinary system.
23    Q    What did you do personally to
24  strengthen the disciplinary process of the

Page 22

1  police department?
2    A    I expanded the size of internal
3  affairs.  We created something called the
4  Supervisory Assignment Board, which gave
5  internal affairs the option, the first right of
6  refusal, if you will, to pick up supervisors.
7  In the event that you're a detective, and
8  you're a homicide detective, you're obviously a
9  good investigator and you get promoted to
10  sergeant.
11           If that sergeant wanted to go back to
12  the detective division as an investigator,
13  internal affairs would have the first
14  opportunity to take them into internal affairs
15  as a supervisor and an investigator, which
16  should improve the prowess of internal affairs
17  to conduct investigations.
18           We also gave internal affairs
19  geographical accountability.  So just like in
20  investigating crimes, you become more
21  knowledgeable of the individuals and the
22  conditions in each area.
23           We increased the training for
24  internal affairs.  I put an experienced -- I

Page 23

1  took in -- promoted a commander from the rank
2  of lieutenant who was considered probably the
3  best investigator in the Chicago Police
4  Department named Brendan Deenihan and violated
5  a policy, if you will, that I created that when
6  you get promoted you go to a district command
7  to learn how to be a district commander because
8  it was one of the most important positions in
9  the department, but Brendan Deenihan became the
10  exception to the rule because internal affairs,
11  in battling corruption and misconduct, was
12  critical to our performance.
13           I also took Eddie Welch who is now
14  the chief of internal affairs, and I promoted
15  him to -- No, I did not promote him to deputy
16  chief.  He was the deputy chief, and I put him
17  in internal affairs as the Number 2, the
18  executive officer, creating a position that had
19  not existed in the past; and the reason why I
20  did that is because Eddie Welch has extensive
21  investigative prowess in detectives earlier in
22  his career.
23           Those are just a few things off the
24  top of my head.  I think we also upgraded their

Plaintiff's Exhibit 5 Page 6

GARRY MCCARTHY
January 20, 2016

Page 24

1  technology.  We purchased something called
2  IA Pro, I believe, and we've done a couple of
3  other things, I'm sure, but that's just off the
4  top of my head.
5       Q    Did any of these changes that you
6  caused allow internal affairs to investigate
7  police brutality?
8       A    No, because it's not a policy change.
9  I'm sorry.  I misspoke because it was not a
10 policy of mine or the superintendent or the
11 Chicago Police.  It's by municipal ordinance
12 that IPRA does those investigations.  I just
13 want to make sure that I got it straight.
14      Q    When you became the superintendent of
15 Chicago Police, how did the police department
16 track and monitor allegations of excessive
17 force by department members?
18           MR. PLATT:  When he first started?
19           MR. MORRISSEY:  Correct.
20           MR. PLATT:  You can answer.
21 BY THE WITNESS:
22      A    Through their personnel files.  If
23 it's coming out of CLEAR, like you suggested
24 earlier in the interview, whatever that process

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 26

1  monitor all CRs of an individual officer?
2       A    Who said we didn't?
3       Q    Well, did the city when you became
4  superintendent of police monitor all CRs of an
5  officer?
6       A    All CRs were on record, yes.
7       Q    Were all CRs taken into account when
8  monitoring or tracking certain police officers
9  or is it only if the officer had a sustained
10 CR?
11      A    Well, you need to describe what you
12 mean by monitoring because a police officer
13 receives a number of different quote, unquote,
14 monitors.  The first one is the first line
15 supervisor who is going out on patrol with them
16 every single day or whatever it is that they
17 are doing, if they are in narcotics or in the
18 gang unit and doing their job with them and
19 they will be watching their behavior; and then
20 there's formal monitoring systems, which is
21 what I'm referring to.  Like I said, if an
22 officer gets "X" number of sustained
23 complaints, then they get a different level of
24 monitoring.

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 25

1  was, that's how they were tracked.
2  BY MR. MORRISSEY:
3       Q    Do you have any personal knowledge
4  how the police department used the CLEAR system
5  to track or monitor certain police officers
6  with allegations of misconduct?
7       A    I don't know the nuts and bolts of
8  it, but there was a couple of separate
9  programs.  You know, I get confused because
10 it's the third department I was in.  In New
11 York it was called force monitoring.  In Newark
12 it was called something else, and I forget what
13 it was called here where an officer receives
14 "X" amount of complaints for "Y" allegation,
15 they go into a monitoring system which could
16 entail more training or supervision.
17      Q    When you talk about a trigger to
18 identify certain police officers, you mentioned
19 complaints, correct?
20      A    Yes.
21      Q    Are these complaints that are
22 sustained or not sustained by IPRA?
23      A    Sustained.
24      Q    Why didn't the police department

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 27

1       So supervision and monitoring could
2  be the same thing and everybody receives
3  supervision on a daily basis.
4       Q    In terms of formal monitoring when
5  you became superintendent of police, the police
6  department looked at the number of sustained
7  CRs of a particular officer, correct?
8       A    Yes.
9       Q    When you left the police department
10 in December of 2015, did anything change
11 regarding that process?
12      A    Just to answer -- I answered your
13 question which is do they look at sustained
14 complaints?  Yes.  Do they look at unsustained
15 complaints?  Yes.  They are all recorded.  They
16 are all in the officer's personnel file.
17      Q    Who was the IPRA chief when you
18 became the superintendent 2011?
19      A    Ilana Rosenzweig.
20           THE REPORTER:  Who?  I'm sorry.
21           THE WITNESS:  Iliana, I-l-i-a-n-a (sic),
22 I believe.
23 BY MR. MORRISSEY:
24      Q    Did you have periodic meetings with

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 7

Page 28

1    the chief at the time?
2        A    Yes.
3        Q    How frequently would you have
4    meetings with the chief?
5        A    I think we had a scheduled monthly
6    meeting, and we may have met other times if
7    necessary; but I don't recall if that ever
8    occurred.
9        Q    Where did these meetings typically
10   occur?
11       A    In my office.
12       Q    Who set the agenda of the meetings?
13       A    We didn't really have an agenda.  She
14   would come in, and we would go over some of the
15   cases that we needed to come to conclusions on.
16            The way the process works is that
17   IPRA makes a recommendation to the
18   superintendent regarding possible disciplinary
19   action based upon their investigation; and then
20   if I agree, and it's less than a 30-day
21   suspension, then it just is done right there.
22            If I were to disagree, we could
23   negotiate.  I could also send cases back for
24   more investigation; and where we both agreed

Page 30

1    it; and if I didn't concur, then we would
2    negotiate or it would go to the police board.
3        Q    How did you learn about that
4    procedure?
5        A    I can't answer that.  It's almost
6    five years ago.  I don't know if somebody sat
7    me down and explained it to me.  I'm sure they
8    did, but I certainly executed that procedure on
9    a very regular basis.  It was part of my work.
10       Q    Was this before or after a Command
11   Channel Review by the police department?
12       A    After.
13       Q    So after IPRA -- Strike that.  I want
14   to talk about initially when you became the
15   superintendent of police.  After IPRA initially
16   recommended a sustained finding of a CR, what
17   would first happen with your police department
18   related to that file?  And let's assume the CR
19   was an --
20       A    I can't be positive.  All I can tell
21   you what I believe the process was, and I think
22   I've described that that it would go to my
23   general counsel who would review it.  It would
24   go through Command Channel Review, as you

Page 29

1    that a case was either greater than a 30-day
2    suspension or a separation case right up to
3    separation, those cases would go to the police
4    board.
5            So we would just really go over the
6    cases and talk about where we were and some
7    policies and things like that.  We didn't ever
8    have a formal set agenda to my recollection.
9        Q    After IPRA completes an investigation
10   of a CR and recommends a sustained finding,
11   what's the next step in the procedure when you
12   became superintendent in 2011 for the police
13   department to review that finding?
14       A    Like I said, they would send that
15   over to the department.  My general counsel and
16   the attorneys would review the case to
17   determine whether or not it warranted charges;
18   and if there were any issues with the actual
19   legalities of their recommendations, then they
20   would summarize it and come to me and talk
21   about it; and then I would draw my conclusion
22   as to whether or not I concurred or didn't
23   concur.  And if I concurred, like I said, if it
24   was less than 30 days, that would be the end of

Page 31

1    mentioned, and then I would make my
2    determination.
3        Q    While it was going through the
4    Command Channel Review, could a commanding
5    officer overrule IPRA's decision?
6        A    No.
7        Q    How do you know that?
8        A    Because I know the process.  They can
9    make recommendations.  All they do is give
10   their opinion.
11       Q    You're referring to the Command
12   Channel Review?
13       A    Yes.
14       Q    What are the options of an individual
15   who has conducted a Command Channel Review of a
16   CR that's sustained against a police officer?
17       A    They could agree.  They could
18   disagree.  They can agree with the finding and
19   disagree with the discipline.  I believe that
20   would be the totality of it, and it's only an
21   opinion.  It's not a finding.
22       Q    And if a member of the police
23   department was conducting a Command Channel
24   Review and disagreed, made an opinion and

Plaintiff's Exhibit 5 Page 8

GARRY MCCARTHY
January 20, 2016

Page 32

1   disagreed with the IPRA recommendation of a
2   sustained finding, what would happen next based
3   on your understanding?
4       A    It would go to the next level and the
5   same process would continue.  So if it was
6   against an officer in a district, the district
7   commander would review it.
8           After that, the area commander, the
9   area deputy chief would review it and then the
10  chief of patrol would review and then the first
11  deputy and then myself.
12      Q    So it's your understanding you would
13  review every CR that was sustained by IPRA and
14  made it's way up the Command Channel Review on
15  the police department side?
16      A    Yeah.
17      Q    Would you make any record that you
18  reviewed a CR finding by IPRA?
19          MR. PLATT:  Objection to the form of
20      the question.  You can answer.
21  BY THE WITNESS:
22      A    I wouldn't make a record.  My staff
23  would come in with a series of cases.  We would
24  go over the cases, and I would agree or

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 34

1   into what's happening when an officer is being
2   disciplined.  Accountability comes with
3   authority.
4       Q    When you worked for the New York City
5   Police Department, how did the department
6   discipline or investigate allegations of
7   misconduct by members of the department?
8           MR. BATTLE:  Objection, relevance.
9           MR. PLATT:  Same objection.  Go
10      ahead.  You can answer.
11  BY THE WITNESS:
12      A    It was a different system.
13  BY MR. MORRISSEY:
14      Q    Can you describe how the system
15  worked in New York City?
16      A    Yeah.
17      Q    Can you briefly describe it?
18          MR. BATTLE:  Same objection to
19      relevance.
20          MR. PLATT:  Go ahead.
21  BY THE WITNESS:
22      A    So allegations of misconduct or
23  corruption were investigated by internal
24  affairs.  Allegations of verbal abuse would be

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 33

1   disagree.  In that same realm of agreeing with
2   the finding, disagreeing with the recommended
3   discipline or agreeing with the recommended
4   discipline.
5   BY MR. MORRISSEY:
6       Q    Did you believe the Command Channel
7   Review was an appropriate step in the process
8   of disciplining a police officer with
9   allegations of misconduct?
10          MR. PLATT:  Objection to the form and
11      relevance.  You can answer.
12  BY THE WITNESS:
13      A    I do.
14  BY MR. MORRISSEY:
15      Q    Why do you think it was an
16  appropriate step?
17          MR. PLATT:  Same objection.  You can
18      answer.
19  BY THE WITNESS:
20      A    Because just like I was accountable
21  of the behavior of every police officer in the
22  department, those individuals are accountable
23  for the officers who work for them; and as a
24  result, they should have some sort of input

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 35

1   investigated by something called Civilian
2   Complaint Review board.
3           Internal affairs would conduct their
4   investigation.  There was actually a department
5   advocate who acted as a prosecutor if there was
6   a finding of a sustained allegation.  That
7   advocate would file charges against an officer
8   where appropriate.
9           The prosecution of it would take
10  place or actually the department -- I got to
11  remember the name, but they're judges, if you
12  will, trial commissioners are what they called,
13  and the officer would have a trial in front of
14  that commissioner with the advocate prosecuting
15  and his union defending.
16          The trial commissioner would
17  determine guilt or innocence and recommend a
18  police commissioner who then
19  would have the final sign off on the
20  discipline.
21      Q    To your knowledge, was there any
22  Command Channel Review in the New York City --
23      A    No.
24      Q    Were the internal affairs

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 9

GARRY MCCARTHY
January 20, 2016

Page 36

```
1   investigators in New York City sworn officers
2   who conducted the investigations?
3       A   Yes.
4       Q   Do you know whether New York City had --
5       A   I'm sorry.  Only for corruption and
6   misconduct in internal affairs.  Civilian
7   Complaint Review Board, those verbal issues, or
8   low level force like somebody complaining of
9   handcuffs were too tight or something like that
10  was handled by civilians, Civilian Complaint
11  Review Board.
12      Q   Based on your understanding, if a
13  citizen in New York alleged that a police
14  officer hit her real hard on the sidewalk,
15  would that be investigated by -- would that be
16  considered misconduct and be investigated by
17  IA?
18      A   Is it an assault or is it a
19  harassment?  The level of injury determines
20  whether or not it's an assault or a battery or
21  what.
22      Q   If a woman complained that a police
23  officer hit her and broke her arm, would that,
24  in New York City, your understanding,
```

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 38

```
1   investigation?
2       MR. BATTLE:  Same objection to
3   relevance.
4   BY THE WITNESS:
5       A   Not how they conduct their
6   investigation, no.
7   BY MR. MORRISSEY:
8       Q   So in New York City, based on your
9   understanding, the internal affairs officer had
10  discretion in how to investigate witnesses and
11  conduct an investigation of a police officer
12  misconduct?
13      A   Okay.
14      MR. BATTLE:  Objection, relevance.
15  BY MR. MORRISSEY:
16      Q   When you became superintendent of the
17  Chicago Police Department in 2011, did you know
18  who IPRA was staffed by?
19      A   Yes.
20      Q   What was your understanding of the
21  investigators in IPRA who investigated
22  allegations of police misconduct?
23      A   I don't understand your question.
24      Q   Are you aware that IPRA has
```

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 37

```
1   be investigated as misconduct by IA?
2       MR. PLATT:  Objection, relevance.
3   You can go ahead.
4       MR. BATTLE:  Objection, incomplete
5   hypothetical and relevance to this entire
6   line of questioning.  It's a waste of time
7   regarding the New York City Police
8   Department.
9   BY THE WITNESS:
10      A   I believe it would be investigated by
11  internal affairs.  I could be mistaken, but I
12  believe it would be investigated by them.
13  BY MR. MORRISSEY:
14      Q   In New Work City, was there a time
15  limit for internal affairs to investigate
16  misconduct by a sworn officer?
17      MR. PLATT:  Objection, relevance.
18  You can answer.
19  BY THE WITNESS:
20      A   I don't recall.
21  BY MR. MORRISSEY:
22      Q   In New York City, did -- Was the
23  internal affairs section controlled by union
24  rules regarding how they could conduct their
```

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 39

```
1   investigators?
2       A   Yes.
3       Q   And do these investigators
4   investigate allegations of police misconduct?
5       A   Yes.
6       Q   Are they sworn officers?
7       A   No.
8       Q   Do you have any personal knowledge of
9   the training that these IPRA investigators
10  received?
11      A   Only to the extent that Scott Ando
12  and I, at one point, I allocated some funding
13  for IPRA to go for some specialized training.
14  Other than that, I have no knowledge of their
15  training.
16      Q   Do you recall when you allocated
17  funding to Mr. Ando?
18      A   Probably about a year ago.
19      Q   Why did you allocate funding to IPRA?
20      A   Because Mr. Ando requested to go to a
21  specialized -- to send some folks to a
22  specialized investigators' training course that
23  we were attending, and he wanted to send some
24  folks along; and my budget was obviously larger
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 10

GARRY MCCARTHY
January 20, 2016

Page 40

1 than his, and I forgot where we got the money
2 from but I'm pretty certain that we provided
3 and they attended.
4      Q    Does Mr. Ando work for the police
5 department?
6      A    No.
7      Q    Were you Mr. Ando's supervisor?
8      A    I'm sorry?
9      Q    Did you supervise Mr. Ando?
10     A    No.
11          Did you ever have a conversation with
12 Mr. Ando regarding the training of the IPRA
13 investigators?
14     A    Only to the degree that I just
15 articulated.
16     Q    Do you have any personal knowledge
17 whether the IPRA investigators are restricted
18 in how they conduct an investigation of police
19 misconduct based on the Chicago Police
20 Department's union?
21          MR. PLATT:  Objection to the form of
22     the question.  You can answer.
23 BY THE WITNESS:
24     A    No.

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 41

1 BY MR. MORRISSEY:
2      Q    As a superintendent of police, did
3 you promote individuals to commander?
4      A    Yes.
5      Q    How many commanders are there on the
6 police department?
7      A    I couldn't answer that.  No idea.
8      Q    What do you look for in a commander?
9      A    Experience, leadership, knowledge of
10 police work, an understanding of the
11 philosophies that I was trying to imbue into
12 the Chicago Police Department like proactive
13 policing, not reactive policing, doing
14 something before somebody gets killed, not
15 waiting until afterwards and trying to solve
16 the crime.
17     Q    Do you have any written criteria that
18 you used to --
19     A    No.
20     Q    How would you solicit suggestions for
21 individuals to be a commander?
22     A    There was a merit board process when
23 I got there where, I guess, a department memo
24 went out soliciting recommendations for

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 42

1 promotion to commander and that would come from
2 commanders and above in the department, and I
3 forget what the numbers were, but I think a
4 commander could recommend one person and a
5 deputy chief could recommend two and a chief
6 had no recommendations, if I recall correctly;
7 and then they would submit paperwork regarding
8 why they recommended those individuals, and it
9 had different areas that they were made to
10 comment on, for instance, integrity, work
11 ethic, things of that nature.
12          They would forward those
13 recommendations, and the department had a merit
14 board; and I don't recall who made up the merit
15 board.  I think it was chaired by the first
16 deputy superintendent and the chiefs.  The
17 federal monitor would sit in on it based upon
18 the Shakman Decree back in the day along with
19 the inspector general, if I recall correctly.
20          Then they would give me a list of
21 individuals who the merit board determined were
22 of sufficient caliber to be recommended for
23 promotion to commander.  That was the process
24 when I got there.

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 43

1          What I added to it was an interview
2 with me being as how I thought it was important
3 to ask those questions personally of
4 individuals to make my own determination.  I
5 thought it was a good thing to do.
6          Subsequently, that processed changed.
7 We entered into a whole new policy in agreement
8 with the inspector general and the federal
9 monitor whereby we changed the actual process.
10 We kicked it down to a promotion board of
11 deputy chiefs and a banding of the individuals
12 who come through there based upon ranking, if I
13 recall correctly, and then I would go through
14 the same interview process.  Other than that,
15 it was it was relatively similar.
16     Q    When did you start interviewing
17 individuals for promotion?
18     A    I'm sorry?
19     Q    When did you begin the process of
20 interviewing the candidate?
21          MR. PLATT:  You mean the process
22     itself or just individuals personally?
23          Form of the question.
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 11

GARRY MCCARTHY
January 20, 2016

Page 44

1  BY MR. MORRISSEY:
2      Q    Well, you testified that you changed
3  the process when you became superintendent to
4  add a component where you actually interviewed
5  a potential candidate for promotion, correct?
6      A    Correct.
7      Q    Do you recall approximately when you
8  started doing that?
9      A    No.
10     Q    Did you consult with the mayor when
11 you considered a promotion?
12         MR. BATTLE:  What type of promotion,
13     if you don't mind me asking?
14 BY THE WITNESS:
15     A    Yeah, we promoted --
16 BY MR. MORRISSEY:
17     Q    Why don't you tell me what types of
18 promotions you can make as superintendent to
19 department members?
20     A    I can promote detectives.  I can
21 promote sergeants, lieutenants, captains,
22 commanders, deputy chiefs, chiefs and in two
23 separate instances, the first deputy
24 superintendent.  There were also some other

GARRY MCCARTHY
January 20, 2016

Page 45

1  positions that I don't really recall right now
2  where there was meritorious promotions, I
3  believe, like bomb technicians and canine
4  handlers and detectives were all subject
5  to meritorious promotion, at least a percentage
6  of them.
7      Q    Would you consult with IPRA when you
8  were promoting, for example, or considering a
9  promotion of an individual to commander?
10     A    I don't believe so.
11     Q    What investigation would you take
12 when you were considering whether to promote an
13 individual to commander?
14     A    What investigation would I take?
15     Q    Correct.
16     A    I would review what was given to me
17 as far as their personnel records whether it be
18 sick time, disciplinary history.  In some
19 cases, I would actually speak to their
20 supervisors.
21     Q    During your entire tenure with the
22 police department, would you always review an
23 individual's disciplinary history when
24 promoting him or her to commander?

GARRY MCCARTHY
January 20, 2016

Page 46

1      A    Yes.
2      Q    What disciplinary history would you
3  look at?
4      A    I think it was a printout of
5  allegations sustained and dispositions of
6  sustained, unsustained, unfounded.
7      Q    And that would encompass the
8  individual's entire tenure on the police
9  department?
10     A    Maybe not because I think there was a
11 union rule that had something to do with how
12 far back those disciplinary records would be
13 available, and I'm not sure if I got all of
14 them.
15     Q    Which union rule are you referring
16 to?
17     A    The one that deals with disciplinary
18 history and how much of that record is kept.
19 There comes a point when it gets purged, I
20 believe, or at least goes into a nonreviewable.
21     Q    When did you first meet Glenn Evans?
22     A    First time I remember meeting Glenn
23 Evans, there was a shooting on Cottage Grove
24 Avenue where some police officers witnessed a

GARRY MCCARTHY
January 20, 2016

Page 47

1  double murder on the street and engaged in a
2  running gun battle with the individuals who
3  were -- had committed that murder.  There was
4  an extensive vehicle pursuit.
5          This happened at like 3:00 o'clock in
6  the afternoon, and I remember there were a
7  number of different crime scenes as a result of
8  that; and I remember meeting then Lieutenant
9  Evans from the 6th District at the scene of one
10 of those events, and he was given the task of
11 supervising one of those crime scenes.
12     Q    Do you recall what year this was?
13     A    It was probably 2011.
14     Q    When was the next time you
15 encountered Glenn Evans?
16     A    I don't know.
17     Q    After you first met Glenn Evans in
18 approximately 2011, did you continue to stay in
19 contact with him?
20     A    I don't understand your question.  I
21 would run across him once in a while.  I don't
22 recall.  I don't know where.
23     Q    You are aware that he was promoted to
24 commander in 2012, correct?

Plaintiff's Exhibit 5 Page 12

GARRY MCCARTHY
January 20, 2016

Page 48

```
 1      A   Yes.
 2      Q   Do you know who suggested Glenn Evans
 3  should be promoted to commander to you?
 4      A   I believe it was Eddie Johnson who
 5  was his commander in 6.
 6      Q   Do you know whether Eddie Johnson
 7  made a written request that Glenn Evans should
 8  be considered for promotion to you?
 9      A   I believe that it was Eddie Johnson
10  who made the recommendation as I articulated
11  before regarding the process of filling out
12  that paperwork and forwarding it.  I believe it
13  was Eddie Johnson.  I'm not positive.
14      Q   And when you considered Glenn Evans
15  for promotion to commander, did you receive a
16  disciplinary history?
17      A   I believe I did.
18      Q   As you sit here today, do you have
19  any recollection of reviewing his paperwork
20  when considering Glenn Evans for promotion?
21      A   I don't recall reviewing the actual
22  paperwork.  I'm sure I did.
23      Q   When you were considering Glenn Evans
24  for promotion to commander, did you have a
```

GARRY MCCARTHY
January 20, 2016

Page 50

```
 1      Q   Do you know whether Rita King's CR
 2  was open at the time you considered Evans for
 3  promotion?
 4      A   I do not recall, but apparently it
 5  was because I'm told it still is.  Mr. Platt
 6  mentioned that to me.
 7      Q   Did you have an interview with Glenn
 8  Evans prior to promoting him to commander?
 9      A   Yes.
10      Q   Approximately when did you have this
11  interview?
12      A   No idea.
13      Q   Do you recall --
14      A   When was he promoted in 2012?
15      Q   I'm not sure.
16      A   Okay.
17      Q   Do you have any recollection of
18  having the interview with Glenn Evans prior to
19  the promotion?
20      A   I remember interviewing him.  I don't
21  remember specifics of the interview.
22      Q   Do you have any recollection of
23  anything that was discussed at the meeting?
24      A   Not specifically, no.
```

GARRY MCCARTHY
January 20, 2016

Page 49

```
 1  conversation with IPRA Chief Rosenzweig
 2  regarding Glenn Evans' CR history?
 3      A   I don't believe so.  As I stated
 4  before, I don't believe I conferred with IPRA
 5  when considering people for promotion.
 6      Q   At some point, did Scott Ando suggest
 7  that you as a superintendent should consider a
 8  CR history or -- Strike that.
 9          Did Scott Ando ever suggest to you
10  that the superintendent should consult with
11  IPRA when considering an individual for
12  promotion to a commander or higher up?
13      MR. PLATT:  Objection to the form of
14  the question.  You mean any commander or
15  Evans?
16      MR. MORRISSEY:  I'm talking about any
17  commander.
18  BY THE WITNESS:
19      A   I don't recall.
20  BY MR. MORRISSEY:
21      Q   Do you recall how many CRs Glenn
22  Evans had at the time when he was considered
23  for promotion to commander?
24      A   No.
```

GARRY MCCARTHY
January 20, 2016

Page 51

```
 1      Q   When you interviewed Glenn Evans for
 2  the commander position, did you discuss the
 3  disciplinary history?
 4      A   I don't recall.  I presume I did.
 5      Q   Where did you first assign Glenn
 6  Evans as commander?
 7      A   3rd District.
 8      Q   Why did you place Glenn Evans in the
 9  3rd District?
10      A   Because I believe that was right
11  after we had to demote the commander who was
12  there who was named Lynnette Helm to captain,
13  and there was an available commander's slot in
14  the 3rd District.
15      Q   As commander, what were -- Strike
16  that.  Prior to making commander, Glenn Evans
17  was a lieutenant, correct?
18      A   Yes.
19      Q   Do you have any personal knowledge of
20  who promoted Glenn Evans to lieutenant?
21      A   No.
22      Q   Are there two ways to move up the
23  ranks in the police department either through
24  merit or -- Is there another way other than
```

Plaintiff's Exhibit 5 Page 13

Page 52

1 merit?

2    A    Yes.

3    Q    What's that called?

4    A    In New York, it's called Career Path.

5 In Chicago it's called -- I forget what it's

6 called.  It's test taking.

7    Q    Do you know whether Glenn Evans was a

8 merit person for the lieutenant position or did

9 he take a test to fill the position of

10 lieutenant?

11    A    I have no idea.

12        MR. MORRISSEY:  Why don't we take a

13    few-minute break.

14                    (WHEREUPON, a short

15                     break was had.)

16 BY MR. MORRISSEY:

17    Q    After Chief Rosenzweig left IPRA,

18 Scott Ando became the IPRA chief, correct?

19    A    Yes.

20    Q    Did you continue the monthly meetings

21 with Scott Ando?

22    A    Yes.

23    Q    Did anything change regarding the

24 structure of the meetings?

Page 54

1 nearby; and based upon that, with the actual

2 interview of that individual, I was able to

3 come to the conclusion that he did, in fact,

4 engage in lying under oath; and, therefore, I

5 recommended his termination.

6 BY MR. MORRISSEY:

7    Q    When did that happen?

8    A    Probably about a year ago.

9    Q    What is Rule 14?

10    A    Rule 14 is lying during a department

11 investigation.

12    Q    And who determined this officer

13 violated Rule 14, is that an IPRA function or

14 IA function?

15    A    It's either or.  In the case of an

16 investigation of IPRA, they will make the

17 determination if an officer is not being

18 truthful.

19        In the case of an investigation that

20 internal affairs is doing, they would make the

21 determination as to whether or not an officer

22 is telling the truth.

23    Q    How would you propose disciplining an

24 officer for violating Rule 14?

Page 53

1    A    No.

2    Q    Who usually attended these meetings?

3    A    I'm sorry.  Something did change in

4 that Ilana Rosenzweig used to come by herself,

5 and Scott Ando would bring two individuals with

6 him as his number one and number two persons

7 whose names I do not recall right now.

8    Q    And was there any agenda that was

9 discussed at those meetings?

10        MR. PLATT:  You mean with Ando?

11        MR. MORRISSEY:  Yes.

12 BY THE WITNESS:

13    A    The same process that we had

14 previously with Ilana Rosenzweig.  We would go

15 over cases and problems.

16        There was one specific time that I

17 know we had a separate meeting besides the

18 monthly meeting, and that had to do with the

19 fact that they recommended a termination of an

20 officer for a Rule 14 violation that I couldn't

21 really sign off on it based upon the way that

22 the report was written.

23        We had a meeting, reviewed videotape

24 of the actual incident that came from the store

Page 55

1    A    They should be terminated.

2    Q    Does the Chicago Police Department

3 keep a list of individuals who have violated

4 Rule 14?

5    A    I mean, I presume that we can

6 generate one, yes.

7    Q    And how would you generate a list?

8    A    You would have to ask the tech

9 people.

10    Q    Have you ever had a conversation with

11 Scott Ando regarding Glenn Evans?

12    A    I believe I did.

13    Q    When did you have this conversation?

14    A    I forget the gentleman's name.  I

15 believe his name is maybe Ricky Williams was

16 the case where they had alleged that Commander

17 Evans had put his gun in his mouth, and they

18 were -- I think there was only one

19 conversation.  I remember that it was my chief

20 of staff who came to me, Gus Menionez (phonetic)

21 to tell me that they were going to swab Glenn

22 Evans', Commander Evans', gun for DNA based

23 upon that allegation and that caused a little

24 bit of a consummation because we didn't know if

GARRY MCCARTHY
January 20, 2016

Page 56

1  that meant that they were taking his gun, in
2  which case, we would have to get a replacement
3  firearm if he was remaining on full duty.
4           I forget the process how that
5  actually worked.  I believe he kept his gun
6  after they swabbed it, but I don't believe that
7  Scott and I had a conversation regarding that
8  process.  I believe that there came a point
9  when Scott recommended that Commander Evans be
10  stripped based upon that allegation, and I did
11  not concur with it.
12      Q   Where did you have this conversation?
13      A   I think it was via telephone.
14      Q   Do you recall when you had this
15  conversation?
16      A   No.
17      Q   Did Scott Ando give you anything in
18  writing that laid out his recommendation that
19  Glenn Evans be stripped?
20      A   I don't recall.  I don't think so.
21      Q   Why did you not agree with Scott
22  Ando's recommendation?
23      A   Because the allegation was that
24  Commander Evans had stuck his gun down the

GARRY MCCARTHY
January 20, 2016

Page 58

1  continue to work as a commander for the police
2  department?
3      A   Yes.
4      Q   Did you take any action to -- Strike
5  that.  How did you supervise commanders in the
6  field?
7      A   They are supervised by the area
8  deputy chiefs and the chief of patrol if they
9  were in patrol.  If they were in another unit
10  like narcotics or some other component of
11  detective, they are supervised by a different
12  chief.
13      Q   So a commander is supervised by a
14  deputy chief in the field?
15      A   Correct.
16      Q   Do you know how the deputy chiefs
17  supervise commanders?
18      A   Well, based upon my observation and
19  my expectations, deputy chiefs would also be in
20  the field and I would see them in the field
21  speaking with the commanders.  I would see them
22  observing their performance.  I would see them
23  engaged in -- Chain of command is something
24  that we followed I want to say strictly,

GARRY MCCARTHY
January 20, 2016

Page 57

1  individual's throat, and you cannot force a
2  weapon into somebody's throat without causing a
3  physical injury.  It's impossible.  There would
4  be an abrasion.  There would be a cut.  There
5  would be broken teeth if that had, in fact, had
6  occurred; and Mr. Ando told me that there
7  was -- that the individual had no injury.
8      Q   As the superintendent of police, did
9  you have the ability to override Mr. Ando's
10  recommendation to strip an officer of his
11  police powers?
12      A   Yes.
13      Q   And where is that authority found; is
14  that in the union contract?
15      A   I don't know.  I don't recall.
16      Q   During this phone conversation, did
17  Mr. Ando tell you that there were other
18  allegations of misconduct by Glenn Evans?
19      A   I don't recall.
20      Q   Did Mr. Ando tell you that Rita King
21  had an open CR file against Commander Evans?
22      A   I don't recall.
23      Q   So after this phone call, you made
24  the decision that Commander Evans would

GARRY MCCARTHY
January 20, 2016

Page 59

1  perhaps not all the time.  If I wanted to know
2  about something that was happening in the 3rd
3  District, I would ask the chief of patrol what
4  had happened; and my expectation is that he had
5  spoken to the area deputy chief.  So there was
6  a number of different methods.  It's by
7  observation.  It's by interaction and it's by
8  being out there working with them.
9      Q   After Mr. Ando recommended that Glenn
10  Evans be stripped of his police powers, did you
11  as superintendent take any action to more
12  closely supervise Glenn Evans in the field?
13      A   Did I?
14      Q   Correct.
15      A   I did not.
16      Q   Are you aware of any deputy chief or
17  chief taking any action to more closely
18  supervise Glenn Evans in the field?
19      A   I don't recall if I gave a direction.
20  I don't recall if I took any specific action.
21  I was regularly on patrol; and whenever I was
22  on proposal, I kind of followed the same
23  routine and I would generally stop into the 3rd
24  District, and I would observe Commander Evans

Plaintiff's Exhibit 5 Page 15

GARRY MCCARTHY
January 20, 2016

Page 60

1  instructing his individual supervisors and
2  officers and routinely engaged in team-led
3  enforcement activities. So it was something
4  that I did on a regular basis, not just with
5  Commander Evans.
6      Q    After Mr. Ando suggested that Glenn
7  Evans be stripped of his police powers, did you
8  ever discuss this issue with Mayor Emanuel?
9      A    I don't recall if I discussed it with
10 him at that point. When the state's attorney
11 charged him, I know I spoke to him.
12     Q    Do you recall approximately when
13 Glenn Evans was charged?
14     A    It was right before Labor Day. So I
15 could tell you exactly. It was the Tuesday
16 before Labor Day, and I believe it was 2014. I
17 don't think it was as far back as 2013.
18     Q    And after Glenn Evans was charged --
19     A    I'm sorry. That's when I was
20 informed that he was going to be charged on
21 Thursday. So he wasn't charged on Tuesday,
22 just for accuracy.
23     Q    Who told you Glenn Evans would be
24 charged criminally?

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 62

1      Q    Did Alderman Irving ever complain to
2  you about Commander Evans' misconduct?
3      A    Yes.
4      Q    What did Alderman Irving tell you?
5      A    Alderman Irving called me complaining
6  that either Commander Evans -- No, I'm sorry.
7  If I have this correct, I received a phone call
8  from Commander Evans telling me that Alderman
9  Irving had blocked in Commander Evans' vehicle
10 in the parking lot of the 11th District and
11 that Alderman Irving was out of line hollering
12 at the commander in public in front of some
13 police officers completely disrespectful and
14 that he was in an unauthorized area and could
15 have been arrested for trespass; and I don't
16 remember actually having a conversation with
17 Alderman Irving about Commander Evans, although
18 I'm positive it would have happened. I got it
19 from Commander Evans, not from Alderman Irving.
20     Q    Did Commander Evans call you before
21 or after Mr. Ando recommended he be stripped of
22 his police powers?
23     A    After, yes.
24     Q    After that initial phone call by

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 61

1      A    The State's Attorney, Anita Alvarez.
2      Q    Why did she contact you?
3      A    Courtesy.
4      Q    What did you do after Anita Alvarez
5  told you Glenn Evans would have criminal
6  charges?
7      A    I called the mayor.
8      Q    What did the mayor say?
9      A    He already knew about it.
10     Q    Did you have any other discussion
11 with the mayor regarding Glenn Evans?
12     A    I don't think so. The conversation
13 was more about what am I going to do in the
14 second busiest district in the city over Labor
15 Day weekend without a commander in charge.
16     Q    Do you recall how much time elapsed
17 between the phone conversation with Mr. Ando
18 and Anita Alvarez contacting you about the
19 criminal charges?
20     A    It was like a year.
21     Q    Did you ever have a conversation with
22 Glenn Evans regarding Mr. Ando's recommendation
23 to strip him of his police powers?
24     A    I don't believe so.

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 63

1  Commander Evans, did you follow up with
2  Commander Evans regarding this incident either
3  in person or on the telephone?
4      A    I probably did, but I don't recall.
5  As I recall, to the best of my recollection, it
6  was something that was resolved between the two
7  of them.
8      Q    Did you tell the mayor about this
9  issue?
10     A    I don't recall specifically, but I
11 probably would have.
12     Q    Did Corey Booker also complain about
13 Glenn Evans to you?
14     A    Not to my recollection. I wouldn't
15 know what relationship Commander Evans and
16 Corey Booker would ever have.
17     Q    Do you know who Corey Booker is?
18     A    Yes.
19     Q    Are you familiar with the term code
20 of silence?
21     A    I'm familiar with what is considered
22 the code of silence.
23     Q    What is your understanding of it?
24     A    My understanding of the code of

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 16

GARRY MCCARTHY
January 20, 2016

Page 64

```
 1   silence is when one individual from a
 2   profession, perhaps an attorney or a doctor or
 3   a police officer, doesn't testify as to some
 4   sort of misconduct by another professional.
 5         Q    When you say "testify," what do you
 6   mean?
 7         A    Speak publically about, make a
 8   complaint.
 9         Q    Does it also mean completing official
10   paperwork?
11         A    It could.
12         Q    What did you do in 2011 when you
13   became superintendent to investigate whether
14   there was a code of silence in the Chicago
15   Police Department?
16         MR. PLATT:  Objection to the form of
17         the question.  It's argumentative.
18         MR. BATTLE:  I'll join.
19         MR. KOLP:  I'll join as well.  I'm
20         going to object to the extent that you lay
21         an appropriate foundation for this line of
22         questioning.
23         MR. PLATT:  Go ahead.
24   BY THE WITNESS:
```

GARRY MCCARTHY
January 20, 2016

Page 65

```
 1         A    During the entirety of my tenure,
 2   there was a very strong focus on
 3   professionalism, which extended way beyond a
 4   code of conduct to the most minor things like
 5   wearing a uniform, like carrying out military
 6   courtesies and having organizational
 7   discipline.  That was reflected in hundreds of
 8   changes in the department.
 9         You asked me about what I did with
10   internal affairs.  I was able to tick off
11   probably five or six things off the top of my
12   head.  The entire focus of my administration
13   was to reduce crime, reduce complaints against
14   officers while at the same time providing
15   professional services and everything that we
16   did was focused on that.
17         When officers -- When I believed
18   officers committed a Rule 14 violation, I
19   recommended their dismissal to the police
20   board.  Many times it was not concurred with by
21   the police board.
22         Q    As a superintendent of the Chicago
23   Police Department, how many Rule 14 violations
24   did you recommend dismissal to the police
```

GARRY MCCARTHY
January 20, 2016

Page 66

```
 1   board?
 2         A    I don't know.  I can tell you that
 3   they only concurred with 75 percent of my --
 4   I'm sorry.  They only concurred with 25 percent
 5   of my separation recommendations.
 6         Q    Approximately how many separations
 7   did you recommend to the police board?
 8         A    I can't even venture a guess.  It was
 9   probably in the vicinity of 30 or 40, and
10   that's completely a guess.
11         Q    What steps did you take when you
12   became the superintendent of the Chicago Police
13   Department in 2011 to investigate whether there
14   was some pattern of officers covering up for
15   one another?
16         MR. PLATT:  Objection to the form of
17         the question, no foundation.  You can
18         answer.
19         MR. BATTLE:  I will join.
20         MR. KOLP:  I'm also going to object
21         to the extent it's argumentative.  It
22         assumes facts that haven't yet been
23         testified to.
24         MR. PLATT:  You can answer.
```

GARRY MCCARTHY
January 20, 2016

Page 67

```
 1   BY THE WITNESS:
 2         A    I think I already answered the
 3   question talking about professionalism.
 4   BY MR. MORRISSEY:
 5         Q    Did you have any conversations with
 6   Mayor Emanuel in 2011 regarding concern about a
 7   code of silence in the police department?
 8         A    Probably not, not to my -- Let me
 9   rephrase that.  Not to my recollection.
10         Q    In 2012 did you ever have any
11   conversations with Mayor Emanuel about any
12   perceived code of silence in the police
13   department?
14         A    I can't recall if it was in 2012 or
15   not, but I know that there was a federal grand
16   jury I believe it was or a federal trial where --
17   I think it came out of the Abbate case that
18   there was a code of silence and that would have
19   sparked some conversation regarding it, and I
20   don't recall speaking to the mayor about it but
21   I presume that I would have, which would have
22   led me into the entire discourse that I gave
23   you already about the disciplinary system and
24   how we should have taken efforts to change the
```

Plaintiff's Exhibit 5 Page 17

Page 68

1  way it was done in my opinion.
2         MR. MORRISSEY:  All right.
3                (WHEREUPON, a short
4                 break was had.)
5         MR. MORRISSEY:  Back on the record.
6  BY MR. MORRISSEY:
7     Q    Do you recall ever having a
8  conversation with the mayor about a code of
9  silence in the police department?
10    A    No.
11    Q    Did the mayor ever mention that to
12 you, that topic?
13    A    I don't recall.
14    Q    Other than you, do you know anybody
15 else under your command who the mayor regularly
16 met with?
17    A    We had a weekly meeting with myself,
18 the first deputy superintendent, my chief of
19 staff and the deputy chief of crime control
20 strategies.  The four of us would meet with the
21 mayor and the mayor's staff on a regular basis,
22 weekly.
23    Q    And were these at City Hall?
24    A    Yes.

---

Page 70

1     Q    During these weekly meetings with the
2  mayor, do you recall ever discussing how the
3  police board wouldn't accept your
4  recommendations regarding terminating some
5  officers?
6     A    I remember having this conversation
7  with the mayor and his staff, and that was all
8  part and parcel of what I already told you
9  about where I recommended a top-to-bottom
10 review of our disciplinary system; and what I
11 recommended was that a blue-ribbon panel of
12 experts in police discipline be convened from
13 across the country because I have a very strong
14 network of police professionals, and I know
15 individuals who have their doctorates with
16 dissertations on police discipline who have
17 experience in a number of different departments
18 across the country; and I recommended that we
19 get a panel of them to come in, take a look at
20 our disciplinary system like I said before
21 between IPRA, the police board and the police
22 department and our internal affairs division
23 and make recommendations as to structural
24 changes regarding how the system worked.  That

---

Page 69

1     Q    Did the mayor control the agenda?
2     A    Yes.  Well -- Yes, he controlled the
3  agenda, but it doesn't mean it's always spoke
4  about because I always went in with a list of
5  things that I needed to talk to him about.
6     Q    Did the -- Who from the mayor's
7  office attended this meeting?
8     A    Usually the mayor's chief of staff,
9  either Janey Rountree or Felicia Davis
10 depending on who was the deputy chief of staff
11 for public safety and sometimes David
12 Spielfogel.  I think that's about it.
13    Q    Was there an agenda disseminated
14 prior to the meeting?
15    A    No.
16    Q    Do you know whether any minutes were
17 generated from the meeting?
18    A    No, no minutes were taken at the
19 meeting.
20    Q    During these weekly meetings, did you
21 ever discuss with the mayor and his staff any
22 pattern or practice of excessive force in the
23 police department?
24    A    I don't recall.

---

Page 71

1  was all part and parcel of the same
2  conversation?
3     Q    And did this happen?  Did they
4  appoint a blue-ribbon committee?
5     A    No.
6     Q    Why not?
7     A    I don't know.
8     Q    When did you ask the mayor to appoint
9  a blue-ribbon committee?
10    A    As I told you earlier, I believe it
11 would have been in early 2012.
12    Q    What did the mayor say in response to
13 your proposal?
14    A    I believe he gave it to his chief of
15 staff to look into.
16    Q    Did his chief of staff or did the
17 mayor ever get back to you?
18    A    Yes.  The chief of staff convened as
19 I already told you, the folks from AT Kearney
20 who came in and took a look at the system.
21    Q    But your vision was different than
22 what the mayor's chief of staff did, correct?
23    A    The process, my vision of the
24 process, was different, yes.

Plaintiff's Exhibit 5 Page 18

### Page 72

GARRY MCCARTHY
January 20, 2016

1    Q    And how was it different?

2    A    I think I already told you.  I said
3  to convene a panel of experts from across the
4  country to come in, and what they did was they
5  hired a consultant to take a look at it.  I'm
6  sorry the consultant was pro bono.  They got a
7  consultant to look at it.

8    Q    You previously testified the way some
9  police officers were disciplined within your
10  department was dysfunctional, correct?

11    A    That's not what I said.

12    Q    Can you describe what you said?

13    A    I said --

14    MR. KOLP:  I'm going to object to the
15  extent that it's asked and answered.
16  You're asking him to clarify what he's
17  already testified to.

18    MR. PLATT:  You can answer.

19  BY THE WITNESS:

20    A    We have what I consider to be a
21  dysfunctional disciplinary system in that I'm
22  accountable for the behavior of every police
23  officer in the Chicago Police Department like
24  Jason Van Dike, and I'm not the final

TOOMEY REPORTING
312-853-0648

### Page 73

GARRY MCCARTHY
January 20, 2016

1  determiner of what happens in disciplinary
2  matters regarding police officers in the
3  department.

4    Q    How did this dysfunctional
5  disciplinary system impair your ability as
6  superintendent of the Chicago Police
7  Department?

8    A    It made it very difficult to
9  implement my vision of policing and standards
10  of behavior.

11    Q    Was this one of your biggest concerns
12  as superintendent?

13    A    Yes.

14    Q    Did you have any -- Strike that.  Did
15  you have any problems with the way IPRA
16  conducted their investigation of police
17  officers?

18    A    On an individual basis, there were
19  some cases that I had problems with that I sent
20  back for further investigation.

21    Q    Did you have any structural issues
22  with the way IPRA conducted investigations of
23  police misconduct?

24    MR. PLATT:  Objection to form.

TOOMEY REPORTING
312-853-0648

### Page 74

GARRY MCCARTHY
January 20, 2016

1    MR. BATTLE:  Structural issues?  Do
2  you understand the question?

3  BY THE WITNESS:

4    A    If you're referring to the fact that
5  an outside agency is investigating force
6  complaints, no, I don't have a problem with
7  that.

8  BY MR. MORRISSEY:

9    Q    Did you have any -- Were you
10  advocating for more of a system that New York
11  had where sworn officers from the department
12  would investigate some allegations of
13  misconduct in Chicago?

14    A    I didn't advocate for any specific
15  system.  What I advocated for was a
16  top-to-bottom review of the way that discipline
17  and the system was implemented in the city of
18  Chicago, and I pointed out the simplest issue,
19  which is that if I'm the person who is
20  instilling the values of the department in the
21  individuals, the discipline system has to
22  reflect that; and when I'm making
23  recommendations for separation, it's troubling
24  that communities across the country want police --

TOOMEY REPORTING
312-853-0648

### Page 75

GARRY MCCARTHY
January 20, 2016

1  civilian oversight of police departments; and
2  here we are where I'm recommending termination
3  of individuals and three out of four are not
4  being terminated.  We are not getting what we
5  want out of that system.

6    Q    Do you have any power over who was on
7  the Chicago Police review board?

8    A    No.

9    Q    Who appoints those individuals?

10    A    The mayor.

11    Q    As the superintendent of the Chicago
12  Police Department, did you ever review findings
13  by IPRA where allegations of excessive force
14  were not sustained where you, in your opinion,
15  believed that they should have had a different
16  outcome?

17    A    Repeat the question, please.

18    MR. MORRISSEY:  We'll take a break.

19        (WHEREUPON, a short

20        break was had.)

21    MR. MORRISSEY:  Back on the record.

22  BY MR. MORRISSEY:

23    Q    As the superintendent, did the police
24  board have the final say if an officer was

TOOMEY REPORTING
312-853-0648

Page 76

1  recommended for discipline over 30 days?

2  **A    Yes.**

3  Q    Did you ever recommend discipline

4  over 30 days but short of termination to the

5  police board?

6  **A    Maybe.  I don't recall.**

7  Q    Do you have any recollection of the

8  police board ever denying your recommendation

9  that an officer should be suspended for more

10  than 30 but short of termination?

11  **A    I don't remember if I ever**

12  **recommended it, so I would have to say no.**

13  Q    But you do recall situations where

14  the police board would not agree with your

15  recommendation to separate a department member,

16  correct?

17  **A    Correct.**

18  Q    What could you do as superintendent

19  if the police board overruled your

20  recommendation?

21  MR. BATTLE:  Objection, asked and

22  answered.

23  BY THE WITNESS:

24  **A    There's an appeal process actually.**

Page 77

1  BY MR. MORRISSEY:

2  Q    Tell me about the appeal process.

3  **A    I'm not sure if it's arbitration or**

4  **not.  I forget what venue it took, but there's**

5  **a system whereby working with the corporation**

6  **counsel, we can appeal that decision and it**

7  **goes to another level outside.  I believe it's**

8  **an arbitration, and that would be our only**

9  **recourse.**

10  Q    Did you ever follow that procedure?

11  **A    Absolutely.**

12  Q    Do you know the outcome -- Strike

13  that.  Did you do that every time the police

14  board overruled your recommendation?

15  **A    Most of the time.**

16  Q    Do you know what happened with the

17  appeal process regarding most of those

18  instances where you tried to override the

19  police board?

20  MR. PLATT:  Objection to the form of

21  the question.  You can answer, if you know.

22  BY THE WITNESS:

23  **A    Many times, the corporation counsel**

24  **would determine that we didn't have a legal**

Page 78

1  **sufficiency to produce enough evidence that we**

2  **could sustain the separation.  Other than that,**

3  **I don't really recall us being successful at**

4  **arbitration very frequently.  As a matter of**

5  **fact, I can't recall at all.  So most of the**

6  **times, we lost those cases.**

7  BY MR. MORRISSEY:

8  Q    Did you ever convey your concerns to

9  the mayor about how the police board would not

10  always agree with your recommendation to

11  terminate a department member?

12  **A    I believe you've asked me that**

13  **question like three times, and I've answered**

14  **yes.**

15  Q    Did you discuss with the mayor ways

16  to rectify the problem?

17  **A    I have already explained.  Yes, I**

18  **suggested a process by which we find a**

19  **solution.**

20  Q    Did the mayor ever ask you for input

21  on who to put on the police board?

22  **A    As I said, the mayor gave it to his**

23  **chief of staff, and the chief of staff asked me**

24  **for recommendations which I provided.**

Page 79

1  Q    Did you have any oversight as the

2  superintendent of the Chicago Police Department

3  if IPRA came back with a not sustained finding

4  of a CR?

5  **A    I don't understand your question.**

6  Q    IPRA can either sustain a CR or not

7  sustain a CR, correct?

8  MR. KOLP:  I'm going to object to the

9  extent that that's not the full catalog of

10  its options.

11  BY THE WITNESS:

12  **A    Yeah, there's other categories that**

13  **they could --**

14  BY MR. MORRISSEY:

15  Q    What other categories are there?

16  **A    Unfounded.**

17  Q    So there's unfounded, sustained and

18  not sustained.  Any others, to your knowledge?

19  **A    There probably is, but I don't**

20  **recall.  Those are the three major categories.**

21  Q    If IPRA returned a CR and decided it

22  was unfounded, what could you as the

23  superintendent of police do relating to that

24  citizen complaint?

Plaintiff's Exhibit 5 Page 20

1    A    What could I do?
2    Q    (Indicating.)
3    A    I'm not positive what I could do.
4    Q    Did you ever have any conversations
5  with the IPRA chief regarding what you as the
6  superintendent could do if a CR was returned
7  and IPRA found that it was unfounded?
8    A    I don't recall.
9    Q    Do you recall ever taking any action --
10 Strike that.  Could you ask IPRA to
11 reinvestigate a complaint if they initially
12 found the CR unfounded?
13   A    Yes.
14   Q    Do you recall ever doing that?
15   A    I don't recall.
16   Q    If IPRA found that a CR was not
17 sustained, how would you as the superintendent
18 be notified of that finding?
19   A    I'm not sure I would be.
20   Q    As the superintendent of police, what
21 could you do if IPRA returned a CR
22 investigation with not sustained?
23        MR. PLATT:  Objection, it's already
24   asked and answered.  You can answer again.

1  Rosenzweig, and I suggested, to speed up the
2  process, that where they're investigating an
3  allegation of excessive force against a police
4  officer and they find that there was some sort
5  of a problem with the paperwork that they
6  should stop their investigation, give it to our
7  internal affairs division and we would handle
8  it; and they could go on to the next case and
9  investigate the next force complaint or
10 whatever they needed to do.  Rather than taking
11 a case and going from A to Z and determining if
12 there's any misconduct in the case to focus on
13 the areas of their concern, which is the force
14 and verbal abuse; and I thought that that would
15 lighten their load.
16   Q    When you talk about paperwork
17 problems, what do you mean?
18   A    There's an inordinate amount of
19 paperwork that goes into arrests, firearms
20 discharges, just street stops now are a
21 two-page report.
22        So at the end of the day, there's a
23 lot of paperwork, and sometimes paperwork may
24 not be properly completed, incorrectly

1        MR. BATTLE:  Join.
2  BY THE WITNESS:
3    A    I already said I don't know what I
4  could have done, and I don't recall if it ever
5  occurred.
6  BY MR. MORRISSEY:
7    Q    When you met with the IPRA chiefs,
8  did you ever discuss the --
9    A    I'm sorry.  I answered the question
10 that I could return it for more investigation.
11 So you asked me the question both ways, and
12 that's the answer.  I could return it for
13 further investigation; but other than that, I'm
14 not sure.
15   Q    Did you ever have any conversations
16 with the IPRA chiefs regarding statistics that
17 IPRA maintained regarding how long it took to
18 complete their investigations?
19   A    Yes.
20   Q    What types of statistics have you
21 discussed with the IPRA chiefs regarding the
22 length?
23   A    Just -- As a matter of fact, very
24 early on, I had a conversation with Ilana

1  supervised and IPRA would stay with that entire
2  investigation from start to finish and where
3  they get an allegation that Police Officer
4  McCarthy beat up a pregnant nun, they can't
5  substantiate the case but yet they find out
6  that I didn't file the proper paperwork and
7  they stay with that case until they seal every
8  allegation, which in my book, is not something
9  that they need to, that we can handle it and we
10 can do it with training or discipline, if
11 necessary, and it would lighten their load.
12   Q    Did Chief Rosenzweig tell you that
13 IPRA had a heavy load of open files?
14   A    Yes.  There were some cases that took
15 like six years to be completed, and you can't
16 expect that that's fair to anybody whether it
17 be the complainant or the subject officer.
18 Some officers have been stripped for seven
19 years, which is just not a good way to run a
20 business.
21   Q    So did you find that the length of
22 time that IPRA took to investigate some
23 allegations of complaints were unacceptable?
24   A    Absolutely.

Plaintiff's Exhibit 5 Page 21

Page 84

1     Q    Other than suggest that Chief
2  Rosenzweig speed up the process by allowing IA
3  to handle some allegations where the paperwork
4  had a problem, what other recommendations did
5  you make?
6     **A    I don't recall if I did.**
7     Q    Did you ever tell the mayor that, at
8  times, it took IPRA too long to complete a CR
9  investigation?
10     **A    Yes.  That was all part of the same**
11  **conversation regarding the dysfunctional**
12  **disciplinary system.**
13     Q    And that we already discussed today,
14  correct?
15     **A    I'm sorry?**
16     Q    We've already discussed that aspect
17  today, correct?
18     **A    At length, yes.**
19     Q    When Chief Ando took over, do you
20  know whether IPRA still had a backlog of cases
21  that were open?
22     **A    Yes, but as I recall, Scott told me**
23  **how he had cut down on the backlog and the**
24  **overall investigative cases of their case log.**

---

Page 85

1  **I don't know if it was an average or what you**
2  **would call it, maybe an average length of**
3  **completion of a case or he had cleaned up a**
4  **backlog of older cases, one or the other or**
5  **maybe even both.  He had told me at one point**
6  **that they were making significant progress on**
7  **that, and I was very pleased about it.**
8     Q    Did Chief Rosenzweig accept your
9  recommendation to allow IA to handle some
10  cases?
11         MR. PLATT:  Objection, that's not
12     what he said.  It's the form of the
13     question and assumes a fact not
14     established.  You can answer the question.
15  BY THE WITNESS:
16     **A    Yeah, that's not what I said.  What I**
17  **said was once they determined that the -- there**
18  **were certain reasons why IPRA handles cases.  I**
19  **have already articulated that a number of**
20  **times.  When that allegation is determined to**
21  **be not sustained and there's other problems**
22  **with the police procedure, I recommended that**
23  **they forward that case now to our internal**
24  **affairs division for completion of**

---

Page 86

1  **investigation.  She did not accept that**
2  **recommendation.**
3  BY MR. MORRISSEY:
4     Q    Did she tell you why?
5     **A    No.**
6     Q    Did you raise that recommendation
7  again to Chief Ando?
8     **A    Yes.**
9     Q    What did Chief Ando do?
10     **A    He accepted it.**
11     Q    In your opinion, was Chief Ando
12  effective as the IPRA administrator?
13         MR. PLATT:  Objection to the form of
14     the question and to the relevance.  You can
15     answer the question.
16  BY THE WITNESS:
17     **A    I'm objecting to the relevance also**
18  **but I will say, yes, I thought he did a good**
19  **job of cutting down on his backlog of his**
20  **caseload based upon what he told me and the**
21  **time it took him to complete those**
22  **investigations; and we did always agree,**
23  **but we always had an intelligent conversation**
24  **about why I felt one way and he felt another.**

---

Page 87

1  **And usually, we were able to come to a**
2  **conclusion.  As I stated earlier, I gave you an**
3  **example of Rule 14 that they recommended that I**
4  **didn't agree with initially that they swung me**
5  **the other way based upon the conversation.**
6  **That's the way I believe that system is**
7  **supposed to work.  So the answer to your**
8  **question is yes.**
9     Q    Do you know why Chief Ando left IPRA?
10     **A    I have not spoken to Scott Ando since**
11  **he left.  What I read in the papers is that he**
12  **resigned based upon the best interest of the**
13  **city or some sort of statement along those**
14  **lines.**
15     Q    Did you ever have a conversation with
16  Chief Ando regarding an alleged code of silence
17  in the department?
18     **A    I don't recall.**
19     Q    As superintendent of police, did you
20  ever review Rita King's CR file?
21     **A    I don't believe so.**
22     Q    Are you aware that IPRA recommended a
23  15-day suspension for Commander Evans?
24     **A    I only learned about that from**

Plaintiff's Exhibit 5 Page 22

1  Mr. Platt in preparation for this meeting.  Oh,
2  I'm sorry.  I may have recalled.  My general
3  counsel, Ralph Price, had given me some
4  information on this case, and I don't recall
5  what it was.  It may have been that there was a
6  recommendation of 15 days, but I don't
7  specifically recall.
8      Q    Are you aware of Ms. King's
9  allegations against Commander Evans?
10     A    Yes.
11     Q    And you're aware that Ms. King was in
12 the 6th District lockup, and she refused an
13 order to be fingerprinted and photographed?
14     A    Am I aware?
15     Q    Correct.
16     A    I have been told that.
17     Q    Have you ever had a conversation with
18 Glenn Evans regarding Ms. King's allegations?
19     A    Not to my recollection.
20     Q    When is the last time you
21 communicated with Commander Evans?
22     A    The day he was acquitted on the case
23 that we referred to earlier.
24     Q    Is Commander Evans still with the

1  BY THE WITNESS:
2      A    Yeah, I'm not even going to speculate
3  based upon how hypothetical that question is.
4  BY MR. MORRISSEY:
5      Q    Are there certain circumstances that
6  a department member can apply force to a
7  citizen?
8      A    Yes.
9      Q    Under what circumstances may a police
10 officer use force to an unarmed arrestee?
11     MR. PLATT:  Objection, incomplete
12     hypothetical, unclear question.
13     MR. BATTLE:  And it's so vague and
14     broad.
15     MR. PLATT:  You can answer, if you
16     know.
17 BY THE WITNESS:
18     A    I can't answer the question based on
19 the way it's being posed.
20 BY MR. MORRISSEY:
21     Q    Assuming there is a woman in the 6th
22 District lockup and she's surrounded by three
23 officers and another officer, a fourth officer,
24 comes into the lockup and this individual is

1  police department?
2      A    I can't answer that.  I have no idea.
3      Q    Are you familiar with the policies
4  and procedures regarding use of force by
5  officers?
6      A    Yes.
7      Q    And do you have any personal
8  knowledge whether Glenn Evans was trained by
9  the police department regarding use of force?
10     A    I presume that he was based upon his
11 graduating from the police academy.
12     Q    Did you ever provide any training to
13 Glenn Evans regarding use of force?
14     A    Did I provide training?
15     Q    Correct, personally.
16     A    No.
17     Q    Based on your experience, under what
18 circumstances may a police officer apply force
19 to a verbally uncooperative arrestee in a
20 police department lockup?
21     MR. PLATT:  Objection to the form of
22     the question and relevance.
23     MR. BATTLE:  And incomplete
24     hypothetical.

1  crying and standing in one spot and verbally
2  refuses an order to move over to the
3  fingerprint machine.  Under what circumstances
4  based on your understanding of the Chicago
5  Police Department policies and procedures may
6  an officer use force to encourage her to
7  cooperate?
8      MR. PLATT:  Objection to the form of
9      the question, incomplete hypothetical.
10     MR. BATTLE:  Join.
11     MR. KOLP:  I'm also going to object
12     to the compound nature of that question as
13     well as I think the witness has already
14     articulated the unduly burdensome nature of
15     the question but --
16 BY THE WITNESS:
17     A    I can't answer that question based on
18 the way it's posed because there's things that
19 that officer will have to articulate based upon
20 their experience, their observation and
21 circumstances that are happening at that time
22 and place, which I can't put myself in somebody
23 else's head.
24

Plaintiff's Exhibit 5 Page 23

Page 92

```
1   BY MR. MORRISSEY:
2        Q    What factors do you know to determine
3   whether the application of force would be
4   appropriate?
5            MR. PLATT:  Objection, he already
6        answered that he can't know what --
7   BY THE WITNESS:
8        A    I just gave you examples.  I just
9   gave you examples.  I don't even know what the
10  person is arrested for.  I don't know if they
11  pose a threat to the officers or any other
12  individual; and if the officer can articulate
13  that, that's a whole different circumstance.
14  That's why I can't answer the question.
15  BY MR. MORRISSEY:
16       Q    Are you aware of a pressure point
17  pain compliance technique that's taught by the
18  police department?
19       A    I did not go through the Chicago
20  Police Department training curriculum except
21  for that 40-hour course.  I did not go through
22  the police academy in Chicago.  So I cannot
23  answer that question.
24       Q    So you have no knowledge whether the
```

Page 94

```
1   BY THE WITNESS:
2        A    I don't recall.
3   BY MR. MORRISSEY:
4        Q    Do you consider Glenn Evans one of
5   your favorite commanders?
6            MR. PLATT:  Objection to the form of
7        the question, relevance.
8            MR. BATTLE:  Join.
9   BY THE WITNESS:
10       A    I love them all equally.  I have
11  tremendous respect for the individuals in the
12  Chicago Police Department who step up to
13  command positions like that, every single one
14  of them.
15  BY MR. MORRISSEY:
16       Q    If a police officer invokes his or
17  her Fifth Amendment privileges in response to
18  official duties, do you believe that individual
19  should be disciplined or fired?
20           MR. BATTLE:  Objection.  He's not an
21       attorney.
22           MR. PLATT:  Yeah, it's also not
23       relevant and form of the question.
24           MR. KOLP:  I object to the
```

Page 93

```
1   police department trains officers to use a pain
2   compliance technique; is that fair to say?
3        A    Actually, it's not fair to say.  I
4   have been told that there is a pain compliance
5   technique that is taught, but I have personally
6   not seen it.  I have not been trained in it.
7        Q    Do you know whether Glenn Evans was
8   trained in the pain compliance technique?
9        A    I do not.
10       Q    Do you have any personal knowledge --
11  Strike that.  Do you have any knowledge of what
12  circumstances -- Strike that.
13           When you were superintendent, were
14  you ever told that an officer applied a pain
15  compliance technique to an arrestee?
16           MR. PLATT:  Objection to the form of
17       the question.
18           MR. BATTLE:  Any officer ever?
19           MR. KOLP:  Yeah.
20           MR. BATTLE:  Is that what we are
21       talking about?
22           MR. KOLP:  Apparently.  So I will
23       object to the form of the question.
24
```

Page 95

```
1        argumentative nature of the question as
2        well.  This is so far beyond what he's here
3        to testify about.
4   BY THE WITNESS:
5        A    I don't even understand the question.
6            MR. MORRISSEY:  A few-minute break.
7                (WHEREUPON, a short
8                break was had.)
9   BY MR. MORRISSEY:
10       Q    Assuming there was an open CR file
11  that was being investigated by IPRA, what could
12  you do as a superintendent to discipline that
13  officer?
14           MR. PLATT:  Objection to the form of
15       the question.
16  BY THE WITNESS:
17       A    What could I do?  I'm not sure what I
18  could do, but I wouldn't do anything because I
19  wouldn't want to jeopardize -- well, you know
20  what, again, I don't understand the question.
21  If you're referring to disciplining him for the
22  allegation that's being investigated --
23  BY MR. MORRISSEY:
24       Q    Correct.
```

Plaintiff's Exhibit 5 Page 24

GARRY MCCARTHY
January 20, 2016

Page 96

```
1        A    -- I would not do that.
2        Q    Why not?
3        A    Because I don't have an investigation
4   in front of me that I can sustain, unsustain or
5   unfound or make any other determination.
6        Q    Is that because the city council
7   delegated the responsibility to IPRA to
8   investigate citizen complaints?
9             MR. PLATT:  Objection to the form of
10      the question.
11  BY THE WITNESS:
12       A    The answer to that question is
13  actually no because if anybody else is
14  investigating it, until I had an investigation
15  in front of me that came to a conclusion, I
16  wouldn't dream of taking any disciplinary
17  action.
18            MR. MORRISSEY:  I have nothing
19      further.
20            MR. PLATT:  I have no questions.
21            MR. BATTLE:  No questions.
22            MR. KOLP:  I have nothing.
23            MR. PLATT:  Reserve signature.
24            FURTHER DEPONENT SAITH NOT.....
```

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 98

```
1   STATE OF ILLINOIS )
2                     )  ss:
    COUNTY OF C O O K )
3             I, Peggy A. Anderson, a Certified
4   Shorthand Reporter in the State of Illinois do
5   hereby certify:
6             That previous to the commencement of
7   the examination of the witness, the witness was
8   duly sworn to testify the whole truth
9   concerning the matters herein;
10            That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction, and constitutes a true
14  record of the testimony given and the
15  proceedings had;
16            That the said deposition was taken
17  before me at the time and place specified;
18            That the said deposition was
19  adjourned as stated herein;
20            That I am not a relative or employee
21  or attorney or counsel, nor a relative or
22  employee of such attorney or counsel for any of
23  the parties hereto, nor interested directly or
24  indirectly in the outcome of this action.
```

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 97

```
1        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
3
    RITA KING,                  )
4                               )
            Plaintiff,          )
5                               )
               vs.              )  No. 13 C 1937
6                               )
    GLENN EVANS, et al.,        )
7                               )
            Defendants.         )
8
9             I, GARRY McCARTHY, being first duly
10  sworn, on oath, say that I am the deponent in
11  the aforesaid deposition, that I have read the
12  foregoing transcript of my deposition,
13  consisting of pages 1-97 inclusive, taken at
14  the aforesaid time and place and that the
15  foregoing is a true and correct transcript of
16  my testimony so given.
17
18            _____
                       GARRY McCARTHY
19
    SUBSCRIBED AND SWORN TO
20  me before this _____ day
21  of _____, A.D. 2016.
22  _____
23  Notary Public
24
```

TOOMEY REPORTING
312-853-0648

GARRY MCCARTHY
January 20, 2016

Page 99

```
1             IN WITNESS WHEREOF, I do hereunto set
2   my hand at Chicago, Illinois, this _____ day
3   of _____, 2016.
4
5
6
7             _____
8             Peggy A. Anderson
9             Certified Shorthand Reporter
10            License No. 084-003813
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 25

## Page 1

GARRY MCCARTHY
January 20, 2016
Page 1

**A**

A.D 97:21
Abbate 67:17
ability 57:9
73:5
able 54:2
65:10 87:1
abrasion 57:4
Absolutely
77:11 83:24
abuse 13:12
14:13 34:24
82:14
academy
12:23 89:11
92:22
accept 70:3
85:8 86:1
accepted
86:10
account 26:7
accountabi...
16:9 22:19
34:2
accountable
16:14 33:20
33:22 72:22
accuracy
60:22
acquitted
88:22
acted 35:5
action 28:19
58:4 59:11
59:17,20
80:9 96:17
98:24
activities
60:3
actual 29:18
43:9 48:21
53:24 54:1
add 44:4
added 43:1

adjourned
98:19
administra...
65:12
administra...
86:12
advocate
35:5,7,14
74:14
advocated
74:15
advocating
74:10
affairs 14:13
19:16 22:3
22:5,13,14
22:16,18,24
23:10,14,17
24:6 34:24
35:3,24
36:6 37:11
37:15,23
38:9 54:20
65:10 70:22
82:7 85:24
aforesaid
97:11,14
afternoon
47:6
agency 74:5
agenda 28:12
28:13 29:8
53:8 69:1,3
69:12
ago 30:6
39:18 54:8
agree 28:20
31:17,18
32:24 56:21
76:14 78:10
86:22 87:4
agreed 28:24
agreeing 33:1
33:3

agreement
43:7
ahead 34:10
34:20 37:3
64:23
at 1:6 97:6
Alderman
62:1,4,5,8
62:11,17,19
65:11 76:17
allegation
9:12 25:14
35:6 55:23
56:10,23
82:3 83:3,8
85:20 95:22
allegations
7:6,12 9:16
9:22 13:22
14:6,20
15:11 17:15
24:16 25:6
33:9 34:6
34:22,24
46:5 57:18
74:12 75:13
83:23 84:3
88:9,18
alleged 36:13
55:16 87:16
allocate
39:19
allocated
39:12,16
allow 24:6
85:9
allowing 84:2
Alvarez 61:1
61:4,18
Amendment
94:17
amount
25:14 82:18
Anderson

1:14 98:3
99:8
Ando 39:11
39:17,20
40:4,9,12
49:6,9
52:18,21
53:5,10
55:11 56:17
57:6,17,20
59:9 60:6
61:17 62:21
84:19 86:7
86:9,11
87:9,10,16
88:4 93:14
apply 10:23
89:18 90:6
appoint 71:4
71:8
appointed
11:24
appoints 75:9
approxima...
33:7,16
35:8 64:21
92:4
approval
44:7 47:18
50:10 60:12
66:6
April 6:18,20
arbitration
43:10 37:18
77:8 78:4
area 22:22
32:8,9 58:7
59:5 62:14
areas 42:9
82:13
argumenta...
64:11 66:21
95:1
arm 36:23
arrested
62:15 92:10
arrestee
89:19 90:10

anybody
64:18 83:16
96:13
apparently
50:4 93:22
appeal 76:24
77:2,6,17
Appeared 2:7
2:15 3:8,16
application
11:4,7 92:3
applied 93:14
applies
64:14 66:21
appoint 71:4
71:8
assigned
86:14
assault 36:18
36:20
assign 51:5
Assignment
22:4
assume 30:18
assumes
66:22 85:13
Assuming
90:21 95:10
attend 21:9
attended
40:3 53:2
69:7
attending
39:23
attention
21:10
attorney
60:10 61:1
64:2 94:21
98:21,22
attorneys
29:16
authority
16:10 34:3
57:13

93:15
arrests 82:19
6:21
articulate
91:19 92:12
articulated
40:15 48:10
85:19 91:14
asked 20:23
65:9 72:15
76:21 78:12
78:23 80:24
81:1
asking 6:22
44:13 72:16
aspect 84:16
assault 36:18
36:20

TOOMEY REPORTING
312-853-0648

## Page 2

GARRY MCCARTHY
January 20, 2016
Page 2

available
11:5 46:13
51:13
Avenue 1:16
2:5 46:24
average 85:1
85:2
aware 38:24
47:23 59:16
87:22 88:8
88:11,14
92:16

**B**

B 4:7
back 8:6
16:24 22:11
28:23 42:18
46:12 60:17
66:5 71:17
73:20 75:21
79:3
backlog
84:20,23
85:4 86:19
banding
43:11
based 12:19
19:22 21:16
28:19 32:2
36:12,24
37:15 41:23
43:21 53:21
53:22 54:1
55:22 56:10
58:18 86:20
87:5,12
89:10,17
90:3,18
91:4,17,19
basically
20:23
basis 19:13
27:3 30:9

60:4 68:21
73:18
battery 36:20
battle 3:12
14:1 17:18
34:8,18
37:4 38:2
44:9 47:20
66:19 74:1
76:21 81:1
89:23 90:13
91:10 93:18
93:20 94:8
94:14 95:24
battling
23:11
beat 83:4
began 19:7
behalf 2:7,15
3:8,16
behavior
16:15 26:19
33:21 72:22
73:10
believe 19:11
20:7 21:6
24:2 27:22
30:21 31:24
36:23 37:10
37:12 45:3
45:10 46:20
48:17 49:3
49:4 51:10
55:12,15
56:5,6,8
60:16 61:24
67:16 71:10
76:17 78:12
78:12 87:6
87:21 94:18
believed 16:8
65:17 75:15

best 13:11
23:3 63:5
87:12
beyond 65:3
95:2
biggest 73:11
bit 20:13
55:24
blanks 11:9
blocked 62:9
blue-ribbon
70:11 71:4
71:9
board 11:10
11:11,13
16:10 19:15
22:4 29:4
91:14
busiest 61:14
business 7:22
83:20

**C**

C 1:5 2:1 3:1
6:6 97:5
caliber 42:22
call 12:21
57:23 62:7
58:2,6
called 1:10
6:3 19:8
20:1,14
22:3 24:1
25:11,12,13
35:1,12
52:3,4,5,6
53:19 54:5
55:4 56:12
causing 57:2
certain 25:15
25:18 26:8
40:2 85:18
90:5
Certified
1:14 98:3
99:9

23:9
BRIAN 2:12
brian.kolp...
2:14
briefly 10:14
34:17
bring 9:9
11:12 53:5
20:24
broad 90:14
broke 36:23
broken 57:5
brought 21:9
8:21,11
83:5,7
84:24 85:3
85:23 88:4
88:22
caseload
86:20
cases 28:15
28:23 29:3
29:6 32:23
32:24 45:19
53:15 73:19
78:6 83:14
84:20 85:4
85:10,18
catalog 79:9
categories
3:3,6,14 8:4
9:2 10:11
10:24 11:10
12:7,13
13:4,21
16:10,16
16:15 18:10
22:3 24:1
25:8 26:8
38:17 40:19
44:23 58:8
45:23 46:1
53:17 56:1

captains
44:21
career 23:22
52:4
carrying 65:5
case 11:14
17:15 29:1
59:16 72:1
54:15,19
55:16 56:2
67:17 82:8
82:11,21
83:5,7
Channel
30:11,24
31:4,12,15
31:23 32:14
33:6 35:22
charge 61:15
charged
60:11,13,18
60:20,21,24
charges 7:16
7:18 29:17
35:7 61:6
61:19
Chicago 1:16
2:5,10,13
3:3,6,14 8:4
9:2 10:11
10:24 11:10
12:7,13
13:4,21
16:10,16
certify 98:5
Ch 12:24
Chain 58:23
chaired 42:15
change 24:8
27:10 52:23
53:3 67:24
changed
21:15 43:6
43:9 44:2
changes 24:5
63:10 64:6
66:1 68:2
82:24 83:15
87:17 89:1
89:20 90:6
90:9 91:5
91:22 94:24
95:7 96:1

TOOMEY REPORTING
312-853-0648

## Page 3

GARRY MCCARTHY
January 20, 2016
Page 3

92:19,22
94:12 99:2
chief 13:18
16:7 23:14
23:16,16
27:17 28:1
28:4 32:9
32:10 42:5
42:5 49:1
52:17,18
55:19 58:8
59:17 68:18
68:19 69:8
69:10 71:14
71:16,18,22
78:23,23
80:5 83:12
84:1,19
85:8 86:7,9
86:11 87:9
87:16
chiefs 42:16
43:11 44:22
44:22 58:8
60:15,16
81:7,16,21
circumstance
92:13
circumstan...
89:18 90:5
90:9 91:2
91:21 93:12
citizen 36:13
76:24 96:9
79:24 90:7
city 2:10 3:3
10:18,21
17:16 21:15
34:3,24
35:22,36:1
36:4,24

37:7,14,22
38:8 61:14
68:23 74:17
87:13 96:6
9:22 10:3
23:1,7 32:7
32:8 41:3,8
41:21 42:1
42:4,23
45:9,13,24
47:24 48:3
48:5,15,24
49:12,14,17
49:23 50:8
51:2,6,11
51:15,16
51:16,22
56:9,24
57:21,24
58:1,13
59:24 60:5
61:15 62:2
62:6,8,9,12
62:17,19,20
63:1,2,15
63:8 87:16
82:9
comes 34:2
commanding
31:4
comment
42:10
commissio...
10:19 35:14
35:16,18
commissio...
68:13 95:12

37:7,14,22
38:8 61:14
64:14 72:3
7:16,18
9:22 10:3
23:1,7 32:7
Civil 1:11
23:1,7 32:7
32:8 41:3,8
41:21 42:1
civilian 35:1
42:4,23
45:9,13,24
47:24 48:3
48:5,15,24
claims 17:16
49:12,14,17
clarify 5:17
49:23 50:8
clean 72:16
cleaned 85:3
51:15,16
51:16,22
CLEAR 7:9
56:9,24
57:21,24
58:1,13
59:24 60:5
Clifford 2:16
closely 59:12
clue 7:11
comm 62:6,8
62:6,8,9,12
62:17,19,20
63:12,14,15
63:8 87:23
commands
13:10 25:14
25:19,21
26:23 27:14
27:15 65:13
74:6 83:23
96:8
commenting
31:4
commence...
26:19 90:24
coming 10:5
24:23
commission
42:10
commissio...
10:19 35:14
35:16,18
commissio...
68:13 95:12

committed
47:3 65:18
committee
71:4,9
71:9 22:10
commander
72:24
commun...
74:24
community
21:7,12
82:13
company
19:21
company
64:2
compensate
85:22
complaint
62:1 63:12
complainant
83:17
complained
36:22
complaining
83:1
complaint
35:2 36:7
36:10 64:8
79:24 80:11
82:9
complaints
13:10 25:14
25:19,21
26:23 27:14
27:15 65:13
74:6 83:23
96:8
complaining
31:4 84:6
completed
82:24 83:15
completely
62:13 66:10
conducting
31:23
confused
5:16 20:13

85:3,24
compliance
92:17 93:2
93:4,8,15
component
13:9 44:4
58:10
compound
91:12
concern 67:6
82:13
concerning
98:9
concerns
73:11 78:8
conclusions
82:22
conduct
22:17 35:3
37:24 38:5
38:11 40:18
65:4
conducted
31:15 36:2
73:16,22
conducting
31:23
conferral
19:18
conferred
29:20
conversation
60:12 71:18
conversation
17:11 18:1

25:9
consider 49:7
72:20 94:4
considered
23:2 36:16
44:14 48:8
44:14 48:8
48:14 49:22
50:2 63:21
considering
45:8,12
48:20,23
49:5,11
consisting
97:13
constitutes
98:3
consult 44:10
45:7 49:10
consultant
72:5,6,7
Consulting
8:22
consuma...
62:8
contact 47:19
61:2
continue 32:5
47:18 52:20
58:1
continued
31:15 36:2
contract
57:14
control 68:19
contract
57:14
control 68:19

TOOMEY REPORTING
312-853-0648

## Page 4

GARRY MCCARTHY
January 20, 2016
Page 4

40:11 49:1
55:10,13,19
56:7,12,15
57:16 61:12
62:16 67:10
66:8 70:6
71:8 84:24
84:11 86:23
87:5,15
88:17
conversatio...
15:3 16:6
17:7 19:6
17:19 42:4
80:4 81:15
convey 78:8
cooperate
91:7
copy 20:6,8
Corey 63:13
corporation
16:6 17:8
17:11 18:1
77:5,23
correct 17:5
18:14 24:19
25:19 27:9
44:5,6
45:15 47:24
51:17 52:18
58:15 59:14
62:7 71:22
76:17 79:7
84:14,17
88:15 89:15
92:5 97:15
correctly
42:6,19
43:13
corruption

23:11 34:23
36:5
47:7,11
65:13 68:19
crimes 22:20
criminal 61:5
61:19
Defendant
6:3 7:3
defendants
6:21 66:2
criteria 41:17
critical 23:12
CRs 26:1,4,6
26:7 27:7
49:21
decision 31:5
57:24 77:6
Decree 42:18
46:23
Deenihan
64:2
Defendant
6:3 7:3
defendants
6:21 66:2
criteria 41:17
critical 23:12
degree 40:14
delegated
70:15,18
72:4 74:24
culture 16:19
currently
7:19,21
curriculum
12:20
cut 57:4
84:23
Courtesy
6:13
Courts 1:12
covering
56:24
crazy 36:1
CR 26:10
29:10 30:16
64:16 61:15
creating
23:18

54:10 55:2
57:24 77:6
65:8,23
65:13 68:19
crimes 22:20
criminal 61:5
61:19
Defendant
6:3 7:3
defendants
6:21 66:2
criteria 41:17
critical 23:12
CRs 26:1,4,6
26:7 27:7
49:21
defending
35:15
degree 40:14
delegated
70:15,18
72:4 74:24
delete 8:12
demote 51:11
denying 76:8
department
8:4 9:3
10:12 11:1
12:8,14
14:1,7,9,22
34:8,18
37:3 43:4
44:19 46:22
46:9 51:23
depending
6:10
depends 14:8
deponent 3:9
96:24 97:10
depose 95:9
deposition
1:13 8:12
9:1 5:3,10
5:17 8:9:1
9:5 18:18
8:17 89:1
91:13 92:15
93:23 94:6
deals 46:17
dealt 4:3,5
35:10 37:8
38:17 40:5
41:6,12,23
43:3,6
68:18,19
89:16 90:2
described 7:1
59:19 98:13

7:4 10:14
13:12 16:21
34:14,17
72:12
described
30:22
detail 7:8
detectives
22:7,8,12
58:11
detectives
23:21 44:20
45:4
determinat...
31:2 43:4
54:17,21
96:7
determine
29:17 35:17
72:24 42:2
depending
determined
42:21 54:12
85:17,20
determiner
16:11 73:1
determines
42:16
determining
16:19 73:5
89:19
different
20:20 26:13
26:23 34:12
42:9 47:7
67:12 98:10
differentiate
14:10
difficult 73:8
Dike 72:24
DIRECT 4:3
direction
59:19 98:13

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 26

GARRY MCCARTHY
January 20, 2016

Page 5

| | | | | |
|---|---|---|---|---|
| **directly** 98:23 | 38:10 | 70:15 | **either** 21:16 29:1 51:23 54:15 62:6 63:2 69:9 79:6 | **Evans** 1:6 3:16 5:4 7:13,16,18 9:13,22 46:21,23 47:9,15,17 48:2,7,14 48:20,23 49:15,22 50:2,8,18 51:1,6,8,16 51:20 52:7 55:11,17 56:9,19,24 57:18,21,24 59:9,13 59:24 60:5 60:7,13,18 60:23 61:5 62:6,8,17 62:19,20 62:21,23 63:15 87:23 88:9,18,21 88:24 89:8 89:13 93:7 94:4 97:6 |
| **director** 10:21 | **discuss** 11:21 18:16 51:2 60:8 69:21 78:15 81:8 | **document** 7:1 7:4 8:6,14 8:18 9:11 10:2,7 | **elapsed** 61:16 **else's** 91:23 **Emanuel** 60:8 67:6 **emotionally** 6:17,21,23 **employed** 7:19,21 | 87:3 **examples** 14:16 92:8 92:9 **exception** 23:1 **excessive** 24:16 69:22 75:13 82:3 **executed** 30:8 **executive** 20:22 23:18 **expanded** 22:2 |
| **disagree** 28:22 31:18 31:19 33:1 | **discussed** 18:13 50:23 **discussing** 53:9 60:9 81:21 84:13 84:16 **discussion** 70:2 | **documents** 6:9,14 **doing** 14:2 21:2 26:17 26:18 41:13 44:8 54:20 80:14 | **employee** 98:20,22 **encompass** 46:7 **encountered** 47:15 **encourage** 91:6 | **expect** 8:22 83:16 **expectation** 59:4 **expectations** 58:19 |
| **disagreed** 31:24 32:1 **disagreeing** 33:2 | **discussion** 61:10 **dismissal** 65:19,24 **disposition** 7:15 | **double** 47:1 **doubt** 15:9 **draw** 29:21 **dream** 96:16 | **enforcement** 10:12,15 12:20 60:3 **engage** 54:1 **engaged** 47:1 | **experience** 41:9 70:17 89:17 91:20 **experienced** 22:24 |
| **discharges** 82:20 **disciplinary** 6:15 7:3 8:23 9:4 10:3 16:8 19:14 21:1 21:22,24 28:18 45:18 45:23 46:2 46:12,17 48:16 51:3 67:23 70:10 70:20 72:21 73:1,5 | **dispositions** 7:6 45:5 **disrespectful** 62:13 **dissemination** 69:13 **dissertations** 70:16 **district** 1:1,1 1:12 23:6,7 32:6,6 47:9 59:3,24 61:14 62:10 88:12 90:22 97:1,1 | **Drive** 3:13 **drug** 14:17 **duly** 5:2 6:4 **duties** 94:18 **duty** 56:3 **dysfunctio...** 16:8 17:4 72:10,21 73:4 84:11 | 58:23 60:2 **entail** 25:16 **entered** 43:7 **entire** 19:18 37:5 45:21 46:8 65:12 67:22 83:1 **entirely** 65:1 **entities** 16:16 **equally** 94:10 **essay** 11:4,8 **established** 85:14 48:6,9,13 **ethic** 42:11 **ethnicity** 87:12 | **Evans'** 6:15 **explained** 30:7 78:17 **extended** 65:3 **extensive** 23:20 47:4 **extent** 39:11 64:20 66:21 72:15 79:9 |
| **discipline** 17:4 31:19 33:3,4 34:6 35:20 65:7 70:12,16 74:16,21 76:1,3 83:10 95:12 | | **E** **E** 2:1,1 3:1,1 **e** 4:17,6 6,6 **e-mail** 8:12 **earlier** 23:21 24:24 71:10 87:2 88:23 **early** 19:3 71:11 81:24 | **events** 45:8 **everybody** 27:2 **evidence** 78:1 **exactly** 60:15 **examination** 1:10 4:3 98:7 **examined** 6:4 **example** 45:8 | **F** **F** 2:12 **face** 53:19 54:3 57:5 74:4 78:5 81:23 85:13 |
| **disciplined** 34:2 72:9 94:19 **disciplining** 33:8 54:23 95:21 **discourse** 67:22 **discretion** | | **EASTERN** 1:2 97:2 **Eddie** 23:13 23:20 48:4 48:6,9,13 **effective** 86:12 **efforts** 67:24 | | **J** |

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 7

| | | | | |
|---|---|---|---|---|
| **heavy** 83:13 **Helm** 51:12 **hereto** 98:23 **hereunto** 99:1 **higher** 49:12 **hired** 72:5 **history** 6:15 72:3,9 9:4 10:4 45:18 45:23 46:2 46:18 48:16 49:2,8 51:3 **hit** 36:14,23 **holding** 10:10 **hollering** 62:11 **homicide** 22:8 **hours** 12:18 **hundreds** 65:7 **hypothetical** 37:5 89:24 90:3,12 91:9 | 3:6,14 12:18 97:1 98:1,4 99:2 **imbue** 41:11 **impair** 73:5 **implement** 21:20 73:9 **implemented** 21:18 74:17 **important** 23:8 43:2 **impossible** 49:2,8 51:3 **improve** 22:16 **incident** 53:24 63:2 **include** 9:12 9:15 14:15 **inclusive** 97:13 **incomplete** 37:4 89:23 90:11 91:9 **incorrectly** 82:24 **increased** 22:23 **Indicating** 20:21 **IA** 24:2 36:17 37:1 54:14 84:2 85:9 **idea** 91:9 41:7 50:12 52:11 89:2 **identify** 25:18 **Ilana** 27:19 53:4,14 81:24 **Illana** 27:21 **Illinois** 1:1,15 1:16 2:5,13 | 11:15 22:21 **internal** 41:21 42:8 43:11,17,22 47:2 53:5 55:3 70:15 74:21 75:3 75:9 94:11 **information** 88:4 **informed** 60:20 **initial** 62:24 **initially** 82:7 85:23 **innately** 20:24 21:21 **injury** 36:19 **innocence** 35:17 **inordinate** 54:2 **inside** 82:18 **input** 33:24 78:20 **inspector** 46:1 96:4 **instance** 42:10 **instances** 44:23 77:18 **instilling** 44:4 **instructing** 41:6 **integrity** 82:9 **intelligent** 86:23 **interaction** 36:15,16 37:1,10,12 94:7 **interactions** 19:15 **interest** 87:12 | **interested** 98:23 99:1,4 **internal** 14:13 19:16 22:2,5,13 22:14,16,18 22:24 23:10 23:14,17 24:6 34:23 35:3,24 36:6 37:11 37:15,23 38:9 54:20 65:10 70:22 82:7 85:23 84:21 40:18 43:16,20 47:24 61:9 87:16,24 **invoking** 13:9 15:7 15:21 22:20 74:5 82:2 96:14 39:19,22 28:24 29:9 35:4 38:1,6 38:11 40:18 45:11,14 54:11,16,19 73:16,19 80:22 81:10 81:13 82:6 83:2 84:9 86:1 96:3 90:14,18 **investigatio...** 14:2 22:17 24:12 36:2 26:22 83:13,22 84:8,20 87:9,22 | 14:11,20 16:6,20 12:19:15 24:12 25:22 27:17 28:17 29:9 30:13 30:15 32:1 32:13,18 31:18,22,24 39:9,13,19 40:12,17 45:7 49:1,4 49:11 52:17 52:18 54:13 54:16 70:21 73:6 79:3 79:6,21 80:5,7,10 80:16,21 81:7,16,17 81:21 83:1 83:13,22 84:8,20 87:9,22 **IPRA's** 31:5 **irrelevant** 12:18 **Irving** 62:1,4 62:5,9,11 62:17,19 **issue** 17:3,12 18:2,16 40:8 74:18 **issued** 20:17 20:17 **issues** 29:18 26:7 36:7 73:21 74:1 **J** |

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 6

| | | | | |
|---|---|---|---|---|
| **factors** 92:2 **facts** 66:22 **fair** 83:16 93:2,3 **familiar** 12:12 63:19 63:21 89:3 **far** 45:17 46:12 60:17 95:2 **fashion** 21:8 **favorite** 94:5 **federal** 1:11 2:10 3:3 47:12,18 67:15,16 **Felicia** 69:9 **felt** 86:24,24 **few-minute** 16:21 52:13 95:6 **field** 58:6,14 58:20,20 59:12,18 **Fifth** 94:17 **file** 72:16 30:18 35:7 57:21 83:6 87:20 95:10 **files** 24:22 83:13 **fill** 11:8 52:9 **filling** 48:11 **final** 16:10 35:19 72:24 75:24 **find** 78:18 82:4 83:5 83:21 **finding** 29:10 29:13 30:16 31:18,21 32:2 33:35:6 | **79:3** 80:18 **findings** 20:11 75:12 **fingerprint** 98:10 **fingerprinted** 88:13 **finish** 83:2 **firearm** 56:3 **firearms** 82:19 **first** 5:2 6:3 17:10 18:19 40:21 43:23 49:13 64:16 66:16 73:24 77:20 85:12 **Floor** 3:13 **focus** 65:2,12 **focused** 65:16 **follow** 63:1 77:10 **followed** 58:24 59:22 **follows** 6:5 **force** 13:9 14:11 24:17 25:11 36:8 57:1 69:22 76:15 82:3,9,13 89:4,9,13 98:18 90:6 90:10 91:6 | **92:3** **foregoing** 97:12,15 98:10 **forget** 12:20 25:12 42:3 52:5 55:14 54 77:4 **forgot** 40:1 **form** 8:17 15:13 21:13 32:19 33:10 40:21 43:23 49:13 64:16 66:16 73:24 77:20 85:12 88:2 **generally** 9:6 59:23 **generate** 55:6 55:7 **generated** 72:20 15:15 69:17 **geographical** 48:12 **getting** 75:4 **give** 7:8 14:16 31:9 42:20 56:17 **given** 2:12 45:16 47:10 83:9 97:16 89:11 **glanced** 7:7 9:20 **Glenn** 1:16 3:16 46:21 46:22 47:15 47:17 48:2 48:7,14,20 48:23 49:2 | **39:12,17,19** 50:18 51:1 51:5,8,16 52:7 55:11 56:19 17:18 59:9,12,18 60:6,13,18 60:23 61:5 61:11,22 63:13 88:18 89:8,13 93:7 94:4 97:6 **H** **H** 4:7 **Hall** 68:23 **hand** 99:2 **handcuffs** 36:9 **handle** 82:7 83:9 84:3 **handled** 36:10 **handlers** 45:4 **handles** 85:18 **happen** 30:17 52:7 64:7 71:3 **happened** 15:17 47:5 59:4 62:18 77:16 **happening** 34:1 59:2 91:2 **happens** 73:11 **harassment** 36:19 **hard** 36:14 **head** 23:24 24:4 65:11 91:23 | **great** 14:23 **greater** 29:1 **group** 19:8 **Grove** 46:23 **guess** 13:11 41:23 66:8 66:10 **guilt** 35:17 **gun** 47:2 **Gus** 55:22 **Gus** 55:20 **H** 22:11 23:6 25:15 28:14 29:3,3 30:2 30:22,24 32:4,24 34:9,20 34:9,20 39:24 43:13 53:14 64:23 82:8 92:19 52:17 87:9 86:19 70:19 71:15 71:20 72:5 72:7 73:5,11 77:8 78:15,20,22 84:19 83:4 97:9 88:5,9,24 88:13 88:17,20 88:24 89:21 91:23 |

TOOMEY REPORTING
312-853-0648

---

GARRY MCCARTHY
January 20, 2016

Page 8

| | | | | |
|---|---|---|---|---|
| **J** 3:5 **Janey** 69:9 **January** 1:16 **Jason** 72:24 **Jersey** 10:22 **job** 26:18 86:19 **Johnson** 48:4 48:6,9,13 49:2,8 47:12,18 67:15,16 **Felicia** 69:9 **July** 10:16 **jury** 67:16 **K** **K** 98:2 **K-e-a-r-n-e-...** 19:10 **K.L.** 2:17 **Kearney** 19:8 19:10 20:11 **knowledge** 25:3 39:18 39:8,14 40:16 41:9 82:19 89:8 92:24 93:10,11 **kept** 46:18 56:5 **kicked** 43:10 **killed** 41:14 **kind** 59:22 **King** 1:3 5:4 5:7 57:20 88:11 97:3 **King's** 90:1 87:20 88:8 88:18 **knew** 61:9 | **know** 9:9 15:1 19:21 20:3,8,11 20:13,18,19 20:19,21 21:4,14 25:7,9 30:6 38:17 47:16 27:2 35:21 55:24 57:15 58:15 66:11 63:13,16 65:18 67:2 71:7 72:12 81:3 84:20 82:9 93:7 93:9 95:19 89:8 92:24 93:10,11 49:8 94:22 39:8,14 40:16 41:9 82:19 89:8 92:24 93:10,11 **K** 98:2 **L** **Labor** 60:14 60:16 61:14 | **laid** 56:18 **larger** 39:24 **LaSalle** 2:12 **law** 2:2,9 3:2 3:10 10:12 10:15 12:19 **lay** 64:20 **leadership** 41:9 **learn** 13:3,15 **least** 7:6 40:23 51:24 52:17 53:17 58:16 59:1 60:11 63:15 **led** 67:22 **left** 2:7,9 62:17 81:11 71:7 72:11 **legal** 77:24 **legalities** 72:7 **length** 81:22 **let's** 16:20 30:18 36:19 32:4 36:8 **license** 99:10 M 6:6 **lifeguard** 88:12 **lieutenant** 42:17,23 51:17,20 52:8,10 44:19 66:20 72:14 79:8 91:11 93:19 93:22 94:24 96:22 **line** 17:14 18:21 26:14 37:6 62:11 64:21 | **lines** 87:14 **list** 42:20 **list** 55:3,7 69:4 **little** 20:13 12:15 25:6,9 **load** 82:15 **lockup** 88:12 **long** 89:20 90:22 30:3 **log** 84:24 **long** 81:17 84:8 86:21 69:1 **Look** 27:13,14 41:8 46:3 70:19 71:15 71:20 72:5 72:7 73:5,11 77:8 84:19 83:4 97:9 **lost** 78:16 **lot** 62:10 **love** 94:10 **low** 36:8 **lying** 54:8,4,10 **Lynnette** 51:12 **M** 6:6 M 6:6 **machine** 91:3 **maintained** 81:17 **major** 79:20 **making** 51:16 74:22 85:24 **MARKED** 4:9 **matter** 78:4 81:23 | **matters** 73:2 98:9 **mayor** 11:16 **meaning** 11:23 13:17 11:24 12:3 12:5 15:6,9 15:19 16:4 18:17,20 19:24 69:20 70:1 **member** 31:22 76:15 78:11 90:6 **members** 13:23 14:7 34:17 63:8 67:6 67:11,20 68:8,11,15 68:21 69:1 69:21 70:2 70:7 71:8 71:12,17 75:10 78:19 78:15,20,22 84:19 **mention** 84:7 **mentioned** 16:13 18:13 18:20 25:18 31:1 50:6 **merit** 41:22 42:13,14,21 51:24 52:1 **meritorious** 45:2,5 **met** 28:6 47:17 68:16 **methods** 78:11 **mean** 26:12 **meant** 56:1 **meet** 46:21 **military** 65:5 **mind** 44:13 **mine** 24:10 **minor** 65:4 **minutes** 69:16,18 **misconduct** 9:13,16 |

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 5 Page 27

GARRY MCCARTHY
January 20, 2016

**Page 9**

13:23 14:7 14:8,10,21 15:8,12,21 23:11 25:6 33:9 34:7 34:22 36:6 36:16 37:1 37:16 38:12 38:22 39:4 40:19 57:18 62:2 64:4 73:23 74:13 82:12
**misspoke** 24:9
**mistaken** 37:11
**moment** 12:14 21:10
**money** 14:17 40:1
**monitor** 24:16 25:5 26:1,4 42:17 43:9
**monitoring** 25:11,15 26:8,12,20 26:24 27:1 27:4
**monitors** 26:14
**monthly** 28:5 52:20 53:18
**month** 12:22
**Morrissey** 2:3,4 4:4 5:3,6,10,13 6:7 9:1 14:5 15:18 16:3 16:20,24 18:7 19:4 19:20 24:19 25:2 27:23 33:5,14 34:13 37:13 37:21 38:7 38:15 41:1 44:1,16 49:16,20 52:12,16 53:11 54:6 67:4 68:2,5 68:6 74:8 75:18,21,22 77:1 78:7 79:14 81:6 86:3 90:4 90:20 92:1 92:15 94:3 94:15 95:6 95:9,23 96:18
**mouth** 55:17
**move** 51:22 91:2
**municipal** 24:11
**murder** 47:1 47:3

**N**
N 2:1 3:1 4:1 6:6,6
**name** 5:6,8 35:11 55:14 55:15
**named** 23:4 51:12
**narcotics** 26:17 58:10
**nature** 13:14 42:11 91:12 91:14 95:1
**nearby** 54:1
**necessary** 28:7 83:11
**need** 26:11 83:9
**needed** 28:15 69:5 82:10
**negotiate** 28:23 30:2
**network** 70:14
**new** 10:18,21 25:10 34:4 34:15 35:22 36:1,4,13 36:24 37:7 37:14,22 38:8 43:7 52:4 74:10
**Newark** 10:21 25:11
**nonreview...** 46:20
**North** 2:12 3:5
**NORTHE...** 1:1 97:1
**Notary** 97:22
**notice** 5:5
**notified** 80:18
**number** 11:12 21:18 23:17 26:13 26:22 27:6 47:7 53:6,6 59:6 70:17 85:19
**numbers** 42:3
**nun** 83:4
**nuts** 25:7

**O**
O 6:6 98:2,2
**o'clock** 47:5
**oath** 54:4 97:10
**object** 17:13 64:20 66:20 72:14 79:8 91:11 93:23 94:24
**objecting** 56:17
**objection** 8:17 15:13 15:22 17:19 18:3,21 32:19 33:10 33:17 34:8 34:13 36:9 37:16 38:9 38:11 53:20 54:12,17,21 54:24 57:10 62:2,22 66:17 70:20 77:20 80:23 82:4 83:3 83:17 89:18 90:10,23,23 91:8 92:5 93:16 94:6 94:20 95:14 96:9
**observation** 58:18 59:7 91:20
**observe** 59:24
**observing** 58:22
**obviously** 22:8 39:24
**occasion** 18:17
**occur** 28:10
**occurred** 28:8 87:6 81:5
10:16,20 97:10
**office** 28:11 69:7
**officer** 9:4 10:17 12:10 12:17 15:12 16:15 17:5 23:18 25:13 26:1,5 26:9,12 27:2 31:5,16 32:6 33:8 33:21 34:1 35:7,13 36:14,23 37:16 38:11,13 38:11 54:12,17 54:24 57:6 65:14 76:3
**officer's** 91:20
**officers** 25:18 26:8 33:23 36:1 39:6 46:24 60:2 62:13 65:14,17,18 66:14 70:5 72:9 73:2 73:17 74:11 83:18 89:5 90:23 92:11 94:18 95:10 95:13
**OFFICES** 2:9 3:2,10
7:12,15,17 8:13 9:24 10:9 11:6 17:22 18:19 20:7 28:7 37:20 39:16 42:6,14,19 43:13 44:7 45:1 47:12 47:22 48:21 49:19,21 50:4,13 50:17 56:7 56:14,20 57:15,19,22 59:19,20 61:24 42:6 42:13 66:5 63:5,10 67:14,20 68:7,13 68:22 74:8 84:3,7 85:9 86:2,6
**official** 64:9 94:18
**Oh** 88:1
**okay** 5:17 38:13 50:16
**older** 85:4
**once** 47:21 85:17
**online** 11:5,7
**open** 50:2 57:21 83:13 84:21 95:10
**opinion** 31:10,21,24 68:1 75:14 86:1
**opportunity** 22:14
**option** 22:5
**options** 31:14 74:20
**orally** 5:16
**order** 88:13
**orders** 13:3
**ordinance** 24:11
**organization** 13:16
**organizatio...** 65:6
**orientation** 13:13
**overall** 19:17 84:24
**override** 57:9 77:18
**overrule** 31:5
**overruled**

GARRY MCCARTHY
January 20, 2016

**Page 11**

**probably** 18:18 19:2 23:2 39:18 47:13 54:8 63:4,11 65:11 66:9 67:8 79:19
**problem** 74:6 78:6 82:5 84:4
**problems** 53:15 73:15 73:19 82:17 85:21
**procedure** 1:11 29:11 30:4,8 77:10 85:22
**procedures** 11:22 21:16 89:4 91:5
**proceedings** 98:15
**process** 11:3 11:12 17:4 19:7 20:16 32:5 32:5 33:7 41:22 42:23 43:9,14,19 43:21 44:3 44:22 51:8 56:4,8 71:23,24 76:24 77:2 77:17 78:18 82:2 84:2
**processed** 43:6
**produce** 78:1
**profession** 64:2
**professional** 64:4 65:15
**professiona...** 65:3 67:3
**professionals** 70:14
**programs** 70:14
**progress** 86:17
**promote** 23:15 41:3
**promoted** 22:9 23:1,6
**promotion** 45:12
**Platt** 8:17 53:6,13 51:18 91:22 97:14 98:17
**Plaintiff** 1:4 1:10 2:8 5:7 97:4
**pleasant** 45:5
**please** 5:11,24 6:2,4 30:19 31:18 31:22 38:10,13 40:22 55:16 65:17
**pledge** 19:12
**plenty** 33:16
**plus** 79:14
**point** 12:15 34:18 35:1 35:5 35:10 38:1 38:5 39:5 42:4 48:1 86:18 91:4
**points** 50:1
**polls** 89:14
**poor** 31:4
**popped** 69:22
**pose** 92:11
**posed** 90:19
**position** 10:10 23:18 51:2 52:8,9 51:16 69:14 92:4 94:13
**positions** 23:8 45:1 94:13
**positive** 9:8 30:20 48:13
**possession** 8:8
**possible** 28:18
**potential** 44:5
**power** 75:6
**powers** 57:11
**practice** 69:22
**pregnant** 33:4
**preparation** 6:9 8:7 88:1
**presented** 21:7
**pressure** 92:16
**presume** 9:23
**pretty** 46:9 79:12 81:2
**previous** 9:6
**previously** 53:14 72:8
**Price** 88:3
**PRIETO** 3:11
**print** 7:9
**printed** 9:6 11:7
**printer** 9:9
**printout** 9:9 46:4
**prior** 10:10 50:8,18 51:16 69:14
**privileges** 94:17
**pro** 19:13
**proactive** 7:12,15,17 8:13 9:24 10:9 11:6 17:22 18:19 20:7 28:7 37:20 39:16 42:6,14,19 43:13 44:7 45:1 47:12 47:22 48:21 49:19,21 50:4,13 50:17 56:7 56:14,20 57:15,19,22 59:19,20 61:24 66:5 63:5,10 67:14,20 68:7,13 68:22 74:8 84:3,7 85:9 86:2,6
11:15 35:17 42:4,5 65:24 66:7 76:3
**recommen...** 28:17 32:1 48:10 56:18 56:22 57:10 61:22 76:6 76:15,20 77:14 78:10 85:9 86:2,6
**recommen...** 20:20 21:19 29:19 31:9 41:24 42:6 42:13 66:5 63:5,10 67:14,20 68:7,13 70:4,23 72:8 84:4
**recommend** 57:11 77:18
**recommends** 29:10 21:24
**record** 5:8 16:24 26:6 32:17,22 46:18 68:5 75:21 98:14
**recorded** 27:15
**records** 45:17

GARRY MCCARTHY
January 20, 2016

**Page 10**

76:19 77:14
**oversight** 75:1 79:1

**P**
P 2:1,1 3:1,1
**P.A** 3:1 1
**p.m** 1:17
**PAGE** 4:1,9
**pages** 97:13
**pain** 92:17 93:1,4,8,14
**panel** 70:11 70:19 72:3
**papers** 87:11
**paperwork** 42:7 48:12 48:19,22 64:10 82:5 82:16,19,23 82:23 83:6 84:3
**parcel** 70:8 71:1
**parking** 62:10
**part** 30:9 70:8 71:1 84:10
**particular** 27:7
**particularly** 7:5
**parties** 98:23
**Pat** 5:6
**PATRICK** 2:4
**patrickmor...** 2:6
**patrol** 26:15 32:10 58:8 58:9 59:3 59:21
**pattern** 66:14 69:22
**Peggy** 1:14 98:3 99:8
**people** 49:5 55:9
**perceived** 67:12
**percent** 66:3 97:14 98:17
**percentage** 45:5
**performance** 23:12 58:22
**period** 15:21 71:3 18:3,21
**person** 16:17 42:4 52:8 63:3 74:19 92:10
**personal** 25:3 39:8 40:16 51:19 89:7 93:10 98:13
**personally** 21:23 43:3 43:22 89:15 93:5
**personnel** 24:22 27:16 45:17
**persons** 6:17 94:22 95:14 95:20
**pertaining** 1:12
**philosophies** 41:11
**phone** 8:10 57:16,23 61:17 62:7 62:24
**phonetic** 18:11 55:20
**photograp...** 88:13
**physical** 14:21 15:11 57:3
**pick** 22:6
**place** 35:10 51:8 91:22 97:14 98:10 68:7 52:3 46:19 49:6 56:8 60:10 85:5 92:16 74:18 80:24
**police** 8:4 9:3
10:1,17,23 10:24 11:10 11:10,11,13 11:22 12:1 12:7,13,23 13:24,21,22 15:21 14:7 14:8,9,16 15:21 16:13 17:13 19:15 20:13,16 21:14 22:1 23:9 24:18 24:11,15,15 25:4,5,18 25:24 26:4 26:8,22 27:5,5,9 29:3,12 30:2,11,15 30:17 31:16 31:22 32:15 33:8,21 34:5 35:18 36:13,22 37:7 38:11 38:17,22 39:4 40:4 41:22 49:17 50:5 53:10 64:16,23 66:16,24 72:18 73:24 75:4 77:20 80:23 85:11 86:13 88:1 89:21 90:11,15 93:10 94:9 94:22 95:14 98:16
**policy** 6:16 89:3 91:5
**policies** 29:7 29:13,14 30:7,18 30:11,23,24 31:4,12,15 33:7 38:12 38:17,22 39:4 40:4
62:18 30:3 8:8 7:6 50:1 44:5 75:6 57:11 69:22 33:4
**preparation** 6:9 8:7 88:1
**presented** 21:7
**pressure** 92:16
**presume** 9:23
**pretty** 46:9 79:12 81:2
**previous** 9:6
**previously** 53:14 72:8
**Price** 88:3
**PRIETO** 3:11
**print** 7:9
**printed** 9:6 11:7
**printer** 9:9
**printout** 9:9 46:4
**prior** 10:10 50:8,18 51:16 69:14
**privileges** 94:17
**pro** 19:13
**proactive**

GARRY MCCARTHY
January 20, 2016

**Page 12**

46:12
**recourse** 77:9
**rectify** 78:16
**reduce** 65:13
**reduced** 98:12
**referred** 88:23
**referring** 26:21 31:11 46:15 74:4 95:21
**reflect** 74:22
**reflected** 65:7
**refusal** 22:6
**refused** 88:12
**refuses** 91:2
**regarding** 6:16,21 7:2 10:3 17:12 18:2 27:11 28:18 37:7 37:24 48:22 49:2 52:23 55:11 56:7 61:11,22 62:3 67:6 67:19 70:4 70:24 73:2 77:17 80:5 81:6,17,21 84:11 87:16 88:18 89:4 91:2 regular 30:9 60:4 68:21 regularly 59:21 68:15 regulations 12:13 reinvestigate 80:11
**related** 30:18
**relating** 7:13
**relation** 9:21 79:23
**relationship** 63:15
**relative** 98:20 98:21
**relatively** 43:15
**relevance** 15:22 33:11
**relevant** 34:8,14 37:2,5,17 38:3,14 24:11,15 25:4
**remaining** 91:5
**remains** 56:3
**remember** 40:17 20:16 33:15 62:16 70:6 33:24 38:17 30:1,11 31:22 11:10,22 31:12,17 32:15 31:22 28:23 34:22 34:20 37:2 37:17,40:21 33:22 46:21 96:18 60:7 62:13 62:13,22 65:24 96:12 94:13 23:8 45:1
**Repeat** 75:17
**rephrase** 67:9
**replacement** 56:2
**report** 19:22 16:17,21 20:3,6,9,12 18:8,11,17 81:8,18,22 21:11,20 32:9,10,13 32:14 33:7 33:1 12:13 31:12 45:16,22 27:20 98:4 99:9
**REPORTI...** 12:24
**reports** 21:4 21:16
**represent** 5:7
**request** 48:7
**requested** 39:20
**Reserve** 96:23
**resigned** 34:18 37:2,5,7 38:3,14
**resolved** 63:6
**respect** 94:11
**response** 34:8,14 37:2,5,17 38:3,14
**RIGHTS** 2:10 3
**Rita** 1:3 5:7
**road** 57:16 57:20 87:10
**Rodgers** 2:17
**Rosenzweig** 27:19 49:1 52:17 53:4 53:14 82:1 83:8
**Rountree** 99:21 80:6
**routine** 59:23
**routinely** 10:2 12:24 19:14 21:11 29:13,16 46:11,15 30:11,23,24 31:4,12,14 55:4 65:13 65:23 87:3
**rules** 1:11 5:14 12:13 37:24
**run** 47:21
**running**
87:20
**reviewed** 6:20,23 7:2 8:7,14,23 32:18 53:23
**reviewing** 48:19,21
**revised** 6:17
**Ricky** 55:15
**right** 22:5 28:21 29:2 45:1 51:10 53:7 60:14 68:2
**RIGHTS** 2:10 3
**Rita** 1:3 5:7
16:18 47:2
**S**
S 2:1 3:1 4:7
**Safer** 20:15 20:17 21:6
**safety** 69:11
**SAITH** 96:24
**sat** 5:10 30:6
**scene** 47:9
**seven** 87:18
**sexual** 13:13
**shooting** 46:23
**shootings** 5:21,18 5:21 8:18 short 16:22 52:14 68:3 58:8 64:4 section 37:23 see 58:20,21 58:22 second 6:16 61:14 see p 83:7 **separate** 25:8 44:23 53:17 **separation** 29:2,3 66:5 74:23 78:2 **separations** 66:6 **sergeant** 22:10,11 **sergeants** 44:21 **series** 32:23 **services** 65:15 **set** 28:22 29:8 97:8 **seven** 87:18 **sexual** 13:13 **Shakman** 42:18 **share** 16:17 **shooting** 46:23 **shootings** 5:21,18 **short** 16:22 52:14 68:3 **Shorthand** 1:14 98:4 **sic** 27:21 **sick** 45:18 **side** 32:15 **sidewalk** 62:20 **sign** 35:19 55:21 **signature** 86:3 **significant** 78:4 **silence** 63:10 **simple** 25:8 64:14 67:7 61:18 68:9 87:16 **similar** 8:15 43:15 **simplest**

TOOMEY REPORTING
312-853-0648

## Page 13

GARRY MCCARTHY
January 20, 2016
Page 13

| | | | | | |
|---|---|---|---|---|---|
| 74:18 | specialized | statement | strong 65:2 | 18:11 24:10 | 50:15 77:3 |
| single 26:16 | 39:13,21,22 | 87:13 | 70:13 | 24:14 26:4 | 80:19 86:12 |
| 94:13 | specific 53:16 | States 1:1,12 | structural | 27:5,18 | 93:17 |
| Sir 5:7 | 59:20 74:14 | 97:1 | 70:23 73:21 | 28:18 29:12 | surrounded |
| sit 42:17 | specifically | statistics | 74:1 | 30:15 38:16 | 90:22 |
| 48:18 | 50:24 63:10 | 81:16,20 | structure | 41:2 42:16 | suspended |
| situations | 88:7 | stay 47:18 | 52:24 | 44:3,18,24 | 76:9 |
| 76:13 | specifics | 83:1,7 | stuck 56:24 | 49:7,10 | suspension |
| six 12:22 | 50:21 | Stealing | study 9:20 | 57:8 59:11 | 28:21 29:2 |
| 65:11 83:15 | specified | 14:17 | subject 45:4 | 64:13 65:22 | 87:23 |
| size 22:2 | 98:17 | stenograph... | 83:17 | 66:12 68:18 | suspensions |
| slot 51:13 | speculate | 98:11 | submit 42:7 | 73:6,12 | 16:11 |
| solicit 41:20 | 90:2 | step 29:11 | SUBSCRI... | 75:11,23 | sustain 78:2 |
| soliciting | speed 82:1 | 33:7,16 | 97:19 | 76:18 79:2 | 79:6,7 96:4 |
| 41:24 | 84:2 | 94:12 | Subsequen... | 79:23 80:6 | sustained |
| solution | Spielfogel | steps 66:11 | 43:6 | 80:17,20 | 25:22,22,23 |
| 78:19 | 69:12 | Steve 18:9 | substantiate | 87:19 93:13 | 26:9,22 |
| solve 41:15 | spoke 12:4 | stop 59:23 | 83:5 | 95:12 | 27:6,13 |
| somebody | 60:11 69:3 | 82:6 | successful | supervise | 29:10 30:16 |
| 30:6 36:8 | spoken 59:5 | stopped 12:3 | 78:1 | 40:9 58:5 | 31:16 32:2 |
| 41:14 91:22 | 87:10 | stops 82:20 | sufficiency | 58:17 59:12 | 32:13 35:6 |
| somebody's | spot 91:1 | store 53:24 | 78:1 | 59:18 | 46:5,6 |
| 57:2 | ss 98:1 | straight | sufficient | supervised | 75:14 79:3 |
| sorry 7:20 | staff 9:8 16:7 | 24:13 | 42:22 | 58:7,11,13 | 79:17,18 |
| 24:9 27:20 | 32:22 55:20 | strategies | suggest 49:6 | 83:1 | 80:17,22 |
| 36:5 40:8 | 68:19,21 | 68:20 | 49:9 84:1 | supervising | 85:21 |
| 43:18 53:3 | 69:8,10,21 | street 2:12 | suggested | 47:11 | Sutton 2:16 |
| 60:19 62:6 | 70:7 71:15 | 3:5 47:1 | 24:23 48:2 | supervision | swab 55:21 |
| 66:4 72:6 | 71:16,18,22 | 82:20 | 60:6 78:18 | 25:16 27:1 | swabbed 56:6 |
| 81:9 84:15 | 78:23,23 | strengthen | 82:1 | 27:3 | sworn 5:2 6:4 |
| 88:2 | staffed 38:18 | 21:22,24 | suggestions | supervisor | 12:10,17 |
| sort 21:8,13 | standards | strictly 58:24 | 41:20 | 22:15 26:15 | 36:1 37:16 |
| 33:24 64:4 | 73:9 | Strike 15:4 | Suite 2:13 3:6 | 40:7 | 39:6 74:11 |
| 82:4 87:13 | standing 91:1 | 30:13 49:8 | summarize | supervisors | 97:10,19 |
| South 1:15 | start 43:16 | 51:15 58:4 | 29:20 | 22:6 45:20 | 98:8 |
| 2:5 3:13 | 83:2 | 73:14 77:12 | summary | 60:1 | swung 87:4 |
| sparked | started 7:24 | 80:10 93:11 | 20:22 | Supervisory | system 7:10 |
| 67:19 | 24:18 44:8 | 93:12 | superinten... | 22:4 | 9:7 16:9 |
| speak 21:17 | state 1:15 5:8 | strip 57:10 | 8:3 9:2 | supposed | 21:1,22 |
| 45:19 64:7 | 98:1,4 | 61:23 | 10:11,24 | 87:7 | 25:4,15 |
| speaking | state's 60:10 | stripped | 11:19 12:1 | sure 8:16 | 34:12,14 |
| 58:21 67:20 | 61:1 | 56:10,19 | 12:7 13:4 | 18:6 24:3 | 67:23 70:10 |
| special 13:11 | stated 49:3 | 59:10 60:7 | 13:17,20 | 24:13 30:7 | 70:20,24 |
| 14:12 | 87:2 98:19 | 62:21 83:18 | 46:13 48:22 | | |

## Page 14

GARRY MCCARTHY
January 20, 2016
Page 14

| | | | | | |
|---|---|---|---|---|---|
| 73:5 74:10 | 13:7 15:16 | 11:13,14 | 84:8 85:20 | 35:16 67:16 | 16:18 38:23 |
| 74:15,17,21 | 15:17 16:4 | 12:18 20:1 | titled 19:24 | tried 77:18 | 47:20 74:2 |
| 75:5 77:5 | 21:18 30:20 | 23:24 28:5 | today 48:18 | trigger 25:17 | 79:5 95:5 |
| 84:12 87:6 | 44:17 55:21 | 30:21 33:15 | 84:13,17 | troubling | 95:20 |
| systems | 57:17,20 | 42:3,15 | today's 6:9 | 74:23 | understand... |
| 26:20 | 60:15 62:4 | 46:4,10 | 8:7 | true 97:15 | 32:3,12 |
| | 63:8 66:2 | 55:18 56:13 | told 9:19 21:1 | 98:13 | 36:12,24 |
| **T** | 77:2 83:12 | 56:16 60:7 | 50:5 57:6 | truth 54:22 | 38:9,20 |
| T 4:7 6:6,6 | 84:7 86:4 | 61:12 67:2 | 60:23 61:5 | 81:20 | 41:10 63:23 |
| take 16:20 | telling 54:22 | 67:17 69:12 | 70:8 71:10 | truthful | 63:24 91:4 |
| 22:14 35:9 | 62:8 | 72:2 91:13 | 71:19 72:2 | 54:18 | unduly 91:14 |
| 45:11,14 | ten 11:14 | third 25:10 | 84:22 85:5 | try 21:22 | unfound 96:5 |
| 52:9,12 | tenure 18:11 | THOMAS | 86:20 88:16 | trying 41:11 | unfounded |
| 58:4 59:11 | 45:21 46:8 | 2:3,4 3:5 | 93:4,14 | 41:15 | 46:6 79:16 |
| 66:11 70:19 | 65:1 | thought | **TOOMEY** | Tuesday | 79:7 72:12 |
| 72:5 75:18 | term 63:19 | 20:24 43:2 | 12:24 | 60:15,21 | 80:7,12 |
| taken 1:10,13 | terminate | 43:5 82:14 | 24:6 65:11 | uniform 65:5 | unique 23:24 |
| 5:4 26:7 | 78:11 | 86:18 | top-to-bott... | 42:5 44:22 | union 35:15 |
| 67:24 69:18 | terminated | threat 92:11 | 70:9 74:16 | 53:6 63:6 | 37:23 40:20 |
| 97:13 98:16 | 55:1 75:4 | three 11:15 | topic 68:12 | two-page | 46:11,15 |
| talk 25:17 | terminating | 75:3 78:13 | totality 31:20 | 82:21 | 57:14 |
| 29:6,20 | 70:4 | 79:20 90:22 | track 24:16 | type 14:8 | unit 26:18 |
| 30:14 69:5 | termination | throat 57:1,2 | 25:5 | 44:12 | 58:9 |
| 82:16 | 53:19 54:5 | Thursday | tracked 25:1 | types 44:17 | United 1:1,12 |
| talked 17:3 | 75:2 76:4 | 60:21 | tracking 26:8 | 81:20 | 97:1 |
| talking 8:19 | 76:10 | tick 65:10 | trained 89:8 | typewriting | unquote |
| 49:16 67:3 | term 27:4 | tight 36:9 | 93:6,8 | 98:12 | 26:13 |
| 93:21 | test 52:6,9 | time 13:18 | training | typically 28:9 | unsustain |
| task 47:10 | testified 6:4 | 18:19 28:1 | 12:19,23 | | 96:4 |
| taught 92:17 | 44:2 66:23 | 37:6,14 | 22:23 25:16 | **U** | unsustained |
| 93:5 | 72:8,17 | 18:18 28:1 | 39:9,13,15 | Uh-huh | 27:14 46:6 |
| team-led 60:2 | testify 64:3,5 | 37:6,14 | 46:18 65:1 | 10:13 | upgraded |
| tech 55:8 | 95:3 98:8 | 43:6 48:16 | 46:16 65:12 | 23:24 | 23:24 |
| technicians | testimony | 47:14 49:22 | 83:10 89:12 | unacceptable | use 89:4,9,13 |
| 45:3 | 97:16 98:14 | 50:2 53:16 | 89:14 92:20 | 83:23 | 90:10 91:6 |
| technique | thing 27:2 | 59:1 61:16 | trains 93:1 | unarmed | 93:1 |
| 92:17 93:2 | 43:5 | 63:14 77:13 | transcript | 90:10 | usually 53:2 |
| 93:5,8,15 | things 13:14 | 77:15 83:22 | 97:12,15 | unauthoriz... | 69:8 87:1 |
| technology | 21:21 23:23 | 84:24 86:21 | 98:11 | 62:14 | |
| 24:1 | 24:3 29:7 | 88:20 91:21 | tremendous | unclear 90:12 | **V** |
| teeth 57:5 | 42:11 65:4 | 97:14 98:17 | 94:11 | uncooperat... | vague 90:13 |
| telephone | 65:11 69:5 | times 28:6 | trespass | 89:19 | values 74:20 |
| 56:13 63:3 | 91:18 | 65:20 77:23 | 72:12 | understand | Van 12:14 |
| tell 12:16 | think 6:18 | 78:6,13 | trial 35:12,13 | 5:13 8:20 | vehicle 47:4 |

## Page 15

GARRY MCCARTHY
January 20, 2016
Page 15

| | | | | |
|---|---|---|---|---|
| 62:9 | 19:18 28:16 | 40:23 44:14 | **Y** | 2 23:17 | 3:14 |
| venture 66:8 | 32:14 51:24 | 49:18 53:12 | Y 25:14 | 20:16 | |
| venue 77:4 | 53:21 65:3 | 64:24 67:1 | yeah 5:18 | 2006 10:17 | **6** |
| verbal 13:12 | 68:1 72:8 | 72:19 74:3 | 32:16 34:16 | 2011 8:5 | 6 48:5 |
| 14:13 34:24 | 73:15,22 | 76:23 77:22 | 44:15 79:12 | 10:20 12:6 | 6-96 4:4 |
| 36:7 82:14 | 74:16 83:19 | 79:11 81:2 | 85:16 90:2 | 27:18 29:12 | 60602 2:13 |
| verbally | 86:24 87:5 | 85:15 86:16 | 93:19 94:22 | 38:17 47:13 | 3:6 |
| 89:19 91:1 | 87:6 90:19 | 90:1,17 | year 39:18 | 47:18 64:12 | 60606 3:14 |
| versus 5:4 | 91:18 | 91:3,16 | 47:12 54:8 | 66:13 67:6 | 60643 2:5 |
| vetting 11:11 | 91:13,16 | 92:7 94:1,9 | 61:20 | 2012 19:3 | 6th 47:9 |
| vicinity 66:9 | 78:15 81:11 | 95:4,16 | years 8:3 | 47:24 50:14 | 88:12 90:21 |
| videotape | We'll 75:18 | 96:11 98:7 | 9:21,24 | 67:10,14 | |
| 5:3 | we've 24:2 | 98:7 99:1 | 12:19 30:6 | 71:11 | **7** |
| violated 23:4 | 84:16 | witnessed | 83:15,19 | 2013 60:17 | 70 th 3:13 |
| 54:13 55:3 | weapon 57:2 | 46:24 | York 10:18 | 2014 6:19 | 744-4833 3:7 |
| violating | wearing 65:5 | witnesses | 25:11 34:4 | 60:16 | 744-0747 |
| 54:24 | Website 11:6 | 38:10 | 34:15 35:22 | 2015 6:18,20 | 2:14 |
| violation | weekend | woman 36:22 | 36:1,4,13 | 8:5 27:10 | 75 66:3 |
| 53:20 65:18 | 61:15 | 90:21 | 36:24 37:7 | 2016 1:16 | 773 2:6 |
| violations | weekly 68:17 | WOOD 3:11 | 37:22 38:8 | 90:7 | |
| 65:23 | 68:22 69:20 | work 10:12 | 52:4 74:10 | 233 3:13 | **8** |
| vision 16:17 | 70:1 | 30:9 33:23 | | 233-7900 2:6 | 81 10:16 |
| 71:21,23 | Welch 23:13 | 37:14 40:4 | **Z** | 25 66:4 | 853-0648 |
| 73:9 | 23:20 | 41:10 42:10 | Z 82:11 | | 12:24 |
| vs 1:5 97:5 | went 10:18 | 58:1 87:7 | | **3** | |
| | 41:24 69:4 | worked 10:15 | **0** | 3:00 1:17 | **9** |
| **W** | Western 1:15 | 13:8 19:19 | 06 10:20 | 47:5 | 900 2:13 3:6 |
| Wacker 3:13 | 2:5 | 34:4,15 | 084-003813 | 30 2:12 3:5 | |
| wait 21:20 | WHEREOF | 56:5 70:24 | 99:10 | 12:19 16:11 | |
| waiting 41:15 | 99:1 | working 59:8 | | 29:24 66:9 | |
| want 24:13 | Williams | 77:5 | **1** | 76:1,4,10 | |
| 30:13 58:24 | 55:15 | works 28:16 | 1-97 97:13 | 30-day 28:20 | |
| 74:24 75:5 | witness 4:1 | wouldn't | 10150 1:15 | 29:1 | |
| 95:19 | 5:1,9,12,18 | 42:5 51:20 | 2:5 | 312 2:14 3:7 | |
| wanted 21:21 | 6:3 8:21 | 63:8 70:3 | 11th 62:10 | 3:14 12:24 | |
| 22:11 39:23 | 14:3 15:15 | 95:19 96:16 | 131 1:5 97:5 | 3rd 51:7,9,14 | |
| 59:1 | 16:17 20:18 | writing 56:18 | 143 3:20 54:9 | 59:2,23 | |
| warranted | 18:5 19:1 | written 41:17 | 54:10,13,24 | | |
| 29:17 | 19:10,12 | 48:7 53:22 | 55:4 65:18 | **4** | |
| wasn't 60:21 | 24:21 27:21 | | 65:23 87:3 | 40 12:18 66:9 | |
| watching | 32:21 33:12 | **X** | 15 88:6 | 40-hour | |
| 26:19 | 33:19 34:11 | X 4:1,7 6:6 | 15-day 87:23 | 92:21 | |
| way 13:11 | 34:21 37:9 | 25:14 26:22 | 1937 1:5 97:5 | | |
| | 37:19 38:4 | | | **5** | |
| | | | | 566-0040 | |

Plaintiff's Exhibit 5 Page 29

Transcript of the Testimony of
**DONALD O'NEILL**

**Date:** October 20, 2015

**Case:** RITA KING VS. COMMANDER EVANS, ET AL.

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

---

DONALD O'NEILL
October 20, 2015

Page 2

1  A P P E A R A N C E S :
2
3      THE LAW OFFICES OF:
       THOMAS G. MORRISSEY
4      BY:  MR. THOMAS G. MORRISSEY
            10150 South Western Avenue
5           Chicago, Illinois  60643
            (773) 233-7900
6           tgmorrisseylaw@gmail.com
7           Appeared on behalf of the
            Plaintiff;
8
9      THE LAW OFFICES OF:
       CITY OF CHICAGO
10     FEDERAL CIVIL RIGHTS
       LITIGATION DIVISION
11
       BY:  MS. TIFFANY Y. HARRIS
12          30 North LaSalle Street
            Suite 900
13          Chicago, Illinois 60602
            (312) 744-7684
14          tiffany.harris@cityofchicago.org
15          Appeared on behalf of the
            individual defendants:
16          Glenn Evans, D.T. Clifford,
            R.A. Sutton, K.L. Rodgers,
17          Wilfredo Lapitan, and
            Lloyd Gray.
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RITA KING,                    )
                              )
          Plaintiff,          )
                              )
          vs.                 )  No. 13 C 1937
                              )
GLENN EVANS, et al.,          )
                              )
          Defendants.         )

     This is the deposition of DONALD O'NEILL,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, taken before
PEGGY A. ANDERSON, a Certified Shorthand Reporter
of the State of Illinois, at 30 North LaSalle Street,
Suite 900, Chicago, Illinois, on October 20, 2015,
at 1:20 p.m.

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 3

1  A P P E A R A N C E S :
2      THE LAW OFFICES OF:
       CITY OF CHICAGO
3      FEDERAL CIVIL RIGHTS
       LITIGATION DIVISION
4
       BY:  MS. CARLA MADELEINE KUPE-ARION
5           30 North LaSalle Street
            Suite 900
6           Chicago, Illinois 60602
            (312) 744-5106
7           carla.kupearion@cityofchicago.org
8           Appeared on behalf of the
            Defendant, City of
9           Chicago;
10     THE LAW OFFICES OF:
       CITY OF CHICAGO
11     FEDERAL CIVIL RIGHTS LITIGATION
12     BY:  MS. MEERA WERTH
            30 North LaSalle Street
13          Suite 900
            Chicago, Illinois 60602
14          (312) 744-6905
15          Appeared on behalf of
            Bruce Dean;
16
       THE LAW OFFICES OF:
17     RAVITZ & PALLES, P.C.
18     BY:  MR. ERIC S. PALLES
            MR. GARY RAVITZ
19          203 North LaSalle Street
            Chicago, Illinois 60601
20          (312) 558-1689
            gravitz@ravitzpalles.com
21
22          Appeared on behalf of the
            Defendant, Glenn Evans, in
23          his criminal case,
            People of the State of
24          Illinois vs. Glenn Evans,
            Case No. 14 CR 16367.

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 6 Page 1

DONALD O'NEILL
October 20, 2015

Page 4

```
 1              I N D E X                    PAGE
 2    WITNESS                               PAGE
 3    DONALD O'NEILL
      DIRECT EXAMINATION BY
 4    MR. MORRISSEY:                        5-57
 5    CROSS-EXAMINATION BY
      MS. KUPE-ARION:                       58-59
 6
      REDIRECT EXAMINATION BY
 7    MR. MORRISSEY:                        59-61
 8
 9              E X H I B I T S
10    MARKED                                PAGE
11    PLAINTIFF'S EXHIBIT NO. 1                5
12
13
14
15
16
17                   ******
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 6

```
 1    A   Number 2 and I believe that's all.
 2    Q   Will you state your full name for the
 3    record?
 4    A   Donald, D-o-n-a-l-d, "J" as in James,
 5    O'Neill, O- apostrophe N-e-i-l-l.
 6    Q   Mr. O'Neill, are you employed?
 7    A   Yes, I am.
 8    Q   Where are you employed?
 9    A   City of Chicago, Chicago Police
10    Department.
11    Q   When did you join the Chicago Police
12    Department?
13    A   November 29th, 1982.
14    Q   Did you go to high school?
15    A   Yes, I did.
16    Q   Where did you go?
17    A   In Chicago.
18    Q   Where in Chicago?
19    A   Lane Tech.
20    Q   Did you go to college?
21    A   Yes, I did.
22    Q   Where did you go to college?
23    A   DePaul University.
24    Q   Did you receive a degree?
```

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 5

```
 1            (WHEREUPON, Plaintiff's
 2             Exhibit No. 1 was marked
 3             For identification.)
 4            (WHEREUPON, the witness
 5             was first duly sworn.)
 6        MR. MORRISSEY:  This is the discovery
 7    deposition of Commander O'Neill taken
 8        pursuant to notice and continued to today's
 9        date.
10    WHEREUPON:
11            DONALD O'NEILL,
12    called as a witness herein, having been first
13    duly sworn, was examined and testified as
14    follows:
15       D I R E C T   E X A M I N A T I O N
16        BY MR. MORRISSEY:
17    Q   I'm showing you what has been marked
18    as Plaintiff's Exhibit Number 1.  It's a notice
19    of a Rule 30(b)(6) Deposition.  I would ask you
20    to tell me under what subject matter you are
21    being produced today.
22    A   So it would probably be about
23    1(d) and (e).
24    Q   Anything else?
```

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 7

```
 1    A   Yes, I did.
 2    Q   And what was your major in college?
 3    A   Commerce.
 4    Q   In what year did you receive your
 5    degree?
 6    A   1981, '80.
 7    Q   Do you have any advanced education
 8    beyond an undergraduate degree in commerce?
 9    A   Yes, I do.
10    Q   What advanced education do you have?
11    A   I have a juris doctorate.
12    Q   From what school?
13    A   John Marshall.
14    Q   In what year?
15    A   1984.
16    Q   Are you licensed as a lawyer?
17    A   Yes, I am.
18    Q   In what year did you become licensed?
19    A   1984.
20    Q   Have you practiced as a lawyer?
21    A   Yes, I have.
22    Q   In what area of the law have you
23    practiced?
24    A   Transactions, depositions, labor law
```

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 6 Page 2

DONALD O'NEILL
October 20, 2015

Page 8

1 and HR.

2     Q    Have you held a legal position with

3 the Chicago Police Department or the City of

4 Chicago?

5     A    I'm not sure I understand the -- Am I --

6 I've worked for Chicago. I'm an attorney and

7 there's an overlap between my jobs, but I'm not

8 hired as an attorney.

9     Q    Now, briefly, from 1982 to the

10 present, what positions have you held with the

11 Chicago Police Department?

12     A    1982, I was a probationary police

13 officer. I spent time in the academy and you

14 are assigned to a training district. I was

15 assigned to the 16th District.

16     In November of '83, I was assigned to

17 the 11th District for one month, and then in

18 January of 1984, I was assigned to the 17th

19 District, Albany Park, where I remained for

20 about ten years.

21     Q    What were your assignments in the

22 17th District?

23     A    I worked patrol. I worked tact. I

24 worked the desk. I worked the lockup.

---

DONALD O'NEILL
October 20, 2015

Page 9

1     Q    During that ten-year period you were

2 at the 17th District, were you a patrol

3 officer?

4     A    Yes, I was.

5     Q    And did you get promoted at some

6 point after that?

7     A    I got appointed to the position of

8 youth officer in '92 and assigned to Area 5,

9 which is central and Grand, Grand and Central,

10 as a youth officer.

11     Q    Now, when you said you were

12 appointed, is that a -- Did you take an exam to

13 become --

14     A    I took an exam, yes.

15     Q    Based upon your score on the exam,

16 did you then get appointed as a youth officer?

17     A    Yes, I did.

18     Q    How long were you a youth officer?

19     A    About two years.

20     Q    Did you get promoted after that?

21     A    Yes, I did.

22     Q    And what promotion did you receive?

23     A    I was promoted to the rank of

24 sergeant in '94, August of '94.

---

DONALD O'NEILL
October 20, 2015

Page 10

1     Q    Now, was that a merit promotion or

2 was that based upon taking an exam?

3     A    Based on taking an exam.

4     Q    To your understanding, are there two

5 manners in which a person can be given the rank

6 of a sergeant in the Chicago Police Department?

7     A    In '94, no, there wasn't. Currently,

8 there is.

9     Q    How long -- What did you -- What

10 types of functions did you serve as a sergeant

11 for the Chicago Police Department?

12     A    As a sergeant, I was assigned to the

13 15th District, far west side close to Oak Park,

14 and then I was moved to Area 4 Youth Division

15 as a sergeant. So in '15, I supervised patrol

16 activities and Area 4 youth. I supervised

17 youth officers.

18     Q    For how long did you remain a

19 sergeant?

20     A    Until '97, December of '97.

21     Q    And did you receive a promotion then?

22     A    Yes, I did.

23     Q    And to a lieutenant?

24     A    To a lieutenant, yes.

---

DONALD O'NEILL
October 20, 2015

Page 11

1     Q    Was that by merit or by taking an

2 exam?

3     A    An exam.

4     Q    What did you do as a lieutenant? For

5 how long were you a lieutenant with the Chicago

6 Police Department?

7     A    About nine years.

8     Q    Where were you assigned as a

9 lieutenant for the Chicago Police Department?

10     A    As a lieutenant, I was initially

11 assigned to the 1st District, Central Business

12 District downtown. I worked midnights there

13 for two and a half, three years supervising a

14 watch.

15     Q    Any other assignments as a

16 lieutenant?

17     A    As the lieutenant, I was -- I became

18 an inspector in the Auditing Internal Control

19 Division of the police department.

20     Q    In what year did you join IAD?

21     A    In about 2001, 2000.

22     Q    How long did you remain as an

23 inspector with the rank of lieutenant in IAD?

24     A    About four or five years.

Plaintiff's Exhibit 6 Page 3

DONALD O'NEILL
October 20, 2015

Page 12

1  Q   What were your duties as a member of
2  IAD?
3  A   My preliminary function was to
4  perform first amendment audits as required by a
5  federal consent decree.
6  Q   Did you have any other functions in
7  IAD other than the first amendment audit?
8  A   Auditing and internal control.
9  Q   Pardon?
10 A   Auditing and internal control, IAD.
11 Yes, I participated in timekeeping audits,
12 different recordkeeping audits, also worked as
13 a field inspector and worked from time to time
14 as a watch commander in District Law
15 Enforcement.  For a short period of time, I was
16 assigned as an inspector in the medical
17 section.
18 Q   Did you receive a subsequent
19 promotion after being a lieutenant?
20 A   Yes, I did.
21 Q   And what year was that?
22 A   '96 -- I'm sorry.  2006.  I'm sorry.
23 Q   And what rank did you --
24 A   Captain, SES captain.

DONALD O'NEILL
October 20, 2015

Page 14

1  A   No, I don't know of one.
2  Q   In particular, before you became a
3  captain, did the Chicago Police Department
4  review any prior citizens' complaints that have
5  been registered against you for police
6  misconduct?
7      MS. KUPE-ARION:  Objection,
8      competence; but if you know, you may
9      answer.
10 BY THE WITNESS:
11 A   I don't really know what they did at
12 that time.
13 BY MR. MORRISSEY:
14 Q   After being promoted -- and who was
15 the superintendent at that time?
16 A   It would be Phil Cline,
17 Superintendent Kline.
18 Q   When you were a candidate to become --
19 when you applied to become a captain, was there
20 an interview process with the superintendent?
21 A   No, there was not.
22 Q   Was there an interview process with
23 any members of the Chicago Police Department?
24 A   No.

DONALD O'NEILL
October 20, 2015

Page 13

1  Q   What is an SES captain?
2  A   It's a senior executive service, not
3  a career service title.
4  Q   Is there a career service title for
5  captain?
6  A   No, there is not.
7  Q   When you were given the rank of
8  captain, did you do that by merit or was it an
9  exam that you took?
10 A   It's a selection process.  There is
11 no exam.
12 Q   How did that selection process work
13 in 2006 to become a captain?
14 A   You put in a resume.  You listed your
15 credentials.  You provided information that was
16 submitted to the superintendent.
17 Q   You were in IAD when you put in your
18 qualifications to be promoted to captain?
19 A   I was in Auditing and Internal
20 Control.
21 Q   Do you know in 2006 prior to being --
22 or after you were selected by the
23 superintendent to become a captain, was there a
24 background check done?

DONALD O'NEILL
October 20, 2015

Page 15

1  Q   Do you know how the selection was
2  made?
3  A   I don't really recall.
4  Q   After you became a captain, what were
5  your duties and where were you assigned?
6  A   As a captain, I was assigned to the
7  9th District, Deering District, which at the
8  time was on 35th Street, just west of Sox Park,
9  Cellular Field.  I worked the first watch.
10 Q   How long did you remain as a captain
11 in the 9th District?
12 A   Until 2008.
13 Q   What position did you take in 2008?
14 A   I was transferred to the 14th
15 District.
16 Q   Where is the 14th District at?
17 A   Milwaukee and California.
18 Q   And that was as a captain?
19 A   Yes.
20 Q   And what were your duties as a
21 captain in the 14th District?
22 A   I was a watch commander on the first
23 watch.
24 Q   How long did you remain in the 14th

Plaintiff's Exhibit 6 Page 4

DONALD O'NEILL
October 20, 2015

Page 16

1   District as a commander?

2       A   Very short period of time, a week.

3       Q   What was your next position?

4       A   And then I got promoted to the

5   position of commander of Management and Labor

6   Affairs Section.

7       Q   Did you -- What was the process to be

8   promoted to the level of commander in 2008?

9       A   It was at the discretion of the

10  superintendent.

11      Q   Who was the superintendent at that

12  time?

13      A   Jody Weis, W-e-i-s.

14      Q   Did you apply for the position?

15      A   No, I did not.

16      Q   Do you know if there was a background

17  check on you prior to receiving that position?

18      A   I do not know.

19      Q   Do you know if your CR files were

20  reviewed by the CPD prior to --

21      A   I do not know.

22      Q   Did you interview with the

23  superintendent of police?

24      A   No, I did not.

---

DONALD O'NEILL
October 20, 2015

Page 17

1       Q   Did you interview with any other

2   members of the supervisory staff in the CPD

3   before being elevated to a commander?

4       A   I had an interview with General

5   Counsel Deb Kirby.

6       Q   Deb?

7       A   Debra Kirby, K-i-r-b-y.

8       Q   Is she still with the CPD?

9       A   No, she is not.

10      Q   Did you have to submit any material

11  to the General Counsel, CPD or the

12  superintendent prior to your promotion?

13      A   I don't recall.

14      Q   You mentioned that you were moved to

15  the Department of Management and Labor Affairs?

16      A   Yes.

17      Q   Is that under Human Relations?

18      A   No, it's under General Counsel.

19      Q   What were your -- You were in the

20  General Counsel Office then?

21      A   I was in the Office of the

22  Superintendent.  In the Office of the

23  Superintendent, there are different sections.

24  I was under the General Counsel section.

---

DONALD O'NEILL
October 20, 2015

Page 18

1       Q   And did you report to the General

2   Counsel?

3       A   Yes, I did.

4       Q   What were your duties -- How many

5   individuals were in the Management and Labor

6   Affairs section?

7       A   It fluctuated.  Three sergeants, two

8   civilians and a lieutenant is about what the

9   average was.

10      Q   What were your responsibilities as

11  commander in the Management and Labor Affairs

12  section in 2008?

13      A   I was responsible for all grievances

14  filed by each of the unions handling contract

15  negotiations, interpreting the collective

16  bargaining agreements, training supervisors on

17  proper implementation of the collective

18  bargaining agreements and advising department

19  members on the collective bargaining

20  agreements.

21      Q   How long did you stay in that

22  position?

23      A   Until October of 2014.

24      Q   Between 2008 and 2014, did your

---

DONALD O'NEILL
October 20, 2015

Page 19

1   responsibilities in Management and Labor change

2   at all?

3       A   No.

4       Q   In October of 2014, did you take a

5   different position?

6       A   October 15th, 2014, I retired from

7   the police department and was given an exempt

8   job as a civilian with the department as

9   Director of Human Resources.

10      Q   Was that a newly established

11  department when you were given that?

12      A   No, it was not.

13      Q   Do you still have the rank of

14  commander?

15      A   No, I am a director.

16      Q   How many directors are there in human

17  resources?

18      A   There is one director in human

19  resources.

20      Q   Does the director -- Do you as the

21  director of human resources report directly to

22  the superintendent?

23      A   No, I do not.

24      Q   Who do you report to?

Plaintiff's Exhibit 6 Page 5

Page 20

1     A     Deputy Director Marvin Shear,
2  S-h-e-a-r.
3     Q     S-h-e-a-r.  And his title --
4     A     Deputy chief.  I'm sorry.
5     Q     Deputy chief.  To your knowledge, how
6  many deputy chiefs are there with the Chicago
7  Police Department?
8     A     At least 12.
9     Q     How large is the Human Resource
10 Department in the CPD?
11    A     Well, it's got several sections.  It
12 has the medical section, the random drug
13 testing unit, the administrative section, the
14 employment section and the awards and
15 recognition section.
16    Q     Briefly, what does the medical
17 section of Human Resources do?
18    A     They handle everybody who takes time
19 off on the medical whether it's injury on duty
20 or ordinary illness and monitors people and
21 provides referrals to people that are on
22 workers' comp. cases or injured-in-line-of-duty
23 cases.
24    Q     The random drug -- These are all

Page 22

1  their employment actions.
2     Q     And the award unit?
3     A     They process awards that are
4  recommended from the annual recognition
5  ceremony and the monthly department awards.
6     Q     Do any of these units of Human
7  Resources focus on or have any role when a
8  police officer or a member of the CPD is
9  promoted to a higher rank?
10    A     Yes.  The employment section makes
11 sure that they're eligible to be promoted.
12    Q     You've gone -- When you were a sworn
13 member, you've gone from being a probationary
14 officer all the way up to one of the highest
15 ranks in the police department, commander,
16 correct?
17    A     Yes.
18    Q     And you testified that you had little
19 knowledge, if any, about what steps were taken
20 internally within the police department during
21 each one of your promotions, correct?
22    A     Correct.
23    Q     Now, are you aware of any changes in
24 the Chicago Police Department in regards to

Page 21

1  units within Human --
2     A     Yes.
3     Q     -- Resources?  Random Drug Testing
4  Unit, what do they do?
5     A     There's two components to that.  One
6  is the random drug testing, which we maintain a
7  pool of people, and they are randomly selected
8  for drug and alcohol testing.  And there's also
9  the "for cause" part of the random drug unit if
10 somebody -- if we get a complaint about
11 somebody under the influence of alcohol or
12 drugs, they would do the testing and they also
13 test all incoming employees.
14    Q     For the Chicago Police Department?
15    A     For the police department, yes.
16    Q     The administration -- The
17 administrative section, what function --
18    A     That handles communications and
19 reports going out and takes care of the stars
20 and shields and ID cards.
21    Q     The employment section or unit?
22    A     The employment unit does the
23 background checks on applicants to the police
24 department, sworn and civilian, and processes

Page 23

1  when a person is promoted internally to a
2  higher rank?
3     A     I don't know if there were changes.
4  I just became aware of what we do now in HR.
5  So I don't know if it's a new process or had
6  been the process since day one.
7     Q     Currently, when a person is promoted,
8  let's say, from a patrol officer to a sergeant,
9  can that be based upon taking an examination?
10    A     Yes.
11    Q     And can it also be based upon a merit
12 appointment?
13    A     Yes, it can.
14    Q     What is the difference?
15    A     For an examination based off of a
16 list or an examination, a test is developed by
17 the Department of Human Resources, City Hall
18 Department of Human Resources.  The test is
19 validated by an outside vendor.  The test is
20 administered by DHR and an outside vendor.
21    Q     DHR is what?
22    A     That's the Department of Human
23 Resources of City Hall.
24    Q     Okay.

Plaintiff's Exhibit 6 Page 6

DONALD O'NEILL
October 20, 2015

Page 24

1    A    And a list is made up -- A rank order
2  list is made up of people that have
3  successfully completed the exam, and that
4  creates the rank order list where people are
5  promoted off that list in rank order.  If they
6  are not promoted off that list in a rank order,
7  then they follow a merit process.  The current
8  merit process involves --
9    Q    Well, let's deal with that exam
10  process first.
11    A    Okay.
12    Q    Is that true of people that -- is
13  there an exam process to become a lieutenant?
14    A    Yes, there is.
15    Q    Is there an exam process to be a
16  captain?
17    A    No, there is not.
18    Q    An exam process to become a
19  commander?
20    A    No, there is not.
21    Q    So it's just the sergeant and
22  lieutenant level where there is an exam
23  process?
24    A    For promotions, correct.

DONALD O'NEILL
October 20, 2015

Page 26

1  open CRs, correct?
2    A    Correct.
3    Q    Is there -- What do you mean by "open
4  CRs"?
5    A    Is there an investigation currently
6  taking place.
7    Q    And that's internal to the police
8  department or with --
9    A    Internal to the police department,
10  yes.
11    Q    Pardon?
12    A    Internal to the police department.
13    Q    What, if any, type of investigation
14  is done in regards to citizens' complaints
15  about excessive force that are open at the time
16  a person selected for either a sergeant or
17  lieutenant position as an exam candidate?
18    A    That would be noted that there is an
19  open investigation.
20    Q    How does Human Resources check to
21  determine whether there are open CR files?
22    A    We make an inquiry into Bureau of
23  Internal Affairs.
24    Q    What type of inquiry is made?  How is

DONALD O'NEILL
October 20, 2015

Page 25

1    Q    Is there an exam process to become a
2  detective?
3    A    It's a matter of semantics.
4  Detective and other police officer ranks,
5  they're a police officer and a detective.  So
6  their career service rank is police officer.
7  There is an exam for the appointment to the
8  position of detective.
9    Q    Currently, for promotion to a
10  sergeant and a lieutenant based upon an exam,
11  after a person is put on the list and there is
12  a decision made by the city to hire "X" number
13  of new sergeants or lieutenants, is there any
14  type of background check done by Human
15  Resources?
16    A    Yes, there is.
17    Q    Describe that background check.
18    A    We check their disciplinary history,
19  discipline if there are any open complaint
20  register investigations ongoing.  We also check
21  their medical status to see if they are
22  full-duty status.
23    Q    You mentioned that for lieutenant and
24  sergeant currently, you check the status of

DONALD O'NEILL
October 20, 2015

Page 27

1  it done in practice?
2    A    An e-mail is sent out looking for
3  their medical history and their open CR
4  investigations.
5    Q    And, to your knowledge, open CRs
6  would be with IPRA?
7    A    No, they would be with Bureau of
8  Internal Affairs.
9    Q    So CR files are merely investigations
10  done by Internal Affairs, to your knowledge?
11    A    No.  They both do complaint register
12  investigations, Bureau of Internal Affairs and
13  IPRA.
14    Q    Is there any check made by Human
15  Resources in regards to open CRs with IPRA?
16    A    We check with IAD, Bureau of Internal
17  Affairs, because they have the records for
18  IPRA.  It's all on one computer database that
19  the Bureau of Internal Affairs has access to.
20    Q    To your knowledge, what type of CR
21  files -- CR complaints are lodged with Internal
22  Affairs?
23    A    All complaint register investigations
24  are filed or initiated with IPRA.  Anytime you

Plaintiff's Exhibit 6 Page 7

Page 28

1  obtain a complaint log or a complaint register
2  investigation, you notify IPRA and they
3  initiate it.
4      Q    You mentioned that IAD also has CR --
5  open CRs?
6      A    Yes.
7      Q    So what type of CRs does IAD handle?
8      A    Well, they come into IPRA, and IPRA
9  then divides them up between what's IPRA's
10 investigation and what's BIA's investigations.
11     Q    IPRA makes the determination what
12 files that they are going to handle?
13     A    Yes.
14     Q    And then they refer certain files to
15 IAD?
16     A    Correct.
17     Q    So what type of CRs are handled by
18 IAD?
19     A    Mostly administrative internal
20 complaints of an officer:  Didn't show up to
21 work, showed up late for work, was
22 insubordinate, possibly was arrested and --
23 yeah, I mean, it's narrowly divided where IPRA
24 gets most of the physical abuse, domestic

Page 29

1  violence.
2      Q    So if a spouse of a policeman alleges
3  that -- physical abuse, does that go to IPRA?
4      A    Yes.  Normally, it would go to IPRA.
5      Q    If a citizen complains about being
6  shot by a police officer, does that go to IPRA?
7      A    Yes.
8      Q    If a citizen complains about a police
9  officer or a member of the Chicago Police
10 Department using excessive force against him or
11 her, that goes solely to IPRA?
12     A    Yes.
13     Q    In reviewing the candidacy for a
14 person to be promoted to sergeant or
15 lieutenant, other than contacting by e-mail IAD
16 about open CRs, what, if anything, does Human
17 Resources do to check further about citizen
18 complaints that have been registered against
19 the prospective candidate to be promoted?
20     A    Like historic?
21     Q    (Indicating.)
22     A    We will get their five-year complaint
23 history.
24     Q    Who provides you with their five-year

Page 30

1  complaint history?
2      A    IAD records, BIA records, Bureau of
3  Internal Affairs records section.
4      Q    For a person that is on the list
5  based upon a test for sergeant or lieutenant,
6  are they promoted despite the number of open
7  CRs?
8          MS. KUPE-ARION:  Objection to the
9      form.
10         MR. MORRISSEY:  Strike that.
11 BY MR. MORRISSEY:
12     Q    Is there any number -- Is there a
13 certain criteria when a person is promoted off
14 an exam as far as how many he or she could --
15 open CRs they could have against them?
16     A    No, there is not.
17     Q    Can a person be denied after taking a
18 test, a lieutenant or sergeant's position,
19 based upon having a certain number of open CRs?
20     A    No, just -- not just on the number.
21     Q    Is there any basis for a person
22 that's on -- is qualified for either a sergeant
23 or lieutenant's position based upon an exam to
24 be not denied a promotion based upon having CRs

Page 31

1  historically lodged against them?
2      A    Yes, there is.
3      Q    What is the criteria?
4      A    If they are currently relieved of
5  police powers.
6      Q    How does a sworn officer get relieved
7  of his or her police powers?
8      A    The superintendent decides that in
9  the best interest of the police department that
10 this officer be relieved of police powers.
11     Q    Does that have to go before any type
12 of board before --
13     A    No, it doesn't.
14     Q    If a person is relieved of police
15 powers, does that person still maintain his or
16 her salary?
17     A    Yes.
18     Q    So the person is not terminated by
19 the superintendent?
20     A    Correct.
21     Q    Termination has to be determined by
22 the police board?
23     A    Correct.
24     Q    In your experience, has anybody been

Plaintiff's Exhibit 6 Page 8

DONALD O'NEILL
October 20, 2015

Page 32

1  denied a promotion to -- Based upon a test
2  result to a sergeant or lieutenant's position
3  because he or she has been relieved of his or
4  her police powers by the superintendent?
5      A   Yes, they have.
6      Q   On how many occasions?
7      A   I could think of a couple of
8  occasions.  One was an officer that was before
9  the police board, having a case before the
10 police board, having been relieved of police
11 powers by the superintendent.
12     Q   And that's in the last year?
13     A   No, that was about four years ago.
14     Q   Any others?
15     A   In the last year, we had one sergeant
16 move into the rank of lieutenant that was not
17 able to be promoted because he was not full
18 duty.
19     Q   Now, you mentioned that to be
20 promoted from a sergeant -- being promoted to
21 either a sergeant or lieutenant that there's
22 another avenue to receive a promotion other
23 than the testing process, correct?
24     A   Correct.

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 34

1      A   Up to 30 percent.
2      Q   Who determines whether a person is a
3  merit appointment?
4      A   The ultimate decisionmaker is the
5  superintendent.
6      Q   Currently, how many police officers
7  are on the eligible list to become sergeants?
8      A   I don't have a number, sir.
9      Q   More than 500?
10     A   Probably more than a thousand.
11     Q   In the last year, how many police
12 officers have been promoted to sergeant?
13     A   In the last year, 31 police officers
14 were promoted to sergeant.
15     Q   And 30 percent of those were merit?
16     A   No.  All 31 of those were off the
17 rank list.
18     Q   How does a police officer receive a
19 merit -- what selection process is followed by
20 Human Resources to determine a person is a
21 merit appointment for either the sergeant or
22 lieutenant?
23         MS. WERTH:  Objection, compound
24     question.

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 33

1      Q   Describe that process and what it's
2  called?
3      A   It's either a merit promotion or a
4  discretionary promotion, discretionary
5  appointments.  So I believe it's merit
6  promotion to the rank of sergeant or
7  lieutenant, and each exam process has its own
8  merit process that's approved by the vendor
9  developing the test.  So it needs to be
10 validated by the vendor.
11     Q   So a person that is a merit
12 appointment, it doesn't matter how he or she
13 scores on the exam?
14     A   They have to be on the eligibility
15 list, but what their rank number is on the
16 eligibility list doesn't matter.
17     Q   How many -- On an annual basis, how
18 many police officers are promoted based upon
19 merit to the sergeant level?
20     A   Up to 30 percent of promotions to
21 sergeant can be merit.
22     Q   What percentage of individuals
23 promoted from sergeant to lieutenant can be
24 merit?

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 35

1  BY THE WITNESS:
2      A   The current selection process to the
3  rank of sergeant involved exempt members of the
4  police department being able to nominate
5  people, and some commanders got one person they
6  could nominate.  Some commanders got two people
7  they could nominate.
8          It was like a total pool of 71 merit
9  nominations.  Anybody that is nominating a PO
10 for the rank of sergeant has to attend training
11 on the nomination process.  I conduct the
12 training on what's appropriate to put in the
13 nomination, what's appropriate to consider for
14 a nomination and what's inappropriate.
15         They fill out a nomination packet,
16 merit nomination packet, and submit that to
17 DHR -- I'm sorry -- HR, Chicago Police HR, my
18 office; and we review each of those packets for
19 completeness and verify eligibility of the
20 candidates.
21 BY MR. MORRISSEY:
22     Q   Is it different for the -- Is there a
23 different process for merit selection to
24 lieutenant?

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 6 Page 9

DONALD O'NEILL
October 20, 2015

Page 36

1   A   We do not have the merit process for
2   lieutenant developed yet for the current exam.
3   It probably would be substantially the same as
4   this, though.
5       Q   Under the old exams, was there a
6   merit process to become a lieutenant?
7   A   Yes, there was.
8       Q   And what type of process was followed
9   under the old exam to become a merit-appointed
10  lieutenant?
11  A   There was a merit board, and there
12  were nominations to it but I never participated
13  in those processes.  I wasn't director of HR at
14  the time.
15      Q   After a person currently is nominated
16  to become a sergeant, is there a background
17  check of that person by HR?
18  A   There is a check of their medical and
19  disciplinary histories.
20      Q   By disciplinary history, you mean
21  CRs?
22  A   Yes.
23      Q   Is it the same process as if a person
24  was a test-eligible promotion to sergeant?

DONALD O'NEILL
October 20, 2015

Page 38

1   selection to a sergeant based upon the number
2   of open CR files?
3   A   Correct.
4       Q   Can there?  Can a person be denied?
5   A   For a merit promotion?
6       Q   Yes.
7   A   Yes, they can be denied.
8       Q   And who would make that decision?
9   A   The superintendent.  I would make a
10  recommendation.
11      Q   Can a merit appointee to the sergeant
12  level be denied the elevation to sergeant based
13  upon a historical number of CRs that were
14  lodged against him or her?
15  A   Yes.
16      Q   And is there a quantity that would
17  disqualify a candidate?
18  A   No.
19      Q   Is that a subjective determination
20  made by the superintendent?
21      MS. KUPE-ARION:  Objection to the
22  form of the question, but you can answer.
23  BY THE WITNESS:
24  A   Yes.

DONALD O'NEILL
October 20, 2015

Page 37

1   A   Correct.
2       Q   Is there any quantity of open CRs
3   that would preclude a person from being a merit
4   appointment to the sergeant level?
5   A   No.  To the merit-promotion process,
6   there is a fixed number of open CRs that would
7   make you ineligible.
8       Q   So that unlike the test candidates to
9   be promoted to sergeant, there is a fixed
10  number of open CR investigations that a merit
11  appointee to the sergeant level can have?
12      MS. KUPE-ARION:  Objection, I believe
13  that mischaracterizes his prior testimony.
14      MR. MORRISSEY:  Well, I'm confused.
15  BY THE WITNESS:
16  A   Okay, we get their disciplinary
17  history.
18  BY MR. MORRISSEY:
19      Q   Right.
20  A   But there is no fixed number of open
21  CR numbers that they could have.
22      Q   For either, the merit or the --
23  A   For either, correct.
24      Q   Can a person be denied a merit

DONALD O'NEILL
October 20, 2015

Page 39

1   BY MR. MORRISSEY:
2       Q   Now, your HR office also has a
3   function when a person is elevated to
4   commander?
5       MS. KUPE-ARION:  Is that a question?
6       MR. MORRISSEY:  Yes.
7   BY THE WITNESS:
8   A   Yes, we have a function.
9   BY MR. MORRISSEY:
10      Q   In 2012, to your knowledge, did Human
11  Resources have a function when a person was
12  promoted to commander?
13  A   Yes.
14      Q   What is the function that Human
15  Resources plays when a person is slated to be
16  promoted to commander?
17  A   We verify that they're eligible for
18  the rank of commander, that there's a budget
19  spot available and get the approval of the
20  Office of Budget Management and DHR, Department
21  of Human Resources, and notify the mayor's
22  office.
23      Q   Since 2012 to the present, who
24  actually appoints a person to the commander

Plaintiff's Exhibit 6 Page 10

Page 40

```
 1   level?
 2        A    The superintendent.
 3        Q    That would be McCarthy?
 4        A    Yes.
 5        Q    Is there a process or has there been
 6   a process since 2012 to contact IAD about prior
 7   CR files of a candidate for commander?
 8        A    I don't know.
 9        Q    To your knowledge, as a director of
10   Human Resources, prior to Superintendent
11   McCarthy appointing a person to commander, is
12   there a review of open CR files?
13        A    I don't know.
14        Q    Is the process the same for
15   appointment to captain and commander in regards
16   to reviewing open CR files?
17        A    I don't know if they have -- review
18   open CR numbers on captains.
19        Q    Does Human Resources do anything
20   differently in regards to a person that's been
21   appointed to the captain's level by the
22   superintendent or the commander?  Is the
23   process the same?
24        A    No, the process is different.
```

Page 42

```
 1   board historically in the past has had some
 2   role with the selection of lieutenants and
 3   sergeants, correct?
 4        A    Yes.
 5        Q    And you've testified that there is
 6   the merit promotion to lieutenant and sergeant
 7   and there's the people that come off the test
 8   list.
 9             In regards to the test list, did the
10   merit board interview those candidates in the
11   past?
12        A    No, they did not.
13        Q    Do you have any knowledge in regards
14   to whether Glenn Evans was a merit or a test --
15   was promoted to sergeant based upon a test
16   result or a merit?
17        A    No, I don't have knowledge.
18        Q    To your knowledge, would there be a
19   file or any information within the police
20   department which would -- you could determine
21   whether or not Evans was promoted based upon a
22   test or a merit promotion?
23        A    I believe it should be in -- HR would
24   have the --
```

Page 41

```
 1        Q    How does your office function
 2   different when a person is slated by the
 3   superintendent to become a captain?
 4        A    The last round of captains, there
 5   were interviews of all the applicants done by a
 6   merit board.
 7        Q    Who appoints the members of the merit
 8   board?
 9        A    The superintendent.
10        Q    Is there currently a merit board?
11        A    No, there is not.
12        Q    When was the merit board disbanded?
13        A    It gets disbanded after each
14   promotion round.
15        Q    And in the past, the merit board only
16   interviewed candidates to become captain?
17        A    They have also interviewed
18   lieutenants and sergeants and reviewed resumes
19   or different steps in the screening process.
20        Q    Did the merit board review the
21   lieutenant and sergeant candidates that came
22   off of the test result?
23        A    I'm sorry.  Could you repeat?
24        Q    Yeah.  You mentioned that the merit
```

Page 43

```
 1        Q    HR is your office?
 2        A    Yes, my office.  I just don't know
 3   what Glenn Evans' status is as far as that
 4   goes.
 5        Q    And that would be true of his
 6   promotion to lieutenant, correct?
 7        A    Correct.
 8        Q    And then for Glenn Evans, all
 9   captains and commanders are merit appointments?
10        A    Correct.
11             MR. MORRISSEY:  To the extent we
12        don't have that document -- I don't know if
13        we were given the complete employment
14        folder for Glenn Evans -- I'm going to make
15        a demand for that document.
16             MS. KUPE-ARION:  You can put it in
17        writing.
18             MR. MORRISSEY:  Well, it's probably
19        already in writing in the production
20        request.
21   BY MR. MORRISSEY:
22        Q    Does Human Resources have any
23   function in monitoring members of the CPD
24   accused of allegations of excessive force?
```

Plaintiff's Exhibit 6 Page 11

DONALD O'NEILL
October 20, 2015

Page 44

1    A    Yes, we could.

2    Q    Under what circumstances does Human

3  Resources monitor members of the department

4  accused of excessive force?

5    A    There are two programs in place.  One

6  is Behavioral Intervention System and the other

7  is Personnel Concerns.

8    Q    The first program you mentioned was

9  Behavioral Intervention.  Is that a function --

10  Are there programs within HR that deal with

11  behavioral interventions?

12    A    That is the name of the program,

13  Behavioral Intervention.

14    Q    How do members of the CPD become

15  involved in the Behavioral Intervention Program

16  run by HR?

17    A    An exempt member of the police

18  department, usually the member's commander,

19  write a report to the director of HR requesting

20  a specific member be evaluated for enrollment

21  in Behavioral Intervention.

22    Q    So is that usually the -- If a patrol

23  officer or -- Strike that.  If somebody within

24  a district is referred to the Behavioral

---

DONALD O'NEILL
October 20, 2015

Page 45

1  Intervention, is that usually done by the

2  commander of that district?

3    A    Yes, it is.

4    Q    Under what circumstances can a

5  commander in a district request or prepare a

6  report to you as the HR director under this

7  Behavioral Intervention Program?

8    A    It's fairly wide.  He could notice

9  that a person is -- his behavior has changed

10  and there is a need for intervention to change

11  the behavior back to a good employee.

12         So a person has been late for work

13  repeatedly.  A person has been missing work.  A

14  person has not been responding to assignments,

15  has become a difficult employee.  There's a

16  whole gamut of reasons they could recommend

17  that a person be enrolled in Behavioral

18  Intervention.

19    Q    And if somebody -- do you as the HR

20  director have to accept that person into your

21  Behavioral Intervention Program?

22    A    No, I don't have to accept them.  I

23  review the recommendation and make a

24  determination if behavioral intervention is

---

DONALD O'NEILL
October 20, 2015

Page 46

1  warranted.

2    Q    If a person is selected for

3  Behavioral Intervention, is that mandatory --

4    A    Yes.

5    Q    -- participation?

6    A    Yes.

7    Q    And what types of programs does your

8  office have for people selected for the

9  Behavioral Intervention Programs?

10    A    Well, first thing we generally do is

11  if it's a change in behavior, we make sure it's

12  not due to some physical or psychological

13  reason.  So we'll send them for a mandatory

14  physical, mandatory psychological evaluation.

15  We put them on the medical role until we get

16  the results of that.

17         If they come back from that, they're

18  physically good, they have just gone down a

19  different path, then we'll send them back to

20  the district and develop a plan of action and

21  how we are going to monitor this employee more

22  closely to help them get back on the track of

23  being a good employee.

24    Q    Does Human Resources monitor the

---

DONALD O'NEILL
October 20, 2015

Page 47

1  progress of a person sent back to the district?

2    A    Yes, we do.

3    Q    How do you monitor?

4    A    We get periodic reports from the

5  district.

6    Q    If the behavioral problems are not

7  corrected, what, if anything, can you do as the

8  Human Resource director?

9    A    We can extend the plan for a longer

10  period of time or we could move them up into a

11  Personnel Concerns Program.

12    Q    Personnel Concerns is the second

13  phase of your office, correct?  I shouldn't --

14  I'll strike that.  It's the other program in

15  your office?

16    A    It's another program, yes.

17    Q    How does Personnel -- How do you

18  become a candidate to fall under the Personnel

19  Concerns if you're a member of the Chicago

20  Police Department?

21    A    Again, you get nominated by our --

22  recommended for enrollment by your commander of

23  exempt rank.

24    Q    Any other way that you can be brought

Plaintiff's Exhibit 6 Page 12

DONALD O'NEILL
October 20, 2015

Page 48

1   in as a police officer or a sergeant or a
2   lieutenant under the Personnel Concern Program
3   of HR?
4        A    HR could move them up from -- if
5   Behavioral Intervention hasn't been successful
6   to Personnel Concerns.
7        Q    Any others other than being selected
8   by your commanding officer?
9        A    Not that I'm aware.
10       Q    Does HR monitor open CRs --
11       A    No.
12       Q    -- involving Let me finish the
13  question here now.
14       A    Okay.
15       Q    Does HR monitor open CRs involving
16  allegations of excessive force by a member of
17  the CPD?
18       A    That's the end of the question?
19       Q    Yes.
20       A    No, we do not.
21       Q    Other than the -- a person's
22  commanding officer, does any other unit of the
23  Chicago Police Department monitor open CR files
24  involving claims of excessive force?

---

DONALD O'NEILL
October 20, 2015

Page 49

1        MS. KUPE-ARION:  Objection to the
2        form of the question.
3   BY MR. MORRISSEY:
4        Q    Do you understand the question?
5        A    No.
6        Q    You mentioned that a person's
7   commanding officer can send a report to HR if
8   an officer has a certain number of open CRs
9   involving excessive force?
10       MS. KUPE-ARION:  Objection,
11       mischaracterizes his prior testimony.
12  BY THE WITNESS:
13       A    It's not based on the number of CR
14  numbers.  It's the nature of the CR number.
15  It's change of behavior.  So they could do it
16  based on a number of CR numbers, I imagine, but
17  that's not in the order.
18  BY MR. MORRISSEY:
19       Q    What criteria does a commanding
20  officer use when referring a police member, a
21  sworn officer or sergeant or lieutenant, to
22  this Personnel Concerns program of HR based
23  upon CRs?
24       A    They could include in their report

---

DONALD O'NEILL
October 20, 2015

Page 50

1   has had a sustained CR number, has several open
2   CR numbers and whatever other factors they
3   think that there needs to be a behavioral
4   intervention.
5        Q    Other than the commanding officer
6   filing a report to HR about a sworn member's CR
7   history or open CRs, is there any other unit of
8   the police department that also can send a
9   report to HR about open or historical CRs?
10       A    Other units could send it to the
11  district commander or the commander of that
12  officer.  But, no, they couldn't send it
13  directly to me to enroll somebody.
14       Q    So everything is funneled by the
15  officer or sergeant or lieutenant's commanding
16  officer to HR?
17       A    Correct.
18       Q    Describe Personnel Concerns, what
19  your office does when an officer receives a
20  report from his or her commanding officer
21  requesting that the person be enrolled in
22  Personnel Concerns?
23       A    Again, this gets -- The officer will
24  be called in and given a written order to be

---

DONALD O'NEILL
October 20, 2015

Page 51

1   placed on the medical to go for a physical and
2   psychological exam, and then there will be a
3   plan put in place to monitor that officer and
4   improve behavior.
5        Q    Does the sworn member of the police
6   department assigned to or enrolled in the
7   Personnel Concerns Program, does he or she
8   remain on active duty?
9        A    Sometimes they do.  I would say most
10  of the time they do, yes.  They could be
11  relieved of police powers depending on what the
12  nature of the investigations are, but HR does
13  not normally relieve someone of police powers
14  based on a recommendation for Personnel
15  Concerns.
16       Q    If a commander -- Is there any person
17  within the Chicago Police Department that can
18  refer a commanding officer to HR's Personnel
19  Concerns Program?
20       A    Yes, their supervisors could.
21       Q    To your knowledge, has any commanding
22  officer ever been referred to HR's Personnel
23  Concerns Program?
24       A    Not to my knowledge.

Plaintiff's Exhibit 6 Page 13

**DONALD O'NEILL**
October 20, 2015

Page 52

1   Q   How many members of the police
2   department currently are in this Personnel
3   Concerns Program?
4       **A   I don't have the number.**
5   Q   More than ten?
6       **A   I would say -- I just don't have a**
7   **firm number, probably less than ten.  Probably**
8   **maybe five.  I'm guessing there, but.**
9   Q   Once a sworn member of the police
10  department is enrolled in the Personnel
11  Concerns Program, is there a duration of time
12  that they remain in the program?
13      **A   Normally, it's a year, then we do an**
14  **evaluation of them; but there's monthly**
15  **evaluation reports that are provided as well.**
16  Q   Does the -- As a former member of
17  IAD, are you aware that IAD receives quarterly
18  reports in regards to open CRs against police
19  officers?
20      MS. KUPE-ARION:  I don't think he --
21  BY THE WITNESS:
22      **A   I was never assigned to IAD.**
23  BY MR. MORRISSEY:
24  Q   Internal Affairs Division?

**DONALD O'NEILL**
October 20, 2015

Page 53

1       **A   No, I was never assigned to Internal**
2   **Affairs Division.**
3   Q   Do you have any knowledge that the
4   Internal Affairs division receives quarterly
5   reports involving the number of open CRs?
6       MS. KUPE-ARION:  Objection,
7       competence and he is not here to speak on
8       behalf of IAD; but if you know, you may
9       answer.
10  BY THE WITNESS:
11      **A   I don't know how they do it.**
12  BY MR. MORRISSEY:
13  Q   But HR doesn't receive the quarterly
14  reports?
15      **A   No, I do not receive quarterly**
16  **reports on open CR numbers.**
17      MR. MORRISSEY:  Can we go off the
18      record?
19                  (WHEREUPON, a discussion
20                  off the record was held.)
21  BY MR. MORRISSEY:
22  Q   For a person that is assigned to the
23  Personnel Concern Program, is there any
24  specific training programs that he or she must

**DONALD O'NEILL**
October 20, 2015

Page 54

1   attend?
2       **A   No.**
3   Q   To your knowledge, has anybody ever
4   failed to complete successfully the Personnel
5   Concern Program?
6       **A   I believe there have been people that**
7   **failed, but I can't give you a number on that.**
8   Q   During your tenure as director, has
9   any member of the police department failed to
10  complete the Personnel Concerns Program?
11      **A   No.**
12  Q   The administrative review of a person
13  that's placed on -- in the Personnel Concern
14  Program, is that done by his or her commanding
15  officer?
16      **A   They provide a report to the director**
17  **of HR, and we do the evaluation.**
18  Q   If a person is placed in the
19  Personnel Concerns Program, Personnel Concern
20  Program, how frequently does his or her
21  commanding officer have to prepare a report?
22      **A   I believe it's monthly.**
23  Q   Now, you mentioned that the people
24  who are in the Personnel Concern Program, there

**DONALD O'NEILL**
October 20, 2015

Page 55

1   is a medical component and psychological
2   component, right?
3       **A   Yes.**
4   Q   And then they are sent back to their
5   district to be monitored by the commander,
6   correct?
7       **A   Generally, yes.**
8   Q   Any other training or administrative
9   review that's done for that person?
10      **A   No.**
11  Q   Does the superintendent of police
12  receive reports in regards to officers that are
13  assigned to the Personnel Concerns Program?
14      MS. KUPE-ARION:  Objection to the
15      form of the question.
16  BY THE WITNESS:
17      **A   I don't believe so.**
18  BY MR. MORRISSEY:
19  Q   Does the -- Does your office, the
20  Human Resource -- HR, does your office, HR,
21  maintain a list of CPD sworn members who have
22  been assigned to this Personnel Concern
23  Program?
24      **A   Yes, we maintain a list.**

DONALD O'NEILL
October 20, 2015

Page 56

1     Q   For how many years does HR maintain a
2 list of the officers?
3     **A   I don't know the retention schedule.**
4     Q   To your knowledge, was Glenn Evans
5 ever assigned to this Personnel Concerns
6 Program?
7     **A   To my knowledge, no, he was not.**
8     Q   Identify any and all monitoring by
9 the City of Glenn Evans concerning allegations
10 of excessive force from January of 2005 to the
11 present?
12     **A   I am not aware of what steps were**
13 **taken.**
14     Q   Are there any other issues that are
15 raised in this 30(b)(6) Deposition that you
16 have been designated to testify for?
17     **A   Nothing I would be competent to**
18 **testify about.**
19     Q   So looking at 1(d): Describe the
20 City's procedures for monitoring members of the
21 CPD accused of allegations of excessive force.
22 After a CPD officer receives a certain quantity
23 or quality of excessive force allegations, does
24 this trigger any further training or

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 57

1 administrative review of the officer by the
2 City? If so, describe this procedure or
3 practices.
4     Is there anything -- Other than what
5 you've testified already today in regards to
6 1(d), is there anything you would like to add?
7     **A   No, I think we've covered it all.**
8     Q   Same in regards to 1(e): Identify
9 the numbers of officers receiving additional
10 training or administrative review as a result
11 of this policy or procedure.
12     You mentioned that, currently, there
13 is some number under five that are in the
14 Personnel Concerns Program, correct?
15     **A   Correct.**
16     Q   Anything else you can add in response
17 to that 30(b)(6)?
18     **A   And there's some people under**
19 **Behavioral Intervention. How many there are in**
20 **Behavioral Intervention, I'm not -- don't know**
21 **the number either.**
22     MR. MORRISSEY: I have nothing
23     further. Thanks.
24

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 58

1   C R O S S - E X A M I N A T I O N
2     BY MS. KUPE-ARION:
3     Q   One question. Director O'Neill, part
4 of -- You mentioned that -- Do you remember the
5 line of questioning that Counsel asked you
6 about what usually are the components of the
7 process if somebody is being referred to the
8 Behavioral Intervention or the Personnel
9 Concern process; do you remember that line of
10 questioning?
11     **A   Yes.**
12     Q   And Counsel asked you -- and I
13 believe you said part of it is that the person
14 has to go through a medical and psychological
15 exam, correct?
16     **A   Yes.**
17     Q   During that phase, are there
18 sometimes what is called action plans that a
19 referred CPD member has to follow?
20     **A   Yes, we develop an action plan for**
21 **the person to follow.**
22     Q   Could part of the action plan be a
23 retraining of some sort if that was the issue
24 for that particular officer?

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 59

1     **A   Yes.**
2     **MS. KUPE-ARION: Okay. No further**
3 **questions.**
4     MR. PALLES: No questions.
5     MS. HARRIS: No questions.
6   R E D I R E C T   E X A M I N A T I O N
7     BY MR. MORRISSEY:
8     Q   To your knowledge, since you have
9 been the director of HR, has there been -- has
10 any individual sworn member of the police
11 department had an action plan?
12     **A   Yes.**
13     Q   And approximately how -- What
14 percentage of the sworn officers enrolled in
15 either the Behavioral Program or the Personnel
16 Concerns Program are given an action plan?
17     **A   Almost all of them are given some**
18 **type of an action plan.**
19     Q   In regards to the individuals that
20 are earmarked for the Personnel Concerns
21 Program, how many of them are sent for further
22 training in regards to the use of excessive
23 force?
24     **A   I don't know.**

TOOMEY REPORTING
312-853-0648

DONALD O'NEILL
October 20, 2015

Page 60

1    Q    In your -- In the history when you've
2  been there since 2014 to the present, have any
3  members of the Personnel Concerns Program been
4  sent for additional training in regards to use
5  of excessive force?
6    A    I don't know.
7    Q    Are the action plans part of a
8  department member's personnel file?
9    A    They are part of their Personnel
10 Concerns file, which is maintained in personnel
11 for HR.
12   Q    Okay.  So if you have the complete
13 personnel file for a sworn officer, if he or
14 she has an action plan, it would be in there?
15   A    No, it probably would not be.  That's
16 in a different section.  The personnel files
17 are maintained in a different than -- The
18 Behavioral Intervention, Personnel Concerns
19 files and the complaint registered files, they
20 are all in different locations.
21   Q    All right.  So if I wanted to get the
22 Personnel Concern file for Glenn Evans, what
23 would I request?  How would I request it?
24   A    You would request any enrollment in

TOOMEY REPORTING
312-853-0648

DONALD O'NEILL
October 20, 2015

Page 62

1  either waive signature or you can reserve
2  it and if they order the transcript, Madam
3  Court Reporter will type it up.  You will
4  be called back here to review the
5  transcript, and then you will be able to
6  affix your signature to it.
7         Do you want to waive or reserve
8  your signature?
9         THE WITNESS:  No, I will reserve my
10 signature.
11        MS. KUPE-ARION:  Okay, we will
12 reserve it.
13
14        FURTHER DEPONENT SAITH NOT....
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

DONALD O'NEILL
October 20, 2015

Page 61

1  the Personnel Concerns Program or Behavioral
2  Intervention for whatever period of time or
3  whatever retention record is on that.  That's
4  what we would provide.
5    Q    Those files are kept by your office?
6    A    Yes.
7    Q    Any other office within the CPD?
8    A    No, they are only maintained in that
9  office.
10   Q    In regards to Officer Sutton, do you
11 know if Officer Sutton has any -- has been
12 enrolled in the Personnel Concerns Program?
13   A    I have never even heard the name
14 Officer Sutton.  I'm sorry.
15   Q    Or Officer Clifford, Dennis Clifford?
16   A    Don't know.
17   Q    Is your office, HR, responsible for
18 disciplining police officers?
19   A    No, we do not discipline police
20 officers.
21        MR. MORRISSEY:  I have nothing
22 further.  Thanks a lot.
23        MS. KUPE-ARION:  Director O'Neill,
24 you have one of two options:  You can

TOOMEY REPORTING
312-853-0648

DONALD O'NEILL
October 20, 2015

Page 63

1       IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  RITA KING,                )
4                            )
         Plaintiff,          )
5                            )
         vs.                 )  No. 13 C 1937
6                            )
   GLENN EVANS, et al.,      )
7                            )
         Defendants.         )
8
9       I, DONALD O'NEILL, being first duly
10 sworn, on oath, say that I am the deponent in
11 the aforesaid deposition, that I have read the
12 foregoing transcript of my deposition,
13 consisting of pages 1-64 inclusive, taken at
14 the aforesaid time and place and that the
15 foregoing is a true and correct transcript of
16 my testimony so given.
17
         _____
18                 DONALD O'NEILL
19 SUBSCRIBED AND SWORN TO
20 me before this _____ day
21 of _____, A.D. 2015.
22        _____
23 Notary Public
24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 6 Page 16

DONALD O'NEILL
October 20, 2015

Page 64

1  STATE OF ILLINOIS )
              ) ss:
2  COUNTY OF C O O K )

3        I, Peggy A. Anderson, a Certified
4  Shorthand Reporter in the State of Illinois do
5  hereby certify:

6        That previous to the commencement of
7  the examination of the witness, the witness was
8  duly sworn to testify the whole truth
9  concerning the matters herein;

10        That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction, and constitutes a true
14  record of the testimony given and the
15  proceedings had;

16        That the said deposition was taken
17  before me at the time and place specified;

18        That the said deposition was
19  adjourned as stated herein;

20        That I am not a relative or employee
21  or attorney or counsel, nor a relative or
22  employee of such attorney or counsel for any of
23  the parties hereto, nor interested directly or
24  indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

---

DONALD O'NEILL
October 20, 2015

Page 65

1        IN WITNESS WHEREOF, I do hereunto set
2  my hand at Chicago, Illinois, this _____ day
3  of _____, 2015.

4

5

6

7 _____

8      Peggy A. Anderson
9      Certified Shorthand Reporter
10     License No. 084-003813

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

Plaintiff's Exhibit 6 Page 17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Chicago Police officer SHANNON SPALDING;  )
Chicago Police Officer DANIEL ECHEVERRIA,  )
                                           )
    Plaintiffs,                            )
                                           )    Case No. 12-cv-8777
        v.                                 )
                                           )    Judge Gary Feinerman
CITY OF CHICAGO, *et al.*,                 )
                                           )
    Defendants.                            )

### *MONELL* CLAIM STIPULATION
### IN REGARD TO "CODE OF SILENCE"

Defendant, City of Chicago (the "City"), by and through its attorneys, stipulates to the

following with respect to Plaintiffs' *Monell* claim against Defendant City:

1.      There is and has been a code of silence within the Chicago Police Department

pursuant to which individual police officers, as the Mayor stated in his December 9, 2015

comments to the City Council, have had a "tendency to ignore, deny or in some cases cover up

the bad actions of a colleague or colleagues."

2.      This code of silence is directly contrary to the official written rules, policies, and

training of the Chicago Police Department.

3.      This code of silence is not a pervasive, widespread, and well-settled custom or

practice to which the City's chief policy-makers have been deliberately indifferent.

### CITY OF CHICAGO

By: **s/ Alan S. King**
Alan S. King, Esq. (ARDC #06198223)
Noreen H. Cull, Esq. (ARDC # 06229417)

85732075.3



# POLICE
## ACCOUNTABILITY
### TASK FORCE

# Recommendations for Reform:
Restoring Trust between the Chicago Police
and the Communities they Serve

REPORT

April 2016



Plaintiff's Exhibit 8

# Table of Contents

Acknowledgements ............................................................................................................... iv

Glossary of Terms ................................................................................................................. v

**Executive Summary** ............................................................................................................. 1

The Tipping Point ................................................................................................................ 2

The Work of the Police Accountability Task Force ............................................................ 4

Community Engagement ..................................................................................................... 5

How did we get to this point? Some Overarching Findings.............................................. 6

Other Key Findings By Working Group ............................................................................. 13

Recommendations............................................................................................................. 17

How We Propose to Empower People. .............................................................................. 17

How We Propose to Address the Inadequate Emphasis on Accountability....................... 18

How We Propose to Address Other Systemic and Longstanding Problems....................... 19

Next Steps.......................................................................................................................... 19

Is Real Reform Possible? ................................................................................................... 20

**Context**................................................................................................................................ **22**

U.S. Department of Justice Investigation ........................................................................ 22

Prior Task Forces.............................................................................................................. 23

National & Local Conversation on Policing...................................................................... 25

Broader Challenges Facing Chicago ................................................................................ 26

Basic Facts About CPD's Structure.................................................................................. 27

**Community-Police Relations** ........................................................................................... **32**

How have CPD's actions created mistrust in communities of color?............................... 32

Is CPD doing enough to combat racial bias?................................................................... 43

How should CPD involve the community in its policing efforts? ..................................... 51

Are CPD officers adequately equipped to interact with youth?...................................... 54

Is CPD doing enough to protect human and civil rights? ............................................... 56

**Legal Oversight & Accountability** .................................................................................. **63**

How does the existing police oversight system work? ................................................... 64

Why does the community not have a role in the police oversight system?...................... 68

What are the barriers to identifying police misconduct? The Code of Silence and beyond. ..................... 69

Why are investigations ineffective and biased? ........................................................................................ 77

Why is it so hard to impose discipline on an officer? ................................................................................ 84

Why aren't the police held accountable through the courts and other systems? ..................................... 89

**Early Intervention & Personnel Concerns** ................................................................................................ **96**

Why does CPD lack a culture of accountability when it comes to the internal management of its police officers? ...................................................................................................................................................... 96

What are the current internal mechanisms for holding CPD's officers accountable for their conduct? .. 99

Why are these current CPD accountability systems ineffective? ............................................................. 101

What is the right tool for CPD to use to hold police officers and their supervisors accountable on a range of issues, including use of force and respectful interactions with citizens? .................................. 105

**De-Escalation** ......................................................................................................................................... **115**

Why are so few 911 calls to OEMC identified as mental health-related? .................................................. 117

What is CPD's current approach to mental health crisis response? Don't they have a Crisis Intervention Team Program? Why isn't it working? ...................................................................................................... 120

Why aren't all identified mental health crisis calls getting a CIT response? .............................................. 121

Why are so many people with mental illnesses having repeat contacts with CPD and ending up in the criminal justice system? ............................................................................................................................ 123

Why are we only treating people after they are in crisis? ......................................................................... 126

How are police escalating trauma, including at crime scenes? ................................................................. 127

**Video Release Policy** ............................................................................................................................. **131**

Why does the City not immediately release all video, audio and police reports on every police shooting or death in custody? ................................................................................................................................ 131

**Overarching Issues** ................................................................................................................................ **137**

Does CPD's training need significant overhaul? ....................................................................................... 137

Are there enough Sergeants to effectively supervise the large number of patrol officers? .................... 140

Why aren't all CPD officers already wearing body cameras? ................................................................... 141

**Disclaimer** .............................................................................................................................................. **143**

Plaintiff's Exhibit 8

**Appendix 1** ....................................................................................................................**144**

    Police Accountability Task Force Members ............................................................... 144

**Appendix 2** ....................................................................................................................**145**

    Police Accountability Task Force Working Group Members ....................................... 145

**Appendix 3** ....................................................................................................................**148**

    Police Accountability Task Force Interviews ............................................................. 148

**Appendix 4** ....................................................................................................................**153**

    Community Relations Working Group Checklist ........................................................ 153

**Appendix 5** ....................................................................................................................**155**

    Oversight Working Group Flowchart ........................................................................ 155

**Appendix 6** ....................................................................................................................**158**

    Oversight Working Group Checklists ........................................................................ 158

    Collective Bargaining Agreement Checklist .............................................................. 159

    Civilian Police Investigative Agency Checklist .......................................................... 161

    IRPA Recommendation Checklist ............................................................................. 164

    Independent Inspector General for Public Safety Checklist........................................ 165

    Community Safety Oversight Board Checklist ........................................................... 169

    Selection Methodology for Community Safety Oversight Board.................................. 170

    Selection for Community Safety Oversight Board Checklist ....................................... 171

**Appendix 7** ....................................................................................................................**173**

    Early Intervention & Personnel Concerns Working Group Checklist .......................... 173

**Appendix 8** ....................................................................................................................**175**

    Early Intervention System – Identifying Triggers ...................................................... 175

**Appendix 9** ....................................................................................................................**179**

    De-Escalation Working Group Checklist ................................................................... 179

**Appendix 10** ..................................................................................................................**180**

    Proposed Video Release Policy ................................................................................ 180

**Appendix 11** ..................................................................................................................**183**

    Overarching Recommendations Checklist ................................................................ 183

Plaintiff's Exhibit 8

# Acknowledgements

**This report reflects the contributions of hundreds of people. The Task Force is grateful for everyone's support in this collaborative effort. While we have tried to capture everyone here and in the appendices to this report, we have inevitably missed some, and apologize for any omissions.**

## WORKING GROUPS

Forty-six men and women from diverse backgrounds volunteered their time and expertise to serve on our Working Groups. They conducted research, interviewed experts and developed and drafted recommendations. Working Group members are listed in Appendix 2.

## INTERVIEWS

The Task Force and Working Groups interviewed more than 100 national and local experts, as well as citizens of Chicago young and old. The interviewees provided invaluable insight to the Task Force's work. Their names and affiliations are found in Appendix 3.

## EMPLOYERS

The Task Force members would like to thank their employers and staff who gave them the time and support necessary to do this work. At Mayer Brown LLP, Paul Theiss, Chairman, and Rebecca Eisner, Partner in Charge of Mayer Brown's Chicago office, allocated a significant amount of staffing resources and in-kind contributions; Abigail M. Bartine, Matthew Sostrin and Gail Tang spent countless hours researching, drafting and formatting the report. At Hinshaw & Culbertson LLP, Kevin Burke, Chairman, and Robert Shannon, Managing Partner, assigned three attorneys and a paralegal to participate in working groups. At DePaul University, Nichole Pinkard, Associate Professor in the College of Computing and Digital Media, supported Sybil Madison-Boyd's participation as a Task Force member. The leadership of NAMI Chicago, John F. Kennedy, NAMI Chicago Outside General Counsel and Vice President Board of Directors, Eddy Eisenberg, Board President, and Jennifer Koehler, Board of Directors, supported Alexa James in her role as Task Force member and provided in-kind contributions.

## STAFFING SUPPORT

The Task Force's work was also made possible by the generosity and contributions of time and talent of individuals as well as non-profit organizations and private funders. The Civic Consulting Alliance, led by Brian Fabes, CEO, provided the following team to assist the working groups: Antonio Benecchi, David Byrd, Danielle Harbison, Lisa Reijula, Yen-Li Thompson and Asheley Van Ness. Communications and public engagement support was provided by Grisko LLC, Adorn Mitchell, Wynona Redmond, Jeff Riley, Delores Robinson and Jennifer Solomon. The University of Chicago Crime Lab provided interns who conducted countless hours of research. Lisa Schneider Fabes served as the project manager.

## FORUM HOSTS

More than 750 people attended one of the Task Force's four community forums, sharing their experiences and ideas. The forums were hosted by Reverend Jonny L. Miller with Mt. Vernon Baptist Church, Rose Joshua with the South Side NAACP, Maria Socorro Pesqueira with Mujeres Latinas en Acción and Principal Juan Carlos Ocón of Benito Juarez Community Academy, and Charles Hardwick with the Howard Area Community Center and Principal Chad Adams of Sullivan High School. The forums were moderated by Darryl Denard and Matt McGill with iHeart media and Sol Flores, Executive Director of La Case Norte.

Plaintiff's Exhibit 8

# Glossary of Terms

| | |
|---|---|
| **ACT** | Assertive Community Treatment |
| **BIA** | Bureau of Internal Affairs |
| **BIS** | Behavioral Intervention System |
| **CAPS** | Chicago's Alternative Police Strategy |
| **CBA** | Collective Bargaining Agreement |
| **CDPH** | Chicago Department of Public Health |
| **CEED** | Community Empowerment and Engagement Districts |
| **CIT** | Crisis Intervention Team |
| **CLEAR** | Citizen and Law Enforcement Analysis and Reporting |
| **CPD** | Chicago Police Department |
| **CPIA** | Civilian Police Investigative Agency |
| **CPS** | Chicago Public Schools |
| **CR** | Complaint Register |
| **CRU** | Crisis Response Unit |
| **CSMP** | Comprehensive Stress Management Program |
| **CSU** | Crisis Stabilization Unit |
| **EIS** | Early Intervention System |
| **FOP** | Fraternal Order of Police |
| **FTO** | Field Training Officer |
| **IAD** | Internal Affairs Division |
| **IPP** | Individualized Performance Plan |
| **IPRA** | Independent Police Review Authority |
| **MEU** | Mental Evaluation Unit |
| **MHCRU** | Mental Health Critical Response Unit |
| **OEMC** | Office of Emergency Management Communications |
| **PC** | Personnel Concerns |
| **PPO** | Probationary Police Officer |
| **SPAR** | Summary Punishment Action Request |
| **TRR** | Tactical Response Report |

Plaintiff's Exhibit 8

# Executive Summary

*"The police need to know who they work for – the community. The authority that they have belongs to the people."[1]*

**A painful but necessary reckoning is upon us. That is what these times demand.**

The Police Accountability Task Force arose amidst a significant and historic public outcry. The outcry brought people into the streets, on social media and on other venues to say in a very clear voice that they had reached a breaking point with the entire local law enforcement infrastructure. People were and are demanding accountability and real and lasting change. The outcry was not localized in any particular neighborhood or demographic, although communities of color and those ravaged by crime added some of the most poignant commentary.

The Task Force immediately understood that one of our most important responsibilities was to actively seek out, listen and respond to voices from all over Chicago who had much to say about their personal and often painful experiences with the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA") and other parts of the local policing infrastructure, as well as their frustrations and lack of confidence in political actors. What we have heard has been humbling. As we dug deeper into the complaints of so many about the callous and disrespectful way in which they had been treated by some officers, we also understood that we had an important duty to lay bare the systemic and sanctioned practices that led to the deaths of fellow citizens and the deprivation of the rights of so many others. We have borne witness to many hard truths which have profound and lasting impacts on the lives and hopes of individuals and communities. Our recommendations are intended to be responsive to the people, empower the people and to specifically identify a range of changes that are essential to building trust, accountability and lasting change.

As part of our work, the Task Force heard from many current and former CPD officers who are dedicated public servants, committed to performing their duties lawfully and making Chicago a safer place for all of its residents. Serving as a police officer is a challenging and often dangerous job. The police face an increasingly daunting challenge in crime fighting. Illegal guns flood the streets of the same neighborhoods that are devastated by crime, poverty and unemployment. We as a society cannot expect the police to cure every ill in Chicago's neighborhoods. Yet we put significant pressure on them to solve and prevent crime, as well as to address the manifestations of a number of other daunting social and economic challenges beyond their charge and capacity to manage, let alone solve. Still, a keen appreciation of and sensitivity to these broader issues is critical to effective law enforcement and positive community-police relations.

The findings and recommendations in this report are not meant to disregard or undervalue the efforts of the many dedicated CPD officers who show up to work every day to serve and protect the community. The challenge is creating a partnership between the police and the community that is premised upon respect and recognizes that our collective fates are very much intertwined. Simply put, a more professional, engaged and respectful police force benefits us all. We cannot and have not shied away

**Plaintiff's Exhibit 8**

from identifying systemic problems or challenges that undermine the efforts of those officers who are sincerely committed to doing their jobs the right way. To be sure, individual officers must own responsibility for not merely their actions each day, but also the reverberating and sometimes corrosive and lingering effect of those actions on citizens. And ultimately, the responsibility for setting the correct course lies with CPD leadership itself.

The City and in particular CPD would do well to embrace the necessary changes to address the systemic problems in CPD and not simply hope that this storm will pass. It will not and ignoring this opportunity will exacerbate an already volatile set of circumstances. CPD in particular must face the problems in order to fix them.

## The Tipping Point

On the night of October 20, 2014, the too short and very tragic life of Laquan McDonald ended when Chicago Police Officer Jason Van Dyke shot him. One of the last officers to arrive at the scene of a call about someone damaging cars, Van Dyke came out of his vehicle, gun raised and immediately fired off 16 shots. The first shot hit McDonald and he immediately fell to the ground. While he lay motionless, Van Dyke continued to unload his clip, firing 16 shots in all into McDonald's body. All of this was captured on police videotape.

Initial reports of the shooting were superficial and false. The false narrative about the shooting originated with comments from the scene by former Fraternal Order of Police spokesperson, Pat Camden. Camden claimed to reporters that:

> *"Officers got out of their car and began approaching McDonald, again telling him to drop the knife." "The boy lunged at police, and one of the officers opened fire."*[2]

> *"[O]fficers were forced to defend themselves."*[3]

> *"[McDonald] is a very serious threat to the officers, and he leaves them no choice at that point but to defend themselves."*[4]

The next day CPD put out a statement that said McDonald "refused to comply with orders to drop the knife and continued to approach the officers." Camden later acknowledged to the Washington Post that his information was *"hearsay, . . . basically." "I have no idea where it came from. It was being told to me after it was told to somebody else who was told by another person, and this was two hours after the incident."*[5]

Also, other on-scene officers repeated the same false narrative. These officers uniformly said that McDonald posed an imminent threat immediately before Van Dyke shot him:[6]

> ### From P.O. Jason Van Dyke:

> *"McDonald was holding the knife in his right hand, in an underhand grip, with the blade pointed forward. He was swinging the knife in an aggressive, exaggerated manner. Van Dyke ordered McDonald to 'Drop the knife!' multiple times. McDonald ignored Van Dyke's verbal direction to drop the knife and continued to advance toward Van Dyke. When McDonald got to within 10 to 15 feet of Officer Van Dyke, McDonald looked toward Van Dyke. McDonald raised the knife across his chest and over his shoulder, pointing the knife at Van Dyke. Van Dyke*

Plaintiff's Exhibit 8

*believed McDonald was attacking Van Dyke with the knife, and attempting to kill Van Dyke. In defense of his life, Van Dyke backpedaled and fired his handgun at McDonald, to stop the attack. McDonald fell to the ground but continued to move and continued to grasp the knife, refusing to let go of it. Van Dyke continued to fire his weapon at McDonald as McDonald was on the ground, as McDonald appeared to be attempting to get up, all the while continuing to point the knife at Van Dyke."*

### *From P.O. Joseph Walsh, Van Dyke's partner:*

*"Walsh ordered McDonald to 'Drop the knife!' multiple times as McDonald approached the officers…. McDonald ignored the verbal direction given by both Walsh and Officer Van Dyke, and continued to advance toward the officers. When McDonald got to within 12 to 15 feet of the officers he swung the knife toward the officers in an aggressive manner. Van Dyke opened fire with his handgun and McDonald fell to the ground. Van Dyke continued firing his weapon at McDonald as McDonald continued moving on the ground, attempting to get up, while still armed with the knife…. Officer Walsh said he believed McDonald was attacking Walsh and Officer Van Dyke with the knife and attempting to kill them when the shots were fired."*

### *From P.O. Dora Fontaine:*

*"Fontaine heard the officers repeatedly order McDonald to 'Drop the knife!' McDonald ignored the verbal direction and instead, raised his right arm toward Officer Van Dyke, as if attacking Van Dyke. At this time Van Dyke fired multiple shots from his handgun, until McDonald fell to the ground and stopped moving his right arm and hand, which still grasped the knife."*

### *From P.O. Ricardo Viramontes:*

*"Viramontes heard Officer Jason Van Dyke repeatedly order McDonald to 'Drop the knife!' McDonald ignored the verbal direction and turned toward Van Dyke and his partner, Officer Joseph Walsh. At this time Van Dyke fired multiple shots from his handgun. McDonald fell to the ground but continued to move, attempting to get back up, with the knife still in his hand."*

### *From P.O. Daphne Sebastian:*

*"Officers Joseph Walsh and Jason Van Dyke exited their vehicle and drew their handguns. McDonald turned toward the two officers and continued to wave the knife. Sebastian heard the officers repeatedly order McDonald to 'Drop the knife!' McDonald ignored the verbal directions and continued to advance on the officers, waving the knife. Officer Sebastian heard multiple gunshots and McDonald fell to the ground, where he continued to move. Sebastian did not know who fired the shots…."[7]*

IPRA referred the investigation of the shooting to the Cook County State's Attorney in November 2014. Thereafter, by early December 2014, the case had been referred to the U.S. Attorney's Office and the Federal Bureau of Investigation. The federal grand jury investigation remains pending.

Not until thirteen months later—after a pitched legal battle doggedly pursued by local investigative journalists resulted in the court-ordered release of the dash-cam video of the shooting—did the public learn the truth: McDonald made no movements toward any officers at the time Van Dyke fired the first shot, and

Plaintiff's Exhibit 8

McDonald certainly did not lunge or otherwise make any threatening movements. The truth is that at the time Van Dyke fired the first of 16 shots, Laquan McDonald posed no immediate threat to anyone.

The civic outrage that followed gave voice to long-simmering anger not just about McDonald, but the deaths of others at the hands of the police, including Rekia Boyd, Ronald Johnson and, more recently, Quintonio LeGrier, Betty Jones and Philip Coleman. The deaths of numerous men and women of color whose lives came to an end solely because of an encounter with CPD became an important rallying cry. That outrage exposed deep and longstanding fault lines between black and Latino communities on the one hand and the police on the other arising from police shootings to be sure, but also about daily, pervasive transgressions that prevent people of all ages, races, ethnicities and gender across Chicago from having basic freedom of movement in their own neighborhoods. Stopped without justification, verbally and physically abused, and in some instances arrested, and then detained without counsel—that is what we heard about over and over again. Many of those voices came from young people who are on the frontlines of daily encounters with the police whether on the streets or in schools. Far too many of our residents are at daily risk of being caught up in a cycle of policing that deprives them of their basic human rights.

McDonald's shooting became the tipping point for long-simmering community anger. The videotape was painful, horrific and illuminating in ways that irrefutably exemplified what those in communities of color have long said, and shocked and stirred the conscience of those in other neighborhoods. The videotape itself, the initial official reaction, which but for the efforts of the journalist community likely would have relegated McDonald's death to less than a footnote in the over 400 police-involved shootings of citizens since 2008, coupled with the 13-month delay in the release of the videotape—all underscored and exposed systemic institutional failures going back decades that can no longer be ignored. These failures manifest themselves in various ways:

- Death and Injury at the Hands of the Police
- Random But Pervasive Physical and Verbal Abuse By the Police
- Deprivation of Basic Human and Constitutional Rights
- Lack of Individual and Systemic Accountability

## The Work of the Police Accountability Task Force

This moment that we are in requires each of us to ask difficult but necessary questions. Questions that reject the status quo, the accepted way of doing business, and which look beyond an individual incident to the larger systemic policies, practices and procedures that spawn, support and protect the kind of corrosive behavior played out every day by the police on the streets.

The Task Force took on this challenge. We heard the chorus of voices from all over Chicago who demanded answers, accountability and change. In conducting our work, the Task Force has been guided by a mission adopted early on:

> **To lay the foundation for the rejuvenation of trust between the police and the communities they serve by facing hard truths and creating a roadmap for real and lasting transparency, respectful engagement, accountability and change.**

Plaintiff's Exhibit 8

The Task Force formed five Working Groups consisting of people from all over Chicago to address the following topics:

**Community Relations**, focusing on the need to bridge the gulf in relations between the police and the communities they serve, beginning with a review of the CPD's policies, procedures and practices with respect to addressing racism and racial bias, training, community policing, protecting human and civil rights and accountability and transparency.

**Legal Oversight & Accountability**, examining impediments to true accountability in the legal infrastructure, such as state statutes, collective bargaining agreements, general orders and other policies and procedures, and comparing Chicago's police oversight system with national best practices and models in other cities.

**Early Intervention & Personnel Concerns**, designing a personnel management system that identifies, rewards and models exemplary conduct while flagging problem behaviors and intervening at the earliest possible stage.

**De-Escalation**, addressing how police officers should de-escalate situations to minimize the use of force, including de-escalation and related issues where officers encounter citizens experiencing mental health crises.

**Video Release Policies**, developing a commonsense policy for the release of video, audio and other evidence related to serious police actions that balances the public's right to know with law enforcement's need to investigate these incidents without compromising critical evidence.

The Working Groups were made up of a broad and diverse range of 46 Chicagoans that included professionals and subject matter experts, such as those in police training, civil rights and mental health, as well as elected officials, faith leaders and community activists.[8] The collective and individual contributions have been significant and have enriched the work in innumerable ways. Through its Working Groups, the Task Force conducted more than 100 discussions with organizations and individuals with subject matter expertise, experience and relevant information and perspectives to share.[9] These conversations included current and former CPD officers and supervisors, police and other government officials in other cities, judges and civil rights lawyers, professors, researchers and community activists.[10]

The Task Force is deeply grateful to all those who participated in this process. The voices of those who joined us in interviews and discussions, sent comments, letters and position papers, and turned out at community forums provided the foundation for this work.

## Community Engagement

Based on the belief that real and lasting change is possible only when the people most affected by policing have a voice, community engagement was central to our work. In order to lay the foundation for building trust between the police and the communities they serve, the Task Force engaged in a robust community engagement process. That process included:

- Community members as active participants in our Working Groups.
- Individual and small group discussions with subject matter experts.

Plaintiff's Exhibit 8

- Four community forums for residents to speak directly with the Task Force.
- Reading comments submitted by mail, through the website, by social media and at the forums.

The forums took place on the West, South, and North Sides and in Pilsen and were attended by over 750 residents. In planning the forums, the Task Force reached out to 95 community groups, 63 elected officials and 83 religious institutions. We also hosted three youth forums with high school students from throughout the City and discussed their perspectives on interactions with the police, both in their schools and in their neighborhoods.

## How did we get to this point? Some Overarching Findings.

*"If you are not severely and wholeheartedly dealing with racism, you are not going to get to the bottom of this issue."*[11]

We arrived at this point in part because of racism.

We arrived at this point because of a mentality in CPD that the ends justify the means.

We arrived at this point because of a failure to make accountability a core value and imperative within CPD.

We arrived at this point because of a significant underinvestment in human capital.

### RACISM

The Task Force heard over and over again from a range of voices, particularly from African-Americans, that some CPD officers are racist, have no respect for the lives and experiences of people of color and approach every encounter with people of color as if the person, regardless of age, gender or circumstance, is a criminal. Some people do not feel safe in any encounter with the police. Some do not feel like they have the ability to walk in their neighborhoods or drive in their cars without being aggressively confronted by the police. The consistent theme of these deeply-held beliefs came from a significant cross-section of people: men and women, young, middle-aged and older, doctors, lawyers, teachers and other professionals, students, and everyday workers. Regardless of the demographic, people of color loudly expressed their outrage about how they are treated by the police.

These encounters leave an indelible mark. Long after the officer moves on to chase the next call or make the next stop, the citizen involved remains affected and if the encounter involved physical or verbal aggression, even if there was no arrest, there is a lasting, negative effect.

The linkage between racism and CPD did not just bubble up in the aftermath of the release of the McDonald video. Racism and maltreatment at the hands of the police have been consistent complaints from communities of color for decades. And there have been many significant flashpoints over the years—the killing of Fred Hampton (1960s), the Metcalfe hearings (1970s), federal court findings of a pattern and practice of discriminatory hiring (1970s), Jon Burge and his midnight crew (1970s to 1990s), widespread disorderly conduct arrests (1980s), the unconstitutional gang loitering ordinance (1990s), widespread use of investigatory stops and frisks (2000s) and other points. False arrests, coerced confessions and wrongful convictions are also a part of this history. Lives lost and countless more

Plaintiff's Exhibit 8

damaged. These events and others mark a long, sad history of death, false imprisonment, physical and verbal abuse and general discontent about police actions in neighborhoods of color.

## THE ENDS JUSTIFYING THE MEANS

There are too many neighborhoods in Chicago that are devastated by crime and abject poverty. In those areas, aside from a recommitment to investments in jobs, education and many other important community anchors, those residents need the protection of the police. However, CPD's own data and other information strongly suggests that CDP's response to the violence is not sufficiently imbued with Constitutional policing tactics and is also comparatively void of actual procedural and restorative justice in the day-to-day encounters between the police and citizens.

CPD's own data gives validity to the widely held belief the police have no regard for the sanctity of life when it comes to people of color.

**Police Officers Shoot African-Americans At Alarming Rates:** Of the 404 shootings between 2008-2015:[12]

- 74% or 299 African Americans were hit or killed by police officers, as compared with
- 14% or 55 Hispanics;
- 8% or 33 Whites; and
- 0.25% Asians.

For perspective, citywide, Chicago is almost evenly split by race among whites (31.7%), blacks (32.9%) and Hispanics (28.9%).[13]



**Police Officers Disproportionately Use Tasers Against African-Americans:** Of the 1,886 taser discharges by CPD between 2012 and 2015, African-Americans were the target of those discharges at a very high rate[14]:

- 76% or 1,435 African-Americans were shot with tasers;
- 13% or 254 Hispanics;
- 8% or 144 Whites; and
- 0.21% or 4 Asians.



Plaintiff's Exhibit 8

Beyond the use of force with guns and tasers, CPD's dependence on investigatory stops as an essential part of its policing strategy has only served to worsen already fractured community relations.

**Traffic Stops:** In 2013,

- 46% of 100,676 traffic stops involved African-Americans;
- 22% involved Hispanics;
- 27% involved Whites.[15]



Moreover, black and Hispanic drivers were searched approximately four times as often as white drivers, yet CPD's own data show that contraband was found on white drivers twice as often as black and Hispanic drivers.



Plaintiff's Exhibit 8

**Other Street Stops:** In the summer of 2014, CPD stopped more than 250,000 people—93.6 for every 10,000 City residents—in encounters not leading to arrests.[16] (This figure dwarfs the number of stops by New York City police, which from 2011-2014, stopped anywhere between 1.6 and 22.9 people per 10,000.)

Of those 250,000 people stopped by CPD in the summer of 2014,

- 72% were African American;
- 17% were Hispanic;
- 9% were White; and
- 1% were Asian.



A 2015 survey of 1,200 Chicago residents, ages 16 and older, also found significant racial disparities in the number of police-initiated stops and the perception of abusive police behavior.[17] The survey found that **almost 70%** of young African-American males reported being stopped by police in the past 12 months, and 56% reported being stopped on foot.[18]



The survey found that "[m]ost people stopped by Chicago police are not ticketed, arrested or taken to a police station."[19] In addition, the survey established "large racial disparities in the use of force reported by respondents."[20] The survey revealed that "15% of Blacks and 17% of Hispanics reported being shoved or pushed around, in contrast to 6% of Whites. [Blacks] were twice as likely as whites to be threatened by a weapon. Compared to whites, all other groups were at least twice as likely to have been subjected to some form of force before being released."[21]

Plaintiff's Exhibit 8

The overuse of investigatory stops has left a lingering, negative perception of the police in communities of color, in part because for people of color, a significant number of those stops also involved actual or threatened physical abuse.[22]

## FAILURE TO MAKE ACCOUNTABILITY A CORE VALUE AND IMPERATIVE

Going back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority. Currently, neither the non-disciplinary interventions available nor the disciplinary system are functioning.

The public has lost faith in the oversight system. Every stage of investigations and discipline is plagued by serious structural and procedural flaws that make real accountability nearly impossible. The collective bargaining agreements provide an unfair advantage to officers, and the investigating agencies—IPRA and CPD's Bureau of Internal Affairs—are under-resourced, lack true independence and are not held accountable for their work. Even where misconduct is found to have occurred, officers are frequently able to avoid meaningful consequences due to an opaque, drawn out and unscrutinized disciplinary process.

**Complaints go uninvestigated.** From 2011-2015, 40% of complaints filed were not investigated by IPRA or BIA.



**INDEPENDENT POLICE REVIEW AUTHORITY**
COMPLAINTS                                          2011–2015

SUSTAINED **7%**
NO AFFIDAVIT **40%**
NOT SUSTAINED **37%**
UNFOUNDED **15%**
EXONERATED **1%**

IN THE LAST 5 YEARS **40%** OF COMPLAINTS WERE NEVER FULLY INVESTIGATED

**DEFINITIONS KEY**

**NO AFFIDAVIT**
Allegation was never fully investigated.
**SUSTAINED**
Allegation was supported by sufficient evidence to justify disciplinary action.
**NOT SUSTAINED**
Allegation lacked sufficient evidence needed to prove or disprove.
**UNFOUNDED**
Allegation was not based on the facts revealed through investigation, or the reported incident did not occur.
**EXONERATED**
Incident occurred, but the action taken by the officer(s) was deemed lawful and proper.

Plaintiff's Exhibit 8

**Arbitrators reduce or void disciplinary recommendations.** In 2015, arbitrators reduced disciplinary recommendations in 56.4% of cases and eliminated any discipline in 16.1% of cases. In total, arbitrators reduced or eliminated discipline in 73% of cases.



**No risk management regarding lawsuits.** There continues to be an unacceptably high number of lawsuits filed against the City and individual police officers every year. Despite this persistent problem, which results in the outlay of tens of millions of dollars every year, CPD does not employ a systematic tool for evaluating risk issues identified in lawsuits.





Plaintiff's Exhibit 8

**High number of CPD officers with significant CRs.**
The enduring issue of CPD officers acquiring a large number of Complaint Registers ("CRs") remains a problem that must be addressed immediately. From 2007-2015, over 1,500 CPD officers acquired 10 or more CRs, 65 of whom accumulated 30 or more CRs. It is important to note that these numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers.



Any one of these metrics in isolation is troubling, but taken together, the only conclusion that can be reached is that there is no serious embrace by CPD leadership of the need to make accountability a core value. These statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself. The absence of accountability benefits only the problem officer and undermines officers who came into the job for the right reasons and remain dedicated to serving and protecting. Sadly, CPD collects a significant amount of data that it could readily use to address these very troubling trends. Unfortunately, there is no systemic approach to addressing these issues, data collection is siloed and individual stakeholders do virtually nothing with the data they possess. Simply put, there is no ownership of the issue within CPD leadership or elsewhere, and thus there have been no substantive efforts to address these problems which continue to cost taxpayers tens of millions of dollars each year. These figures demand immediate change.

## SIGNIFICANT UNDERINVESTMENT IN HUMAN CAPITAL

The problems that the Task Force has identified have their origins in systemic failings going back many years. These failings touch:

- **Recruitment of Young Officers.** Chicago remains one of the most segregated cities in the country. CPD recruits from those segregated neighborhoods, but has fallen woefully short in acknowledging and addressing the fact that for many young recruits, the Training Academy may be their first substantive experience with someone who is of a different race or ethnicity.

- **Training Officers To Address Conscious and Unconscious Bias in the Daily Discharge of Their Responsibilities.** While CPD has made significant strides in addressing cultural literacy in the Academy's Procedural Justice training and Crisis Intervention Team ("CIT") training, much more needs to be done. Fundamentally, there needs to be a real commitment to Constitutional policing strategies and tactics that strike the appropriate balance between keeping our communities safe without trampling on basic Constitutional and human rights. This important value must be embedded into all training, on an annual basis. Serving and protecting cannot mean that the rights of certain communities or individuals must be sacrificed.

- **Absence of Other Investments.** If there is a real commitment to cultural change within CPD, the balance will shift when there are adequate resources devoted to training. Currently, aside from annual firearms certification and sporadic training sessions, there is no mandatory training on any other topic.

Plaintiff's Exhibit 8

This means that after an officer leaves the Academy, he can serve his entire career without ever receiving any annual, mandatory training of any kind. An astounding fact, particularly in light of recent sea changes in policing strategies and technology.

What limited post-Academy training happens is primarily delivered through roll-call videos. Roll call was derisively described by one officer as "day care," meaning that officers slept, checked their smartphones or otherwise paid little attention to what was happening. Compounding this problem is that there are no metrics used to determine the level of comprehension or retention of the topic reflected in the video training. What also seems certain is that the level of attention given to the videos is not required to be reinforced with any training materials for the roll-call commander and rarely are officers afforded an opportunity to ask follow-up questions or otherwise access FAQs or other materials to reinforce the training. Also, CPD has a large portfolio of training videos that officers can access through a web-based portal, but no effort is made to even track the number of times officers access those training videos. And in recent memory, there has been no effort to survey officers to assess the areas in which they need training.

Right now, the community has no role in any of the training done either in the Academy or thereafter. Cities across the country recognize that community involvement in training is an important element and yet another way to bridge the gap between the police and the communities they serve.

Also, service as an Academy instructor is not sufficiently valued within CPD and some instructors are teaching while under investigation for a range of alleged offenses. The Academy's physical space is also woefully inadequate to meet current and future needs. For example, the recent mandatory Taser training is being conducted in the hallways of the Academy because there is simply no other space available. The physical structure that houses the Academy is antiquated, cramped and cannot accommodate even current needs, let alone the increased training that will be necessary to make real cultural change. The constraints of the physical space negatively impact the effectiveness of training.

## Other Key Findings By Working Group

### COMMUNITY-POLICE RELATIONS

The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particuarly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself.

CPD is not doing enough to combat racial bias. Policies need further clarification, as it is not clear whether and when officers may use race as a factor when initiating stops. While CPD collects a fair amount of data, little is reported to the public. CPD still has significant work to do to diversify its ranks, especially at supervisory levels. And more needs to be done to train officers to acknowledge and address their biases and deploy officers who are culturally competent and have a proper understanding of the communities they are assigned to serve.

Historically, CPD has relied on the Community Alternative Policing Strategy ("CAPS") to fulfill its community-policing function. The CAPS brand is significantly damaged after years of neglect. Ultimately,

Plaintiff's Exhibit 8

community policing cannot be relegated to a small, underfunded program; it must be treated as a core philosophy infused throughout CPD.

CPD officers are not adequately equipped to engage with youth. The existing relationship between CPD and youth—particularly youth of color—is antagonistic, to say the least. Children in some areas of the City are not only being raised in high-crime environments, but they are also being mistreated by those who have sworn to protect and serve them.

Finally, CPD is not doing enough to protect human and civil rights. Providing arrestees access to counsel is a particular problem. In 2014, only 3 out of every 1,000 arrestees had an attorney at any point while in police custody. In 2015, that number "doubled" to 6. The City's youth are particularly vulnerable and often lack awareness of their rights.

## LEGAL OVERSIGHT & ACCOUNTABILITY

Chicago's police accountability system is broken. The system is supposed to hold police officers accountable to the people they serve and protect by identifying potential misconduct, investigating it and, when appropriate, imposing discipline. But at every step of the way, the police oversight system is riddled with legal and practical barriers to accountability.

IPRA is badly broken. Almost since its inception, there have been questions about whether the agency performed its work fairly, competently, with rigor and independence. The answer is no. Cases go uninvestigated, the agency lacks resources and IPRA's findings raise troubling concerns about whether it is biased in favor of police officers. Up until recently, the agency has been run by former law enforcement, who allowed leadership to reverse findings without creating any record of the changes. IPRA has lost the trust of the community, which it cannot function without.

Imposing discipline on officers guilty of misconduct has also been a challenge. Existing policies and the woefully inadequate oversight regarding how discipline is imposed have allowed far too many officers to receive little or no discipline even after a complaint is sustained. Discipline is not handed down evenly, and there are several layers in the process where discipline is often reduced.

The collective bargaining agreements between the police unions and the City have essentially turned the code of silence into official policy. The CBAs discourage reporting misconduct by requiring affidavits, prohibiting anonymous complaints and requiring that accused officers be given the complainant's name early in the process. Once a complaint is in the system, the CBAs make it easy for officers to lie if they are so inclined —they can wait 24 hours before providing a statement after a shooting, allowing them to confer with other officers, and they can amend statements after viewing video or audio evidence. In many cases, the CBAs also require the City to ignore or even destroy evidence of misconduct after a certain number of years.

The community has long been shut out of Chicago's police oversight system. Meaningful engagement with the community—and giving the community power in the oversight system—is critical to ensuring that officers are held accountable for misconduct.

Finally, in the current system, there is no entity to police the police oversight system itself. There is no way to know if existing entities are performing their jobs with rigor and integrity, and no entity is equipped to identify and address systemic changes regarding patterns and practices of misconduct or bias, or to

Plaintiff's Exhibit 8

analyze policies and procedures to prevent future problems. Police inspectors general—often called auditors—have emerged nationally in response to a growing belief that traditional oversight agencies would benefit from having a second set of eyes to ensure that they perform as they should.

## EARLY INTERVENTION AND PERSONNEL CONCERNS

The community is rightfully skeptical that enough is being done within CPD to adequately supervise and identify officers whose actions are falling short of expectations. There is a general absence of a culture of accountability within CPD, largely because no one in top leadership has taken ownership of how to identify and handle problem officers.

CPD currently collects a variety of data on issues related to officer performance—including complaints and lawsuits—but does little to holistically analyze officer performance and intervene when troubling patterns emerge. Data collection is incomplete. Distribution, analysis and follow-up is limited.

Although supervisors have potentially-invaluable tools for managing each of the officers under their charge through a Performance Recognition System and a dashboard program, this monitoring and intervention system is not working. There are no mandatory requirements that supervisors use the system to analyze data or intervene in officer misconduct. Review of the data is entirely discretionary—or it is at least treated that way. Supervisors are not required to input information to explain the data or take any action in response to the data they receive. As a result, there is no way to know if supervisors are even using the dashboard, much less how they are using it. There do not appear to be any enforcement mechanisms to ensure supervisors use the program and, according to our interviews, the system is considered far from mandatory. In fact, our interviews with officers and supervisory personnel indicate that the dashboard has not been functional so far in 2016.

In recent years, CPD's two formal early intervention programs—the Behavioral Intervention System ("BIS") and Personnel Concerns ("PC")—have rarely been used. In 2007, 276 officers were included in either BIS or PC. Participation quickly dropped off after FOP filed a grievance against CPD for certain officers' inclusion. CPD and FOP settled the grievance by agreeing to remove officers from the programs. By 2013, *zero* officers were being actively managed through either of those programs. In 2014, only 7 officers were enrolled in the program. In 2015, 13 officers were enrolled.



**NUMBER OF OFFICERS** IN BEHAVIORAL INTERVENTION AND PERSONNEL CONCERNS PROGRAMS *COMBINED*

276  219  134  82  22  13  0  7  13

2007 ⟶ 2015

There are many national models to design a more effective early intervention system, including systems mandated by Department of Justice consent decrees. Chicago has a lot of catching up to do. Advances in technology and data analysis allow police departments to identify officers who may be in need of interventions and to respond appropriately. It is imperative that CPD have a system in place that allows for a 360-degree view of the activity and conduct of its officers. The system should allow CPD to identify problematic behaviors at the earliest possible instance so that it can get officers back on track or, if necessary, manage them out of the department before it is too late. This is an essential component in re-establishing legitimacy with the community.

**Plaintiff's Exhibit 8**

## DE-ESCALATION

Unfortunately, there have been many examples of CPD encounters with citizens in rountine situations that have gone tragically wrong. There are also widespread reports from people all over Chicago that some officers approach these same routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language. It is critically important that each officer approach every encounter with a citizen with respect and a commitment to the sanctity of life.

In addition, there have increasingly been situations in which police response to calls involving persons experiencing mental health crises ended with devastating results. OEMC must be able to identify calls and encounters that are mental-health related and respond with appropriate resources.

Emergency calltakers and dispatchers are a critical component of mental health crisis response, but they are ill-equipped to identify mental health calls and dispatch appropriate resources. OEMC personnel receive only one hour of annual training about crisis intervention and mental health, and their (understandable) focus on speedy dispatches often hinders accurate identification of mental health calls and the quality of response.

In 2005, following a series of highly publicized shootings of persons with mental illnesses, CPD established a CIT program to train officers on addressing individuals in mental health crises. Officers can take a 40-hour course to become CIT-certified. The CIT program has had a number of positive outcomes, but only 15% of CPD officers are CIT-certified. This is not enough to ensure that there are enough CIT-certified officers to respond to mental health calls.

Even when officers have CIT training, they have limited options to divert those living with mental illness to healthcare providers instead of jail. Currently, the only diversion option is the emergency room at various hospitals. More often, officers take individuals to Cook County Jail, which has become one of the largest mental health treatment providers in the nation. When officers do transport individuals to designated emergency room drop-offs, they often see the same person back in their beat hours or days later, with no change in their behavior. This is a poor use of manpower and resources.

Police officers are too often the first responders to those living with mental illness and experiencing a crisis. Most people living with mental illness do not receive treatment, in large part due to the shrinking mental healthcare safety net. The mental health system focuses on chronic care management for people who are living with severe, disabling mental illnesses. It does not address early intervention that might encourage recovery and avoid long-term disability. Without these less intensive, recovery-promoting services, persons living with mental illness fail to get timely treatment until their symptoms are so severe as to require costly crisis management.

Plaintiff's Exhibit 8

**VIDEO RELEASE**

On February 16, 2016, the Task Force released on an expedited basis a policy for the public release of video and audio recordings of certain critical incidents involving police officers. The Mayor immediately adopted the policy. Before the adoption of the policy, the practice in Chicago was generally to withhold from public release any video recording of a police incident until investigations, whether criminal or merely disciplinary, were concluded. The absence of a clear, written policy led to inconsistencies, confusion and mistrust on the part of the public, as well as a proliferation of expensive and time-consuming litigation conducted under the Freedom of Information Act. In many cases, it also left the public in the dark about matters of serious public interest.

## Where do we go from here?

**Task Force Recommendations.** The Task Force's Report contains observations and findings about a range of issues that likely have never been seen before by the public, or at least never been addressed so openly. The recommendations, if adopted, will fundamentally change the way in which the public engages with the police, create more effective oversight and auditing, and create a transparent system of accountability and responsibility for all stakeholders. We have not solved all problems, but we have created a blueprint for lasting change.

Our recommendations are designed to address the root causes of the issues facing CPD, IPRA and other stake holders.

## How We Propose to Empower People.

- Create a **Community Safety Oversight Board**, allowing the community to have a powerful platform and role in the police oversight system.
- Implement a citywide **Reconciliation Process** beginning with the Superintendent publicly acknowledging CPD's history of racial disparity and discrimination, and making a public commitment to cultural change.
- **Replace CAPS with localized Community Empowerment and Engagement Districts (CEED) for each of the city's 22 police districts**, and support them accordingly. Under CEED, district Commanders and other leadership would work with local stakeholders to develop tailored community policing strategies and partnerships.
- **Renew commitment to beat-based policing and expand community patrols** so that officers learn about and get to know the communities they serve, and community members take an active role in partnering with the police.
- **Reinvigorate community policing as a core philosophy and approach** that informs actions throughout the department.
- **Evaluate and improve the training officers receive with respect to youth** so that they are prepared to engage in ways that are age-appropriate, trauma-informed and based in a restorative justice model.

Plaintiff's Exhibit 8

- Require CPD and the police oversight system to be more **transparent** and release to the public incident-level information on arrests, traffic and investigatory stops, officer weapon use and disciplinary cases.
- **Host citywide summits** jointly sponsored by the Mayor and the President of the Cook County Board to develop and implement comprehensive criminal justice reform.
- Encourage the Mayor and President of the Cook County Board to work together to develop and implement programs that address **socioeconomic justice and equality, housing segregation, systemic racism, poverty, education, health and safety.**
- Adoption of a citywide protocol allowing arrestees to make **phone calls to an attorney and/or family member(s) within one hour of arrest**.
- Implementation of citywide **"Know Your Rights" training** for youth.

## How We Propose to Address the Inadequate Emphasis on Accountability.

- Create a dedicated **Inspector General for Public Safety**, which would independently audit and monitor CPD and the police oversight system, including for patterns of racial bias.
- **Replace the Independent Police Review Authority with a new and fully transparent and accountable Civilian Police Investigative Agency**, which will enhance structural protections, powers and resources for investigating serious cases of police misconduct, even in the absence of sworn complaints. The new CPIA should ensure an accessible, professional and supportive complaint process.
- Implement a data-driven, best-in-class **Early Intervention System for CPD to identify officers with problems** before they become problems for the community.
- Fundamentally **change provisions in the collective bargaining agreements** that are impediments to accountability, such as allowing for anonymous complaints, eliminating the ability to change statements after reviewing video and removing the requirement to destroy complaint records.
- Fully **implement the first-in-the-nation written video release policy** for officer-involved shootings.
- **Expand CPD's body cam** pilot program.
- Require that **all disciplinary information be provided online** so that citizens can track complaints and discipline histories.

Plaintiff's Exhibit 8

## How We Propose to Address Other Systemic and Longstanding Problems.

- Establish for the first time in Chicago a **Deputy Chief of Diversity and Inclusion in CPD**.

- Implement policies to **dismantle the institutionalization of the police "code of silence,"** including substantial changes to the collective bargaining agreements between the police and the City, ending command channel review, reforming the role of CPD supervisors and pattern and practice analysis.

- **Establish a smart 911 system** for OEMC, allowing residents to pre-enter information on mental health or other issues that would be instantly available to OEMC operators.

- **Create a multi-layer co-responder system** where mental health providers work with OEMC and CPD to link individuals to treatment.

- **Expand significantly the Crisis Intervention System** for CPD and other first responders.

- **Create a "Mental Health Critical Response Unit"** within CPD that is responsible for mental health crisis response functions, training, support, community outreach and engagement, cross-agency co-ordination and data collection.

- **Create a hotline for CPD members**, whether civilian or sworn, to lodge complaints, and develop a third-party system for the processing and follow-up of all comments and complaints reported to the hotline.

While we address some statistics regarding the use of force by CPD officers, in deference to the U.S. Department of Justice's ongoing pattern and practice investigation, we did not conduct a detailed analysis of CDP's use of force practices. But as statistics on police shooting of civilians, taser discharges and other troubling practices like shooting at cars, at the backs of fleeing suspects and the range of off-duty incidents involving weapons discharges all make plain, there must be a fundamental re-thinking of the current use-of-force policies. The Task Force heard over and over: just because you *can* use force, does not mean you *should* use force. The community must also be at the table for this conversation. The primary guiding principle of CPD's use of force policies and practices must be sanctity of all lives.

The full list of recommendations can be found throughout the Task Force Report as well as in stand alone recommendation checklists in the appendices.

## Next Steps

The publishing of this Report is a point of departure for the next phase of work in fixing the system of policing in Chicago. This report is just a blueprint of the work necessary to reform structures that have for too long gone on unchecked and fundamentally unchanged. The citizens, elected officials and others in public life in Chicago now must take this report and act on it. We have outlined many steps that will require decisions, planning and action from many different actors, including the Mayor, City Council and CPD. Moreover, to make fundamental change, a broad range of stakeholders—including Cook County bodies, State legislators, community and faith organizations, advocates, philanthropic organizations and the community—all need to embrace the need for change and do their part.

Plaintiff's Exhibit 8

For the Mayor and City Council, we expect that policies, ordinances and procedures will be adopted in the next 90 to 180 days to take aggressive steps to implement the recommendations within this Report. We hope that someone within each branch of government will lay out a timeline for delivering what we have outlined as necessary, and set up an accountability structure for ensuring that action is taken and changes are implemented. For CPD, there is much that can be done immediately and it will only inure to the benefit of the new leadership to adopt as many changes—including both policies and practices—described here, as quickly as is practicable. We encourage Cook County and State legislators to join the effort, as policing reform in Chicago impacts both the region and state, and many of our recommendations affect other areas of Illinois.

The challenge is broader but no less important for advocates, community and faith organizations, philanthropy and the broader community. From this moment we hope that these individuals and groups will push for and demand that the police accountability system in Chicago change, whether they agree with our recommendations or not. We further hope that all who have labored over or otherwise been affected by these issues will continue to ensure that their voices are heard in this debate and that this moment for change does not pass. Finally, we hope that these bodies will think about and consider a design for the path ahead. The Task Force cannot say exactly what should happen next in this debate. It is to the government and the people of Chicago—through the bodies outlined above and others—to determine where we go from here.

## Is Real Reform Possible?

Reform is possible if there is a will and a commitment. But where reform must begin is with an acknowledgement of the sad history and present conditions that have left the people totally alienated from the police, and afraid for their physical and emotional safety. And while many individuals and entities have a role to play, the change must start with CPD. CPD cannot begin to build trust, repair what is broken and tattered unless—from the top leadership on down—it faces these hard truths, acknowledges what it has done at the individual and institutional levels and earnestly reaches out with respect. Only then can it expect to engage the community in a true partnership.

## Endnotes

[1] Comment from Sullivan High School Community Forum (Feb. 25, 2016).

[2] Quinn Ford, Cops: Boy, 17, Fatally Shot by Officer After Refusing to Drop Knife, Chicago Tribune (Oct. 21, 2014), *available at* http://www.chicagotribune.com/news/local/breaking/chi-chicago-shootings-violence-20141021-story.html.

[3] *Id*.

[4] CBS2 Chicago, Marissa Bailey reporting (Oct. 21, 2014); ABC7 Chicago, Tanja Babich reporting (Oct. 21, 2014).

[5] Mark Berman, Why Did Authorities Say Laquan McDonald Lunged at Chicago Police Officers? Washington Post (Nov. 25, 2015), *available at* https://www.washingtonpost.com/news/post-nation/wp/2015/11/25/why-did-authorities-say-laquan-mcdonald-lunged-at-chicago-police-officers/.

[6] As reported by Detective David Marsh who interviewed the various responding officers, including Van Dyke. *See* Case Supplementary Reports, *available at* http://www.nbcchicago.com/investigations/Laquan-McDonald-Police-Report-Dashcam-360644211.html.

[7] All of these officers and others are the subject of an investigation being conducted by the City's Office of Inspector General.

Plaintiff's Exhibit 8

[8] The Working Group members are identified in Appendix 2.

[9] The Civic Consulting Alliance provided invaluable staffing to support the Task Force. The research team disseminated hundreds of law enforcement policies from across the nation, consent decrees involving other cities and research reports from a variety of leading experts and organizations. As part of its work, the Task Force also made over 100 data and document requests to the City of Chicago. Many are available on the Task Force website at https://chicagopatf.org/resources/research-documents/

[10] The individuals interviewed by the Working Groups are identified in Appendix 3.

[11] Comment from Pamela Hunt, Mt. Vernon Baptist Church Community Forum (Feb. 2, 2016).

[12] Data provided by IPRA.

[13] United States Census Bureau, QuickFacts, Chicago, Illinois, *available at* http://www.census.gov/quickfacts/table/PST045215/1714000.

[14] *Id*.

[15] CPD Traffic Stops and Resulting Searches in 2013, ACLU of Illinois (Dec. 2014), *available at* http://www.aclu-il.org/wp-content/uploads/2014/12/Report-re-CPD-traffic-stops-in-2013.pdf.

[16] Stop and Frisk Practices in Chicago, ACLU of Illinois (Mar. 2015), *available at* http://www.aclu-il.org/wp-content/uploads/2015/03/ACLU_StopandFrisk_6.pdf.

[17] Wesley G. Skogan, Chicago Community Survey, Preliminary Survey of Findings (Dec. 29, 2015). The survey respondents were "selected from randomly chosen residential addresses throughout the city. They were questioned in their homes by professional interviewers from the Survey Research Laboratory of the University of Illinois-Chicago.

[18] *Id*.

[19] *Id*.

[20] *Id*.

[21] *Id*.

[22] *Id*.

Plaintiff's Exhibit 8

# Context

Before addressing the Task Force's findings and recommendations, it is important to set the context for our work. While we were doing our work, the U.S. Department of Justice was investigating CPD as well. We are also not the first "task force" to evaluate CPD, which has a history of great accomplishment as well as scandal resulting in reform efforts. Moreover, many of the issues discussed in this report are not unique to Chicago, as issues of race and policing have received significant national attention in recent years. At the same time, policing in Chicago involves several overarching challenges that must be taken into account. Finally, a basic understanding of CPD's current structure, training and promotion system is important to contextualize the issues addressed in this report.

## U.S. Department of Justice Investigation

On December 7, 2015, six days after Mayor Emanuel appointed the Task Force, the U.S. Department of Justice announced that it had opened a civil pattern or practice investigation into CPD. By statute, it is unlawful for police "to engage in a pattern or practice of conduct … that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."[23] The Department of Justice can bring civil suits for relief "to eliminate the pattern or practice."[24] The Department of Justice notified CPD that its investigation "will focus on CPD's use of force, including racial, ethnic and other disparities in use of force, and its systems of accountability."[25] Given the Department of Justice's focus, the Task Force has not conducted a detailed analysis of CPD's use-of-force practices.

A pattern or practice proceeding is a powerful tool, but the process "typically takes years" from start to finish.[26] From 2009-2015, the Department of Justice opened 23 pattern or practice investigations. Of the larger police departments investigated, the first stage of the process alone—investigating and issuing findings—took anywhere from eight months to three plus years: Cleveland Division of Police (19 months); Las Vegas Metropolitan Police Department (8 months); Miami Police Department (20 months); New Orleans Police Department (10 months); Newark Police Department (38 months); Seattle Police Department (9 months); and Baltimore Police Department (11 months and counting). The implementation of remedies takes more time. And CPD is far larger than any of these departments.

The Task Force views its findings and recommendations as complementary to the Department of Justice's ongoing investigation. Given the likely length of the federal process, the Task Force's report presents an opportunity to begin immediately the process of improving transparency, respectful engagement and accountability. Since early December, the Department of Justice has been well aware of the scope of the Task Force's work. With the issuance of this report, the Department of Justice can decide whether and how to take the Task Force's findings and recommendations—and the City's and CPD's efforts to implement them—into account when it releases its own findings.

Plaintiff's Exhibit 8

## Prior Task Forces

CPD dates back to 1835, when the Town of Chicago was first authorized to establish its own police force. The City of Chicago was incorporated two years later. Since then, CPD has not been immune to the corruption that has often plagued City government.

We are at least the sixth "task force" to recommend reforms to CPD. These reform efforts typically occurred in response to corruption-related scandals. Though some of these reforms led to the police oversight system that is in place today, few if any prior task forces have been charged with broadly reviewing community-police relations and the patchwork oversight system that has developed over time. Nonetheless, there are a number of issues and themes associated with these prior reform efforts that resonate today. This Task Force has a unique opportunity to ensure that CPD and its oversight system are structured to ensure that the core values of respectful engagement and accountability are given the priority they deserve.

The first body commissioned to review CPD that we identified dates back to 1898. At that time, Governor Tanner appointed the "Berry Committee" to examine the City's compliance with a civil service law that was supposed to ensure that positions in CPD were filled based on merit.[27] The Berry Committee concluded that "the administration now in force in Chicago is unalterably opposed to the merit system and has done everything in its power to destroy the law and nullify its provisions and has made it a mockery, a byword and a sham."[28] The administration "remove[d] from office competent and capable men without any cause, in order to appoint their own friends to office," leading to the appointment of "many men of unsavory reputation and mental and physical unfitness."[29] The Berry Committee found that CPD "should be removed … as far as possible[] from politics" and that police officers should "be retained alone upon their merits and discharged only for cause."[30]

In 1911, Mayor Harrison directed the Chicago Civil Service Commission to investigate connections between CPD and "various criminal classes," including gamblers.[31] The Commission found that "there is, and for years has been, a connection between [CPD] and the various criminal classes in the city of Chicago."[32] Because gambling was so widespread, CPD's "Gambling Squad itself was not above suspicion, either on account of palpable stupidity or deliberate collusion with the gambling fraternity."[33] The Commission also noted lax discipline throughout CPD, finding that "[i]f there is one great fault in [CPD], it is the fact that to a large extent the sergeants do not exercise that degree of authority and responsibility which their title and increased pay demands."[34] The Commission recommended a number of actions to address its findings. Among them, it recommended that "the Police Pension Law be revised so as to prevent payment of pensions to persons discharged from the force."[35]

In 1960, Mayor Richard J. Daley appointed a committee to recommend ways to modernize and professionalize CPD in response to what was then described as "the mother of all scandals."[36] A group of eight CPD officers from the Summerdale District on Chicago's North Side had been caught operating a large-scale burglary ring.[37] (Unfortunately, calling Summerdale the "mother" of all scandals proved prophetic as other officers have been caught engaging in criminal conduct over the years.) The head of the committee was Orlando Wilson, the Dean of the School of Criminology at the University of California.

Plaintiff's Exhibit 8

The Summerdale scandal brought about a significant reorganization and transformation of CPD into a "professional" police force.[38] The committee nominated Wilson to serve as Superintendent of Police, a position he held for seven years. Wilson promptly turned over the top command and made CPD more independent of partisan political influences. The committee also recommended the establishment of a five-member Police Board to nominate candidates for superintendent vacancies, adopt rules and regulations for CPD, prepare budgets and address recommendations for officer discipline in serious cases. This body would ultimately become today's Chicago Police Board.

In the early 1970s, CPD faced increasing allegations of police brutality, particularly in African-American communities. In response, Congressman Ralph Metcalfe convened a "Blue Ribbon Panel" to report on "The Misuse of Police Authority in Chicago."[39] The panel heard testimony concerning "many instances of grossly abusive conduct on the part of Chicago policemen," which "poison[] police-community relations."[40] The panel found that CPD used fatal force more frequently than in other big cities, and that 75% of those killed were black.[41] It also noted "the false arrests, the illegal searches or the more common kind of psychological violence that occurs daily, especially in exchanges between police and minorities and young people. Very few young Blacks and Browns have been spared the experience of having to swallow their pride and take a bullying insult from a police officer."[42]

And yet, the Metcalfe panel found, "complaints from citizens of abusive conduct by police are almost universally rejected by [CPD's] self-investigation system."[43] Excessive force complaints were sustained in only 1.4% of cases.[44] This led the panel to recommend that "an entirely new independent investigating agency, reporting its factual findings to the Police Board for imposition of discipline ... should be created."[45] The panel's recommendation led to the establishment of the Office of Professional Standards ("OPS") in 1974. (In 2007, OPS was replaced by the Independent Police Review Authority.) The panel also recommended increasing the size of the Police Board from five to fifteen to promote "genuine, representative public participation."[46] The board was ultimately enlarged to nine members.

In 1997, Mayor Richard M. Daley appointed the Commission on Police Integrity to examine the root causes of police corruption, review how other urban police departments approach the issue and propose changes to CPD policies and procedures. Prominent attorney Dan Webb headed the commission, and served along with then-Assistant State's Attorney Anita Alvarez, Sharon Gist Gilliam, former CPD Superintendent Fred Rice and Brian L. Crowe. The mayor appointed the commission after a group of seven CPD officers from the Austin District (15th) on Chicago's West Side were indicted for robbing and extorting money and narcotics from drug dealers. Another three officers from the Gresham District (6th) were indicted for conspiracy to commit robbery and sales of illegally confiscated narcotics.

The 1997 Commission on Police Integrity made a number of recommendations. The recommendations included: (1) increasing the minimum requirements for new recruits to a bachelor's degree and one year of work history; (2) overhauling the field training officer program and extending the probationary period for new officers from 12 to 18 months; (3) establishing an "early warning" system to alert command personnel when an officer may be involved in a pattern of misconduct; (4) implementing a range of management improvements, including emphasizing supervisor accountability and expanding training for new Sergeants; and (5) implementing continuing education or in-service training for officers.[47] Some of these recommendations were implemented. Unfortunately, other recommendations were not addressed and still need attention, as we discuss in more detail below.

Plaintiff's Exhibit 8

## National & Local Conversation on Policing

In a large urban environment like Chicago, race matters in policing. In recent years in particular, race and policing have received significant public attention, often in response to officer-involved shootings and other tragic incidents affecting people of color. Information about these incidents can spread quickly over social media, especially if part of the incident is captured on video, an increasingly frequent occurrence. These incidents have sparked national attention and discussion, sometimes leading to violent protests.

In Ferguson, Missouri, Officer Darren Wilson shot and killed Michael Brown, 18.

In Cleveland, Ohio, Officer Timothy Loehmann shot and killed Tamir Rice, 12.

In Baltimore, Maryland, Freddie Gray died after sustaining spinal cord injuries while he was transported in a police van after his arrest for possessing an allegedly illegal switchblade.

In New York City, Eric Garner died after Officer Daniel Pantaleo put him in a chokehold while arresting him on suspicion of selling loose cigarettes.

In the wake of Ferguson and other events, President Obama appointed a Task Force on 21st Century Policing. The 21st Century Policing Task Force was charged with identifying best practices and offering recommendations on how policing practices can promote effective crime reduction while building public trust. The 21st Century Policing Task Force made a variety of recommendations organized around six "pillars": building trust and legitimacy, policy and oversight, technology and social media, community policing and crime reduction, officer training and education and officer safety and wellness.[48] These recommendations address many of the same topics at issue in this report, and will be discussed in more detail later.

Chicago has had its own share of officer-involved shootings. While these shootings have declined over the past five years, of the 404 shootings by police officers between 2008 and 2015,[49] 299 or 74% of the victims shot or killed were black. Thus, little has changed since the early 1970s when the Metcalfe panel found that 75% of those killed by CPD were black.

IPRA investigated all of these shootings and deemed nearly all of them justified. The justifications for these historic shootings have been repeatedly called into question. IPRA recently announced the hiring of outside experts to "audit … closed officer-involved shooting investigations . . . to assess the quality of the investigative process and the accuracy of the findings and outcomes."[50]

Some of these shootings—in addition to Laquan McDonald—have raised significant public concern. On March 21, 2012, Rekia Boyd, 22, was shot and killed by off-duty CPD detective Dante Servin. After warning a group of people about talking too loudly, Servin fired at them from his car as they turned to walk away. Boyd was struck in the head and killed. Servin claimed that he thought he saw a gun, but it turned out to be a cell phone. Servin was charged with involuntary manslaughter, which applies in cases of recklessness. In an odd twist, the court dismissed the involuntary manslaughter charge because it deemed Servin's alleged conduct *intentional* (not reckless) and suggested that Servin could have been charged with first-degree murder. Proceedings are underway to terminate Servin's employment with CPD, and the City paid $4.5 million to settle a lawsuit by Boyd's family.[51]

Plaintiff's Exhibit 8

On December 26, 2015, Quintonio LeGrier, 19, made three 911 calls seeking help concerning a fight with his father. Officers were dispatched only after LeGrier's father made his own 911 call reporting that LeGrier was threatening him with a baseball bat. LeGrier had a history of mental illness that went undetected by 911 operators. What happened next when police arrived on the scene is not clear. But Officer Robert Rialmo shot and killed LeGrier. A neighbor, Betty Jones, 55, was also struck and killed. In one final twist, Rialmo has responded to a civil suit filed against him by counterclaiming against LeGrier's estate for assault and infliction of emotion distress. Rialmo asserts that "forc[ing] Rialmo to end LeGrier's life" and Jones's as well caused "Rialmo to suffer extreme emotional trauma."[52]

## Broader Challenges Facing Chicago

**Diversity and Segregation.** Chicago is one of the most diverse cities in the nation. Citywide, Chicago is almost evenly split by race among whites (31.7%), blacks (32.9%) and Hispanics (28.9%). Chicago has a significant Asian population (5.5%) as well.[53] Chicago is also home to a wide variety of ethnic groups from across the globe. Chicago's great cultural diversity is often considered one of its greatest strengths.

At the same time, many of Chicago's neighborhoods are heavily segregated. This segregation dates back a century or more, as segregation enforced by law gave way to de facto segregation.[54] While at least certain neighborhoods are gradually integrating, Chicago still consistently rates as one of the most segregated big cities in the United States.[55] For example, 19 of Chicago's 77 "community areas" are at least two-thirds white, 26 are at least two-thirds black and 10 are at least two-thirds Hispanic. Many of Chicago's black citizens remain particularly isolated. Twenty community areas are at least 90% black, and 12 are at least 95% black (led by Burnside at 99.4%, Auburn Gresham at 98.5% and Washington Park at 98.1%).[56]

Because many neighborhoods are predominantly white, black or Hispanic, residents are often largely isolated from other races and ethnic groups. This segregation poses particular challenges for younger police officers, whose early assignments to certain neighborhoods may be their first significant experience interacting with different racial and ethnic groups and understanding the culture of communities different from their own.

**Poverty and Unemployment.** Citywide, 22.1% of Chicagoans live in poverty, 10.1% live in extreme poverty and 12.9% are unemployed. These figures are roughly in line with other big cites. Not surprisingly, however, Chicago's highest-crime neighborhoods have even higher rates of poverty and unemployment. In Austin, which is 86.4% black, 30.6% live in poverty, 13.0% live in extreme poverty and 22.6% are unemployed. In North Lawndale, which is 92.5% black, 45.3% live in poverty, 25.4% live in extreme poverty and 21.2% are unemployed. In Roseland, which is 96.6% black, 23.3% live in poverty, 12.7% live in extreme poverty and 20.3% are unemployed. And in West Englewood, which is 95.1% black, 39.8% live in poverty, 19.1% live in extreme poverty and 35.9% are unemployed.[57]

These same neighborhoods are ravaged by violent crime. In Austin (population 98,162), in 2013 and 2014, there were 3,341 violent crimes, including 67 homicides, 219 non fatal shootings and 725 armed robberies with guns. In North Lawndale (population 36,074), there were 1,859 violent crimes, including 27 homicides, 110 non fatal shootings and 315 armed robberies with guns. In Roseland (population 45,285), there were 1,586 violent crimes, including 27 homicides, 119 non fatal shootings and 376 armed

Plaintiff's Exhibit 8

robberies with guns. And in West Englewood (population 35,294), there were 1,831 violent crimes, including 48 homicides, 175 non fatal shootings and 316 armed robberies with guns.[58]

Chicago has many neighborhoods where there is an alarming lack of jobs as well as a dearth of basic community services and anchors like decent schools, day care, churches, community centers, parks or grocery stores. As a result, many of these communities lack hope or the tools to break the vicious cycle of poverty and crime. Given the myriad social problems plaguing these neighborhoods, police officers are often ill-equipped to address many of these communities' needs. Yet they are frequently expected to do so.

**Illegal Guns.** Chicago also has a significant gun violence problem. In recent years, CPD has recovered significantly more guns used in crimes *per capita* than New York City and Los Angeles combined. In 2012, Chicago recovered 27.7 crime guns per 10,000 residents, compared to 12.2 by Los Angeles and 3.9 by New York City.[59] The number of gun recoveries is even more striking in Chicago's highest-crime neighborhoods. In 2013 and 2014, CPD recovered 58.9 crime guns per 10,000 residents in Austin, 115.2 in West Englewood, 111.4 in Roseland and 120.6 in North Lawndale.[60]

These differences in gun recoveries cannot be explained by superior policing strategies or the devotion of more resources in Chicago compared to Los Angeles and New York City. Chicago simply has more guns used in crimes. In 2011, while Chicago, Los Angeles and New York City had similar non-gun homicide rates (between 1.90 and 2.67 per 100,000 residents), Chicago significantly outpaced Los Angeles and New York City for gun-related homicides: 13.39 per 100,000 residents compared to 5.93 and 3.84, respectively.[61] And while Chicago has strict gun laws, certain areas of the City are literally ringed by suburban gun shops, and guns can easily be procured in neighboring states like Indiana and Wisconsin, as well as through an entrenched pipeline of illegal guns coming from southern states.

The proliferation of guns inevitably raises the stakes for police-citizen encounters and fundamentally changes the dynamic of policing.

## Basic Facts About CPD's Structure

A Chicago police officer's job is also affected by the internal structure and operations of CPD itself. A police officer must interact not only with members of the community, but also with his or her supervisors, subordinates and colleagues. Below, we provide a brief overview of CPD's structure and its hiring, training and promotion processes. This overview provides further context to the findings and recommendations later in this report.

CPD is the second-largest police department in the United States, with 12,500 budgeted sworn officers. It trails only New York City's (34,454 sworn officers). After Chicago, the next largest police departments are in Los Angeles (9,920), Philadelphia (6,515), Houston (5,295), Washington DC (3,865), Dallas (3,478), Phoenix (2,952), Baltimore (2,949) and Miami-Dade (2,745).[62]

The Superintendent of Police, along with his First Deputy Superintendent, are in charge of administering and directing CPD's operations. The Superintendent and First Deputy manage four Bureaus—Patrol, Detectives, Organized Crime and Support Services—each of which is commanded by a Chief and between one to six Deputy Chiefs.[63]

Plaintiff's Exhibit 8

Patrol is by far the largest Bureau in CPD. It is responsible for general field operations, including the protection of life and property, apprehension of criminals and enforcement of traffic laws and ordinances. Within Patrol, Chicago is divided into 22 districts, organized into three Areas (North, South, and Central). Each Area is commanded by a Deputy Chief, and each district is run by a Commander.[64] Within each district, under the Commander, there are Captains, Lieutenants, Sergeants and Police Officers.

Every few years, CPD accepts applications for entry-level officers. The process begins with a written exam. Applicants who pass the test are then placed in a lottery for further consideration, with preferences for certain groups (e.g., military veterans, Chicago Public School graduates). If selected, applicants are subjected to a physical fitness test, drug screening, medical exam, background investigation and psychological evaluation. If an applicant makes it through the screening process, he or she then enters the Police Academy. A year or more can pass between the time an applicant takes the written exam and the start of the Academy, depending on the availability of Academy slots. This lengthy lag time can defeat recruitment efforts to diversify Academy classes.

Overall, about 15% of applicants who start the hiring process make it to the Academy, at which point they become Probationary Police Officers ("PPOs"). In the Academy, PPOs receive six months of formal training (between 900 and 1,000 hours). The Academy graduates 70-75 person classes every few months. At the time of hire, new officers must be 21 years old and have at least 60 semester hours from an accredited college or university (with exceptions for military service). Thus, the typical Academy graduate is in his or her early-to-mid 20s and has at least some college education, if not a degree.

After graduating from the Academy, CPD recruits remain PPOs for another 12 months (18 months total). During that time, PPOs remain "assigned" to the Academy. The PPOs are assigned to work with field training officers ("FTOs") for training in three cycles (often 28 days per cycle) in varying districts. The PPOs are then detailed to particular districts to complete their probationary periods. The starting annual salary when a PPO begins the Academy is $46,668. After 12 months, PPOs are paid $66,606. After 18 months, when the probationary period ends, newly-minted officers receive an annual salary of $70,380.[65]

After the probationary period, a new officer is assigned to a particular district for permanent assignment. A small number of officers who achieved academic and other distinctions in the Academy get to choose their initial district assignment. Upon assignment to a district, the Commander assigns officers to particular watches and beats. After the initial assignment, an officer may transfer to another district pursuant to a bidding process.

Non-supervisory officers and detectives are represented by the Fraternal Order of Police ("FOP") and are covered by FOP's collective bargaining agreement with the City. The agreement governs watch and beat assignments, as well as the bidding process for transfers. Under the agreement, these processes are generally based on seniority, which means that new officers often end up in high-crime beats and the most difficult watches.

Officers are supervised by Sergeants. According to their job description, Sergeants are expected to prepare officers for duty and roll call, monitor officer activity, provide guidance on how to handle incidents, monitor adherence to procedures and ensure that officers are carrying out assigned responsibilities. Sergeants are also responsible for reviewing and evaluating officers' performance and administering counseling, development and corrective action. Sergeants must report significant incidents

Plaintiff's Exhibit 8

up the chain of command and conduct activities related to internal and complaint investigations and employee grievances.[66]

As of January 1, 2016, CPD had 1,094 Sergeants. Sporadically, CPD takes applications for Sergeants. Officers are eligible for promotion based on the results of a written exam and assessment exercise. Up to 30% of Sergeant promotions can be made through a merit selection process as well. At the time of promotion, Sergeants must have served at least five years as officers. Notably, an officer's disciplinary record is not considered in the Sergeant promotion process.[67] In addition, the promotion criteria does not include an assessment of an individual's ability to mentor or otherwise manage the health and well-being of officers or other accountability measures like citizen or administrative complaints or interventions. Sergeants are represented by the Policemen's Benevolent & Protective Association of Illinois, Unit 156-Sergeants, and have their own collective bargaining agreement with the City.

Sergeants are supervised by Lieutenants. According to their job description, the Lieutenant serves as the officer in charge of a unit or section during an assigned tour of duty. Among other things, Lieutenants are expected to (i) ensure that Sergeants evaluate, guide and instruct officers as needed, (ii) coach and mentor subordinates, (iii) maintain an environment in which clear standards exist for acceptable behavior and performance and (iv) monitor and ensure compliance with investigative guidelines regarding complaint, disciplinary and summary punishment procedures.[68]

As of January 1, 2016, CPD had 187 Lieutenants. Sporadically, CPD takes applications for Lieutenants. Sergeants are eligible for promotion to Lieutenant based on the results of a written exam and assessment exercise. Again, up to 30% of Lieutenant promotions can be made through a merit selection process as well. At the time of promotion, Lieutenants must have served at least three years as a Sergeant. They also must have a bachelor's degree. Notably, a Sergeant's disciplinary record (and the disciplinary record of the officers he or she supervises) is not considered in the Lieutenant promotion process.[69] Lieutenants are represented by the Policemen's Benevolent & Protective Association of Illinois, Unit 156-Lieutenants, and have their own collective bargaining agreement with the City.

CPD also has 31 Captains, who supervise the Lieutenants.[70] A Captain is the second in command of a district (beneath the Commander), or may serve as an executive officer of another unit. Among other things, Captains assist the District Commander in operations, administration, planning, identification of emerging crime trends and preparing strategic plans to address crime and disorder issues impacting the community.

The Superintendent is responsible for selecting Captains. To be eligible, a candidate must have at least two years' experience as Lieutenant at the time of promotion. A candidate also must have "an acceptable disciplinary record" at the time of application, meaning that the record "cannot include any sustained Complaint Register ("CR") investigations for misconduct resulting in suspensions of more than 7 days during the prior 12 months, or 3 or more sustained CR investigations resulting in suspensions of any length during the past 5 years.[71] This is the only instance in which disciplinary records are considered during the promotion process. Captains are represented by the Policemen's Benevolent & Protective Association of Illinois, Unit 156-Captains, and have their own collective bargaining agreement with the City.

Plaintiff's Exhibit 8

After an officer leaves the Academy, aside from annual firearms certifications, there are no mandatory annual training requirements for the rest of that officer's career. To be sure, occasional trainings are sometimes put in place, such as the recent Taser training, but those kinds of trainings appear to be reactive and not part of a regular regime of in-service mandatory training. In addition, years ago CPD started a series of streaming video training to be used during roll calls. Some of these videos are well produced and provide excellent content. However, there is no program in place to ensure that they are consistently used.

## Endnotes

[23] 42 U.S.C. § 14141(a).

[24] *Id.* § 14141(b).

[25] U.S. Department of Justice Press Release, Justice Department Opens Pattern or Practice Investigation into the Chicago Police Department (Dec. 7, 2015), *available at* https://www.justice.gov/opa/pr/justice-department-opens-pattern-or-practice-investigation-chicago-police-department.

[26] U.S. Department of Justice, How Department of Justice Civil Rights Division Conducts Pattern-or-Practice Investigations (May 8, 2015), *available at* https://www.justice.gov/file/how-pp-investigations-work/download.

[27] Journal of the Senate, Special Session of the Fortieth General Assembly of the State of Illinois, 136-52 (1898).

[28] *Id.* at 140.

[29] *Id.*

[30] *Id.* at 152.

[31] H.M. Campbell, Flynn, Lower, Chicago Police Report of the Chicago Civil Service Commission, 3 J. Am. Inst. Crim. L. & Criminology 62 (May 1912 to Mar. 1913), *available at* http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1153&context=jclc.

[32] *Id.* at 81.

[33] *Id.* at 64.

[34] *Id.* at 77.

[35] *Id.* at 83.

[36] Police Forum, Academy of Criminal Justice Sciences Police Section, Vol. 4, No. 4 (Oct. 1994) ("Police Forum").

[37] *See* Richard C. Lindberg, The Babbling Burglar and the Summerdale Scandal: The Lessons of Police Malfeasance (2002).

[38] *See generally* Police Forum, *supra* note 36; *see also* Municipal Reference Collection, Chicago Public Library, A Chronological History of Chicago: 1673- (last updated Aug. 1997); Wesley G. Skogan, Police and Community in Chicago, Ch. 9 (Oxford Univ. Press 2006).

[39] The Misuse of Police Authority in Chicago, A Report and Recommendations based on hearings before the Blue Ribbon Panel convened by the Honorable Ralph H. Metcalfe, Representative, First Congressional District of Illinois, on June 26, July 17, July 24, and July 31, 1972.

[40] *Id.* at 29.

[41] *Id.* at 30.

[42] *Id.* at 31.

[43] *Id.* at 32.

[44] *Id.* at 33.

[45] *Id.* at 42.

[46] *Id.* at 58.

[47] Report of the Commission on Police Integrity (Nov. 1997).

[48] Final Report, President's Task Force on 21st Century Policing (May 2015) ("21st Century Policing Task Force Report"), *available at* http://www.cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[49] Jeremy Gorner, Chicago Police Shot Fewer People in 2015, Chicago Tribune (Jan. 2, 2016), *available at* http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-shootings-2015-met-20160101-story.html.

[50] IPRA Press Release, The Independent Police Review Authority to Conduct Historical Review of Officer-Involved Shooting Investigations (Mar. 23, 2016), *available at*

Plaintiff's Exhibit 8

http://www.iprachicago.org/content/dam/ipra/Documents/Press_Releases_and_Statements/March_23_2016_IPRA_Historical_Review.pdf.

[51] *See, e.g.,* Jeremy Gorner, McCarthy Moves to Fire Detective Dante Servin in Fatal Off-Duty Shooting of Rekia Boyd, Chicago Tribune (Nov. 24, 2015), *available at* http://www.chicagotribune.com/news/ct-mccarthy-moves-to-fire-detective-dante-servin-after-fatal-off-duty-shooting-20151123-story.html.

[52] *See, e.g.,* David A. Graham, Why the Officer Who Killed Quintonio LeGrier Is Suing Him, *The Atlantic* (Feb. 8, 2016), *available at* http://www.theatlantic.com/national/archive/2016/02/why-the-officer-who-killed-quintonio-legrier-is-suing-him/460443/; Jeremy Gorner & Annie Sweeney, Quintonio LeGrier Called 911 Three Times Before a Chicago Cop Shot Him, Chicago Tribune (Jan. 26, 2016), *available at* http://www.chicagotribune.com/news/local/breaking/ct-quintonio-legrier-bettie-jones-911-calls-met-20160125-story.html.

[53] United States Census Bureau, QuickFacts, Chicago, Illinois, *available at* http://www.census.gov/quickfacts/table/PST045215/1714000.

[54] *See, e.g.,* Ta-Nehisi Coates, The Case For Reparations, The Atlantic (June 2014), *available at* http://www.theatlantic.com/magazine/archive/2014/06/the-case-for-reparations/361631/.

[55] Edward Glaeser & Jacob Vigdor, The End of The Segregated Century: Racial Segregation in America's Neighborhoods, 1890-2010, Manhattan Institute, (Jan. 22, 2012), *available at* https://www.manhattan-institute.org/html/end-segregated-century-racial-separation-americas-neighborhoods-1890-2010-5848.html; John R. Logan & Brian J. Stults, US2010 Project, The Persistence of Segregation in the Metropolis: New Findings from the 2010 Census (Mar. 24, 2011), *available at* http://www.s4.brown.edu/us2010/Data/Report/report2.pdf; William H. Frey, Brookings Institution, Census Shows Modest Declines in Black-White Segregation (Dec. 8, 2015), *available at* http://www.brookings.edu/blogs/the-avenue/posts/2015/12/08-census-black-white-segregation-frey; Nate Silver, The Most Diverse Cities Are Often the Most Segregated, FiveThirtyEight (May 1, 2015), *available at* http://fivethirtyeight.com/features/the-most-diverse-cities-are-often-the-most-segregated/.

[56] Jennifer Clary, Social Impact Research Center, A Heartland Alliance Program, Chicago Community Indicators (2012) (analyzing data from the U.S. Census Bureau's 2000 Dicennial Census and 2008-12 American Community Survey 5-year estimates program) ("Chicago Community Indicators"), *available at* http://www.ilpovertyreport.org/sites/default/files/uploads/Chicago%20Community%20Area%20Indicators,%202000-2012_140321.pdf.

[57] *Id.*

[58] Data provided by the University of Chicago Crime Lab.

[59] City of Chicago – Office of the Mayor, Chicago Police Department, Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago, Figure A (May 27, 2014) ("Tracing The Guns"), *available at* http://www.chicagobusiness.com/Assets/downloads/20151102-Tracing-Guns.pdf.

[60] Data provided by the University of Chicago Crime Lab.

[61] Tracing The Guns, *supra* note 59, Figure B.

[62] U.S. Department of Justice, Local Police Departments, 2013: Personnel, Policies, and Practices, Appendix Table 2 (May 2015), *available at* http://www.bjs.gov/content/pub/pdf/lpd13ppp.pdf.

[63] CPD, General Order G01-02, Department Organization for Command, Attachments 1-6 (Jan. 21, 2015).

[64] CPD, General Order G01-02-03, Organization and Functions of the Bureau of Patrol (Jan. 21, 2015).

[65] CPD, 2016 Position & Salary Schedule, *available at* http://directives.chicagopolice.org/forms/CPD-61.400.pdf.

[66] *See generally* CPD, Police Sergeant Job Announcement (2013).

[67] *Id.*

[68] CPD, Lieutenant Job Announcement (2014).

[69] *Id.*

[70] CPD, Captain – Senior Executive Service (SES), Employee Resource E05-05 (Apr. 3, 2013).

[71] *Id.* at 2.

Plaintiff's Exhibit 8

# Community-Police Relations

*"The ability of the police to perform their duties is dependent upon public approval of police existence, actions, behavior and the ability of the police to secure and maintain public respect."*

Sir Robert Peel, Principles of Law Enforcement, 1829

*"Injustice anywhere is a threat to justice everywhere. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly, affects all indirectly."*

Martin Luther King, Jr., 1963

*"When you have police officers who abuse citizens, you erode public confidence in law enforcement. That makes the job of good police officers unsafe."*

Mary Frances Berry, 1999

## How have CPD's actions created mistrust in communities of color?

The lack of trust between the police and the communities they serve—especially communities of color—is one of the most significant issues facing CPD today. At each of its community forums, the Task Force heard a large and diverse group of Chicago residents express their deeply held view that racism, or at least racial bias, is the root cause of the lack of trust between CPD and minority communities. People of color articulated instance after instance in which police officers interacted with them in disrespectful and sometimes outright racist ways. The forums provided a window into the intense sadness, pain and frustration the community feels as a result of their first-hand experiences with CPD. Indeed, recent polling suggests that only 20% of Chicagoans—including just 6% of African-Americans—believe CPD treats all citizens fairly.[72]

The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through enforcement and other practices that disproportionately affect and often show little respect for people of color. CPD's long history and current practices are at the root of the deep distrust of the police and remain a significant impediment to improved community-police relations.

Plaintiff's Exhibit 8

## RACISM & RACIAL BIAS IN POLICING – HISTORY

In recounting the history of race and policing, it is difficult to pick a starting point. We could go back a century or more. Between 1910 and 1940, Chicago's black population increased from 40,000 to 278,000 as many black families moved to Chicago as part of the Great Migration.[73] Many families moved to Chicago to escape increasing racism and violence in the South, undoubtedly taking scars and distrust with them.

Chicago had its own race issues. In 1919, race riots broke out after white men threw rocks at black swimmers at a South Side beach for violating the unofficial segregation of Chicago's beaches, causing the death of Eugene Williams, 17. The police's refusal to arrest a white offender sparked weeks of violence, leaving 38 dead, over 500 injured, and 1,000 black families homeless.[74] By the 1930s, 90% of Chicago's black residents were confined to a narrow four-block strip on the South Side known as the "Black Belt."[75] Blacks who tried to move elsewhere were often met with vandalism, arson and other acts of violence.[76] This violence would not have been possible without at least tacit support of the police.

While acknowledging this older history, we focus below on some salient events and trends in Chicago policing over the past 50 years. This review captures some of the key incidents and practices which many of today's residents experienced or witnessed first hand, directly shaping their views of CPD. Some are examples of intentional mistreatment of people of color. Others are examples of well-intentioned practices that nonetheless had a significantly disparate impact in Chicago's minority neighborhoods.

**Fred Hampton.** One of the most notorious flash points in the racial dynamics between the police and communities of color was the shooting of Fred Hampton. At 4:45 a.m. on December 4, 1969, 14 CPD officers attached to the Cook County State's Attorney's Office executed a search warrant at an apartment where nine members of the Illinois Black Panther Party were staying. After seven minutes of gunfire, Hampton, 21, and another Panther, Mark Clark, 22, were dead. Hampton was the charismatic and controversial Chairman of the Illinois Black Panthers. To many in the black community, the raid was little more than a pretext to kill Hampton.

The events of that morning were hotly disputed. A federal grand jury ultimately found that the raid was "not professionally planned or properly executed."[77] The grand jury was also troubled by an "irreconcilable disparity" between officers' accounts of the raid and the physical evidence.[78] While officers claimed that the Panthers fired at them at least 10-15 times, ballistics showed that all but one of the 80-100 shots fired that morning came from the police.[79] The grand jury did not indict the officers (largely because the surviving Panthers had not cooperated in its investigation), though it concluded that the officers' performance "gives some reasonable basis for public doubt of their efficiency or even of their credibility."[80]

A state grand jury later indicted State's Attorney Edward Hanrahan and the raiding officers for obstruction of justice based on their actions and statements after the raid. They were ultimately acquitted in a bench trial, but Hanrahan lost re-election in 1972 and would not hold public office again. Hampton's and Clark's families and several Panthers who survived the raid filed a federal civil rights suit. After many years of litigation, including an 18-month trial,[81] the City agreed in 1982 to settle the plaintiffs' claims for $1.85 million (the equivalent of roughly $4.5 million in today's dollars, a not-insubstantial sum).

Plaintiff's Exhibit 8

**Disorderly Conduct Arrests.** In the early 1980s, a *Chicago Reporter* investigation found that CPD was making approximately 150,000 "disorderly conduct" arrests each year, predominantly in minority communities. What constituted disorderly conduct was often vague, and few cases were prosecuted because officers routinely failed to appear in court. In 1980, 89,382 blacks were arrested for disorderly conduct, compared to 33,270 whites and 17,931 Latinos. The arrests constituted almost half of all arrests by CPD and therefore became one of the primary ways police interacted with minority communities.[82]

The ACLU filed suit to stop CPD's practice of making disorderly conduct arrests with no intention of prosecuting. A reportedly "outraged" and "irate" federal judge declared the practice unconstitutional after the City repeatedly failed to participate in the case (a sadly ironic failure, given the underlying problem of officers failing to appear in court).[83] As part of its order, the court directed the City to expunge more than 800,000 disorderly conduct arrests over the prior five years where the arresting officer failed to appear for court hearings.[84] The ACLU and the City ultimately entered into a consent decree requiring officers who make disorderly conduct arrests to appear at all court hearings until a case is resolved.[85]

By the early 1990s, disorderly conduct arrests dropped to approximately 60,000 per year, but racial disparities remained. In 1993, CPD arrested approximately 40,000 blacks for disorderly conduct, compared to approximately 10,000 Hispanics and 8,000 whites. By the 2000s, disorderly conduct arrests dropped significantly, to approximately 10,000 per year. Even then, the black/white ratio for disorderly conduct arrests was 10:1.[86]

**Jon Burge.** From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions. Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns and burning them on radiators. For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police "code of silence." Burge was eventually suspended in 1991, and the Chicago Police Board fired him in 1993. After Burge's firing, the FOP attempted (unsuccessfully) to enter a float in the South Side Irish Parade honoring him.[87]

In 2006, after a four-year investigation, special prosecutors concluded that there was enough evidence to bring criminal charges against police officers in three cases of torture (Andrew Wilson, Phillip Adkins and Alfonzo Pinex), but the statute of limitations had already run out.[88] While it was too late to bring criminal charges for the torture itself, federal prosecutors later charged and convicted Burge for obstruction of justice and perjury after he lied about the torture in a civil case. Burge served 54 months in federal prison, far less time than that served by the innocent men he helped convict through coerced and false confessions.[89] As discussed later in this report, Burge was allowed to keep his pension.[90]

The fallout from Burge's actions was substantial. Many convictions where Burge had played a role were reversed, remanded or overturned.[91] In 2003, Governor Ryan pardoned four African-American inmates on death row who had long maintained that Burge tortured them to confess to murders they did not commit.[92] Numerous civil suits were filed. To date, the City has spent upwards of $100 million on Burge-related settlements, judgments and legal fees.[93]

In 2013, Mayor Emanuel apologized for this "dark chapter" in the city's history.[94] Two years later, the Mayor and City Council "acknowledge[d] and condemn[ed], as evil and reprehensible, any and all acts of

Plaintiff's Exhibit 8

torture and abuse inflicted upon the Burge victims" and "apologize[d] to the Burge victims for these horrific and inexcusable acts." Along with the apology, the City agreed to pay $5.5 million in reparations and provide other city services to Burge victims and to educate future CPS students about the Burge case and its legacy.[95]

**Gang Loitering Ordinance.** In 1992, Chicago enacted a "gang loitering ordinance" in response to complaints that gang members were intimidating law-abiding citizens. The ordinance prohibited individuals believed to be "criminal street gang members" from "loitering" in a public place after they had been ordered to disperse. From 1992 to 1995, CPD issued over 89,000 dispersal orders and arrested over 42,000 individuals. While precise statistics are not available, the ordinance was predominantly enforced against people of color.[96]

In 1999, the U.S. Supreme Court held that the ordinance violated due process rights because it was unconstitutionally vague.[97] The Court held that the ordinance "left[t] the public uncertain as to the conduct it prohibits" because it "fail[ed] to distinguish between innocent conduct and conduct threatening harm."[98] The Court further held that the ordinance created a "potential for arbitrary enforcement" because it "afford[ed] too much discretion to the police" and "reach[ed] a substantial amount of innocent conduct."[99]

After the U.S. Supreme Court's ruling, the City amended its gang loitering ordinance to make it more specific. However, the ordinance is still predominantly enforced against people of color. In the summer of 2014, CPD officers issued 4,842 dispersal orders—4,100 against blacks (84.7%), 673 against Hispanics (13.9%) and 66 against whites (1.4%).[100]

## RACIAL BIAS IN POLICING – CPD'S CURRENT PRACTICES

Racial bias is not a thing of the past. Rather, data establishes that CPD's use of force disproportionately affects people of color. The same is true for foot and traffic stops. These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. Racial bias extends to other areas as well, including the police oversight system itself.

**Use of Force.** For both officer-involved shootings and Taser discharges, citizens on the other end of use of force by CPD are predominantly African-American.

From 2008 through 2015, there were 404 officer-involved shootings resulting in injury or death. Of those 404 shootings, 299 (74%) of the persons killed or injured were black, 55 (14%) were Hispanic, 33 (8%) were white and 1 (0.25%) was Asian.[101]



**OFFICER INVOLVED SHOOTINGS** 2008 - 2015

**74%** of the persons killed or injured were black

NUMBER OF SHOOTINGS

300

0

BLACK  HISPANIC  WHITE  ASIAN

Plaintiff's Exhibit 8

From 2012 through 2015, there were a total of 1,886 officer-involved Taser discharges. Of those 1,886 discharges, 1,435 (76%) of the persons subjected to Taser discharges were black, 254 (13%) were Hispanic, 144 (8%) were white and 4 (0.21%) were Asian.[102]



**Investigatory Stops.** Under the U.S. Supreme Court's 1968 decision in *Terry v. Ohio*,[103] an officer may conduct a brief investigatory stop upon "reasonable suspicion"—based on "specific and articulable facts"— that a person has committed or is about to commit a crime. An officer also may conduct a limited search or pat down for weapons upon reasonable suspicion that a person is armed and dangerous. While the Court granted police officers these powers in appropriate cases, it also acknowledged that investigatory stops and frisks "must surely be an annoying, frightening, and perhaps humiliating experience."[104]



CPD's data raises serious questions about whether it abides by *Terry* and its progeny. In the summer of 2014, CPD stopped more than 250,000 people in encounters not leading to arrests. These investigatory stops amounted to 93.6 per 10,000 people. (In contrast, New York City, from 2011-2014, stopped between 1.6 and 22.9 per 10,000 people.)[105]

Notably, out of the 250,000 investigatory stops in the summer of 2014, 72% of those stopped were black, compared to 17% Hispanic and 9% white.[106]

Plaintiff's Exhibit 8

African Americans have been particularly targeted in predominantly white neighborhoods. In District 18, which covers the Near North Side and part of Lincoln Park, only 9.1% of the population is black, yet blacks accounted for 57.7% of all stops. Meanwhile, 75.5% of the district's population is white, yet whites accounted for only 28.6% of all stops. Similarly, in District 19, which covers parts of Lincoln Park, Lakeview, Uptown and Lincoln Square, only 6.6% of the population is black, yet blacks accounted for 51.1% of all stops. 75% of the district's population is white, yet whites accounted for only 29.2% of all stops.[107]



Plaintiff's Exhibit 8

Investigatory stops have accumulated in striking numbers among young black males. A survey of Chicago residents in 2015 found that 56% of young black males reported being stopped on foot by CPD one or more times during the prior 12 months. When traffic stops were included, almost 70% of young black males reported being stopped by the police in the past year, a number far exceeding any other demographic.[108] In addition, the survey established "large racial disparities in the use of force reported by respondents."[109] The survey revealed that "15% of Blacks and 17% of Hispanics reported being shoved or pushed around, in contrast to 6% of Whites. [Blacks] were twice as likely as whites to be threatened by a weapon. Compared to whites, all other groups were at least twice as likely to have been subjected to some form of force before being released."[110]



We heard many personal accounts corroborating this data. For example, in a youth forum at the Mikva Challenge, we spoke with a high school student who reported being stopped by CPD and placed in squad cars six or seven times. Each time, he reported, officers tersely kicked him out of the car when they were finished without explanation or apology. Similarly, in a youth forum at Precious Blood Ministries, a young Latino man reported being stopped by the police on his way home from work. He had just cashed his paycheck, and an officer suggested that he "had a lot of money for a Mexican."

These stops—and how they were conducted—had clearly left a deep mark on how youths and young adults view the police. The stops were also traumatizing, and rendered the youths involved powerless and voiceless. Multiply these experiences by the hundreds of thousands if not millions of investigatory stops in recent years, particularly in the black community, and the indelible mark left on the City is deep and will continue to reverberate for years.

Plaintiff's Exhibit 8

**Traffic Stops.** CPD's traffic stop data also raise significant concerns regarding racial bias. In 2013, 46% of CPD's 100,676 traffic stops involved black drivers, even though only 32% of the City's population is black. White and Hispanic drivers were stopped at rates lower than their representation in the City's population.[111]

For both blacks and Hispanics, the disparity widens significantly when it comes to vehicle searches. In 2013, CPD was over four times more likely to search *with* consent vehicles of black and Hispanic motorists, compared to white motorists (4.74 and 4.09 times, respectively). CPD was also more likely to search *without* consent vehicles of black and Hispanic motorists, compared to white motorists (3.42 and 4.82 times).[112]



Given these numbers, one might expect that CPD finds contraband in vehicles of black and Hispanic motorists at higher rates. That is not the case. In fact, the opposite is true. In consent searches, CPD found contraband when officers searched white motorists ***twice as often*** compared to black and Hispanic motorists. The "hit rates" were 12% for black motorists, 13% for Hispanic motorists and 24% for white motorists. The same pattern held for searches without consent. The hit rates were 17% for black motorists, 20% for Hispanic motorists and 30% for white motorists.[113] These numbers appear to suggest that black and Hispanic motorists are subject to a high number of vehicle searches even though CPD's own data suggest that, relative to whites, they are less likely to have contraband.

**Plaintiff's Exhibit 8**

The disparate impact on minority motorists is not limited to routine traffic stops. From 2008 through 2013, CPD set up 84% of DUI checkpoints in predominantly black or Hispanic police districts.[114] Moreover, between March and August 2015, CPD set up 14 DUI checkpoints: nine in majority-black police districts, four in majority-Hispanic districts, and only one in a majority-white district. Some majority-white police districts have more alcohol-related car crashes than many of these minority districts, raising significant questions about how CPD selects the locations for these DUI checkpoints.[115]

**Police Oversight System.** The police oversight system itself is not immune to racial bias. From March 2011 through September 2015, CPD's Bureau of Internal Affairs and IPRA examined about 17,500 complaints of police misconduct with named complainants. Of those 17,500 complaints, 61% were filed by African-Americans, 21% were filed by whites and 12% were filed by Hispanics. And yet, the rates of sustained cases looked very different. Of the misconduct complaints sustained, 25% were filed by African-Americans, compared to 58% by whites and 15% by Hispanics.[116] In short, allegations of police misconduct by whites "are nine times more likely to be upheld than those by blacks and almost three times more likely than those by Hispanics."[117]



Racial bias may also come into play on the officer side. Some reports suggest that black officers are disproportionately found guilty of offenses, and black officers with sustained findings are punished more than twice as often as white officers.[118]

Plaintiff's Exhibit 8

## *Recommendations*

**The City should engage the National Initiative for Building Community Trust and Justice to implement a "Reconciliation Process" in Chicago. Critical elements of the process involve the Superintendent publicly acknowledging CPD's history of racial disparity and discrimination in police practices and making a public commitment to cultural change required to eliminate racial bias and disparity.**

Early in the Task Force's work, a South Side minister told one of its members, "If you don't face it, you can't fix it." This prescient comment captures the emerging best practice for acknowledging and attempting to repair fractures in community-police relations.

The President's Task Force on 21st Century Policing recommended that police departments "acknowledge the role of policing in past and present injustice and discrimination and how it is a hurdle to the promotion of community trust." The President's Task Force heard from police chiefs who described what they were doing to "recognize and own their history" and "change the culture within both their police forces and their communities."[119]

Similarly, the Department of Justice's Office of Community Oriented Policing Services ("COPS") has acknowledged the importance of reconciliation, which requires "frank engagements" between minority communities and the police "in order to reset relationships." As an initial step in the reconciliation process, COPS observed, "high-level police executives have been willing to make powerful public statements acknowledging history and seeking to foster reconciliation efforts." In particular, COPS cited recent remarks by NYPD Police Chief William Bratton that "[s]ome of the worst parts of black history would have been impossible without a perverted, oppressive law and order," and that "our history follows us like a second shadow. We can never underestimate the impact these had . . . As police, we must fix what we've done and what we continue to do wrong. It's ours to set right."[120]

To oversee a truth-telling and reconciliation process, the Task Force recommends that the City engage the National Initiative for Building Community Trust and Justice (the "National Initiative"). The National Initiative has developed a detailed reconciliation process and is already implementing the process working with police departments in Birmingham, Fort Worth, Minneapolis and Pittsburgh, as well as in Gary, Indiana and Stockton, California.

The National Initiative's process begins with a public acknowledgment of past harms, including the role of police in pre-civil-rights-era wrongs, harms during the civil rights era, some degree of racist or biased policing and outright illegality since then, disrespectful treatment by police officers and overuse of particular tactics like stop and frisk.[121] After publicly acknowledging past harms, the National Initiative process then calls for (1) sustained listening to community constituencies and stakeholders, (2) an explicit commitment to changing policing in specific ways, (3) fact-finding, (4) the identification of key experiences and narratives on both sides, (5) specifying concrete changes in policies and practices that will move toward new practices and relationships and (6) a mechanism for driving changes.[122]

Plaintiff's Exhibit 8

**The Mayor and the President of the Cook County Board should work together to co-sponsor quarterly summits of key stakeholders and community leaders to develop and implement comprehensive criminal justice reform.**

**The Mayor and the President of the Cook County Board should work together to develop and implement programs that address socioeconomic justice and equality, housing segregation, systemic racism, poverty, education, health and safety.**

CPD is not the cause of, nor the solution to, all of the significant problems facing many of Chicago's minority communities. At the same time, in these communities, CPD is the public face of the broader criminal justice system, which is badly broken and need of significant reform. Through its daily contacts in underserved communities, CPD is also often the public face for government more broadly. While reforming CPD is vitally important, those changes will only accomplish so much unless we meaningfully address broader issues facing Chicago's disadvantaged communities.

Poverty and high unemployment are endemic in many of the Chicago communities that experience the highest levels of violent crime. Chicago is one of the most racially-segregated big cities in America, but Chicago's racial segregation is not the only issue. Chicago is socioeconomically unequal as well. People of color are disproportionately poor. Many black and Hispanic residents have been trapped for multiple generations in poor neighborhoods with little or no economic mobility and, as a result, no geographic mobility.

Both informal and formal local and national laws and policies have been identified as factors in contributing to racial and economic segregation, including discriminatory housing policies, barriers to healthcare services, inequity in the criminal justice system and unbalanced public school funding.[123] In effect, these long-standing practices have resulted in the creation and preservation of poor and isolated neighborhoods where minorities have been denied equal socioeconomic opportunity. The impact of these policies persists today, and the cumulative effects of poverty and isolation make it extremely difficult to break the cycle of poverty.[124]

In addition, minority teens and young adults experience the highest rates of being out of school and unemployed. In a recent study of Chicago, 41% of African-Americans between the ages of 20 and 24 were out of school and out of work, compared to 19% for Hispanics and 7% for whites.[125] Young African-Americans fared significantly worse in Chicago (41% out of school and unemployed) than in Los Angeles (29.3%) or New York (27.3%).[126]



OUT OF SCHOOL AND OUT OF EMPLOYMENT
AGES 20 - 24 BY RACE

Many of the City's policing problems could be avoided altogether by ensuring that African-American and Hispanic teens and young adults have adequate opportunities through education and employment. When people are in school or employed their self-esteem increases, their time

Plaintiff's Exhibit 8

becomes more structured, they use energy in a constructive manner and, in the case of employment, they gain a legal means of providing for themselves and their families. Employing teens and young adults reduces crime and recidivism rates.[127]

There are no easy fixes to these problems. But our public officials must work together to study these problems and develop and implement meaningful solutions. Efforts are underway now, but they are often fragmented and do not lead to any real, significant change.

The Task Force therefore recommends that the Mayor and the President of the Cook County Board co-sponsor quarterly summits of criminal justice stakeholders, community leaders, faith-based organizations, businesspeople, legal and government organizations, civil and human rights organizations, academics and other leaders to develop and implement criminal justice reform. The Task Force also recommends that the Mayor and the President of the Cook County Board co-sponsor community-based programs that address socioeconomic justice and equality, segregation, systemic racism, poverty, education, health and safety.

## Is CPD doing enough to combat racial bias?

### POLICIES

The City and CPD each have antidiscrimination policies in place, which they have worked to improve over time. On paper, these policies generally say the right things. The challenge of course is ensuring that these policies translate to practice.

Chicago's human rights ordinance provides that "[i]t is the policy of the City of Chicago to assure that all persons within its jurisdiction shall have equal access to public services and shall be protected in the enjoyment of civil rights, and to promote mutual understanding and respect among all who live and work within this city."[128]

The ordinance declares that "prejudice, intolerance, bigotry and discrimination … threaten the rights and proper privileges of the city's inhabitants and menace the institutions and foundation of a free and democratic society," and that "behavior which denies equal treatment to any individual because of his or her race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, source of income, or credit history (as to employment only) undermines civil order and deprives persons of the benefits of a free and open society."[129]

Similarly, CPD has a general order on human rights acknowledging that while Chicago "encompasses a variety of communities, each with its own distinctive cultures, lifestyles, [and] customs," "all persons in each area of the City share the common need for protection and service through objective and impartial law enforcement."[130]

Plaintiff's Exhibit 8

The order requires that officers "respect and protect each person's human rights," "treat all persons with the courtesy and dignity which is inherently due every person as a human being," "not exhibit a condescending attitude or direct any derogatory terms toward any person in any manner," and "not exhibit any bias or prejudice against any individual or group because of race, color, gender, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, or source of income."[131]

CPD also has a general order specifically prohibiting "racial profiling or other bias-based policing." In January 2016, CPD updated the order to provide that officers "may not use race" in making routine or spontaneous law enforcement decisions unless race is part of a specific suspect description.[132] The new language is taken nearly word-for-word from Department of Justice guidance to federal law enforcement agencies, which directs that race may not be used "to any degree" in making routine or spontaneous law enforcement decisions.[133] However, CPD's revised order does not include the "to any degree" language and still retains older language prohibiting officers from using race "as the sole basis" for developing grounds for a traffic or street stop—seemingly suggesting that race may be used as *a* basis.

### Recommendations

**CPD should clarify in its general order prohibiting racial profiling and other biased-based policing whether race may be used to any degree in developing grounds for a stop, other than where race is part of a specific suspect description.**

CPD's general order prohibiting racial profiling or other bias-based policing (G02-04) is unclear—and somewhat contradictory—on the role race may play in developing reasonable suspicion or grounds for a traffic or street stop. On the one hand, it says that officers "may not use race." On the other hand, it says that officers may not use race "as the sole basis" for a traffic or street stop, implying that race may be used as one of multiple factors taken into account. CPD should clarify whether race may be used to any degree in street and traffic stops, other than in cases where race is part of a specific suspect description. If there are circumstances where CPD believes race is an appropriate factor for officers to consider, it should spell out those circumstances both for officers and for the public.

## DATA COLLECTION, REPORTING AND TRANSPARENCY

Data collection, reporting and transparency provides a crucial check against racially-biased policing. The City is already subject to heightened requirements under state law and the terms of a settlement agreement with the ACLU, but more needs to be done.

By law, foot and traffic stops are each tracked to guard against racial bias. These requirements have increased in recent years. Since 2004, the Illinois Traffic Stop Statistical Study Act has required the collection of certain data—including on race—for traffic stops, even where no citation or warning is issued.[134] As of January 1, 2016, the law was revised to require that officers collect detailed information on pedestrian stops as well.[135]

In August 2015, CPD also reached an agreement with the ACLU concerning investigatory stops and protective pat downs.[136] In the agreement, CPD agreed to collect data through "Investigatory Stop Reports." The reports replaced the old "contact card" system and collect the same information now required to be collected under state law.[137] CPD also revised its policies on stops and pat downs and is

Plaintiff's Exhibit 8

training its officers accordingly.[138] Moreover, CPD agreed to establish policies for continuous district-level supervisory review and quarterly or semiannual department-level audits of its stop and pat-down practices.[139]

As part of its agreement, the City agreed to provide data and other information to a retired federal magistrate judge who will review its stop and pat-down practices for substantial compliance with the agreement and other legal requirements. The judge will issue a public report twice a year. The agreement will terminate only when the judge finds that CPD has been in substantial compliance for at least a year (in mid-2017 at the earliest).

CPD's public reporting of many types of data is limited. While CPD reports detailed crime incident data on a daily basis through a "Data Portal,"[140] it provides little other information allowing the public to assess its performance. The "Statistical Reports" section of CPD's website does not contain *any* information since 2010. Rather, it provides Annual Reports for 1965 through 2010, monthly index crime reports for 1999 through 2010, crime trend reports from 1991 through 2007, beat-level data for 2007 through 2010, murder reports from 1999 through 2008 and juvenile reports from 1991 through 2008.[141]

### *Recommendations*

**Through its Data Portal, CPD should regularly release incident-level information on arrests, traffic stop reports, investigatory stop reports and predecessor contact cards and officer weapon use (firearm and nonlethal). To facilitate trend analysis, the incident-level data should reach back at least to January 1, 2010.**

For traffic stop reports, investigatory stop reports and predecessor contact cards, the incident-level information should include all collected information, including on each subject's apparent race. For arrests, the incident-level information should include the date, detailed arrest category, drug type (if applicable), central booking number, all text arrest description fields, FBI code and a linking crime incident number, if any. For officer weapon use, the incident-level data should include dates and beat locations, and cover Tasers, pepper spray or other chemical weapons, impact munitions, and firearm discharges of all kinds.

**CPD should resume publishing annual reports.**

**After the ACLU agreement terminates, CPD should continue supervisory review and audits of investigatory stop and pat-down practices, with oversight by the new Community Safety Oversight Board and Inspector General for the Public Safety.**

Plaintiff's Exhibit 8

## RECRUITMENT, HIRING AND PROMOTION

A diverse police department is critical for policing a diverse city and reducing bias-based policing. In our community forums, residents often associated poor treatment with biases that officers held about them and their communities. And in both the community forums and our panels with youth, many individuals expressed a desire that more officers "look like" them and have deeper connections to their communities.

Minority recruitment, hiring and promotion has been a challenge for CPD. In the early 1970s, CPD was 83% white, 16% black and 1% Hispanic.[142] The Afro-American Patrolmen's League, other black and Hispanic officers and the United States sued alleging racial discrimination. A federal court found that CPD's patrolman's exam, background investigation and Sergeant's promotion exam were all racially biased.[143] In a later lawsuit, a federal court found that the Lieutenant's exam was racially biased as well.[144]

Though there was no finding of intentional discrimination, the substantial disparate impact on black and Hispanic applicants and officers led one federal court to conclude that CPD had "knowingly discriminated" against blacks and Hispanics.[145] To remedy these impacts, the court imposed quotas for hiring and promotions.[146] Over time, the quotas were reduced and eventually eliminated.[147] (Today, the use of racial quotas would be impermissible.)



By the mid-1990s, CPD was 65% white, 25% black and 9% Hispanic.[148]

Since then, Hispanics have seen significant gains within CPD, while blacks regressed slightly. In 2014, CPD was 52% white, 23% black and 21% Hispanic.[149] CPD is generally moving in the right direction, but it still has a ways to go to approach the racial makeup of the City.

Plaintiff's Exhibit 8

The CPD has particular work to do when it comes to promotions. As of March 10, 2016, CPD Sergeants were 67% white, 14% black and 16% Hispanic. Lieutenants were 78% white, 11% black and 11% Hispanic. Captains were 70% white, 15% black and 9% Hispanic. And detectives were 64% white, 18% black and 16% Hispanic.[150]









In its most recent hiring sequence, which began in late 2015, CPD launched a recruitment drive aimed specifically at minorities.[151] In an interview with the Task Force, CPD's Director of Human Resources reported that, of the applicants who signed up for the test, approximately 40% were black, 40% were Hispanic and 20% were white. While these initial numbers are encouraging, minorities have been at greater risk of either dropping out or being screened out at various stages of the hiring process (e.g., the written exam, psychological exam or background check). More work on diversity still needs to be done.

Plaintiff's Exhibit 8

### Recommendations

**CPD should develop and use recruitment, selection and promotion strategies that increase diversity and the likelihood that officers will be culturally competent, fair and impartial, especially when policing communities of color.**

The Task Force recommends that CPD develop and use recruitment, selection and promotion strategies geared to increasing diversity. As part of this work, CPD should analyze root causes for failing to attract minority candidates historically and assess the barriers to those candidates making it through the hiring and promotion process. Other departments have addressed these issues by strategically recruiting outside the city, reviewing cutoff scores for psychometrics exams and fitness tests, collaborating with local workforce development agencies and having a long-term strategy for mentoring youth of color.[152]

CPD should also seek to identify officers who have had exposure to diverse communities, are willing to reflect on their own behavior and inherent biases and have a desire to serve vulnerable populations. Officers certainly do not need to be of a certain race to effectively operate in communities of color, but CPD needs to do a better job of identifying officers who are likely to thrive in these communities and screening out officers who will not.

**CPD should hire a Deputy Chief of Diversity and Inclusion.**

Almost every large company or organization today has a diversity and inclusion program, typically overseen by a director or committee whose specific job is to manage diversity and inclusion efforts. CPD should be no exception. CPD should create a new Deputy Chief of Diversity and Inclusion position, with sufficient support staff. In addition to overseeing minority recruitment and promotion efforts, the Deputy Chief should be charged with overseeing the implementation of the Task Force's recommendations with respect to race, as well as overseeing how CPD's actions affect its minority "customers" in the community.

## TRAINING

Training is another important component to reducing racial bias. Everyone has biases. Police officers must learn to acknowledge and address their own.

In the Academy, probationary officers receive 24 hours of training in "Diversity Management," including "police citizen relationships, bias, prejudice, and hate."[153] Additionally, CPD reports that cultural competence is addressed at various points during training, as appropriate.[154] CPD generally teaches about bias and cultural competence through internal trainers. Often, police departments do not have a deep capacity for conducting training on fair and impartial policing and cultural competence issues. When the Task Force interviewed some of the trainers who deliver cultural-related content, not surprisingly, there seemed to be some lack of comfort in instructing officers on sensitive cultural topics and related issues.

CPD started, but has not completed, training on procedural justice. Procedural justice is a key component of 21st-century policing models. It is based on decades of research and practice showing that "people are more likely to obey the law when they believe that those who are enforcing it have the legitimate authority to tell them what to do. But the public confers legitimacy only on those they believe are acting in

Plaintiff's Exhibit 8

procedurally just ways."[155] Procedurally just behavior is based on four principles: (1) treating people with dignity and respect; (2) giving individuals "voice" during encounters by listening to what they have to say; (3) being neutral and transparent in decision making; and (4) conveying trustworthy motives.[156]

In July 2012, CPD rolled out a first round of "Procedural Justice and Police Legitimacy" training. Nearly all officers have completed this 8-hour course.[157] In February 2015, CPD rolled out a second round of "Procedural Justice: A Tactical Mindset" training. So far, only approximately 2,500 officers—out of the more than 12,000 sworn officers in CPD—have completed this second 8-hour course.[158] CPD is currently in the process of developing a third round of procedural justice training that will specifically address implicit bias. CPD introduced the topic of implicit bias in the first two rounds, but the topic will be more fully developed in the third round. This training must not be allowed to stall.

### Recommendations

**CPD should adopt and promote a clear, progressive policing philosophy grounded in core values such as respect, protecting the sanctity of all life and protecting civil and human rights.**

Mission-driven organizations organize their cultures around core values that convey organizational aspirations, determine important outcomes and metrics, inform budgetary decisions and guide behavior. In organizations with a strong, mission-driven culture, these core values are made visible in numerous ways, including literally displaying them visually in words and images around the organization. Core values are then made "real" and "living" through practices and processes that shape the organization's employees, including through recruitment, selection, training, recognition and other incentives.

The President's Task Force on 21st Century Policing recommended that law enforcement embrace a "guardian" mindset to build public trust and legitimacy.[159] Historically, police have been trained more like soldiers, with a "warrior" mentality. But police officers are not soldiers. The President's Task Force observed that while "[s]oldiers come into communities as an outside, occupying force," "[g]uardians are members of the community, protecting from within."[160] The President's Task Force recommended that police departments adopt procedural justice as the "guiding principle" for the guardian mindset.[161]

Similarly, the Police Executive Research Forum ("PERF") has stressed the importance of a police culture of protecting "the sanctity of *all* human life."[162] Thus, rather than "think[ing] solely about their own safety," police officers should take "a broader approach designed to protect everyone's lives."[163] A number of police departments—including in Las Vegas and in Northern Virginia—have adopted use-of-force policies based on this broader approach.[164] The shift to a guardian model has many potential benefits for both communities and the police. Many police leaders believe that the approach increases police legitimacy, which ultimately results in more community collaboration and, in turn, decreases in crime.

CPD should adopt and promote a 21st-century model of policing where officers act as "guardians" of the community, not soldiers. This must be more than just a catchphrase. This philosophy must be promoted throughout the department, and at all stages of an officer's career—from recruitment to Academy training, field training and the field. This approach should be apparent not just to officers, but to the community as well.

Plaintiff's Exhibit 8

**CPD should bring in experts and credible trainers to deliver comprehensive training on cultural competence and implicit bias for all recruits, officers and supervisors.**

CPD should expand its approach to teaching recruits, officers and supervisors about implicit bias and cultural competence. Because these are often uncomfortable topics and involve specialized knowledge, best practice is to bring in subject matter experts to teach this content and facilitate meaningful discussion. These trainers can also establish a "train the trainer" approach to build capacity within CPD. It is critically important that this training is provided from the "top down," signaling to the entire CPD that new approaches to building cultural competence and engendering fair and impartial policing are being taken. The Diversity People, Fair and Impartial Policing, Center for Police Equity and The Center for Human Diversity all have experience training police departments on these critical issues.

**CPD should involve the community in officer training that includes being trained by and partnering with community leaders, organizations and youth.**

Throughout its community engagement process, the Task Force heard from numerous community members about missed opportunities for CPD to leverage the strengths of communities. In its Academy and field training, as far as we can tell, CPD makes little effort to engage with communities in ways that enable them to educate officers about their strengths and assets. The Task Force recommends that CPD take an asset-based community development approach to training by bringing in members of the community to educate new officers on the assets that exist in the community, to discuss the roles that communities can play in helping to reduce crime and to partner with officers to achieve mutual goals.[165]

For example, CPD should consider integrating in its training: (1) youth panels, so that youth can talk to trainees and dispel negative stereotypes often held about youth of color and discuss how they would prefer to be engaged; (2) videos and other training materials created by community members that provide district-assigned officers with specific knowledge of the unique history and strengths of their communities; (3) youth- and community-led tours for district-assigned police officers that enable community members to highlight the assets in their neighborhoods; (4) tasking district-assigned officers with identifying key community leaders, institutions and organizations and developing relationships with these partners; (5) visits to neighborhood schools and regular roundtables with high school youth; and (6) participation in community service and other volunteer opportunities.

## DEPLOYMENT

CPD's current officer deployment strategies do little to reduce the potential for racially-biased policing. Because the deployment system is largely seniority-based, as mandated by collective bargaining agreements, younger and less experienced officers are often assigned to high-crime neighborhoods and the most difficult watches and beats. Many of these officers are placed in these high-stress situations with little to no experience or familiarity with the neighborhoods they will be policing. This is a recipe for trouble.

Plaintiff's Exhibit 8

*Recommendations*

**CPD, including the Deputy Chief of Diversity and Inclusion, should analyze deployment strategies to ensure officers are culturally competent and have a proper understanding of the neighborhoods where they are assigned.**

As part of its analysis, CPD should also consider deploying more mixed race patrol teams whenever possible, particularly in communities of color.

**Where possible, CPD should assign more experienced officers to high-crime districts, beats and shifts. If new officers are given these difficult assignments, they should be partnered with experienced officers with exemplary disciplinary histories and the proven ability to work with diverse populations.**

## How should CPD involve the community in its policing efforts?

In the early 1990s, Chicago's Alternative Police Strategy ("CAPS") was designed to promote positive police interactions and engagement with the community as a key to long-term crime reduction. Its original architects were then-Deputy Chief of Patrol Charles Ramsey (recently retired Commissioner of the Philadelphia Police Department and co-chair of the President's Task Force on 21st Century Policing) and the civilian Director of CPD's Research and Development Division, Barbara McDonald. CAPS was tested in five police districts beginning in April 1993 and was rolled out City-wide in spring 1995.

As initially conceived, CAPS was based on five key features. First, CAPS adopted a problem-solving model. Rather than responding to individual calls, officers were expected to employ a proactive, prevention-oriented stance to neighborhood problems. The problem-solving model focused on chronic concentrations of related incidents, which could then be addressed by identifying and prioritizing problems, analyzing them, designing response strategies, implementing those strategies and assessing their success.[166]

Second, CAPS focused on turf orientation so that police would become more acclimated to the communities they served. Officers were supposed to stay in one place long enough to develop partnerships with and trust among community members and spend more time working with the community and less time answering radio dispatches. This was accomplished by assigning officers to particular beats, ideally for at least a year.[167]

Third, CAPS reorganized police to enhance communication and consultation with neighborhood residents. Community policing relies on active citizen engagement concerning the needs of the community, and it creates opportunities for resident involvement. This was accomplished through beat meetings between residents and police who work in the neighborhood and district advisory committees to advise Commanders in each police district.[168]

Fourth, CAPS expanded the police's role by allowing them to mobilize other city services to solve problems in particular neighborhoods (e.g., graffiti, abandoned vehicles and buildings, malfunctioning street lights and other signs of neighborhood disorder).[169]

Finally, CAPS relied on new tools to address chronic problems. These tools included crime maps and data to identify chronic problems, a roving task force to enforce housing ordinances and cooperation with

Plaintiff's Exhibit 8

prosecutors, who would also get out into the community and work with beat officers on problem buildings.[170]

Over its first 5-10 years, CAPS had successes and failures. On the positive side, community involvement increased substantially. Beat meetings were held monthly, and nearly 390,000 Chicagoans attended beat meetings through the end of 2000.[171] Positive public perceptions of CPD increased, as measured in community surveys.[172] Crime dropped, though the extent of CAPS' contribution is not clear.[173] At least in the black community, surveys showed that neighborhood problems, such as physical decay, had dropped significantly.[174]

The results were mixed, however. CAPS never succeeded in involving youths.[175] Integrating Hispanic residents into the program was difficult.[176] The beat meetings were well attended but often failed to produce noticeable results, and few district advisory committees carved out a meaningful role.[177] Turf orientation proved difficult, as officers were called away on 911 calls, stretched too thin to spend significant time interacting with the communities and often transferred between districts or beats.[178] Similarly, it was difficult for officers to focus on problem-solving, as they dealt with large numbers of service calls.

CAPS also failed to tailor community outreach efforts to particular districts and instead relied on a uniform "cookie cutter" approach to community engagement.[179] Similarly, while beat meetings were well attended, CAPS did not succeed in consistently developing deep, genuine and lasting partnerships with local stakeholders.

By the late 2000s, funding for CAPS had been cut considerably.[180] Many CAPS personnel were based downtown, and civilian staff had been significantly reduced, resulting in fewer community outreach programs. Beat meetings were held less frequency (every two-three months instead of monthly) and often combined multiple beats at more distant locations. Attendance dropped off significantly after 2000.[181]

In early 2013, Mayor Emanuel tried to revitalize CAPS by shifting resources to individual districts, with each Commander responsible for tailoring the program to the neighborhood. Each district was assigned a CAPS Sergeant and two officers, along with a community organizer and a youth services provider. The overall budget for CAPS did not change, however.[182] The CAPS Sergeant and two officers in each district were still less than the Sergeant and six officers in each district at the height of CAPS.[183] The new initiative has not reversed the trend of decreased community participation, and public confidence in CAPS remains low.[184]

As the fate of CAPS sadly attests, community policing techniques are not self-sustaining. Unless it is thoroughly incorporated into the organizational structure of the police department at every level and continually rejuvenated with personnel, funding and other resources, community policing runs the risk of being marginalized and forgotten.[185] "Until community policing becomes the business-as-usual approach to policing—something that has probably been accomplished in relatively few departments—there is the grave possibility that it will vanish, even as it continues to be heralded as a sterling idea."[186]

Plaintiff's Exhibit 8

## Recommendations

### CPD should adopt community policing as a core philosophy.

National best practices are clear—community policing must be treated as a core philosophy throughout CPD. Community policing cannot be relegated to a small, underfunded program. As the President's Task Force on 21st Century Policing recommended, community policing "should be infused throughout the culture and organizational structure of law enforcement agencies."[187] Similarly, the Department of Justice's Office of Community Orientated Policing Services recommends that police departments "adopt[] community service as the overarching philosophy of the organization" and make "an institutional commitment to community policing that is internalized throughout the command structure."

### CPD should replace CAPS with localized Community Empowerment and Engagement Districts (CEED) and support them accordingly.

The CAPS brand is significantly damaged and should be replaced. To promote community policing principles based on local community engagement, CPD should designate each of the City's 22 police districts as a "Community Empowerment and Engagement District." Within each CEED, district Commanders and other leadership should make a sustained effort to engage local stakeholders and develop strategies and partnerships for reducing crime. These CEED strategies should be individually tailored to each particular district.

Moreover, the CEED strategy should focus on developing a unified approach in each district, drawing from a variety of community programs that are already being pursued throughout the City. The CEED strategy should include training and developing officers on proven community empowerment and engagement approaches like Restorative Justice, Advanced Youth Development and Asset Based Community Development. These practices are currently being implemented by a variety of groups, including Bridging the Divide, Community Justice for Youth Institute, Alternatives, Inc., EMBRACE, RJ HUBS, FOUS Youth Development Services and the World Cafe.

### CPD should expand the methods it uses to communicate and work with neighborhood residents.

As part of CAPS, CPD often relied on a formulaic menu of methods for engaging the community. Those methods largely focused on beat meetings and district advisory committees. Especially as attendance dropped, those methods proved insufficient to consistently reach and engage members of the community. CPD should pursue alternative and flexible avenues for communicating and working with neighborhood residents. While it will not reach everyone, social media is a promising and largely untapped resource.[188] As part of a CEED strategy, district leadership should also proactively identify and contact key community stakeholders to develop strategies and partnerships for reducing crime.

### CPD should reinvest in civilian organizing staff.

One of the reasons CAPS is failing is because its civilian staff has dwindled to the point of ineffectiveness. As part of the CEED approach, CPD should invest in civilian staff to assist district leadership in organizing and mobilizing residents to address significant issues. CPD should ensure that the civilian staff has community organizing, restorative justice, advanced youth development

Plaintiff's Exhibit 8

and other community development skills. While there will undoubtedly be a cost to building and maintaining this civilian staff, an effective community engagement strategy will pay dividends on the back end by reducing crime and increasing safety.

**CPD should renew its commitment to beat-based policing and work to expand community patrols.**

Beat-based policing is a critical component to any community policing approach. Officers must have time to get to know the communities they serve. The Task Force heard from many residents frustrated by frequent turnover of both officers and supervisory personnel in their neighborhoods. As the CAPS experience showed, it is very easy for beat-based policing to fall by the wayside as officers are pulled away on 911 calls or transferred between beats or districts. CPD must make a conscious effort to renew its commitment to beat-based policing and develop strategies that allow officers to truly learn their beats.

The community has a role to play as well. In addition to beat-based policing, community-led patrols have shown promise in reducing crime rates, increasing community safety and empowering the local community. For example, the City has successfully partnered with CPS and community-based organizations in the "Safe Passage" program, which creates routes where students can walk to school with safe passage workers.[189] Community-led patrols have also shown promise dealing with outbursts of violence, particularly during warmer weather. Police and community residents have also worked together to ensure the safety and success of community-wide events, such as midnight basketball and cultural-based community celebrations held in local public spaces. For these efforts to work, there must be strong, open communication between community patrols and the police, along with a clear shared decision-making structure at the local levels guided by both police and community residents.

**CPD should include information about how the public is being involved and how effectively neighborhood concerns are being addressed in CompStat.**

To show that community policing matters, CPD should include measures of community policing performance in CompStat. Before the recent Superintendent change, CPD was exploring a new "RespectStat" system, which would "analyze[] data on the quality of police-citizen interactions to provide constructive feedback to command-level personnel about performance in specific geographic areas."[190] The RespectStat proposal was based on community satisfaction surveys managed by the University of Illinois at Chicago.[191] CPD should integrate this data as part of CompStat. Also, as part of CompStat, CPD should gather and report information about how the public is being involved in each district.

## Are CPD officers adequately equipped to interact with youth?

The existing relationship between CPD and youth—particularly youth of color—can be described as antagonistic, to say the least. Children in some areas of the City are not only being raised in high-crime environments, but they are also being mistreated by those who have sworn to protect and serve them.[192] Throughout our community engagement efforts, including during our youth panels, we heard story after

Plaintiff's Exhibit 8

story of officers treating youth with disrespect, humiliating them or worse. Overuse of stop and frisk practices, without any individualized reasonable suspicion, appears to be a particular problem.

The troubled relationship between CPD and youth is a significant missed opportunity. During our youth panels, we also heard positive stories from youth about police officers at their schools who had taken the time to get to know them, helped them solve problems and coached and mentored them. Many students had developed strong relationships with officers in their schools. Other youth talked about positive interactions with officers at a local station that hosted community events. However, the stories shared by local youth were overwhelmingly negative and painted a dark view of police-youth interactions.

Most CPD officers are not adequately trained or equipped to interact with youth. In the Academy, recruits receive 8 hours of training on juvenile law and processing and another 2 hours of training on intergenerational police-community relations. CPD has developed an advanced 40-hour "CIT-Youth" training for officers who have completed the basic 40-hour CIT training. Approximately 800 officers have completed "CIT-Youth" training.

In schools, in the late 1990s and early 2000s, CPS enforced a strict zero tolerance policy for misconduct by students. The zero tolerance policy merely accentuated a school to prison pipeline. Since then, CPS has undergone a shift from a "we need to get the bad apples out" approach to an approach of "we need to support student success and keep them in school," wherever possible. 75 schools now have officers assigned to the building, with an average of two officers per school. That number is down from 125 schools four years ago.[193]

CPS trains officers who will be assigned to schools and works closely with district Commanders to address and resolve concerns. These officers are generally expected to contribute to a culture and climate of calm by building relationships with students, supporting problem-solving and engaging in restorative justice practices. However, there does not appear to be a specific job description for officers in schools that provides a clear and shared understanding of their role. Based on our interviews, this lack of guidance leads to some inconsistency in what officers actually do from school to school.

### Recommendations

**CPD should evaluate and improve the training officers receive with respect to youths to ensure that all officers are prepared to engage with youth in ways that are age-appropriate, trauma-informed and based in a restorative justice model.**

Training police officers with respect to youth should have at least three key components. First, officers must learn age-appropriate treatment. Officers should work with an understanding of the fundamental differences between adolescents and adults and recognize that youth are biologically susceptible to impulsive, risk-taking and peer-influenced behavior. Officers should also know that youth possess a unique capacity for positive change. Youth are not miniature adults and should not be treated the same as the worst adult offenders.

Second, engagement with youth must be trauma-informed. Ultimately, police should protect the most vulnerable (children), even when they have done something wrong. To be trauma-informed means recognizing that most children who encounter the law—either as victims or offenders—tend to be some of the most abused, neglected and traumatized children in our society. Therefore,

Plaintiff's Exhibit 8

officers should treat children with the utmost sensitivity to potential past trauma and do everything possible to not cause further harm. Subject matter experts are needed to train officers to respond appropriately and effectively to children who might have experienced trauma. The Substance Abuse and Mental Health Services Administration and the International Association of Chiefs of Police offer resources on these issues.

Finally, officers should be ready to use restorative justice models in appropriate cases. Arrest and detention should be reserved for the most violent youth offenders. Otherwise, diversion to community-based resources should be the first priority when working with youth. Restorative justice models have shown significant promise and typically involve inclusion of all parties (offender and victim), encountering the other side, making amends for the harm and reintegrating the parties into their communities. Again, CPD should bring in subject matter experts to develop a strategy for using restorative justice practices with youth.

**CPD and CPS should ensure that officers who are assigned to schools have clear job descriptions and expectations that are shared by CPS and CPD, receive extensive and ongoing training on how to engage with youth and crisis intervention and are swiftly reassigned if they fail to meet expectations.**

## Is CPD doing enough to protect human and civil rights?

Under the U.S. Supreme Court's ruling in *Miranda v. Arizona*, criminal suspects must be advised of their constitutional rights before statements they make to the police under interrogation can be used against them.[194] *Miranda* requires that the defendant be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."[195] In addition to being advised of his rights, a defendant is also guaranteed the right to have counsel present at all "critical" stages of the criminal proceedings.[196] This constitutional right to counsel attaches at the defendant's initial appearance before a judicial officer.[197]

Illinois law supplements these constitutional safeguards with additional requirements for earlier access to legal counsel. State law provides that arrested individuals "shall have the right to communicate with an attorney of their choice and a member of their family."[198] Communication with counsel must be permitted by the police "within a *reasonable* time after arrival at the first place of custody."[199] A CPD general order also requires that individuals in custody be permitted to telephone a lawyer "within a reasonable period of time" after being taken into custody.[200] Finally, state law requires that all police stations advise persons in custody of their right to communicate with a lawyer by "post[ing] in every room, other than cells … in conspicuous places where it may be seen and read by persons in custody and others, a poster" that explicitly outlines a defendant's right to counsel.[201]

And yet, few Chicagoans arrested by CPD consult counsel while in police custody. Based on our interviews, CPD generally provides phone access only at the end of processing, after interrogation and charging, while arrestees wait in lockup to be released or transferred to county custody. Remarkably, in 2014, only *3 out of every 1,000 arrestees* had an attorney at any point while in police custody.[202] In 2015, the City reports that out of a total of 113,018 arrests, only 702 Attorney Visitor Request Forms were filled

Plaintiff's Exhibit 8

out by counsel—about 6 out of every 1,000 arrestees. The rates for filling out these forms varied widely by Area. In the North and Central Areas, there was 1 counsel visit for every 168 and 125 arrestees, respectively. In the South Area, there was 1 counsel visit for every 227 arrestees.[203]

Throughout our work, we have heard from community members that their rights are not protected. Individuals who have been taken into police custody frequently report being denied phone calls and access to an attorney. The police do not provide contact information for legal aid to arrestees. When individuals in custody attempt to invoke their legal rights to counsel, they report facing hostility from police. And counsel report that CPD often has difficulty telling them where an arrestee is being held at any given moment.

The City's youth are particularly vulnerable. Youth often lack awareness of their basic constitutional rights. CPS does not require instruction on this subject as part of the school curriculum. Further, as far as we can tell, CPD has not made the legal rights of juveniles a priority. We have heard that police frequently tell lawyers working on behalf of juveniles that their clients do not have a right to counsel or that the juvenile's guardian must approve a visit by a lawyer. Youth should be receiving more, not less, protection.

### *Recommendations*

**Train the community in Know Your Rights and Responsibilities, including by:**

**(a)** **Creating a CPS policy and City Ordinance requiring that students receive instruction on how to exercise 4th, 5th and 6th Amendment rights; and**

**(b)** **Create a technology platform to assist with a public service announcement campaign and informational videos in police stations.**

Everyone should know their rights. The Task Force recommends that CPS develop a compendium to teach all students their constitutional rights and how to exercise them when in contact with the police at some point between the 6th and 10th grades. The City should also create a technology platform to assist with a public service announcement campaign and informational video, to be broadcast at police stations, that will ensure that arrestees are made aware of their constitutional rights.

**The City should enact an ordinance, and CPD should promulgate general orders:**

**(a)** **Mandating that arrestees be allowed to make phone calls to an attorney and/or family member(s) within one hour after arrest, allowing only for limited exceptions in exigent circumstances;**

**(b)** **Mandating that a legal aid or other provider be contacted within 30 minutes of the arrest of any juvenile, and that CPD wait for legal representation to arrive before any questioning of a juvenile occurs; and**

**(c)** **Confirming that CPD will prominently post information concerning rights to counsel, as already required under state law, and include any willing legal aid provider's name and 24-hour contact information.**

Plaintiff's Exhibit 8

The City and CPD should promulgate an ordinance and general order, respectively, expressly stating what time is "reasonable" for allowing arrestees to make calls to an attorney and/or family member(s). Several states, including California, Nevada, New Mexico, Rhode Island and Tennessee, require that an individual be able to telephone counsel within a specific time frame after arrest—ranging from one to three hours.[204] The Task Force recommends that arrestees be allowed to make calls within one hour of arrest. The ability for arrestees to call on counsel and to understand their constitutional rights "protects people at a time when they are most vulnerable, and is a key safeguard against … ill treatment."[205]

The Task Force recognizes that there may be limited instances where exceptions are warranted. The ordinance and general order should provide for exceptions where allowing arrestees to make phone calls within one hour would pose a clear and immediate threat to public safety, or where doing so would be impractical, such as if an arrestee is incapacitated due to a serious medical condition. If CPD invokes the exception in a given case, it should be required to explain and document the specific grounds in a particular case.

When CPD arrests a juvenile, the ordinance and general order should require that CPD contact a legal aid provider within 30 minutes of arrest, absent the same exigent circumstances as with an adult. CPD should then be required to wait for legal counsel to arrive and meet with the juvenile before any questioning occurs. This practice is consistent with Senate Bill 2370, which is currently pending in the Illinois Senate. That bill would require that all juveniles in police custody have legal representation before interrogation.

In addition, CPD should ensure that it complies with all laws—including existing state law—requiring posting of rights to counsel and that every reasonable attempt is made to ensure that detainees understand their rights. Postings should include any willing government or non-profit legal aid provider's name and 24-hour contact information.

## Endnotes

[72] Bill Ruthhart & Lolly Bowean, Distrust of Chicago Cops Helps Drive Emanuel's Low Approval on Crime, Chicago Tribune (Feb. 3, 2016), *available at* http://www.chicagotribune.com/news/local/politics/ct-rahm-emanuel-crime-poll-met-0203-20160202-story.html.

[73] African-Americans, Encyclopedia of Chicago, Chicago Historical Society (2005).

[74] Elaine Lewinnek, On the 95th Anniversary of the Chicago Race Riots, OUPblog (July 30, 2014), *available at* http://blog.oup.com/2014/07/chicago-race-riots-property-values-anniversary/.

[75] *Id.*

[76] *Id.*

[77] Report of the January 1970 Grand Jury, U.S. District Court, N.D. Ill. at 113 (May 15, 1970).

[78] *Id.* at 108.

[79] *Id.* at 86-89, 108-10.

[80] *Id.* at 126.

[81] *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979).

[82] Wilfredo Cruz, Minority Leaders Charge Police with "Disorderly Conduct," Chicago Reporter (Oct. 1, 1982), *available at* http://chicagoreporter.com/arrests-jump-sharply-minority-leaders-charge-police-with-disorderly-conduct/.

Plaintiff's Exhibit 8

[83] Maurice Possley, 800,000 Arrests Voided, Chicago Tribune (Mar. 31, 1984), *available at* http://archives.chicagotribune.com/1984/03/31/page/1/article/800-000-arrests-voided; William B. Crawford, Jr., Judge Criticizes City Lawyers for Arrest Suit Delay, Chicago Tribune (Apr. 4, 1984), *available at* http://archives.chicagotribune.com/1984/04/05/page/73/article/judge-criticizes-city-lawyers-for-arrest-suit-delay.

[84] Partial Final Decree, *Nelson v. City of Chicago*, Case No. 83-C-1168 (N.D. Ill. Mar. 30, 1984).

[85] Consent Decree, *Nelson v. City of Chicago*, Case No. 83-C-1168 (N.D. Ill. Aug. 3, 1990).

[86] Unpublished article by Wesley Skogan, Public Complaints, Weapon Use and Force, Traffic Stops and Arrest Trends in Chicago (Jan. 2016).

[87] Citing Race Angle in a Float, Parade Bars a Police Entry, New York Times (Mar. 10, 1993), *available at* http://www.nytimes.com/1993/03/10/us/citing-race-angle-in-a-float-parade-bars-a-police-entry.html.

[88] Edward J. Egan & Robert D. Boyle, Report of the Special State's Attorney, Appointed and Ordered by the Presiding Judge of the Criminal Division of the Circuit Court of Cook County in No. 2001 Misc. 4 (July 19, 2006), *available at* http://www.aele.org/law/2006LROCT/chicagoreport.pdf.

[89] U.S. Department of Justice Press Release, Former Chicago Police Commander Convicted of Perjury, Obstruction of Justice Related to Torture of Suspects (June 28, 2010).

[90] *See generally People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶¶ 6-8.

[91] *See, e.g., People v. Wilson*, 116 Ill. 2d 29 (1987).

[92] Ryan Pardons 4, Chicago Tribune (Jan. 10, 2003), *available at* http://www.chicagotribune.com/chi-030110pardons-story.html.

[93] *E.g.,* Jeremy Gorner, Former Chicago Police Cmdr. Jon Burge Released From Home Confinement, Chicago Tribune (Feb. 13, 2015), *available at* http://www.chicagotribune.com/news/chi-jon-burge-police-torture-released-20150213-story.html.

[94] Hal Dardick & John Byrne, Mayor: "Sorry" for Burge Torture Era, Chicago Tribune (Sept. 11, 2013), *available at* http://articles.chicagotribune.com/2013-09-11/news/chi-city-council-settles-burge-torture-cases-for-123-million-20130911_1_burge-victims-burge-era-torture-era.

[95] City Council Resolution (Apr. 14, 2015).

[96] Working Group Interview.

[97] *City of Chicago v. Morales*, 527 U.S. 41 (1999).

[98] *Id.* at 56-58.

[99] *Id.* at 56, 60-61, 64.

[100] Data provided to the Task Force by the ACLU.

[101] Independent Police Review Authority, Annual Reports, 2008-2015, Officer-Involved Shootings, *available at* http://www.iprachicago.org/ipra/homepage/PublicationPress/archived_reports.html.

[102] *Id.*, 2012-2015, Officer-Involved Taser Discharge.

[103] *Terry v. Ohio*, 392 U.S. 1 (1968).

[104] *Id.* at 24.

[105] Stop and Frisk Practices in Chicago, supra *note* 16.

[106] *Id.*

[107] **Id.**

[108] Wesley G. Skogan, Chicago Community Survey, Preliminary Survey of Findings (Dec. 29, 2015).

[109] *Id*.

[110] *Id*.

[111] CPD Traffic Stops and Resulting Searches in 2013, *supra* note 15.

[112] *Id.* at 4-5.

[113] *Id.*

[114] Angela Caputo, Chicago Police Sobriety Checkpoints Target Black, Latino Neighborhoods, Chicago Tribune (May 8, 2015), *available at* http://www.chicagotribune.com/news/watchdog/ct-dui-checkpoints-chicago-met-20150507-story.html.

[115] Angela Caputo, Chicago Police DUI Checkpoints Still Concentrated In Minority Neighborhoods, Chicago Tribune (Sept. 11, 2015), *available at* http://www.chicagotribune.com/news/watchdog/ct-chicago-dui-checkpoints-met-20150909-story.html.

[116] Citizens Police Data Project, 2011-2015 Use of Force, *available at* http://cpdb.co/data/bZQ5YL/20112015-use-of-force.

Plaintiff's Exhibit 8

[117] Adeshina Emmanuel & Jonah Newman, Police Misconduct Complaints by Whites More Likely to be Upheld, Chicago Reporter (Nov. 10, 2015), *available at* http://chicagoreporter.com/police-misconduct-complaints-by-whites-more-likely-to-be-upheld/; Citizens Police Data Project, Findings, *available at* http://cpdb.co/findings/.

[118] Tanveer Ali, Black Officers Twice as Likely to be Punished by CPD: Data (Nov. 10, 2015), *available at* https://www.dnainfo.com/chicago/20151110/bronzeville/repeat-excessive-force-offenders-within-cpd-rarely-punished-data-shows.

[119] 21st Century Policing Task Force Report, *supra* note 48, at 12.

[120] National Initiative for Building Community Trust and Justice, Reconciliation, Community Oriented Trust and Justice Briefs, Washington, DC: Office of Community Orientated Policing Services (2015), *available at* http://ric-zai-inc.com/Publications/cops-w0794-pub.pdf.

[121] National Initiative for Building Community Trust and Justice, Reconciliation Process Overview (Draft).

[122] *Id.*

[123] Social Impact Research Center, Racism's Toll: Report on Illinois Poverty (Feb. 2016), *available at* http://www.ilpovertyreport.org/sites/default/files/uploads/PR16_Report.pdf.

[124] Patrick Sharkey, Stuck in Place—Urban Neighborhoods and the End of Progress Towards Racial Equality (Univ. of Chicago Press 2013).

[125] University of Illinois Chicago Great Cities Institute, Lost: The Crisis of Jobless and Out of School Teens and Young Adults in Chicago, Illinois, and the U.S. (Jan. 2016), *available at* https://greatcities.uic.edu/wp-content/uploads/2016/02/ASN-Report-v4.pdf.

[126] *Id.*

[127] University of Chicago Crime Lab, Short Term Results of the One Summer Plus 2012 Evaluation (2013); Safer Foundation Three-Year Recidivism Study (2010), *available at* http://www.saferfoundation.org/files/documents/Safer%20Recidivism%20Study%202008%20Summary.pdf.

[128] Chicago Municipal Code § 2-160-010.

[129] *Id.*

[130] CPD, General Order G02-01, Human Rights and Community Partnerships (July 4, 1992).

[131] *Id.*

[132] CPD, General Order G02-04, Prohibition Regarding Racial Profiling and Other Bias Based Policing (Jan. 1, 2016).

[133] U.S. Department of Justice, Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity (Dec. 2014), *available at* https://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf.

[134] 625 ILCS 5/11-212(a)-(b).

[135] 625 ILCS 5/11-212(b-5).

[136] CPD/ACLU Investigatory Stop and Protective Pat Down Settlement Agreement (Aug. 6, 2015).

[137] *Compare id.* at I(1)(a) through (l) *with* 625 ILCS 5/11-212(b-5)(1) through (11).

[138] CPD, Special Order S04-13-09, Investigatory Stop System (Mar. 22, 2016).

[139] CPD/ACLU Investigatory Stop and Protective Pat Down Settlement Agreement, *supra* note 135, at II(3).

[140] CPD Data Portal, *available at* https://data.cityofchicago.org/Public-Safety/Crimes-2001-to-present/ijzp-q8t2.

[141] CPD, Statistical Reports, *available at* http://home.chicagopolice.org/inside-the-cpd/statistical-reports/.

[142] *United States v. City of Chicago*, 411 F. Supp. 218, 234 (N.D. Ill. 1976).

[143] *Id.* at 233-39, *aff. in part and rev. in part*, 549 F.2d 415, 429 (7th Cir. 1977).

[144] *Bigby v. City of Chicago*, 766 F.2d 1053 (7th Cir. 1985).

[145] 411 F. Supp. at 224; 549 F.2d at 435.

[146] 549 F.2d at 436.

[147] *E.g.*, *United States v. City of Chicago*, 663 F.2d 1354 (7th Cir. 1981).

[148] CPD Data Systems.

[149] *Id.*

[150] Data provided by the City of Chicago via letter dated Mar. 11, 2016.

[151] WLS, CPD Is Hiring, Aims to Increase Diversity Among Ranks (Nov. 2, 2015), *available at* http://abc7chicago.com/news/cpd-is-hiring-aims-to-increase-diversity-among-ranks/1063634/.

[152] *See, e.g.*, Carl F. Matthies, Kirsten M. Keller & Nelson Lim, Identifying Barriers to Diversity in Law Enforcement Agencies, RAND Corporation (2012), *available at* http://www.rand.org/content/dam/rand/pubs/occasional_papers/2012/RAND_OP370.pdf; Alexa

Plaintiff's Exhibit 8

Kasdan, Increasing Diversity in Police Departments: Strategies and Tools for Human Rights Commissions and Others, Kennedy School of Government, Harvard University (Oct. 2006), *available at* http://www.hks.harvard.edu/index.php/content/download/67469/1242686/version/1/file/increasing_police_diversity.pdf.

[153] Working Group Interview.

[154] Working Group Interview.

[155] 21st Century Policing Task Force Report, *supra* note 48, at 9; Tom Tyler, Why People Obey the Law (Princeton Univ. Press 2006).

[156] 21st Century Policing Task Force Report, *supra* note 48, at 10.

[157] Working Group Interview.

[158] Working Group Interview.

[159] 21st Century Policing Task Force Report, *supra* note 48, at 11.

[160] *Id.* (*quoting* Susan Rahr, Executive Director, Washington State Criminal Justice Training Commission).

[161] *Id.*

[162] Police Executive Research Forum, Re-Engineering Training on Police Use of Force, at 4 (Aug. 2015), *available at* http://www.policeforum.org/assets/reengineeringtraining1.pdf.

[163] *Id.*

[164] *Id.*

[165] John P. Kretzmann & John L. McKnight, Building Communities from the Inside Out, Evanston: Center for Urban Affairs and Policy Research, Northwestern University (1971).

[166] Wesley G. Skogan et al., Taking Stock: Community Policing in Chicago, National Institute of Justice, Office of Justice Programs, U.S. Department of Justice (July 2002), *available at* https://www.ncjrs.gov/pdffiles1/nij/189909.pdf.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.* at 8.

[172] *Id.* at 17-18.

[173] *Id.* at 20-24.

[174] *Id.* at 26.

[175] Wesley G. Skogan, *Trends in CAPS*, at 1 (Jan. 25, 2016).

[176] Skogan, *supra* note 165, at 2.

[177] Skogan, *supra* note 165, at 2-3.

[178] Skogan, *supra* note 165, at 8-13.

[179] Multiple Working Group Interviews.

[180] Phil Rogers, Emanuel, McCarthy Aim to Change CAPS, www.nbcchicago.com (Jan. 8, 2013), *available at* http://www.nbcchicago.com/blogs/ward-room/Emanuel-McCarthy-Aim-to-Change-CAPS-186084182.html.

[181] Skogan, *supra* note 165, at 8.

[182] Rogers, *supra* note 179.

[183] Working Group Interview.

[184] Multiple Working Group Interviews.

[185] *See* Mary Ann Wycoff, Making Sure Community Policing Is Here to Stay, at 210-11, in Community Policing: The Past, Present, and Future (Nov. 2004), *available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Community_Policing/community%20policing%20-%20the%20past%20present%20and%20future%202004.pdf.

[186] *Id.*

[187] 21st Century Policing Task Force Report, *supra* note 48, at 43.

[188] *See, e.g.*, 21st Century Policing Task Force Report, *supra* note 48, at 31-40; Community Orientated Policing Services, U.S. Department of Justice, and Police Executive Research Forum, Social Media and Tactical Considerations for Law Enforcement (May 2013), *available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Technology/social%20media%20and%20tactical%20consideratio ns%20for%20law%20enforcement%202013.pdf .

Plaintiff's Exhibit 8

[189] City of Chicago, Chicago's Key Initiatives to Reduce Youth Violence: A Review of Investments and Results (2014), *available at* http://www.cityofchicago.org/content/dam/city/depts/fss/supp_info/YouthServices/YouthViolenceReport012814.pdf

[190] Garry F. McCarthy & Dennis P. Rosenbaum, From CompStat to RespectStat: Accountability for Respectful Policing, The Police Chief, 76-78 (Aug. 2015), *available at* http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=print_display&article_id=3812&issue_id=82015.

[191] *Id.*

[192] *See, e.g.*, Xavier McElrath-Bey, Brutal Treatment of Black and Brown Youths Reflects Disregard for Their Lives (Aug. 23, 2014), *available at* http://www.theroot.com/articles/culture/2014/08/police_brutality_toward_black_and_brown_youths_reflects_disregard_for_their.html.

[193] Working Group Interview.

[194] *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

[195] *Id.*

[196] *See United States v. Wade*, 388 U.S. 218, 227-28 (1967).

[197] *See Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 199 (2008).

[198] 725 ILCS 5/103-3(a).

[199] *Id.* (emphasis added).

[200] CPD, General Order G06-01-04, Arrestee and In-Custody Communications, Sec. VI. A (Jan. 29, 2015).

[201] 725 ILCS 5/103-7.

[202] *See* Bryan L. Sykes et al., The Fiscal Savings of Accessing the Right to Legal Counsel Within Twenty-Four Hours of Arrest: Chicago and Cook County, 2013, 5 U.C. Irvine L. Rev. 813, 816 n.13 (2015).

[203] Data provided by the City of Chicago via letter dated Mar. 18, 2016.

[204] *See* Cal. Penal Code § 851.5(a)(1); Nev. Rev. Stat. § 153(1); N.M. Stat. Ann. § 31-1-5(A); Tenn. Code Ann. § 40-7-106(b); R.I. Gen. Laws § 12-7-20.

[205] Early Access to Legal Aid in Criminal Justice Processes: A Handbook for Policymakers and Practitioners, United Nations Office on Drugs and Crime, at 7 (2014), *available at* http://www.unodc.org/documents/justice-and-prison-reform/eBook-early_access_to_legal_aid.pdf.

Plaintiff's Exhibit 8

# Legal Oversight & Accountability

Chicago's police accountability system does not work. The system should identify and investigate police misconduct and then impose appropriate punishment. But at every step, there are enormous barriers. There are barriers that discourage citizens or police officers from reporting misconduct. There are barriers that make it difficult for CPD to identify misconduct. Once misconduct has been identified, there are barriers to investigating it fairly and thoroughly. Even in cases where there is some investigation, there are barriers to imposing discipline—including numerous ways to negate or dilute findings of misconduct that undermine real accountability. Standards are not clear for imposing discipline, so punishment is often arbitrary. And there is very little transparency, which further breeds mistrust.

The Task Force has repeatedly heard the frustrated conclusion of the community that the current system is a sham, and that it allows misconduct—including criminal behavior and other abuse—to go largely or entirely unpunished. The concerns are justified. Of the 28,567 allegations of misconduct filed against CPD officers between March 2011 and September 2015, only 2% of allegations result in actual discipline, after what was frequently a multi-year process.[206]

When case after high-profile case results in punishment that does not match the gravity of the misconduct, it sends a message that the police can act with impunity. It gives victims reason to question whether there is any point in reporting misconduct. It also leaves those who break the rules emboldened to continue doing so. Meanwhile, well-meaning officers are left to wonder why the system does not reward good behavior. The police oversight system must be fundamentally reformed in order to remove impediments to bringing complaints, identifying troubling behavior, investigating misconduct, intervening and, where necessary, imposing discipline. The system must operate in a timely manner, fairly and entirely without bias and with full transparency and accountability.

In this section, we begin by outlining the police oversight system as it currently exists. We then discuss fundamental questions that have been posed in the wake of high-profile police-involved shootings and how flaws in the current oversight system caused these realities to come into existence and continue unchecked. We then address specific recommendations, including the creation of a Community Safety Oversight Board, an Inspector General for Public Safety and a Civilian Police Investigative Agency ("CPIA"). The Community Safety Oversight Board and the Inspector General for Public Safety would be new and vital additions to Chicago's police oversight system, while CPIA would replace IPRA.

Plaintiff's Exhibit 8



Overall, these reforms are intended to improve the transparency, independence and quality of the police oversight structure in Chicago. More technical details about recommended reforms are set forth in appendices at the end of this report.

## How does the existing police oversight system work?

The current police oversight system in Chicago developed piecemeal over time, without significant consideration of the whole. As a result, it is a tangled patchwork, involving hundreds of people in multiple entities, often working without any real oversight of their own work or coordination with each other. As a result, complaints can and often do take years to resolve, and frequently result in little or no discipline for the officer.

**IPRA.** The best-known piece in the current police oversight system is IPRA. IPRA is a 83-person civilian agency formed in 2007 and run by a Chief Administrator appointed by the Mayor and confirmed by the City Council.[207] IPRA is responsible for taking in all complaints against CPD members. Of the complaints it

Plaintiff's Exhibit 8

receives, IPRA investigates many of the most serious types of officer misconduct such as excessive force, domestic violence, violent coercion or verbal, bias-based abuse.[208] IPRA also investigates any time an officer discharges a firearm or deploys a Taser, and any time a citizen is injured or dies in police custody. Over the past five years, IPRA has received 5,400 to 9,000 complaints per year, and opened another 1,300 to 3,000 investigations per year itself.[209]

**BIA.** Though IPRA serves as the initial intake point for all misconduct complaints, by law most are matters beyond its jurisdiction which it must therefore refer to the Bureau of Internal Affairs ("BIA"), within the CPD itself.[210] In 2015 BIA had a staff of 108 (though recent reports indicate a reduction to 93)— predominantly sworn CPD officers.[211] The complaints investigated by BIA typically include criminal misconduct, corruption, operational violations, substance abuse and off-duty incidents that warrant department oversight. The head of the BIA is a sworn CPD officer selected by the Superintendent. On average, BIA investigates approximately 3,000 complaints each year.[212]

BIA forwards complaints alleging lesser offenses—typically those that could result in a five-day suspension or less—to the 22 individual police districts. Over the past five years, on average, the police districts investigated approximately 2,200 complaints per year. While the police districts do not receive much attention in the public debate over the police oversight structure in Chicago, a significant number of cases land there.

**CPD Review.** If an IPRA or BIA investigation results in a sustained finding and the recommended discipline is not termination, the case is forwarded for review within the CPD by members of the accused officer's chain of command ("Command Channel Review"), and then to the Superintendent. If IPRA or BIA recommends termination, the case goes straight to the Superintendent. If the Superintendent agrees with the sustained finding and the recommended discipline, IPRA or BIA serve notice on the officer.

**Arbitration.** An officer can challenge sustained findings and disciplinary recommendations in arbitration. The specific procedure depends on an officer's rank and the level of discipline recommended. The arbitrator's decision is final.

**Police Board.** The Chicago Police Board is made up of nine civilians appointed by the Mayor and confirmed by the City Council. The Board's primary function is the adjudication of disciplinary cases where the recommended penalty is termination, as well as suspensions over 30 days for Sergeants, Lieutenants and Captains.[213] A contracted hearing officer presides over an evidentiary hearing, similar to a trial. The Board members review the record, and decide by majority vote whether the officer is guilty and, if so, what the penalty should be. The Board's decisions are appealable to the Circuit Court.

Plaintiff's Exhibit 8



Plaintiff's Exhibit 8



Plaintiff's Exhibit 8

## Why does the community not have a role in the police oversight system?

At the Task Force's community forums, public comments repeatedly converged on two central themes: many residents across the City have lost trust in the current system of police accountability, and many will not trust an oversight system in which they do not play a meaningful role. The message is clear that substantial community involvement is an absolute necessity to build trust in the police accountability system.

The Task Force agrees that the police oversight system would benefit greatly from increased community involvement. A community oversight body is an increasingly common element of effective police accountability systems around the country. This would fill a gaping hole in Chicago's current system—one that would likely be required by the Department of Justice regardless of this Task Force's recommendations.

### *Recommendations*

**The City should create a Community Safety Oversight Board, allowing the community to have powerful involvement in the police oversight system.**

The Community Safety Oversight Board would be comprised entirely of community representatives and would have power to oversee CPD, the new CPIA and all police oversight mechanisms. The Community Board would ensure that CPIA and all components of the police oversight system are held fully accountable, operate with maximum transparency and perform their roles in a manner that is informed by community needs.

If the Community Board is to earn the legitimacy it requires and deserves, its precise powers and makeup should not be set by the Task Force, but should be developed with broad public input. The Mayor and the City Council should hold full and robust public hearings on the topic and fully vet the design and implementation of this critical body. Nonetheless, the Task Force does suggest that the Community Board's powers and authority include:

- Selecting the Chief Administrator of the new CPIA and conducting public hearings to make the selection.

- Requesting that the Inspector General for Public Safety perform specific audits and analysis of the policies, procedures and practices of CPD, CPIA and the Police Board that the community does not believe are being adequately addressed, and issuing recommendations based on the findings to which CPD or the relevant agency must respond.

- Requesting that the Inspector General for Public Safety perform specific audits of CPIA and BIA investigations of serious cases of alleged police misconduct or use of force to promote the quality and integrity of the investigations.

- Directing CPD, CPIA and the Police Board, through requests to the Inspector General for Public Safety, to collect and share data to facilitate community oversight.

Plaintiff's Exhibit 8

- Analyzing all sustained findings and discipline recommended by CPIA, BIA or the Police Board to assess disciplinary trends, determine whether discipline is consistently applied and fair, and determine whether final disciplinary decisions are being executed.

- Conducting public hearings on any and all matters related to the CPD and its oversight entities.

- As representatives of the broader community, holding frequent public meetings.

In selecting Community Board members, it will be critical to establish a process that maximizes the Board's independence, ensures transparency and provides accountability to the public. The Task Force considered five methods for selecting Board members, which are summarized in Appendix 6. In sum, the Task Force considered elections, City Council or Mayoral appointment, a third-party application process and hybrid versions of these options.

Ultimately, each option has advantages and disadvantages, but a model that populates the Community Board solely through elections, or solely through Mayoral appointment, would undermine the Board's effectiveness and legitimacy at the outset.

The election model in particular has not been successfully implemented elsewhere, and brings a host of challenges. These include cooption by pre-existing power structures (e.g., well-funded groups could run slates of candidates and take over the Board), use by individuals looking for a political springboard, and a potential lack of diversity. Further, the cost and political nature of elections lead the Task Force to disfavor this method.

As part of any selection process other than direct election, the system should build in protections against manipulation. For example, qualifications should be established for the job, a screening committee could, after reviewing applications, select three people for every vacancy, and all could be required to participate in a series of public hearings to present their credentials and answer questions from a selection committee and the public. The Mayor, City Council or third party would then select or vote for one of three nominated candidates for each open position, or a selection committee could approve them.

## What are the barriers to identifying police misconduct? The Code of Silence and beyond.

The police cannot be held accountable for misconduct that is hidden. Yet there are many ways in which the current system serves to make it more difficult to identify potential misconduct. For years, people have talked about a "blue code of silence," an unwritten rule that says that a police officer will not report on another police officer's misdeeds.

In December 2015, Mayor Emanuel was asked if there is a "code of silence" that exists among Chicago police officers. "The short answer is yes," he said. Referring to the shooting death of Laquan McDonald, Mayor Emanuel conceded that "this isn't the first shooting where maybe there hasn't been honest reporting by officers who were there."[214] As he then explained in a December 9, 2015 speech to the City Council:

> *This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues. . . . We cannot ask citizens in crime-ravaged neighborhoods to break*

Plaintiff's Exhibit 8

> *the code of silence if we continue to allow a code of silence to exist within our own police department.[215]*

Current and former CPD officials have also increasingly acknowledged a "code of silence." Former Superintendent Richard Brzeczek (1980-83) has said that a code of silence "has always existed in the police department."[216] Eugene Williams, the current Chief of the Bureau of Support Services, and former Chief of the Bureau of Patrol, stated that:

> *[S]ix months of academy training cannot stand up to a career of "on the streets influence" by veteran officers who are all too anxious to show the rookies how things are really done on the streets. The way it is done on the streets is to protect and cover for your partner at all cost, even at the expense of sacrificing every ounce of one's integrity. This culture has been all too evident when we investigate thousands of allegations where the partner of the accused never sees, or hear[s] of any inappropriate conduct although they work in very close proximity of each other during their entire tour of duty. Yet, within this culture it is considered righteous to cut corners and embellish on the facts in a case report or arrest report to win a case in court.[217]*

The Task Force has found that the code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City. These impediments to identifying potential misconduct must be eliminated if CPD and the City are to end this persistent challenge.

## COLLECTIVE BARGAINING AGREEMENTS MAKE IT HARDER TO IDENTIFY MISCONDUCT

Police officers are often called upon to take great risks, and in order to protect themselves and the public, they are authorized to use force.[218] Any time an officer is alleged to have used excessive force, they are afforded all the due process protections the law provides. However, the Task Force found that in the interest of protecting police officers from unfair or unfounded allegations, the collective bargaining agreements (CBAs) between the four police unions and the City create unnecessary barriers to identifying and addressing police misconduct. Many provisions are out of step with national trends or pose impediments to accountability that are not sufficiently justified by the needs of due process.

Union leadership defends these CBA provisions, noting that they are the product of arm's length negotiations. But their members' foremost duty is to serve and protect the public. Any provision of the CBAs that impedes or obstructs accountability undermines that primary duty and violates the public trust. Eliminating or amending these provisions will allow valid complaints to be reviewed and make it easier to uncover patterns of abuse.

### *The CBAs discourage citizens from coming forward with complaints.*

The CBAs state that disciplinary proceedings cannot be brought against an officer unless they are based on complaints accompanied by a signed affidavit—a legal document in which the person filing a complaint swears that everything in the complaint is true and acknowledges that there are legal consequences for lying.[219] That may sound like a commonsense way to ensure that people do not bring false claims. But many citizens lack faith in the oversight structure or broader legal system and may think

Plaintiff's Exhibit 8

that even if their complaint is justified, signing an affidavit could put them in legal jeopardy. The affidavit requirement keeps people from bringing complaints and helps some police misconduct remain hidden from view.

Without a signed affidavit, there is generally no investigation at all. Over the past five years, BIA closed an average of 537 complaints per year for lack of an affidavit. IPRA closed an average of 618 cases per year—or nearly 40% of investigations—over the past five years due to the absence of affidavits. Moreover, an analysis of CPD records from a four-year period ending in mid-December 2014 found that fully 58% of the 17,700 complaints of police misconduct filed with IPRA were tagged as having "no affidavit" and were therefore not investigated.[220] The amount of unsigned complaints leaves the City, and CPD, unable to fully understand the nature and challenges underlying these allegations of misconduct.

The CBAs allow for the Chief Administrator of IPRA and the BIA to in effect override the affidavit requirement after reviewing "objective verifiable evidence" and affirming that based on that evidence, "it is necessary and appropriate for the investigation to continue."[221] This provision is rarely used, and not to the extent it could and should be.

The CBAs also prohibit most anonymous complaints.[222] Like the affidavit requirement, this may discourage some people from bringing perfectly legitimate complaints. Indeed, more and more cities are recognizing that the cost of forbidding anonymous complaints greatly exceeds the benefits. Today there is a strong trend toward accepting them, including as part of court-enforced Department of Justice consent decrees (in New Orleans and Cincinnati).[223] Accepting anonymous complaints also allows a police department to use an additional set of data as a management tool for proactively addressing performance problems.

The CBAs also state that before an officer is questioned about alleged misconduct, he or she must be notified of the complainant's name.[224] If officers are put on trial for breaking the law, they clearly have a right to confront their accusers. And in an internal disciplinary hearing, if a complaint is sustained, fundamental fairness may warrant disclosure of the complainant, especially in cases in which the complainant is the primary witness. But there is a danger to enforcing this requirement while an investigation is still pending: it may invite an officer to intimidate a complainant, or even to seek retribution. Where many citizens already do not trust the police, this provision may provide one more reason not to come forward.

### *The CBAs make it easy for officers to lie in official reports.*

Under the CBAs, officers involved in shooting incidents cannot be required to provide a statement to IPRA until after at least a 24-hour period.[225] Critics contend that the waiting period provides officers time to protect themselves by agreeing on a false story they will all tell when they have their official interviews with investigators.[226] Chicago is not alone in providing this buffer of time and there is an argument that the memories of those involved in traumatic events are clouded by recent experiences. As scholars have noted, the evidence on the impact of stress on memory is very complex, with contradictory findings.[227] While the science is unsettled, the critics' view has gained support as evidence has emerged from more and more cases—including the shooting of Laquan McDonald—where police officers gave remarkably similar reports of incidents and later evidence made clear that the reports were simply not true. This makes it difficult to identify misconduct, especially where an incident was not captured on video.

Plaintiff's Exhibit 8

Similarly, the FOP contract includes a provision that can be used to protect officers whose statements are contradicted by video or audio evidence. The contract provides that an officer cannot be charged with a false statement if the CPD, IPRA or BIA is in possession of video or audio evidence and (a) did not provide the officer an opportunity to review it prior to giving a statement, or (b) after giving a statement, the officer was not provided an opportunity to clarify and amend the original statement. This provision does not seem to serve any valid purpose. When an officer's report differs from the video or audio evidence, we should not assume that the officer knowingly made a false statement. But at the same time, we should not make it impossible to discipline an officer when there is evidence that a statement was knowingly false.

The CBAs further constrain investigations by dictating and micromanaging how interrogators may ask questions. For example, the FOP contract provides that: "Generally, the secondary interrogator will ask follow-up questions for clarification purposes. The primary interrogator will not ask any questions until the secondary interrogator has finished asking questions and invites the primary interrogator to ask follow-up questions."[228] Of course, CPD officers and detectives are not similarly constrained when they interrogate suspects.

As a result of the collective bargaining process, IPRA and BIA are also required to give officers highly specific notice of allegations, which threatens the efficiency and efficacy of the investigation.[229] For example, arbitrators have found that if an officer lies to investigators, IPRA must present the officer with a new set of allegations that specifically addresses the lie, or else IPRA cannot charge the officer with making a false statement.[230]

### *The CBAs require officials to ignore and destroy evidence of misconduct.*

Under some circumstances, the CBAs require that evidence of misconduct be ignored. For example, the CBAs forbid the investigation of complaints older than five years without permission of the Superintendent.[231] There is certainly a place for consideration of an applicable statute of limitations, as it is harder to prove or disprove events that happened long ago. And it is reasonable to require good proof before disciplining an officer. It is not reasonable to impose strict limitations on what matters can even be investigated. Misconduct may never come to light, and patterns may be more difficult to uncover. Principles of procedural due process, the application of evidentiary standards and consideration of mitigating factors better serves just outcomes consistent with the public interest than do absolute prohibitions on investigation.

Similarly, the CBAs require that in some cases where there is a finding that an officer engaged in misconduct, but the finding did not result in significant punishment, the information cannot be used against the officer after a short amount of time and must be removed from the officer's record entirely in a few years.[232] There is no compelling reason for these provisions. The CPD and the various police oversight entities should be able to draw on any relevant evidence and findings to identify potential patterns of misbehavior.

The CBAs also mandate the destruction of most disciplinary files after five years.[233] While the City has, in practice, not implemented the requirement for many years because it contradicts Illinois law, the language in the contract should be eliminated. Expunging records contradicts best practices, impedes the development of early intervention systems and deprives the public of information that is rightfully

Plaintiff's Exhibit 8

theirs.[234] As noted above, it also deprives police oversight bodies of evidence of potential patterns of bad behavior. Moreover, it may also deprive wrongfully convicted persons of exonerating information.

Finally, the CBAs provide that CPD can only restrict secondary employment based on the nature of the employment or if the hours interfere with job duties.[235] Even that limited constraint is based on a system of officers policing themselves; unlike other City workers, police officers are not currently required to disclose secondary employment to CPD. The CPD is missing a key tool for identifying red flags that can be indicators of corruption, such as unexplained income, or addressing potential conflicts of interest and emotional stressors that may adversely impact performance that otherwise would not come to light.

### *The CBAs make it harder to encourage officers to report misconduct.*

The single best source of information about police misconduct is police officers themselves. Officers work extremely closely with other officers. Sometimes they are the only people who see what their fellow officers do. Officers have a duty to report misconduct,[236] though it seems clear that they routinely fall short of fulfilling that duty. The CBA disserves and arguably encourages noncompliance with this critical public duty by expressly prohibiting the CPD from rewarding officers who come forward as whistleblowers.[237]

## MISSED OPPORTUNITIES TO IDENTIFY MISCONDUCT

### *No dedicated system exists to identify and address patterns or practices.*

While they are charged with investigating police misconduct, IPRA and BIA historically have not engaged in efforts to identify officers whose records suggest repeated instances of misconduct or bias. They also historically have not engaged in efforts to identify broader patterns or practices either of misconduct or racially biased policing within CPD. The persistent failure of IPRA and BIA to examine pattern and practice evidence substantially contributes to the police accountability vacuum in Chicago.

Effective police oversight means not just examining individual incidents, but also information in the aggregate—identifying troubling trends and making sure that patterns of abuse or malfeasance are identified and prosecuted. That means identifying officers whose records suggest repeated instances of misconduct or bias, and exploring why a disproportionate number of complaints are concentrated in certain units.

Since its inception, IPRA has had the power to examine patterns of complaints when investigating police misconduct, but has not exercised it.[238] The tragedies and scandals involving CPD officers have consistently involved individuals and groups of officers who had amassed patterns of complaints that went unchecked and underinvestigated by CPD and the City. IPRA is positioned to function as a feedback loop to inform and improve CPD policies, practices and training. IPRA's failure to effectively analyze and apply its expansive knowledge of policing is a lost opportunity that perpetuates the status quo by shielding ineffective and illegal practices from scrutiny, and puts citizens at risk by allowing abusive officers to remain in the field.

Plaintiff's Exhibit 8

### *Police officers have no method to report misconduct confidentially.*

In recognition of the inherent difficulties in reporting misconduct by coworkers, many organizations including corporations, federal agencies and—in a few instances—police departments, have implemented whistleblower hotlines to allow anonymous reporting of unethical or improper conduct.

The Task Force is aware of at least one police department that has established a hotline. San Diego established an anonymous, confidential hotline in 2011 with 24/7 availability.[239] The hotline received over 100 calls in the first month and then a total of 300 calls in the 18 months that followed. Calls are recorded as messages, and the Chief of Police conducts an initial review of messages on a daily basis before forwarding them for follow-up.

### *Information from outside lawsuits is not used.*

Additionally, police oversight bodies have not used valuable information from outside lawsuits to generate investigations. The civil rights and criminal defense bars in Chicago have, through decades of litigation, developed rich data regarding CPD policy and practice. This information has largely been untouched by the various oversight entities. This represents a significant missed opportunity to ensure accountability.

### *Recommendations*

**When the CBAs are renegotiated in 2016 and 2017, the Mayor and the Law Department should seek to eliminate or revise provisions that perpetuate the code of silence and make it more difficult to identify misconduct.**

The following CBA provisions should be removed or revised:

- The affidavit requirement should be removed so that investigators can identify additional cases of police misconduct.

- Anonymous complaints should be allowed to encourage reporting by those who fear retaliation, including whistleblowers.

- Officers should not be informed of the complainant's name prior to interrogation. There is little need for the officer to know the name of a complainant prior to interrogation if it is later disclosed during the resolution of the case.

- The provisions delaying interviews in shooting cases for at least 24 hours should be revised to ensure that officers are separated and remain separated from other officers until all officers have given statements. The Department of Justice's Consent Decree with the Los Angeles Police Department contains such a requirement.[240] When formal questioning begins, the inquiry will start with a recitation of any and all conversations that the officer has had with law enforcement between the shooting and the commencement of the interview.

- Officers should no longer have a right to amend statements if they have not been provided with the audio or video evidence, and reviews of the footage should not be pre-conditions to charging a Rule 14 violation.

Plaintiff's Exhibit 8

- Investigations of complaints known to the CPD for five years or more should not require Superintendent permission. This is an unnecessary rule, as the statute of limitations will apply for criminal matters and, for administrative matters, the nature and severity of the conduct should determine whether the complaint should be investigated. Should an individual continue to make such decisions, the authority should be vested in someone outside of the CPD, such as the Chief Administrator of IPRA (or its successor, CPIA).

- The provision requiring destruction of records should be eliminated. The rule is in tension if not outright conflict with general principles of public record-keeping, and deprives the public of important information that is rightfully theirs and may include the destruction of information that serves numerous operational and public policy objectives.

- The provision that forbids the CPD from rewarding officers who act as whistleblowers should be removed.

- The CBAs should be amended to require police officers to disclose secondary employment, as other City workers are required to do.

- The FOP contract dictates the manner in which interrogators can ask questions, which presents an unnecessary burden on interrogators and potentially sets them up to violate the CBA for a technicality. The policy does not appear to comport with any best practices, and should be eliminated.

- Officers must be informed of the nature of the allegation prior to interrogation. This provision is presently interpreted very specifically to mean a detailed recitation of the facts that support all possible charges. Moreover, if the officer lies to investigators during the investigation, new allegations must be presented to the officer. This provision should be amended to allow for more general recitation of allegations.

### The Mayor and the City Council should create an Inspector General for Public Safety, to be housed within the City of Chicago Office of the Inspector General.[241]

The creation of an Inspector General for Public Safety will greatly enhance the transparency, accountability and quality of Chicago's police oversight structure. The Inspector General for Public Safety should have a broad grant of authority so that it is empowered to examine and make recommendations regarding the full scope of police department-related activity. Effective execution of its duties will require new, dedicated funding and specialized personnel.

Over the past few decades, the number of police inspectors general has grown substantially and a consensus has emerged that these auditors play a unique and essential role. In sum, this role will police the police as well as the entire police oversight system in Chicago. While there is need for police oversight bodies that focus on investigating individual allegations of misconduct, the Inspector General for Public Safety would go farther and work to identify and address patterns of police misconduct or racial bias. In its ideal form, it will review past acts within the system to uncover what is not working, monitor ongoing actions to improve the system of today and recommend policy changes to ensure systemic improvements for the future.

Plaintiff's Exhibit 8

The Inspector General for Public Safety should be empowered to identify misconduct and racial bias and their sources by auditing and monitoring patterns of police activity and complaints. The pattern analysis should include, but not be limited to: officer use of force; police-involved shootings; use of any weapon used to inflict pain and/or gain compliance; allegations of warrantless searches, theft or other criminal activity; and potential bias including but not limited to bias in policing related to race, ethnicity, gender, sexual orientation, gender-identity and geography. The pattern analysis could also include analyses of lawsuits and other relevant data to identify individuals and groups of officers who may be engaged in a pattern of misconduct.

Analyzing patterns can be incredibly powerful. Many individual complaints are not sustained because the complainant tells one story and the officer tells another, and there is no independent evidence to support either side. But evidence that an officer may have a pattern of bad behavior, particularly a pattern of a specific kind of bad behavior, can identify problems that an investigation into a single "he said, she said" incident could not.

This kind of pattern analysis can also identify underlying management problems that are likely to lead to misconduct. Investigation of individual incidents places the focus on an individual bad actor, when the bigger problem may be the organizational culture that either promotes, acquiesces in or fails to address bad behavior or their indicators. Similarly, pattern analysis, focusing on police department policies and procedures may help to uncover the underlying causes of chronic misconduct, like when an outdated policy or a lack of training leads multiple officers to make bad decisions or engage in misconduct.

The Inspector General for Public Safety would also review policies and practices of CPD and the police oversight bodies in order to identify systemic problems and propose changes in policies and procedures, training and supervision. Further, the body should use complaint history for purposes of identifying patterns and share these results with CPIA and BIA. In this way, the Inspector General for Public Safety would help prevent future misconduct, criminal behavior and biased policing. In all areas, the Inspector General for Public Safety would also be authorized to follow up to determine whether changes have been implemented and are effective.

Pattern and practice analysis should not only be the job of the Inspector General for Public Safety. The new CPIA (discussed below) and BIA must conduct pattern and practice analysis both proactively and reactively as part of their disciplinary investigations. CPIA should conduct regular and systematic analysis of citizen complaints, civil rights lawsuits, uses of force, hearings on criminal motions to suppress, judicial findings, incidents where individuals were charged with offenses commonly believed to cover up police misconduct and other relevant evidence. When CPIA identifies potential patterns of abuse, it should launch disciplinary investigations as appropriate and refer its findings to the Inspector General for Public Safety for possible broader program analysis and recommendations.

The new CPIA and BIA should also be required by law to share specified information with the Inspector General for Public Safety in order to identify potential misconduct or sources of misconduct. This could include information uncovered through pattern and practice analysis. For example, CPIA and BIA should be required to report monthly to the Inspector General for Public Safety any problems and deficiencies relating to CPD's operations, policies, programs and practices

Plaintiff's Exhibit 8

that would reasonably be expected to adversely affect the effectiveness of CPD, public safety, the exercise of civil liberties and civil rights or the public's confidence in CPD. New York City and Denver have similar requirements.

Within the Inspector General for Public Safety, there should also be a Diversity and Inclusion Monitor specifically charged with reviewing CPD's actions for potential racial and other bias, along with reviewing CPD's anti-discrimination policies and procedures and tracking the consequences for violations of these policies and procedures. The Diversity and Inclusion Monitor would make bi-annual reports to the new Community Safety Oversight Board on CPD's performance by race, any racial disparities or discrimination and the consequences administered for policy violations and other race-related misconduct.

Some key features of the new Inspector General for Public Safety are discussed in the remainder of this section, and are addressed in further detail in Appendix 6.

**CPD should create a hotline for department members, whether civilian or sworn, to lodge complaints, and develop a third-party system for the processing and follow-up of all comments and complaints reported to the hotline.**

Hotlines are well documented in the private sector and federal government, and research into their experiences provides further guidance. Keeping hotlines open outside of normal work hours is important for facilitating reports from employees that feel more comfortable when they are able to report outside of the workplace.[242] Anonymity and explicit procedures for the protection of a whistleblower from retaliation are important to fostering the trust in the program.[243] Employees often trust third-party hotline services more than internally-operated hotline services, suggesting that a fellow police department colleague (or supervisor) should not be the one answering the phone.[244]

## Why are investigations ineffective and biased?

Citizens have little to no faith in police misconduct investigations. Officers, likewise, are not forced to take the existing system seriously. From start to finish, investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias.

### THE MEDIATION PROCESS UNFAIRLY PREEMPTS INVESTIGATIONS

IPRA and BIA preempt full inquiry into potentially serious misconduct and abuse allegations through what they call a "mediation" process. In reality, this process functions as a form of plea bargaining. It requires that an officer admit to alleged misconduct in exchange for reduced punishment. IPRA and BIA then close the case without a complete investigation. This mediation process was originally intended as an efficient way to address complaints about minor infractions for which multi-year investigations were unwarranted.

The mediation process is now used in cases involving serious misconduct that could warrant lengthy suspensions or even termination. This is especially troubling given the fact that CPD oversight agencies

Plaintiff's Exhibit 8

have been using mediation more frequently. IPRA's use of mediation has increased considerably in recent years, going from just 15 cases in 2011 to over 100 in 2013 and 68 in 2015. [245] BIA reported performing an average of 11 mediations per year since 2012. In the first few months of 2016, BIA has performed 12 mediations.

IPRA has historically had no criteria or limitations to determine which complaints are eligible for mediation. In cases mediated in 2015, officers agreed to accept IPRA's sustained findings for: slapping, punching and directing profanities at a victim; striking a victim in the head while she was handcuffed and on her knees; hitting a victim/girlfriend multiple times, fracturing her nose; striking a victim's head on concrete and failing to render assistance; and strip-searching a minor without justification, authorization or completing documentation.[246] Closing cases like these without complete investigation deprives the City of important information about potentially criminal conduct and officer fitness and, as some reasonably argue, furthers CPD's code of silence.[247]

BIA has developed some standards and criteria regarding what types of complaints it will consider mediating—yet none of these standards are formalized in writing. At best, before approving mediation for an investigation, BIA reviews the case for appropriateness, especially when the request for mediation comes from the union.

This standardless plea bargaining system is an impediment to appropriate investigation and true accountability. However, a true mediation program can be a valuable part of an effective police accountability system. Other cities take a very different approach than Chicago. Unlike Chicago's program, mediation programs in many other cities involve face-to-face meetings between citizens who brought complaints and the police who are the subject of the complaints. In model programs, these meetings are facilitated by a neutral third party.[248] Such an approach both meets with best practices and, more importantly, is aligned with the objectives of restorative justice that is an important missing element of community-police relations.

Studies show that mediation programs that involve citizens produce positive outcomes for citizens as well as police. A study of the Denver mediation program found that almost 60% of complainants were satisfied with the outcome and 75% were satisfied with the process; officers' rates of satisfaction were high as well—68% were satisfied with the outcome and 79% with the process.[249] Additionally, in at least one study, mediation was found to correlate to fewer complaints in the follow-up period included as part of the evaluation, suggesting that mediation may have an impact on future officer behavior. Officers who engaged in mediation had statistically fewer discourtesy and improper procedure complaints following the mediation, compared to the control group officers.[250]

High satisfaction rates may be largely explained by the fact that traditional police misconduct investigations do not focus on providing what most complainants actually want. Studies of complainants' goals indicate that few want to see the officer punished, but many instead just want to report the incident, desire an apology or explanation from the officer or would like to meet in person and express themselves to the officer.[251]

Plaintiff's Exhibit 8

## INVESTIGATIONS ARE COMPROMISED BY REAL AND PERCEIVED BIAS AND CONFLICTS OF INTEREST

Early on in its tenure, IPRA enjoyed relative independence from City Hall and spoke to the media freely, without prior approval of either timing or content. In contrast, the tragic fatal shooting of Laquan McDonald exposed levels of collaboration between the administration and IPRA with regard to messaging.

Personnel and staffing practices pose an unacceptable risk of producing biased investigations. IPRA is a civilian entity and therefore is intended to be free of bias in favor of the police. However, IPRA's leadership as recently as 2014 was comprised entirely of former law enforcement officials, which throws serious doubt upon the agency's ability to be independent and lends credence to concerns that bias pervades IPRA's findings. Additionally, the fact that candidates for certain IPRA positions must be reviewed by City Hall further compromises the independence of its staff.[252]

Shooting investigations show an institutional bias toward police. Of the 400 officer-involved shootings from 2007 (when IPRA was created) through 2014, less than 1% have been found unjustified.[253] This number appears to be particularly troubling in light of the fact that Chicago tops big cities in fatal police-involved shootings.[254] The legitimacy of these findings is further questioned by allegations that IPRA maintained a highly problematic policy permitting the Chief Administrator to order investigators to change findings without creating a record of the disagreement.[255]

Moreover, where investigations are carried out at the district level, an officer's direct supervisor is involved. That can easily create a conflict of interest for a number of reasons, including where the supervisor may have given orders that led to the officer's alleged misconduct. Additionally, the district investigations are structured inconsistently depending on the district—some have Sergeants and Lieutenants rotate doing investigations, others dedicate one specific person to this function—which poses an obstacle to oversight and accountability.

## RESOURCE AND STAFFING CONCERNS IMPEDE EFFECTIVE INVESTIGATIONS

IPRA's budget is insufficient and unprotected. IPRA's budget in recent years has not adequately supported the needs of the agency, and any increases are subject to the political process like most other agency budgets. For IPRA, a watchdog, this poses an inherent conflict of interest, as IPRA should not be at the mercy of the Mayor and City Council for its funding.

BIA struggles to recruit qualified sworn personnel, and both BIA and IPRA do not provide adequate training, which directly affects the quality of investigations. The ability to recruit a motivated and talented staff is critical to the success of any organization. It is difficult for BIA to attract qualified department members, as investigating misconduct is a politically challenging and often thankless task. For those staff it does have, BIA has been unable to secure sufficient funding for training, despite making requests. IPRA likewise has an inadequate non-personnel budget to meet, in addition to basic office needs, training and information technology needs critical to a high-functioning investigative agency.

Outdated, inadequate and fragmented technology systems are also a significant obstacle to effective investigations. IPRA and BIA use a computer case management system, CLEAR, a database CPD operates. IPRA's reliance on CLEAR hinders its effectiveness and transparency, and potentially compromises its independence in appearance and fact. However, IPRA lacks the technology, infrastructure and staff

Plaintiff's Exhibit 8

expertise to manage its own data systems. As a result, IPRA lacks robust access to CPD information and data. The limited functionality of CLEAR needlessly causes challenges when IPRA attempts to carry out basic core functions, such as uploading and viewing video, and does not facilitate data analysis.

Case management at the district level is not done in CLEAR, but rather using a paper-based system. This poses an obstacle to coordination and timeliness of investigations, as BIA cannot systematically track the status of the investigations.

## UNNECESSARY INVESTIGATION DELAYS

IPRA investigations have consistently been suspended while the Cook County State's Attorney's determined whether or not it would move forward with criminal charges under the same set of facts IPRA was investigating. The practice led to long delays in investigating and resolving IPRA's cases after the State's Attorney's Office closed its investigation. This need not be the case. While it may sometimes make sense for an IPRA investigator to pause an investigation to preserve the integrity of the criminal matter, this rule should not be applied universally in all cases, particularly where a delay is adverse to the City's and the public's interests in administrative justice.

## INSUFFICIENT TRANSPARENCY IMPEDES OVERSIGHT OF INVESTIGATIONS

Overall, IPRA lacks transparency in both its processes and data, which makes it more difficult for independent entities or the public to assess the quality of its work. The data that IPRA does provide is confusing, incomplete and challenging to use. IPRA has not published an annual report since 2012, and is under no legal obligation to do so. While IPRA does post summaries of de-identified sustained investigations, the agency does not provide any substantive information related to other investigation dispositions. IPRA does not post any information about the final disposition of its investigations, which can occur years after IPRA's sustained finding and often result in different discipline. There are several critical activities IPRA engages in that are not sufficiently governed by written, thoughtful or transparent policies. Key among these are the affidavit override process, mediation criteria, early warning policies, discipline criteria and the litigation review process.

Investigations and discipline from BIA and the districts are not transparent in almost every respect. There is no way for the public to follow a complaint through the process. The only information BIA posts is contained in a single, 2-3 page annual report, listing the number of "complaint logs received by initial category" for the most recent and previous year. The report also includes basic Police Board data for the year. This information is difficult to locate on CPD's website. The report for 2015 is not yet posted as of April 2016. BIA and the districts do not provide the following information: the investigating entity (district or BIA), complaints closed for lack of affidavit, average duration of investigation, recommended discipline for sustained complaints, and summaries of sustained or not sustained investigations.

### Recommendations

**IPRA should be replaced with a new Civilian Police Investigative Agency. The City Council should enact legislation that ensures CPIA is established in accordance with the principles described in the report.**

There is little doubt that IPRA is badly broken. The more difficult question is what to do about it. The Task Force carefully considered whether IPRA should be allowed time to implement reforms, or if it

Plaintiff's Exhibit 8

is simply beyond repair. The Task Force does not take this question lightly. Like CPD, IPRA undoubtedly has many employees who perform their job every day trying to do the right thing and are dedicated public servants. And IPRA's current leadership appears dedicated to enacting necessary reforms. They have done admirable work in a short amount of time, all while facing uncertainty over the agency's future.

Nonetheless, it is clear that IPRA has lost the public trust. IPRA has failed to perform its duties as a civilian police monitor and oversight agency fairly, competently, with rigor and independence. IPRA's record of incomplete and botched investigations, such as that reflected in public reports of court findings in the recent excessive force trial involving Commander Glen Evans, coupled with its dubious track record of finding virtually every police-involved shooting of civilians to be justified—all of these factors and more have seriously undermined IPRA's effectiveness and impaired its ability to build trust in the community. Without the public trust, IPRA cannot fulfill its critically important police oversight functions.

Recently appointed Chief Administrator Sharon Fairley has initiated substantial reform efforts at IPRA that should be applauded. However, the perception that IPRA is irretrievably broken remains widespread and profound. A police oversight body charged with investigating the most severe misconduct, abuse and brutality cannot fulfill its most basic function in the face of such widespread mistrust. According to a recent poll, 64% of all Chicagoans believe that cover-ups and a code of silence are widespread problems in CPD.[256] The Task Force believes that this view of policing is fueled by the clear message that bad police officers are able to act with impunity—that police oversight bodies, the most well-known of which is IPRA, do not hold police officers accountable.

For these reasons, the Task Force recommends that IPRA be stood down and replaced with a new, more independent and well-resourced CPIA. CPIA will serve the same core function as IPRA—taking citizen complaints and investigating serious cases of police misconduct. CPIA will not be the same body with a different name, however. The Task Force recommends reforms to create a true culture of accountability and transparency.

To provide greater independence and accountability to the community, the Chief Administrator of CPIA should be selected by the new Community Safety Oversight Board. The selection of this position should be insulated from politics, transparent and widely inclusive. Moreover, the City should establish hiring standards for CPIA investigators to avoid bias, or the perception of bias. Previous sworn CPD employees (and non-sworn if they have worked for CPD in the past five years) and employees of the Cook County State's Attorney Office should be prohibited from serving as investigators and/or the Chief Administrator. Individuals who hold these positions must reflect the city's diversity.

Additionally, CPIA's independence would be protected by giving it sufficient resources and powers to conduct prompt, unbiased and independent investigations. CPIA's funding would be set as a percentage of CPD's budget so that the office cannot be defunded. This funding should provide CPIA with sufficient resources and powers to conduct prompt, unbiased and independent investigations into police misconduct. Best practices within the field indicate that the budget should be tied to a minimum floor of 1% of CPD's budget and/or a ratio of at least one CPIA investigator for every 250 sworn CPD officers.

Plaintiff's Exhibit 8

In order to further ensure CPIA's independence, CPIA should be able to retain its own counsel and represent itself in legal proceedings. It should have the power to collect evidence, conduct prompt interviews, subpoena witnesses and enforce subpoenas through its counsel. CPIA should be allocated technology and infrastructure resources sufficient to manage its own data systems, tracking software and case management capacity so that it does not need to rely on CPD for technology that might bring into question its independence.

CPIA's jurisdiction would be increased to include unlawful searches and seizures, false arrests and denial of access to counsel. At the end of CPIA's first year of operation, an independent entity will evaluate whether further expanded jurisdiction is appropriate or achievable. CPIA would also have jurisdiction to conduct follow-up investigations in any case where it has original jurisdiction—e.g., if an officer files a false police report.

CPIA should also be empowered to investigate any incidents that fall under its jurisdiction, even in the absence of sworn complaints. No credible allegation should be ignored because of technical complaint submission requirements. CPIA should be able to launch investigations based on any credible source, including media accounts, a review of use-of-force reports or referrals from other oversight entities.

CPIA should gather and leverage data generated by civil litigation and criminal motions to suppress to investigate potential police misconduct. CPIA should be charged with investigating all civil lawsuits, which if submitted as a complaint, would fall under its jurisdiction. Further, to determine if an investigation is warranted, CPIA should develop a process to analyze all criminal motions to suppress that allege facts, which if submitted as a complaint, would fall under its jurisdiction. As mentioned previously, CPIA should also be expected to play a role in investigating policies and practices and using the findings to inform its investigations. In addition, CPIA (along with BIA) should examine officers' complaint histories and relevant complaint investigative files as standard, required parts of every disciplinary investigation into police misconduct.

CPIA should ensure an accessible, professional and supportive complaint process. Victims should be able to file complaints via the internet, over the phone and in their communities. Practices should be informed by national models, such as the New York City's Civilian Complaint Review Board, which has developed a model of hosting meetings within city neighborhoods on a posted rotating basis to take and verify complaints. CPIA should also provide support services to complainants, including regular updates regarding investigations, information about the process and outcomes, and referrals to outside service providers when needed. CPIA should conduct community education and engagement campaigns to educate the public about the complaint/investigative process and their rights. All CPIA investigators should be trained to work with victims of trauma, and taught to conduct victim/trauma-sensitive interviews.

Finally, CPIA should operate with complete transparency. At present, there is simply no way for a citizen to easily track a complaint. In contrast, the New York City Citizen Complaint Review Board allows tracking of all cases via its website.[257] Chicago is behind the times and needs to catch up to sufficiently serve its citizens. CPIA must also prioritize keeping the general public informed by posting summary reports of each completed investigation; publishing comprehensive annual reports

on its work; and by establishing a transparent process to make training, policy and procedure recommendations to the CPD.

**The Inspector General for Public Safety should be given express authority to audit, monitor and review investigations of individual cases of police misconduct.**

The Inspector General for Public Safety should be authorized to audit, monitor and review the quality and integrity of individual investigations and findings. This may include reviewing a completed investigation or monitoring an ongoing investigation. It should be empowered to request that individual investigations be expanded or reopened and, if the investigating agency refuses, to conduct the investigation itself. When investigations into serious uses of force do not result in sustained findings, the Inspector General for Public Safety should be required to work with CPIA and CPD to conduct Force Analysis Panels to determine if the incident revealed any systemic deficiencies in training, policy, supervision or equipment.

**If CPIA and BIA continue "mediating" complaints alleging officer misconduct, they should develop clear standards for mediations and implement new processes.**

The Task Force understands that the current mediation system has some benefits, particularly when investigating cases that allege minor infractions, which may not warrant the use of limited resources to investigate fully, and domestic violence cases, which are notoriously difficult to prove. We recommend that if CPIA and BIA continue alternative dispute mechanisms such as "mediation," the process should be reformed to proceed on the basis of formal, jointly developed eligibility criteria that take into consideration, at a minimum, the severity of the allegations, the officer's disciplinary history and the quality and quantum of evidence. The criteria should (1) be informed by national best practices; (2) prohibit pleas in complaints concerning conduct that, if sustained, would result in serious discipline; (3) be tied to a discipline matrix; (4) be made publicly available; and (5) involve the complainant where appropriate.

Reasonable limits should be placed on the use of alternative dispute resolution to prevent potential abuse. For example, the policy could provide that officers cannot participate in plea bargaining more than once in any two-year period. Further, consideration should be given for banning the use of mediation in cases of significant physical harm.

As part of the mediation process, CPIA and BIA should invite citizens and officers to engage with one another to promote dialogue and understanding. Establishing a mediation program based on national best practices by involving citizens in the process could produce many potential benefits to complainants, police and the state of community-police relations in Chicago. This change might require amending the CBAs, which defines mediation as a method for agreeing on discipline.

**Civilian oversight should run concurrently with criminal investigations absent compelling criminal justice needs expressly stated by prosecuting authorities.**

It is better practice to presume that investigations should run concurrently. Prosecutors and the new CPIA should meet regularly to determine if one or the other's investigation should be paused or whether both matters can be investigated at the same time.

Plaintiff's Exhibit 8

**BIA should be given the resources and staff it needs to conduct effective investigations, exercise more oversight over district investigations and increase the transparency of investigations.**

To ensure that BIA is staffed by qualified personnel and CPD personnel understand the important role BIA plays, anyone who wants to rise in the ranks should be required to rotate through BIA before being eligible for promotion to Commander.

BIA (and the new CPIA) should receive a dedicated training fund to provide sufficient training for its staff. BIA and the police districts should purchase a single, integrated case management system off the shelf, and sufficiently train their employees on it.

BIA should exercise more oversight over individual districts to ensure consistency throughout the districts with regard to the structure of investigations. BIA should institute an automatic process whereby once an officer receives a third complaint, the investigation at the district level would be led by the Deputy Chief in order to ensure greater independence from the officer's daily chain of command.

Finally, BIA and the districts should post all investigative data in a manner that is accessible and user-friendly, as well as summaries of all investigations, and should be held to the same transparency standard as the new CPIA.

## Why is it so hard to impose discipline on an officer?

A true police accountability system requires that individual officers who engage in misconduct face real consequences commensurate with the nature of the offense and any mitigating and aggravating circumstances. In its current form, Chicago's police oversight system is essentially structured to prevent this from happening in a meaningful way.

### THERE ARE NO CLEAR STANDARDS TO DECIDE THE APPROPRIATE LEVEL OF DISCIPLINE

IPRA, BIA, the Superintendent, the Police Board and arbitrators all make decisions at various points in the process regarding what the appropriate discipline should be for an officer who engaged in misconduct. At present, none use a discipline matrix, a national best practice that determines a fixed set of penalties for behavior and history, and takes into consideration any mitigating and aggravating circumstances. Instead, most of the entities turn to past precedent when making decisions about the level of discipline to impose. A discipline matrix not only helps to ensure an officer receives the appropriate level of discipline and therefore is held accountable, but it makes the oversight system more effective by sending the message that actions have real consequences because discipline is fair, predictable and consistent.

### CPD POLICIES AND PRACTICES CAN WEAKEN DISCIPLINE

#### Options

When a CPD member is suspended, he or she is not necessarily required to miss work or lose pay. "Options" to suspension may be granted by the Superintendent to a member who has been ordered suspended for a specified number of days.[258] Subject to some limitations, the Superintendent may permit the member to satisfy all or part of the suspension by forfeiting leave time, such as vacation days, or working regular scheduled days off without compensation.

Plaintiff's Exhibit 8

The ability to serve the suspension using options lessens the impact of the discipline on both CPD and the member. This reduces CPD's incentive to prevent misconduct and its consequences because CPD does not lose the member's services to a suspension. Similarly, the member feels no effect on his or her paycheck at the present time, if ever. It also disincentivizes the reporting of misconduct when an officer found to have engaged in serious misconduct has almost no disruption to time in duty and sends a signal to the rank and file generally that the disciplinary system lacks rigor and bite.

### *Command Channel Review*

When IPRA or BIA recommends suspension, the case goes through Command Channel Review, a process in which multiple members of an officer's chain of command review the investigative file and the appropriateness of the discipline recommendation.[259] Command Channel Review provides a platform for members who are potentially sympathetic to the accused officer to advocate to reduce or eliminate discipline.

Command Channel reviewers have an opportunity to influence the Superintendent's discipline decision, and also that of the arbitrator, who frequently makes the final decision. Some arbitration decisions reference the recommendations of CPD supervisors who participate in Command Channel Review.[260] For example, in an arbitration decided in 2015 the arbitrator quoted multiple officers who participated in Command Channel Review and recommended finding the case not sustained or unfounded.[261]

The CPD review process overall can add considerable time to the process, which weakens the quality of the record and delays holding officers accountable. When IPRA recommends discipline, CPD is required to respond within 90 days. When BIA recommends discipline, there is no limit and the process can take up to a year.[262] There are no guidelines regarding how much time each of the Command Channel reviewers should spend with the case, or any triggers built into the review process to move it along.[263] After the Command Channel Review, the case goes before the Superintendent.[264] There is no amount of time given for the Superintendent's review.[265]

## THE CBAS CREATE A GRIEVANCE SYSTEM THAT WEAKENS OR OVERTURNS DISCIPLINARY DECISIONS

Even after a misconduct complaint is sustained, the collective bargaining agreements provide a grievance procedure that can minimize the severity of the punishment or overturn it completely. The CBAs leave much of the final decision-making about discipline to arbitrators, who frequently reduce the discipline.[266] There are different processes to challenge the discipline, depending on the rank of the CPD member and the amount of recommended discipline. The most recent FOP CBA introduced a form of arbitration called the Summary Opinion process, intended to produce faster results. The arbitrator's decision is final, often results in reduced discipline and is not subject to oversight.[267]

The Task Force reviewed all 62 discipline-related grievances decided via arbitration in 2015—59 decided through a streamlined process and 3 through a full arbitration.[268] In 42 out of the 59 grievances decided via the streamlined process (more than 70%), the arbitrator reduced or eliminated the discipline. The three full arbitrations were decided in a single case, in which the arbitrator reversed IPRA's sustained finding. This pattern of arbitrators reducing discipline is not a new phenomenon. A review of 328 CPD arbitration cases decided from 1990-1993 found that discipline was "routinely cut in half by arbitrators."[269]

Plaintiff's Exhibit 8

The decisions also varied dramatically from one arbitrator to another. One arbitrator upheld the full discipline in the majority of cases by dismissing two-thirds of the grievances presented to him. Another arbitrator upheld the discipline in only 20% of cases, reduced the discipline in 70% of cases and eliminated the discipline in 10% of cases.

The new Summary Opinion process may have some benefits, including potentially resolving matters more quickly. Of the 56 cases for which the Task Force was able to establish the date of conduct, 24 involved conduct from 2014 or 2015. In those cases, the average time between the conduct and the opinion was 447 days; 7 cases even came in under one year. In contrast, in all 56 cases (including those involving pre-2014 conduct), an average of 1,049 days elapsed between the conduct and the opinion. Thus, with the Summary Opinion process in the past 2 years, cases have been moving toward a final resolution more swiftly.

## THE POLICE BOARD'S HISTORIC FINDINGS MAY HAVE IMPEDED DISCIPLINE

The Police Board has historically only terminated officers in a low percentage of cases, either reversing the Superintendent's discharge recommendations or imposing a term of suspension instead. From 1999-2008, the Police Board agreed with the Superintendent's discharge recommendations in only 39% of cases.[270] Over the past five years, the Board upheld discharge recommendations in only 41% of cases.[271] In the remaining cases, the Board either found the officer guilty of misconduct and reduced the penalty to a suspension, or found the officer not guilty.[272] This practice not only has negative impacts internal to CPD—*e.g.*, perpetuating officers' feeling of impunity—but also further erodes community trust in the accountability and disciplinary process.

These numbers have changed of late, coinciding with a recent change of leadership on the Police Board. From September 2015 through February 2016, the Board decided cases involving nine officers. For eight of the nine officers, the Board upheld the Superintendent's discharge recommendation. In the single instance where the Board disagreed with the recommendation, the Board ordered a two-year suspension and three Board members authored a dissenting opinion arguing for termination as the more appropriate penalty.[273]

The precise reason for the historic discrepancy between the Superintendent's discharge recommendations and the Police Board's decisions is not clear. Beyond the makeup of the Board, the quality of the record may be a factor. Several years can pass between the alleged conduct and the evidentiary hearing. A review of Police Board cases over the past five years indicates that it takes an average of 28 months for a case to reach the Police Board if it originates with BIA, and 48 months if it comes from IPRA.[274] When so much time passes before the evidentiary hearing, which resembles a trial and involves live witness testimony, the quality of the City's case, including witnesses' recollections, can be negatively affected.

Prosecuting attorneys also may not be sufficiently supported in putting on their cases before the Police Board. The attorneys, who work for the City's Law Department, are not involved in the underlying investigations. Rather, they work from the written file already compiled by IPRA or BIA, which may be several years old. Once a case makes it before the Board, witnesses may no longer remember what occurred, they may testify differently from the facts in the written file, or the original charges may not match the live testimony.

Plaintiff's Exhibit 8

The Police Board is relatively transparent but the organization of its information presents some obstacles to effective analysis. The Board issues monthly, quarterly and annual reports, posts the full written decision for each case it hears, and its monthly meetings and evidentiary hearings are open to the public. However, some information that could easily be placed in its regular reports is only available in the Board opinions themselves, such as the number of suspension days, where relevant, and the rank of the CPD member. The Board also does not post monthly or quarterly report archives—only the reports for the most recent month and quarter are available online. Finally, reports and data are located in several different places on the website, making it challenging to navigate without prior knowledge about where information is housed.

The Police Board is fairly streamlined and efficient. In 2015, the median number of days from filing of charges to Police Board decision was 209 days.[275] Given the Police Board's process of taking live testimony and performing a de novo review of each disciplinary case before it, it would be difficult to cut time from this stage of the process.

## THERE IS NO INDEPENDENT OVERSIGHT OF HOW DISCIPLINE IS IMPOSED

The public is largely deprived of basic information regarding what discipline is imposed in response to complaints of misconduct. State statutes, the Municipal Code, CPD Orders, CBAs and Police Board procedures govern CPD's disciplinary process. It is difficult for the public to obtain a complete picture of the process.

Because only a small fraction of complaints result in discipline, it is deeply troubling that so many systems exist for determining final discipline and no entity tracks them or knows the degree to which the recommended discipline is maintained, reduced or eliminated. Of the methods for imposing final discipline, IPRA mediations and Police Board decisions are made public, while BIA mediations, all arbitrations and instances in which the officer simply accepted the discipline are not. This is particularly significant because in the majority of cases reviewed by the Task Force, including both cases that go through the grievance and arbitration process and those heard by the Police Board, the ultimate discipline imposed was lower than what IPRA or BIA initially recommended.

The fragmented system involving IPRA, the Superintendent, BIA within CPD, numerous arbitrators and the Police Board compromises the strength and significance of the investigative findings and recommendations over time, and discourages systemic accountability and transparency. Each stage of the disciplinary process must be publicly posted, and an entity within the police oversight system must report on the data.

### *Recommendations*

**The CPD and IPRA should finalize a discipline matrix and all oversight entities should be required to follow it when recommending or imposing discipline.**

The Task Force understands that IPRA already has a draft penalty matrix, and IPRA, the Police Board and BIA are awaiting its formal review and implementation. The matrix should establish clear penalties for failure to cooperate. It should require that officers who lie during misconduct investigations be fired, and officers who retaliate against any complainant be fired and referred for criminal prosecution.

Plaintiff's Exhibit 8

**The CPD should develop standards regarding when options may and may not be granted by the Superintendent.**

This should also be included in any discipline matrix. Further, the granting and utilizing of options should be publicly disclosed.

**Command Channel review should be eliminated entirely, and Superintendent review of BIA cases should also be limited to 90 days, like with IPRA.**

**The arbitration process should be subject to oversight.**

The arbitration process should be scrutinized and monitored by the Inspector General for Public Safety and the Community Safety Oversight Board, and decisions must be made easily accessible to facilitate such accountability measures. Additionally, the Police Board's suspension decision should be binding on Sergeants, Lieutenants and Captains. CPD members should not be allowed to grieve a reduced suspension.

**The City should conduct further analysis regarding the role of prosecuting attorneys in Police Board proceedings and whether they are sufficiently supported and best situated to prosecute cases of police misconduct before the Board.**

In the meantime, the City Law Department should use training and enhanced trial advocacy protocols to support its prosecutors who try cases before the Board. New York City's model may provide some useful lessons and ideas for future reforms. New York City found when it implemented a program allowing its Civilian Complaint Review Board to prosecute cases using its own prosecutors, there were considerable benefits.[276]

**The Inspector General for Public Safety should audit CPD policies and procedures that may create barriers to imposing discipline for misconduct.**

The Inspector General for Public Safety should conduct pattern analysis that includes review of all discipline that is recommended by the new CPIA and BIA in order to assess disciplinary trends, to determine whether discipline is consistently applied and fair and to determine whether final disciplinary decisions are being executed as resolved.

**The disciplinary process should be made fully transparent.**

Immediately when BIA or IPRA serve a suspension to a CPD member, the process should be publicly posted and tracked. In real time, the public must be able to see if the member accepted the discipline, grieved the discipline or sought Police Board review, where applicable; how much time was spent in each stage; and the final disposition. While the disciplinary system is dispersed through several entities, it must always run through the CPD at some point.

### *Other Considerations*

Some have questioned whether the Police Board should continue to serve as yet another fact-finding entity that adds an extra layer to the police oversight system, given its historically-high rate of overturning Superintendent discharge recommendations. Instead of reviewing the evidence anew (usually years after the fact), some argue that the Board could serve more of a traditional appellate role by reviewing

Plaintiff's Exhibit 8

investigatory findings and discipline recommendations under a more deferential abuse-of-discretion standard.

These changes would negate the need for Police Board hearings as they are currently conducted. An officer appealing discipline would have the opportunity to file a written brief outlining why the findings or the discipline imposed were an abuse of discretion, and the City would have the opportunity to file a brief in response, defending its actions. The Board would then render its decision, taking into account the standard of review.

While this approach has some appeal, the Task Force has not adopted it. In the current process, the Police Board represents an officer's only opportunity to be heard in termination cases. Further study would be needed before eliminating this fundamental level of due process. Moreover, the recent trend of officers universally choosing arbitration over the Police Board for suspension cases seems to suggest that officers do not view the Board as a favorable venue.

# Why aren't the police held accountable through the courts and other systems?

## POLICE MISCONDUCT SETTLEMENTS LACK TRANSPARENCY AND ADEQUATE OVERSIGHT

Currently, the Corporation Counsel must seek approval from the City Council for litigation settlements (including those relating to police misconduct) in excess of $100,000. For every case for which City Council settlement approval is sought, the Corporation Counsel provides oral presentations or memorandums to the Finance Committee explaining the reasons why the proposed settlement is being recommended. The Corporation Counsel claims attorney/client privilege for these presentations and memoranda, so they are not made public. In addition, the Corporation Counsel provides the Finance Committee a monthly report about all settlements, including those below the $100,000 City Council threshold.

The Law Department posts on its website a list of judgment and settlement payment requests sent to the Comptroller from 2008 to the present.[277] The downloadable spreadsheets include the case number, payee name, amount, fee costs, primary cause, city department involved, disposition and date. The primary cause field is typically limited to a few words such as "fall down/sidewalk," "illegal search/seizure" or "false arrest," although many entries— approximately 25% in 2015—are abbreviations or acronyms that are not explained. While the Law Department should be commended for placing settlement data on the web that can be tracked, more can and should be done to make the system fully transparent.

Information as to the Corporation Counsel's police misconduct docket and the attorneys' evaluation of the cases on that docket is essential for the City Council to know in order to discharge its oversight responsibility. The Corporation Counsel has a duty pursuant to Rule 1.4 of the Illinois Rules of Professional Conduct to inform the members of the City Council with respect to all ongoing litigation relating to the CPD.

Additionally, the City's lawyer has conflicts that may make it more difficult to hold officers accountable for misconduct and to make the system transparent. The Corporation Counsel, the City's top lawyer, is charged with conducting "all the law business of the city."[278] That includes representing the Mayor, the City Council, IPRA and the Office of Inspector General, as well as individual police officers in some cases. This can create all kinds of complicated situations, because fundamentally a lawyer has a duty of loyalty

Plaintiff's Exhibit 8

to his "client," but if the same legal department represents multiple clients whose interests diverge, conflicts may significantly compromise the multiple, simultaneous representations. The Corporation Counsel has some process in place that attempts to address some of these inherent conflicts.

These conflicts—or at least the appearance of conflict—can frequently arise in police misconduct lawsuits. The Corporation Counsel often represents both the police officer and the City, which is often also named as a defendant. The potential for conflict is even greater when the Corporation Counsel wishes to settle a case by making a payment to the victim.

## LITIGATION PRACTICES MAY IMPEDE ACCOUNTABILITY IN THE COURTS

Inefficiencies and delays arising in litigation of civil rights and other cases against the police, particularly discovery issues, significantly slow down the processing of civil lawsuits by citizens. Civil rights attorneys with extensive experience litigating against the City have raised concerns about the City's compliance with discovery requests. They maintain that documentation is frequently withheld through a system in which discovery is delegated to paralegals, City attorneys maintain ignorance of available documents within CPD, and discovery obligations are not treated with appropriate seriousness.

The City recently retained Winston & Strawn to conduct an independent review of the Law Department's Federal Civil Rights Litigation division. In deference to that review, the Task Force is not making substantive findings or recommendations on these issues.

## BIAS OR THE PERCEPTION OF BIAS MAY TAINT THE STATE'S ATTORNEY IN POLICE MATTERS

The relationship between police officers and the Cook County State's Attorney's Office creates actual bias or the perception of bias that undermines trust in the system and may result in criminal behavior by police going unpunished.

CPD and the Cook County State's Attorney's Office are required to work in close collaboration. CPD investigates cases that the State's Attorney ultimately prosecutes. Police officers often testify in cases brought by the State's Attorney and the strength of the State's Attorney's case may depend on the strength of the police officer testimony. Because of that close working relationship and interdependence, many wonder whether the State's Attorney can be fair and impartial when deciding whether to bring charges against police officers accused of misconduct, or when deciding the severity of the charges to bring.

Indeed, many believe that the State's Attorney's office has a bias in favor of police officers, especially in cases that may involve more serious misconduct where police officers might face severe penalties. They believe that the long time that elapsed from the Laquan McDonald shooting to the day charges were brought against Officer Jason Van Dyke reflects that bias.

Though it is difficult to prove whether some State's Attorneys do in fact fail to zealously prosecute cases of police misconduct, it is certainly the case that even the perception of bias undermines trust in the system. However, Illinois law does not currently permit the appointment of a special prosecutor in these situations.

Aside from the specific issue of police prosecutions, in its day-to-day work the State's Attorney regularly encounters police misconduct. However, the State's Attorney has no mandatory information-sharing protocol with IPRA and BIA. The Task Force is aware of troubling incidents where the Cook County State's

Plaintiff's Exhibit 8

Attorney's Office has failed to pursue perjury charges when CPD members have lied or are otherwise found not credible in court. In order for the CPD to take meaningful steps toward breaking the "code of silence," it must be made aware of such conduct and take swift action.

## THE PENSION SYSTEM HOLDS FEW POLICE ACCOUNTABLE FOR MISCONDUCT

Police officers found guilty of serious misconduct can sometimes continue to receive publicly funded pensions. None of the entities involved in the disciplinary infrastructure have any ability to impair an officer's pension benefits.

Under Illinois law, pension benefits may not be paid to any person who is "convicted of any felony relating to or arising out of or in connection with his service as a policeman."[279] The Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago authorizes payments to fund members. Historically, the Retirement Board has rarely voted to deny officers their pensions, even in the face of serious findings of misconduct. For example, the Retirement Board in 2011 voted 4-4 to allow Jon Burge to keep his pension. Burge argued that his convictions for obstruction of justice and perjury related to conduct *after* he had left the CPD.[280] The tie vote meant that Burge would continue to receive pension benefits.

Following the Burge case, a new state law was passed that specifically permits the Attorney General to file a civil action to cease pension payments to public employees convicted of felonies related to employment.[281] The Attorney General's ability to bring these actions is an important check on the police oversight system because non-parties, such as the City of Chicago, are very limited in their legal ability to challenge Pension Board decisions. But it is still difficult and rare to deny a former police officer a publicly funded pension, even if the officer was found to have engaged in serious misconduct while on the job.

### *Recommendations*

### The City should disclose more information on police misconduct settlements to the City Council and the public.

The text of oral presentations and written memoranda from the Corporation Counsel to the City Council describing the reasons for proposed settlements above the $100,000 threshold should describe the reasons for the proposed settlement in sufficient detail to enable the members of the City Council to make an informed decision as to whether to approve the settlement. Moreover, because taxpayer funds are at stake and because of the public importance of cases with a settlement value above the threshold, the memoranda should also be publicly available after a settlement is finalized.

The Corporation Counsel should provide the Public Safety Committee of the City Council with a quarterly police misconduct docket report listing all cases (regardless of settlement amount) and providing: (a) the case name and court number; (b) the names of the defendants and plaintiffs; (c) a brief description of the allegations (beyond the limited information currently provided by Law online); (d) where appropriate, information as to the disposition of the case, including, with respect to cases that have been settled or have resulted in judgments in favor of the plaintiff, the amounts in question; and (d) any additional information with respect to a specific case that, in the Corporation

Plaintiff's Exhibit 8

Counsel's judgment, should be brought to the Committee's attention. (Note that this is a significant advance beyond annual reports currently created by the office.) Further, because of the public importance of the police misconduct docket, the docket report described above should be publicly available.

The new Inspector General for Public Safety should also provide a "red flag" coversheet for every proposed settlement that goes before the City Council. The coversheet should detail any history of complaints and allegations for the officers involved in the subject case.

To avoid conflicts in police misconduct cases and other matters, the City Council should enact legislation that permits it to hire its own General Counsel to provide legal services and advice on legislative, policy and litigation matters.

The General Counsel office must be adequately staffed and fully empowered to represent the interests of the City Council. This should include the legal authority to issue subpoenas to compel the attendance of witnesses for purposes of examination and the production of documents and other items for inspection and/or duplication, and the authority to hire outside counsel as appropriate. Similarly, CPIA should have the ability to retain and compensate counsel of the agency's choosing to represent the agency in actions to enforce subpoenas issued by the agency.

The City should advocate for new state legislation that would require the appointment of an independent prosecutor, separate from the State's Attorney, to handle all phases of any prosecution of any case in which a police officer is charged with causing death or great bodily harm without justification.

The State's Attorney should be required to provide oversight bodies with evidence of police misconduct that is not the subject of an ongoing prosecution.

The City should seek to secure a Memorandum of Understanding with the Cook County State's Attorney's Office and the Public Defender's Office that requires these entities to notify CPD, the Corporation Counsel's office and the police oversight bodies—BIA, CPIA and the Public Safety Inspector General—in any case where an officer is found to be lying or otherwise found to be not credible under oath. Such a notification should trigger a complaint log number and an automatic investigation, much like a firearm discharge notification.

Further research into the Policemen's Annuity and Benefit Fund is required to determine if additional changes in law and policy can ensure that police officers are not rewarded for official misconduct.

Understandably, the law makes it difficult to take away a pension benefit from someone who has earned it. But people should not be rewarded for abusing their power and violating the public trust and the law.

Plaintiff's Exhibit 8

## Endnotes

206 Citizens Police Data Project, *supra* note 115.

207 Data provided by IPRA Chief of Staff Annette Moore via e-mail on Feb. 4, 2016.

208 Chicago Municipal Code §2-57-010.

209 Independent Police Review Authority, Annual and Quarterly Reports, *available at*
http://www.iprachicago.org/ipra/homepage/PublicationPress/archived_reports/quarterly_report_2013.html.

210 Chicago Municipal Code 2-57-010; CPD General Order G08-01, Complaint and Disciplinary Procedures (July 17, 2015).

211 Data provided by the City of Chicago via letter dated Mar. 18, 2016.

212 Data provided by the City of Chicago via letter dated Mar. 24, 2016.

213 Chicago Municipal Code § 2-84-020.

214 Rahm Decries Police "Code of Silence" Ahead of Morning Speech to City Council, Chicagoist (Dec. 9, 2015) (quoting Dec. 8, 2015
Chicago Tonight interview), *available at* http://chicagoist.com/2015/12/09/rahm_gives_preview_of_city_council.php.

215 Remarks of Mayor Rahm Emanuel, Justice, Culture and Community (Dec. 9, 2015), *available at*
http://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2015/December/12.9.15MREremar
ks.pdf.

216 Mary Ann Ahern, Former Chicago Police Supt.: Code of Silence "Has Always Existed," www.nbcchicago.com (Mar. 3, 2016), *available
at* http://www.nbcchicago.com/blogs/ward-room/Former-Chicago-Police-Supt-Code-of-Silence-Has-Always-Existed--370994101.html.

217 Eugene Williams, Superintendent Application, Essay Question No. 6.

218 Kevin M. Keenan & Samuel Walker, An Impediment to Police Accountability? An Analysis of Statutory Law Enforcement Officers'
Bills of Rights, 14 B.U. Pub. Int. L.J., 185, 192, *available at* http://www.bu.edu/law/journals-archive/pilj/vol14no2/documents/14-
2keenanandwalkerarticle.pdf.

219 FOP Contract Appendix L; Sergeants, Lieutenants and Captains Contracts§ 6.10.

220 Jeremy Gorner and Geoffrey Hing, Cops who pile up complaints routinely escape discipline, Chicago Tribune (June 13, 2015),
*available at* http://www.chicagotribune.com/news/ct-chicago-police-citizen-complaints-met-20150613-story.html.

221 FOP Contract Appendix L ¶ 7.

222 FOP Contract § 6.1 D; Sergeants, Lieutenants and Captains Contracts § 6.1 E-F.

223 Samuel Walker, The New World of Police Accountability, at 78 (2005). Additional information can be found at http://www.cincinnati-
oh.gov/police/linkservid/97D9709F-F1C1-4A75-804C07D9873DC70F/showMeta/0/ and http://www.nola.gov/nopd/nopd-consent-
decree/.

224 FOP Contract § 6.1 (E); Sergeants, Lieutenants and Captains Contracts § 6.1 (G).

225 CPD, General Order G08-01-01, Department Member's Bill of Rights, Sec. III B-E (Mar. 17, 2013). This provision resulted from an
arbitrator's ruling. *See also* Working Group Interview.

226 Multiple Working Group Interviews.

227 Samuel Walker, Police Union Contract "Waiting Periods" for Misconduct Investigations Not Supported by Scientific Evidence, at 5
(July 2015), *available at* http://samuelwalker.net/wp-content/uploads/2015/06/48HourSciencepdf.pdf.

228 FOP Contract § 6.1 (C).

229 FOP, Sergeants, Lieutenants and Captains Contracts § 6.1 (C).

230 *See* Grievance No. 016-02-001 (Arbitrator Peter R. Meyers, 2005) and Grievance No. 002-07-008 (Arbitrator Steven M. Bierig, 2010).

231 FOP, Sergeant, Lieutenant and Captain Contracts § 6.1 (D).

232 FOP, Sergeant, Lieutenant and Captain Contracts § 8.4.

233 FOP, Sergeant, Lieutenant and Captain Contracts § 8.4.

234 Samuel Walker, The Baltimore Police Union Contract and the Law Enforcement Officer's Bill of Rights: Impediments to
Accountability, at 5-6 (May 2015), *available at* http://www.aclu-md.org/uploaded_files/0000/0681/walker_-
_baltimore_police_union_contract_report.pdf.

235 FOP, Sergeant, Lieutenant and Captain Contracts § 16.

236 CPD, General Order G08-01-02, Specific Responsibilities Regarding Allegations of Misconduct, Sec. (B)(1).

237 FOP Contract § 6.1 (G); Sergeant, Lieutenant and Captain Contracts § 6.1 (I).

238 *See, e.g.*, http://www.iprachicago.org/resources.html.

Plaintiff's Exhibit 8

[239] Police Executive Research Forum, Critical Response, Technical Assessment Review: Police Accountability- Findings and National Implications of an Assessment of the San Diego Police Department, Washington D.C.: Office of Community Orientated Police Services (2015), *available at* https://www.sandiego.gov/sites/default/files/legacy/police/pdf/perfrpt.pdf.

[240] Los Angeles Police Department Consent Decree, § 61, http://assets.lapdonline.org/assets/pdf/final_consent_decree.pdf.

[241] The Inspector General, Joe Ferguson, was a member of both the Task Force and the Legal Oversight and Accountability Working Group. Mr. Ferguson recused himself and did not participate in Task Force discussions concerning where the new Inspector General for Public Safety should be housed.

[242] Bill Libit, et al., Elements of an Effective Whistleblower Hotline, Harvard Law School Forum on Corporate Governance and Financial Regulation (Oct. 25, 2014), *available at* https://corpgov.law.harvard.edu/2014/10/25/elements-of-an-effective-whistleblower-hotline/#11b; Jim Ratley, Creating an Effective Whistleblower Program, Security Magazine (Aug. 1, 2012), *available at* http://www.securitymagazine.com/articles/83343-creating-an-effective-whistleblower-program.

[243] *Id.*

[244] *Id.*

[245] IPRA, 2015 Sustained Case Reports, *available at* http://www.iprachicago.org/ipra/homepage/PublicationPress/archived_reports/quarterly_report_2015.html.

[246] Independent Police Review Authority, Budget Statements to the City Council Committee on the Budget and Government Operations for Nov. 8, 2013 and Oct. 5, 2015, *available at* http://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/2014%20Budget/2014BudgetHearingMaterials/IPRA2014_BudgetHearingMaterials_FINAL.pdf and http://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/2016Budget/BudgetHearingStatements/2016_IPRA_Statement_merge.pdf, respectively.

[247] Complaint Submitted to the United States Department of Justice Documenting the Role of the Independent Police Review Authority in Perpetuating a Code of Silence and Culture of Violence in the Chicago Police Department, submitted by Alexa A. Van Brunt, et. al., at 36, *available at* http://www.law.northwestern.edu/legalclinic/macarthur/projects/police/documents/Complaint%20to%20DOJ%20Concerning%20IPRA.pdf.

[248] *See e.g.*, Eugene Police Operations Manual, Policy 1020, ch.1020.7.2, *available at* http://coeapps.eugene-or.gov/EPD_POM_EXT/docview.aspx?id=1393648; Albuquerque Police Oversight Ordinance 9-4-1-6 ( c) (3), *available at* http://www.cabq.gov/cpoa/documents/Amended%20Police%20Oversight%20Ordianance.pdf; San Francisco Office of Citizen Complaints Citizen-Police Mediation Program Brochure, *available at* http://sfgov.org/sites/sfgov.org.occ/files/migrated/ftp/uploadedfiles/occ/mediation_english.pdf.

[249] Jon L. Proctor, Richard Rosenthal, and AJ Clemmons, Denver's Citizen/Police Complaint Mediation Program: A Comprehensive Evaluation, at 18 (Feb. 24, 2009), *available at* https://www.denvergov.org/content/dam/denvergov/Portals/374/documents/Mediation_Journal_Article_2-24-09.pdf.

[250] *Id.* at 28.

[251] Samuel Walker & Carol Archbold, Mediating Citizen Complaints against the Police: An Exploratory Study, 2000 J. Disp. Resol. 9-10, *available at* http://scholarship.law.missouri.edu/cgi/viewcontent.cgi?article=1376&context=jdr.

[252] Working Group Interview.

[253] Jennifer Smith Richards & Chad Yoder, IPRA Data of Police Involved Shootings, Chicago Tribune (Dec. 4, 2015), *available at* http://www.chicagotribune.com/ct-police-shooting-data-ipra-20151203-htmlstory.html.

[254] Andrew Schroedter, Fatal Shootings by Chicago Police: Tops Among Biggest U.S. Cities, Better Govenment Association (July 26, 2015), *available at* http://www.bettergov.org/news/fatal-shootings-by-chicago-police-tops-among-biggest-us-cities.

[255] Chip Mitchell, Fired Investigator: Policy Change Could Help Cover up Police Misconduct, WBEZ (Aug. 11, 2015), *available at* http://www.wbez.org/news/fired-investigator-policy-change-could-help-cover-police-misconduct-112614.

[256] Bill Ruthhart & Lolly Bowean, *supra* note 72.

[257] New York City Civilian Complaint Review Board, *available at* http://www1.nyc.gov/apps/ccrb-status-lookup.

[258] CPD, Special Order S08-01-04, Suspension/Options, Sec. II (Mar. 17, 2013), *available at* http://directives.chicagopolice.org/lt2015/data/a9fe0202-12ce5c17-7e612-ce5e-c89e9add877a4f7d.html?ownapi=1.

[259] CPD, Special Order S08-01-03 Complaint Summary Reporting and Review Procedures, Sec. III (May 14, 2013), *available at* http://directives.chicagopolice.org/lt2015/data/a9fe0202-12ce5c17-7e612-ce5e-c9c4fbeffbc626e7.html?ownapi=1.

[260] Working Group review of Summary Opinions provided by CPD.

[261] Grievance 019-12-110, 019-12-109/456; Grievance 019-12-110/455, 25-26.

[262] MCC 2-57-060; Working Group Interview.

Plaintiff's Exhibit 8

263 Special Order S08-01-03, *supra* note 258, at Sec. III.

264 Working Group Interview.

265 Working Group Interview.

266 While the Police Board is the more commonly known entity involved in deciding final discipline, it does not handle many suspension cases. The Board decide s 30-plus-day suspension cases for Sergeants, Lieutenants and Captains, though there are few of them—one in 2015 and five in 2014. The Board also decides suspension cases over one year for all ranks.

267 Ron Safer, Preventing and Disciplining Police Misconduct: An Independent Review and Recommendation Concerning Chicago's Police Disciplinary System, at 16 (Dec. 2014), *available at* http://www.cityofchicago.org/content/dam/city/progs/safety/Preventing_Disciplining_Police_Misconduct_Dec_2014.pdf.

268 The numbers 59 and 3 refer to the number of grievances not the number of opinions, which can involve disposition of multiple cases.

269 Mark Iris, Police Discipline in Chicago: Arbitration or Arbitrary?, 89 J. Crim. L. & Criminology 216 (1998), *available at* http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6990&context=jclc.

270 Chicago Justice Project, Chicago Police Board: A Ten-Year Analysis, *available at* http://chicagojustice.org/research/long-form-reports/chicago-police-board-a-ten-year-analysis.

271 The Chicago Justice Project, Chicago Police Board: A Ten-Year Analysis (2009), *available at* http://www.chicagojustice.org/research/long-form-reports/chicago-police-board-a-ten-year-analysis/CJP_CPB_Report_2009.pdf.

272 Chicago Police Board, Annual and Quarterly Reports, *available at* http://www.cityofchicago.org/city/en/depts/cpb/supp_info/annual_reports.html and http://www.cityofchicago.org/city/en/depts/cpb/auto_generated/police_discipline_archives.html.

273 *See* Case No. 15 PB 2881 (Lightfoot, Conlon and Sweeny, dissenting), *available at* http://www.cityofchicago.org/content/dam/city/depts/cpb/PoliceDiscipline/15PB2881.pdf.

274 Review of Police Board cases filed with the Board from 2011-2016, measured from date of primary incident to date filed.

275 Chicago Police Board, Quarterly Report (Dec. 31, 2015).

276 Civilian Complaint Review Board, The CCRB Announces Historic Agreement with the NYPD for Expanded Prosecutorial Authority (Mar. 28, 2012), *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/CCRB_APU_announcement.pdf.

277 City of Chicago Department of Law, *available at* http://www.cityofchicago.org/city/en/depts/dol.html.

278 Corporation Counsel and Law Department, Mission Statement, *available at* http://www.cityofchicago.org/city/en/depts/dol/auto_generated/dol_mission.html.

279 40 ILCS 5/5-227

280 *See supra* note 90.

281 Illinois Attorney General Press Release, Madigan Applauds Governor's Action on Bill to Stop Pension Benefits for Felons (Dec. 30, 2014), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2014_12/20141230.html.

Plaintiff's Exhibit 8

# Early Intervention & Personnel Concerns

## Why does CPD lack a culture of accountability when it comes to the internal management of its police officers?

There is a sense within the community, which the Task Force has heard time and again, that police officers are not held accountable for their actions and misconduct. The larger discussion on policing that is taking place across Chicago has included the question as to why CPD has fostered a culture in which supervisors turn a blind eye to misconduct and do not provide sufficient oversight to ensure that officers perform their duties with integrity.

Community members are rightfully skeptical that enough is being done internally to adequately supervise officers and to identify officers whose actions are falling short of the community's expectations. CPD lags behind other police departments when it comes to managing risk posed by officer misconduct.

The fact of the matter is that there is a general absence of a culture of accountability within CPD, largely because no one in top leadership has taken ownership of the issue. Although so-called "problem officers" are either well known to their supervisors and CPD's leadership or easily identified, few steps are being taken to proactively manage and redirect those officers' conduct. The effective tools for providing greater oversight and supervision to officers are well known and widely used in other jurisdictions. There appears to be no urgency within CPD around accountability. Something must change, and that change must come from the highest levels of CPD.

CPD's efforts to actively monitor and improve officer behavior appear to be at a standstill, but the problem is not new. CPD's history is replete with examples of wayward officers whose bad behavior or propensity for bad behavior could have been identified much earlier if anyone had viewed managing this risk as a business imperative.

Take former CPD officer Jerome Finnigan as an example. In 2006, Finnigan, an 18-year CPD veteran, was arrested for leading a rogue group of officers in CPD's elite Special Operations Section in carrying out robberies, home invasions, kidnappings and other crimes. Finnigan was later charged with plotting to hire a hit man from a street gang to murder his former partner, who he believed was cooperating with prosecutors. Finnigan pled guilty to the murder-for-hire scheme and income tax-related charges stemming from money he stole and is serving a 12-year sentence in federal prison.

When Finnigan was arrested, many reported that he had been considered a model officer. Indeed, he won numerous commendations for his work in the Special Operations Section. In 1999, he received the Superintendent's Award of Valor for protecting a store owner during a robbery and helping apprehend the offenders, all while he was off duty. Even prosecutors conceded at his sentencing that Finnigan was at one point viewed as an outstanding officer.

Plaintiff's Exhibit 8

But, despite outward appearances, red flags were piling up long before 2006. Between 2000 and the time he was indicted in 2006 and ultimately resigned in 2008, Finnigan racked up 89 CRs. Over the entire course of his career, he had 161 total CRs—a shocking number by any standard. These CRs were for a range of serious complaints, including numerous lawsuits; numerous warrantless, non-consensual searches; theft; and other felony crimes. And yet, according to CPD records provided by the City, no effort was ever taken to enroll Finnigan in the department's formal intervention programs or otherwise intercede in his obvious pattern of misconduct.[282] (Finnigan was later identified in CPD's manual efforts to identify and enroll more officers in the department's formal intervention programs—discussed in more detail below—but, by that point, Finnigan had already been indicted.)

In 2005, another CPD officer, Corey Flagg, was arrested for his part in a ring of five Englewood officers who used traffic stops and home invasions to rob drug dealers. Flagg pled guilty to conspiracy to distribute cocaine and marijuana, as well as possession of a firearm in a drug trafficking crime, and was sentenced to nearly 10 years in prison. Flagg's record also raised numerous red flags. As with Finnigan, Flagg incurred large numbers of CRs during his tenure at CPD—88 in total—and received a number of lengthy suspensions. (Unlike Finnigan, Flagg was enrolled in the department's behavioral intervention program in 2003.)

Some might argue that Finnigan's and Flagg's criminal conduct is aberrational. It is not. Police corruption cases in Chicago may not be commonplace, but neither are they rare occurrences. Former CPD Gang Crimes Officer Joseph Miedzianowski (sentenced to life imprisonment for racketeering, drug conspiracy and robbery), former CPD Chief of Detectives William Harnhardt (pled guilty to racketeering and conspiracy) and former CPD Narcotics Officer Glenn Lewellen (guilty of narcotics conspiracy) are but three of the most notorious instances of police corruption in recent memory.[283] But there have been others, and it is clear that some portion of the Chicago police force still is not meeting their professional and legal obligations.



Certainly, a great majority of CPD officers are principled, dedicated and ethical employees who serve our community with respect and care. However, for any number of reasons, unfortunately there are times when officer performance comes up short. For example, a review of CR histories of all CPD officers between 2007 and 2015 showed that approximately 1,572 officers had 10 or more CRs to their name during that time period (many with more than 10).[284] Of those officers, 189 were Sergeants, 21 were Lieutenants and 2 were Commanders.

Plaintiff's Exhibit 8

The Task Force also took a close look at litigation and settlement data provided by the City for civil rights cases involving allegations against CPD officers. Given the often-disheveled state of this data, as the City provided it to the Task Force, it is difficult to report on these cases with absolute certainty, but we can provide reasonable estimates.[285]

From 2010 through 2015, the City has handled approximately 2,000 cases involving civil rights allegations against its police officers. The Task Force has been told that there are about 400 such cases pending against police officers at any one time. The amount of money the City pays to resolve these cases is staggering—over $600 million since 2004, with close to $400 million spent in the last five years alone.[286] Many of the names of CPD officers who appear frequently on the litigation and settlement lists are familiar with the public—Joe Dortha Parker (24 cases), Richard Fiorito (11 cases), Jerome Finnigan (10 cases) and Keith Herrera (8 cases). Clearly, a portion of CPD's officers are costing the City and its taxpayers many millions of dollars each year in settlements, judgments and lost man-hours and, in the most egregious circumstances, unnecessarily injuring or killing community members. The actions of these officers are significantly contributing to the erosion of trust between CPD and the public—the very people they have sworn to serve and protect.





One part of the solution to this deeply ingrained problem is improving oversight and management of police officers, something that is sorely lacking in today's CPD. When men and women choose to join the police force, it is often for life. CPD—and, in turn, the taxpayers and citizens of Chicago—make a huge investment in every police officer over the course of his or her career.

More can and should be done to support these officers and redirect their behavior before it is too late. Police departments around the country use tools to identify officers with at-risk behavior to receive additional non-disciplinary supports in order to redirect the behavior of wayward cops, including counseling, training and reassignment. It is up to CPD leadership to take responsibility for a pivot toward a culture of accountability and embrace these management tools to improve oversight of their officers and, in turn, improve policing outcomes for the community.

Plaintiff's Exhibit 8

## What are the current internal mechanisms for holding CPD's officers accountable for their conduct?

Although it would be unfair to say that CPD is not taking any steps to understand and intervene in officer misconduct, the proactive steps that have been taken are significantly limited and woefully inadequate compared to best practices. Moreover, some steps have been subject to significant resistance from stakeholders, such as the police unions.

CPD relies on two formal early intervention programs to address officers exhibiting potentially problematic conduct. These are known as Behavioral Intervention System (BIS) and Personnel Concerns (PC), and both were implemented in 1980 and remain in place today.[287] BIS is a non-disciplinary system that seeks to provide "early indentification of members who engage in conduct which is contrary to the goals of the Department."[288] This program puts the onus on command and supervisory officers to monitor the performance of their subordinates. Police officers are placed in BIS upon approval by the command staff member of the Human Resources Division. The command staff member may consider officers for inclusion based on recommendations from certain high-level individuals within the CPD system. The program looks at certain "performance data" as "behavioral intervention indicators." Once admitted into the BIS, the police officer will be subject to an Individualized Performance Plan ("IPP"), which governs the steps used to resolve the unacceptable performance/behaviors.

PC is another non-disciplinary system that addresses the most serious problematic behavior or performance issues and is often the second line of intervention where BIS has not reformed undesirable conduct. CPD uses the system "to intervene in an employee's problems, behavior, or performance issues which, without assistance, may lead to severe disciplinary measures or separation from the Department."[289] As with BIS, any number of high-ranking individuals within the CPD system can recommend a police officer for placement into PC and must be approved by the command staff member of the Human Resources Division.

PC allows for a range of "corrective action[s] to address the identified behavior," including but not limited to, requesting a Psychological Fitness for Duty Evaluation, changing the officer's partner, weekly performance reviews and retraining. The steps taken are documented in the officer's IPP, and Personnel Concerns Progress reports are prepared and submitted up the chain of command to the command staff member of the Human Resources Division for review. For both the BIS and PC programs, supervisors are required to prepare reports regarding counseling sessions and other meetings, as well as compliance with the IPP. These reports are sent to CPD's Human Resources Division. The Human Resources Division only began tracking these reports with an Excel spreadsheet in 2014.[290]

In the mid-1990s, CPD was on the cutting edge of using technology to identify police officers who were engaging in blatant misconduct or whose behavior was otherwise out of step with department policies. CPD acquired a computer software system called BrainMaker Professional to sift through internal data on all officers and, based on computer code that identified behavioral patterns, picked out the officers who showed potential for problem behavior.[291] The idea was to divert the identified officers toward counseling before they committed any crimes.[292] According to reports, initial runs of the system showed that it was fairly adept at picking out problem officers, based on the fact that many of the officers identified by the system had already been singled out by supervisors for participation in CPD's formal intervention

**Plaintiff's Exhibit 8**

programs.[293] But it also picked out others who, based on patterns of behavior hidden in the troves of data kept on them in CPD, were potentially at risk for problems; even though their disciplinary and intervention histories were clean.[294]

Eventually, CPD scrapped the BrainMaker system.[295] According to some, the program was discontinued in response to opposition from the FOP; others suggest that the program was never fully embraced by CPD leadership.[296]

In 1997, the Commission on Police Integrity promoted an "early warning" system in Chicago, which the Commission explained was embodied in CPD's existing BIS and PC programs.[297] To "enhance the Department's ability to identify and correct the behavior of officers at risk," the Commission called for expansion of those programs. Essentially, the Commission applauded steps CPD was already taking to add a requirement that officers who were participating in the BIS and PC programs to complete IPPs. Eventually, this requirement was implemented in both programs. Although it moved the ball forward, this recommendation clearly did not go far enough to promote a culture of accountability. (The Commission also recommended that CPD analyze unit-wide conduct as part of its "early warning" system. It does not appear that CPD ever adopted that recommendation.)

CPD undertook other efforts in the late 1990s and early 2000s to expand accountability measures and early intervention activities. One example was the implementation of the Citizen and Law Enforcement Analysis and Reporting ("CLEAR") system, which gave supervisory personnel a new tool to analyze officer behavior.[298] Numerous analyses were conducted using the CLEAR system to better understand police officer behavior and outcomes, including use and misuse of medical leave and factors that contribute to the lodging of citizen complaints against police officers. Another reform that was created was the use of management intervention for certain infractions that were viewed as minor.

 But those reforms, in large part, were allowed to wither on the vine or were never executed at all. Money that was slated for the development of a computer-based early intervention system was diverted to other department priorities. Realizing that CPD still needed to address problem officers even without the help of a computer program, in 2006, CPD tried to manually conduct a review of employees and recommend police officers it viewed as requiring intervention for more supervision and monitoring. This assessment was based on the number of CRs filed against them and the number of TRRs they had completed over a certain period of time. Many of the officers who were identified were enrolled in BIS or PC.

In 2006, the FOP filed a grievance in response to this manual review and sought to have officers who were placed in BIS removed from the programs.[299] According to the FOP, the members who were placed in BIS did not satisfy the criteria for placement in the program as set forth in the corresponding general order, in violation of the CBA.[300] In a subsequent settlement agreement, CPD agreed to remove officers from BIS, as well as any officers who had been upgraded to PC.

A later innovation was the implementation in 2008 of a "dashboard" as part of CPD's Performance Recognition System, which tracks various data points for individual officers, including CRs, days off and trends in citations. The full list of data points for the Performance Recognition System dashboard is: Complaint Registers, Complaint Register Logs, Tactical Response Reports, Summary Punishment Action Requests, Awards, Arrests, Contacts, Driver Cards, Traffic Stop Statistical Study Cards, Recovered

Plaintiff's Exhibit 8

Firearms, Search Warrants, Medical Events, Injured on Duty Days, Non-Injured on Duty Days, CR Ratio and TRR Ratio.[301]

The purpose of the Performance Recognition System and its complementary dashboard is ostensibly to "assist[] Department supervisors in recognizing exceptional or adverse behavior related to job performance of members under their command" and identify behavior that "may be improved by nondisciplinary options or methods."[302] The dashboard comes equipped with the ability to compare individual officers against others, with adjustments from unit to unit and supervisor to supervisor. Each officer is given a red, yellow or green designation with respect to the officer's CRs and TFFs. The CR Ratio is a percentage ratio of the number of CRs divided by the number of arrests. The TRR Ratio is a percentage ratio of TRRs divided by the number of arrests. For each percentage ratio, under 3% is a green designation, 3-10% is a yellow designation, and over 10% is a red designation.[303] The Performance Evaluation System policy also includes a range of "interventions" that a supervisor can take if he or she identifies exceptional or adverse behavior among any of their officers.

## Why are these current CPD accountability systems ineffective?

### INCOMPLETE DATA COLLECTION AND LIMITED ANALYSIS

Our research reveals that CPD engages in a wide range of data collection about officer behavior. But, as with other data collection activities across CPD, this collection is incomplete, and distribution and analysis is decentralized and limited. In addition, systematic follow-up or review does not appear to be required for shared data.

For instance, on a quarterly basis, the Office of Legal Affairs and the BIA distribute, respectively, summaries of lawsuits naming police officers as defendants and officers recommended for BIS/PC. These reports are pushed out to command personnel in CPD, but they are apparently used for information purposes only and no action is sought or required. Thus, distribution and analysis is limited, and follow-up on this crucial information is neither mandatory nor documented in any systematic way. Moreover, the information contained in the OLA reports is skeletal and provides very little useful information to command staff and supervisors about the nature of lawsuits lodged against their officers. Below are sample excerpts of these reports.

Sample Office of Legal Affairs Quarterly Report:

**Quarterly Report**

| Olname | Ofirstname | Docketnum | Daterecvd | Officer# | Unit Assign | category |
|--------|------------|-----------|-----------|----------|-------------|----------|
| ███ | ███ | 13C4152 | 7/11/2013 | ███ | 001 | 03d |
| ███ | ███ | 13M1303255 | 12/16/2013 | ███ | 001 | TC |
| ███ | ███ | 13C4152 | 7/11/2013 | ███ | 001 | 03d |

Plaintiff's Exhibit 8

Sample BIA Quarterly Report:



Other important litigation-related data points receive even less attention from CPD. One recent case highlighted the most dramatic manifestation of this problem, where a judge expressly ruled that an officer's testimony against a defendant was not credible.

In 2015, a Cook County court ruled against the detective in a hearing to suppress two incriminating statements that the detective said he obtained from the defendant.[304] The detective claimed that the defendant confessed to the alleged crime when he visited him in the hospital while he was heavily sedated after emergency surgery for multiple gunshot wounds. Nurses who were present for the questioning testified that the defendant was in no condition to be interviewed because of the heavy morphine sedation he was under at the time. In granting the motion to supress, the judge reportedly described the detective's testimony as "garbage" and concluded that he had "to seriously question whether [the defendant] ever did anything but maybe grunt or even knew who he was talking to."[305] Not long after the court excluded the alleged incriminating statements, the State's Attorney's Office dropped the charges against the defendant.[306]

Although some judges will go on record expressly finding that a police officer's testimony is not credible, explicit findings are the exception. More often, we hear that evidence is lacking against a defendant to sustain the charges, but the message is clear. There is no systematic or regular collection of information regarding adverse findings against individual officers in criminal or civil cases.

In addition, other sources of highly relevant information are currently available to CPD but not acted upon. For instance, we know that there is a problem with CPD officers showing up for court appearances. Data provided by CPD shows that, of the 20,922 Summary Punishment Action Requests ("SPARs") initiated by supervisors from January 1, 2010 to December 31, 2015, approximately 9,440 of the SPARs were opened under the "court appearance violation" complaint category. (SPARs are "[a]n alternative disciplinary procedure for conduct defined as a less serious transgression which is observed by or comes to the attention of a Department supervisor or command staff member."[307]) That means that 45% of all SPARs for that 5-year period relate to an officer's violation of a mandatory court appearance.

When an officer makes an arrest but then fails to show up to account for that arrest in open court, legitimacy is lost and trust diminishes. This high number of no-shows also raises serious questions about the underlying legitimacy of the arrests. Even in the face of a lack of accountability for this crucial element of their officers' job, it is not clear how CPD addresses this issue internally outside of issuing SPARs and, as a result, short suspensions.

Plaintiff's Exhibit 8

Finally, notwithstanding the staggering amount of money that the City spends annually on legal settlements and judgments against officers, there is no action taken within CPD on the basis of that information. Officers who are creating significant liability for the City are among the first category of officers who warrant special attention for possible professional intervention. And yet this important metric is not being monitored closely, nor are any specific disciplinary or non-disciplinary actions taken in the face of the filing or disposition of a lawsuit. Moreover, if the City decides it must settle a case due to credibility questions or other indefensible actions by an individual officer, there currently exists no formal, systematic process for identifying problem officers and taking appropriate action. Clearly, the lines of communication between CPD and the City's Law Department, which is responsible for defending individual officers in legal proceedings, could be significantly improved. Moreover, CPD, particularly the BIA, Office of Legal Affairs and Human Resources, must develop a comprehensive plan for acting and intervening based on litigation information.

## DISCRETIONARY SUPERVISOR REVIEW OF PERFORMANCE DATA

Although supervisors have a potentially invaluable tool and data for each of the officers under their charge through the Performance Recognition System and the dashboard program, this monitoring and intervention system is literally not working.

First, there are no mandatory requirements that supervisors use the system to analyze data or intervene in officer misconduct. Review of the data is entirely discretionary—or it is at least treated that way.[308] Second, supervisors are not required to input information to explain the data or the reasons for the green-yellow-red designations or take any action in response to the data they receive.[309] As a result, there is no way to know if supervisors are even using the dashboard, much less how they are using it. Although the governing departmental policy says that it is a designated supervisor's responsibility to monitor, track and take action in response to "exemplary" or "adverse" behavior,[310] there do not appear to be any enforcement mechanisms and, according to our interviews, the system is considered far from mandatory. In fact, Task Force interviews with officers and supervisory personnel indicate that the dashboard has not been functional so far in 2016.[311]

## FORMAL INTERVENTION PROGRAMS ARE UNDER-UTILIZED

Even CPD's more formalized intervention programs—BIS and PC—are only lightly used. They are also not structured in a systematic way that is supported from top leadership and promotes buy-in from supervisors and the rank-and-file.



**NUMBER OF OFFICERS** IN BEHAVIORAL INTERVENTION AND PERSONNEL CONCERNS PROGRAMS *COMBINED*

276  219  134  82  22  13  0  7  13

2007 ⟶ 2015

Participation in the BIS and PC programs has dropped off precipitously in recent years. In 2007, 276 officers were included in either BI or PC. Participation quickly dropped off after the FOP filed a grievance against CPD for certain officers' inclusion. CPD and the FOP settled the grievance by agreeing to remove officers from the programs. By 2013, **zero** officers were being actively managed through either of those programs. In 2014, only 7 officers were enrolled in the program. In 2015, 13 officers were enrolled.

Plaintiff's Exhibit 8

Logic tells us that far more officers should be in these programs. CPD has approximately 12,500 budgeted sworn officers. We know that, each year, thousands of CRs are lodged, and a consistently high number of lawsuits are filed. If supervisors and leadership were truly taking a hard look at the conduct of their officers, we would expect many more officers to be involved in the formal intervention programs.

In addition to being used for only a handful of officers (and for one year, not at all), the programs appear to be used on an ad hoc basis only. That is, officers are admitted to the programs if they are identified for inclusion by a select group within CPD, including their chain of command, BIA or IPRA, but no one is required to evaluate officers for potential inclusion in the programs in any systematic or mandatory way. Under those conditions, we can be sure that officers who warrant additional attention are falling through the cracks. Officers can also only be included in the program for intervention if approved by the department's top Human Resources staff, which makes it more likely that officers are only included in the programs when their conduct is so egregious as to call for action at the highest levels of the department. It also requires the attention of high-level administrators with innumerable demands on their time. The programs also focus mostly on problems that are identified through the department's disciplinary system, and trends of problematic behavior are not based on a more nuanced mosaic of data. On top of that, CPD does not use any metrics to measure or assess the effectiveness of the programs. This further diminishes the ability to hold officers and the entire intervention system accountable.

With that said, CPD did implement a nondisciplinary intervention program in 2004 to try to target one form of misconduct (verbal abuse) that is often the subject of CRs but is difficult to investigate because of the he-said/she-said nature of the allegation. Under the program, supervisors are responsible for implementing interventions when a verbal abuse complaint register is received for his/her direct report. The program provides a schedule of interventions that increase in magnitude as the number of verbal abuse complaint registers rack up against an officer. However, it does not appear that CPD has made any sustained efforts to measure or analyze the effectiveness of this program, even though the Special Order governing the program requires CPD to do so.[312] Although the Task Force was told that CPD performed one such assessment of the program around 2008,[313] CPD has not provided the relevant materials evidencing the results of that assessment in response to the Task Force's requests.[314]

## LITTLE FOCUS ON MANAGEMENT ROLE OF SUPERVISORS

Our review of CPD's policies has revealed that there is very little focus on the development of personnel management skills for officers in supervisory positions.

Sergeants are promoted through exam or merit appointment. Neither promotional process, however, formally evaluates Sergeant candidates for competency with personnel management principles or concepts. As CPD acknowledges, this process does not address the development of leadership skills or determine whether candidates for promotion are capable of handling the management roles regarding the health and well-being of supervisees they would assume. Although the panel reviewing candidates for promotion consider leadership potential, they do not consider metrics or requirements that are focused on the ability to manage the well-being or overall conduct of police officers under their supervision. Upon promotion, Sergeants receive very little additional leadership or management training. The sum total of newly promoted Sergeants' training on relevant issues includes seven hours of leadership training.

Plaintiff's Exhibit 8

After officers are promoted to supervisor roles, there is no formal process in place to evaluate their performance. Supervisor evaluations are merely informal in nature, and any evaluation practice is completely dependent on the practices of each district's and district Commander's informal evaluation practices. The performance of a supervisor's officers may be addressed in this informal evaluation that is provided to supervisors, but it is not required and is provided only at the discretion of the leadership of the particular district in which a supervisor works.

Neither the message from the top nor the evaluation and promotion processes emphasize officers' performance and/or personnel concerns. Instead, the focus of top leadership at the department appears to be entirely concerned with crime statistics to the exclusion of any other metrics. For instance, command staff meets monthly for CompStat meetings. The meetings' focus is on discussion and dissemination of crime statistics, but, according to our interviews, there was, until very recently, no attention paid to personnel issues, much less discussion of addressing real or suspected misconduct.

As an indication of the lack of focus on management issues, it appears that training on the BIS and PC intervention programs was only provided to Commanders, Captains and Lieutenants during a CompStat meeting earlier this year.[315] So far as we can tell, this training has not been provided to Sergeants who are the direct supervisors of beat officers and on a daily basis teach more officers than any other supervisor. While we applaud this step toward elevating the importance of intervention within the department, much more must be done within CPD to ensure that active management of its police officers is a top priority.

## What is the right tool for CPD to use to hold police officers and their supervisors accountable on a range of issues, including use of force and respectful interactions with citizens?

A robust management system for police officers is essential. Pre-employment screening, recruit training, and in-service training are clearly not enough. And CPD's current monitoring and intervention system is woefully inadequate, lacking any sense of leadership or urgency and therefore failing to provide adequate oversight. To permit comprehensive management of the City's police officers, it is imperative that CPD has a system in place that allows for a 360-degree view on the conduct of its officers.[316] This comprehensive system will require the aggregation and analysis of data across a wide range of officer touch points to identify those officers requiring additional management and intervention.

The intention should be to provide a tool that CPD can use to identify problematic behaviors at the earliest possible instance so that it can get officers back on track or manage them out of the department. Implementing such a system will not require CPD to re invent the wheel. Indeed, as mentioned previously, many other jurisdictions across the country have led the way by implementing EIS as a way of proactively identifying officers who exhibit behaviors that put them at risk of misconduct.

In significant part, this widespread practice is the result of the Department of Justice requiring the implementation of EIS through the consent decrees that result from the type of pattern and practice investigation that it is currently conducting of CPD. Based on this precedent, if the Department of Justice substantiates a pattern and practice violation in Chicago, we fully expect that the Department of Justice will impose EIS on CPD at the end of its investigation. To varying degrees, a number of other jurisdictions have also implemented EIS independently of the Department of Justice. Indeed, as early as 1999,

Plaintiff's Exhibit 8

approximately 27% of the law enforcement offices surveyed by the National Institute of Justice had already implemented some form of EIS.[317] The New York Police Department, for instance, has long had EIS to monitor officer conduct and intervene with additional supports where needed.[318] It is currently in the process of updating its EIS to create "a single, integrated database for both officer performance analysis and department-wide risk assessment."[319] The Miami-Dade Police Department's EIS may be the oldest such system, which was first developed around 1981.[320]

Studies of these systems show that they can work and are effective at reducing instances of officer misconduct.[321] EIS leverages numerous sources of data regarding officer conduct, including arrests, citizen complaints, missed training and much more, to spot officers whose behavior is outside of the acceptable range of other peer officers with similar assignments. Isolating these officers then allows the police department to use the system to apply non-disciplinary interventions to modify problem behavior or, on the flip side, acknowledge and commend exceptional conduct. But no EIS will have the intended impact without complete buy-in from CPD's top leadership, line supervisors and unions.

### *Recommendations*

**CPD leadership must take ownership of accountability issues and order the design and implementation of a mandatory EIS that centrally collects data across a broad range of data points to capture information on the totality of officer activity.**

CPD leadership must fully embrace a shift toward a culture of accountability. To that end, the Task Force recommends that CPD implement a mandatory EIS system. Support for this new accountability mechanism must come from the top. Our research shows that CPD has suffered from a crisis of leadership when it comes to taking ownership of accountability for the conduct of its officers and the impact they have in the community.

An accountability system requires buy-in from the whole spectrum of the law enforcement system— from CPD brass and rank-and-file to judges to prosecutors to all external investigatory bodies (currently IPRA and the Chicago Police Board). One challenge to implementing EIS is obtaining support from the relevant stakeholders. This includes police officers, supervisors and the unions. Many studies indicate great apprehension about the motivations for and effectiveness of an EIS from these stakeholders, but those studies also indicate that the problems that were feared are generally not realized.[322]

To get ahead of this challenge, experts in the field stress the importance of "operational change management" to promote buy-in.[323] That means owning the roll-out of EIS to ensure that those impacted understand the purpose and process of the new system and making sure that any necessary organizational changes are made to absorb the new activity required by the system. Educating officers that EIS is for intervention and not discipline can go a long way toward forging a smooth transition.[324]

This education process can also extend to community stakeholders. Informing community members about EIS can improve confidence in accountability practices and foster better community relations.[325] For instance, at the Detroit Police Department, leadership instituted a meeting similar to CompStat to discuss use of force issues and policy changes with respect to its EIS in which community members were invited to participate.[326] This was also meant to show community

Plaintiff's Exhibit 8

members that these performance and policy issues were taken seriously, and, to do so, leadership made a point of discussing these topics in the stand-alone Command Accountability Meetings that they convened.[327]

In recommending that CPD adopt an EIS, it is not the Task Force's intention to lay out every specific detail of the EIS that should be adopted. Without careful study of the department's needs, that exercise would be impossible. However, our research has identified many consistent themes and insights that we believe should inform any EIS:

*(1) CPD's EIS must be non-disiplinary in nature.*

First and foremost, as a best practice, it is important to be clear that an EIS is meant to be exactly what its name implies—intervention and *not* discipline.[328] EIS is meant to be complementary to a police department's disciplinary system as a "component of an agency's personnel management toolbox."[329] Numerous police departments that the Task Force interviewed regarding their EIS programs stressed the importance of this point.[330]

*(2) CPD's EIS should track all available data on officer activities.*

The next issue that must be confronted is what types of data points or performance indicators will be fed into the system for analysis. Based on our review, current models vary between a dozen to a few dozen data points/indicators. In the Los Angeles Police Department and the San Diego Police Department, for instance, their EIS programs use 14 different data points on each individual officer.[331] The Detroit Police Department, on the other hand, tracks 52 different performance indicators.[332] There is a basic universe of data points that are common to the existing systems (e.g., uses of force, complaints), but some data points may also be adopted in response to issues or controversies that are specific to a given police department.[333]

In order to obtain a true 360-degree view on CPD officer conduct, the Task Force recommends that all trackable officer activities should be fed into its EIS. The system should be designed to integrate data from a variety of sources to capture information on the totality of officer activity. Minimum data collected should include: citizen complaints; SPARs; traffic accidents; missed court appearances; medical usage; traffic crashes; traffic chases; shots fired; discretionary "contempt of cop" arrests (e.g., resisting arrest, disorderly conduct); and legal actions naming police officers (tracking through resolution of civil lawsuit or criminal case and any adverse findings at any stage of case). Currently, CPD already collects a great deal of this data, but efforts to analyze that data are sorely lacking. CPD can better leverage the data it has at its fingertips to measure the performance of its officers in a systematic way and intervene with those officers who are sliding off track.

*(3) CPD's EIS should use peer-to-peer data comparisons to identify which officers receive interventions.*

Once the relevant data points have been identified, the system must determine how to identify officers for intervention. Within the context of an EIS, this is often referred to as setting "thresholds" or "triggers." There is no consensus on the best set of thresholds or triggers, and a variety of different practices are used, including: (1) setting department-level thresholds; (2) setting them based on a comparison between officers who perform similar functions (known as "peer groups"); and (3) using performance ratios (e.g., uses of force to number of arrests).[334]

Plaintiff's Exhibit 8

The Los Angeles Police Department analyzes each officer's data against the officer's designated "peer group," of which there are 33 in all. [335] The peer groups are designated so that officers performing similar activities are compared against other officers performing those same activities (i.e., similar rank, function, duty, and assignment); however, the peer groups do not take into account how those same activities can differ based on a geographic assignment across the city. In contrast, the Seattle Police Department's trigger thresholds are standard across the department for all officers. [336] This means that there are no peer groups to ensure that the thresholds are tailored to the different kind of functions that officers can perform across the police department.

Given the vast differences in policing across Chicago, CPD should use true peer-to-peer comparisons to allow for apples-to-apples comparisons. Therefore, officers who are performing patrol duties are compared against other patrol officers and officers assigned to "fast" districts are not held up against officers in relatively "slow" districts. One challenge with this approach is that the actual "task" that a given officer undertakes—both in terms of its potential productive value for society, and its risk of an adverse outcome—can vary enormously even within job assignments, police beats and shifts. In developing its peer-to-peer comparisons, CPD must ensure that EIS is not confounding the influence of officer risk with the challenge of the job or environment in which they are working to avoid disincentivizing officers from taking on the hardest assignments. With this in mind, the actual triggers that CPD would use in this system must be determined based on a careful study of the data. Appendix 8 explores the technical aspects of identifying the right triggers in more detail.

### (4) CPD's EIS should use a structured, tiered program where interventions are appropriate, escalated proportionally and are timely.

Research also stresses the importance of having a varied menu of intervention options available to meet the varied needs of officers. [337] Some successful options suggested by the best practices research include informal counseling by the officer's supervisor, training opportunities, professional counseling on personal issues, officer-to-officer peer support program, crisis intervention teams, and reassignment or relief from duty. [338]

Our research of other police departments' programs showed that there can be a wide range of approaches to interventions. In Los Angeles, department policy delineates the types of interventions that may be adopted by an immediate supervisor, but which intervention is used is left to the discretion of the supervisor. [339] The San Diego Police Department utilizes a range of mandatory and discretionary interventions. [340] The mandatory interventions are applied in cases of officer-involved shootings and deaths in custody. Discretionary interventions are used in other cases where intervention is triggered and include a range of potential options, including counseling by immediate supervisor, substance abuse treatment, a peer officer program, meeting with the department's Wellness Unit and reassignment. Other departments, like the Seattle Police Department, leave the option of which intervention to use within the discretion of the officer's supervisor, although the choice is reviewed by the supervisor's chain of command and the internal body (the Performance Review Committee), which oversees the EIS program. [341]

The Task Force recommends that CPD create a structured, tiered program where interventions are appropriate, escalate proportionally and are timely. It should adopt a set of mandatory interventions to provide supervisors with a range of options for personnel actions. Intervention options should

Plaintiff's Exhibit 8

include, but not be limited to, meeting with a direct supervisor, meeting with a commander, training, referral to employee assistance resources and/or reassignment or relief from duty.

*(5) CPD's EIS should track officer transfers and require supervisors to review and acknowledge data on new officers who are transferred onto their assignment.*

Given the reality that officers are often transferred around to different districts, it is imperative that the EIS should include tracking of all transfers and require the officer's new supervisor to log into that officer's activity history within the EIS and acknowledge a review of the history, and, to the extent that the officer is involved in a series of ongoing interventions, the supervisor must confirm participation in the interventions. This is an element of many of the EIS programs the Task Force reviewed, including the system in the Los Angeles Police Department[342] and the Detroit Police Department.[343]

*(6) CPD's EIS should require ongoing monitoring of interventions and develop an assessment tool to routinely examine the program for improvement.*

In addition, follow-through and ongoing monitoring of interventions is critical to ensuring that the interventions are fully implemented and to impart upon the officers that the process is being taken seriously.[344] CPD should also develop an assessment tool that routinely examines the EIS process and interventions to determine the program's effectiveness and to identify areas for improvement. Although the academic research on this aspect of EIS programs is not as developed, ongoing oversight of a program is a logical strategy for strengthening its efficacy and accountability. Routine monitoring, assessment and modification of EIS programs is required in other jurisdictions. The Seattle Police Department requires the Performance Review Committee, the internal body that oversees the EIS program, to review and make changes to the program as dictated by its outcomes.[345] In the Detroit Police Department, the Civil Rights Division manages the program and conducts performance and environmental audits, including examinations of command morale and department operations.[346]

As a final note, putting an EIS program into place will obviously represent a significant shift in CPD's culture of accountability, and many challenges are likely to accompany that change. As the experiences of other jurisdictions indicate, a major challenge lies in the creation of the technology and data environment that is necessary for building an EIS program.[347] Based on other jurisdictions' experiences, EIS programs often take years to design and implement. While much of the needed data might already exist, it is often siloed across different functions of the department, some of it may not be digitized, and there are important data security and privacy concerns to take into account. Then there are the more nuanced questions about how to actually build the data criteria that will trigger interventions. Implementing an EIS program within CPD is likely to carry many of these same challenges.

Plaintiff's Exhibit 8

**CPD must make support and training of supervisors a top priority and create policies that hold supervisors accountable for the conduct of their officers.**

The literature is clear that one of the most critical elements of a successful EIS program is the prominent role of immediate supervisors.[348] Considering that immediate supervisors are the department employees with the most interaction with and responsibility for police officers, this finding makes sense. As representatives of the Los Angeles Police Department made clear, its EIS program's focus on supervisors helps to achieve the program's risk management aims, because it forces supervisors to pay attention to the behavior of their officers and, in turn, reinforces good behavior among their officers, because they know that their supervisors are paying attention.[349]

A robust EIS program can represent a sea change in the job responsibilities of a supervisor. The best practice research identifies the preparation of supervisors to conduct interventions as the most important issue challenging the implementation of an EIS program.[350] As such, it is essential to the success of the program that departments provide comprehensive training to supervisors regarding their new role in the EIS program well before the system is set into place. The San Diego Police Department has gone to great lengths to support its officers through the creation of its Wellness Unit.[351] The Wellness Unit staff—a total of four who provide 24/7 officer support—are responsible for providing resources to officers on a 24/7 basis. This includes assisting supervisors by checking in with officers if a supervisor cannot do so for any reason, and providing a neutral and trusted resources for discussing problematic officer behavior.

Studies point to some key principles for ensuring that supervisors have the skills and support they need to support a strong EIS program: (1) having supervisors who fully understand the EIS program in place in their department and their responsibilities, which requires training on the system's capabilities and processes; (2) providing supervisors with the tools and resources they need to create change; and (3) adopting mechanisms to ensure that supervisors are accountable for executing their responsibilities under the EIS program.[352] Training supervisors on leadership and basic management skills is imperative. EIS programs require supervisors to take a hands-on role in their officers' professional development, and many times interventions lead to the discovery of deep personal or professional issues that require deft management. Supervisors need to be trained to take on this new dynamic when they are promoted from officer to Sergeant.[353]

The Task Force makes several recommendations in this regard. First, CPD must provide training to supervisors on their responsibilities and obligations as the first line of defense in accountability generally and in the EIS process specifically. This means, at the very least, providing mandatory training and talking points that help guide supervisory interventions with officers.

CPD should also integrate regular accountability measures for supervisors to incentivize buy-in to the new system. As part of that effort, CPD should integrate supervisor responsibilities for EIS and personnel management into the testing and promotional requirements. Also, CompStat meetings must be expanded immediately to include information about personnel actions, and supervisors should be held accountable for the performance indicators of their officers, just as they currently are with crime statistics and trends.

Plaintiff's Exhibit 8

In a broader sense, CPD must provide greater support to supervisors in their management roles. All Sergeants, Lieutenants, Captains and Commanders should be trained in managing the well-being of officers under their command and be compelled to use the dashboards that track officer activity.

**The individual in charge of human resources at CPD must be an expert in the field of human resources and related personnel matters.**

The Director of Human Resources for CPD must be an actual human resources professional with bona fide experience handling a diverse and complex work force in a complicated organization, such as CPD. The CPD Director of personnel plays a critically important role in the accountability system. Presently, the Director serves as the gatekeeper for who is admitted into the formal intervention programs, can act as a resource on very sensitive personnel matters, is heavily involved in developing strategies for the recruitment of new members to the department, and also has a hand in developing tests for promotions and managing the overall promotion process. Going forward, the Director must also have responsibility for making sure that the Early Intervention System is socialized through the entire department, that supervisors receive the kind of training and support that they need to intervene where appropriate, be conversant in and embrace the best practices in addressing the health and well-being of the department's most valuable assets, its people, and ensure that accountability becomes a core value of the department at all levels. Given the centrality of the position, the Director must be someone who has a track record of experience and success with implementing accountability systems such as the early intervention systems recommended in this report, expertise in managing relations with unions, and appropriate certifications and experience in managing a complex human relations function in a large organization like the CPD.

**Until a fully automated EIS program can be implemented, CPD should create a manual intervention system, which undertakes an immediate assessment of officer fitness for duty.**

CPD, working with IPRA and/or the new CPIA, and with reference to the time period January 1, 2010 – January 1, 2016, should immediately identify officers (1) with 10 or more CRs, whether or not an affidavit was completed; (2) who have a pattern of missing court; or (3) who have been named in two/three or more lawsuits during this time period.

During this time, CPD should conduct monthly meetings with the State's Attorney, Public Defender, Presiding Judge of Criminal Division, City Law Department and, separately, Chief Judge of the Northern District of Illinois for the purpose of determining any adverse findings against police officers that bear on credibility, training issues or patterns of behavior. All information gathered should be factored into the manual intervention system.

Any officers identified through these methods should be assessed for placement in BIS, PC or some other form of individualized work plan that involves their chain of command.

**The EIS program should include community outreach efforts by providing public access to data generated by the EIS program and inviting community stakeholders to CompStat-type meetings to discuss EIS data and outcomes.**

With all of the data that will be generated by the EIS program at its disposal, it is incumbent on CPD to make important information about its officers available to the public. As in many of the areas the Task Force examined, transparency into its non-disciplinary intervention programs and the data it

Plaintiff's Exhibit 8

collects surrounding the performance of its police officers is essentially nonexistent. Although there are important privacy restrictions to keep in mind as it pertains to sensitive personnel matters, much of the information that CPD currently collects, and the information that we recommend it collects in the future, is information that can be made public.

In order to provide the community with this important data, the Task Force recommends that CPD publish, on a monthly basis, aggregate data on the following: new and pending complaints by unit, disciplinary actions, missed court dates, new civil legal proceedings against officers, new criminal legal proceedings against officers, vehicle pursuits, vehicle collisions, uses of force, employee commendations, use of firearms, injuries to persons in custody, judicial proceedings where an officer is the subjective of a protective or restraining order, adverse judicial credibility determinations against an officer, or disciplinary actions.

Moreover, additional steps must be taken to reach out to community stakeholders in a real and meaningful way about police interventions. As many thought leaders on the topic have explored, early intervention is consistent with the goals of community policy and can be another avenue to help improve community-police relations. In Detroit, for example, the police department's consent decree with the Department of Justice included recommendations for increased community outreach.[354] In response, the Detroit Police Department instituted quarterly meetings with community members to discuss performance issues, providing scorecards for units that outlined the number of officers trained, the number of officers that missed training and the number of use-of-force incidents, among other indicators.[355] The meetings include an opportunity for questions from the community audience.[356] The Task Force recommends that CPD establish a similar regular community-inclusive meeting to share data and insights from EIS.[357]

## Endnotes

[282] Data provided by the City of Chicago via letter dated Mar. 11, 2016.

[283] *See also* 1997 Report of the Commission on Police Integrity, *supra* note 47, at 9-10 (providing a history of police corruption in Chicago).

[284] Data provided by the City of Chicago via letter dated Mar. 11, 2016.

[285] Andrew Schroeder, Chicago Police Misconduct – A Rising Financial Toll, Better Government Association (Jan. 31, 2016), *available at* http://www.bettergov.org/news/chicago-police-misconduct-%E2%80%93-a-rising-financial-toll; Mark Iris, Your Tax Dollars at Work! Chicago Police Lawsuit Payments: How Much, and for What?, 2 Va. J. Crim. Law 25 (2014), *available at* http://virginiajournalofcriminallaw.com/wp-content/uploads/2014/08/2.1-Iris-SMW-3.31.14.pdf.

[286] Better Government Association, *supra* note 284.

[287] Data provided by the City of Chicago via letter dated Mar. 29, 2016

[288] CPD, Employee Resource E06-05, Behavioral Intervention System (Mar. 22, 2005).

[289] CPD, Employee Resource E06-06, Personnel Concerns Program (May 4, 2005).

[290] Data provided by the City of Chicago via letter dated Mar. 29, 2016.

[291] Taras Grescoe, The Brain and The Badge, Chicago Tribune (June 30, 1996), *available at* http://articles.chicagotribune.com/1996-06-30/features/9606300363_1_police-force-internal-affairs-division-chicago-police-department (*cited in* Rob Arthur, We Now Have Algorithms to Predict Police Misconduct, FiveThirtyEight (Mar. 9, 2016), *available at* http://fivethirtyeight.com/features/we-now-have-algorithms-to-predict-police-misconduct/).

[292] Steve Mills, High-Tech Tool to Weed Out Bad Cops Proved a Bust, Chicago Tribune (Oct. 15, 1997), *available at* http://articles.chicagotribune.com/1997-10-15/news/9710150457_1_police-brutality-police-department-matt-rodriguez.

[293] Grescoe, *supra* note 290.

Plaintiff's Exhibit 8

[294] *Id.*

[295] Mills, *supra* note 291.

[296] *Id.*

[297] 1997 Report of the Commission on Police Integrity, *supra* note 47, at 3, 20-21.

[298] *See* Wes Skogan et al., "Policing Smarter Through IT: Learning from 'Chicago's Citizen and Law Enforcement Analysis and Reporting (CLEAR) System," Washington, D.C.: Office of Community Oriented Policing Services (Dec. 2003), *available at* http://www.cops.usdoj.gov/html/cd_rom/tech_docs/pubs/policingsmarterthroughitlessonsenterprise.pdf.

[299] FOP Grievance No. 129-06-021.

[300] *Id.*

[301] Data provided by the City of Chicago via letter dated Mar. 7, 2016.

[302] CPD, Employee Resource E05-02, Performance Recognition System (Feb. 21, 2012).

[303] Data provided by the City of Chicago via letter dated Mar. 7, 2016.

[304] Steve Schmadeke, In Chicago Police Shooting, Judge Ripped Cop and Tossed Hospital Bed Testimony, Chicago Tribune (Jan. 29, 2016), *available at* http://www.chicagotribune.com/news/ct-chicago-cop-shooting-judge-outraged-met-20160128-story.html.

[305] *Id.*

[306] *See* Certified Statement of Conviction/Disposition, 14-cr-187202 (May 12, 2015 entry).

[307] CPD, Special Order S08-01-05, Summary Punishment (Apr. 26, 2013).

[308] Working Group Interview.

[309] Working Group Interview.

[310] CPD, Employee Resource E05-02, *supra* note 301.

[311] Working Group Interview.

[312] CPD, Special Order S08-01-08, Nondisciplinary Intervention Program, Sec. VIII (May 1, 2004).

[313] Working Group Interview.

[314] Data provided by the City of Chicago via letters dated Mar. 2, 2016 and Apr. 7, 2016.

[315] Data provided by the City of Chicago via letter dated Mar. 29, 2016.

[316] *See, e.g.*, Samuel Walker & Stacy Osnick Milligan with Anna Berke, Strategies for Intervening with Officers Through Early Intervention Systems, Washington, D.C.: Office of Community Oriented Policing Services, at 39 (Feb. 2006) (noting that EIS "gives a global picture of behavior"), *available at* http://www.cops.usdoj.gov/pdf/publications/e01060004.pdf.

[317] Samuel Walker, Geoffrey P. Alpert and Dennis J. Kenney, Early Warning Systems: Responding to the Problem Police Officer, National Institute of Justice, at 2 (July 2001), *available at* https://www.ncjrs.gov/pdffiles1/nij/188565.pdf.

[318] *See* U.S. Commission on Civil Rights, Who is Guarding the Guardians?, at 82, *available at* http://babel.hathitrust.org/cgi/pt?id=uc1.32106015219253;view=1up;seq=15.

[319] Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing, Office of the Inspector General for the NYPD (Apr. 2015), *available at* http://www1.nyc.gov/assets/oignypd/downloads/pdf/2015-04-20-litigation-data-report.pdf.

[320] Walker, Early Warning Systems, *supra* note 316, at 4.

[321] *Id.*, at 3.

[322] Samuel Walker, Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide, Washington D.C.: Office of Community Oriented Policing Services, at 73-81 (2003), *available at* http://www.cops.usdoj.gov/html/cd_rom/inaction1/pubs/EarlyInterventionSystemsLawEnforcement.pdf.

[323] Working Group Interview. *See also* Walker, Strategies for Intervening, *supra* note 315, at 11-12.

[324] Walker, Strategies for Intervening, *supra* note 315, at 11-12.

[325] Samuel Walker & Stacy Osnick Milligan with Anna Berke, Supervision and Intervention Within Early Intervention Systems: A Guide for Law Enforcement Executives, Washington, D.C.: Office of Community Oriented Policing Services, at 40-41 (Dec. 2005), *available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Early_Intervention_Systems/supervision%20and%20intervention%20within%20early%20intervention%20systems%202005.pdf.

[326] Working Group Interview.

[327] Working Group Interview.

[328] Walker, Strategies for Intervening, *supra* note 315, at 27.

[329] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 5.

Plaintiff's Exhibit 8

[330] Multiple Working Group Interviews.

[331] Working Group Interview.

[332] Working Group Interview.

[333] Walker, A Planning and Management Guide, *supra* note 321, at 29-30.

[334] *Id.* at 31-33.

[335] Working Group Interview.

[336] Working Group Interview.

[337] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 21.

[338] *Id.* at 21-27; Walker, Strategies for Intervening, *supra* note 315, at 31-35.

[339] Working Group Interview.

[340] Working Group Interview.

[341] Working Group Interview.

[342] Working Group Interview.

[343] Working Group Interview.

[344] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 27-28; Walker, Strategies for Intervening, *supra* note 315, at 23-24.

[345] Working Group Interview.

[346] Working Group Interview.

[347] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 31-33.

[348] Walker, Strategies for Intervening, *supra* note 315, at 1; Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 9-10.

[349] Working Group Interview.

[350] Walker, A Planning and Management Guide, *supra* note 321, at 37.

[351] Working Group Interview.

[352] Walker, Strategies for Intervening, *supra* note 315, at 9-26

[353] *Id.* at 28-29.

[354] Working Group Interview.

[355] Working Group Interview.

[356] Working Group Interview.

[357] The access and/or publishing of aggregated EIS data in any format will be most helpful if designed in a way as to not interfere with or jeopardize the integrity of the system. The primary function of an EIS is to accurately predict police officer behavior, and to provide the framework to then respond to those predictions with appropriate interventions.

Plaintiff's Exhibit 8

# De-Escalation

It is critically important that all CPD officers approach each and every citizen encounter with an emphasis on respect and the sanctity of all life. That approach will avoid escalating even the most casual encounter. CPD officers must also seek to de-escalate situations so as to minimize the use of force. Minimizing the use of force not only prevents unnecessary injury and loss of life, it builds police legitimacy and trust. The recommendations throughout this report, if implemented, will contribute to overarching de-escalation efforts, such as developing a stronger, values-based policing philosophy, addressing racism and implicit bias, re-defining community policing, developing an early intervention system to identify problem officers, holding officers accountable for misconduct and continuing the rollout of body cameras. Out of deference to the Department of Justice's ongoing investigation, the Task Force did not conduct a detailed analysis of CPD's use-of-force practices. Rather, we focused our de-escalation analysis on the frequent situations where officers encounter citizens experiencing a mental health crisis.

The Task Force does not need to search very far to find examples of police encounters with persons experiencing mental health crises that went tragically wrong. In these situations, the person in crisis may be agitated, overwhelmed and frightened. Officers approaching in a command and control manner may increase the person's fear and agitation, reducing his or her willingness and ability to peacefully comply with instructions.

At the same time, officers perceive these situations as unpredictable and potentially very dangerous and understandably want to gain control of the scene quickly. Unfortunately, if officers do not have strong de-escalation skills, they may act in a way that inadvertently escalates the situation. In the worst case scenario, officers, the person in crisis or bystanders may get hurt or killed. At best, unnecessary escalation results in a stressful interaction and often an arrest of the person in crisis for behavior that occurred as a result of the police encounter (e.g., battery to a police officer) and entry into the criminal justice system.

These potentially avoidable outcomes are costly in terms of human life, as well as taxpayer dollars. They also further erode the relationship between the police and the community. There is an urgent need for policing approaches that embrace de-escalation and procedural justice over traditional command and control strategies for mental health-related and other types of police encounters with the public.

Changes in police procedures and practices are not the only challenge facing our local mental health system. The mental health care safety net has been eroded in recent years. Our bare bones mental health system fails to provide adequate treatment for early intervention, preventive mental health treatment or crisis mental health care. Neither Medicaid nor private coverage devotes to providers the resources necessary to effectively treat those living with mental illness. This is so despite national policy initiatives—most notably the Affordable Care Act—to improve and expand access to services. There are huge capacity shortages, and people who need and want help are not able to readily access it.

One in five people experience a mental illness in their lifetime.[358] Although most of those individuals will never need crisis intervention services, many will. Mental health treatment is extremely effective in restoring the health and well-being of people who are living with mental illness.[359] Some individuals with intellectual or developmental disabilities experience similar crises, sometimes arising from psychiatric co-

Plaintiff's Exhibit 8

morbidities. These individuals also require appropriate crisis intervention and treatment outside the stigmatizing reach of the criminal justice system.[360]

The bottom line is that most people living with mental illness still do not receive treatment. Without treatment, mental illness—especially serious mental illness—can result in significant disability and decreased quality of life.

Sadly, those who suffer from mental illness often end up in jail and not in treatment. Even more sadly, there are countless stories of individuals acting in a purposefully criminal way so that they would get arrested in order to get their medications or mental health treatment. We have also heard from many families begging that their child get arrested as they see Cook County Jail as the only accessible treatment provider. On any given day, a significant percentage of intakes at Cook County Jail self-identify as mentally ill.[361] We are arresting and incarcerating people with mental illness in record numbers throughout the County. This is a national tragedy.

Without community care—services and supports, including insurance coverage to help them recover—people living with mental illness simply do not get treatment, and their illnesses get worse. When that happens, people living with mental illness end up in emergency rooms, in jail or on the streets with no place to live. Too often, all of the above happens. Here's a snapshot of what has happened in Illinois since funding cuts took place in FY2009:

- Emergency room visits for people experiencing psychiatric crises increased by19% between 2009 and 2012.[362]
- The total number of nights spent in a shelter statewide increased from 2,000,000 in FY2011 to 3,041,000 in FY2013.[363] The National Alliance to End Homelessness estimates that approximately 32% of the 14,144 individuals who currently experience homelessness on any given night in Illinois have a serious mental illness.[364]

These patterns reflect three real and solvable problems. First, studies show that emergency rooms and jails cost much more than community treatment.[365]

Second, a vicious cycle arises involving jails, homelessness and excessive emergency room use. People leaving jail who are living with mental illness have few, if any, housing options. Without a warm handoff to a service provider, they often become homeless. In 2015, 2,134 individuals experiencing homelessness were detained overnight at Cook County Jail, 34% of which were flagged for mental illness.[366] Once homeless, they lack access to health care services or do not seek services. Consequently, their mental health problems get worse. Then one of two things is likely to happen: they get arrested and end up back in jail, or they end up in an emergency room. At the emergency room, because there are so few housing options, hospitals often refer the homeless who are living with serious mental illness into expensive nursing home care. Many people do not need such an intensive, expensive level of care. They need the recovery-promoting combination of community care and supported housing shown to successfully help remove this population from homelessness.

Third, none of these are ideal treatment methods or outcomes for people living with mental illness. Their treatment options and outcomes should not be emergency rooms, jails, living on the street or in nursing homes. Instead, mental health treatment should involve a compassionate, comprehensive system of care that provides the effective treatment that breaks this cycle and renders these options unacceptable.

Plaintiff's Exhibit 8

Police officers are too often the first responders to those living with mental illness and experiencing a crisis. This has been the status quo for far too long. No other chronic health condition is treated in this way. In turn, police officers are arresting individuals experiencing mental illness and are symptomatic in their illness. This occurs because symptoms of mental illness are sometimes demonstrated in behaviors that may look criminal. Furthermore, officers who are not well trained to identify the signs and symptoms of mental illness can further escalate a situation to the point that an arrest is made. Reliance on the police to respond to those living with mental illness or in crisis must stop. This costly and wasteful response often perpetuates trauma and limits recovery.

Even officers who have training to support those in crises have limited options to divert those living with mental illness to health care providers instead of jail. Currently, the only diversion option is the emergency room at various hospitals.[367] If someone is experiencing a mental health crisis and reports feeling like harming himself or someone else, he meets the criteria for hospitalization. However, many individuals whom officers encounter do not meet the criteria. Nevertheless, officers have no option but to transport those people to an emergency room that is designated a police drop-off. Officers report increased frustration when they see that same person back in their beat hours or days later untreated, with no change in their behavior. This demonstrates the poor use of manpower and wasted resources.

The police are being held responsible for responding to all the social ills in our communities but are left with few resources to respond proactively. We must shift the responsibility to other community partners and resources to support our community. This cannot be done without a well-thought-out and properly executed plan. A tremendous investment needs to be made by all parties. This includes CPD, hospital systems, social services, the Office of Emergency Management Communications ("OEMC") and other community stakeholders. As is the case with anything that creates change, this cannot happen in isolation. The task requires buy-in from the City and participating organizations, adequate funding and other resources, meaningful data collection and community engagement.

## Why are so few 911 calls to OEMC identified as mental health-related?

In 2015, there were approximately 5 million 911 calls made to OEMC.[368] Of those, approximately 2.45 million—slightly less than half—were dispatched to the police.[369] While only 25,000 of those calls were pre-identified by the caller as mental health-related, national estimates suggest that anywhere from 3-10% of police contacts are mental health-related.[370] This suggests that, last year alone, the OEMC fielded anywhere from 73,500 to 245,000 mental health-related calls, most of which were *not* flagged as mental health-related by the caller.

Emergency call takers and dispatchers are a critical component of mental health crisis response. Our observations indicate that OEMC suffers from recurring problems with its approach to determining whether calls involve a mental health crisis, including inadequate protocols, limited training, lack of data and other support, and gaps in communication with CPD.

OEMC's procedures emphasize speedy dispatch of emergency resources in response to service calls. Insufficient manpower may contribute to this emphasis on speed, at the expense of accurate identification of mental health calls and the quality of response.

Plaintiff's Exhibit 8

OEMC personnel currently receive only a one-hour annual training about crisis intervention and mental health from a non-subject matter expert. OEMC personnel report that it is challenging to effectively probe callers to determine whether mental health may be at issue. Callers may not like to discuss mental health because of its stigma. Even if they do, callers often do not use clinical terms to describe their situations, and callers from different communities may use different words to explain the same mental health crisis. Additional training could improve call takers' ability and comfort in asking questions and identifying mental health calls.

Additionally, current OEMC data systems do not utilize data on prior calls to provide location or personal history that could assist in identifying likely mental health calls or other relevant background information for responding officers.

### Recommendations

#### OEMC should invest in a Smart911 system.

Some cities have worked to solve the challenge of the lack of information presented to dispatch by callers through implementing Smart911 systems. Smart911 allows citizens to create a "Safety Profile" for their household that includes any information they want 911 and emergency response teams to have in the case of an emergency. This can include health and medical information, including known mental health issues. When a household member makes a call to 911, his or her Safety Profile automatically displays to the 911 dispatcher, which enables the dispatcher to send the right response teams with the right information to the scene.

While Smart911 has been made available to the City in recent years, the City has yet to purchase and implement this effective program. This is so despite the fact that 32 states and more than 400 municipalities, including Washington, D.C., Seattle, Atlanta and Denver, are currently using the program. The effectiveness of Smart911 is tested every day. As an example, in Addison, Illinois, emergency responders received a 911 hang-up call from a resident who had registered a Safety Profile that showed her adult son had a cognitive disability and violent nature. The information provided through Smart911 alerted the responding officers that the son would not respond to verbal commands but, by using other methods they were still able to de-escalate the situation without any physical injury to him.

Smart911 systems show significant promise and can deliver a substantial return on the investment. They can also help avoid tragic incidents like the shooting deaths of Quintonio LeGrier and Betty Jones. If LeGrier's mental health history had been entered into a Smart911 system and that information was made available to emergency dispatchers and responding officers, the entire incident could have played out very differently. The Task Force recommends that the OEMC invest in and implement a Smart911 system for Chicago immediately.

#### OEMC should implement a 16-hour mental health awareness training.

The Crisis Intervention Team ("CIT") model includes training emergency communicators as a key element of effective programs. There is currently no "best practice" approach, as some agencies have emergency communicators go through the full 40-hour CIT training with police officers, while others have developed training specifically designed for emergency communicators. The Alameda Police

Plaintiff's Exhibit 8

Department provides 16 hours of training that covers mental health awareness and CIT information and, similar to CIT trainings, includes panels of persons with lived experience and family members. The Task Force believes that the Alameda model strikes a good balance and recommends that the OEMC implement a 16-hour mental health awareness training specifically tailored to call takers.

**OEMC should devote attention to supporting personnel in providing compassionate and effective service to the community and implementing stress management training that complies with national standards.**

Emergency communicators have a very stressful job dealing with members of the community in life-threatening and emotional situations. The nature of the job puts them at high risk for compassion fatigue, which can significantly impact their sensitivity to and patience with members of the public and lead to poor job performance (e.g., failing to recognize mental health calls or failing to obtain mental health information from callers).

Many studies have also found that the 911 worker populations often suffer from Post-Traumatic Stress Disorder and other stress-triggered issues. While research has not yet focused on the potential solutions to mitigate these problems, the National Emergency Number Association ("NENA") has established standards for implementing a Comprehensive Stress Management Program ("CSMP").[371]

NENA recommends that a CSMP: (1) provide stress management training; (2) offer on-site educational materials and resources about stress-related risks and managing stress; (3) establish internal operating procedures that will ensure employee participation in critical incident stress management activities; (4) establish and encourage employee use of Employee Assistance Programs that provide counseling services for their employees; (5) identify local resources and encourage proactive utilization of those resources; (6) establish peer support programs; (7) include comprehensive information on how to manage suicidal callers and calls that involve individuals with serious mental illness as part of general 911 training; and (8) incentivize personal health programs relating to lifestyle practices and changes.

The Association of Public-Safety Communication Officials International ("APCO") has also published minimum training standards for 911 call takers, echoing many of NENA's recommendations. APCO further recommends that an agency be responsible for providing information in both verbal and written form, though the call takers themselves are responsible for the "application of stress management principles."[372]

**The Chicago Department of Public Health ("CDPH") should partner with mental health agencies and advocacy groups to develop a two-step community education campaign on the signs of mental illness and how to best respond to a mental health or related crisis.**

CDPH should partner with mental health agencies and advocacy groups to develop and support mental health awareness and education in the community. An ideal time to do that would be when it rolls out a new Smart911 system. As part of the campaign, the City should sponsor the training and education of credible messengers in communities throughout the City on signs and symptoms of mental illness and on how to either enter information in Smart911 or otherwise request a CIT-trained officer when calling 911. Those credible messengers should then engage with the community

Plaintiff's Exhibit 8

and pass on that same training and education. Particular constituencies, such as caregivers for individuals living with severe mental illness and intellectual disabilities, school systems, faith-based groups and agencies supporting those with disabilities, should be engaged in this process.

## What is CPD's current approach to mental health crisis response? Don't they have a Crisis Intervention Team Program? Why isn't it working?

In 2005, following a series of highly publicized shootings of persons with mental illnesses, CPD established its CIT program to ensure the "dignified treatment and safety of arrestees and other persons requiring assistance … to obtain mental health evaluation treatment, or hospitalization."[373] CIT, sometimes called the Memphis Model, includes partnerships between police, mental health agencies, advocates and persons with lived experience; 40 hours of specialized training for officers who volunteer to become CIT officers; designated points of access to emergency psychiatric assessment and care; and changes to policies and procedures to facilitate a more effective response to persons experiencing mental health crisis.[374] The CIT Center at the University of Memphis estimates that over 2,700 jurisdictions are implementing CIT programs.[375]

Consistent with the Memphis Model, CPD collaborated with community stakeholders to develop and implement the 40-hour training and to work through various system issues. The training educates officers on how to respond to mental health crises and collaborate between law enforcement and community mental health agencies.[376] The training also provides opportunities for officers to interact with persons with lived experience of mental illness, family members and mental health professionals. Both internal evaluations and externally funded studies indicate that officers find the training extremely useful and that it improves their ability to respond to persons in crisis.

CPD initially began by piloting the program in two districts, providing the 40-hour training to 30-40 officers and supervisors in each district.[377] In light of initial successes, CPD rapidly expanded the CIT program and was training roughly 30 officers throughout the City each month by July 2006.[378] Since 2006, the number of trainings provided annually has varied based on funding, which has come primarily from external sources. Today, approximately 15% of Chicago's more than 12,000 police officers are certified by the Illinois Law Enforcement Training and Standards Board as CIT officers.

In response to requests from CIT-trained officers based in Chicago public schools, in 2010, CPD became the first in the nation to offer an "Advanced" 40-hour CIT training program to focus on the unique needs of youth.[379] CIT-Youth trains officers to identify and divert juveniles with mental health needs to treatment, rather than incarceration.[380] CPD also offers a similar program targeting veterans.[381]

The CIT program has had a number of positive outcomes. A National Institute of Mental Health-funded research study found significant differences in how Chicago's CIT-trained officers respond to persons potentially experiencing a mental health crisis compared to their non-CIT-trained officers. Specifically, CIT-trained officers were less likely to use force with more resistant subjects, and they were more likely to take steps to link individuals to mental health services. CIT-trained officers also reported feeling better prepared to respond without needing to use force and that the skills they learned in CIT training really worked to de-escalate tense and potentially dangerous situations.[382]

Plaintiff's Exhibit 8

# Why aren't all identified mental health crisis calls getting a CIT response?

Notwithstanding a promising beginning and strong training curriculum, the Critical Response Unit ("CRU") has been significantly constrained in its ability to fully implement the CIT model. With only four staff members assigned full-time to the unit, the CRU simply does not have the resources to fully support CIT officers in Chicago's 22 police districts; work with OEMC to ensure call-taker protocols and training support effective identification of mental health calls; liaise with other City agencies, community providers and stakeholders; respond to special call outs; track CIT call data; and run up to 30-week-long training sessions per year.

Additionally, the number of CIT-trained officers is insufficient to ensure CIT availability 24/7 in all districts. While existing data does not allow for accurate estimates of the needed capacity, it does suggest current capacity is not adequate to meet demand. For example, out of the nearly 60,000 calls in 2010 to 2012 that 911 call-takers initially identified as "mental health-related," only a quarter of them were handled by CIT officers, even though call-takers "make every effort" to dispatch the calls to them.[383] As noted above, OEMC significantly under-identifies mental health-related calls. As a result, the actual number of calls appropriate for CIT response is likely much higher, and the capacity issue may be more dire.

These problems are further exacerbated by a poor communications system between the OEMC and CPD. OEMC personnel are hindered in dispatching CIT officers on duty for each watch and district because they cannot easily and consistently identify them, even though station supervisors are supposed to send OEMC a list of officers that are CIT-trained at the beginning of each watch. Then, OEMC personnel have to manually enter daily watch rosters into their systems. These tasks could easily be automated to save time and improve accuracy of information. There is also no process in place for CPD to share changes in their General Orders or day-to-day operational practices in a consistent and timely manner.

### Recommendations

**CPD should increase the number of CIT-certified officers to 35% of all patrol officers, and ensure that individual districts with the highest number of mental-health calls are staffed to 35% or higher. All districts and all watches should staff at least two CIT-certified officers. Refresher courses should be developed and provided to CIT-trained officers. CPD should attach a permanent code "z" to officer names that OEMC can always access so dispatch can assign appropriate officers to calls.**

Ensuring that there are a sufficient number of CIT-trained officers during any watch to provide full coverage for mental health-related incidents is crucial. Yet, it is not necessary and may not be desirable to train all officers in CIT. The "Memphis Model" recommends having only a portion of a police force CIT-trained, reasoning that not all officers have the ability to be CIT officers and that volunteers may be more interested, invested and effective.[384]

Initial recommendations from the CIT Center at the University of Memphis suggested that 25% of a department's patrol force be CIT trained to ensure availability of CIT response. More recently, they have acknowledged that this may vary based on the needs of specific cities and that larger, more densely populated cities may need to train 35% or more to ensure coverage. Chicago does not

Plaintiff's Exhibit 8

CITATION

currently have adequate data to determine the precise capacity needed. However, it is clear that 15% is not sufficient. The Task Force recommends that Chicago increase its CIT capacity to 35% of patrol officers. We also recommend that data systems be improved so that the adequacy of CIT capacity can be empirically assessed.

The City should create a "Mental Health Critical Response Unit" within CPD that is responsible for mental health crisis response functions, training, support, community outreach and engagement, cross-agency coordination and data collection and houses the CRU.

The Task Force recommends that the City create a new unit within CPD known as the Mental Health Critical Response Unit ("MHCRU"). MHCRU would be responsible for overall mental health crisis response functions, training, supporting community outreach and engagement, cross-agency coordination and data collection and would house the CRU. MHCRU should be housed within the Bureau of Support Services, in the Education & Training Division. It should be led by an officer with the rank of Lieutenant or higher, be adequately resourced and staffed and work with an advisory board of local stakeholders. MHCUR would oversee CIT training, support CIT officers in the field and operate a co-responder unit assisting with high-risk subjects or providing follow-up for persons who frequently come in contact with police.



Plaintiff's Exhibit 8

In order for CPD's mental health crisis response strategies to be effective, the MHCRU unit must have the organizational support and resources to do its work. The CRU must be prioritized such that both the police department and the community give mental health crises the attention they merit, and the CRU can obtain the amount and quality of resources that it needs. The U.S. Department of Justice has recognized this and required the prioritization of these units in its consent decrees and settlement agreements with several cities.[385]

Given the breadth of functions of the MHCRU unit, it should be staffed by at minimum 8 full-time sworn personnel carefully selected and vetted based on experience and commitment to providing effective mental health response and an absence of excessive force complaints against persons experiencing crisis in the preceding three years. Pending a comprehensive assessment of personnel need, unit staffing may be increased beyond 8.

A full-time data analyst should be assigned to this unit to evaluate the CIT training program and inform personnel need, community feedback, and analysis of OEMC calls, as well as effectiveness of police interventions and evaluations of the training.

## Why are so many people with mental illnesses having repeat contacts with CPD and ending up in the criminal justice system?

Studies suggest that over 60% of incarcerated individuals meet diagnostic criteria for some mental illness.[386] That means that of the approximately 76,400 people who were admitted to Cook County Jail in 2012, approximately 46,000 were people living with mental illness.[387] It is therefore not surprising that following national trends, many jails and prisons in Illinois have become the de facto mental health treatment centers. The Cook County Jail is now considered one of the larger, if not the largest, mental health care providers in the country. In fact, many people do not receive mental health treatment until they enter the criminal justice system.

In the past decade, Illinois has made some of the largest cuts to mental health spending in the nation. During that same time period, the City of Chicago closed six of its twelve mental health clinics and other private agencies closed their doors. While there are community mental health agencies providing good services in Chicago and the Affordable Care Act has infused additional resources, long waiting lists are common. The current State budget crisis further threatens the ability of many facilities to stay open at all. The situation is particularly dire on the South and West sides of the City.

In the context of an overburdened mental health system, police officers frequently encounter persons with mental illnesses who are in crisis or struggling to get their basic needs met. Officers have few options for addressing these situations. They can arrest the person and take him or her to lock-up or jail, transport the person to the designated hospital emergency department for psychiatric evaluation or do nothing at all. Many individuals in crisis do not need or meet the criteria to be hospitalized nor are they engaged in criminal behavior. But an officer may recognize that without some type of intervention, the problem will continue and, in some cases, put the individual with mental illness or others at risk.

Interviews with officers indicate they are often frustrated with the time it takes to transport an individual to the hospital and then see the same individual back in their beat within hours, in the same or worse condition. Under current conditions, arresting the person and taking him or her to jail may be a more

Plaintiff's Exhibit 8

efficient use of officer time, and ironically may also be more effective in obtaining the required mental health treatment. This is not an acceptable system response to the predictable challenges of severe mental illness. Emergency departments and jails are poor venues to provide proper treatment for persons experiencing mental health crises. And both are very expensive. The lack of appropriate resources needlessly criminalizes many men and women who could receive more effective and humane treatment outside the criminal justice system, with a more carefully organized and properly funded mental health system.

### Recommendations

**The City should create a crisis response system to support multi layer co-responder units where behavioral health providers are working with OEMC and CPD to link individuals with mental health issues to treatment, 24 hours a day.**

While providing CIT training to police officers is a key tool for de-escalating responses to mental health crises, many jurisdictions recognize the value of also going beyond traditional police functions to more directly address the problem of mental illness. The President's Task Force on 21st Century Policing recommended that law enforcement agencies "engage in multidisciplinary, community team approaches for planning, implementing, and responding to crisis situations with complex causal factors."[388]

The co-responder model is one such approach. The model's primary component is intensive collaboration with mental health professionals for responding to crises and persons with mental health issues who repeatedly come to the attention of police. Police may respond in tandem with mental health professionals, allowing them to maximize their respective skills and better share information. Instead of simply arresting a person experiencing a mental health crisis, these clinicians help assess whether an alternative intervention (e.g., connecting with a social worker, getting treatment) would be more appropriate. After an incident, a clinician may follow up with the person who experienced a crisis.

The crisis response system includes a crisis line that is staffed by clinicians and is well-connected to other systems (like OEMC) that can respond to mental health emergencies. Intensive training and development of this multi layer co-responder model is necessary and relies heavily on the City and its Department of Public Health. The crisis response system should also include mobile crisis workers that can respond and provide assessments. These clinicians may also respond at the request of police officers, and request police assistance when needed.

The Los Angeles Police Department's crisis response system includes co-response teams and has become nationally recognized as a best practice.[389] Its Mental Evaluation Unit ("MEU") consists of 61 officers and detectives and 28 clinicians with the Los Angeles County Department of Mental Health.[390] The MEU has teams that pair a clinician with a police officer or, for more complex cases, with a police detective. Deploying these teams for crisis calls saved more than 6,600 hours of patrol time and at least $10 million in 2014.[391] MEU officers and clinicians also help staff a crisis hotline that patrol officers—before taking action in a situation that appears to involve a mental health crisis—are required to contact for an assessment of the most appropriate intervention. Approximately two-thirds of these calls involved a "one-time crisis" resolved with the first contact.

Plaintiff's Exhibit 8

Moreover, in Pawtucket, Rhode Island, the police department's partnership with the largest community provider of mental health services to respond to crisis calls resulted in further benefits. Besides providing people experiencing mental health crises with the help they needed and generating significant cost savings, the collaboration in Pawtucket enhanced transparency and rebuilt trust between law enforcement and mental health professionals, as well as between law enforcement and community members.[392]

**The City should expand and invest in Crisis Stabilization Units ("CSU") for individuals suffering from symptoms of mental illness who do not need to be psychiatrically hospitalized.**

Holy Cross Hospital has a small CSU for adults. In the 8 months the unit has been open, inpatient hospitalizations have decreased 42% because patients are immediately linked to mental health providers.[393] Holy Cross is not a CPD drop-off site nor does CPD's general order currently allow officers to drop off individuals experiencing symptoms of mental illness at a CSU as opposed to a designated emergency room. However, this is an important option for persons needing stabilization and has shown initial promising results:

- Prior to the CSU, 75% of individuals suffering from symptoms of mental illness in the emergency room were admitted as inpatients; after the CSU that number dropped to 34%.

- The Holy Cross CSU has served 466 people.

- The average length of stay is 14 hours.

- In the emergency room, for an individual with both mental illness symptoms and medical issues, the average wait time is 5 hours. For individuals with mental illness symptoms, the wait time for the CSU is only 1 hour, down from 18 hours in the emergency room.[394]

Several projects are also under way to better link individuals with mental illnesses who come in contact with the police to mental health services. Funded by the Bureau of Justice Assistance, CPD is working with Mt. Sinai Hospital and Thresholds to link persons transported to the Mt. Sinai emergency room for psychiatric evaluation. This pilot project also includes a hotline that officers can call for persons not needing transport but in need of linkage. This service is only available during business hours and not widely known within CPD. This is yet another reason why an MHCRU would be such an essential component to the internal and external communication of services and resources available to officers.

**The City and the MHCRU should identify frequent, high-use and high-need individuals and help them get mental health treatment.**

Some individuals in mental health crises are frequent players in both CPD and hospital emergency departments. The strain on both CPD and the healthcare system could be significantly reduced by identifying these high-use individuals and helping them get the mental health treatment they sorely need. Sharing data between the City's Department of Public Health, insurers, hospitals and other mental health providers, CPD and OEMC is critical to identifying frequent, high-use individuals for intervention.

For example, in response to a recognition that a small group of individuals were very high users of emergency room services, Illinois Masonic Hospital developed a program that identifies high users of

Plaintiff's Exhibit 8

emergency services and links them to community treatment teams. Last year they intervened with a woman who visited the emergency department over 700 times costing the hospital $2.5 million.[395] With engagement and community treatment, employment support, medication management, and continual following up, this patient reduced her visits to only eight times the following year, saving millions of dollars.

Several recent demonstration projects and randomized trials explore strategies to address the medical and psycho social needs of individuals who come into repeated contact with law enforcement, medical and social service systems. Medical facilities across the United States pay increasing attention to "hot-spotters"—specific individuals and settings associated with repeated and costly use of medical and social services.[396] Many of these interventions implement cooperative interventions from housing, mental health and social service agencies to provide effective case management, secure housing and other services to address chronic risks.

To help frequent, high-use and high-need individuals receive treatment, the City should fully fund Assertive Community Treatment ("ACT") teams and Mobile Crisis Prevention to provide relentless engagement. ACT is an evidence-based program that is less expensive than hospitalization or jail and significantly reduces recidivism and re-admittance.

## Why are we only treating people after they are in crisis?

The current mental health system focuses on chronic care management for people who are living with severe, disabling mental illnesses. It does not address early intervention that might encourage recovering and support a high functioning individual avoiding long-term disability. It also does not address the needs of other individuals who do not experience severe mental illness, but who satisfy criteria for intellectual and developmental disabilities that may heighten risks of mental health crises. Without these less intensive, recovery-promoting services, persons living with mental illness fail to get timely treatment until their symptoms are so severe as to require costly crisis management. In other words, the current mental health system may treat pneumonia but not the common cold, so you have to wait until your cold turns into pneumonia before you can get treatment.[397]

Clinical research studies have long established the importance of early intervention following the first episode of psychosis.[398] Prolonged duration of untreated psychosis not only reduces the effectiveness of treatment, but also increases the risk of incarceration.[399] Persons experiencing the first episode of psychosis while still untreated are at an increased risk of substance abuse, violence and arrest.[400] Moreover, recent studies have found that changes in the brain caused by child trauma result in heightened sensitivity to stress often found in people diagnosed with psychotic disorders.[401]

Interventions found effective for promoting recovery after a first episode of psychosis include low doses of atypical antipsychotic medications, cognitive and behavioral psychotherapy, family education and support and educational and vocational rehabilitation.[402] Care and services should be offered over at least a two- to three-year period.[403] The RA1SE Early Treatment Program reflecting this programming has been implemented in 17 community clinics across the nation thus far.[404]

Early intervention is crucial to countering the progression of the illness and decreasing the risk of criminal justice involvement. This treatment is particularly important for young adults. Studies have

Plaintiff's Exhibit 8

found that younger inmates generally suffer from the highest rate of mental health problems.[405] For example, 63% of state prisoners age 24 or younger had a mental health problem, while 40% of those age 55 or older had one.[406]

*Recommendations*

**The City should invest in first episode programming so that young adults experiencing their first episode of psychosis or major depression are immediately linked to intensive services to reduce progression of illness and decrease the risk of criminal justice involvement.**

## How are police escalating trauma, including at crime scenes?

Many communities in Chicago are constantly traumatized due to community violence and other toxic stress. Over 75% of children in a high-violence urban area report contact with community violence, meaning they either have seen violence, been a victim of violence or known a victim of violence.[407] This level of trauma and violence is devastating—children exposed to gun violence report high levels of anger, withdrawal and post-traumatic stress.[408]

Youth living in violent communities may experience "pathological adaptions" and can find it hard to form trusting relationships, especially with police.[409] Repeated exposure to violence is traumatic and creates a constant state of fear for children and adults. When children are raised in this environment, they are continuously in a heightened state of arousal, which can lead to perceiving threats when there are none and to either respond by withdrawing or lashing out. This is the environment that officers are walking into when responding to calls. Many parts of our community are in a constant state of fear, mistrust and survival.

The vicious cycle of violence feeds into our criminal justice system when children experience such high levels of trauma that affects their development, leading to the development of mood and anxiety disorders, aggression, deficits in social skills and substance use. The high levels of trauma not only affect youth in their current lives, but affect their behaviors and development later on. Children who experience violence are more likely to perpetrate violence as an adult, including aggression, delinquency and other violent crimes. Community violence, toxic stress and trauma saturate our city, and efforts to break the cycle of violence will be suffocated unless we actively work to address the trauma that people are experiencing every day.

*Recommendations*

**CPD should work to decrease trauma and escalation at crime scenes by reducing the show of heavy weapons and expanding the Chicago Survivors program.**

Police officers must be cognizant of the traumatized state of many communities when they respond to crime scenes so as to not exacerbate matters. Officers should seek to reduce a show of force and heavy weapons where appropriate.

In September 2015, the Chicago Department of Public Health's Crisis Response and Recovery Program partnered with Chicago's Citizens for Change on its "Chicago Survivors" program.[410] The collaboration sought to provide immediate responses to family members of murder victims in order

Plaintiff's Exhibit 8

to provide services and assist them through the aftermath of loss due to violence.[411] Chicago Survivors is a promising program, but its funding cycle is ending and its efforts are constrained by current staffing. The program currently provides one-hour training to lead homicide investigators on "More Effective Engagement and Communication with Families Following Homicide." It also provides a fresher course on crime victims' services and a general overview of the symptoms of PTSD and complicated grief.

The City and CPD should expand the capacity of the Chicago Survivors program by using the program to: (1) respond to all homicides City-wide; (2) provide homicide scene de-escalation, which would lower arrests and agitation within the community; (3) conduct PTSD assessments; (4) provide links to six months of family support services; (5) provide officer training to promote more effective and compassionate engagement; (6) provide training to state prosecutors and the medical examiner's office; and (7) help ensure that working adults have sufficient time and ability to mourn the loss of loved ones.

# Endnotes

[358] National Institute of Mental Health, Any Mental Illness (AMI) Among U.S. Adults, *available at* http://www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-ami-among-us-adults.shtml.

[359] *See, e.g.*, NAMI Chicago, White Paper, Making the Case for Funding and Supporting Comprehensive, Evidence-Based Mental Health Services in Illinois, at n.8 (May 2015), *available at* http://www.namigc.org/wp-content/uploads/2012/08/NAMI-White-Paper-NAMI-Chicago-May-2015.

[360] IDD and Community Policing, Tennessee Department of Intellectual and Developmental Disabilities (Apr. 2015), *available at* http://www.tn.gov/assets/entities/didd/attachments/DIDD_Materials_for_Law_Enforcement.pdf.

[361] *See* http://www.cookcountysheriff.com/index.html.

[362] The Path Forward: Investing in the Illinois Community Mental Health System, Improving Lives, Saving Money, Thresholds, at 9 (Nov. 2013), *available at* http://www.thresholds.org/wp-content/uploads/2013/11/Path-Forward_Investing-in-Illinois-Community-Mental-Health_Final.pdf.

[363] State of Illinois, Office of Management and Budget, Executive Office of the Governor, Department of Human Services Budgets, Executive Budget for Fiscal Year 2015, *available at* https://www.illinois.gov/gov/budget/Pages/BudgetBooks.aspx.

[364] National Association of Mental Illness-Greater Chicago, Mental Health 2013: An Important Public Health Issue, at 2 (July 2013), *available at* http://www.namigc.org/wp-content/uploads/2013/01/MentalIllnessFactSheet-July-2013.pdf

[365] Illinois Association of Rehabilitation Facilities, 51,447 to Lose Community Developmental Disability and Mental Health Services, 1,539 Lost Jobs Under Proposed Budget (Mar. 12, 2015), *available at* https://mentalhealthsummit.files.wordpress.com/2015/02/2015-03-11-iarf-press-statement-over-51000-to-lose-dd-and-mh-services-under-proposed-budget.pdf; Thresholds, *supra* note 361, at 2-4.

[366] Cook County Jail, Detainee Data, 2015.

[367] CPD, Special Order S06-08, Approved Medical Facilities (June 5, 2015).

[368] OEMC Report, *available at* http://www.cityofchicago.org/content/dam/city/narr/Transition%20Reports/OEMC.pdf.

[369] Working Group Interview.

[370] Matthew Tinney & Nils Rosenbaum, Police Perceptions of the Percentages of contacts in Albuquerque, NM that Involve People Living with Mental Illness (Dec. 2015), *available at* https://www.cabq.gov/mental-health-response-advisory-committee/documents/survey-of-police-officers-for-calls-for-services-as-mental-illness.pdf.

[371] National Emergency Number Association, Public Safety Answering Points Operations Committee, 9-1-1 Acute/Traumatic and Chronic Stress Working Group, NENA Standard on 9-1-1 Acute/Traumatic and Chronic Stress Management, at 23 (Aug. 5, 2013).

[372] APCO ANS 3.103.2.2015, Minimum Training Standards for Public Safety Telecommunicators, Association of Public-Safety Communications Officials International, at 22 (2015), *available at* http://www.apcointl.org/doc/911-resources/apco-standards/75-minimum-training-standards-for-public-safety-telecommunicators/file.html.

Plaintiff's Exhibit 8

[373] Kelli E. Canada et al., Crisis Intervention Teams in Chicago: Successes on the Ground, 10 J. Police Crisis Negotiations 86 (2010), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2990632/.

[374] Randolph Dupont, Sam Cochran, and Sarah Pillsburg, Crisis Intervention Team Core Elements, The University of Memphis School of Urban Affairs and Public Policy, Department of Criminology and Criminal Justice, CIT Center, Crisis Intervention Team Website (2007), *retrieved from* http://cit.memphis.edu/CoreElements.pdf.

[375] National Model, University of Memphis CIT Center, *available at* http://cit.memphis.edu/overview.php?page=7.

[376] CPD, Special Order S05-14, Crisis Intervention Team (CIT) Program (Feb. 29, 2012); Crisis Intervention Teams (CIT), NAMI Chicago (2015), *available at* http://www.namigc.org/wp-content/uploads/2012/06/CIT-Advocacy-Sheet-2015.pdf.

[377] Canada, *supra* note 372.

[378] *Id.*

[379] Crisis Intervention Team, NAMI Chicago, *available at* http://www.namichicago.org/about-us/partnerships/crisis-intervention-team/.

[380] *Id.*

[381] Crisis Intervention Teams (CIT), NAMI Chicago (2015), *available at* http://www.namigc.org/wp-content/uploads/2012/06/CIT-Advocacy-Sheet-2015.pdf.

[382] Amy C. Watson, et al., Outcomes of Police Contacts with Persons with Mental Illness: The Impact of CIT, Administration and Policy in Mental Health and Mental Health Services Research, Vol. 37 (4), at 302-17 (2010), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3171588/.

[383] *Id.*

[384] Amy C. Watson & Anjali J. Fulambarker, *The Crisis Intervention Team Model of Police Response to Mental Health Crises: A Primer for Mental Health Practitioners*, 8 Best Practices in Mental Health 71 (2012), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3769782/.

[385] *See, e.g.,* Settlement Agreement, *United States v. City of Portland*, Case No. 3:12-cv-02265 (D. Or. Dec. 17, 2012).

[386] Fred Osher et al., Adults with Behavioral Health Needs Under Correctional Supervision: A Shared Framework for Reducing Recidivism and Promoting Recovery, Washington D.C., U.S. Department of Justice, Bureau of Justice Assistance (2012), *available at* https://www.bja.gov/Publications/CSG_Behavioral_Framework.pdf.

[387] Cook County Sheriff's Reentry Council, An Examination of Admissions, Discharges & The Population of the Cook County Jail, 2012, Chicago, IL: Cook County Sheriff's Office (2013), *available at* http://ecommons.luc.edu/cgi/viewcontent.cgi?article=1015&context=social_justice.

[388] 21st Century Policing Task Force Report, *supra* note 48, at 44.

[389] *See, e.g.,* LAPD, News Release, The Los Angeles Police Department to Serve as National Learning Site on Responding to People with Mental Illnesses (Jan. 19, 2011), *available at* http://www.lapdonline.org/january_2011/news_view/46989.

[390] Stephanie O'Neill, Police and the Mentally Ill: LAPD Unit Praised as Model for Nation, 89.3 KPCC (Mar. 9, 2015), *available at* http://www.scpr.org/news/2015/03/09/50245/police-and-the-mentally-ill-lapd-unit-praised-as-m/.

[391] *Id.*

[392] Jacqueline B. Helfgott, et al., A Descriptive Evaluation of the Seattle Police Department's Crisis Response Team Officer/Mental Health Professional Partnership Pilot Program, 44 Int'l J. Law & Psychiatry 109, 111 (2016).

[393] Working Group Interview.

[394] Working Group Interview.

[395] Shannon Heffernan, Emergency Room Visits for Mental Health Skyrocket in Chicago, WBEZ News (Apr. 16, 2015), *available at* https://www.wbez.org/shows/wbez-news/emergency-room-visits-for-mental-health-skyrocket-in-chicago/b59a93f9-f6dc-447d-b9d4-37378fcd8b8d.

[396] David Meltzer & Gregory Ruhnke, Redesigning Care for Patients at Increased Hospitalization Risk: The Comprehensive Care Physician Model, Health Affairs (May 2014).

[397] NAMI Chicago White Paper, *supra* note 358, at 8.

[398] Robert K. Heinssen, et al., Evidence-Based Treatments for First Episode Psychosis: Components of Coordinated Specialty Care, RA1SE 2 (2014), *available at* http://www.nimh.nih.gov/health/topics/schizophrenia/raise/nimh-white-paper-csc-for-fep_147096.pdf.

[399] John Read, et al., The Traumagenic Neurodevelopmenal Model of Psychosis, 4 Neuropsychiatry 65 (2014).

[400] *Id.*

[401] Andrea K. Blanch, et al., Toxic Stress, Behavioral Health, and the Next Major Era in Public Health, Mental Health America 7 (2014), *available at* http://www.mentalhealthamerica.net/issues/toxic-stress-behavioral-health-and-next-major-era-public-health.

[402] Heinssen, *supra* note 397, at 2-3.

Plaintiff's Exhibit 8

[403] Heinssen, *supra* note 397, at 3.

[404] John M. Kane, et al., Comprehensive Versus Usual Community Care for First-Episode Psychosis: 2-Year Outcomes From the NIMH RAISE Early Treatment Program, American Journal of Psychiatry (2015).

[405] Doris J. James & Lauren E. Glaze, Special Report: Mental Health Problems of Prison and Jail Inmates, U.S. Department of Justice, Bureau of Justice Statistics (2006), *available at* http://www.bjs.gov/content/pub/pdf/mhppji.pdf.

[406] *Id.*

[407] *See, e.g.,* Guerra, N. et al., Community Violence Exposure, Social Cognition, and Aggression Among Urban Elementary School Children, Child Development, Vol. 74, No. 5, at 1561-1576 (Sept./Oct. 2003); Deborah Gorman-Smith & Patrick Tolan, The Role of Exposure to Community Violence and Developmental Problems Among Inner-City Youth, Development and Psychopathology, at 101-116 (1998).

[408] James Garbarino, Catherine P. Bradshaw, and Joseph A. Vorrasi, Mitigating the Effects of Gun Violence on Children and Youth, The Future of Children (Summer/Fall 2002), *available at* http://futureofchildren.org/publications/journals/article/index.xml?journalid=42&articleid=166&sectionid=1068.

[409] *Id.*

[410] CPD, Special Order S12-08, Crisis Response and Recovery Program, at 1 (Sept. 24, 2015).

[411] *Id.*

Plaintiff's Exhibit 8

# Video Release Policy

The Task Force developed a policy for the public release of video and audio recordings of certain critical incidents involving police officers, in particular those involving the use of deadly force or in which death or serious injury results. The Task Force produced this policy on a somewhat expedited basis due to the need to address pending issues and incidents.

The Task Force released the proposed policy on February 16, 2016, and the Mayor immediately adopted it. The adoption of the policy made Chicago the first city in the nation to have a specific, written policy that guarantees the public's timely access to video and audio recordings relating to sensitive police-involved incidents. Nevertheless, and in keeping with the overall timetable for the presentation of its final report, the Task Force has continued to review the policy as it was adopted, and has received and reviewed additional comments and relevant materials. This section of the report will address the process by which the policy was created and some of the concerns behind it, as well as some changes the Task Force proposes in light of information received since its adoption.

The Task Force received and reviewed a considerable quantity of material related to the issue of the public release of recordings of police incidents. While no other city had a written policy, there was a wealth of material to consider, including proposed policies as well as commentary from people and groups on all sides of the issue. The Task Force obtained input directly from a number of concerned entities and individuals, including members of the public, City agencies (including the Law Department and IPRA), prosecutors, criminal defense attorneys, leadership of the FOP, and attorneys who litigate claims against police officers and who pursue FOIA claims directed at obtaining the release of recordings of police incidents. After the policy was released by the Task Force and adopted by the Mayor, the Task Force received a number of comments and additional information, some of which is reflected in proposed changes to the policy that are described below.

## Why does the City not immediately release all video, audio and police reports on every police shooting or death in custody?

Before the Mayor's adoption of the policy on February 16, 2016, the practice in Chicago was generally to withhold from public release any video recording of a police incident until investigations, whether criminal or merely disciplinary, were concluded. This practice, like the absence of any written policy, was consistent with many jurisdictions the Task Force surveyed. However, the Task Force found that the absence of a clear, written policy led to inconsistencies, confusion and mistrust on the part of the public, as well as a proliferation of expensive and time-consuming litigation conducted under the Freedom of Information Act. In many cases, it also left the public in the dark about matters of serious public interest.

In deciding what the video release policy should say, the Task Force was keenly interested in how other jurisdictions handled this issue. As noted, the Task Force's survey of policies around the nation found that as of February 16, 2016, no other city had a written policy on the release of audio and video of police-involved incidents. But other jurisdictions have considered the issue, and their experiences were

**Plaintiff's Exhibit 8**

informative. This report will summarize two of the many jurisdictions that were considered—New Orleans and Seattle.

New Orleans, by coincidence, issued a written policy on February 24, 2016, just eight days after the Mayor adopted the video release policy produced by the Task Force. New Orleans is under a police-related federal consent decree, and the new policy was also approved by the Federal Monitor and the U.S. Department of Justice.

The New Orleans policy provides that, within 48 hours of a critical incident involving a police officer, the Public Integrity Bureau ("PIB") of the New Orleans Police Department ("NOPD") must provide any recording recovered from the scene to: (1) the Orleans Parish District Attorney's Office; (2) the City Attorney's Office; (3) the NOPD Compliance Bureau; and (4) the local United States Attorney's Office. Those agencies then advise the Superintendent of the NOPD on whether the recording should be made public. The PIB considers the nature of the incident, the safety and privacy concerns of individuals involved, and whether the release would interfere with an ongoing investigation. Taking the advice of those agencies into account, the PIB must make a final recommendation to the Superintendent no more than seven days following the incident. The Superintendent then determines, within 48 hours of receiving the PIB's recommendation, whether any recordings may be released to the public. Any recordings that are released may be redacted to protect the identity of juveniles, victims, witnesses, and suspects, and to ensure the safety and security of anyone involved with the incident. If the Superintendent decides recordings will not be released, the NOPD must inform the federal judge overseeing the consent decree, the Department of Justice, and the Federal Monitor.

The New Orleans policy arises in a somewhat different context than that present in Chicago, principally because of the presence of the consent decree. That said, differences between the New Orleans policy and the policy produced by the Task Force should be noted. The most prominent is the affording of discretion to the NOPD Superintendent, albeit after consultation with other concerned entities, as to whether a recording should be released. By contrast, the Task Force's policy eschews discretion on the part of any official in favor of mandatory release after a specific and limited interval. The Task Force felt that this model was more likely to serve the interests of transparency and trust that were its paramount goals. In addition, the Task Force found that use of a model in which some official or agency was charged with deciding whether to release a recording on a case-by case basis would raise difficult issues regarding in what City office or agency such an official would be lodged and what criteria would be applied in deciding whether recordings should be released—issues addressed more fully below.

Many commentators, including some who provided input directly to the Task Force, suggested that it consider how the issue of the release of recordings is handled in Seattle. Aumber in fact claimed that Seattle followed a policy of releasing all such recordings immediately, and touted that approach.

When the Task Force contacted responsible Seattle officials, it turned out that was not the case. First, Seattle does not have, and never has had, a department-wide immediate release rule, and it has no written policy at all. From December 2014 to July 2015, the Seattle Police Department ("SPD") operated a pilot project in which 12 police officers (out of approximately 1,300 in the department) wore body cameras while on duty. With the assistance of local hackers, software was developed that allowed the video and audio recorded by those 12 body cameras to be redacted to obscure all images and eliminate audio, and then to be uploaded to a YouTube channel, where it was available for public

Plaintiff's Exhibit 8

review within a day of its being recorded. The recordings covered by this policy were not limited to incidents involving the use of force; rather, they included everything that was recorded on the officer's body cameras. The pilot project ended, and currently there are no Seattle officers wearing body cameras or uploading recordings. Nor has the pilot project been expanded to include more officers. The SPD continues to assess its pilot project.

So how, after having the benefit of the pilot program, does Seattle actually handle these issues? Seattle's current policy gives discretion to the Chief of Police to release a video when she deems it appropriate and necessary. If the Chief of Police declines to release a recording, the Washington Public Records Act ("WPRA," equivalent to Illinois' FOIA) allows interested parties to request release of a video and, if necessary, sue to obtain its release. The WPRA includes an exemption from release for pending criminal investigations. The authority to declare an investigation of a police-involved incident a "criminal investigation" exempt from release under WPRA rests solely with the Director of the SPD's Office of Professional Accountability, who reports to the Chief of Police, but is otherwise outside the SPD chain of command. Moreover, under Washington state law the criminal investigation exemption to WPRA ceases to apply once a matter is actually referred to a prosecutor's office. Like the New Orleans model, and unlike the policy produced by the Task Force, the Seattle policy that is actually currently in force affords at least some discretion to the SPD to withhold a recording from release for some period of time, subject to litigation seeking its release.

### Recommendations

**The Task Force's video release policy provides that recordings and reports related to certain specified types of police incidents be automatically released to the public no later than 60 calendar days from the date of incident, or at an earlier date when possible. Law enforcement agencies, or IPRA (or its successor), may by written request obtain a one-time extension of that deadline, limited in length to 30 days.**

This policy makes Chicago the first city in the nation to have a specific, written policy guaranteeing the public's timely access to information relating to sensitive police-involved incidents, including police-involved shootings and deaths in custody. The policy strikes a balance between the public's need for information about police activity and the interests of law enforcement agencies in conducting investigations without risk of compromising important sources of evidence. The policy is attached as Appendix 10.

In formulating the policy, the Task Force attempted to balance the interests of various concerned people and entities. These interests included, but were not limited to, the public's need to be informed about the way its police officers conduct themselves, especially where the use of force is concerned, as well as the need for agencies charged with addressing the consequences of police incidents to be able effectively to investigate them. While the public's interest in being informed is obviously substantial, the Task Force believes that it is also in the public's interest to assure the ability of prosecutors and other agencies to investigate these incidents and to address their consequences, legal or otherwise.

The Task Force believes this policy addresses these and other concerns effectively in a way that will foster greater transparency and trust between the community and its police force. It is important to

Plaintiff's Exhibit 8

note, though, that the Task Force believes that consideration of these issues needs to be an ongoing process. The policy expressly provides that it should be reviewed after one year (or less) to determine whether earlier release (or other changes designed to further increase transparency) might be appropriate in light of experience and implementation.

**Specific Provisions of the Policy.** After stating its purpose in Section I, the policy sets forth the considerations behind it in Section II. These include the public's interest in timely access to recordings and reports about certain kinds of serious incidents involving the use of force by police officers, the interests of persons depicted in those recordings, and the interests of agencies investigating those incidents in avoiding the compromise of their investigations by, for example, prematurely making such materials available to potential witnesses. As Section II indicates, the goal of the policy is to balance those interests, and in that respect, Section II speaks for itself. The Task Force regards all of those concerns, including not impairing the investigative process, as being in the public interest.

Section III of the policy defines its scope, both with respect to the kinds of incidents it covers and the kinds of recordings and reports it covers. As to the former, the Task Force considered, but did not entirely mirror, the categories of incidents that are within the power of IPRA to investigate under Chicago Municipal Code § 2-57-040(c) and (d). The policy covers incidents in which force is used both "on the street" and when an individual is in police custody. While some suggested that covered incidents involving the discharge of firearms be limited to those in which an individual is actually struck, the Working Group and the Task Force rejected that view, deeming an instance in which an officer fires at a civilian but misses to be well within the zone of interests governed by this policy.

In light of comments received since its adoption, the Task Force does recommend some modifications to Section III A as it was adopted by the Mayor. One concerns the inclusion of incidents involving the use by police officers of stun guns or Tasers. After the policy was produced, the Working Group received, and relayed to the Task Force, concerns related to the administrative burden that would be imposed by including the literally hundreds of such incidents that take place each year within the scope of the policy. While the Task Force does believe that the issues raised by those types of incidents are indeed of public concern, it does not want to see what it views as an otherwise workable policy dragged down by its own administrative weight. Accordingly, the Task Force recommends that at this time incidents involving Tasers and stun guns be included only if they result in death or in great bodily harm, a concept that is already defined in Section III A.

Another proposed change, offered mainly for purposes of clarification, would clarify that covered incidents involving the discharge of firearms do not include accidental discharges.

Finally, the Task Force recommends modifying the policy to make clear that incidents resulting in death or great bodily harm to a person in CPD custody refers to those incidents where the death or great bodily harm results from the use of force by another person.

Section III B addresses what kinds of materials are covered by the policy. The policy applies to both audio and video recordings, as well as certain specified police reports. Notably, the policy is not limited in its application to recordings made on City equipment; rather, it includes any recordings made on private or other equipment that come into the possession of the City later. As a matter of

Plaintiff's Exhibit 8

clarification, the Task Force notes that recordings made during and as part of an investigation of an incident, including recordings of witness statements, are not intended to fall within the scope of this policy.

Section IV of the policy governs the release of materials that it covers. The Working Group and the Task Force considered a number of possible models and intervals with respect to when and whether recordings and reports should be released, including immediate release of all materials, mandatory but delayed release, and release unless delay was approved by some responsible official or agency. Here, as in all of its considerations regarding this policy, the Working Group and the Task Force balanced the interests of those seeking release as soon as possible with those seeking to delay release.

The possibility of charging some official of the City with determining whether and for how long the release of material covered by the policy should be delayed was considered at length, but was ultimately rejected for several reasons. One was the concern that trust and transparency would not be fostered by affording such discretion to an official of the City's executive branch. Another was the difficulty in setting forth the criteria under which such an official would decide whether to delay release, and for how long. A third reason was that no City official could accurately evaluate the concerns of law enforcement agencies as well as they could themselves. The Task Force also considered the possibility of subjecting the question of whether and when to release to a court process, but determined that doing so would require an exercise of jurisdiction not currently afforded to Illinois courts. Ultimately, the Task Force opted for a policy that mandated release rather than leaving it, as other jurisdictions do, to the discretion (however cabined) of an official.

Having decided to mandate release, the Task Force also felt that immediate release in every case would not necessarily serve the public interest. Just as it has an interest in knowing how its police officers are doing their jobs, the public also has an interest in seeing that the agencies charged with investigating incidents involving the use of force by police, including prosecutors and IPRA, are able to conduct their investigations without fear that the release of recordings or reports would compromise their efforts. The Task Force recognized that, under certain circumstances, making recorded evidence or reports available to the public during the early stages of an investigation could result in those materials influencing witness accounts of the incident. Accordingly, the Task Force concluded that while release should be mandatory, some period of delay should be provided to allow for the conducting of witness interviews and other early investigatory functions.

Informed by the experience of a number of members of the Task Force and the Working Group with investigating cases involving the use of force by police officers, as well as the views it received from others, including criminal defense attorneys whose clients' interests could be adversely affected by an earlier release, the Task Force settled on a 60-day delay from the date of the incident (or, if the recording was made on non-City equipment, from the date a City agency comes to possess it) before release. Section III C of the policy makes it clear that material can be released earlier if it can be determined that doing so will not compromise an investigation.

Recognizing also that not all investigations proceed on the same timetable, the Task Force provided for an additional, one-time, 30-day extension upon written request made by a law enforcement agency or IPRA. Written requests need not contain investigative detail, but should invoke concerns

Plaintiff's Exhibit 8

similar to one or more of the exemptions included in FOIA. Written extension requests will themselves be made public, so that the cause of the additional delay can be known to persons interested in the issue. Following this period of up to 90 days, the policy does not allow for any further delay in release of these materials.

Section V of the policy addresses notice to affected parties. It requires IPRA, prior to the release of any material it covers, to provide notice of the pending release to any individual who was the subject of the police action depicted or described in it, or to the person's family or legal representative if they are deceased. The policy permits them to view the recording themselves and requires IPRA to brief them on the status of the investigation in a way and to an extent that does not itself compromise that investigation.

Section VI, as noted above, calls for review of the policy in one year or less to determine whether, after the policy has been in use, the period of delay in releasing material can be shortened. The Task Force recommends that this section be modified to make clear that ongoing review should address any provisions of the policy that might appropriately be modified, including, for example, whether to add all incidents involving Tasers and stun guns back into the policy's coverage.

Finally, Section VII makes it clear that the policy is not intended to supersede any legal obligation with respect to the release of any material, including any court order, any legal obligation to withhold identifying or other sensitive information of any person, or any obligation under FOIA, including those relating to privacy and safety.

The policy is intended to balance the interests of a range of stakeholders with varied, and sometimes opposing, interests in the issue of when the recordings and reports it covers are made public. Like any balancing effort, the result will not make everyone happy, and the Task Force recognizes that implementing it will impose burdens and costs. But those concerns must, in the view of the Task Force, give way in some respect to what the Task Force views as the paramount interest of the public in timely access to the best available information regarding how the police officers that serve them exercise their unique ability to use force in performing their duties. Indeed, nowhere is the public's interest more strongly implicated than in situations in which an officer uses deadly force on a civilian, or when harm comes to one held in police custody. It was for this reason, in large part, that the Task Force chose mandatory release, as opposed to release at the discretion of some official or agency.

The Task Force hopes that the policy will foster transparency and thus encourage trust. The more informed members of the community are about how officers act at their most critical moments, the more grounds they will have to trust their police force, and to trust that officers who violate rules or the law will be dealt with justly. But the Task Force recognized that the public interest is also served by protecting the efficacy of the processes by which police incidents of this kind are investigated. Just as transparency regarding what police officers do will foster trust between the police and the community, so will the sense that relevant agencies can effectively determine what has occurred as a first step to determining what the consequences should be.

Plaintiff's Exhibit 8

# Overarching Issues

## Does CPD's training need significant overhaul?

The answer is yes. The Task Force found that CPD has consistently failed to devote adequate resources to training officers once they leave the Academy. While CPD provides almost double the state-mandated time for new recruit training, once an officer leaves the Academy, over the remaining decades of an officer's career, there is virtually no annual, mandated training. The only annual mandated training is for firearms certification, nothing more. To be sure, there are occasional mandated Academy trainings, such as the recent trainings for procedural justice and Taser use. However, unlike in other jurisdictions that have a portfolio of annual, mandatory, trainings, survey their members and supervisors on training needs and develop a strategic plan for training, no such processes exist for CPD training. Therefore, the Task Force recommends that CPD should address several aspects of its training programs that cut across all subject areas.

### CONTINUING EDUCATION

Based on the Task Force's interviews and review of materials, it appears that CPD does not have a robust strategic approach for ensuring that all officers have ongoing training and professional development opportunities to develop and maintain the professional competencies needed to perform well. Other than an annual, under-resourced firearms qualification, there is no regular in-service training or certification requirement. Even though all officers complete pre-service training, training changes over time based on best practices and needs.

Any additional mandatory in-service training appears to be reactive, rather than systematically planned to address identified needs and changes in policing. For example, CPD is currently developing a 16-hour, two-part force mitigation training for patrol officers to begin in spring 2016 and end July 2016. There is no information about the frequency or decision to make this an annual or refresher training, however. CPD has developed and is continuing to develop procedural justice training, but, as discussed earlier in the report, the roll-out of this important training has not been fully implemented.

The International Association of Directors of Law Enforcement Standards and Training ("IADLEST") endorses mandated annual in-service law enforcement training, although it leaves the number of training hours and the selection and/or approval of subjects to the discretion of local law enforcement administrators. There is some variation here, with Utah, Portland, and Massachusetts requiring 40 hours annually; Indiana, Missouri, and Washington requiring 24 hours annually; and California requiring 24 hours every two years.

Additionally, practices in other jurisdictions suggest that it is highly important to regularly assess training needs, conduct in-service training, and engage the community. For New Orleans, the Department of Justice recommended that the police department establish an executive training education task force—including both law enforcement leadership and community members—that would provide the superintendent with information on current training priorities and broad training goals.[412] Moreover, the Education and Training Division Commander conducts an annual training needs assessment to update its

Plaintiff's Exhibit 8

training, and its plan includes having subject matter experts help create, implement, and teach the curriculum. The New Orleans Consent Decree also requires that the department provide eight hours of in-service training annually on community policing and problem solving.[413]

### Recommendations

**Provide an annual 40-hour in-service training for all sworn personnel, including periodic refresher classes on procedural justice.**

Law enforcement is an ever-changing occupation. Laws, court decisions, techniques, technology, and the broader community are in a constant state of flux. As a result, it is imperative that police officers keep abreast of changes and community needs in the areas they serve so that they can more effectively serve the citizens, help the agencies that employ them avoid civil liability, and develop necessary supervisory and management skills.

**Implement a systematic approach to identify training needs and revise in-service training curriculum on an annual basis.**

This systemic approach will require CPD to conduct a thorough training review and needs assessment to inform the development of annual in-service training. The training review should be conducted annually and take into consideration: (1) analysis of officer safety issues; (2) misconduct complaints; (3) problematic uses of force; (4) input from all levels of CPD; (5) community input; (6) recent court decisions; (7) best practices research; (8) the latest law enforcement trends; (9) individual district needs; and (10) any changes to Illinois or federal law, Chicago law, or CPD policy. Training priorities should reflect CPD's commitment to transforming the department by incorporating problem-solving, community-focused and trauma-informed goals that are represented in all policing strategy.

### FIELD TRAINING OFFICER PROGRAM

CPD relies on FTOs to train probationary officers after they leave the Academy. The FTO program has great potential, but it has long needed improvement. When the Commission on Police Integrity reviewed the FTO program in 1997, it found the program "understaffed" and recommended that the number of FTOs should be increased from the then-current level of 67 officers "to at least 200 officers."[414] The Commission also recommended that the salaries for FTOs should be raised to attract more officers.[415]

Unfortunately, not much has changed over the past 18 years. There are currently 88 FTOs, and, at times, there are four probationary officers for every FTO. Ideally, the ratio would be closer to 1:1. Otherwise, probationary officers have less time to interact with and learn from their FTOs and must spend significant time without FTO supervision.

Moreover, there still does not appear to be sufficient incentive for experienced officers to become FTOs. Although there is a pay increase (about $3,000) and opportunity for overtime, the extra pay is not substantial. For a short period, CPD created training districts, which limited FTOs' options for where they could work. They are not eligible to work in specialized units due to their assignments with PPOs. FTOs work without a partner if they are not currently supervising a PPO unless it is third watch. Officers report that working with a random partner with whom they have not developed rapport or trust is

Plaintiff's Exhibit 8

troublesome. FTOs have a tremendous amount of responsibility and none of the authority or incentive to take on the job.

Finally, although there is an initial training program for when an officer first becomes an FTO, the program lacks ongoing or regular refresher courses for its FTOs.

### Recommendations

#### Reinvigorate the Field Training Officer program.

CPD needs to attract, train and employ more FTOs to provide valuable training and mentoring to probationary police officers. Current staffing levels of FTOs are not sufficient. CPD should analyze the current impediments to attracting FTOs and develop additional incentives for officers to become FTOs. For example, CPD could consider giving officers some form of credit for serving as FTOs during the Sergeant promotion process.

#### Implementation of Policy Changes

Changes in policy directives are reflected in general and special orders, and they are made accessible online and available 24 hours a day. However, there is no documentation of or any record that officers read and understood the orders. Officers may be reminded of an order during roll call to reflect a current instance, but this occurs infrequently. In general, officers are not held accountable for keeping up to date with orders.

The International Association of Chiefs of Police ("IACP") has recommended disseminating information in multiple ways, including (1) roll calls, (2) training bulletins, (3) email messages, and (4) a three-ring binder in squad cars.[416] The orders could also include checklists of the required procedures that the officers have to submit along with their incident reports. However, the IACP recommendations, published in 2004, likely need to be updated based on advances in technology and the availability of additional tools for ensuring that officers are knowledgeable about current policies.

There does not appear to be much data available on the practices of other jurisdictions regarding ensuring that all officers are regularly updated on new policy changes. Washington, D.C.'s Metropolitan Police Department, however, has issued a special order mandating that all sworn and civilian members must sign for the receipt of the General Orders, Special Orders, Standard Operating Procedures, and General Order Changes.[417] At a minimum, there must be (1) a signature roster that each member will sign and date upon receipt of newly published directives and (2) a signature roster file that contains copies of all signature rosters that have been completed and submitted.

### Recommendations

#### Implement procedures to ensure that sworn personnel remain informed on all directives and policies.

Within 30 days of the release of new directives and policies, all sworn officers should be provided copies and be required to sign a statement acknowledging that they received and reviewed the directive or policy and had an opportunity to ask questions. CPD could also use brief online quizzes to ensure officers understand new directives and policies.

Plaintiff's Exhibit 8

Officers should also be held accountable for knowing how and where to access CPD guides and manuals and for knowing the contents. Officers should be required to sign a receipt acknowledging this responsibility and that they have received instructions on how and where to access the guides and manuals. Officers should also have adequate resources, such as working computers in their squad cars and at the stations, so they can review general orders as needed. CPD should also consider investing in technology, such as a Smartphone app, to provide easy access to general orders and other important communications.

## Are there enough Sergeants to effectively supervise the large number of patrol officers?

Sergeants are the linchpin to ensuring that patrol officers are accountable to the communities in which they serve. Sergeants work directly with their officers on a regular basis and are in the best position to notice, document and address officer behavior. But, due to budget constraints, the number of available Sergeants per shift does not always provide appropriate coverage to ensure all patrol officers are adequately supervised.

Currently, CPD's average "span of control" is a ratio of 1 Sergeant to every 11 officers. But, when other elements are factored in, such as vacations, sick leave and other events that disrupt officer and Sergeant availability, the ratio is often closer to 1:20. "Span of control" is defined as the number of individuals or resources that one supervisor can manage effectively during emergency response incidents or special events.[418] One commentator has defined "span of control" as simply representing the number of people a manager has responsibility for communicating with.[419] High spans of control mean that there is not enough time for a supervisor to evenly disperse his or her time among subordinates.

How did this state of affairs come to pass at CPD? The problem starts with structural issues. Years of budget cuts and the flattening of supervisory ranks have caused a staffing shortage in supervisory personnel. The career ladder within CPD is broken, and surveys show that 98% of officers believe that promotions are due to connections, not merit.[420] This sentiment is compounded by the fact that almost 10 years passed between the two most recent Sergeant promotion exams, which left many out of the promotion process for years.[421]

There are additional, on-the-ground issues that further strain supervisors' ability to do their job. First, as a result of the CBA's bidding process, junior officers, who need the most support, are placed in the most difficult neighborhoods at the most difficult times. Second, personnel information does not follow officers around as they move between assignments and supervisors. Thus, Sergeants are not provided documentation about their officers' prior behavior or disciplinary history, which hampers their ability to monitor the officers' actions in the field. Third, officers often work with several different Sergeants over the course of a week-long shift in order to maximize coverage. Fourth, due to the limited number of Field Training Officers, Sergeants often take time away from supervising their patrol officers to check on officers who are still on their probationary periods. Finally, Sergeants must respond to calls due to a lack of available officers, which additionally reduces their ability to supervise.

Plaintiff's Exhibit 8

*Recommendations:*

CPD should increase the number of Sergeants on patrol.

CPD should implement monthly meetings of all Sergeants in a district to ensure the sharing of officer performance, to provide mentoring opportunities to newer Sergeants, and to provide a forum for best practice sharing to prevent officer misconduct.

## Why aren't all CPD officers already wearing body cameras?

Body cameras are a promising technological tool to protect both the public from police misconduct and police officers from false allegations of misconduct. They promote accountability and transparency. The presence of body cameras can also de-escalate encounters, resulting in improved behavior among both police officers and the public. The commander in charge of CPD's body camera pilot program, Marc Buslik, recently explained this phenomenon: "When they know they are being recorded, both sides, everything becomes less intense"; "[t]he camera brings everything down on both sides. Officers noticed right away."[422]

CPD is already embracing the use of body cameras. In January 2015, CPD initiated a body camera pilot program.[423] The program initially involved 30 body cameras on officers working the 2:00 p.m. to midnight shift in the Shakespeare District (14th). Though the sample size is small, initial results were promising. Since the program was launched, complaints filed against officers for that district/watch fell by 26%, and excessive force complaints fell to zero in 2015 compared with seven in 2014.[424] In 2016, CPD is expanding the pilot program to all three watches in six additional police districts—Wentworth (2nd), South Chicago (4th), Gresham (6th), Deering (9th), Ogden (10th), and Austin (15th).[425]

Police departments nationwide are increasingly using body cameras. As of early 2015, about 25% of the nation's 17,000 police agencies were using them in whole or in part, with 80% evaluating the technology.[426] In Los Angeles, the LAPD is outfitting every officer with body cameras.[427] While empirical data is still trickling in, several studies have documented substantial decreases in citizen complaints, use of force, and assaults on officers after body cameras were distributed.[428] There is some debate about whether these declines are attributable to improved officer behavior, improved citizen behavior, or citizens being less likely to file frivolous complaints (or some mix). Regardless, these are all positive developments.

*Recommendations*

CPD should continue rolling out and evaluating body cameras with the ultimate goal of providing body cameras to every police officer who regularly comes into contact with civilians.

Body cameras show significant promise. Only a small percentage of the many thousands of complaints filed against CPD officers result in sustained findings, often because there is insufficient evidence of what happened aside from a "he said, she said." Body cameras can provide objective evidence to support meritorious complaints, while also discouraging and reducing the filing of unfounded complaints. In either case, the use of body cameras would greatly improve the functioning of Chicago's police oversight system. To the extent body cameras improve officer

Plaintiff's Exhibit 8

behavior, they also could help pay for themselves by reducing the more than $600 million the City has paid to resolve police misconduct cases since 2004.

CPD should continue its roll-out and evaluation of body cameras with the ultimate goal of providing body cameras to every police officer who regularly comes into contact with civilians. The City should also continue to evaluate policies governing the use of body cameras, which raise a variety of issues (e.g., what to record, how to record and store recordings, and how to ensure that officers comply with the policy and properly use the cameras). Some of these questions are already addressed in a new state law that went into effect on January 1, 2016, the Law Enforcement Officer-Worn Body Camera Act.[429] The Act creates "standardized protocols and procedures" on such issues as when cameras must be turned on, how citizens are notified, access, retention, and discipline.[430]

## Endnotes

[412] New Orleans Police Department Policy Manual (2014).

[413] New Orleans Consent Decree (2012), *available at* http://www.nola.gov/nopd/nopd-consent-decree/.

[414] 1997 Report of the Commission on Police Integrity, *supra* note 47, at 19.

[415] *Id.*

[416] W. Dwayne Orrick, Best Practices Guide: Developing a Police Department Policy-Procedure Manual, International Association of Chiefs of Police (2014), *available at* http://www.theiacp.org/portals/0/pdfs/BP-PolicyProcedures.pdf.

[417] Special Order: Dissemination of Written Directives, Metropolitan Police Department D.C. (2006), *available at* https://go.mpdconline.com/GO/SO-06-13.pdf.

[418] Management Span of Control: Introduction to the Incident Command System (ICS100), Federal Emergency Management Agency, Washington, D.C.

[419] Robert L. Bailey, Span of No Control (Mar. 1, 2015).

[420] Wesley G. Skogan, Summary, Chicago Officer Survey 2013 (Oct. 8, 2013).

[421] Working Group Interview.

[422] Paul Biasco, How Chicago Police Hope Body Cameras Will Restore The Public's Trust, dnainfo.com (Jan. 7, 2016), *available at* https://www.dnainfo.com/chicago/20160107/logan-square/how-chicago-police-hope-body-cameras-will-restore-publics-trust.

[423] CPD, Body Worn Camera Pilot Program – Phase 1, Department Notice D15-01 (Jan. 1, 2016).

[424] *Id.*

[425] CPD, Office of News Affairs, Mayor Emanuel and Police Superintendent Escalante Announce Districts for Body-Worn Camera Expansion (Dec. 23, 2015), *available at* http://4abpn833c0nr1zvwp7447f2b.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/23Dec15-Release-Body-Worn-Camera-Expansion.pdf.

[426] Jay Stanley, Police Body-Mounted Cameras: With Right Policies in Place, A Win For All, ACLU (Mar. 2015), *available at* https://www.aclu.org/police-body-mounted-cameras-right-policies-place-win-all.

[427] Kate Mather, A Fight Over Access to Video from LAPD Body Cameras is Shaping Up, Los Angeles Times (Feb. 5, 2015), *available at* http://www.latimes.com/local/crime/la-me-lapd-cameras-20150205-story.html.

[428] Michael D. White, Police Officer Body-Worn Cameras, Washington D.C.: Office of Community-Orientated Policing Services (2014), *available at* https://www.ojpdiagnosticcenter.org/sites/default/files/spotlight/download/Police%20Officer%20Body-Worn%20Cameras.pdf.

[429] 50 ILCS 706/10-1, 35.

[430] 50 ILCS 706/10-5.

Plaintiff's Exhibit 8

# Disclaimer

This report is the product of the Police Accountability Task Force and its affiliated Working Groups, with participants of diverse expertise and affiliations addressing many complex and contentious topics. It is inevitable that arriving at a consensus document in these circumstances entailed some compromise. Accordingly, it should not be assumed that every Task Force (or Working Group) member embraces in totality every formulation in this report or even that all participants would agree with any given recommendation if it were taken in isolation. Rather, the Task Force reached consensus on these recommendations as a package.

Moreover, while the Task Force formed Working Groups to address five general subject areas, there was inevitably overlap between the Working Groups and subject areas. The discussion of a particular issue in this report under a particular Working Group should not be construed to mean that only that Working Group contributed to the Task Force's findings and recommendations. In the end, the findings and recommendations in this report represent the work of the entire Task Force.

Plaintiff's Exhibit 8

# Appendix 1

## Police Accountability Task Force Members

**Lori E. Lightfoot**, Chair, is President of the Chicago Police Board, a partner at Mayer Brown LLP, and a former federal prosecutor. She served as Chief Administrator for the Office of Professional Standards of the Chicago Police Department, where she managed a 100-person office of civilian investigators charged with investigating police-involved shootings, allegations of excessive force and other misconduct alleged against Chicago police officers.

**Deval Patrick**, Senior Advisor, was formerly Governor of Massachusetts and is a native of Chicago. Governor Patrick served under President Bill Clinton as the U.S. Assistant Attorney General for the Civil Rights Division of the Justice Department, where he worked on issues including racial profiling and police misconduct.

**Joe Ferguson**, Technical Advisor, is Inspector General of the City of Chicago and a former federal prosecutor with experience representing the United States in cases involving employment discrimination, civil rights, environmental law and government program fraud.

**Randolph Stone** is a clinical professor at the University of Chicago Law School, director of the Criminal and Juvenile Justice Project Clinic, and a former Cook County Public Defender. He serves on the boards of the Youth Advocate Programs, Inc., the Federal Defender Program, and the Illinois Department of Juvenile Justice, and writes and teaches on criminal law, juvenile justice, indigent defense, and race and criminal justice.

**Sergio Acosta** is a partner at Hinshaw & Culbertson LLP and is an experienced criminal litigator, investigator, former federal prosecutor, and member of the National Hispanic Prosecutors Association and the Hispanic National Bar Association.

**Victor B. Dickson** is the President/CEO of Safer Foundation, which is a national leader in the fields of community corrections, prisoner re-entry, and workforce development. He worked for more than 20 years in the corporate sector with AT&T and Sprint and in 2014 was appointed to the Illinois Human Services Commission. He also serves on the Illinois Commission to Eliminate Poverty and the Illinois Workforce Investment Board.

**Maurice Classen** is a Program Officer with the MacArthur Foundation, where he focuses his work on public safety, justice, police reform, municipal and neighborhood growth, and policy issues. Prior to joining the MacArthur Foundation, he was a Senior Deputy Prosecuting Attorney in King County (Seattle), Washington.

**Alexa James** is the Executive Director of NAMI Chicago, which is the largest mental health advocacy agency in Chicago and supports those impacted by mental illness. Prior to joining NAMI Chicago, she worked with children and adults living with mental illness, as well as those impacted by poverty and trauma.

**Sybil Madison-Boyd** is the Director of the Learning Pathways Program at Digital Youth Network in DePaul University's College of Computing and Digital Media. Her work addresses barriers to equitable educational outcomes for urban youth through systems change and innovative reform and, for the past 20 years, in partnership with Chicago Public School leaders, teachers, social workers, and students.

Plaintiff's Exhibit 8

# Appendix 2

## Police Accountability Task Force Working Group Members

### COMMUNITY-POLICE RELATIONS

**Leader: Victor Dickson**, Safer Foundation; President and CEO

**Leader: Sybil Madison-Boyd**, DePaul University; Learning Pathways Director, Digital Youth Network

**Leader: Randolph Stone**, University of Chicago Law School; Clinical Professor of Law


**Keith Ahmad**, Law Office of the Public Defender – Cook County; First Assistant Public Defender

**Karina Ayala-Bermejo**, Legal Aid Society of Metropolitan Family Services; Executive Vice President of Human Resources & General Counsel

**Todd Belcore**, Social Change (Chicago International Social Change Film Festival); Executive Director

**Amy Campanelli**, Law Office of the Public Defender – Cook County; Public Defender

**Herschella Conyers**, University of Chicago Law School; Clinical Professor of Law

**Sol Flores**, La Casa Norte; Founding Executive Director

**Craig Futterman**, University of Chicago Law School; Clinical Professor of Law

**Steve Gates**, Youth Advocate Programs; Director

**Benny Lee**, National Alliance for the Empowerment of the Formerly Incarcerated (NAEFI); CEO

**Xavier McElrath-Bey**, Campaign for the Fair Sentencing of Youth; Youth Justice Advocate/ICAN; Co-Founder & Coordinator

**Jonathan Peck**, Alternatives Inc.; Restorative Justice Coordinator

**Howard Saffold**, Positive Anticrime Thrust; CEO

**Rabbi Michael Siegel**, Anshe Emet Synagogue; Senior Rabbi

**Wesley Skogan**, Northwestern University; Professor

**Eliza Solowiej**, First Defense Legal Aid; Executive Director

**Debra Wesley**, Sinai Community Institute; Founder and President

**Richard Wooten**, Gathering Point Community Council; President and CEO

Plaintiff's Exhibit 8

## POLICE OVERSIGHT

**Leader: Maurice Classen**, MacArthur Foundation; Program Officer

**Advisor: Joe Ferguson**, City of Chicago Office of the Inspector General; Inspector General

**Anthony Beale**, 9th Ward, City of Chicago; Alderman

**Sheila Bedi**, MacArthur Justice Center; Attorney

**Locke Bowman**, MacArthur Justice Center; Executive Director

**Mark Flessner**, Holland and Knight LLP; Partner

**Adam Gross**, Business and Professional People for the Public Interest Chicago; Director of Justice Reform Program

**Janine Hoft**, The People's Law Office; Attorney

**Kwame Raoul**, 13th District, State of Illinois; State Senator

**Freya Rigterink**, City of Chicago Office of the Inspector General; Assistant Inspector General

**Ronald Safer**, Riley, Safer, Holmes and Cancila LLP; Partner

**Gretchen Slusser**, Thred Partners; President

## EARLY INTERVENTION & PERSONNEL CONCERNS

**Leader: Lori Lightfoot**, Mayer Brown LLP; Partner

**Anthony Berglund**, University of Chicago Crime Lab; Research Manager

**Craig Chico**, Back of the Yards Neighborhood Council; Executive Director

**Monica Haslip**, Little Black Pearl; Founder and Executive Director

**Daniel O'Neil**, Smart Chicago Collaborative; Executive Director

**Julia Quinn**, University of Chicago Crime Lab; Research Manager

**Dave Williams**, Youth Advocate Programs; Regional Director

## DE-ESCALATION

**Leader: Alexa James**, National Alliance on Mental Illness Chicago; Executive Director

**Fred Coffey**, Chicago Police Department; Former Deputy

**John O'Malley**, United States Marshal Service; Retired Chief Deputy

Plaintiff's Exhibit 8

**Harold Pollack**, University of Chicago School of Social Services Administration; Helen Ross Professor

**Carolyn Vessel**, I AM ABLE Center for Family Development; President and CEO

**Amy Watson**, University of Illinois at Chicago; Associate Professor

**Ronnie Watson**, Chicago State University; Retired Chief of Police


## VIDEO RELEASE
**Leader: Sergio Acosta**, Hinshaw & Culbertson; Partner


**Joel Bertocchi**, Hinshaw & Culbertson LLP; Partner

**Lori Lightfoot**, Mayer Brown LLP; Partner

**Barry Miller**, Illinois Torture Inquiry and Relief Commission; Former Executive Director

**Lisa Plaza**, Hinshaw & Culbertson LLP; Paralegal

**Randy Samborn**, Levick; Senior Vice President (Former PIO for the US Attorney)

**Jeff Urdangen**, Northwestern University Pritzker School of Law; Clinical Associate Professor of Law

**Adam Vaught**, Hinshaw & Culbertson LLP; Associate

Plaintiff's Exhibit 8

# Appendix 3

## Police Accountability Task Force Interviews

Below is a list of the subject matter experts and community members consulted as part of our fact finding. In the course of our work, Task Force and Working Group members consulted with numerous subject matter expects at various points in the process. While we have tried to capture them all here, we have inevitably missed some, and we acknowledge everyone's contributions and apologize for any omissions.

### INDIVIDUALS:

**Keith Ahmad**, Law Office of the Cook County Public Defender; First Deputy Public Defender

**Arif Alikhan**, Los Angeles Police Department; Director, Office of Constitutional Policing and Policy

**Roseanna Ander**, University of Chicago Crime Lab; Executive Director

**Scott Ando**, Independent Police Review Authority; Former Chief Administrator

**Dean Angelo**, Fraternal Order of Police, Chicago Lodge 7; President

**Greg Bella**, Fraternal Order of Police, Chicago Lodge 7; Recording Secretary

**Lucius Black**, Community Renewal Society, Police Issue Team

**Rebecca Boatright**, Seattle Police Department; Senior Legal Counsel

**Merrick Bobb**, Federal Court-Appointed Monitor Overseeing Seattle Police Department and Police Assessment Resource Center; Executive Director

**Brian Buchner**, National Association for Civilian Oversight of Law Enforcement; President

**Alexander Bustamante**, Los Angeles Police Department; Inspector General

**Max Caproni**, Chicago Police Board; Executive Director

**Keith Calloway**, Chicago Police Department; Deputy Chief and Director of Education and Training Division

**Amy Campanelli**, Law Office of the Cook County Public Defender; Public Defender

**Jadine Chou**, Chicago Public Schools; Chief Safety and Security Officer

**Sarah Creighton**, San Diego Police Department; Assistant Chief of Police

**Joseph De Angelis**, University of Idaho; Assistant Professor of Criminology and Sociology

**Kathe Dellacecca**, Sinai Health System; System Vice President for Behavioral Health

**Richard Emery**, New York City Civilian Complaint Review Board; Chair

**Jason Ervin**, City of Chicago – 28th Ward; Alderman

**John Escalante**, Chicago Police Department; Interim Superintendent

Plaintiff's Exhibit 8

**Philip K. Eure**, Office of the Inspector General for the NYPD, NYC Department of Investigation; Inspector General

**Sharon Fairley**, Independent Police Review Authority; Chief Administrator

**Joe Ferguson**, City of Chicago Office of Inspector General; Inspector General

**Pastor Cy Fields**, Community Renewal Society | New Landmark Missionary Baptist Church, Senior Pastor

**Peggy Flaherty**, Thresholds; Senior Vice President, Clinical Operations

**Lorie Fridell**, Police Executive Research Forum; Former Director of Research

**Craig Futterman**, University of Chicago Law School; Clinical Professor of Law

**Mike Gennaco**, OIR Group; Principal

**Mike Golden**, Office of the State's Attorney, Cook County; Assistant State's Attorney

**Maggie Goodrich**, Los Angeles Police Department; Chief Information Officer

**Cheryl Graves**, Community Justice for Youth Institute; Executive Director

**Rev. Christopher Griffin**, Community Renewal Society | First Baptist Congregational Church

**Norris Henderson**, Voice of the Ex-Offender (VOTE); Founder and Executive Director

**Susan Hutson**, New Orleans Office of the Independent Police Monitor; Independent Police Monitor

**Mark Ishaug**, Thresholds; Chief Executive Officer

**Beth Johnson**, Cabrini Green Legal Aid; Director, Legal Programs

**David Johnson**, Franczek Radelet; Partner

**Jeff Jordon**, San Diego Police Department

**Jamie Kalven**, Invisible Institute; Executive Director

**Walter Katz**, Office of the Independent Police Auditor; Independent Police Auditor for the City of San Jose

**Annette Kelly**, FOUS Youth Development Services; President

**David Kennedy**, National Network for Safe Communities; Director

**Dan Kirk**, Office of the State's Attorney, Cook County; First Assistant State's Attorney

**Robert Klimas**, Chicago Police Department, Bureau of Internal Affairs; Commander

**Armand Lemoyne**, Los Angeles Police Department; Sergeant

**Anne Levinson**, Seattle Police Department; Civilian Auditor for the Office of Professional Accountability

**David LeValley**, Detroit Police Department; Deputy Chief

**Lori Lightfoot**, Chicago Police Board; Chair

**Marc Loveless**, Coalition for Justice and Respect; Founding Director

**Jon Lucas**, Seattle Police Department; Sergeant

Plaintiff's Exhibit 8

**Mina Malik**, New York City Civilian Complaint Review Board; Executive Director

**Garry McCarthy**, Chicago Police Department; Former Superintendent of Police

**Todd Miller**, Rave Mobile Safety; Vice President of Public Safety

**Nicholas Mitchell**, Denver Police and Sheriff Departments; Independent Monitor

**Dr. Julie Morita**, Chicago Department of Public Health; Commissioner

**Kim Neal**, Cincinnati Citizen Complaint Authority; Director

**Roger Nunez**, Los Angeles Police Department; Sergeant

**Donald O'Neill**, Chicago Police Department; Director of Human Resources

**Emily Owens**, University of Pennsylvania; Associate Professor of Criminology, Business Economics, and Public Policy

**Stephen R. Patton**, City of Chicago; Corporation Counsel

**Ursula Price**, New Orleans Office of the Independent Police Monitor; Executive Director for Community Relations

**Sheri Richardt**, Advocate Illinois Masonic Medical Center; Management Team, Behavioral Health Services Department

**Dennis Rosenbaum**, University of Illinois at Chicago; Professor, Department of Criminology, Law and Justice

**Ilana Rosenzweig**, Independent Police Review Authority; Former Chief Administrator

**Ralph Russo**, New Orleans Police Department; Insight Project Director

**Dr. Rashad Saafir**, Bobby E. Wright Comprehensive Behavioral Health Center; Psychiatrist/President and CEO

**Ron Reid**

**Seretha Reid**

**Ron Safer**, Riley Safer Holmes & Cancila LLP; Partner

**Bob Scales**, Sanford, Olson & Scales; Partner

**Ora Schub**, Community Justice for Youth Institute

**Michael Schlosser**, University of Illinois at Urbana-Champaign Police Training Institute; Associate Director

**Karen Sheley**, ACLU of Illinois; Director, Police Practices Project

**Andre Simenauer**, Motorola Solutions; Senior Public Safety Solutions Consultant

**Tracy Sitka**, Chicago Justice Project; Executive Director

**Wes Skogan**, Northwestern University; Professor, Department of Political Science, Legal Studies and the Institute for Policy Research

Plaintiff's Exhibit 8

**Brandon Smith**, Journalist

**Sandra Sosa**, Alternatives, Inc.; Restorative Justice Manager

**Dr. Carrie Steiner**, First Responders Wellness Center; Clinical Psychologist

**Flint Taylor**, People's Law Group; Partner

**Michael Tobin**, Office of Police Complaints, Washington D.C.; Executive Director

**Matthew Topic**, Loevy & Loevy; Attorney

**John Vassal**, Office of the State's Attorney, Cook County

**Ciera Walker**, Community Renewal Society, Congregational Organizer

**Samuel Walker**, University of Nebraska – Omaha, School of Criminology and Criminal Justice; Professor Emeritus

**Eric Washington**, Chicago Police Department; Deputy Chief of Community Policing

**Ronnie Watson**, Chicago Police Department; Deputy Chief - Retired

**Vanessa Wesley**, Chicago Police Department; Officer and Coordinator - Bridging the Divide

**Chuck Wexler**, Police Executive Research Forum; Executive Director

**James White**, Detroit Police Department; Assistant Chief of Police

**Alex Wiesendanger**, Community Renewal Society; Director of Organizing

**Camille Williamson**, Adler University; Director of Community Engagement

**Linda Zerwin**, Emergency Telephone System Board of DuPage County; Executive Director

## THE TASK FORCE CONVENED AND MET MULTIPLE REPRESENTATIVES FROM THE FOLLOWING ORGANIZATIONS:

Chicago Coalition for Police Accountability

Chicago Survivors/Chicago Citizens for Change

Civil Rights and Criminal Defense Attorneys

Fraternal Order of Police Chicago Lodge 7

## THE TASK FORCE MET WITH YOUTH FROM THE FOLLOWING ORGANIZATIONS:

Mikva Challenge – Emilo Araujo, Shacretta Bernard, Kristine Hernandez, Dwayne Lewis, Daniel Mercado, Amber Snelling

Precious Blood Ministry of Reconciliation

Sullivan High School

Plaintiff's Exhibit 8

## THE TASK FORCE MET WITH SENIOR STAFF FROM THE FOLLOWING AGENCIES/DEPARTMENTS:

Chicago Police Department – Commanders, Current and Retired Officers, District Advisory Council Volunteers

Chicago Police Department Taser Training Team

City of Chicago Law Department

City of Chicago Office of Emergency Management and Communications

Cook County Public Defender

Cook County State's Attorney

Independent Police Review Authority

Seattle Police Department

Plaintiff's Exhibit 8

# Appendix 4

## Community Relations Working Group Checklist

- The City should engage the National Initiative for Building Community Trust and Justice to implement a "Reconciliation Process" in Chicago. Critical elements of the process involve the Superintendent publicly acknowledging CPD's history of racial disparity and discrimination in police practices and making a public commitment to cultural change required to eliminate racial bias and disparity.

- The Mayor and the President of the Cook County Board should work together to co-sponsor quarterly summits of key stakeholders and community leaders to develop and implement comprehensive criminal justice reform.

- The Mayor and the President of the Cook County Board should work together to develop and implement programs that address socioeconomic justice and equality, housing segregation, systemic racism, poverty, education, health and safety.

- CPD should clarify in its general order prohibiting racial profiling and other biased-based policing whether race may be used to any degree in developing grounds for a stop, other than where race is part of a specific suspect description.

- Through its Data Portal, CPD should regularly release incident-level information on arrests, traffic stop reports, investigatory stop reports and predecessor contact cards and officer weapon use (firearm and nonlethal). To facilitate trend analysis, the incident-level data should reach back at least to January 1, 2010.

- CPD should resume publishing annual reports.

- After the ACLU agreement terminates, CPD should continue supervisory review and audits of investigatory stop and pat-down practices, with oversight by the new Community Safety Oversight Board and Inspector General for the Public Safety.

- CPD should develop and use recruitment, selection and promotion strategies that increase diversity and the likelihood that officers will be culturally competent, fair and impartial, especially when policing communities of color.

- CPD should hire a Deputy Chief of Diversity and Inclusion.

- CPD should adopt and promote a clear, progressive policing philosophy grounded in core values such as respect, protecting the sanctity of all life and protecting civil and human rights.

- CPD should bring in experts and credible trainers to deliver comprehensive training on cultural competence and implicit bias for all recruits, officers and supervisors.

- CPD should involve the community in officer training that includes being trained by and partnering with community leaders, organizations and youth.

- CPD, including the Deputy Chief of Diversity and Inclusion, should analyze deployment strategies to ensure officers are culturally competent and have a proper understanding of the neighborhoods where they are assigned.

Plaintiff's Exhibit 8

- Where possible, CPD should assign more experienced officers to high-crime districts, beats and shifts. If new officers are given these difficult assignments, they should be partnered with experienced officers with exemplary disciplinary histories and the proven ability to work with diverse populations.
- CPD should adopt community policing as a core philosophy.
- CPD should replace CAPS with localized Community Empowerment and Engagement Districts (CEED) and support them accordingly.
- CPD should expand the methods it uses to communicate and work with neighborhood residents.
- CPD should reinvest in civilian organizing staff.
- CPD should renew its commitment to beat-based policing and work to expand community patrols.
- CPD should include information about how the public is being involved and how effectively neighborhood concerns are being addressed in CompStat.
- CPD should evaluate and improve the training officers receive with respect to youths to ensure that all officers are prepared to engage with youth in ways that are age-appropriate, trauma-informed and based in a restorative justice model.
- CPD and CPS should ensure that officers who are assigned to schools have clear job descriptions and expectations that are shared by CPS and CPD, receive extensive and ongoing training on how to engage with youth and crisis intervention and are swiftly reassigned if they fail to meet expectations.
- Train the community in Know Your Rights and Responsibilities, including by:
- Creating a CPS policy and City Ordinance requiring that students receive instruction on how to exercise 4th, 5th and 6th Amendment rights; and
- Create a technology platform to assist with a public service announcement campaign and informational videos in police stations.
- The City should enact an ordinance, and CPD should promulgate general orders:
- Mandating that arrestees be allowed to make phone calls to an attorney and/or family member(s) within one hour after arrest, allowing only for limited exceptions in exigent circumstances;
- Mandating that a legal aid or other provider be contacted within 30 minutes of the arrest of any juvenile, and that CPD wait for legal representation to arrive before any questioning of a juvenile occurs; and
- Confirming that CPD will prominently post information concerning rights to counsel, as already required under state law, and include any willing legal aid provider's name and 24-hour contact information.

Plaintiff's Exhibit 8

# Appendix 5

## Oversight Working Group Flowchart

Plaintiff's Exhibit 8

# CURRENT REVIEW, GRIEVANCE & ADJUDICATION STAGES

## Chicago Police Department

Termination? — No → Command Channel Review (6) → Superintendent Review → CPD member served notice → CPD member accepts discipline? — Yes ▶ End / No → Level of Discipline? → Police Board / Arbitration

Yes → Legal Affairs reviews for legal sufficiency, Superintendent signs, City Corp Counsel drafts changes. Officer is served with separation charges. → Police Board

## Arbitration (7)

**Suspend 1 to 10 days**
Summary Opinion (Paper Review Arbitration)

**Suspend 11 to 30 days**
Is CPD Member an Officer?
- No → Full Expedited Arbitration
- Yes → Grievance or Summary Opinion

**Suspend 31 to 365 days**
Is CPD Member an Officer?
- No → Police Board
- Yes → Police Board or Full Arbitration

## Chicago Police Board (8)

Conducts Evidentiary Hearing and Issues Opinion

**Not Guilty**

**Guilty**
Different discipline imposed
(9) If suspension is reduced to 30 days or less, can seek arbitration | Can appeal to Circuit Court

**Guilty**
Recommended discipline imposed
Can appeal to Circuit Court

Plaintiff's Exhibit 8

# PATF PROPOSAL CHANGES

The Task Force recommendations will significantly streamline and bring much-needed accountability and transparency to the complaint, investigation and adjudication processes. The descriptions of proposed changes correspond to numbers on the Complaint Flowchart diagram to highlight some major areas of reform.

## Current Complaint Triage, Investigation & Discipline Recommendation Stages

**IPRA & CPD BIA**

 The affidavit step, which is an obstacle to the reporting of misconduct, requires investigators' time and resources and leads directly to the closure of numerous cases each year, would be eliminated. Anonymous complaints and a community engagement process would also facilitate easier reporting.

**CPD BIA**

 Improvements to the investigations conducted by individual police districts, such as requiring a consistent investigative structure and updating data and case tracking systems, would streamline operations and improve accountability.

**IPRA & CPD BIA INVESTIGATION PROCESS**

③ The "mediation" program, which presently functions like plea bargaining and preempts a full investigation of the complaint, would be reformed. Mediations of allegations that could result in serious discipline would be prohibited. Additionally, the City would be encouraged to establish a mediation program based on national best practices that involves both police and citizens to promote dialogue and better understanding in accordance with restorative justice principles and objectives.

④ IPRA would be replaced by a more independent Civilian Police Investigative Agency (CPIA). Investigations by CPIA and BIA would be informed by pattern and practice analysis, and would be improved through regular audits by the Inspector General for Public Safety, greater oversight through the Community Safety Oversight Board, enhanced technology and new training. Numerous steps currently mandated by the collective bargaining agreements that hinder the efficiency and effectiveness of investigations would also be eliminated. Examples of current CBA-based practices include allowing officers to amend prior statements after viewing video footage, limitations on when and how interviews of officers may be conducted and limitations on how closed complaint files can be used in disciplinary proceedings.

⑤ The investigative oversight entities (currently IPRA and BIA) would be required to make disciplinary recommendations according to a single, formal, publicly available discipline matrix, thereby bringing more predictability and fairness to the disciplinary system. Additionally, there would be greater transparency in their reporting of investigatory findings.

## Current Review, Grievance & Adjudication Stages

**CPD**

 Command Channel review, a process by which multiple CPD members in the accused's chain of command can recommend changing the finding and discipline recommendation made by IPRA or BIA, would be eliminated. This process adds time to the process and is a redundant layer of due process.

**ARBITRATION**

 Increased transparency and scrutiny would bring much needed accountability to the arbitration process, where the majority of suspension decisions (other than those which are mediated) are ultimately resolved. When IPRA and BIA recommend discipline, arbitrators frequently eliminate or reduce the discipline and only maintain the recommended discipline in a minority of cases.

**CPB**

⑧ There would be greater oversight of termination cases before the Police Board through regular, publicly reported Public Safety Inspector General assessments of disciplinary trends and impediments to imposing discipline.

⑨ The opportunity for sergeants, lieutenants, and captains to challenge a suspension through the grievance process after the Police Board has already issued a decision on the case would be eliminated.

**Plaintiff's Exhibit 8**

# Appendix 6

## Oversight Working Group Checklists

### OVERSIGHT TOP LINE RECOMMENDATIONS

1. The creation of a new Inspector General for Public Safety, which would audit and monitor CPD and the entire police oversight system.

2. The creation of a new Community Safety Oversight Board, which would allow the community to have a powerful platform and role in the police oversight process.

3. The creation of a new Civilian Police Investigative Agency, which would replace the Independent Police Review Authority in investigating serious cases of police misconduct.

4. The implementation of reforms to other components of the police oversight system, including BIA and the Chicago Police Board, to improve investigations and transparency within the system.

5. The implementation of additional reforms to remove roadblocks to accountability, including reforms to improve the mediation program across the oversight entities and elimination of command channel review.

6. Overhaul to the City's collective bargaining agreements with policing employee entities.

Plaintiff's Exhibit 8

## Collective Bargaining Agreement Checklist

The contracts for Sergeants, Lieutenants and Captains expire on June 30, 2016. The FOP contract expires a year later, on June 30, 2017. Preparation for the negotiation of all four contracts is currently under way.

**The following CBA provisions should be removed or revised:**

- The affidavit requirement should be removed so that investigators can identify additional cases of police misconduct.

- Anonymous complaints should be allowed to encourage reporting by those who fear retaliation, including whistleblowers.

- Officers should not be informed of the complainant's name prior to interrogation. There is little need for the officer to know the name of a complainant prior to interrogation if it is later disclosed during the resolution of the case.

- The provisions delaying interviews in shooting cases for at least 24 hours should be revised to ensure that officers are separated and remain separated from other officers until all officers have given statements. The Department of Justice's Consent Decree with the Los Angeles Police Department contains such a requirement. When formal questioning begins, the inquiry will start with a recitation of any and all conversations that the officer has had with law enforcement between the shooting and the commencement of the interview.

- Officers should no longer have a right to amend statements if they have not been provided with the audio or video evidence, and reviews of the footage should not be pre-conditions to charging a Rule 14 violation.

- Investigations of complaints known to CPD for five years or more should not require Superintendent permission. This is an unnecessary rule, as the statute of limitation will apply for criminal matters, and, for administrative matters, the nature and severity of the conduct should determine whether the complaint should be investigated. Should an individual continue to make such decisions, the authority should be vested in someone outside of CPD, such as the Chief Administrator of IPRA (or its successor, CPIA).

- The provision requiring destruction of records should be eliminated. The rule is in tension, if not outright conflict, with general principles of public record-keeping, deprives the public of important information that is rightfully theirs, and may include the destruction of information that serves numerous operational and public policy objectives.

- The provision that forbids CPD from rewarding officers who act as whistleblowers should be removed.

- The CBAs should be amended to require police officers to disclose secondary employment, as other City workers are required to do.

- The CBA dictates the manner in which interrogators can ask questions, which presents an unnecessary burden on interrogators and potentially sets them up to violate the CBA for a technicality. The policy does not appear to comport with any best practices and should be eliminated.

Plaintiff's Exhibit 8

- The CBA requires that officers must be informed of the nature of the allegation prior to interrogation. This provision is presently interpreted very specifically to mean a detailed recitation of the facts that support all possible charges. Moreover, if the officer lies to investigators during the investigation, new allegations must be presented to the officer. This provision should be amended to allow for more general recitation of allegations.

Plaintiff's Exhibit 8

# Civilian Police Investigative Agency Checklist

IPRA should be replaced with a new Civilian Police Investigative Agency (CPIA). The City Council should enact legislation that ensures the new civilian oversight entity is established in accordance with the principles described below.

- **Design an open and public selection process for a Chief Administrator.**
  The new Community Safety Oversight Board should select the Chief Administrator. It is important that CPIA be perceived as legitimate; the selection of this position should be insulated from politics, transparent and widely inclusive. The selection process should also include multiple opportunities for significant community input that will be seriously considered by the selection committee.

- **Establish selection requirements for the Chief Administrator and investigators to avoid bias.**
  In order to prevent bias (and the perception of bias), previously sworn employees of CPD (and non-sworn employees who have worked for CPD within the past five years) and the Cook County State's Attorney Office should be prohibited from serving as investigators and/or the Chief Administrator. Individuals who hold these positions must reflect the City's diversity.

- **Provide a grant of jurisdiction that ensures that CPIA is informed by community complaints.**
  CPIA must be empowered to investigate the issues that are of most pressing concern to the community. CPIA's jurisdiction should be expanded beyond IPRA's current jurisdiction to include unlawful search and seizures and denial of access to counsel. At the end of CPIA's first year of operation, an outside, independent entity should evaluate whether the expanded jurisdiction of CPIA is appropriate and achievable.

- **Establish a clear, easy-to-understand mission statement.**
  This is essential to provide civilians and officers with a fair and impartial complaint system and to employ the preponderance of the evidence standard when deliberating on complaints.

- **Remove barriers to accountability.**
  No credible allegation should be ignored because of technical complaint submission requirements (like an affidavit requirement) or because the civilian involved is hesitant or unable to provide a complaint form. The Chief Administrator should be empowered to investigate any incidents that fall under her jurisdiction, even in the absence of sworn complaints. Complaints must be accepted from anyone with personal knowledge of the incident. The Chief Administrator may launch investigations based on any credible source, including media accounts, a review of use of force reports or referrals from other oversight entities.

- **Gather and leverage data generated by civil litigation and criminal motions to suppress to learn more about trends in citizen complaints.**
  The civil rights and criminal defense bars in Chicago have, through decades of litigation, developed rich data regarding CPD policy and practice. This information has largely been untouched by the various oversight entities. This represents a significant missed opportunity to ensure accountability. CPIA should be charged with investigating the facts of all civil lawsuits, which, if submitted as a complaint, would fall under its jurisdiction. Further, CPIA should develop a process to gather the facts contained in all criminal motions to suppress that allege facts, which if submitted as a complaint, would fall under its jurisdiction to determine if a full investigation is warranted.

Plaintiff's Exhibit 8

- **Establish clear lines of jurisdiction.**
  Misconduct investigations often reveal multiple layers of wrongdoing. For example, in a use of force investigation, it may become clear that an officer filed a false police report. CPIA does not have original jurisdiction to investigate false reporting, but, if the false reporting is related to a force investigation, the monitor should be empowered to investigate it and issue appropriate findings.

- **Empower CPIA with the authority needed to investigate.**
  CPIA must have the ability to collect evidence, conduct prompt interviews, subpoena witnesses and enforce its subpoena power by retaining outside, independent counsel. This is an existing power within IPRA and should be continued in a new body unabated.

- **Civilian oversight should run currently with criminal investigations.**
  In the past, IPRA investigations have consistently stalled while the Cook County State's Attorney determined whether or not it would move forward with criminal charges under the same set of facts as IPRA was investigating. The practice led to long delays in investigating and resolving IPRA's cases after the State's Attorney's Office closed its investigation. This need not be the case. While it may sometimes make sense for an IPRA investigator to pause her or his investigation to preserve the integrity of the criminal matter, this rule is not universal. Rather, it is better practice to presume that the matters should be run concurrently, and both entities should meet regularly to determine if one or the other investigation should be paused during the process or, in the ideal, if both cases can be investigated at the same time.

- **Ensure an accessible, safe and comfortable complaint process.**
  Civilians must be able to file complaints via the internet, over the phone and in their communities. The new body should use national models, such as New York City's Civilian Complaint Review Board, which has developed a model of hosting meetings within city neighborhoods on a posted rotating basis to take and verify complaints.

- **Conduct community education regarding rights and the oversight process.**
  CPIA must be responsible for launching a public education/community engagement campaign that educates the public about their rights and the complaint/investigative process.

- **Establish community oversight over CPIA.**
  CPIA must be legitimately accountable to members of the community. The community must have the power to require that CPIA hold public hearings through the new Community Safety Oversight Board, CPIA must develop (and be responsive to) a civilian feedback process, and CPIA must be audited by an independent third-party entity selected by those on the selection committee if an auditing function is not otherwise available in the City. Additionally, CPIA must hold regular community meetings to inform the public of its actions.

- **Proactively prevent abuse and misconduct through policy and practice recommendations and use-of-force analyses.**
  CPIA must conduct pattern and practice analyses both proactively and reactively where it has subject matter jurisdiction. This should include proactive analyses of potential patterns of police misconduct that are within its subject matter jurisdiction, including information found in court filings, judicial findings, internal CPD documents and incidents where individuals were charged with offenses commonly believed to cover up police misconduct (such as assault on a police officer, disorderly conduct, resisting arrest and misconduct investigations), and other potential pattern evidence, and the

Plaintiff's Exhibit 8

establishment of a transparent process (that is informed by community concerns) for CPIA to make training, policy, and procedure recommendations to CPD. In turn, CPD must publically respond to these recommendations.

- **Operate with complete transparency.**
  CPIA must prioritize keeping the public informed by posting summary reports of each completed investigation; publishing comprehensive annual reports on its work; and establishing a transparent process to make training, policy and procedure recommendations to CPD and a transparent process to make public CPD's response. CPIA should also promptly respond to all requests from the new Community Safety Oversight Board.

- **Provide resources to be rigorous and independent.**
  In order to provide sufficient oversight and meet the demands of an expanded jurisdiction that includes explicit obligations regarding community engagement and policy and practice recommendations, CPIA must have sufficient resources, and those resources should, to the extent possible, be insulated from the political process. CPIA's funding should be a percentage of CPD's budget so that the office cannot be defunded. This funding should provide CPIA with sufficient resources and powers to conduct prompt, unbiased and independent investigations into police misconduct that are of the highest quality. Best practices within the field indicate that the budget should be tied to 1% of CPD's budget and/or a ratio of 1 CPIA investigator for every 250 sworn CPD officers.

- **Provide complainant support.**
  CPIA should provide supportive services to complainants, including regular updates regarding the investigation, information about the process and outcomes and referrals to outside service providers when needed. All of the investigators who work for CPIA and BIA should be trained to work with victims of trauma and taught to conduct victim/trauma-sensitive interviews.

- **Develop and adopt standardized penalties.**
  As with other oversight entities, CPIA should adopt a discipline matrix, a national best practice that determines a fixed set of penalties for behavior and history. A matrix has been used informally at IPRA for over a year and should be formally reviewed and adopted.

- **Establish penalties for CPD's failure to cooperate.**
  Require CPD to fire officers who lie during misconduct investigations. Require CPD to fire and refer for criminal prosecution any officer who retaliates against any person who reports police abuse.

- **Ensure the appropriate use of the mediation program.**
  CPIA should establish clear and bright line rules regarding the cases and procedures for its mediation program. To the extent possible, CPIA should create a program that is in line with national best practices for mediation for citizen oversight organizations.

- **Address limits imposed by the CBAs.**
  Require that the collective bargaining agreements conform with rigorous, transparent and accountable civilian oversight.

Plaintiff's Exhibit 8

## IRPA Recommendation Checklist

We recommend that IPRA should continue to conduct police misconduct investigations until CPIA is able to assume responsibility for those investigations. During this interim period, the following actions should be taken:

- **IPRA should contract with an independent, third-party entity**, such as the Police Assessment Resource Center (PARC) or the National Association for Civilian Oversight of Law Enforcement (NACOLE), to conduct an ongoing audit of IPRA's operations and to audit each completed investigation prior to finalization. IPRA staff should defer to the outside entity's findings regarding deficiencies in investigative practices and findings.

- **IPRA should immediately begin implementing, where possible, the transparency** requirements recommended for CPIA.

- IPRA, with oversight and guidance from the City of Chicago Inspector General and the incoming Chief Administrator of CPIA, **should begin the process of drafting a series of transition memos** that will attempt to memorialize institutional knowledge regarding technology infrastructure, complaint intake processes, investigative protocols, interactions with the police department, and all other topics identified as critical to a successful transition to CPIA.

- **IPRA should engage in the community outreach activities** described for CPIA.

- **IPRA should review and clarify its process and criteria for the affidavit override process and keep data related to it.** IPRA should also be more proactive in seeking affidavits. Investigators used to actively seek out the affidavits, sometimes even knocking on doors. Investigators now play a much more passive role and have placed the burden on the complainant.

- **IPRA should develop and adopt a clear discipline matrix** that provides a range of potential penalties for different types of misconduct, along with aggravating and mitigating factors that can be considered.

Plaintiff's Exhibit 8

## Independent Inspector General for Public Safety Checklist

Based on our review of the national experience with police oversight generally and police auditing specifically, we have concluded that Chicago would benefit tremendously from the creation of an independent monitoring entity. The creation of this position would greatly enhance the transparency, accountability and quality of the oversight structure. The Task Force recommends that the new entity be housed within the City of Chicago Office of the Inspector General because it already has relevant expertise, the general authority to conduct this work and has begun to audit some police department functions and build up institutional knowledge. We also recommend the following related to the new Inspector General's powers and obligations:

- **Give the inspector general a broad scope of authority to review and make recommendations.** Enabling legislation should follow the models set out in Los Angeles, Denver and New York, where the inspector general or monitor's powers are defined in broad terms, rather than providing a list of narrow functions, which could be interpreted as significantly restricting the auditor's authority. The enabling legislation should leave no doubt that the inspector general may perform the functions laid out below. While the inspector general would have the power to make findings and issue recommendations, the inspector general could not override the decision of another investigative body.

- **Auditing/Monitoring/Reviewing individual cases.** While CPD and IPRA or its successor have primary responsibility for investigating civilian complaints and incidents involving death, serious injury or serious use of force, the inspector general would work to ensure the quality and integrity of individual investigations.

  - The inspector general should be authorized not just to raise concerns about the quality and integrity of an investigation generally, but also about the quality and integrity of specific findings from the investigation.

  - The inspector general should be empowered to request that individual investigations be expanded or reopened. If CPD or IPRA (or its successor) does not expand or reopen the investigation, or complete it to the satisfaction of the inspector general, the inspector general's office should be authorized to conduct additional investigation.

  - When investigations into serious uses of force do not result in sustained findings, the inspector general should be required to work with IPRA (or its successor) and CPD to conduct Force Analysis Panels to determine if the incident revealed any systemic deficiencies in training, policy, supervision, or equipment.

- **Auditing and Monitoring patterns of police activity and complaints.** When reviewing complaints and data about police behavior, the inspector general should be empowered to examine not just individual incidents as described above, but also information in the aggregate. The inspector general should identify patterns, determine whether the patterns reflect systemic problems, and, if so, make recommendations about how to address them.

  - Pattern analysis should include, but not be limited to: officer use of force; police shootings; use of Tasers or any weapon used to inflict pain and/or gain compliance; citizen complaint log numbers; and potential bias, including, but not limited, to bias in policing related to race, ethnicity, gender, sexual orientation, gender identity and geography.

  - Pattern analysis could also include reviewing all sustained findings and discipline recommended by IPRA or its successor, the Police Board and BIA in order to assess disciplinary trends, to determine

Plaintiff's Exhibit 8

whether discipline is consistently applied and fair, and to determine whether final disciplinary decisions are being executed as resolved.

– Pattern analysis could also include analyses of citizen complaints, use of force, lawsuits, and other relevant data to identify individual and groups of officers who may be engaged in a pattern of misconduct.

- **Auditing operations, policies and procedures.** The inspector general should have broad authority to review police operations, policies, supervision, training and procedures. The goal is to review and analyze all relevant information (including litigation and settlement data) in order to identify systemic patterns and problems, including, but not limited to, those that may correlate to race, ethnicity, gender, sexual orientation, gender identity and geography, and propose changes in policies and procedures, training and supervision.

- **Provide broad power to initiate audits.** The inspector general should not be required to seek approval to conduct any specific audit or investigation. Enabling legislation should incorporate language like Los Angeles' "The Inspector General is empowered to initiate and conduct investigations of the Department, without limitation as to the type of the activity of the Department, including on-going and in-progress matters."

- **Oversight authority should not be limited to CPD.** The inspector general should be authorized to make recommendations for all departments whose work directly affects CPD operations, including, but not limited to, IPRA (or its successor), the Police Board, OEMC, the Fire Department and the City's Department of Law.

- **The inspector general should serve for a fixed term and should only be removed for cause.** City ordinance should establish a fixed term of office for the inspector general, though, at the conclusion of a term, an inspector general could be considered for reappointment. The removal process should also require a City Council hearing. These provisions will make it much more difficult to remove the inspector general for political reasons and will make it easier to issue critical reports without fear of reprisal.

- **Job qualifications should be established.** There should be clearly articulated educational and employment history requirements for leadership positions. Job qualifications could include relevant certification. In addition, in order to prevent bias and the perception of bias, former police officers should be prohibited from serving as inspectors general.

- **There should be public engagement in the selection process.** The selection of an inspector general must incorporate meaningful community input. The City of Chicago Inspector General should have the ultimate authority to hire the Inspector General for Public Safety, but the process should include extensive public engagement. At minimum, CPIA should have an opportunity to review applications and interview finalists, and finalists should be required to participate in several public forums where they would answer questions from the general public. The position should require City Council confirmation. It is essential that the selection process be perceived as fair, open and uninfluenced by politics, and that it include genuine opportunities for community engagement.

- **There should be public engagement with the office of the Inspector General for Public Safety.** Either the civilian oversight entity should have regular meetings with the Inspector General for Public Safety to facilitate communication with the broader community, or a Citizen Advisory Board should be

Plaintiff's Exhibit 8

created for the Inspector General for Public safety for this purpose. The civilian oversight entity should have the authority to request that the inspector general perform an audit into a particular area. In addition, the inspector general should have a community outreach staff and budget. The outreach should include public events to solicit feedback and input on the auditing entity and its work and public education initiatives to inform the public about the office and the scope of its work. The outreach should include both youth and adult populations. Engagement and outreach will help to ensure that people have enough information to take full advantage of the office's skills and capacity, especially in communities where trust in CPD is lowest. A civilian oversight entity or Civilian Advisory Board and a committed, engaged, sensitive and thoughtful community outreach staff can help to ensure that the office reaches its full potential.

- **The office of inspector general must be authorized to legally represent itself, including as necessary, retaining outside, private legal counsel** in any legal matter, enforcement action or court proceeding when the inspector general determines that the City of Chicago's Corporation Counsel would have a conflict in representing the interests of the inspector general.

- **The inspector general must have sufficient resources to meet the substantial demands of the office.** Additional research should be conducted to determine an appropriate funding and staffing level, but our assessment based on the interviews we have conducted so far suggests that the office should maintain a ratio of approximately 1 staff person for every 250 sworn officers, with sufficient discretion vested in the Inspector General to determine the appropriate balance of staffing levels and qualifications.

- **The budget should be insulated from politics.** City ordinance should mandate a specific staffing ratio and require funding to provide for that staffing level. The ordinance should establish a minimum annual budget for the office.

- **City ordinance must specify that the inspector general have unfettered access to data from CPD, IPRA (or its successor) and other agencies such as the law department, except where the law prohibits it, and that access must be clearly spelled out in legislation.** Access to data must include direct access to CPD databases and, to protect the integrity of investigations, the ability to use information from the databases in a way that is invisible to CPD. The access to data must include litigation and settlement data, data from body and car cameras and early warning system data. The inspector general should have direct access to information wherever possible, and the rest should be provided in a timely fashion unless a written explanation is provided. There should be a presumption of disclosure. The City should consider including a provision that permits sanctions in the event that any entity fails to cooperate in any request for data. The inspector general should be provided documents without charge.

- **The ordinance should include affirmative obligations for some law enforcement-related officials to share specified information with the inspector general.** For example, IPRA or its successor and BIA should be required to report monthly to the inspector general any problems and deficiencies relating to CPD's operations, policies, programs and practices that would reasonably be expected to adversely affect the effectiveness of the department, public safety, the exercise of civil liberties and civil rights, or the public's confidence in the police force.

Plaintiff's Exhibit 8

- **The ordinance should specify protections afforded to sources in order to prevent retaliation and encourage people to come forward with information.** City ordinance should require the inspector general to keep confidential the identity of a complainant, as well as all information and documents, except when necessary for the inspector general to carry out its duties and when the law so requires. Among other things, the City should not be able to subpoena the inspector general's notes of interviews with complainants. City ordinance should also prohibit retaliation against any employee who has contact with the inspector general. If retaliation is suspected, the inspector general should be authorized to open an investigation into the matter and issue a complaint to the appropriate entity.

- **The inspector general should be required to produce an annual report.** The report should summarize the audits and investigations conducted in the past year, reporting the analysis of information including patterns and trends, the outcomes of individual investigations/complaints and all recommendations. Annual reports should also provide status updates on the adoption of previous policy recommendations. All reports should be available to the public on the inspector general's web site.

- **The inspector general should be required to prepare a written report for every investigation, review, study or audit it conducts, including any recommendations that come out of the investigation, review, study or audit.**

- Though the inspector general should have broad discretion to initiate investigations about anything within the scope of its jurisdiction, **the inspector general should also be required to perform regularly scheduled audits on certain subjects**, including but not limited to:

  – sustained findings and discipline recommended and implemented by IPRA or its successor, the Police Board, and BIA in order to assess trends, consistency, fairness, and whether final disciplinary decisions are being executed as resolved;

  – citizen complaints and investigations, use of force, lawsuits and settlements to identify individuals and groups of officers who may be engaged in a pattern of misconduct and to identify areas for reform; and

  – video footage from officer body and officer car dashboard cameras to evaluate whether they are fully operational and being used according to policy and to ensure that all possible officer violations of CPD policy and/or law captured on video footage are properly investigated.

- **The inspector general should be required to provide reports to the City Council prior to any vote regarding a payout providing information on litigation and settlement trends, as well as any information or trends regarding the officer or supervisor involved.**

- **The CPD Superintendent or head of any entity that is the subject of recommendations should be required to publicly respond to reports in writing within 60 days of the issuance of the report.**

- **The inspector general should provide the City Council with an analysis of the complaint history of those officers who are the subject of potential civil lawsuit settlements before the Council considers said settlement proposals.**

Plaintiff's Exhibit 8

## Community Safety Oversight Board Checklist

We propose the creation of an entity compromised of community representatives that will have the power to oversee CPD, its BIA, the new CPIA and all other police oversight mechanisms. The particular powers of this Community Safety Oversight Board and the process for selecting its members should not be decided until the Mayor and City Council hold full and robust public hearings on the topic and fully vet the design and implementation of this critical body. Though we do not provide a specific design and implementation process for the Board, the Task Force makes the following general recommendations about powers and responsibilities:

- Selecting the Chief Administrator of the new CPIA and conducting public hearings to make the selection.
- Requesting that the Inspector General for Public Safety perform specific audits and analyses of the policies, procedures and practices of CPD, CPIA and the Police Board that the community does not believe are being adequately addressed, and issuing recommendations based on the findings, to which CPD or the relevant agency must respond.
- Requesting that the Inspector General for Public Safety perform specific audits of CPIA and BIA investigations of serious cases of alleged police misconduct or the use of force to promote the quality and integrity of the investigations.
- Directing CPD, CPIA and the Police Board, through requests to the Inspector General for Public Safety, to collect and share data to facilitate community oversight.
- Analyzing all sustained findings and discipline recommended by CPIA, BIA or the Police Board to assess disciplinary trends, determine whether discipline is consistently applied and fair, and determine whether final disciplinary decisions are being executed.
- Conducting public hearings on any and all matters related to the CPD and its oversight entities.
- As representatives of the broader community, holding frequent public meetings.

Plaintiff's Exhibit 8

## Selection Methodology for Community Safety Oversight Board

In selecting Community Board members, it will be critical to establish a process that maximizes the Board's independence, ensures transparency and provides accountability to the public. The Task Force considered five methods for selecting Board members. In sum, the Task Force considered elections, City Council or Mayoral appointments, a third-party application process and hybrid versions of these options:

- **City Council Appointment.** This model would follow an extensive process of public application among a number of citizen constituent groups (noted below), hearing and selection, with the determination of eventual selection made by the Council, which could manage it through one or more of its standing committees (e.g., the Police and Fire Committee and the Human Relations Committee) or working through or in conjunction with a non-partisan external body with expertise in community relations and/or police accountability. One advantage of this model is that it would leave to the most locally elected political actors the determination of balance and inclusivity of representation across the broad array of constituent groups and interests directly impacted by policing and police accountability.

- **Inspector General (IG)/third-party body Appointment** (the "good governance" actor model). This model would follow the same selection process as highlighted above but would leave the application process and ultimate selection to an entity somewhat removed from City government. This model could include a selection committee run by the inspector general's office or the Better Government Association, with eventual ratification by the City Council. The model is attractive as it is removed from government, but that same attribute may also lead to a delegitimization of current bodies.

- **Election.** A process by which each member of the Board is elected by district or neighborhood, arriving at a fully representative body. This model does not exist, has not been successfully implemented anywhere else in the country, and is disfavored because it brings with it a host of challenges, which include being susceptible to cooptation by pre-existing power structures, use by individuals looking for a political springboard and a potential lack of diversity. Additionally, the cost and political nature of this process lead us to be concerned about this approach.

- **Mayoral Appointment.** This model would involve a public application process and eventual appointment by the Mayor. This method would accord with recent practices in such cities as Seattle and Cleveland, which have recently undergone Department of Justice investigations. However, in our current political climate, it is likely this process would be perceived as highly influenced by politics. Thus it is not recommended.

- **Hybrid Model.** Some hybrid of the foregoing options.

- As part of the selection process in the Mayoral, City Council or third-party selection processes, candidates will submit their applications to a specified office to ensure proper qualification. These applications will then be posted to the internet and nominated by a proscribed process (e.g., for every vacancy on the Board of the civilian oversight entity, the screening committee will interview candidates and recommend three people, who would participate in a series of public hearings to present their credentials and answer questions from the selection committee and the public). The Mayor/City Council/third-party would then select/vote for one of three nominated candidates for each position, or the selection committee would approve them.

Plaintiff's Exhibit 8

## Selection for Community Safety Oversight Board Checklist

Whether selected by the Mayor, the City Council, a third party or otherwise, the membership of the Board would include the following:

- **9 to 11 members** (an odd number) selected from across the City, representing various communities and a cross-cut of interests.
- 2-year (or 4-year) terms that are **staggered to ensure regular review of the membership**. Individuals will have to apply to be reappointed and max out after two or three terms.
- **Diversity requirements stated expressly to require inclusion** of representatives of each of the following communities: faith, LGTBQ, immigrant, previous complainants about police abuse, youth, civil rights advocates and neighborhood leaders. There will also be requirements for geographic diversity, as well as one representative each from the Mayor's office and CPD (retired or active).
- **No payment for participation.**
- The members must be residents of Chicago, **cannot be employees, officials or appointees of the City** or its delegate agencies or affiliated non-for-profits, and cannot have run previously for public office.
- Meetings and **votes for the body will be public.**

A coalition of community groups has proposed the creation of a Civilian Police Accountability Council (CPAC) to establish direct community oversight over CPD. The proposal here strives to honor the principles established by CPAC. We recommend that, as soon as possible, the City Council hold public hearings with the goal of developing the specific details of the Board—based on direction of the community—and selection of the Board members within 90 days of the start of the hearings. Among the issues, these hearings should address:

- The role and responsibilities of the Board.
- The selection of those involved in the Board, including, but not limited to, the feasibility of electing representatives to fill certain roles.
- The staff and resources that will be made available to the Board.

### *Remaining Recommendations*

- CPD should create a hotline for department members, whether civilian or sworn, to lodge complaints, and develop a third-party system for the processing and follow-up of all comments and complaints reported to the hotline.
- BIA should be given the resources and staff it needs to conduct effective investigations, exercise more oversight over district investigations and increase the transparency of investigations.
- CPD and IPRA/CPIA should finalize a discipline matrix and all oversight entities should be required to follow it when recommending or imposing discipline.
- CPD should develop standards regarding when options may and may not be granted by the Superintendent.

Plaintiff's Exhibit 8

- Command Channel review should be eliminated entirely, and Superintendent review of BIA cases should also be limited to 90 days, like with IPRA.

- The City and CPD should ensure that the arbitration process should be subject to oversight.

- The City should conduct further analysis regarding the role of prosecuting attorneys in Police Board proceedings and whether they are sufficiently supported and best situated to prosecute cases of police misconduct before the Board.

- The City must ensure that the disciplinary process be made fully transparent.

- The City should disclose more information on police misconduct settlements to the City Council and the public.

- To avoid conflicts in police misconduct cases and other matters, the City Council should enact legislation that permits it to hire its own General Counsel to provide legal services and advice on legislative, policy and litigation matters.

- The City should advocate for new state legislation that would require the appointment of an independent prosecutor, separate from the State's Attorney, to handle all phases of any prosecution of any case in which a police officer is charged with causing death or great bodily harm without justification.

- The State's Attorney should be required to provide oversight bodies with evidence of police misconduct that is not the subject of an ongoing prosecution.

- Further research into the Policemen's Annuity and Benefit Fund is required to determine if additional changes in law and policy can ensure that police officers are not rewarded for official misconduct.

Plaintiff's Exhibit 8

# Appendix 7

## Early Intervention & Personnel Concerns Working Group Checklist

- CPD leadership must take ownership of accountability issues and order the design and implementation of a mandatory EIS that centrally collects data across a broad range of data points to capture information on the totality of officer activity.
  - CPD's EIS must be non-disciplinary in nature.
  - CPD's EIS should track all available data on officer activities.
  - CPD's EIS should use peer-to-peer data comparisons to identify which officers receive interventions.
  - Create a structured, tiered program where interventions are appropriate, escalate proportionally and are timely.
  - CPD's EIS should track officer transfers and require supervisors to review and acknowledge data on new officers who are transferred onto their assignment.
  - CPD's EIS should require ongoing monitoring of interventions and develop an assessment tool to continuely examine the program for improvement.
- CPD must make support and training of supervisors a top priority and create policies that hold supervisors accountable for the conduct of their officers.
  - Provide training to supervisors on their responsibilities and obligations as the first-line of defense in accountability generally and in the EIS process specifically.  This means, at the very least, providing mandatory training and talking points that help guide supervisory interventions with officers.
  - Integrate regular accountability measures for supervisors to incentivize buy-in to the new system.  As part of that effort, CPD should integrate supervisor responsibilities for EIS and personnel management into the testing and promotional requirements.  Also, CompStat meetings must be expanded immediately to include information about personnel actions, and supervisors should be held accountable for the performance indicators of their officers, just as they currently are with crime statistics and trends.
  - Provide greater support to supervisors in their management roles.  All sergeants, lieutenants, captains and Commanders should be trained in managing the well-being of officers under their command and be compelled to use the dashboards that track officer activity.
- The individual in charge of human resources at CPD must be an expert in the field of human resources and related personnel maters.
- Until a fully automated EIS program can be implemented, CPD should create a manual intervention system, which undertakes an immediate assessment of officer fitness for duty.
  - CPD, working with IPRA and/or the new CPIA, and with reference to the time period January 1, 2010 – January 1, 2016, should immediately identify officers (1) with 10 or more CRs, whether or not an affidavit was completed; (2) who have a pattern of missing court; or (3) have been named in two/three or more lawsuits during this time period.
  - During this time, CPD should conduct monthly meetings with the State's Attorney, Public Defender, Presiding Judge of Criminal Division, City Law Department and, separately, Chief Judge of the Northern District of Illinois for the purpose of determining any adverse findings against police

Plaintiff's Exhibit 8

officers that bear on credibility, training issues or patterns of behavior. All information gathered should be factored into the manual intervention system.

– Any officers identified through these methods should be assessed for placement in BIS, PC or some other form of individualized work plan that involves their chain of command.

- The EIS program should include community outreach efforts by providing public access to data generated by the EIS program and inviting community stakeholders to CompStat-type meetings to discuss EIS data and outcomes.

– Publish, on a monthly basis, aggregate data on the following: new and pending complaints by unit, disciplinary actions, missed court dates, new civil legal proceedings against officers, new criminal legal proceedings against officers, vehicle pursuits, vehicle collisions, uses of force, employee commendations, uses of firearms, injuries to persons in custody, judicial proceedings where an officer is the subjective of a protective or restraining order, adverse judicial credibility determinations against an officer, or disciplinary actions.

– Establish a regular community-inclusive meeting to share data and insights from EIS.

Plaintiff's Exhibit 8

# Appendix 8

## Early Intervention System – Identifying Triggers

### I.    OVERVIEW

The hope for an EIS system is to improve relations between police and the community, reduce officer misbehavior, and save both taxpayer dollars and the career prospects of individual police officers. Many police departments around the country now employ these tools, including several departments that are working with the Department of Justice. However, one limitation of most EIS systems is that they are not validated—the way they select officers to receive additional non-disciplinary supports is not based on any real data or empirical evidence about what indicators actually predict which officers will engage in unproductive practices or future misconduct. The University of Chicago Crime Lab intends to work closely with CPD in the coming months to develop such a data-driven system.

### II.    CHALLENGES TO BUILDING PRODUCTIVE EARLY INTERVENTION SYSTEMS

EIS tools are only as useful as they are accurate. Every police department has limits on resources that can be used to provide non-disciplinary supports to officers. EIS systems that recommend services to officers who are actually at low risk of engaging in misconduct waste valuable resources that could have benefited another officer to a greater degree. And EIS systems that fail to recommend officers who are truly high risk miss an opportunity to help that officer as well as the rest of the department and community at large. Many reports have noted that these are challenges with many EIS systems that are in operation around the country.

Perhaps the main reason so many EIS tools have low predictive accuracy is that they are not validated, which means that the "triggers"—or thresholds of behavior that automatically initiate an intervention targeted toward an officer—were not developed by using data to determine statistically which early indicators are truly predictive of future misconduct or unproductive performance. Instead many EIS triggers are simply set at certain levels because departments, unions, and the Department of Justice decided on them based on educated assumptions—that is, based on guesses.

A different challenge for every EIS system is that typically we do not have access to "ground truth" measures of officer misbehavior or any other aspect of officer productivity. Many measures that are used in EIS systems capture whether a given police action resulted in a bad outcome. But given the inherent challenges of policing, particularly in big-city, high-crime environments, even correct police actions will sometimes result in bad outcomes. What an EIS system would ideally wish to predict is inappropriate police actions, rather than bad outcomes.

A third challenge for EIS systems is difficulty in isolating the contribution of the individual officer from the potentially confounding effects of the specific job assignment or context in which the individual is working. The challenge is analogous to one that is frequently encountered in the education field, where focusing on measures of teacher performance (like the test scores of students in a teacher's classroom) runs the risk of conflating the contribution of the teacher-to-student learning from the contribution of community social factors that affect student outcomes and are beyond the control of the teacher. If a performance system does not adequately control for differences among teachers in the socio economic

Plaintiff's Exhibit 8

and related challenges faced by the students in the teacher's classroom, the result will be to effectively penalize those teachers that choose to take on the most challenging assignments.

A similar problem arises in the case of policing, where a good EIS system should not disincentivize officers from choosing to work in the most challenging jobs and communities where arguably the importance of and need for high-quality policing is the greatest. Some EIS systems try to address this problem by making "peer-to-peer" comparisons. One challenge with this approach is that the actual "task" that a given officer undertakes—both in terms of its potential productive value for society, and its risk of an adverse outcome—can vary enormously even within job assignments, police beats, and shifts (for example, due to differences in the amount of self-initiated activities that officers undertake). We refer to this as the "task confounding" problem. Attempts to address this task confounding problem by accounting for officer activity often rely on fairly crude measures, such as arrests made, which inevitably miss many other aspects of variation across officers as to what they actually do on the streets. Ultimately, a good performance measure has to take the features of task and context into account.

## III.   BUILDING A NEW EIS TOOL IN CHICAGO

A top priority for any new EIS tool for CPD would be to make better use of the rich set of data that the department collects to build a tool that is as accurate as possible in predicting future officer behavior. The key outcome that existing EIS tools within CPD are currently oriented around is to predict which officers will be fired by the department in the future. A different type of outcome that many EIS systems predict, including many of the EIS systems developed by departments working under a consent decree with the Department of Justice, is some indicator of an officer's use of excessive force. There is a long list of officer behaviors that could, in principle, be predictive of those outcomes. Which behaviors are actually most predictive in practice is a statistical question.

The University of Chicago Crime Lab will work closely with the CPD to try to build the most accurate possible validated EIS, using the best possible analytic techniques, including new methods from the computer science field of machine learning or statistical learning.

One challenge in forming accurate predictions of which officers might benefit from early intervention is the sheer quantity of candidate indicators that could potentially be considered. The City of Chicago collects vast amounts of information about individual officers and policing outcomes that are distributed across multiple different data systems. These include various measures of misconduct originating from BIA, IPRA, and the department's automated complaint system (AutoCR), which includes allegations that have been founded as well as those that have not. The City also collects measures of officer activity while out on the street (arrests, guns confiscated, field interrogations conducted, use of force), in court (including disposition of court cases, or even attendance rates at court), and other aspects of job performance, such as commendations received or use of medical leave. Most EIS systems focus on just a subset of these candidate predictors, chosen through some combination of professional judgment (that is, a best guess) and other practical or political considerations. There is no guarantee that the subset of candidate predictors that are selected in this way is the most predictive possible set of predictors—which, in turn, means that the EIS system that results is not nearly as effective as it could or should be.

Machine learning provides a powerful technique to search over very large numbers of candidate predictors to find the optimal combination that is the most predictive, given the data that are available.

Plaintiff's Exhibit 8

These tools are built by assembling information about the experiences of previous officers while on the force at CPD, and allowing the data to determine which patterns of behavior or outcomes are predictive of outcomes such as being terminated by the department in the future or being found to have used excessive force. The tool can then help flag similar patterns that arise to individual officers in the future who could then be diverted to non-disciplinary supports to reduce the chances that they wind up either harming the public, themselves, or their own prospects at a successful career at CPD.

Machine learning also has distinct advantages over traditional statistical methods given its ability to detect subtle patterns among variables that would never occur to a human data analyst. As an example, previous job records predict how well individuals perform as officers, but only for officers below a certain age. Traditional statistics would require the analyst to know and specify this interactive effect, whereas statistical learning algorithms could discover that age and previous job, together, hold predictive power.

In building an EIS tool with machine learning algorithms, we address the task confounding problem through two steps. First, whenever possible, we will incorporate fine-grained features of the task (such as beats in which the officers are working, the shift, the time of year, and indicators of individual officer activity levels) into the model. Controlling for these differences will help facilitate comparisons of officers facing similar circumstances. Second, whenever possible, we plan to predict a measure of officer performance as reflected in CPD's own disciplinary and personnel decisions. For example, we can predict which officers will be fired by CPD, which is the focus of the department's current EIS. Analogously, we can predict which officers will face sustained complaints of misconduct. The presumption behind this approach is that CPD, IPRA and other related actors have already invested resources in investigating these situations, and the resulting decisions take into account the specific context (task) in which an officer was working in deciding if his or her behavior warrants disciplinary action or some other form of intervention. If the disciplinary system is functioning properly then by focusing on this type of outcome, part of the task confounding problem has already been taken into consideration.

For the sake of being as helpful as possible to individual officers and to the members of the public who might be affected by adverse officer behavior, there would be great value in being able to tell as soon as possible when an officer starts down a path that might result in founded misconduct. The usual tradeoff for prediction systems is that the closer in time to the outcome being predicted, the greater the predictive power of the system—but the more harm that has already resulted. Any new EIS system could explore the possibility of enhancing the ability to predict future misconduct as early in an officer's career as possible by potentially drawing on non-standard sources of data, such as even including what the department collects from officers at the hiring stage and how they perform in the Academy.

Finally, other departments around the country have found that the ability of such tools to be helpful for early intervention can be enhanced if the tool is part of a larger performance measurement system for officers. The methods we develop for predicting misconduct can easily be extended to positive performance. As an example, these techniques can be used to predict which officers receive commendations for their exceptional service at CPD. In addition, a more general performance measurement system could, in principle, be used to help inform other department human resource decisions, for example by predicting which patrol officers will be successful in specialized roles like detective, FTO, or even supervisory positions. Overall, these tools can be used to help the department identify highly productive officers within their ranks.

Plaintiff's Exhibit 8

Ultimately, frontline officers and supervisors must view the EIS tool as helpful to their day-to-day jobs in order for it to be deemed worthwhile by CPD. The Crime Lab intends to work closely with CPD, as well as with key stakeholders, to ensure a full range of perspectives is considered. Whether these prediction tools translate into any changes in CPD personnel choices is a policy decision that will be made by CPD and the City, and is beyond the purview of our analytical work. Our goal would be to build a set of predictions that can highlight for the City the potential gains that could come from incorporating these predictive analytics into different aspects of CPD's day-to-day operations. Which of these predictive analytic tools should ultimately be incorporated into those operations, and how, is ultimately a policy question, not a social science question.

Plaintiff's Exhibit 8

# Appendix 9

## De-Escalation Working Group Checklist

- OEMC should invest in a Smart911 system.

- OEMC should implement a 16-hour mental health awareness training.

- OEMC should devote attention to supporting personnel in providing compassionate and effective service to the community and implementing stress management training that complies with national standards.

- The Chicago Department of Public Health ("CDPH") should partner with mental health agencies and advocacy groups to develop a two-step community education campaign on the signs of mental illness and how to best respond to a mental health or related crisis.

- CPD should increase the number of CIT-certified officers to 35% of all patrol officers, and ensure that individual districts with the highest number of mental-health calls are staffed to 35% or higher. All districts and all watches should staff at least two CIT-certified officers. Refresher courses should be developed and provided to CIT-trained officers. CPD should attach a permanent code "z" to officer names that OEMC can always access so dispatch can assign appropriate officers to calls.

- The City should create a "Mental Health Critical Response Unit" within CPD that is responsible for mental health crisis response functions, training, support, community outreach and engagement, cross-agency coordination and data collection and houses the CRU.

- The City should create a crisis response system to support multi layer co-responder units where behavioral health providers are working with OEMC and CPD to link individuals with mental health issues to treatment, 24 hours a day.

- The City should expand and invest in Crisis Stabilization Units ("CSU") for individuals suffering from symptoms of mental illness who do not need to be psychiatrically hospitalized.

- The City and the MHCRU should identify frequent, high-use and high-need individuals and help them get mental health treatment.

- The City should invest in first episode programming so that young adults experiencing their first episode of psychosis or major depression are immediately linked to intensive services to reduce progression of illness and decrease the risk of criminal justice involvement.

- CPD should work to decrease trauma and escalation at crime scenes by reducing the show of heavy weapons and expanding the Chicago Survivors program.

Plaintiff's Exhibit 8

# Appendix 10

## Proposed Video Release Policy

### I. PURPOSE.

This policy will provide direction to officials and agencies of the City of Chicago ("City") with respect to the public release by the City of videotape and audiotape recordings and certain specified police reports that relate to certain types of incidents involving Chicago Police Department ("CPD") officers, and shall prescribe procedures under which requests can be made to delay temporarily the release of those items to the public.

### II. POLICY CONSIDERATIONS.

This policy is intended to strike a balance between competing and sometimes conflicting interests of (a) the public in timely access to video and audio recordings and particular related initial police reports pertaining to certain incidents involving the use of force by police officers; (b) individuals who are the subject of the police action; and (c) units of local, state  and  federal  government (including agencies of the City) involved in  investigating or otherwise addressing the consequences of those incidents. Government institutions and officials with appropriate jurisdiction may have an interest in temporarily delaying the release of such information to the public in circumstances where it might compromise their efforts to address these incidents, including (but not limited to) criminal, disciplinary or other types of investigations; those interests may include a desire to avoid instances where early release of information could cause fact witnesses, whether civilian or otherwise, intentionally or inadvertently to conform their recollections of events to fit what they see in a video, hear in an audio recording, or read in a report. In addition, certain individuals, such as persons injured in these incidents or their families, may also have interests concerning the release of these items. Despite those interests, however, the people of the City have an undeniable, and in some cases paramount, interest in being informed, in a timely fashion and based on the most accurate information possible, about how their police force conducts its business, especially where the use of force by the police results in the death of, or great bodily harm to, a civilian.

This policy attempts to balance those competing interests by permitting specifically interested entities to request a temporary delay in the public release of recordings or reports in order to protect the integrity and effectiveness of their investigations, while assuring that these materials will become available to the public within a limited and certain period of time. The goal of this policy is to increase transparency with respect to the operations of CPD, and in doing so to foster increased trust and communication between the community and the police officers who serve it.

### III. SCOPE.

**A. Incidents.** Consistent with (though not identical to) Municipal Ordinance Code Section 2-57-040(c)  and (d), this policy encompasses the following types of incidents: (1) those in which a CPD officer discharges his or her firearm in a manner that strikes, or that potentially could strike, another individual, even if no allegation of misconduct is made; (2) those in which a CPD officer discharges his or her taser or stun gun in a manner that strikes another individual and results in death or great bodily harm; and (3) those in which, as a result of the use of force by a police officer, the death of, or great bodily harm to, a person

Plaintiff's Exhibit 8

occurs while that person is in police custody. (Referred to hereinafter as the "Incident.") "Great bodily harm" means any injury that is serious enough to require treatment in a hospital or similar facility located in a correctional institution.

**B. Recordings and Reports.** This policy applies to the following items that relate to any Incident: all video and audio recordings relating to the Incident, including tapes of 911 calls, OEMC dispatch recordings, CPD radio calls, video and audio from CPD dash or body cameras, videos from CPD or OEMC POD cameras, as well as any video or audio recordings made using cameras or equipment not owned or controlled by the City that come into the possession or control of CPD or IPRA; and any arrest reports, original case incident reports, tactical response reports (TRR's), and officer's battery reports (OBRs) (Referred to hereinafter as the "Information.")

## IV. RELEASE OF INFORMATION

**A. Timing of Release of Information.** Any Information covered by this policy shall be released to the public no more than 60 calendar days from the date of the Incident unless a request is made to delay the release of any or all of the Information pursuant to this policy. Where any video or audio recording covered by this policy made using cameras or equipment not owned or controlled by the City comes into the possession of the City after the date of that incident, it shall be released to the public no more than 60 days after it comes into the possession of the City, but the City shall make every effort to provide for the release of such recordings simultaneously with the release of other Information related to the Incident.

**B. Requests to Delay Release.** Upon written request from a government entity specified herein, the City will delay release of Information for a period not to exceed 30 calendar days. Any such request shall be made in writing and shall be directed to the City Corporation Counsel. Such a request may be made by the United States Attorney for the Northern District of Illinois, the Cook County State's Attorney, the Attorney General of Illinois, IPRA, or any other federal, state, county or local law enforcement agency. Any request must set forth with specificity the length of the delay requested (not to exceed an additional 30 calendar days) and shall set forth as reasons supporting the requested delay one or more of the factors listed at 5 ILCS 140/7(d)(i) through (vii). In addition, any such request must identify the specific item(s) sought to be temporarily withheld from release. The written request to delay release will itself be released to the public immediately upon receipt using a portal or website used for the distribution of Information subject to this policy. The City will not honor any further requests to delay release beyond the initial request, and will not honor a request for a delay of release that exceeds 30 calendar days.

**C. Early Release of Information.** Where doing so will not compromise an ongoing investigation, any Information covered by this policy may be released before the expiration of 60 calendar days, and may occur as soon as possible after the Incident.

**D. Manner of Release of Information.** The City shall create and maintain a publicly accessible website, dropbox or similar portal dedicated to the posting of the Information covered by this policy.

## V. NOTICE TO AFFECTED PARTIES.

Prior to the release of the Information, IPRA will attempt to notify any person who was the subject of the police action and is depicted in any video recording, or if that person is deceased or otherwise unavailable, that person's legal representative and/or next of kin, that the video recording and any related Information will be released and the date of release. IPRA will also offer to promptly show such

Plaintiff's Exhibit 8

individuals (and/or, if applicable, their legal representative and/or next of kin) the video recording(s) in which that person was depicted, and to play any related audio, in advance of its public release, and to answer questions and provide other information concerning the Incident and the status of any investigation of the Incident, to the extent that information can be provided without compromising any investigation.

## VI. ONGOING REVIEW.

The provisions of this policy should be reviewed by the City after it has been in effect for one year (or sooner if appropriate) in order to determine whether experience with its implementation and application supports revision of the policy with respect to any issue, including (but not limited to) whether the 60-day period and the 30-day extension it provides for may be shortened or whether its scope may be expanded to cover additional types of incidents.

## VII. LEGAL PROCESS.

This policy is intended solely to govern the conduct of the City and its agencies and officials with respect to the matters it covers. It is not intended to displace or supersede any legal right or remedy available to any person or entity. It is also not intended to prevent or hinder compliance by the City with respect to any legal obligations, including (but not limited to): (a) any order of court; (b) any obligation to redact identifying or other information from any item covered by this policy before its release to the public; or (c) any obligations imposed by the Freedom of Information Act, 5 ILCS 140/1 *et seq*.

Plaintiff's Exhibit 8

# Appendix 11

## Overarching Recommendations Checklist

- Provide an annual 40-hour in-service training for all sworn personnel, including periodic refresher classes on procedural justice.

- Implement a systematic approach to identify training needs and revise in-service training curriculum on an annual basis.

- Reinvigorate the Field Training Officer program.

- Implement procedures to ensure that sworn personnel remain informed on all directives and policies.

- CPD should increase the number of sergeants on patrol.

- CPD should implement monthly meetings of all sergeants in a District to ensure the sharing of officer performance, to provide mentoring opportunities to newer sergeants, and provide a forum for best-practice sharing to prevent officer misconduct.

- CPD should continue rolling out and evaluating body cameras with the ultimate goal of providing body cameras to every police officer who regularly comes into contact with civilians.

Plaintiff's Exhibit 8





Plaintiff's Exhibit 8

Case: 1:13-cv-01937 Document #: 360-9 Filed: 12/18/16 Page 323 of 345 PageID #:2514

# Rahm Emanuel op-ed: Next steps on our road to reform



Chicago Mayor Rahm Emanuel and acting IPRA chief administrator Sharon Fairley address police accountability at City Hall briefing room in Chicago on Monday, Dec. 7, 2015. (Zbigniew Bzdak, Chicago Tribune)

By **Rahm Emanuel**

MAY 13, 2016, 6:18 PM

Five months ago, I pledged to the residents of Chicago that we would do whatever it takes to rebuild public trust and restore accountability in the police department. My goal is to bring safety to every community though building trust in our police department. That requires creating a new system for police accountability and oversight.

Today I can announce that in the coming weeks, we will have the final details worked out on a comprehensive plan to fundamentally reshape our system of police accountability and it will be introduced at the following meeting of the full City Council on June 22nd. It will be based on the thoughtful suggestions made by my Police Accountability Task Force. It will also be informed by the conversations my administration is having with aldermen, community leaders, the U.S. Department of Justice and experts in the field. We want to make sure the police accountability system is trusted by the members of the Chicago Police Department and the residents of Chicago.

Plaintiff's Exhibit 9 Page 1

ADVERTISING



The framework for the new structure was outlined in the tast force's reforms and is driven by core principles that lie at the heart of the police accountability: independence, integrity, transparency and citizen participation.

First, we will replace the Independent Police Review Authority with a new civilian investigative agency that has more independence and more resources to do its work. Under the leadership of Sharon Fairley, IPRA has taken important steps to reshape and improve its investigative efforts. But it is clear that a totally new agency is required to rebuild trust in investigations of officer-involved shootings and the most serious allegations of police misconduct. As we create this new civilian agency, the Police Board will continue to hear cases regarding those police officers who face allegations of serious misconduct, as required by Illinois state law.

Second, we will create a new Public Safety Inspector General to audit and monitor policing in Chicago. It will have authority to conduct regular audits of the Chicago Police Department as well as investigations completed by the new civilian oversight agency. The IG's goal will be to identify and address emerging problems and trends in order to prevent acts of abuse from occurring in the first place. The office will be led by someone with impeccable credentials and credibility.

Third, we will create a new Community Safety Oversight Board — comprised of Chicago city residents — to oversee the city's entire policy accountability system. Consistent with the task force's recommendations, this board will hold public meetings and require regular, public reporting from the Police Department, the new civilian investigative agency, Police Review Board, and Public Safety Inspector General. It will also be empowered to request audits and make improvements. The new Board will give a voice to Chicago residents whose lives are affected daily by police practices. It will also provide a forum for our Police Department to respond to concerns and share information. Public dialogue is essential to building a common understanding of how best to keep our communities safe.

I believe these guiding principles and key reforms will meet our goals for transforming Chicago's police accountability structure and reflect the conversations and proposals that have been offered by aldermen to me.

Plaintiff's Exhibit 9 Page 2

Ald. Ariel Reboyras, 30th, and Ald. Willie B. Cochran, 20th, are committed to working with our office and leading the council on drafting an ordinance that reflects these principles.

This plan represents the second installment of the original down payment that we announced days after the task force published its report. The first installment focused on technology, transparency and training. This second installment is focused on accountability and oversight. And it is just one part of the city's work to restore trust between police and communities.

As the Justice Department continues its review into Chicago police practices, they have identified urgent issues to address. The task force recently added its own recommendations. We must address the concerns of both, as well as those issues we have identified through our continuing engagement with the community. Some of those issues can and have been addressed immediately — from expanding body-worn cameras, to purchasing Tasers, to making sure more police are certified in Crisis Intervention Training. Other reforms will take longer and will require leadership and sustained effort as we make important changes — like those I've outlined — and work to make them permanent.

Our goal has been to act quickly wherever possible but also to commit to the hard work to ensure all of our reforms will stand the test of time. As this process continues, we will issue quarterly reports so we can all be held accountable.

While much work still remains, we will continue to make significant strides on the road to reform. To fully fix Chicago's police accountability system, we must be thoughtful and bold and have the courage to call out and address the root causes that have eroded trust between police and Chicago's communities and some of Chicago's residents.

We will be judged by whether our actions truly measure up to the demands of the moment. I am confident that by creating this new structure and committing to this comprehensive plan, Chicago will be better off because we are facing up to these difficult challenges and we are doing so together.

*Rahm Emanuel is mayor of Chicago.*

Copyright © 2016, Chicago Tribune

**This article is related to:** Rahm Emanuel, Chicago Police Department, U.S. Department of Justice, Ariel E. Reboyras

Plaintiff's Exhibit 9 Page 3

11/14/2016    New Interim Supt. Johnson Says He's Never Witnessed Police Misconduct In 27 Years With CPD « CBS Chicago

Case: 1:13-cv-01037 Document #: 360-2 Filed: 12/19/16 Page 326 of 345 PageID #:2517



Chicago    SIGN UP FOR NEWSLETTERS

CBS Local Rewards   2    Log In    Register    Search

CBS Chicago

  

| HOME | NEWS | SPORTS | TRAFFIC | AUDIO | VIDEO | WEATHER | E.S.P. | CONTESTS | MORE |



*Sloppy Bears Fall 36-10 To Bucs, Drop To 2-7* | Bernstein: Bears Fumble Away Any Trust | Kyle Long Leaves Game With Ankle Injury | Emma: Back To Ugly Reality For Battered Bears | Jordan Howard Apparently Suffers Injury

# New Interim Supt. Johnson Says He's Never Witnessed Police Misconduct In 27 Years With CPD

March 29, 2016 5:13 PM   **By Derrick Blakley**

Filed Under: Chicago Police Superintendent, Derrick Blakley, Eddie Johnson

**LISTEN LIVE**



Maxboost 4.8A 24W 2 Smart Port Car Charger - Black

**$9.99**

**FOLLOW US ON**

✉ Sign Up for Newsletters

**CHICAGO (CBS)** — On his first full day as interim Police Superintendent Eddie Johnson hit the ground running.

Johnson sat down with CBS 2's Derrick Blakley to talk about his plan for reducing crime, police misconduct and the surprise call from City Hall that put him in charge.

Johnson said he didn't see the call from the mayor coming.

"It was a bit overwhelming," he said.

Plaintiff's Exhibit 10 Page 1

On his very first <u>day</u> in a job he never sought, Eddie Johnson told reporters he's never witnessed police wrongdoing first hand, not once in 27 years on the job.

"I've actually never encountered police misconduct, cause you got to understand, officers that commit misconduct don't do it in front of people that they think are going to hold them accountable for it," Johnson said. "Now that I'm sitting in this chair, if I come across it, I will deal with it accordingly."



Get shipments out the door faster with a year of free pickups.

GET A FREE YEAR →

united problem solvers™

UPS

**MORE NEWS**


Blackhawks Warrior Player Among Many In Attendance At Veteran's Day Cere...


Emanuel Tells Undocumented Immigrants Chicago 'Always Will Be A Sanctuar...


Man Sues Southwest Airlines After Flight Attendant Spills Hot Drink

Powered by CBS

It was the unrest after the Laquan McDonald shooting that eroded community confidence, something Johnson says must be rebuilt.

"I think the relationship is fractured but I also thing we can regain their trust and that's what I'm aiming to do," Johnson said.

But Johnson said he must also re-energize street cops, put on the defensive by weeks of controversy.

"The officers right now are confused a little bit," he said. "They're hurt. They went from being right about everything to now being under enormous scrutiny, and not just in Chicago, that's across the country."

He says it's officers' duty to tell the truth even when things go wrong.

"I'm gonna put some things in place to ensure they do feel they can admit honest mistakes," Johnson said. "One thing I've learned over the years is a cover-up is always, always worse than an incident, always. So if they do make a mistake, own it, fix it."

Johnson said it's his job to root out the so-called "code of silence" if it is there but draws a sharp distinction between intentional misconduct and honest mistakes.

"It's when they make honest mistakes that they need me," he said. "So if they make honest mistakes, we'll get them training and get them on the back on the right track… but all officers out there, if they see misconduct, they're obligated to report it."

Plaintiff's Exhibit 10 Page 2

11/14/2016　New interim Supt. Johnson Says He's Never Witnessed Police Misconduct In 27 Years With CPD « CBS Chicago

Case: 1:13-cv-01037 Document #: 360-2 Filed: 12/19/16 Page 329 of 845 PageID #:2519

Johnson said he'll run the department independent of City Hall, listening for community input every step of the way.

"The politics of things going on in Chicago, I don't do that," he said. "The one thing I do know how to do is be a cop and I know how to listen to people and that's what we need right now."

Meantime, Johnson intends to go citywide to do what he did as a district commander, listen to citizens and community leaders to get their ideas and input for fighting crime. The cops, he says, can't win this battle this alone.

**Derrick Blakley**

 Follow @BlakleyCBS2

Derrick Blakley is a general assignment reporter for CBS 2 Chicago. Send An E-Mail To Derrick Blakley In June 2003, Blakley returned to CBS after 15 years at NBC 5 Chicago. Previously, he had worked for CBS News for seven years, based in...

**More from** Derrick Blakley



SPONSORED CONTENT

**Special: Celebs Born In Surprising Parts of the World**

Hollywood is full of actors and actresses from all around the world. Germany, Holland, Denmark, India and many more. Some of those stars play ...

*Promoted by* **Connatix**



**More From CBS Chicago**







Follow Us

NEWS　　　　SPORTS　　　　SCORES & STATS　　CONTACT US　　CORPORATE

Plaintiff's Exhibit 10 Page 3

# Eddie T. Johnson

\* Chicago, Illinois 60643 \*
Eddie.Johnson@chicagopolice.org

**OBJECTIVE:**  To become an integral part of the Chicago Police Department, by enhancing and expanding crime detection techniques and abilities while learning Federal, State and municipal law enforcement strategies.

## EXPERIENCE

**Chief (Bureau of Patrol)**                                                                              Dec 2015 - Present
Chief of the Bureau of Patrol, 3rd highest in chain of command, which includes over 8000 sworn personnel. Responsible for overall oversight of the Bureau of Patrol including all 22 districts within the bureau of patrol, CAPS and the Special Functions Division, which include SWAT, Public Transportation, Traffic, Mounted, Helicopter and Marine Units. Immediate supervisor six Deputy Chiefs within the Bureau of Patrol as well as Commanding Officers holding the rank of Lieutenant.

**Executive Officer (Bureau of Patrol)**                                                          Apr 2014 – Dec 2015
Deputy Chief assigned as the Executive Officer for the Chief of Bureau of Patrol. Responsible for oversight of the Bureau of Patrol including all 22 districts within the bureau of patrol and the Special Functions Division, which include SWAT, Public Transportation, Traffic, Mounted, Helicopter and the Marine Unit. Immediate supervisor of Commanding Officer and Administrative Sergeants and patrolmen assigned to the Bureau of Patrol administrative office.

**Deputy Chief (Area Central)**                                                                   Feb 2012 – Apr 2014
Re-assigned as Deputy Chief tasked to create Area Central Patrol after the consolidation of the Department. As Deputy Chief of Area Central Bureau of Patrol, I was the immediate supervisor for district commanders in 01st, 02nd, 03rd, 08th, 09th, 10th, 12th, 13th and 18th districts which included 3,995 police officers, 71 miles of geography and just under 1 million residents and the downtown business district the economic hub of the city. Responsible for oversight of all crime conditions within area central and ensuring efficient operational functions of those districts as well as directing Area Saturation Teams, Project Safe Neighborhood (PSN) and Gun teams assigned to the area central deputy chiefs office. Supervised several large scale events sports and protests etc.

**Deputy Chief (Area Four)**                                                                     Aug 2011 – Feb 2012
Promoted To Deputy Chief of Area Four August 2011. Immediate supervisor for district commanders in the 10th, 11th, 12th and 13th districts. Responsible for oversight of all crime conditions and ensuring efficient operational functions of those districts as well as directing area strike force, Project Safe Neighborhood and Gun teams assigned to area four.

**Commander (006th District)**                                                                   Mar 2008 – Aug 2011
Promoted to Commander of 006th District in March 2008; Responsibilities include oversight of all operational functions of the 006th District, serving a community with a population of approximately 105,000. Operational functions include the coordination and planning of deployment strategies across all watch operations and tactical/gang teams within the District in order to combat crime and disorder. Administrative oversight of all personnel assigned to the District which includes approximately 375 sworn and civilian members. Review and assess crime patterns through the CLEAR application focusing on the District Strategic Operational Plan incorporating all necessary resources from within the district and specialized units. Acted as Area Two Deputy Chief in the absence of the Area Two Deputy Chief. Also acted as the Assistant Deputy Superintendent representing the Superintendent when he is not available regarding all operational activities citywide.

**Lieutenant (015th District)**                                                                  Feb 2007 – Mar 2008
Field Lieutenant, responsible for ensuring Sergeants monitor subordinates, while responding to radio assignments and ensuring action is taken. Act as Watch Commander in the absence of the Captain, responsible for overall operations within the district during the 1st watch.

**Plaintiff's Exhibit 11 Page 1**

**Sergeant (Area 4 Detective Division)**                                    Jun 2001 – Feb 2007
Responsible for directing investigative and administrative activity within the Homicide/Gangs/Sex oversight unit. Serve as the unit watch commander in the absence of the Lieutenant. Review, evaluate and assign cases for field investigation. Respond to homicide and serious aggravated battery crime scenes. Provide roll call training to district personnel and also disseminate information regarding district crime conditions, and also attend community and beat meetings in that district as needed. Also served in this capacity in the Robbery/Burglary/ Theft oversight unit. Member of the Detective Division's heavy weapons team.

**Gang/Tactical Sergeant (005th District)**                                 Jan 2000 – Jun 2001
Supervise identification of hierarchy and members of gangs operating in the district. Institute pro-active approaches to solve gang related problems. Develop and implement reverse narcotics and prostitution stings. Supervise gathering of information, execution and debriefing of search warrants.

**Supervising Sergeant/Gately Stadium Detail (005th District)**             Aug-Nov 1998 & 1999
Supervisor in charge and liaison between Chicago Board of Education, citywide units and 5th district personnel, responsible for ensuring the safety of citizens attending sporting events at Gately Stadium. Responsible for deployment of personnel to strategic locations to ensure safe ingress and egress of pedestrian and vehicular traffic.

**Sector Sergeant (005th District)**                                        Aug 1998 – Jan 2000
Respond to emergency calls, while evaluating officers performance of duties. Motivating officers to maintain a high level of performance and discipline. CAPS beat team leader, responsible for cultivating and facilitating the relationship among police and citizens while encouraging a partnership to find solutions to chronic crime.

**Patrol Specialist (006th District)**                                      Jun 1992 – Aug 1998
Responsible for training probationary police officers in all aspects of department policies and procedures, while instructing on crime prevention and crime identification techniques, during routine aggressive patrol.

**Patrolman (004th & 006th District's)**                                    Sep 1988 – Jun 1992
Performed preliminary investigation of crimes. Enforcement of state and local criminal and traffic laws, while routinely and aggressively patrolling an assigned police beat. Participated in the CAPS program.

## EDUCATION

**Northwestern University**, Evanston IL (*Master of Arts* ) in Public Policy and Administration (specialization in *Public Safety & National Security*) expected completion date, Spring 2016.

**Governors State University**, University Park IL (*Bachelor of Arts Degree*)        Apr 2005

## SPECIALIZED TRAINING

Counter Terrorism Training – Tel Aviv Israel  **Sep 2015**
Prevention and Response to Suicide Bombing Incidents (PRSBI) – Deming New Mexico  **Jan 2010**
Senior Management Institute for Police (Police Executive Research Forum) 39th Session  **Jun 2008**
Chicago Police Executive Development Management Program      21 Sep – 27 Oct 2006
National Incident Management System Training (FEMA)     **May 2006**
Multi Jurisdictional Counter-drug Task Force Surveillance Techniques
Northwestern University Traffic Institute Management Training Institute - Mar 1999
The Neurophysiology of Aggression in Youth
Prevention & Deterrence Of Terrorism Awareness (**TARA**)
Patrol Specialist Certification   **Jun 1992**

Plaintiff's Exhibit 11 Page 2

## COMMITTEES

Member of the Executive Board of NOBLE (Chicago Metro Chapter)      Jan 2013 – Present
Member of the St. Judes Board of Directors                         Jun 2012 – Present
Member of Chicago Police Memorial Foundation Assistance Committee    Mar 2009 – Present

## AWARDS

* 29 Honorable Mentions
* 4 Fitness Awards
* 2 Department Commendations
* 2 Attendance Recognition Awards
* 1 Certificate of Appreciation

* 11 Complimentary Letters
* 2 Special Service Awards
* 1 Unit Meritorious Award
* 1 Appearance Award
* 1 Problem Solving Award

* Chicago Defender 2013 Men of Excellence Award
* 2014 CAT Most Distinguished Man of Illinois Award

 Chicago City Wire  (/)

Plaintiff's Exhibit 11 Page 3

```
 1
 2   STATE OF ILLINOIS   )
                         ) SS:
 3   COUNTY OF COOK      )
 4
         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 5            COUNTY DEPARTMENT-MUNICIPAL DIVISION
 6
     THE PEOPLE OF THE     )
 7   STATE OF ILLINOIS,    )
                           )
 8        Plaintiff,       )
                           )  CHARGE: MISDEMEANOR
 9        vs.              )
                           )  BRANCH: 46
10   RENNIE SIMMONS,       )
                           )
11        Defendant.       )
12                    BENCH TRIAL
13            BE IT REMEMBERED, that on the 17th day
14   of SEPTEMBER, 2007, A.D, this cause came on to be heard
     before the HONORABLE ADAM BOURGEOIS, Judge of said court,
15   herein, the defendant having entered a plea of not
     guilty.
16
17   A P P E A R A N C E S :
     HON:  RICHARD DEVINE,
18   State's Attorney of Cook County by;
     MR. BILL CONWAY,
19   Asst. State's Attorney,
          On behalf of the People of Illinois;
20                * * * * * * * * * *
     MR. R. EUGENE PINCHAM,
21   PRIVATE COUNSEL,
     ATTORNEY AT LAW,
22        On behalf of the Defendant.
                * * * * * * * * * *
23
     JAMIE MITCHELL
24   OFFICIAL COURT REPORTER
     CIRCUIT COURT OF COOK COUNTY
                                          3
```

```
 1   #084-003450
 2
 3                    I N D E X
 4
 5        HON:  ADAM BOURGEOIS
 6        DATE:  9-17-07
 7        CHARGE:  MISDEMEANOR
 8        PAGES:  1-54
 9
10
     FINDING OF NOT GUILTY:
11
12   DIRECT EXAMINATION OF:  MR. DAVID ANTHONY STANCZYK
     ON PAGE.............................06
13
     CROSS EXAMINATION:
14   ON PAGE.............................14
15   REDIRECT EXAMINATION:
     ON PAGE.............................40
16
     DIRECT EXAMINATION OF:  LT. GLENN EVANS
17   ON PAGE.............................42
18   CROSS EXAMINATION:
     ON PAGE.............................52
19
20
21
22
23
24
                                          4
```

```
 1        THE CLERK:  Rennie Simmons.
 2        MR. PINCHAM:  R. Eugene Pincham.  I represent
 3   the defendant.  I've informed him, and he understands his
 4   constitutional and statutory rights to be tried by a
 5   jury.  He desires to waive his right to jury.
 6        THE COURT:  You have a jury waiver executed?
 7        MR. CONWAY:  Bill Conway for the State of
 8   Illinois.
 9        THE COURT:  You have your witnesses here?
10        MR. CONWAY:  We do, your Honor.  We also make a
11   motion to amend the complaint.  I have shown those
12   amendments to counsel.  I changed the charge from A 1
13   battery to A 2.
14        THE COURT:  Let's see if there is anything
15   else.  Are there any other trials?
16        MR. CONWAY:  There is another trial set.
17        THE COURT:  What is it?
18        MR. CONWAY:  Assault trial.  I believe it's
19   only one witness on each side.
20        THE COURT:  Send it next door.  You have to get
21   an interpreter too.  Jury waiver.
22        MR. PINCHAM:  I don't have one, judge.
23        MR. CONWAY:  I believe they're in that bin.
24        MR. PINCHAM:  I ain't got no business prying
                                          5
```

```
 1   around in your courtroom.  They're not in this box here.
 2        MS. SEMROW:  Looks like we're out of them.  Let
 3   me see if we got some in here.
 4        THE COURT:  Come on.  We have a hundred
 5   defendants here everyday and we don't have any jury
 6   waivers?
 7        MR. PINCHAM:  The defendant has signed and
 8   executed a jury waiver.  I'm submitting the same to the
 9   Court.
10        THE COURT:  Thank you, judge.  Mr. Simmons,
11   your lawyer has tendered to me a jury waiver that's been
12   signed by you.  Is that, in fact, your signature?
13        DEFENDANT SIMMONS:  Yes, your Honor.
14        THE COURT:  Was it your intent to give up your
15   right to a trial by jury when you signed it?
16        DEFENDANT SIMMONS:  Yes.
17        THE COURT:  I'll accept your jury waiver.  Any
18   other preliminary matters?
19        MR. CONWAY:  Your Honor, I'm confused.  Were
20   the amendments to the complaint accepted?
21        THE COURT:  Any objection?
22        MR. PINCHAM:  No objection, judge.
23        THE COURT:  Amendments will be allowed.  All
24   those testifying, raise your right hand, please.  Mutual
                                          6
```

Plaintiff's Exhibit 12 Page 1

**Page 7**

1  motion to exclude.  Judge, if you would like to have a
2  seat or you could stand?
3      MR. PINCHAM:  At my age, judge, I don't have to
4  much energy left.  I think I would rather sit down.
5      THE COURT:  What's your pleasure?
6      MR. PINCHAM:  I'll submit to the Court and to
7  counsel an exhibit list.
8      THE COURT:  You've seen this?
9      MR. CONWAY:  No, your Honor.
10     THE COURT:  Now, have a seat.  We ready?
11     MR. PINCHAM:  Motion to exclude, judge.
12     THE COURT:  Yes, mutual motion.  State, you
13 have anything to say about this?
14     MR. CONWAY:  Your Honor, I would state that
15 this doesn't appear to be relevant.
16     THE COURT:  We'll cross that bridge when we get
17 to it.  Call your first witness.
18     MR. CONWAY:  State calls David Stanczyk.
19     THE COURT:  Judge, can you hear from there?
20     MR. PINCHAM:  Oh, yes, if he talks loud enough.
21     THE COURT:  Stand on this side.  Go ahead.
22
23
24

**Page 8**

1              MR. DAVID ANTHONY STANCZYK,
2  called as a witness on behalf of the People of the State
3  of Illinois, after having been first duly sworn, was
4  examined and testified as follows:
5              DIRECT EXAMINATION
6  BY MR. CONWAY:
7      Q.   Would you please introduce yourself to the
8  Court, spell your last name for the court reporter?
9      A.   David Anthony Stanczyk.
10     Q.   And, Mr. Stanczyk, what do you do for a living?
11     A.   Home remodeling.
12     Q.   Do you remember the date of July 7th, 2006 at
13 12:09 p.m.
14     A.   Yes, I do.
15     Q.   And, were you at the location of 550 West a
16 126th Place?
17     A.   Yes.
18     Q.   And, what's at that location?
19     A.   It's a home that's owned by Mr. Evans.  We were
20 in the process of putting a new roof on it.
21     Q.   Did you see anyone on July 7th at 12:09 that
22 you see in court today at that location?
23     A.   Yes.
24     Q.   Could you identify that person for the Court?

**Page 9**

1      A.   The defendant, Mr. Simmons.
2      MR. CONWAY:  Record reflect in-court
3  identification.
4      THE COURT:  Record so reflect.
5  BY MR. CONWAY:
6      Q.   What happened?
7      A.   I was up on the roof right above the front
8  door.  Mr. Simmons came up holding some paperwork,
9  including an orange -- like a sticky note.  He asked me
10 if I was the homeowner.
11     Q.   And, what happened next?
12     A.   I told him no, but the homeowner was in the
13 house, and if he wanted to see him, he could go knock on
14 the door.
15     Q.   And, what did he do next?
16     A.   He went up to knock on the door, and Mr. Evans
17 came out to the door and asked who he was.  He said he
18 was with the water department; he was there to post the
19 house for having water shut off, and he wanted to take a
20 picture.
21     Q.   How did Mr. Evans respond to that?
22     A.   He asked him to show him some identification to
23 prove who he was.  He said, "you could go and do anything
24 you want, but I need to know who you are and if you're

**Page 10**

1  with the water department."
2      Q.   What did Mr. Simmons do in response?
3      A.   He refused to show his identification.
4      MR. PINCHAM:  I ask that that be stricken.
5  That's a conclusion.
6      THE COURT:  Sustained.
7  BY MR. CONWAY:
8      Q.   What did he say?
9      A.   He had i.d. around his neck, but none of them
10 was facing out.  I could see that from where I was.  I
11 was right above him.
12     Q.   And, what did Mr. Simmons --
13     THE COURT:  You're up on the roof looking down?
14     THE WITNESS:  I was right above him.
15     THE COURT:  You're up on the roof, correct?
16     THE WITNESS:  Yes, five feet above his head.
17     THE COURT:  Next question.
18 BY MR. CONWAY:
19     Q.   What did Mr. Simmons say in response?
20     A.   He said, "I'm with the City of Chicago.  I can
21 do whatever I need to do to get my job done."  He went to
22 push his way past Mr. Evans.
23     Q.   Now, let me stop you.  At this point, was his
24 identification still facing the wrong way on his chest?

**Page 11**

1    A.   Yes, it was.

2    Q.   And, when you -- what did the defendant do at

3  that point?

4    A.   He went to push his way past Mr. Evans to get

5  in the house.

6    Q.   How did he push him?

7    A.   He put his hands on him.

8    MR. CONWAY:  Let the record reflect two hands,

9  palms out, extended arms.

10    THE COURT:  Record so reflect.

11  BY MR. CONWAY:

12    Q.   What happened after that?

13    A.   Mr. Evans retaliated after the initial push.

14  Mr. Simmons tried to shoulder past him, and that's when

15  Mr. Evans pushed him backwards and said, "get off me.

16  Get off my property.  Unless you show me identification,

17  you cannot come on my property."

18    Q.   When you say, "Mr. Evans retaliated," what do

19  you mean?

20    A.   He defended himself.

21    Q.   How did he do that?

22    A.   He just pushed the man backwards.

23    Q.   And, how did Mr. Simmons respond to that?

24    A.   He walked off the porch and said he was going

**Page 13**

1  BY MR. CONWAY:

2    Q.   When --

3    THE COURT:  Strike that.

4  BY MR. CONWAY:

5    Q.   When did you leave the roof?

6    A.   When all this commotion started, pushing and

7  shoving, I came off the roof.

8    Q.   How did you get off the roof?

9    A.   There was a ladder right next to where they

10  were standing.

11    Q.   Did you ever lose sight of Mr. Evans or

12  Mr. Simmons?

13    A.   The whole time I was -- I was standing right

14  there on the edge of the roof, five feet away from where

15  they were standing from me.

16    Q.   When you first saw Mr. Simmons push Mr. Evans

17  initially, how far away were you from them?

18    A.   I could reach down and touch them both on the

19  heads.  The roof -- I was on -- was like --

20    THE COURT:  Sir, there's no question pending.

21    MR. PINCHAM:  Motion to strike.  There was no

22  question pending.

23    THE COURT:  Strike it.

24  BY MR. CONWAY:

**Page 12**

1  to take pictures and post his notice.  He never posted

2  any notice.

3    Q.   Well, let me stop you --

4    THE COURT:  Sustained that last part.

5  BY MR. CONWAY:

6    Q.   What happened as he was walking away from the

7  property?

8    A.   He said, "I'm going to call the police.  I'm

9  going to take some pictures.  I'm going to post my

10  notice."  That's when he walked off and he started taking

11  pictures.

12    Q.   And, how was he taking pictures?

13    A.   With a camera phone.

14    Q.   What happened after that?

15    A.   Mr. Evans walked down behind him in the yard

16  and said, "okay, I'll take pictures of you too."

17    THE COURT:  At this point, are you still on the

18  roof?

19    THE WITNESS:  I had already come down, sir.  I

20  have a 13-year old nephew.

21    THE COURT:  I didn't ask you about your nephew.

22  Were you still on the roof?

23    THE WITNESS:  No, I had come down for fear of my

24  nephew's safety.

**Page 14**

1    Q.   Now, as Mr. Simmons was walking away from the

2  property, where did he go?

3    A.   He started taking some pictures.

4    Q.   And, what happened next?

5    A.   He said he was going to call the police.

6    Q.   What happened after that?

7    A.   He went up to his car.  That's when Lieutenant

8  Evans came around and started taking pictures with his

9  camera phone of the defendant and his license plate.

10  There was another verbal altercation between the two

11  about who was going to do this, who was going to do that.

12  I told the guy, the best thing he could do was just leave

13  it alone.

14    MR PINCHAM:  Objection.

15    THE COURT:  Sustained.

16  BY MR. CONWAY:

17    Q.   What happened next after they were taking

18  pictures of each other?

19    A.   Mr. Simmons said, "I got something for you that

20  will fix you."  He reached in the trunk of his car and

21  went to pull something out.

22    Q.   What did he pull out?

23    A.   To me it looked like a pipe wrench.

24    MR. PINCHAM: Objection, what it looked like to

Plaintiff's Exhibit 12 Page 3

**Page 15**

```
1    him.
2           THE COURT:  Sustained.
3    BY MR CONWAY:
4       Q.   What did this object look like?
5           THE COURT:  No, no, what was this object?
6    BY MR. CONWAY:
7       Q.   What was this object?
8       A.   Handle was similar to a pipe wrench.
9       Q.   Could you tell what material it was made out
10   of?
11      A.   Steel.
12      Q.   And, approximately how long was the object?
13      A.   About three feet.
14      Q.   What happened after that?
15      A.   That's when Lieutenant Evans and him grabbed
16   each other and started tussling in the grass.  Lieutenant
17   Evans was trying to retain him.
18      Q.   What happened next?
19      A.   During the wrestling match, Mr. Simmons grabbed
20   the Lieutenant's hand and bent his thumb back trying to
21   get away from him.
22      Q.   What happened next?
23      A.   That's when we all gathered around.  We were
24   telling the guy just to lay down, relax.  This guy is a
                            15
```

**Page 16**

```
1    cop.  You don't need to fight him.  You're going to get
2    yourself hurt.  You're going to get yourself in trouble.
3       Q.   Did the police come and subsequently arrest --
4       A.   Yes, two Chicago Tact Units came and arrested
5    Mr. Simmons.
6       Q.   Prior to that, did Mr. Simmons ever put any
7    kind of notice --
8       A.   No, he never posted any notice.
9           MR. CONWAY:  Nothing further, at this time.
10          THE COURT:  Judge.
11                CROSS EXAMINATION
12   BY MR. PINCHAM:
13          THE COURT:  Briefly.
14          MR. PINCHAM:  Pardon me.
15          THE COURT:  Briefly.
16                CROSS EXAMINATION
17   BY MR. PINCHAM:
18      Q.   You were on the roof preparing the roof, right?
19      A.   Yes.
20      Q.   And, the address was 550 West a 125th Place, is
21   that correct?
22      A.   Yes.
23      Q.   And, you say Mr. Evans owns the building,
24   right?
                            16
```

**Page 17**

```
1       A.   Yes.
2       Q.   You, were there preparing the roof of
3    Mr. Evans?
4       A.   Yes.
5       Q.   Mr. Simmons came onto the property, right?
6       A.   Yes.
7       Q.   Mr. Simmons had some tags around his neck,
8    didn't he?
9       A.   Yes.
10      Q.   And, the tags he had around his neck looked
11   like what I'm showing you now, do they not?
12      A.   Yes.
13          THE COURT:  Mark Defendant's Exhibit.
14   BY MR. PINCHAM:
15      Q.   Marking this as Defendant's Exhibit No A for
16   identification.
17      A.   But, I don't think there were that many on the
18   ring, sir.
19      Q.   How many was on the ring?
20      A.   It looked like one, maybe two.
21      Q.   Well, how many is on this ring?
22      A.   Well, there is two or three of them there.
23      Q.   You call that two or three.  Judge, could you
24   see?
                            17
```

**Page 18**

```
1           THE COURT:  How many are on the ring?
2           THE WITNESS:  Two.  All right, two.
3    BY MR. PINCHAM:
4       Q.   So, the one you saw on the day in question,
5    there were two?
6       A.   It looked -- it might have been two on the
7    ring.
8       Q.   And, does this appear to be what was on his
9    neck at the time?
10      A.   There was no picture showing.  They were just
11   like a white card that was showing on the back.
12      Q.   It's a picture showing on this one?
13      A.   Yes, but this is what I saw from the roof right
14   there.
15      Q.   Now, he said he was there to post a cut off
16   notice, didn't he?
17      A.   Yes.
18      Q.   A water cut off notice, didn't he?
19      A.   Huh-huh.
20      Q.   You have to answer.
21      A.   Yes.
22      Q.   And, the water cut off notice was being posted
23   because there was a water bill due and owing, is that
24   correct?
                            18
```

Plaintiff's Exhibit 12 Page 4

MR. CONWAY: Objection.

THE COURT: Sustained.

BY MR. PINCHAM:

Q. Did you know what a cut off notice was?

A. All I know it was a water cut off notice. There was no water on at the house.

Q. My question is, do you know what a water cut off notice is?

A. Yes.

Q. What's a water cut off notice?

A. It's where the City post your house to cut your water off because you haven't paid your bill.

Q. And, he said he was there to post?

A. Yes.

Q. And, he said that to Mr. Evans, didn't he?

A. Yes.

Q. You told the Court that he asked you were you the owner, right?

A. Yes.

Q. You -- you told him the owner was inside the building, right?

A. Yes.

Q. He knocked on the door?

A. He didn't have to, the door was opened.

19

Q. Did he knock on the door?

A. He didn't knock at all.

Q. All right. Did Mr. Evans come out?

A. He was standing in the doorway, sir.

Q. Now, did Mr. Simmons say to him -- oh, by the way, he came up in a car, didn't he?

A. Yes.

Q. Mr. Simmons drove in a car, didn't he?

A. Yes.

Q. He parked the car right in front of the house, didn't he?

A. Yes.

Q. And so, on a hundred and what now?

A. A 126th Place, sir.

Q. A 126th Place runs east and west, doesn't it?

A. Yes.

Q. And, he parked his car in front of the house?

A. Yes.

Q. Facing which direction?

A. West.

Q. Facing west. Okay. What side of the street?

A. North.

Q. Right in front of the house?

A. Yes.

20

Q. And, the lights were flashing on his car, weren't they?

A. No, they weren't.

Q. Were the lights on in the car?

A. It was no lights on. It was a private vehicle. It wasn't a City vehicle.

Q. I didn't ask you that. I asked you was the lights on in the car?

A. No.

Q. On or off.

A. They were off.

Q. They were not flashing?

A. No.

Q. Was there a sign in the window of the car?

A. Not that I saw.

Q. Could you see in the window of the car?

A. Yes.

Q. I'll show you Defendant's Exhibit No B for identification. Was this in the window of the car, Plaintiff's Exhibit No B?

A. I didn't see that in the window.

Q. Did you see the dashboard of the car?

A. Yes.

Q. From the roof?

21

A. Yes.

Q. From where you were?

A. Yes.

Q. You looked down through the roof of the car?

A. I could see the front end.

Q. Just answer my question. You could look down from the roof of the house, right?

A. Yes.

Q. Down through the roof of the car, right?

A. No one could see through the roof.

Q. And, onto the dashboard, right?

A. The dashboard was in plain sight, sir.

Q. And nothing on the dashboard?

A. No.

Q. You were looking on the dashboard?

A. I looked to see.

Q. Wait a minute. Wait a minute. Wait a minute. Just answer my question. You're looking on the dashboard?

A. I looked in the car.

Q. Did you look on the dashboard?

A. In the car, sir, on the dashboard through the window.

Q. Were you looking on the dashboard to see if

22

Plaintiff's Exhibit 12 Page 5

```
 1    there was anything on the dashboard?
 2         A.    I looked on the dashboard.
 3         Q.    You were looking to see if anything was on the
 4    dashboard, right?
 5         A.    Yes.
 6         Q.    You say Mr. Simmons had a piece of yellow paper
 7    in his hands?
 8         A.    He had one of those orange stickers.
 9         Q.    He had a orange sticker?
10         A.    Huh-huh.
11               THE COURT: You have to say yes or no.
12               THE WITNESS:  Yes.
13    BY MR. PINCHAM:
14         Q.    And, the orange sticker he had was a cut off
15    notice, wasn't it?
16         A.    Yes.
17         Q.    You knew it was a cut off notice?  It's been
18    marked as Defendant's Exhibit No 8?
19               THE COURT:  Number 8.
20               MR. PINCHAM:  8.
21               MR. CONWAY:  I've seen it.
22    BY MR. PINCHAM:
23         Q.    That's the cut off notice he had in his hand,
24    wasn't it?

                            23
```

```
 1         A.    Yes.
 2         Q.    And, you don't need to notify the owner to post
 3    a water cut off notice, do you?
 4               MR. CONWAY:  Objection, speculation.
 5               THE WITNESS:  That I don't know.
 6               THE COURT:  You let him answer all of these
 7    questions as if he were some expert.  You brought it up.
 8               THE WITNESS:  That I don't know for sure.
 9    BY MR. PINCHAM:
10         Q.    Well, did he say to you "I need to talk to the
11    owner of the building to post this water cut off notice?"
12               MR. CONWAY:  Objection, asked and answered.
13               THE COURT:  Overruled.
14    BY MR. PINCHAM:
15         Q.    Did he say that?
16         A.    He asked me if I was the homeowner.
17         Q.    Did he ask you "do I need to talk to the owner
18    to post the water cut off notice?"
19         A.    No, he didn't.
20         Q.    Did he say to Mr. Evans "I need your permission
21    to post this water cut off notice?"
22         A.    No.
23         Q.    By the way, let's get this out of the way.  You
24    saw the man walk up, didn't you?

                            25
```

```
 1         A.    I don't know if that's the exact one, but he
 2    had one like that in his hand.
 3         Q.    He had one like this in his hand?
 4         A.    Yes.
 5         Q.    And, when you saw it in his hand, you knew it
 6    to be a water cut off notice, didn't you, sir?
 7         A.    Yes.
 8         Q.    And, he had it in his hand.  He said he was
 9    there to post the cut off notice, did he not?
10         A.    Yes.
11         Q.    Posting the cut off notice meant that he was
12    going to attach the notice to the wall of the house, is
13    that correct?
14               MR. CONWAY:  Objection.
15               THE COURT:  He knows everything else.  You let
16    him stand up here and say all this other stuff.
17    Overruled.
18    BY MR. PINCHAM:
19         Q.    He was going to put this notice on the wall of
20    the house to indicate notice of water service terminated,
21    is that correct?
22         A.    That's what he said.
23         Q.    And, it has a sticker on the back of it,
24    doesn't it?

                            24
```

```
 1         A.    Yes.
 2         Q.    He was crippled, wasn't he?
 3         A.    Didn't look it to me.
 4         Q.    As you stand there now, you didn't know this
 5    man had a stroke and was paralyzed on his right side?
 6         A.    No, he walked with a slight limp, but --
 7         Q.    He walked with a slight limp?
 8         A.    How would I know if he had a stroke.
 9         Q.    You know everything else.
10         A.    I'm not a doctor.
11         Q.    You know everything else.
12               THE COURT:  Just answer the question.
13    BY MR. PINCHAM:
14         Q.    You say he walked with a limp?
15         A.    He walked with a limp.
16         Q.    And, you saw him walking with a limp when he
17    walked up, didn't he?
18         A.    Slight limp.
19               MR. PINCHAM:  Stand up, son.  May I have the
20    defendant walk up to the bar, please?
21               MR. CONWAY:  Your Honor, I object.
22               THE COURT:  Overruled.
23               MR. PINCHAM:  Walk up to the bar.
24               THE WITNESS:  He wasn't moving that way that

                            26
```

Plaintiff's Exhibit 12 Page 6

**Page 27**

```
 1    day.
 2    BY MR. PINCHAM:
 3        Q.   He wasn't moving that way that day?
 4        A.   No.
 5        Q.   He was moving faster than that?
 6        A.   A little spryer than that.
 7        Q.   Were you aware that he had been hospitalized --
 8             MR. CONWAY:  Objection.
 9             THE COURT:  Let him ask the question first.
10    BY MR. PINCHAM:
11        Q.   -- for over a month with a parallactic stroke
12    prior to him coming out there when you saw him?
13             THE COURT:  Now, sustained.  Sustained.
14             MR. CONWAY:  Objection.
15    BY MR. PINCHAM:
16        Q.   Were you aware when he was limping that he was
17    limping from a stroke?
18             MR. CONWAY:  Objection.
19             THE COURT:  Sustained.
20    BY MR. PINCHAM:
21        Q.   Do you know why he was limping?
22        A.   No idea.
23        Q.   Beg your pardon?
24        A.   No idea.
```

**Page 28**

```
 1        Q.   But, you saw him limping?
 2        A.   He was limping.
 3        Q.   Now, he walked up to Mr. Evans and said to
 4    Mr. Evans "I'm here to post a cut off notice."  What did
 5    Mr. Evans say?
 6        A.   Show me your identification.
 7        Q.   And, what did the -- did Mr. Simmons say?
 8        A.   He said, "I don't have to.  I got this in my
 9    hand.  That should be enough."
10        Q.   Could you tell the Court why there would be any
11    earthly reason for a citizen to say, "I don't have to
12    show you any identification," and he got it around his
13    neck?
14             MR. CONWAY:  Objection
15             THE COURT:  Sustained.
16    BY MR. PINCHAM:
17        Q.   Do you know of any reason why Mr. Simmons would
18    say to him, "I don't have to show you identification,"
19    when he got the identification around his neck?
20        A.   No.
21        Q.   Do you know of any reason he would have to say
22    to him "I don't want to show you identification," when
23    he's got an official yellow -- what color is this, orange
24    water shut off notice in his hand?
```

**Page 29**

```
 1             MR. CONWAY:  Objection.
 2             THE COURT:  Sustained.
 3    BY MR. PINCHAM:
 4        Q.   Well, did he say, "well, here's a cut off
 5    notice.  I'm from the City of Chicago to cut off your
 6    water?"
 7        A.   He just said, "I'm here to post a notice."
 8        Q.   And, that didn't make Mr. Evans mad, did it?
 9        A.   The water wasn't -- there was no water there
10    anyway.
11        Q.   But, it made Mr. Evans mad, though, didn't it?
12        A.   No.
13        Q.   You say he pushed by him?
14        A.   He went to push by him to get in the house.
15        Q.   To get in the house?
16        A.   He wanted to inspect to make sure there was no
17    water.
18        Q.   Who said that?
19        A.   He did.
20        Q.   He wanted to get in to see if there was no
21    water there?
22        A.   He had been told by the --
23        Q.   Wait, wait, wait.  Now, that's what you say?
24        A.   He had been told by us.
```

**Page 30**

```
 1        Q.   I didn't ask you that.  I'm asking you, you
 2    said he said, "I want to get in to inspect to see that
 3    there is no water?
 4        A.   He wanted to see if water was working, sir.
 5        Q.   Okay.  That's what was said?
 6        A.   Yes.
 7        Q.   And, he went to push by to see if the water was
 8    working?
 9        A.   Yes.
10        Q.   Are you aware that it is not the duty of a cut
11    off person from the water department to check to see if
12    the water is on or off?
13             MR. CONWAY:  Objection.
14             THE COURT:  He may answer if he knows.
15             THE WITNESS:  I don't know that, sir.
16    BY MR. PINCHAM:
17        Q.   Then, he turned after pushing by him.  Did he
18    go in the house?
19        A.   No, he didn't get in the house.
20        Q.   Did he try to get in the house?
21        A.   Yes, he did.
22        Q.   Did he pull on the door to get in the house?
23        A.   The door was open.
24        Q.   Did he pull on the door to open the door?
```

**Page 31**

1     A.   He didn't have to open the door, the door was

2 standing open, sir.

3     Q.   Well, did he walk into the door and open the

4 door?

5     A.   He couldn't get by Mr. Evans.

6     Q.   Mr. Evans wouldn't let him by?

7     A.   No.

8     Q.   He tried to get in the house?

9     A.   Yes.

10     Q.   So, then he turned around, you say, right?

11     A.   Huh-huh.

12     Q.   And, started going to his car, right?

13     A.   Yes.

14     Q.   And, he said he was going to call the police,

15 right?

16     A.   Yes.

17     Q.   Mr. Simmons said he was going to call the

18 police?

19     A.   Yes.

20     Q.   Well, did Mr. Evans say then, "I'm the police?"

21     A.   No.

22     Q.   Mr. Evans didn't say, "I'm a lieutenant of the

23 Chicago Police Department?"

24     A.   No.

**Page 32**

1     Q.   And, when Mr. Evans said -- when Mr. Simmons

2 said, "I'm going to call the police," you were down on

3 the ground?

4     A.   By this time, I had come down off the ladder.

5     Q.   Did you then say, "well, you don't need to call

6 the police, Mr. Evans is the police?"

7     A.   I did. I told him he was a lieutenant on the

8 Chicago Police Force.

9     Q.   He still said, "I'm going to call the police?"

10     A.   He said he was still going to call.

11     Q.   He went to his car, right?

12     A.   Huh-huh.

13     Q.   Opened the trunk, right?

14     A.   No, no, he didn't open the trunk right away.

15     Q.   At some point, he opened the trunk?

16     A.   Yes.

17     Q.   After he had taken pictures?

18     A.   Yes.

19     Q.   He took some pictures of the house, didn't he?

20     A.   Yes. You could see me standing on the roof in

21 one of them.

22     Q.   Wait. We're going to get to that. You say

23 you're down on the ground now, didn't you?

24     A.   Those pictures -- he must have taken --

**Page 33**

1     Q.   Just answer the question. You say at this

2 point, you're down on the ground?

3     A.   By this time, I was coming down.

4     Q.   You didn't say you had started coming down, you

5 said you were down.

6     THE COURT: You have to answer the question,

7 sir.

8     THE WITNESS: Yes, I was on the ground.

9 BY MR. PINCHAM:

10     Q.   I'll show you Defendant's Exhibit No 10. Look

11 at Defendant's No 10.

12     A.   Yes.

13     Q.   You're on that picture?

14     A.   Yes.

15     Q.   You're on the roof there, aren't you?

16     A.   Yes.

17     Q.   And, there is somebody on the roof with you?

18     A.   Wait, I had gone back up on the roof by this

19 time. I came down off the roof and went back up.

20     MR. PINCHAM: Judge --

21     THE WITNESS: When the picture-taking thing

22 started happening, I had gone back up on the roof.

23 BY MR. PINCHAM:

24     Q.   There was no picture taken?

**Page 34**

1     THE COURT: Go ahead.

2 BY MR. PINCHAM:

3     Q.   You were down on the ground, that's what you

4 said? He got his camera, right?

5     A.   He had the camera with him in his hand.

6     Q.   And, he started taking some pictures, right?

7     A.   Yes.

8     Q.   And, then you went back up on the roof?

9     A.   Yes.

10     Q.   After he got the camera?

11     A.   I don't know when he had it. He was like this

12 with the phone in his hand. He flipped it open and

13 started taking pictures.

14     Q.   I'll show you Defendant's Exhibit No 10.

15     THE COURT: That's -- no, we did --

16     THE WITNESS: That's the same picture.

17     MR. PINCHAM: Group Exhibit 10.

18     THE COURT: Group Exhibit 10.

19 BY MR. PINCHAM:

20     Q.   I'll show you that one.

21     A.   That's the same picture, sir, just enlarged.

22     Q.   That's when you were on the roof, right?

23     A.   Yes.

24     Q.   That's when you went back on the roof, right?

Plaintiff's Exhibit 12 Page 8

```
 1      A.   That's right, yes.
 2      Q.   Now, I will ask you to look at Defendant's
 3   Exhibit 10.  Judge, may I show it to you, please?
 4           THE COURT:  Any objection.
 5           MR. CONWAY:  No, your Honor.  Well, I mean,
 6   I'll object to its admissibility, but not you looking at
 7   them.
 8   BY MR. PINCHAM:
 9      Q.   And, you see a man standing there on the ground
10   by the ladder?
11      A.   Yes.
12      Q.   Who is that?
13      A.   Mr. Evans.
14      Q.   So, Mr. Evans is standing on the ground while
15   Mr. Simmons was taking pictures, right?
16      A.   That's when --
17      Q.   Is that right?
18      A.   Yes.
19      Q.   And, that's after you had gone back up on the
20   roof?
21      A.   Yes.
22      Q.   You had come down on the roof, right?
23      A.   Yes.
24      Q.   He had resisted this man trying to get in the
                          35
```

```
 1           THE WITNESS:  Yes, I apologize.
 2           THE COURT:  You get flipped with me, you'll
 3   wind up in the County Jail.
 4           THE WITNESS:  I'm apologizing to your Honor.
 5           THE COURT:  Be quite.
 6   BY MR. PINCHAM:
 7      Q.   He opened the trunk of the car, right?
 8      A.   Yes.
 9      Q.   Where was Mr. Evans when he went to the trunk
10   of the car?
11      A.   Standing in the grass.
12      Q.   In the yard?
13      A.   Yes.
14      Q.   And, there's a fence around the yard, isn't it?
15      A.   No, not the front yard.
16      Q.   He opened the trunk of the car?
17      A.   Yes.
18      Q.   He stated, "I got something for you."  What did
19   he say now?  What did you say he said?
20      A.   I don't think I should use that language in
21   front of the ladies.
22           THE COURT:  Sir, you have to tell us what you
23   heard, period.
24           THE WITNESS:  I got something for your fuckin
                          37
```

```
 1   house, right?
 2      A.   Yes.
 3      Q.   Then you go back up on the roof, right?
 4      A.   Yes.
 5      Q.   And, Mr. Evans was standing there while Mr.
 6   Simmons took the pictures, that's what you're telling the
 7   Court?
 8      A.   Yes.
 9      Q.   After Mr. Evans had refused -- after Mr.
10   Simmons had refused to give him identification, right?
11      A.   Yes.
12      Q.   Now, after the picture was -- now wait, let me
13   get this straight.  Did he go in the trunk of the car
14   after the pictures were taken or before?
15      A.   After the picture was taken.
16      Q.   So, after the picture was taken, he then went
17   to the trunk of the car, right?
18      A.   Yes.
19      Q.   Opened the trunk of the car?
20      A.   And, he moved pretty quick to the trunk of the
21   car from the door of his car.
22           THE COURT:  Stricken.  Would you please wait
23   until there is a question asked, then answer that
24   question, nothing more.
                          36
```

```
 1   ass.  Excuse me, ma'am.
 2   BY MR. PINCHAM:
 3      Q.   As he reached in the trunk of the car?
 4      A.   Yes.
 5      Q.   He pulled out what you thought was a wrench?
 6      A.   A pipe wrench.
 7      Q.   The police came.  Did they take this pipe
 8   wrench that you say you saw?
 9      A.   I don't recall them taking anything out of the
10   car.
11      Q.   Did Mr. Evans take the pipe wrench?
12      A.   I don't recall that.
13      Q.   Did Mr. Evans -- did the police take anything
14   out of the man's car?
15      A.   No, they didn't take anything out of his car
16   that I know of.
17      Q.   That never happened, did it?
18           MR. CONWAY:  Objection.
19           THE WITNESS:  What happened?
20   BY MR. PINCHAM:
21      Q.   Went in the car and pulled out a wrench?
22      A.   Yes, he did.
23      Q.   That's something you and Mr. Evans made up,
24   isn't it?
                          38
```

Plaintiff's Exhibit 12 Page 9

1  MR. CONWAY: Objection.
2  THE COURT: Overruled.
3  THE WITNESS: No.
4  BY MR. PINCHAM:
5  Q. Did you make a statement to the police?
6  A. Yes, I did.
7  Q. Did you sign it?
8  A. Yes, I did, to a female captain at 111th
9  Street.
10  Q. And, in that statement, you said he went in the
11  trunk of the car and got a wrench, right?
12  A. He reached in the trunk of the car.
13  Q. That's not what I'm asking you. Wait a minute.
14  You said to this female lieutenant or captain whoever you
15  say she was, that he reached in the car and got a wrench.
16  That's what you told her, right?
17  A. May I read what I wrote on the statement,
18  please, your Honor?
19  MR. PINCHAM: Can I have the statement?
20  THE COURT: Mr. Stanczyk, you will answer the
21  question that's addressed to you.
22  THE WITNESS: I told the captain that he
23  reached in the car for something that looked like a
24  wrench.

39

1  Q. And, didn't the police say, "well, Mr. Evans is
2  the police lieutenant. He calls the shots?"
3  A. No, I don't recall him saying that.
4  Q. Didn't Mr. Evans say, "well, I'm the one that's
5  telling you officers on the scene what to do?"
6  A. He did tell the officers what to do.
7  Q. And, didn't one of the officers say, "well,
8  Lieutenant, dun jumped on somebody else?"
9  A. I don't remember that being said.
10  MR. CONWAY: Objection.
11  THE COURT: It's just a question. He said he
12  didn't hear it.
13  BY MR. PINCHAM:
14  Q. Didn't the officer say this is the second
15  incident in which a person posing as a building inspector
16  failed to introduce identification to Mr. Evans?
17  A. Yes, I remember that being said.
18  Q. So, Mr. Simmons was not the first person who
19  had been there to try to post a water cut off notice?
20  A. I don't know, sir, because I didn't see that
21  one.
22  Q. I agree with you. But, you did hear arresting
23  officers say that this is the second time Mr. Evans has
24  confronted somebody coming to his house to inspect, words

41

1  BY MR PINCHAM:
2  Q. And, did you say you saw the metal part of it?
3  A. Yes.
4  MR. PINCHAM: You have that statement?
5  MR. CONWAY: Actually, I do not.
6  MR. PINCHAM: You don't have any such
7  statement?
8  MR. CONWAY: I'm sure --
9  THE COURT: You're not sure. Have you seen
10  such a statement?
11  MR. CONWAY: I don't recall what the statement
12  -- contents of the statement were.
13  MR. PINCHAM: What I'm asking you --
14  THE COURT: Judge, you made your point.
15  BY MR. PINCHAM:
16  Q. The police came and they arrested Mr. Simmons,
17  didn't they?
18  A. Yes.
19  Q. Didn't Mr. Simmons say, "why you arresting me?
20  I'm the one that called the police?"
21  A. Yes.
22  Q. Didn't Mr. Simmons say, "he is the one who
23  attacked me," talking about Mr. Evans?
24  A. That's what he said.

40

1  to that effect?
2  A. Words to that effect.
3  MR. PINCHAM: I don't have anything else,
4  judge.
5  THE COURT: Any redirect?
6  MR. CONWAY: Yes.
7  REDIRECT EXAMINATION
8  BY MR. CONWAY:
9  Q. Did you see any markings on the car at all
10  indicating that it was a City vehicle?
11  A. It was nothing.
12  Q. What did the vehicle look like?
13  MR. PINCHAM: Objection, judge.
14  THE COURT: You know, I don't understand this.
15  The man admitted -- in the picture I'm looking at, he's
16  standing on the roof. There is a lawn. It must be a
17  sidewalk, a curb. The car is on the street. I don't
18  know what you think he saw. You have anymore questions
19  for this witness?
20  THE WITNESS: Your Honor, from this picture --
21  THE COURT: Sir, you don't have a question
22  before you. Where do you think you are?
23  THE WITNESS: I'm just making -- I'm sorry.
24  THE COURT: You don't get to talk unless there

42

1    is a question. Anything further of this witness?
2          MR. CONWAY: Your Honor, I'm simply trying to
3    rehabilitate or clear up some of the things --
4          THE COURT: We'll be here until next week with
5    you rehabilitating this witness. What do you want to ask
6    him?
7    BY MR. CONWAY:
8       Q.   When did you go back on the roof?
9       A.   I went back on the roof after I came down to
10   make sure my nephew was okay. I went back up to start
11   doing my job again.
12         THE COURT: Is this your nephew with you on the
13   roof?
14         THE WITNESS: No, my nephew was sitting in the
15   van.
16         THE COURT: He was in the van during this whole
17   incident?
18         THE WITNESS: Right across the street.
19         THE COURT: In the van during this whole
20   incident?
21         THE WITNESS: Sitting right in front of the
22   window, sir.
23         THE COURT: You have anything else to ask this
24   witness? Sir, you may step out. Call your next witness.

                        43

1    Place?
2       A.   Yes.
3       Q.   What's at that address?
4       A.   Property I own.
5       Q.   Is that in Chicago, Illinois, Cook County?
6       A.   Yes.
7       Q.   And, did you see anyone at that date, time and
8    location, you see in court today?
9       A.   Yes.
10      Q.   Please point to that person and identify an
11   article of clothing he's wearing?
12      A.   The gentleman with the two-piece black suit, to
13   my right.
14         THE COURT: Record reflect in-court
15   identification. Well, you know what, point to him.
16         THE WITNESS: This gentleman sitting where I'm
17   pointing to, wearing the two-piece black suit.
18         THE COURT: Record reflect in-court
19   identification.
20   BY MR. CONWAY:
21      Q.   What happened on that date, time and location?
22      A.   I was at the place rehabbing it and getting it
23   looked at.
24         MR. PINCHAM: Judge, I ask the witness to keep

                        45

1          MR. CONWAY: State calls Glenn Evans.
2          THE COURT: The witness has been sworn. Sir,
3    if you'll step over here and stand here. Let's go.
4             LT. GLENN EVANS,
5    called as a witness on behalf of the People of the State
6    of Illinois, after having been first duly sworn, was
7    examined and testified as follows:
8             DIRECT EXAMINATION
9    BY MR. CONWAY:
10      Q.   Mr. Evans, would you please tell your name to
11   the Court, spell your first and last name for the court
12   reporter?
13      A.   Glenn Evans, E-v-a-n-s.
14      Q.   Mr. Evans, what do you do for a living?
15      A.   Chicago Police Department.
16      Q.   And, what's your rank as a Chicago Police
17   Officer?
18      A.   I'm a Lieutenant.
19      Q.   Mr. Evans, do you recall July 7th, 2006 at
20   12:09 p.m.?
21      A.   Yes.
22      Q.   Were you on duty on July 7th, 2007?
23      A.   No.
24      Q.   Were you at the location of 550 West 126th

                        44

1    his voice up.
2          THE WITNESS: I'm sorry. I was at the location
3    rehabbing and getting some work done on the house.
4          MR. PINCHAM: I could not hear, judge.
5          THE COURT: If you could keep your voice up.
6          THE WITNESS: I have a cold and everything.
7    This is about as far as my voice can go.
8          MR. CONWAY: Maybe we can move.
9          THE WITNESS: You have a mic or something.
10         MR. PINCHAM: I'll move.
11   BY MR. CONWAY:
12      Q.   What happened?
13      A.   I was at my property when I was approached by
14   the individual I pointed out, the defendant, Mr. Simmons.
15   He walked up to the property and I asked him, can I help
16   him.
17      Q.   And, what did he say?
18      A.   He said, "I'm here to post a notice and take a
19   picture of your property -- take a picture of your
20   property." I asked him "who do you work for?" He said,
21   "I work for the water department." I said, "if you show
22   me some identification, you could do what you want to
23   do." In fact, I been trying to get the water department
24   to come out to that property since 2003 to inspect it and

                        46

```
 1   verify that it was vacant, unoccupied."  There was no
 2   running water, no pipes, nothing in it.
 3        Q.   Do you live at this location?
 4        A.   No, I do not.
 5        Q.   What happened after that?
 6        A.   Mr. Simmons refuse to produce any
 7   identification.
 8        Q.   How did he refuse?
 9        A.   He wouldn't show me his identification.  He had
10   an identification card that was around his neck, but it
11   was face down.  I couldn't see who it was or what the
12   identification was.
13        Q.   What happened next?
14        A.   I asked him if he could produce his
15   identification.  He wouldn't produce his identification.
16        Q.   What happened after that?
17        A.   We got into -- we got into a verbal
18   altercation.
19             MR. PINCHAM:  Objection to that as a
20   conclusion.  I ask that it be stricken.
21             THE COURT:  Sustained.
22   BY MR. CONWAY:
23        Q.   What happened?
24        A.   He begin raising his voice.  I raised my voice.

                           47
```

```
 1             MR. CONWAY:  Record reflect right arm in an (1)
 2   shape pushed downward.
 3             THE COURT:  Record so reflect.
 4   BY MR. CONWAY:
 5        Q.   What happened after that?
 6        A.   I pushed him off me.  I told him to get off my
 7   property, I'm calling the police.
 8        Q.   What happened next?
 9        A.   He initially refused to get off the property.
10   He said that he was calling the police.  I had already
11   called the police and made the call.
12        Q.   How did you make -- when did you make the call?
13        A.   On the cell phone immediately after he -- after
14   he pushed me for the second time.
15        Q.   What happened next?
16        A.   Initially, it was a verbal exchange that went
17   on between us.  He stepped off the property, but he took
18   out his camera and started taking pictures of myself and
19   the property.  It was a cell phone camera.
20        Q.   What happened after he took the pictures?
21        A.   He started walking to his vehicle.  Then, I
22   went to his vehicle to look at his license plate to
23   photograph his license plate and photograph him.
24        Q.   Why did you do that?

                           49
```

```
 1   I asked him to leave the property.
 2        Q.   Did either one of you make any contact with
 3   either one, at this point?
 4        A.   No.
 5        Q.   What happened after that?
 6        A.   I stood my ground.  I told him again to leave
 7   my property unless he produced identification.  He
 8   refused to do so.  Then, he tried to walk right through
 9   me.
10        Q.   How did he try to walk through you?
11        A.   He walked -- I was standing right at the
12   property.  He walked up to me -- initially walked up and
13   put his hands on my chest, about this area right here,
14   and he pushed me.
15             MR. CONWAY:  Record reflect right hand pushed
16   downward.
17             THE COURT:  Record so reflect.
18   BY MR. CONWAY:
19        Q.   What happened then?
20        A.   After I didn't budge, at that point, he turned
21   his shoulder and initially tried to make -- after the
22   initial push, he took his shoulder into me and put -- and
23   butted me with this part of his forearm and his shoulder
24   as if he was trying to push me out of the --

                           48
```

```
 1        A.   So I could make a police report in regards to
 2   this incident.  This was the second time in about two
 3   months.
 4             THE COURT:  Sustained.
 5             THE WITNESS:  Sorry.
 6   BY MR. CONWAY:
 7        Q.   Why did you want a police report?
 8        A.   Because the battery that occurred, and then the
 9   number of incidents I had.
10             THE COURT:  Sustained.
11   BY MR. CONWAY:
12        Q.   What happened after you took pictures?
13        A.   I didn't get a chance to take a picture.  I
14   tried to take a picture of his license plate.  He walked
15   to the door of his car, almost entered his car.  He
16   stopped short and said, "I got something for your smart
17   ass."  Then, he turned back around and ran to the side of
18   his vehicle, opened up the trunk and reached in and
19   grabbed an object.
20        Q.   Did you see what the -- did you see this
21   object?
22        A.   It might have been a pipe, a wrench.  It was
23   one of the two.
24        Q.   Why did you think it was a pipe?

                           50
```

Plaintiff's Exhibit 12 Page 12

**Page 51**

```
1       A.   Pardon me.
2       Q.   What did the object look like?
3       A.   Long cylindrical.
4       Q.   Did you see what it was made of?
5       A.   It was metallic.
6       Q.   What happened next?
7       A.   I grabbed him.  I picked him up and I threw him
8   to the ground.
9            THE COURT:  You grabbed Mr. Simmons?
10           THE WITNESS:  I picked him up and put him on
11  the pavement.  I'm sorry, on the parkway.
12           MR PINCHAM:  Wait.  Now, that's my stuff.  You
13  can't be lookin at my exhibits.
14  BY MR. CONWAY:
15      Q.   Where did you place him?
16      A.   On the parkway.
17           MR PINCHAM:  He said pavement, judge.  May the
18  record say --
19           THE WITNESS:  He looked at the -- he looked at
20  the picture and changed it.
21  BY MR. CONWAY:
22      Q.   When you say, "parkway," what do you mean?
23      A.   There's a sidewalk right there, a small
24  sidewalk.  Then, there is a parkway.  The parkway is a
```
51

**Page 52**

```
1   grassy area.  Then, there's a pavement, and then there's
2   the lawn, and then there is the property.
3       Q.   This is the grassy area between the street --
4   street and sidewalk?
5       A.   Yes.
6       Q.   What happened after that?
7       A.   I held him down.  We got into -- we begin
8   wrestling.  And, at one point, I told him "lay down,
9   you're under arrest.  I'm calling the police on you.
10  You're not going anywhere."
11      Q.   And, what happened after that?
12      A.   I started -- he was struggling and wrestling
13  and trying to get me to loosen my grip.  I wouldn't
14  loosin my grip.  At one point, he grabbed my hand, my
15  right thumb and he bent it all the way back.
16      Q.   And, what happened after that?
17      A.   I told him I wasn't letting him go.  The police
18  are coming to get you.  Stay down.
19      Q.   And, how did -- what did he say in response to
20  that?
21      A.   He said -- first he asked me would I let him up
22  because he had problems breathing.  I said, "I'll let you
23  up, but you're not going anywhere."  Then, when I went to
24  let him up, he kind of pushed me off of him.  He grabbed
```
52

**Page 53**

```
1   my hand while I was trying to let him go.  While I was
2   trying to get him to stand up, he grabbed my hand and
3   reached it backwards.
4       Q.   Now, have you had a problem with people posing
5   as --
6            MR PINCHAM:  Objection.
7            THE COURT:  Sustained.
8   BY MR. CONWAY:
9       Q.   Has anyone come to your residence posing as
10  a --
11           MR PINCHAM:  Objection.
12           THE COURT:  Sustained.
13  BY MR. CONWAY:
14      Q.   How long has the house been vacant?
15           MR PINCHAM:  Objection.
16           THE COURT:  Sustained.
17  BY MR. CONWAY:
18      Q.   Did Mr. Simmons ever put up a notice of any
19  kind?
20      A.   Pardon me.
21           THE COURT:  How could he.  He is on the ground.
22  Next question.
23  BY MR. CONWAY:
24      Q.   Mr. Simmons never put up any notice?
```
53

**Page 54**

```
1            MR PINCHAM:  You're leading and suggesting.
2            THE COURT:  Leading.  Move on.  Sustained.
3            MR PINCHAM:  If I may, I believe it would be --
4            THE COURT:  The charge is battery.  I don't
5   care if a notice was put up or not.  Two City officials
6   acting like children.  Do you have any other questions?
7            MR PINCHAM:  No, your Honor.
8            THE COURT:  Any cross?
9                   CROSS EXAMINATION
10  BY MR. PINCHAM:
11      Q.   Well, the only thing I want to ask him is.  He
12  had a yellow or orange cut off notice in his hand, didn't
13  he?
14           MR. CONWAY:  Objection
15           THE COURT:  You could ask him.
16           THE WITNESS:  I don't know if he had this
17  notice.
18  BY MR PINCHAM:
19      Q.   I didn't say this.  He had a yellow cut off
20  notice in his hand, didn't he?
21      A.   That orange notice, yes he had --
22      Q.   And, you knew it was a cut off notice, didn't
23  you?
24      A.   Yes, I did.
```
54

Plaintiff's Exhibit 12 Page 13

```
 1        Q.   And, that was a water bill due and owing,
 2   wasn't it?
 3        A.   No, it was not due and owing.
 4             THE COURT:  I really don't want to hear
 5   anymore, judge.
 6             MR. PINCHAM:  Yes, judge.
 7             THE COURT:  State rest?
 8             MR. CONWAY:  We do, your Honor.
 9             THE COURT:  Defense rest?
10             MR. PINCHAM:  Rest, judge.
11             THE COURT:  State, has the burden of proof to
12   prove beyond a reasonable doubt the charges that have
13   been levied against Mr. Simmons.  Lieutenant, there is a
14   lot I can say this morning, but I'm going to hold my
15   tongue.  The State has failed to meet its burden.  The
16   next time you pick somebody to come in here as a witness,
17   make sure they lie a little better.  Finding of not
18   guilty.
19             MR. PINCHAM:  Thank you, your Honor.
20             (Which were all the proceedings had this day.)
21
22
23
24
```

55

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - MUNICIPAL DIVISION
 2
 3
 4             I, Jamie Mitchell CSR, an Official Court
 5   Reporter for the Circuit Court of Cook County, County
 6   Department-Criminal Division, do hereby certify that I
 7   reported in shorthand the proceedings had at the hearing
 8   of the above-entitled cause; that I thereafter caused the
 9   foregoing to be transcribed into typewriting, which I
10   hereby certify to be a true and accurate transcript of
11   the proceedings before the Honorable ADAM BOURGEOIS,
12   Judge of said court.
13
14
15
16
17                   _____
18                   Official Court Reporter
19
20   Dated this 25th day
21   of SEPTEMBER, 2007
22
23
24
```

56

Plaintiff's Exhibit 12 Page 14